## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE | ) Chapter 11 |
| | ) |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.,*[1] | ) Case No. 17-12560-KJC |
| | ) (Jointly Administered) |
| | ) |
| Debtors. | ) **Hearing Date: TBD** |
| | ) **Obj. Deadline: TBD** |

### MOTION BY THE U.S. SECURITIES AND EXCHANGE COMMISSION FOR ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

The U.S. Securities and Exchange Commission (the "**SEC**"), appearing in this case as a creditor pursuant to 11 U.S.C. §1109(b), requests the entry of an order, pursuant to 11 U.S.C. §1104(a)(1) and (2), directing the appointment of a Chapter 11 trustee for all of the Debtors.

### PRELIMINARY STATEMENT

1.     With his Ponzi scheme collapsing and the SEC at his doorstep, Robert Shapiro knew that the end was near. It would be just a matter of time before the SEC filed a case in U.S. District Court and sought a court-appointed receiver to take control of the fraudulent enterprise, and begin the extremely important and meaningful work of attempting to provide some sort of recovery to the victims of this enormous fraud. Shapiro's only hope of keeping some level of control was a Chapter 11 bankruptcy. But a Shapiro-led bankruptcy would be a non-starter – he needed to create the appearance of a bankruptcy that resembled a bona fide Chapter 11, complete with legal and restructuring professionals of the type normally seen in a real reorganization.

---

[1]  The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3606. The mailing address is 14225 Ventura Blvd., Suite 100, Sherman Oaks, CA 91423. The complete list of debtors, the last four digits of their federal tax ID numbers, and their addresses may be obtained on the website of the noticing and claims agent at www.gardencitygroup.com/cases/WGC.

2.      So instead of allowing a District Court to appoint an independent fiduciary, Robert Shapiro decided that he would select the victims' fiduciaries when he started hiring the team of managers and professionals who are representing the Debtors' estates today.  Mr. Shapiro hired Gibson Dunn.  Mr. Shapiro hired Lawrence Perkins.  And Mr. Shapiro hired Marc Beilinson.  Now, post-bankruptcy, that management team is trying desperately to distance themselves from Mr. Shapiro and convince everybody that they'll do good, and that they'll be fair, even though some fraudulent sales of securities occurred during their pre-petition employment.

3.      Everyone, including Mr. Shapiro, knows that if he still legally controls the Debtors, then the appointment of a trustee (or receiver) is virtually guaranteed.  That is why Mr. Shapiro's strategy, as carried out by the bankruptcy team, is to convince whatever court rules on the trustee/receiver issue, that no such relief is necessary.  None of the evidence relating to this massive Ponzi scheme matters because "independent" management is now in place.  There's nothing to see here.

4.      But the truth is that Shapiro and his bankruptcy team are completely aligned in controlling this bankruptcy, because both are profiting substantially from that effort.  Gibson Dunn was paid nearly $1.8 million prior to the bankruptcy, and is positioned to reap substantially more by billing out at rates of up to nearly $1,300 per hour going forward.  Mr. Perkins received an undisclosed amount for work done since October 23, 2017, and will be paid $575 per hour going forward.  Mr. Beilinson's contract entitles him to $480,000 per year, regardless of whether he performs any services at all.  For his part, Shapiro's new contract entitles him to a salary of more than $2 million per year during the bankruptcy, plus numerous other benefits negotiated prior to the filing, while he continues having an active role on behalf of the Debtors.  The cost of

this Shapiro-orchestrated bankruptcy is high, and the fraud victims are being forced to pick-up the tab.[2]

5.      In the end, the ability of Mr. Shapiro's bankruptcy team to act as disinterested and competent fiduciaries for the victims and other creditors in this case may be debatable, but it is also irrelevant.  As the architect of this billion-dollar fraud, Robert Shapiro should not have any voice -- let alone be the sole voice -- of who serves as fiduciary.  That should be directed by a court.  Thus, the facts relating to Shapiro's fraud are indeed relevant to a Chapter 11 trustee motion because, under these facts, he should be barred, per se, from selecting the team to run these debtors-in-possession.  Moreover, based on his continuing duties and lucrative employment terms, Mr. Shapiro is, in fact, still a part of current management, so his prior acts are attributable to the current debtors-in-possession.  Finally, even if Shapiro is not viewed to be a part of current management, there are substantial questions relating to the independence of the newly-added management team, which also provide sufficient grounds for a trustee.

## JURISDICTION

6.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §1334(b).  This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A).

---

[2]      By contrast, the receiver recommended by the SEC has 25 years of experience in complex receivership and chapter 11 restructuring work, has received numerous awards and recognitions, and has agreed to substantially discount his hourly rate to $260 per hour.  This rate is $400 per hour *less* than a third-year associate at Gibson Dunn, and $205 per hour *less* than a Gibson Dunn paralegal.  The proposed receiver's agreement to substantially discount his rate is based, in large part, on the belief that work for fraud victims is a public service.

# BACKGROUND[3]

## A.    Shapiro Controlled the Debtors

7.    Since its inception, Robert Shapiro was the president of, and maintained sole operational control over, Woodbridge Group of Companies, LLC, d/b/a Woodbridge Wealth (**"Woodbridge"**), and its affiliates (together with Woodbridge, the "**Woodbridge Entities**"). There was no board of directors or any other executives with decision-making authority, and at all relevant times, Shapiro maintained absolute control over the entities' day-to-day operations. Woodbridge was the principal operating company of Shapiro's businesses and employed over 140 people in offices in six states.  Shapiro identified the properties underlying the entities' investments, approved every real estate purchase, selected the amount and type of investments sold, determined sales agents' commissions and calculated the company's potential profits. Shapiro had sole signature authority over all of Woodbridge's bank accounts.

8.    Despite Woodbridge being an over $1 billion dollar company, Shapiro hand-signed every investor interest check and every sales agent commission check.  Shapiro was provided with daily notifications of the company's income and expenses and a monthly report showing the company's revenue and interest payments to investors.  Shapiro was notified whenever an investor chose to withdraw funds from Woodbridge.  Shapiro also personally solicited "bridge loans" from wealthy individuals to cover gaps in the company's funding.

---

[3]  The following background facts are alleged by the SEC in support of the relief sought in the district court action. (Case No. 17-cv-24624, S.D. Fla.)  For purposes of this motion, the SEC intends to present at the hearing limited, but sufficient, evidence to demonstrate that Mr. Shapiro, through the Debtors, engaged in a fraudulent scheme and grossly mismanaged the Debtors.  The SEC does not intend to present its entire securities fraud case in the context of the trustee motion.  However, each of these allegations is supported by exhibits – including investigative testimony and other sources – filed in the district court action [D.Ct. ECF No. 36].  The specific references to these exhibits are contained in the SEC's *Memorandum of Law in Support of Ex Parte Emergency Motion for Asset Freeze and Other Relief.* [D.Ct. ECF No. 6].

B.     **The Fraudulent Investments**

9.     Woodbridge sold investors two primary products, a five-year private placement security ("**Fund Offerings**" and "**Fund Investors**")[4] and a twelve to eighteen month promissory note security called First Position Commercial Mortgages ("**FPCMs**" and "**FPCM Investors**"),[5] which were based on the purported revenues Woodbridge received from issuing one-year loans to supposed third-party commercial property owners ("**Borrowers**").

10.     During the period from August 2012 through December 4, 2017, Debtor WMF Management, LLC ("**WMF**") conducted the Fund Offerings (i.e., Units) through purported mortgage investment funds and bridge loan funds (collectively, "**Woodbridge Fund Entities**")[6] pursuant to purported exemptions under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors.  Woodbridge admits it ultimately raised at least $226 million from nearly 1,583 Fund Investors.

11.     Woodbridge purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend."  At the end of the five-year term, Fund Investors would also be entitled to a distribution based on Woodbridge's profits.  In the offering memoranda for each of the Fund Offerings, Woodbridge represented to investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs.  The Fund Offerings, in effect, were investments into pooled FPCMs ("The Company plans to use the net proceeds from this offering

---

[4]   The Fund Offerings and Fund Investors have been referred to in this case as Units and Unitholders, respectively.
[5]   The FPCMs and FPCM Investors have been referred to in this case as Notes and Noteholders, respectively.
[6]   The mortgage investment funds consist of the following Debtors: (i) Woodbridge Mortgage Investment Fund 1, LLC; (ii) Woodbridge Mortgage Investment Fund 2, LLC; (iii) Woodbridge Mortgage Investment Fund 3, LLC; (iv) Woodbridge Mortgage Investment Fund 3A, LLC; and (v) Woodbridge Mortgage Investment Fund 4, LLC.  The bridge loan funds are Debtors Woodbridge Commercial Bridge Loan Fund 1, LLC and Woodbridge Commercial Bridge Loan Fund 2, LLC.

to invest in *first mortgages*") (emphasis added).  Woodbridge and Shapiro used Fund Investors'

funds to purchase at least 193 residential and commercial properties located primarily in Los

Angeles, California and Aspen, Colorado.

12.    For each of the properties purchased through the Fund Offerings, Woodbridge

then issued FPCMs (i.e., Notes) to pools of unrelated, private investors that each contributed at

least $25,000.  Many of these pools contained 40 or more investors.  Woodbridge told investors

that it was making short-term loans, between $1 million and $100 million, to bona-fide third-

party commercial property borrowers ("**Borrowers**") at high rates of interest, approximately

11%-15%, secured by a mortgage on the property.  Woodbridge in-turn promised FPCM

Investors 5% to 8% annual interest paid monthly with a return of their principal at the end of

their note's term and assigned each investor a pro-rata portion of Woodbridge's first position lien

interest in the underlying property.  Woodbridge explained to investors that Woodbridge would

receive the spread between what the Borrowers paid Woodbridge, and what Woodbridge was

paying the investors.  Woodbridge represented on its website and in its sales materials that it

provided loan-to-value ratios of approximately 60-70%, ensuring that the "properties that secure

the mortgages are worth considerably more than the loans themselves at closing."  At the end of

the one-year term, the Borrower was purportedly obligated to repay Woodbridge the principal

amount of the loan and if it defaulted, Woodbridge could foreclose on the property to recover the

amount owed.

13.    Investors often received a one-page description of the key terms of the FPCM, a

list of FAQs and perfunctory examples of the collateral properties, including a graphic that

summarized the FPCM as follows:



The premise of this pitch—that there would be "property owner[s] mak[ing] payments to Woodbridge"—was false. Virtually all the loans were to Woodbridge affiliates, who earned no revenue and made no payments.

14.    The FPCM Investors played no role in selecting or analyzing the underlying properties and, unless requested, were not provided Woodbridge's purported due diligence on the property. Shapiro instructed Woodbridge's Managing Director of Investments, ("**Head of Sales**"), to fund certain FPCM Investors' securities prior to any underlying property actually being purchased.[7] Many of the FPCM Investors were retired and approximately 2,600 investors used their Individual Retirement Accounts ("IRAs") to fund their investments. Recognizing this,

---

[7]   When questioned by the SEC staff during the course of its investigation, the Head of Sales refused to answer any questions, asserting his rights under the Fifth Amendment to the Constitution.

the Head of Sales told Shapiro that "most people are placing their life savings and retirement funds into these investments."

### C.    **Aggressive Marketing Tactics and Their Reward**

15.    Woodbridge maintained an internal team of approximately 30 sales agents, led by the Head of Sales, responsible for soliciting Fund Investors.  Shapiro provided frequent, often daily, requirements to the Head of Sales of the number ("we need to raise 45 million in the next 39 days,") and type ("I need $5 million in [Fund Investors] in the next 2 weeks") of securities that needed to be sold.  To ensure compliance with these demands, Shapiro would either threaten his employees with termination or promise bonuses.  Shapiro called for daily sales updates from the Head of Sales, who in turn requested additional amounts and types of securities to sell from Shapiro.

16.    Woodbridge also relied on a nationwide network of hundreds of purportedly "independent" external sales agents to solicit prospective FPCM Investors.  In reality, however, Woodbridge required these external sales agents to provide prospective FPCM Investors solely the information and sales materials that Woodbridge provided.  As such, the external sales agents solicited the general public through marketing materials created, and in many cases, paid for by Woodbridge that they disseminated via television commercials, radio ads and talk shows, newspaper ads, social media, newsletters, internet websites, YouTube videos, and in-person gatherings.

17.    Woodbridge did not require or evaluate whether the FPCM investors were "sophisticated," "accredited" or otherwise had any particular financial acumen.  Indeed, instructions from a company providing Woodbridge with leads on potential investors remarked

that leads that are followed up within 20 minutes of generation are "where your sales team will find the majority of low hanging, easiest to harvest fruit."

18.    In numerous marketing materials sent to FPCM investors Woodbridge described this investment as "low risk," "simpler," "safe" and "conservative" and that investor returns were generated by Borrowers' interest payments.  Woodbridge also posted these documents online and instructed external sales agents to direct their clients to the company's website to view them. The company's consultant training manual included a sales script for its internal sales agents to follow when offering the FPCM to external sales agents.  The script reiterated the information contained in the sales packet and on the website.  To ensure its sales agents followed this script, Woodbridge maintained an internal telephone recording system monitored by quality assurance personnel ("QAP") who reported any inconsistencies to the Head of Sales.

19.    As an example of a sales pitch, in August 2017, a Woodbridge salesperson pitched a husband and wife over the telephone for more than 45 minutes to invest and stated:

> It's a very good vehicle. *One of the – the greatest things about it is that we're lending and not purchasing the properties* and that we're lending at low loan to value ratios so there's enough equity in those properties to protect us against a market downturn or protect us from a property owner defaulting, so that if we do have to foreclose, there's enough equity there for us to be able to profit.

*(emphasis added).* The salesperson was attempting to convince this husband and wife to invest $500,000.

20.    Woodbridge did not disclose or inform investors that several of their sales agents had been previously censured or barred by the SEC, FINRA or state securities regulators.  Many of their sales agents were not registered by the SEC or FINRA.  Pertaining to external sales agents, Woodbridge compensated them at a 9% wholesale rate, and the agents in turn offered the FPCM to their investor clients at 5% to 8% annual interest—the sales agent received a

commission equivalent to the difference.  Woodbridge paid external sales agents at least $64.5 million in commissions through this arrangement.

21.    Shapiro demanded that the Head of Sales and his internal sales team continuously seek to move FPCM Investors into one of the Fund Offerings.  Woodbridge's internal sales team solicited each FPCM Investor approximately 90 days after they invested to "move your loan from the First Position Mortgage . . . even if your term hasn't expired yet—to our higher-return Mortgage Investment Fund."  Woodbridge threatened to terminate its relationship with external sales agents who would not permit Woodbridge to contact the sales agents' clients about moving from the FPCM to the Funds.  Aggressive solicitation was encouraged, as for example, on March 4, 2016, the Head of Sales celebrated with his sales team that "even without being able to fund due to lack of inventory we funded over 37 million in [FPCMs] and 6 million in [Fund Offerings]!!!!!!!  By far our biggest month to date!!!!!" and congratulated his sales team, stating "WE ARE WINNERS!!!!" Woodbridge successfully convinced 90% of its FPCM Investors to re-enroll when terms became due, thus avoiding having to pay large returns of principal.

22.    Despite being barred from soliciting and selling FPCMs in numerous states, Woodbridge continued to do so at an alarming rate.  After cease and desist orders were entered in Massachusetts, Pennsylvania, Texas, and Arizona, Woodbridge nonetheless raised $3.2 million, $2.6 million, $2.3 million, and $900,000, respectively, from investors in those states. Woodbridge's internal sales agents falsely mischaracterized the dispositions of these regulatory actions to external sales agents, claiming Woodbridge "was exonerated of any wrongdoing or fraudulent activity."  Moreover, on a sales-pitch call in July 2017 (during the course of the Commission's ongoing investigation), a Woodbridge salesperson falsely told a financial planner,

"The SEC looked into us. We passed with flying colors," touting that the product Woodbridge was offering had a "zero default rate in anything we've had to offer."

23.    Shapiro hired a public relations firm to manipulate search engine results so that investors who looked up Woodbridge would not see the state regulatory orders filed against the company.  Also, at Shapiro's specific instructions, Woodbridge made a series of negligible charitable donations with the sole purpose of generating a stream of positive press releases to push these regulatory actions off the front page of internet search results relating to the company.

24.    Indeed, prior to its bankruptcy filing, Woodbridge recently created two new private placement offerings, Fund 5 and Bridge Loan Fund 3, and its website promised "New Product Coming Soon!"  Woodbridge was attempting to transition investors into a new product called a Co-Lending Opportunity ("CLO").  The CLO mirrors the FPCM in every material respect save one—the CLO's term is for 9 months.  In email communications, Shapiro and the Head of Sales contended that this small change ensured that the CLO was not a security and that Woodbridge could circumvent the states' regulatory agencies.  Instead of disclosing this product to state regulators and ensuring that the terms of the new offering allayed their legitimate concerns, Shapiro and the Head of Sales decided to "switch first then settle quietly [with Colorado and California]."

**D.    The Fraudulent Scheme**

**1.    The Debtors' Investment Products Were a Sham**

25.    Despite Woodbridge representing that the claimed interest payments in the FPCM product emanated from bona-fide third party borrowers, almost all of the purported "Borrowers" were Woodbridge affiliates owned and controlled by Shapiro's trust ("**RS Trust**"), such affiliates, the "**Shapiro Property LLCs**."  In practice, Shapiro directed Woodbridge to use the

funds raised from the Fund Offerings to purchase residential real estate, create a self-owned

Shapiro Property LLC to hold title to each property and then issued FPCMs to investors based on

the value of the underlying property.

26.     Woodbridge further reassured investors, telling them not to worry about the risk

of a borrower failing to make it loans payments because Woodbridge would continue to pay the

investor their interest payments.  For example, in a Frequently Asked Question brochure for the

FPCM product, Woodbridge stated the following:

> Q:  If the borrower does not make their payments to Woodbridge will I be
> informed?
>
> A:  This question is actually irrelevant, because Woodbridge would continue
> to make monthly payments to you . . .  and may or may not inform you of the
> underlying non-payment.  *As long as Woodbridge continues to make regular*
> *payments to you, there would be no reason to be concerned.*

(emphasis added).

27.     Assertions such as these by Woodbridge led investors to believe their investments

were safe no matter how the "borrower" performed.  To support the misrepresentations,

Woodbridge and Shapiro provided FPCM Investors with the promissory notes between the

underlying Borrowers and the Fund Offerings.  However, Woodbridge did not disclose that the

"Borrowers" were in virtually all cases Shapiro Property LLCs that earned no revenue—did not

even have bank accounts—and had no ability to make the interest payments Woodbridge needed

to make payments to the FPCM Investors.  Hence, in reality, the claimed interest "payments to

Woodbridge" demonstrated in Woodbridge's glossy "three circles" brochure, referenced above,

did not exist.

28.     Shapiro and RS Trust made every effort to hide the fact that most of the third-

party borrowers and owners of the underlying properties were Shapiro and his family.  None of

the publicly available documentation indicated that RS Trust was the sole member of the Shapiro Property LLCs purportedly doing the borrowing as well as paying the Fund Offerings the high rate of interest needed to make the required monthly payments to Fund Investors and FPCM Investors.  Indeed, as early as 2014, a high ranking Woodbridge employee under Shapiro's direction specifically instructed Woodbridge's Registered Agent to not include any member/manager information on the Certificates of Formation for certain LLCs.[8]  And when an investor asked Shapiro point blank for the name of the borrower his investment was being lent to, Shapiro responded that Woodbridge does not provide borrowers' names because it is "not the way to do business" and "we don't want people pestering them."

29.    In April 2017, when one potential financial planner being pitched by a Woodbridge salesperson pointed out his suspicion of this incestuous structure on a recorded sales pitch call, QAP alerted the Head of Sales stating that, "[External Sales Agent] seems to know an awful lot about our business model...He also knows Bob [Shapiro] owns Sturmer Pippin,[9] stating Woodbridge is loaning money to ourselves."

30.    Similarly, Fund Investors were told that their returns were generated by these "loans" as well as Woodbridge's property development.  First, as with FPCM Investors, Woodbridge did not disclose to Fund Investors that the purported interest payments required by the promissory notes underlying the FPCMs were non-existent.  Second, Woodbridge failed to

---

[8]  Given that the corporate filings were predominantly in Delaware, with extremely limited public information, the SEC was forced to subpoena over two-hundred individual LLCs controlled by Shapiro, and then was forced to file a subpoena enforcement action in district court to obtain these documents after the LLCs did not respond to those subpoenas. The SEC only recently received these formation documents pursuant to stipulated Court Order.  *See SEC v. 235 Limited Liability Companies,* 17-mc-23986-HUCK/MCALILEY (S.D. Fla.).  In addition, the SEC was forced to file a separate subpoena enforcement action against Woodbridge to obtain, amongst other items, the company emails of Shapiro and Woodbridge's Controller.  *See SEC v. Woodbridge Group of Companies, LLC,* 17-mc-22665-ALTONAGA/GOODMAN (S.D. Fla.).  The SEC was also forced to file a Motion for Contempt for Woodbridge's willful failure to comply with the Court's Order requiring production of those emails.

[9]  Sturmer Pippin is the Holding LLC which owns the Owlwood estate in Beverly Hills, California, which Woodbridge bought for $90 million in 2016, financing 100% of the purchase price with investor money. Woodbridge touted Owlwood in its FPCM promotions.

tell Fund Investors that the profits from its development of properties were wholly inadequate to generate the promised returns.  Although Woodbridge, through the Shapiro Property LLCs, purchased almost 200 properties in and around Aspen and Los Angeles for approximately $675 million, the company has generated nominal net proceeds.  Many of the properties Woodbridge purchased remain as vacant lots that have sat undeveloped for several years.

### 2.    The Debtors Operated a Ponzi Scheme

#### a.    Insufficient Revenue Generated

31.    During the relevant time period, Woodbridge raised approximately $1.22 billion from over 8,400 investors.  It paid back approximately $265 million in principal and $103 million in interest, resulting in a net liability of $961 million due to investors.  However, Woodbridge's business activities were woefully inadequate to fund the interest payments made to investors.  From July 11, 2012 through September 30, 2017, Woodbridge generated approximately $13.7 million in interest payments from unaffiliated third-party borrowers.  There was no other meaningful source of operating cash flow to Woodbridge to fund the difference between the interest payments and the interest income.

32.    As early as the third quarter of 2012 (the first quarter in which there were funds received from investors), Woodbridge did not generate sufficient income to pay investor interest and dividend payments and operating expenses.  Until the first quarter of 2013, Woodbridge utilized a cash balance carried over from the activities of Woodbridge Structured Funding, LLC ("**WSF**") and funds received from other Shapiro related entities to fund the cash flow deficits.[10] Beginning in the second quarter of 2013, Woodbridge had continuing deficits in each quarter and

---

[10]    WSF was in the business of purchasing structured settlements, annuity and lottery payments, and raised money from investors to buy the annuity streams at a discount.  The investor would then purportedly receive the future payment stream.

the only source of funds available to fund the deficits was investor funds.  This deficit grew to more than $250 million as of September 2017.

33.    As of April 28, 2017, out of $736 million in loans outstanding, $718 million (98%) were due from Woodbridge-affiliated entities.  These "borrowers" were not making interest payments and the Woodbridge Fund Entities simply recorded interest income for book purposes only.  Woodbridge boasted a 90% rollover rate.  Had these investors redeemed their investments, Woodbridge would not have had sufficient immediate liquidity to pay off the notes without using funds raised from other investors.

### b.    Comingling of Funds

34.    Woodbridge pooled FPCM Investors' and Fund Investors' funds into bank accounts associated with the Funds and then further commingled them into a single Woodbridge operating account under Shapiro's control.  Woodbridge and Shapiro used $368 million of new investor funds to pay interest and principal to existing investors.

35.    And although Woodbridge, WSF and each of the Woodbridge Fund Entities maintained a separate bank account and general ledger, there were transfers totaling approximately $1.66 billion, exceeding 10,700 transactions between each of them, resulting in extensive commingling of investor funds.  In email conversations, Shapiro and the Head of Sales discussed how to manipulate its records to show Woodbridge's supposed "profits" from certain property development.  In fact, in its bankruptcy filing, Woodbridge admits that it has less than $12 million in its bank accounts while having investor liabilities approaching $1 billion.

### c.    Shapiro Misappropriated Investor Funds

36.    Woodbridge falsely told FPCM Investors and Fund Investors that it would invest their funds solely as promised.  Instead, Shapiro misappropriated at least $21.2 million for his

own personal benefit and to benefit his related entities or family members.  For example, Shapiro charged at least approximately $9 million dollars on credit cards which were paid for nearly entirely by one or more Woodbridge entity.  In fact, about 99% of the payments made toward those credit cards were derived from Woodbridge.

37.     Shapiro charged personal items, including extravagant travel expenses, luxury brand items, and furnishings.  For example, Shapiro used investor funds on at least the following:

- $200,000 at Four Seasons Hotels and Ritz Carlton Hotels.

- $34,000 on limousine services.

- $1.6 million on home furnishings.

- $1.4 million on luxury retail purchases like Louis Vuitton and Chanel.

- $600,000 on political contributions.

- $400,000 on jewelry purchases.

- $308,000 on wine.

In addition to the credit card charges, Shapiro spent additional investor funds as follows:

- $3.1 million for chartering private planes.

- $1.2 million in alimony to his ex-wife.

- $340,000 in luxury automobiles.

- $130,000 on country club fees.

Woodbridge and Shapiro also paid nearly $1 million to a rare coin and precious metal firm, purportedly for client gifts.

E.     **Shapiro Assembles His Bankruptcy Team to File Chapter 11**

38.     On Monday, December 4, 2017, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Up until the previous Friday, December 1, 2017, Mr.

Shapiro controlled all of the Debtors. *ECF No. 12 (Perkins Decl.) at ¶24.* At that point, the

Debtors contend that Mr. Shapiro appointed an "independent management team to take control

of [the Debtors'] assets and operations during the pendency of the Chapter 11 Cases to give

regulators and…investors comfort that the business is being operated for the benefit of its

creditors and stakeholders." *Id.* at ¶25.

  39. The new bankruptcy team tried to conceal (or at a minimum, disclosed extremely

poorly) a critical fact about this new arrangement: that Shapiro could remove the new manager at

any time, for no reason at all. In order to discover this, one had to turn to Exhibit A to Exhibit F

of the Perkins Declaration (literally an exhibit to an exhibit), and read on Page 121 of the 157-

page filing that the new manager could be removed by Shapiro for no cause whatsoever, even

during the bankruptcy. Shapiro only needed to give ten (10) business days' notice to the Court.

*Perkins Decl.* at p. 121. This removal power gave Shapiro substantial leverage over the

bankruptcy team, because if he used it, the appointment of a Chapter 11 trustee would be

inevitable and everyone would be gone. It should have been visibly disclosed. In fact, it was

only after the SEC staff expressed concern post-bankruptcy that the Debtors modified the

provision to allow Shapiro to remove the new manager only for cause. *ECF No. 84.*

  40. In the Creditors' Committee's trustee motion [ECF No. 150], the Committee

details various transactions, arrangements and events that draw into question the ability of the

newly-added members of the team to effectively operate and represent the Debtors' estates. To

avoid duplication, the SEC adopts and incorporates by reference Paragraphs 42-67 of the

Committee's motion. However, these facts, and others not specifically alleged in the

Committee's motion, can be summarized as follows:

> While it was public that the Debtors were under federal investigation for a
> massive securities fraud, that Shapiro and other key witnesses invoked their Fifth

Amendment rights in sworn testimony as part of that investigation, and that the Debtors failed to comply with investigative subpoenas warranting the filing of two subpoena enforcement actions and a contempt motion, the new bankruptcy team *still*:

- Allowed the fraudulent sale of securities to continue, and allowed the Debtors to advertise those investments on the their website post-bankruptcy;[11]

- Made a deal with Shapiro allowing him to carve-out at least $30 million in assets held by non-debtor Woodbridge affiliates;

- Allowed Shapiro to have personal use, post-bankruptcy, of properties purchased with investor money at below market rental rates;

- Allowed Shapiro to sell assets just before and just after the bankruptcy was filed, allowing him to keep an unknown amount of proceeds;

- Entered into a contract with Shapiro worth more than $2.1 million in compensation and other employment benefits in exchange for performing management services for the Debtors during the first year of the bankruptcy (but then stated in court pleadings that Shapiro has been replaced and "independent" management is now in place);

- Allowed Shapiro to continue to have access to the Debtors' computer systems and business records;

- Allowed Shapiro to take up to $500,000 from the sale of properties on an upfront basis;

- Failed to adequately disclose as part of the bankruptcy filing that Shapiro retained the power to remove the new managing member of the Debtors without cause; and

- Issued false press releases that the Debtors lost liquidity because of increased regulatory scrutiny, when in fact, the loss of liquidity was from the substantial decrease, and ultimately, elimination of new investor funds.

41. In addition, on December 20, 2017, Shapiro purported to transfer control to Mr.

Beilinson of thirteen Woodbridge-related entities that are not in bankruptcy. But once again,

---

[11] At the December 21, 2017 hearing in this case, one investor stated in open court that he purchased a $75,000 promissory note from Woodbridge on November 20, 2017. [12/21/17 Transcript at p. 131. Lines 13-19]. Further, Mr. Perkins testified that he would not be surprised if the sales of notes took place until as late as November 22, 2017. [Transcript at p. 90, lines 13-20]. A copy of the Transcript is attached as Exhibit H to the Debtors' adversary complaint in Adv. Proc. No. 17-ap-51891.

Shapiro demanded concessions, to which the bankruptcy team agreed, in exchange for this

transfer of control.  Specifically, Mr. Shapiro was allowed to execute, on behalf of three of these

non-debtor entities, lease agreements with Shapiro's wife for two properties in Colorado and one

in California (collectively, the "**Additional Leases**") as follows:

-   Five-year lease for property at 14115 Moorpark Street, #212, Sherman Oaks, CA.  Rent is $2,500 per month with no increase over five-year term [Landlord is non-debtor Woodbridge affiliate, Lilac Valley Investments, LLC];

-   Two-year lease for property (including furniture) at 238 Sundance Trail, Carbondale, CO (Aspen Glen Club).  Rent is $3,500/month. Tenant has option to renew for two years at $4,025/month [Landlord is non-debtor Woodbridge affiliate, Massabesic Investments, LLC]; and

-   Two-year lease for property (including furniture) at 90 Primrose Road, Carbondale, CO (the Peaks at Aspen Glen).  Rent is $3,500/month.  Tenant has option to renew for two years at $4,025/month [Landlord is non-debtor Woodbridge affiliate, Carbondale Peaks Lot L-1, LLC].

## APPLICABLE LAW

42.    Section 1104(a) contains two separate grounds for the appointment of a Chapter

11 trustee.  The standard under subsection (a)(1) is "cause," and the standard under subsection

(a)(2) is "appointment in the interests of creditors, any equity security holders and other interests

of the estate."  11 U.S.C. §1104(a)(1)-(2).  Both sections are satisfied in this case.

### A.    Appointment for Cause – 11 U.S.C. §1104(a)(1)

43.    Section 1104(a)(1) requires the appointment of a trustee "for cause, including

fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current

management, either before or after the commencement of the case, or similar cause…." 11

U.S.C. §1104(a)(1).  As alleged in the district court action, and as will be supported by evidence

at the hearing on this motion, Mr. Shapiro engaged in widespread fraud, dishonesty,

incompetence and gross mismanagement in operating the Debtors prior to the bankruptcy.  This

conduct is sufficient cause for a trustee under Section 1104(a)(1). <u>In re Vaughan</u>, 429 B.R. 14

(Bankr. D. N.M. 2010)(conduct relating to operation of Ponzi scheme falls squarely within

Section 1104(a)); *Cf.* <u>In re PRS Insurance Group, Inc.</u>, 274 B.R. 381, 385 (Bankr. D. Del.

2001)("Diversion of funds and misuse of corporate assets constitute fraud or dishonesty to

warrant appointment of a trustee under section 1104(a)(1).")(citations omitted); <u>Wilmington

Trust Co. v. Aardvark, Inc. (In re Aardvark, Inc.)</u>, 1997 WL 129346 (D. Del. March 4,

1997)(reversing bankruptcy court's decision not to appoint trustee where undisputed evidence

showed that debtor had inadequate recordkeeping, failed to file tax returns and failed to make

required payments).

     44.    No doubt the Debtors will cling to the reference to "current management" in

Section 1104(a)(1) and resort to their position that the new managers have not engaged in any

bad deeds.  However, the Bankruptcy Code states that the terms "includes" and "including,"

when used in the Bankruptcy Code, "are not limiting." 11 U.S.C. §102(3).  Thus, the various

grounds that could constitute cause under Section 1104(a) should not be limited solely to the

conduct of current management, even though in most cases, that is the appropriate focus. <u>In re

Marvel Entertainment Group, Inc.</u>, 140 F.3d 463, 472 (3rd Cir. 1998) ("It is significant that the

language of § 1104(a)(1) does not promulgate an exclusive list of causes for which a trustee must

be appointed….").  This flexible approach to Section 1104(a) is consistent with the principle that

"section 1104(a) decisions must be made on a case-by-case basis." <u>In re Sharon Steel Corp.</u>, 871

F.2d 1217, 1226 (3rd Cir. 1989).  Further, allowing the Court to consider Shapiro's conduct, who

appointed new managers, is consistent with Section 1104(e) of the Bankruptcy Code.  That

section requires the U.S. Trustee's office to seek a trustee under Section 1104(a) if members (not

necessarily current members) of the debtor's governing body, who selected the debtor's current

chief executive or financial officer, participated in fraud or dishonesty. 11 U.S.C. §1104(e); see

also In re Sharon Steel, 871 F.2d at 1227-28 (adopting position that current management must be

free from previous management's taint, and post-petition solutions to isolated problems created

by pre-petition management do not obviate need for trustee)..

45.    Regardless, Mr. Shapiro's fraudulent conduct should provide a basis for "cause"

because, based on his continued role with the Debtors, he is in fact a member of current

management.  Shapiro's post-bankruptcy duties include (i) advising on the development,

construction, design, marketing and purchase and sale strategies for the Debtors' properties, (ii)

advising on the investments and capitalization of the Debtors and their funds, (iii) advising on

the management of employees and outside consultants, (iv) advising on matters involving

potential buyers of the Debtors' assets, and (v) meeting regularly with the management team

with respect to operating the Debtors' business. *Perkins Decl*. at p. 58.  Shapiro's compensation

for this work is $175,000 per month, or $2.1 million per year, making him the highest paid (non-

attorney) member of the Debtors' bankruptcy team.[12]  Moreover, Shapiro remains as the sole

member of the Debtors' ultimate parent entity and has retained various rights to remove the

newly-appointment corporate manager of the Debtors.[13]  Based on his current corporate powers,

employment duties, and level of compensation, it cannot seriously be disputed that Mr. Shapiro

remains a part of the Debtors' management team.  In the context of Section 1104(a)(1), the

phrase "current management" is broad enough to include Shapiro. In re Brown, 31 B.R. 583

---

[12]  By comparison, Mr. Perkins (the CRO), whom the Debtors no doubt admit is a member of the management team, would have to work more than 304 hours per month in order to receive the same amount of monthly compensation payable to Shapiro.
[13]  Specifically, until various Termination Events occur, Shapiro may remove the new manager for cause.  After a Termination Event occurs, Shapiro may remove the new manager at any time, with or without cause, and without any notice.  Thus, whatever ultimate corporate control Shapiro ceded on the eve of bankruptcy is limited and temporary. *Perkins Decl*. at p. 121.

(Bankr. D. D.C. 1983)(determining that "current management" of individual chapter 11 debtor was broad enough to include management company of affiliated corporation, such that management company's conduct was attributable to individual debtor for purposes of trustee motion).

46.     Finally, in its trustee motion, the Committee presents facts and legal analysis as to why the conduct of the new management team – standing alone – provides sufficient cause under Section 1104(a)(1). [ECF No. 150 at ¶¶42-67; 80-92].  These acts include the circumstances relating to the Contribution Agreement, Shapiro's employment under the Consulting Agreement, and his benefits under the Forbearance Agreement (each as defined therein).  Further, as summarized above, the current management team engaged in other harmful conduct, such as allowing the fraudulent sales of securities to continue after their retention, issuing false press releases about the Debtors' loss of liquidity, and allowing Shapiro and his wife to obtain benefits under the Additional Leases as recently as December 20, 2017.  To avoid duplication, the SEC incorporates and adopts the Committee's facts and legal arguments in support of this motion.

**B.      Appointment for Interests of Creditors – 11 U.S.C. §1104(a)(2)**

47.     In the alternative, the SEC believes that appointment of a trustee is required under Section 1104(a)(2), because the appointment is in the best interests of creditors, any equity holders and other interests of the estate.  Section 1104(a)(2) "envisions a flexible standard" and does not require a specific finding of cause. Marvel Entertainment, 140 F.3d at 474.  Conflicts and acrimony between the debtor and its creditors is an example of sufficient grounds under this section. Id.  The Court has broad discretion when analyzing a motion under this subsection, allowing the Court to consider the "practical reality" of whether a trustee is needed. In re Euro-American Lodging Corp., 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007).

48.     First, the Committee already has moved for the appointment of a trustee on an emergency basis.  From that filing, it is clear that the Committee and its constituents have no confidence in either Robert Shapiro, or the team of bankruptcy professionals that he has hired to manage these estates.

49.     Second, the Debtors and their management team have engaged in a number of transactions that must be investigated, and if necessary, pursued on behalf of the Debtors' estates.  Without a trustee, those transactions may not receive an independent investigation because of the inherent conflict of the management team. In re Microwave Products of America, Inc., 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989) (appointing trustee under Section 1104(a)(2), in part "because the debtor is not in a strong position to pursue possible claims that have resulted from conflicts and fraudulent transfers….").

50.     Finally, the benefits of a trustee outweigh any harm that could result.  Appointing a trustee will create an aura of legitimacy to what is widely viewed as an illegitimate bankruptcy process controlled by the Debtors.  There is no trust in either Shapiro or his bankruptcy team.  A trustee will give comfort to the creditors that (i) the sweetheart deals for Shapiro will stop and, to the extent capable, be unwound and invalidated; (ii) claims and causes of action will be thoroughly investigated and pursued; (iii) the bankruptcy process will be used simply to maximize value through a controlled liquidation, and not to try to restructure a fraudulent enterprise; and (iv) valuable estate resources will no longer be wasted by Shapiro's bankruptcy team trying to retain control over the Debtors' estates.  These cases have been pending for less than one month, the new management team has just come onboard, and a trustee can take over the day-to-day management without upsetting value or any alleged progress that Shapiro's team

may have made to date.  Despite their efforts, they are not so entrenched that disproportionate harm will result from their removal.

## CONCLUSION

51.     Cause exists to appoint a Chapter 11 trustee because current management (whether or not that includes Shapiro) has engaged in gross mismanagement of the Debtors' estates, both prior to and after the bankruptcy.  Further, Shapiro's enormous fraud upon thousands of individual investors constitutes cause for a trustee because he remains a member of current management, and his fraud is so extreme that he should be barred from having any ability to select the fiduciaries for the Debtors' estates.  In the alternative, a trustee is in the best interests of the creditors of these estates.  This case must be in the hands of a truly independent fiduciary, whose appointment is approved by a court, to give victims the comfort that Shapiro will no longer be able to cause them harm.  As long as Shapiro or his hired team remains involved in this proceeding, there will continue to be a large cloud of illegitimacy and mistrust over this bankruptcy.  For these reasons, the SEC respectfully requests the entry of an Order (in the form attached hereto) directing the U.S. Trustee to appoint a Chapter 11 trustee in these cases.

## CERTIFICATION UNDER LOCAL RULE 9013-1(f)

For purposes of this motion only, the SEC consents to entry of a final order or judgment by the Court if it is determined that the Court, absent consent of the parties, cannot enter a final order or judgment on this motion consistent with Article III of the United States Constitution.

Dated:  January 2, 2018

Respectfully Submitted,


 /s/ *David W. Baddley*
David W. Baddley
Admitted Per L.R. 9010-1(e)(1)
Bankruptcy Counsel
Florida Bar No. 0148393
Illinois ARDC 6282466
Telephone:  (404) 842-7625
E-mail:  baddleyd@sec.gov

**Counsel for**:

**U. S. SECURITIES AND EXCHANGE COMMISSION**
Atlanta Regional Office
950 East Paces Ferry Road, N.E.
Suite 900
Atlanta, GA  30326-1382
Telephone:  (404) 842-7625

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of January, 2018, a true and correct copy of the foregoing Motion to Appoint Chapter 11 Trustee was furnished to all ECF Participants via Notice of Electronic Filing and additionally was served by Email and Overnight Delivery to:

| | |
|---|---|
| Samuel A. Newman<br>Oscar Garza<br>Daniel B. Denny<br>Gibson, Dunn & Crutcher, LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071-3197<br>snewman@gibsondunn.com<br>ogarza@gibsondunn.com<br>ddenny@gibsondunn.com | Sean M. Beach<br>Edmon L. Morton<br>Ian J. Bambrick<br>Allison S. Mielke<br>Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>bankfilings@ycst.com<br>ibambrick@ycst.com<br>amielke@ycst.com |
| J. Eric Wise<br>Matthew K. Kelsey<br>Matthew P. Porcelli<br>Gibson, Dunn & Crutcher, LLP<br>200 Park Avenue<br>New York, NY 10166<br>ewise@gibsondunn.com<br>mkelsey@gibsondunn.com<br>mporcelli@gibsondunn.com | Timothy J. Fox, Jr.<br>Office of the United States Trustee<br>Region 3 – District of Delaware<br>844 King Street, Suite 2207<br>Lockbox #35<br>Wilmington, DE 19801<br>timothy.fox@usdoj.gov |
| Richard M. Pachulski<br>James I. Stang<br>Jeffrey Pomerantz<br>10100 Santa Monica Blvd.<br>13th Floor<br>Los Angeles, CA 90067-4100<br>rpachulski@pszjlaw.com<br>jstang@pszjlaw.com<br>jpomerantz@pszjlaw.com | Bradford J. Sandler<br>John A. Morris<br>Colin R. Robinson<br>919 North Market Street<br>17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19801<br>bsandler@pszjlaw.com<br>jmorris@pszjlaw.com<br>crobinson@pszjlaw.com |
| Stuart M. Brown<br>DLA Piper LLP (US)<br>1201 North Market Street<br>Suite 2100<br>Wilmington, DE 19801-1147<br>stuart.brown@dlapiper.com | Eric D. Goldberg<br>DLA Piper LLP (US)<br>2000 Avenue of the Stars<br>Suite 400 North Tower<br>Los Angeles, CA 90067-4704<br>eric.goldberg@dlapiper.com |

| | |
|---|---|
| Ryan D. O'Quinn<br>DLA Piper LLP (US)<br>200 South Biscayne Blvd.<br>Suite 2500<br>Miami, FL 33131<br>ryan.oquinn@dlapiper.com | William S. Brody<br>Paul S. Arrow<br>BUCHALTER<br>1000 Wilshire Blvd., Suite 1500<br>Los Angeles, CA 90017<br>wbrody@buchalter.com<br>parrow@buchalter.com |
| John H. Knight<br>Christopher M. De Lillo<br>Richards Layton & Finger, P.A.<br>One Rodney Square<br>920 North King Street<br>Wilmington, DE 19801<br>knight@rlf.com<br>delillo@rlf.com | Ronald Richards, Esq.<br>P.O. Box 11480<br>Beverly Hills, CA 90213<br>ron@ronaldrichards.com |
| Andrew D. Warner<br>United States Department of Justice<br>Civil Division<br>1100 L Street NW<br>Washington, DC 20530<br>andrew.warner@usdoj.gov | Steven K. Kortanek<br>Patrick A. Jackson<br>Joseph N. Argentina Jr.<br>Drinker, Biddle and Reath, LLP<br>222 Delaware Ave., Suite 1410<br>Wilmington, DE 19801<br>steven.kortanek@dbr.com<br>patrick.jackson@dbr.com<br>joseph.argentina@dbr.com |
| James H. Millar<br>Drinker, Biddle and Reath, LLP<br>1177 Avenue of the Americas, 41st Floor<br>New York, NY 10036-2714<br>james.millar@dbr.com | James G. Lundy<br>Drinker, Biddle and Reath, LLP<br>191 N. Wacker Dr., Suite 3700<br>Chicago, IL 60606-1698<br>james.lundy@dbr.com |
| Paul J. Pascuzzi<br>Felderstein, Fitzgerald, Willoughby & Pascuzzi<br>400 Capitol Mall, Suite 1750<br>Sacramento, CA 95814<br>ppascuzzi@ffwplaw.com | Milton Bender<br>1690 Duck Creek Road<br>Ione, CA 95640<br>miltonbender@volcano.net |
| Marc Beilinson (email only)<br>Beilinson Advisory Group<br>mbeilinson@beilinsonadvisorygroup.com | Eugene Rubinstein<br>Robert Reed<br>Woodbridge Group of Companies, LLC<br>14225 Ventura Blvd., Suite 100<br>Sherman Oaks, CA 91423<br>eugene@woodbridgecompanies.com<br>rreed@woodbridgecompanies.com |

| | |
|---|---|
| Lawrence Perkins<br>Sierra Constellation Partners, LLC<br>400 South Hope St., Suite 1050<br>Los Angeles, CA 90071<br>lperkins@scpllc.com | Katrina Brountzas (overnight only)<br>GCG, LLC<br>1985 Marcus Avenue, Suite 200<br>Lake Success, NY 11042 |

*/s/ David W. Baddley*