## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>                              Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>Jointly Administered<br><br>**Ref. Docket Nos. 150 and 157**<br>**Hearing Date: Jan. 10, 2018, at 9:00 a.m. (ET)** |

## DEBTORS' OBJECTION TO MOTIONS OF
## (I) OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## AND (II) THE U.S. SECURITIES AND EXCHANGE COMMISSION FOR ENTRY
## <u>OF AN ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>

---

[1]         The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14225 Ventura Boulevard #100, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at <u>www.gardencitygroup.com/cases/WGC</u>, or by contacting the proposed undersigned counsel for the Debtors.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

I.      BACKGROUND ........................................................................................................ 8

      A.    General Background ........................................................................... 8

      B.    The SEC Investigation Prior to the Chapter 11 Cases and Florida Securities Action ................................................................................. 9

      C.    Prepetition Agreements With Mr. Shapiro ....................................... 11

      D.    The Appointment of an Independent Management Team for the Debtors ........... 15

      E.    Actions of Independent Management Since Gaining Control of the Debtors ............................................................................................. 16

II.     ARGUMENT ........................................................................................................... 21

      A.    "Cause" Does Not Exist to Warrant Appointing a Trustee.................................. 24

            i.     The Conduct Described in the Motion Demonstrates Current Management is Independent and Has Benefited the Debtors' Estates .................................................................................. 24

            ii.    No Negative Inferences Can Be Drawn From The Prepetition Agreements ............................................................... 28

            iii.   The Specific Allegations Made Regarding Prepetition Agreements are Misguided and Do Not Prove Misdeeds by Current Management.......................................................... 32

            iv.   There Are No Credible Allegations of Fraud or Misconduct By Current Management, Which Is Completely Independent From Mr. Shapiro .................................................................................. 36

      B.    Appointing a Trustee Is Not in The Best Interests of Creditors or Any Other Interests of the Debtors' Estates and Will Harm the Interests of the Majority of Investors.......................................................................... 41

            i.     Appointment of a Trustee Will Cause the Debtors to Default Under the DIP Financing Agreement ................................. 43

            ii.    The Best Interests of All Creditors Are Served by Allowing WGC Independent Manager to Continue Oversight of the Restructuring Process .............................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.,*
441 B.R. 6 (Bankr. S.D.N.Y. 2010) ................................................................44

*In re Anchorage Boat Sales, Inc.,*
4 B.R. 635 (Bankr. E.D.N.Y. 1980) ...............................................................47

*In re Appleridge Ret. Cmty., Inc.,*
422 B.R. 383 (Bankr. W.D.N.Y. 2010) ..........................................................37

*In re Bayou Grp., LLC,*
564 F.3d 541 (2d Cir. 2009) ...........................................................................47

*In re Blue Stone Real Estate, Constr. & Dev. Corp.,*
392 B.R. 897 (Bankr. M.D. Fla. 2008) ...........................................22, 37, 38, 39, 40

*Commodity Futures Trading Comm'n v. Weintraub,*
471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed. 2d 372 (1985) ..................................36

*Cruzan by Cruzan v. Director, Missouri Dept. of Health,*
497 U.S. 261 (1990) ........................................................................................23

*In re DBSD N. Am., Inc.,*
421 B.R. 133 (Bankr. S.D.N.Y. 2009) .......................................................7, 44

*In re Dura Automotive Systems, Inc.,*
2007 WL 7728109 (Bankr. D. Del. Aug. 15, 2007) ......................................46

*Euro-American Lodging Corp.,*
365 B.R. 421 (Bankr. S.D.N.Y. 2007) ...........................................................36

*In re F. A. Potts & Co., Inc.,*
20 B.R. 3 (E.D. Pa. 1981) ..............................................................................45

*In re Five Rivers Petroleum LLC,*
No. 11–25202–JAD, 2013 WL 656026 (Bankr. W.D. Pa. Feb. 22, 2013) ............................41

*In re Fosamax (Alendronate Sodium) Products Liability Litig.,*
852 F.3d 268 (3d Cir. 2017) ...........................................................................23

*In re G-I Holdings, Inc.,*
295 B.R. 502 (D.N.J. 2003), *aff'd,* 385 F.3d 313 (3d Cir. 2004) ..................23

*In re G-I Holdings, Inc.*,
    385 F.3d 313 (3d Cir. 2004)...................................................................2, 21, 22, 23

*Matter of Jobes*,
    108 N.J. 394 (1987) ..............................................................................................23

*In re L.S. Good & Co.*,
    8 B.R. 312 (Bankr. N.D. W. Va. 1980)..................................................................41

*In re LHC, LLC*,
    497 B.R. 281 (Bankr. N.D. Ill. 2013) ....................................................................37

*In re Liberal Market, Inc.*,
    11 B.R. 742 (Bankr. S.D. Ohio 1981).....................................................................47

*In re Marvel Entm't Grp. Inc.*,
    140 F.3d 463 (3d Cir. 1998)..................................................................2, 21, 23, 36

*In re Microwave Prods. Of Am., Inc.*,
    102 B.R. 666 (Bankr. W.D. Tenn. 1989) ..........................................................36, 41

*Official Comm. of Unsec'd Creds. Of Cybergenics Corp. v. Chinery*,
    330 F.3d 548 (3d Cir. 2003).....................................................................................2

*Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*,
    838 F.2d 1133 (10th Cir. 1988) ..............................................................................36

*In re Ondova Ltd. Co.*,
    Case No. 09-34784 (SGJ) (Bankr. N.D. Tex.).........................................25, 26, 37

*In re Pinnacle Brands, Inc.*,
    259 B.R. 46 (Bankr. D. Del. 2001) .........................................................................46

*In re PRS Ins. Grp., Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ..........................................................26, 36, 41

*In re Rivermeadows Assocs., Ltd.*,
    185 B.R. 615 (Bankr. D. Wyo. 1995) .....................................................................36

*In re RNI Wind Down Corp.*,
    Case No. 06-10110 (Sontchi, J.) .............................................................................37

*Schuster v. Dragone*,
    266 B.R. 268 (D. Conn. 2001)................................................................................45

*SEC v. Shapiro*,
    17-cv-24624 (MGC) (S.D. Fla. Dec. 20, 2017) ......................................................24

*SEC v. Woodbridge Grp. of Cos.*,
   17-cv-22665 (CMA) (S.D. Fla. Jul. 17, 2017) ...................................................9, 10

*In re Sharon Steel Corp.*,
   871 F.2d 1217 (3d Cir. 1989) ...........................................................................21, 22

*In re Shotwell Landfill, Inc.*,
   2014 WL 43777321 (Bankr. E.D.N.C. 2014) ...........................................22, 37, 38

*In re Sletteland*,
   260 B.R. 657 (S.D.N.Y. 2001) ...........................................................................22, 41

*In re Solyndra, LLC*,
   11-12799 (MFW) (Bankr. D. Del. 2011) ....................................22, 26, 27, 37, 38

*In re Sunbum5 Enters., LLC*,
   2011 WL 4529648 (M.D. Fla. Sept. 30, 2011) .......................................................37

*In re Tanglewood Farms, Inc.*,
   Nos. 10-06719-8-JRL, 10-06745-8-JRL, 2011 WL 606820
   (Bankr. E.D.N.C. Feb. 10, 2011) ...........................................................................37

*In re The 1031 Tax Grp. LLC*,
   48 B.R. 78 (S.D.N.Y. 2007) ............................................................................36, 37

*In re V. Savino Oil & Heating Co.*,
   99 B.R. 518 (Bankr. E.D.N.Y. 1989) .....................................................................36

*In re William H. Vaughan & Co.*,
   40 B.R. 524 (Bankr. E.D. Pa. 1984) .....................................................................36

**Statutes**

11 U.S.C. § 702(a)(1) .................................................................................................47

11 U.S.C. § 1102(a)(2) ...............................................................................................40

11 U.S.C. § 1104 .............................................................................2, 21, 36, 40, 46

**Other Authorities**

1978 U.S. Code Cong. & Admin. News 5787, 5963, 6192 ........................................45

7 COLLIER ON BANKRUPTCY ¶ 11402[1] (16th Rev. Ed. 2017) ...........................2, 22, 41

H.R.Rep. No. 595, 95th Cong., 1st Sess. 233 (1977) ................................................45

Woodbridge Group of Companies, LLC ("Woodbridge") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby submit their opposition to (i) the Emergency Motion of Official Committee of Unsecured Creditors (the "Committee") for Entry of an Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104 (the "Committee Motion," D.I. 150) and (ii) the Motion by the U.S. Securities and Exchange Commission (the "SEC") for Order Directing the Appointment of a Chapter 11 Trustee (the "SEC Motion," D.I. 157 and, together with the Committee Motion, the "Trustee Motions"). Due to the substantial overlap of arguments in the Trustee Motions, Debtors address both in this Objection.

## PRELIMINARY STATEMENT

1.      The Debtors, operating under independent management, are acting to preserve the value of the Debtors' assets, safeguard and pursue claims against third parties and insiders, and gather the necessary information to create a proposed path forward to put as much money in the hands of investors as rapidly as possible. The SEC—the self-proclaimed statutory guardian of the investing public—complains about the alleged Woodbridge fraud that it failed to stop and the manner in which it was finally brought to an end. The Committee, made up of one trade creditor and the only two noteholders known to have waived their lien rights, relies on incomplete and inaccurate information to second guess the Debtors' business judgement—all while repeatedly refusing to meet in-person with the Debtors' independent management. None of this rises to the high standard required to justify the extraordinary remedy of appointment of a chapter 11 trustee. Meanwhile, *ad hoc* groups representing large numbers of investors (and millions of dollars of investors' claims) support the Debtors' current management, and desire that the parties promptly attend to the business of getting investors paid.

2.      It is far from controversial to observe that the appointment of a chapter 11 trustee under section 1104 of the Bankruptcy Code is a remedy limited to extraordinary circumstances.[2] As the Third Circuit instructs, there is a "strong presumption" against appointing a chapter 11 trustee.[3] This presumption is so strong that it may only be refuted by the movant through clear and convincing evidence.[4] One of the primary rationales for this high burden is that the debtor in possession is a fiduciary for all of the debtors' stakeholders and, thus, is obligated by law "to refrain from acting in a manner which could damage the estate or hinder a successful reorganization."[5] Given these clear legal predicates, the Trustee Motions must be denied under the facts of these cases, as neither demonstrates cause justifying appointment of a chapter 11 trustee, nor how the appointment of a trustee is in the best interests of creditors, other parties in interest, or the estates. An analysis of the facts and applicable case law make this conclusion inescapable.

3.      The Trustee Motions reveal that the near-exclusive focus of the Committee and the SEC (collectively, the "Movants") is: (a) the alleged prepetition misconduct of Mr. Shapiro, who is the *former* manager of the Debtors; and (b) unwarranted negative inferences derived from certain prepetition transactions between the Debtors' current independent management and Mr. Shapiro, that resulted in Mr. Shapiro ceding control of the Debtors and hundreds of millions in assets to them, resulting in the commencement of the Chapter 11 Cases supervised in the transparent "fish bowl" of this Court. These factual predicates, however, fall well short of

---

[2]      *See* 7 COLLIER ON BANKRUPTCY ¶ 11402[1] (16th Rev. Ed. 2017)

[3]      *See In re G-I Holdings, Inc.*, 385 F.3d 313, 319 (3d Cir. 2004) (a party "moving for appointment of a trustee . . . must prove the need for a trustee . . . by clear and convincing evidence") (quoting *In re Marvel Entm't Grp. Inc.*, 140 F.3d 463, 471 (3d Cir. 1998)). *See also Official Comm. of Unsec'd Creds. Of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (recognizing that there is a strong presumption that the debtor should remain as debtor in possession).

[4]      *See In re G-I Holdings*, F.3d at 319.

[5]      *Id.* (quoting *In re Marvel*, 140 F.3d at 471).

supporting the extraordinary measure of appointing a chapter 11 trustee and are based on a series

of misunderstandings, misconceptions, and plain falsehoods contained in the Trustee Motions

about the true independence of current management and the business activities being presently

conducted by the Debtors.

4.      The Debtors' *current* management has exercised reasoned and proper business

judgment in obtaining and administering the significant assets of these estates for the benefit of

their creditors and other stakeholders, principally the noteholders and unitholders. Current

management has not engaged in any improper behavior, let alone behavior so egregious as to

warrant the extraordinary relief the Movants are requesting. Indeed, section 1104(a) of the

Bankruptcy Code is clear that "cause" is established only by showing egregious behavior of

*current* management. The alleged misdeeds of Mr. Shapiro, albeit alarming, are inapposite to this

question and, in any event, current management is assessing potential actions that might benefit

the Debtors' estates. But Mr. Shapiro is no longer a manager of the Debtors and, upon learning

of the Florida Court's asset freeze (based on the SEC's *ex parte* application) of Mr. Shapiro and

other Shapiro-related entities, the Debtors immediately suspended all services and payments

under the Consulting Agreement (defined below). Simply put, since December 1, 2017, Mr.

Shapiro has had no control of the Debtors or role in their management and, thus, the Movants'

allegations regarding his misdeeds do not bear on whether *current* management can perform as

effectively as fiduciaries of the estates.

5.      The Movants, apparently recognizing this defect in their argument, attempt to

taint Mr. Beilinson and Mr. Perkins with Mr. Shapiro's alleged misdeeds by making unfounded

inferences based on the existence of prepetition agreements between Mr. Shapiro and the

Debtors. The true narrative, however, is that experienced and independent management exercised

3

their reasoned business judgment in negotiating to bring assets worth hundreds of millions of dollars under the supervision and ultimate control of this Court to maximize value and provide transparency for stakeholders. The notion that the decisions of the Debtors' independent management are, or ever have been, dictated by Mr. Shapiro is not only baseless, but offensive. Both Mr. Beilinson and Mr. Perkins have well-established professional credentials and substantial experience in large and complex restructurings, both in and out of court.

6.      But perhaps the most important flaw in the Trustee Motions is the notion that Mr. Beilinson and Mr. Perkins could have forced Mr. Shapiro to cede control over the Debtors absent an agreement from Mr. Shapiro. Prior to December 1, 2017, independent management did not have the requisite leverage to force Mr. Shapiro to release his control of the significant assets that are now under this Court's supervision. Rather, the party that had that power was the SEC. Yet even after investigating Mr. Shapiro for over one year, the SEC had failed to take any action to protect the Debtors' investors and did not do so until several weeks *after* the Chapter 11 Cases were commenced.

7.      In fact, the actual alternatives that faced the Debtors' stakeholders were quite stark: Mr. Beilinson and Mr. Perkins negotiated a process to turn over control of the Debtors' assets to independent management through a series of integrated, simultaneous, and entirely reviewable transactions, while maintaining the necessary institutional knowledge and liquidity to preserve the value of hundreds of millions of dollars invested in multiple real estate projects—which serve as a major source of investors' recovery with the most pressing risk of depreciation if not protected. The SEC—which took no action at the time—and the Committee second guess certain aspects of this process. The only real alternative at the time, however, was for Mr. Shapiro to continue to manage the Debtors, while the long-running SEC investigation might (or

might not have) eventually resulted in an equity receivership that would not have had the benefits afforded by the Bankruptcy Code to protect the noteholders and unitholders, including the automatic stay, financing flexibility, the ability to sell assets free and clear, the legal right to pursue avoidance claims to enhance value, and other reporting provisions that ensure that stakeholders have a view into the Debtors' efforts to maximize value for their benefit. Given these alternatives, negotiating a process with Mr. Shapiro to transition the Debtors' assets into the Chapter 11 Cases was unequivocally in the best interests of all of the Debtors' stakeholders.

8.    The Movants ignore that upon Mr. Shapiro's replacement, the Debtors' independent management took and continues to take the actions of a responsible fiduciary, and that these actions benefited and continue to benefit stakeholders. The decisive actions of the Debtors' independent management have preserved hundreds of millions of dollars of value. Specifically, the independent management took the following actions promptly after being appointed:

- Ceased all retail fundraising activities, which was the primary source of the SEC's concerns relative to Mr. Shapiro;

- Commenced the Chapter 11 Cases to protect the Debtors' assets for the benefit of all stakeholders—which the Committee admits was a sound decision, considering available alternatives;

- Disclosed all of the agreements that the Debtors entered into with Mr. Shapiro to obtain control from him, knowing full well that each prepetition contract would be subject to scrutiny by all parties in interest and the Court in the bankruptcy proceedings;

- Retained all bankruptcy rights and powers, including the power to avoid prepetition payments to Mr. Shapiro, reject prepetition agreements with Mr. Shapiro, and subordinate any claims Mr. Shapiro might assert against the Debtors in response to any of the foregoing;

- Used the leverage of the bankruptcy process—including the right of turnover under section 542 of the Bankruptcy Code—to convince Mr. Shapiro (and Ms. Pedersen) to turn over the Debtors' property to the SEC in a matter of weeks;

- Based on Mr. Shapiro's agreement to contribute 28 properties to the Woodbridge Group of Companies, obtained a commitment from an institutional third-party lender to provide $100 million in postpetition financing, thereby allowing the Debtors to preserve the value of their real estate portfolio, a decision that the Committee supports;

- Amended the agreement vesting control of the Debtors to the independent management, which drastically reduced Mr. Shapiro's ability to remove independent management;

- Identified and brought additional non-debtor assets under the control of the Debtors' independent management so that these companies and their assets could be added to the Court-supervised Chapter 11 Cases (which efforts would have resulted in chapter 11 filings for the entities holding those assets but for the *ex parte* asset freeze order obtained by the SEC on the same day such proceedings were to be commenced);

- Secured and continue to secure books and records regarding the Debtors' business and operations;

- Provided the SEC with all requested information, including all information available to the Debtors regarding the identification of non-debtor affiliates and the assets they held, which was the very information used by the SEC to implement an *ex parte* asset freeze that prevented those entities (and their assets) from being placed under this Court's supervision and protection; and

- Requested and attended several meetings with the SEC (beginning on the Petition Date) to share independent management's knowledge of the business, the Debtors' cash needs, and current business plan.

The totality of these facts, coupled with the substantial benefits they conferred to the Debtors' stakeholders, completely undermines the unsupported—and unsupportable—insinuations by the Movants that Mr. Beilinson and Mr. Perkins are somehow controlled or tainted by Mr. Shapiro.

9.    The success of the Debtors' post-filing negotiations with Mr. Shapiro is not accidental. As seasoned bankruptcy professionals, both Mr. Beilinson and Mr. Perkins were aware that an immense leverage shift would occur upon filing the Chapter 11 Cases—with visibility increased and the assistance of the Court and interested parties to assert appropriate pressure. The Debtors' independent management team has made maximum use of the process to

obtain value for the Debtors' stakeholders, and these results should comfort the Court that the best path forward is the current path, despite the second-guessing of the Movants.

10.    The Movants also fail to demonstrate that it is in the best interest of all interested parties to appoint a chapter 11 trustee. The Committee represents a small fraction of interested parties here. The Debtors estimate that unsecured creditors hold approximately $9 million in claims, while noteholders that have not waived their lien rights and unitholders combined hold close to $1 billion in claims or interests. As such, the Committee is in no position to assert that it speaks for more than a relative handful of creditors.

11.    Likewise, the SEC cannot credibly assert that it is acting in the best interests of the estates. Since the filing of these Chapter 11 Cases, the SEC has taken actions to disrupt the orderly administration of the Debtors' assets, not the least of which is to commence, under seal, an action to assert an equity receivership over the Debtors' assets, in contravention of the automatic stay and without any effort to obtain relief from this Court. Moreover, the SEC commenced this action *after* the Debtors' independent management cooperated fully with the SEC, even to the point of convincing Mr. Shapiro and Ms. Pedersen to turn over documents to aid in its investigation. Worse still, the SEC sat silently during the second interim hearing to approve the DIP Financing (as defined below) while its receiver motion was still under seal. The DIP Financing contains a typical provision that the commencement of a receivership action could trigger a default, which would obviously prejudice all stakeholders.[6]

12.    By contrast, the Debtors' independent management has succeeded in stabilizing the Debtors' business and managing their continued construction of the Debtors' real estate

---

[6]    As aptly noted in a similar situation, to seek the appointment of a chapter 11 trustee in this context is not only not in the best interests of the estates, but borders on "disgraceful." *See In re DBSD N. Am., Inc.*, 421 B.R. 133, 141 (Bankr. S.D.N.Y. 2009) (describing as "disgraceful" a group of investors' motion to appoint a trustee, "knowing that such would cause a default on the Debtors' DIP financing facility and a default on the sale of the company upon which all of the creditors' recoveries would rest").

portfolio to maximize value. Appointing a trustee would threaten the DIP Financing, which the Committee admits is "required … to continue construction, to maximize value."[7] The best interests of all parties would be served by allowing the Debtors—managed by Mr. Beilinson and Mr. Perkins—to continue the important and time-sensitive work they are accomplishing at this very moment.

13.    For all of these reasons, and as detailed below, the Trustee Motions should be denied.

## I.    BACKGROUND

### A.    General Background

14.    On December 4, 2017 (the "Petition Date"), each of the 279 Debtors commenced a voluntary case under chapter 11 of the of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession. The Chapter 11 Cases are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1. No trustee or examiner has been appointed.

15.    Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the *Declaration of Lawrence R. Perkins in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (D.I. 12) (the "First Day Declaration") and the *Supplemental Declaration of Lawrence R. Perkins* (D.I. 84) (the "Supplemental Declaration").

---

[7]    *Woodbridge Grp. of Cos., LLC v.* SEC, Case no. 17-51891 (KJC), Dkt. No. 1 ("Verified Compl."), Ex. H ("December 21 Hearing Transcript") at 123:5-7. A true and correct copy of the December 21 Hearing Transcript is attached as Exhibit A.

16.     On December 14, 2017, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.

17.     On December 28, 2017, the Committee filed the Committee Motion. On January 2, 2018, the SEC filed the SEC Motion.

**B.      The SEC Investigation Prior to the Chapter 11 Cases and Florida Securities Action**

18.     Prior to the Petition Date, the Debtors received a variety of inquiries from federal and state regulators in connection with their fundraising activities. As of the Petition Date, certain of the Debtors had received information requests from state securities regulators in approximately 25 states.

19.     The concerns raised by state regulators generally focused on the alleged offer and sale of unregistered securities, including by allegedly unregistered agents. Three of these inquiries were resolved through settlements, which included the entry of consent orders. As of the Petition Date, the Debtors had resolved actions in Massachusetts, Pennsylvania and Texas, all without admission of fault or wrongdoing. In each proceeding against certain Debtors pending in Arizona, Colorado, Idaho, Michigan, Oregon and South Carolina, the Debtors' prepetition management, with the assistance of counsel from large national law firms, was engaged in advanced settlement discussions with the applicable regulators prior to the commencement of the Chapter 11 Cases. The Debtors' current independent management team has continued the efforts to negotiate further settlements of the pending investigations.

20.     Since September 2016, the Debtors have been under investigation by the SEC in connection with possible securities law violations. In connection therewith, the SEC brought two applications to enforce administrative subpoenas that it issued against certain Woodbridge Group entities (among other entities). Specifically, on September 27, 2016, the SEC issued a formal order directing an investigation of Debtor Woodbridge Mortgage Investment Fund 3, LLC. On

July 17, 2017, the SEC filed an application in the District Court for the Southern District of Florida (the "Florida Court") seeking enforcement of an administrative subpoena that it issued on January 31, 2017 (the "Woodbridge Group Subpoena"). *See SEC v. Woodbridge Grp. of Cos.*, 17-cv-22665 (CMA) (S.D. Fla. Jul. 17, 2017), Dkt. No. 1. The Florida Court issued an order granting the SEC's request on September 20, 2017. *Id.*, Dkt. No. 25.

21.    On October 13, 2017, the SEC filed a motion for contempt of court, alleging that Woodbridge had failed to provide certain company-related emails from the AOL accounts of Mr. Shapiro and Nina Pedersen. *Id.*, Dkt. No. 29. This motion was pending as of the Petition Date.[8]

22.    On October 31, 2017, the SEC also filed a second application in the Florida Court (the "LLC Application") seeking an order to show cause enforcing subpoenas that it issued on August 16 and 17, 2017 (the "LLC Subpoenas") to 235 limited liability companies allegedly owned and controlled by Robert Shapiro to explain why they had not fully complied with the LLC Subpoenas. *See SEC v. 235 Ltd. Liab. Cos.*, No. 17-mc-23986 (PCH) (S.D. Fla. Nov. 14, 2017), Dkt. No. 1.

23.    While the Debtors sought to resolve disputes over these subpoenas, the Debtors to date have provided over three million pages of documents, including loan documentation, real property information, attorney trust account records, sales and marketing materials, company emails, accounting records and recorded telephone calls. The Debtors have also made available and facilitated site visits and interviews of several employees throughout the course of the SEC's investigation.

24.    As of the Petition Date, the SEC had not commenced an enforcement action and

---

[8]    As discussed below, the Debtors' current independent management successfully obtained stipulations from Mr. Shapiro and Ms. Pedersen, approved by order of the Florida Court, requiring that they turn those emails over to the SEC.

did not issue a Wells Notice. On September 21, 2017 (a year after commencing its investigation), despite its investigation of possible securities laws violations involving "Woodbridge's receipt of more than $1 billion of investor funds from thousands of investors nationwide," the SEC stated:

> The SEC is continuing its fact-finding investigation and to date *has not concluded that any individual or entity has violated the federal securities laws*.

Verified Compl., Ex. E ("September 21 Press Release"). A true and correct copy of the September 21 Press Release is attached hereto as Exhibit B.

## C.    Prepetition Agreements With Mr. Shapiro

25.    Prior to the transfer of authority, independent management had no authority over the Debtors and their affiliates (collectively, the "Woodbridge Group"), who were subject to the complete and exclusive control of Mr. Shapiro. As the corporate structure annexed as Exhibit A to the First Day Declaration (the "Organizational Chart") makes clear, the RS Protection Trust, which is wholly controlled by Mr. Shapiro, is the direct or indirect owner of all of the entities set forth on Schedule A-2 thereto. These are all "PropCo" and "MezzCo" entities that are mortgagors to the various Debtor investment funds. Prior to entry into the Contribution Agreement, the entities listed on Schedule A-1 to the Organizational Chart were also wholly-owned and controlled by the RS Protection Trust.

26.    Given this structure, Mr. Beilinson and Mr. Perkins could not obtain control of the Debtors from the RS Protection Trust without Mr. Shapiro's consent. Accordingly, Mr. Beilinson and Mr. Perkins negotiated a framework whereby (a) Mr. Shapiro would give them, through the WGC Independent Manager entity, control of the Debtors, (b) the RS Protection Trust would contribute its equity in the Debtors holding the 28 properties that serve as collateral for the DIP financing, and (c) the RS Protection Trust would deliver to the Debtors certain proceeds of sales (above and beyond the amount needed to repay noteholders) of RS Protection Trust-owned

properties. These negotiations culminated in three prepetition agreements with Mr. Shapiro executed in connection with delivering control of the Debtors to Mr. Beilinson and Mr. Perkins: the Contribution Agreement, the Consulting Agreement, and the Forbearance Agreement.

27.    Consulting Agreement. Independent management agreed to a transition services agreement (the "Consulting Agreement"), pursuant to which WGC Independent Manager agreed to retain Mr. Shapiro as a consultant to provide informational services such as to locate and provide historical data concerning the Woodbridge Group's real property holdings and development plans. *See* First Day Decl. Ex. B. Given the scope and complexity of the Debtors' operations and assets, the Woodbridge business information asymmetry between Mr. Shapiro, (who operated the business for over 20 years) and the independent management, as well as less than optimal internal corporate documentation, Mr. Beilinson and Mr. Shapiro determined that it would be beneficial to the estates to have the option to require Mr. Shapiro to provide services to the Debtors if such services were later determined to be necessary. One prepetition payment of $175,000 was made to Mr. Shapiro under the Consulting Agreement. *See* Ex. A, at 20:22-25. No postpetition payments have been made under the Consulting Agreement. *Id.* at 21:1-9.

28.    Contribution Agreement. Independent management and Mr. Shapiro executed a prepetition contribution agreement (the "Contribution Agreement") whereby RS Protection Trust contributed its membership interests in certain "MezzCos" and (and indirectly, their associated "PropCos") WMF Management to Woodbridge. The Contribution Agreement was entered into by independent management to ensure that the Debtors could obtain additional liquidity sufficient to fund their operations during the pendency of the Chapter 11 Cases. Indeed, Hankey Capital, LLC (the "DIP Lender") would not have agreed to provide its $100 million in financing (the "DIP Financing") if the Debtors had not obtained the assets provided in the Contribution

12

Agreement. The Contribution Agreement implements the following arrangement (the "Distribution Arrangement") with respect to the proceeds of sales of DIP Financing collateral properties held by the PropCo Debtors. After all Notes issued by the PropCos holding the Contracted Properties and the MezzCos holding such PropCos have been satisfied in full, (i) 50% of any remaining proceeds up to a cap of $500,000 will be promptly paid to RS Protection Trust as an advance on any distributions to which it may be entitled as the member of the MezzCos, and (ii) any remaining proceeds will be retained by the PropCo. *See* First Day Decl., at ¶ 37, Ex. H. No payments have been made to the RS Protection Trust under the Distribution Arrangement.

29.    Independent management also convinced Mr. Shapiro to turn over the proceeds of the sale of a property from a prepetition agreement between a non-Debtor Woodbridge Group entity and a third party that closed on November 30, 2017. *See* First Day Decl. at 29-31. While $500,000 of the proceeds of this sale was paid to WFS Holding Co LLC, an entity owned by Mr. Shapiro, the Debtors are currently holding all of the remaining net proceeds from this sale and have reserved all of their rights with respect to the property that was sold. With respect to a second prepetition agreement between a non-Debtor Woodbridge Group entity and a third party, independent management obtained a prepetition representation from Mr. Shapiro that he would distribute proceeds of the sale in accordance with the Distribution Arrangement in the Contribution Agreement, even though the non-Debtor seller was not contributed pursuant to the Contribution Agreement. *Id.* This sale closed on December 12, all of the net proceeds from this sale, which are subject to the TRO Asset Freeze Order, are being held by the Debtors, and the Debtors have reserved all of their rights with respect to the property.[9]

---

[9]    The SEC Motion (at ¶ 40) alleges that independent management "[a]llowed Shapiro to sell assets just before and just after the bankruptcy was filed, allowing him to keep an unknown amount of proceeds." The SEC

30.     <u>Forbearance Agreement</u>: Independent management entered into a forbearance agreement (the "<u>Forbearance Agreement</u>") and two subordination, non-disturbance, and attornment agreements (the "<u>SNDAs</u>") that permit Mr. Shapiro (and his wife) to continue to occupy two residential properties during the pendency of the Chapter 11 Cases as long as the existing leases for such properties remain in effect. Rent is paid on these properties pursuant to existing leases with certain of the Debtors. If rent payments are not made, remedies can be pursued under the leases notwithstanding the Forbearance Agreement and the SNDAs, and if the leases are terminated, the forbearance and the non-disturbance under the SNDAs are also terminated. These agreements allow Mr. Shapiro to make rent payments to the Debtors under existing leases for two of the approximately 140 properties.

31.     During the course of these negotiations, Mr. Shapiro was represented by his own counsel, the law firm DLA Piper. Counsel for the Debtors advised DLA Piper that each of the Contribution Agreement, Forbearance Agreement, and the Consulting Agreement would constitute executory contracts under the Bankruptcy Code, and may be subject to avoidance or subordination actions. Under the agreements, the Debtors did not waive any of the manifold powers conferred to them by commencing the Chapter 11 Cases, including the power to avoid prepetition payments, seek turnover of estate assets, reject executory contracts, and subordinate asserted claims. Further, the Debtors were not required to take any action in the early stages of the case to assume or affirm these agreements, giving parties in interest ample time to get up to speed and evaluate the arrangements.

---

Motion ignore that these were not sales of the Debtors' assets, the Debtors retain the proceeds they've received from the sales, and the Debtors have reserved all of their rights with respect to the properties. *See* First Day Decl. at 29-31.

**D.**    **The Appointment of an Independent Management Team for the Debtors**

32.    As of October 5, 2017, the Debtors retained the law firm of Gibson, Dunn &

Crutcher LLP ("Gibson Dunn") to conduct an analysis of alternatives to restructure its business.

Gibson Dunn and the Debtors interviewed financial advisors, including SCP, and ultimately

retained SierraConstellation Partners ("SCP") to assist in that analysis on October 23, 2017. SCP

had no involvement with Mr. Shapiro or the Debtors' business prior to being considered for this

role.[10]

33.    After retaining advisors, the Debtors considered a number of alternatives related

to their business, including that the Debtors be placed under independent management, that an

institutional source of liquidity be obtained to allow the Debtors to preserve the value of their

real estate portfolio, and that the Debtors commence chapter 11 cases to obtain the breathing

space necessary to implement a restructuring. Following that review, on November 14, 2017,

SCP recommended to Mr. Shapiro that all fundraising activity cease.

34.    To address the requirements of the office of the U.S. Trustee known as the J. Alix

Protocol, several potential independent managers were identified to serve as independent

manager of the Debtors during the Chapter 11 Cases and, ultimately, Marc Beilinson (through

his firm, Beilinson Advisory Group) was selected for the appointment. Mr. Beilinson had no

prior contact or involvement with Mr. Shapiro or the Debtors.

35.    Both Mr. Beilinson and Mr. Perkins have substantial restructuring experience and

impeccable credentials. Since founding Beilinson Advisory Group, Mr. Beilinson has served as

chief restructuring officer and a director of distressed companies including Westinghouse,

Caesar's Acquisition Corp., Fisker Automotive, Eagle Hospitality, Innkeepers USA, and MF

---

[10]    SCP was first contacted by Mr. Shapiro in August 2017, but was not engaged until October 23,
2017 under its terms with Gibson Dunn.

Global Assurance Company. Throughout his career, Mr. Beilinson has been active in the restructuring of complex commercial and retail real estate portfolios throughout the United States and has also specialized in restructuring retail chains. Mr. Perkins has more than 15 years of management consulting and advisory experience restructuring companies.

36.     To effect the transfer of authority to the Beilinson Advisory Group, RS Protection Trust created a new subsidiary, WGC Independent Manager. Mr. Shapiro, acting as trustee of RS Protection Trust, exercised RS Protection Trust's ownership rights over certain of the Debtors to execute a written consent removing himself and his affiliates as manager of certain of such Debtors and appointing WGC Independent Manager as replacement manager. Beilinson Advisory Group was appointed the manager of WGC Independent Manager. Following the transition of authority and control to WGC Independent Manager, Beilinson Advisory Group immediately took action to appoint Mr. Perkins as Chief Restructuring Officer of WGC Independent Manager and remove Mr. Shapiro from his capacity as an officer of each entity controlled by WGC Independent Manager.

37.     Through these steps, as of December 1, 2017 Mr. Beilinson, Mr. Perkins and WGC Independent Manager, were empowered to oversee and manage all legal, financial, operational, and transactional aspects of the Debtors' business for the duration of the Chapter 11 Cases.

### E.     Actions of Independent Management Since Gaining Control of the Debtors

38.     Upon their appointment, independent management caused the Debtors to immediately cease all fundraising activities, which was the primary source of the SEC's concerns relative to Mr. Shapiro (and is the conduct that both of the Trustee Motions predominantly rely upon to argue that a chapter 11 trustee should be appointed).

39.     The next business day following their appointment, independent management caused the Debtors to file petitions commencing the Chapter 11 Cases. This allowed the Court to supervise the estates, and provided visibility into the operations of the Debtors to all parties in interest, including the SEC and the Committee.

40.     In the First Day Declaration, Mr. Perkins provided comprehensive disclosure of all of the agreements between the Debtors and Mr. Shapiro that permitted independent management to assume control over the Debtors. *See* First Day Decl., ¶¶ 27-38. The disclosure was robust, thereby allowing both the SEC and the U.S. Trustee to raise concerns regarding these agreements at the First Day Hearing. *See* Verified Compl., Ex. G ("First Day Hearing Transcript"), 32:3-33:12; 76:9-14. A true and correct copy of the First Day Hearing Transcript is attached hereto as Exhibit C. True and correct copies of these agreements were attached to the First Day Declaration so that parties in interest would be able to review and satisfy themselves as to the entirety of the contents of these arrangements. *See* First Day Decl., Exs. B-H.

41.     As noted above, Mr. Beilinson and Mr. Perkins entered these agreements prepetition to preserve bankruptcy powers afforded to them once the Chapter 11 Cases were commenced. Since the Petition Date, the Debtors have already begun asserting certain of these powers against Mr. Shapiro.

42.     For instance, on December 8, 2017, independent management caused the Debtors to send demand letters to Mr. Shapiro and Ms. Pedersen asserting that their emails used to conduct Woodbridge business were property of the Debtors' estates, demanding that they turn over such emails by no later than Tuesday, December 12, and informing them that if they did not comply, the Debtors would request an order from the Bankruptcy Court requiring turnover of the information. *See* Verified Compl., Ex. A (Letter of December 8, 2017 re: Robert Shapiro's

17

Possession of Estate Property "Shapiro Demand Letter"); Ex. B (Letter of December 8, 2017 re: Nina Pedersen's Possession of Estate Property "Pedersen Demand Letter"). True and correct copies of the Shapiro Demand Letter and the Pedersen Demand Letter are attached as Exhibit D and Exhibit E respectively. Mr. Shapiro and Ms. Pedersen are each currently each cooperating with the Debtors' demands. The Florida Court entered orders on December 19 and 20, 2017, on joint motions approving production protocols for Mr. Shapiro and Ms. Pedersen. *See* Verified Compl., Ex. C (Order Approving Production Protocols for Pedersen Emails); Ex. D (Order Approving Production Protocols for Shapiro Emails).

43.     Independent management has also taken steps to preserve the value of the estates' portfolio of real estate, which the Debtors currently estimate to be worth hundreds of millions of dollars and which is at various stages of development and marketing—from vacant lots, tear-down construction, remodeling and extensive marketing to a select buyer pool. To this end, having ceased all fundraising efforts related to notes and units, the Debtors have secured DIP Financing from the DIP Lender, which provides a commitment of $100 million in postpetition financing. The DIP Financing should provide the necessary liquidity to maintain appropriate operations and preserve the value of the Debtors' real estate portfolio for the benefit of their various investor constituencies. Without this liquidity, the Debtors could be forced to hastily liquidate their real estate holdings at fire-sale prices, destroying the profit opportunity with many properties under renovation and construction. At a hearing before this Court just a week before filing this motion, the Committee agreed that the DIP Financing should be approved on an interim basis, with the hope that the Debtors could obtain a similar commitment on better terms. *See* Ex. A at 123:5-16.

44.     Typical of most DIP financing arrangements, the DIP Financing has events of defaults relating to the commencement of a receivership action or the appointment of a chapter 11 trustee. Specifically, pursuant to Section 11.1(k)(v) of the DIP Financing Agreement (D.I. 130-1), "[t]he entry of an order appointing an interim or permanent trustee, or an examiner having enlarged powers …" constitutes an Event of Default. Upon the occurrence of that Event of Default, the DIP Lender may "declare any Obligations immediately due and payable," (§ 11.2(a)), may "terminate … any Commitment" (§ 11.2(b)), and may "exercise any other rights or remedies afforded," including taking possession and selling 28 properties that constitute the real estate collateral and which form a significant portion of the estate's value.[11]

45.     On December 8, 2017, WGC Independent Manager demanded, and RS Protection Trust agreed, to limit the right of the RS Protection Trust to remove Beilinson Advisory Group as independent manager of WGC Independent Manager only upon a finding of the Court that among other things, "cause" as defined in Section 1112(b)(4) of the Bankruptcy Code (or cases interpreting that section) exists to remove Beilinson Advisory Group as the sole manager of WGC Independent Manager. *See* Supplemental Decl., Ex. A. A true and correct copy of the Supplemental Declaration is attached hereto as <u>Exhibit F</u>.

46.     On December 28, approximately one week after the Florida Court made the SEC's specific allegations against Mr. Shapiro public, Debtors' counsel sent a letter (the "<u>O'Quinn Letter</u>") to Ryan O'Quinn, counsel for Mr. Shapiro, informing him of the formal suspension of the Consulting Agreement pending final resolution of the SEC's allegations. In the letter the Debtors reserved all rights and remedies if Mr. Shapiro sought to assert claims against

---

[11]     The occurrence of an Event of Default under the DIP Credit Agreement also "constitutes an event of default" under the second interim order approving the DIP Financing [D.I. 130] ("<u>Second Interim DIP Order</u>"). *See* Second Interim DIP Order § 4.1(b).

the Debtors, including the right to seek equitable subordination of those claims. A true and correct copy of the O'Quinn Letter is attached hereto as Exhibit G.

47.     On December 11, 2017, Mr. Shapiro consented to the demand of WGC Independent Manager to turn over control of 10 properties identified as non-Debtor assets, one of which owns an apartment building valued at approximately $20 million. On December 20, 2017, counsel for the Debtors and Mr. Shapiro met in person to prepare and execute the necessary documentation for the transfer of control of 13 entities directly or indirectly owning these 10 properties worth approximately $30 million. Counsel for the Debtors also prepared chapter 11 petitions for the 14 entities[12] associated with these 10 properties.

48.     On the same date, however, the SEC forwarded a sealed temporary restraining order to the Debtors, which, among other relief, froze the assets of Robert Shapiro, RS Protection Trust, and each of the non-Debtor Woodbridge Group entities for which the independent management team of the Debtors had provided information to the SEC (the "TRO Asset Freeze Order"). As a result of the TRO Asset Freeze Order, WGC Independent Manager determined not to commence bankruptcy cases for those additional entities. The SEC obtained the TRO Asset Freeze Order without consultation with or notice to the Debtors' current independent management or this Court, which frustrated placing additional valuable assets under this Court's protection.

49.     While this Motion is pending, the Debtors' development projects remain in various stages of construction. Some are finished with pending offers, while others are in the midst of important groundwork that must be completed to stabilize the soil and make the site safe

---

[12]     Through the course of the investigation, one entity, a MezzCo, had been included in the December 1st transfer-of-control entities to WGC Independent Manager, but was listed as an inactive entity and was not part of the December 4th bankruptcy filing. Subsequently, this MezzCo was identified as the indirect owner of the apartment building referred to above.

over the long term. The Debtors seek to operate in the ordinary course of business to continue to

develop, market, and sell their properties in order to maximize recoveries for all of their

stakeholders, conduct a prompt review and re-evaluation of the Debtors' business plan, and

modify the business plan as appropriate to maximize value.

50.     The Debtors intend to address the substance of all pending investigations,

complaints, and litigation related to the Woodbridge Group's past fundraising practices (as

further described below) and to negotiate and settle disputes with any investors or regulators,

including the SEC, with respect to the Woodbridge Group's past conduct. The Debtors also hope

to promptly and consensually (if possible) resolve all issues relating to the defects in perfection

of the noteholders' liens.

## II.    <u>ARGUMENT</u>

51.     Pursuant to section 1104 of the Bankruptcy Code, a trustee may only be appointed

(1) "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs

of the debtor by current management," or (2) if the appointment of a trustee "is in the interests of

creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a).

There is a "strong presumption against appointing an outside trustee." *In re G-I Holdings, Inc.*,

385 F.3d 313, 318 (3d Cir. 2004) (quoting *In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471

(3d Cir. 1998)).

52.     The "for cause" basis for appointment of a trustee in section 1104(a)(1) of the

Bankruptcy Code refers to "current management," not the misdeeds of prior management. 11

U.S.C. § 1104(a)(1) (defining "cause" to include "fraud, dishonesty, incompetence, or gross

mismanagement of the affairs of the debtor *by current management*, either before or after the

commencement of the case" (emphasis added)). Thus, the mere fact that prior management may

have been guilty of fraud, dishonesty, incompetence, or gross mismanagement is not grounds for

the appointment of a trustee, as long as the court is satisfied that current management is free from

the taint of prior management. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1217 (3d Cir. 1989).

Further, some courts have found that, even when a trustee motion contains allegations of

wrongdoing against current management, the appointment of an independent manager after a

chapter 11 trustee motion is filed and prior to a hearing on that motion is sufficient to avoid the

appointment of a chapter 11 trustee.[13]

53.      In analyzing the second basis for appointment of a trustee under section

1104(a)(2)—where such appointment is in the interests of creditors, equity security holders, and

other estate interests—courts apply a fact-specific flexible balancing approach. *See, e.g.*, *In re*

*Sharon Steel*, 871 F.2d at 1226 (describing the 1104(a)(2) standard as "flexible," "made on a

case-by-case basis," and "emphasiz[ing] the court's discretion"). Though flexible, the 1104(a)(2)

standard is difficult to satisfy, as it requires a showing that the appointment of a trustee is in the

interests of essentially *all* interested constituencies—i.e., the appointment must benefit the estate

generally, and not merely one constituency such as a creditor group. 7 Collier ¶ 1104.02[3][d][i];

*In re Sletteland*, 260 B.R. 657, 672 (S.D.N.Y. 2001) ("[A] creditor group, no matter how

dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it

would be in its interests. It must show that the appointment is in the interests of all those with a

stake in the estate, which in this case would include the Debtor.").

54.      Consequently, "[i]t is settled that appointment of a trustee should be the

exception, rather than the rule." *In re Sharon Steel*, 871 F.2d at 1225; *see also* 7 Collier on

---

[13]      *See, e.g.*, *In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. 897, 899-901 (Bankr.
M.D. Fla. 2008) (denying trustee motion even though CRO motion was filed *after* trustee motion); *In re Shotwell
Landfill, Inc.*, 2014 WL 43777321, at *2 (Bankr. E.D.N.C. 2014) (same); *In re Solyndra, LLC*, 11-12799 (MFW)
(Bankr. D. Del. 2011) Dkt Nos. 247, ¶¶ 42, 47; 266 (denying trustee motion despite the fact that the motion to
appoint CRO was filed a mere six days prior to hearing on trustee motion).

Bankruptcy ¶ 1104.02[3][b][i] (15th ed. rev. 2011) (noting that "appointment of a trustee in a Chapter 11 case is an extraordinary remedy"). Indeed, "the party seeking the appointment of an outside trustee must face" a "heavy burden of persuasion." *G-I Holdings, Inc.*, 385 F.3d at 318. That burden of persuasion means that the Movants, whether requesting appointment of a trustee under either section 1104(a)(1) or (a)(2), must "prove the need for a trustee under either subsection by clear and convincing evidence." *Id.* at 317-18 (quoting *Marvel Entm't Group,* 140 F.3d at 473) (internal quotations omitted). "Evidence is 'clear and convincing' when: '[it] produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'" *In re G-I Holdings, Inc.*, 295 B.R. 502, 507-08 (D.N.J. 2003), *aff'd*, 385 F.3d 313 (3d Cir. 2004) (citing *Matter of Jobes*, 108 N.J. 394, 407 (1987) (quoted in *Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 285 n.11 (1990))), *see also, In re Fosamax (Alendronate Sodium) Products Liability Litig.,* 852 F.3d 268, 285-86 (3d Cir. 2017) (defining clear and convincing evidence as "evidence indicating that the thing to be proved is highly probable or reasonably certain.").

55.     Here, as shown below, the Trustee Motions fail to demonstrate by "clear and convincing evidence" that the appointment of a chapter 11 trustee is warranted either "for cause" or because such appointment is in the best interests of the estate. Instead, the facts and circumstances of this case strongly militate against appointing a chapter 11 trustee.

A.    **"Cause" Does Not Exist to Warrant Appointing a Trustee**

i.    **The Conduct Described in the Motion Demonstrates Current Management is Independent and Has Benefited the Debtors' Estates**

56.    Mr. Shapiro, the primary subject of the Trustee Motions, was replaced by WGC Independent Manager prior to the Petition Date. Prior to appointment, Mr. Beilinson and Mr. Perkins had no substantial prior contact or involvement with Mr. Shapiro or the Debtors.

57.    The SEC requests that this Court find that clear and convincing evidence of Mr. Shapiro's fraud or misconduct exists based on five declarations provided to the Debtors less than one week before the hearing on the Trustee Motions, four by investors and one by a forensic accountant. The four investor declarations purport to show misrepresentations by Shapiro and his management team (mostly focused on solicitations and loans provided prior to April 2017 – Declarations of Jacobson, Sims, and Vandenbos), and never allege any contact with the Debtors after *current* management obtained control of the Debtors (despite the fact that all declarations were executed on the Petition Date or thereafter). *See SEC v. Shapiro*, 17-cv-24624 (MGC) (S.D. Fla. Dec. 20, 2017), Dkt. No. 36, Exs. 6, 84, 106; Declaration of Yakov Sarnov. The forensic accountant declaration purports to provide evidence of the existence of the $1.2 billion Ponzi scheme alleged in the SEC Motion. *SEC v. Shapiro*, 17-cv-24624 (MGC) (S.D. Fla. Dec. 20, 2017), Dkt. No. 36, Ex. 1. The SEC appears to be attempting to prove its allegations against Mr. Shapiro in the securities action in Florida in this contested matter in the Chapter 11 Cases. Whether the SEC satisfies its heavy evidentiary burden relative to Mr. Shapiro based on these affidavits is up to the Court, but the SEC's evidence does not in any way address whether *current* management cannot be independent and cannot perform as effectively as a chapter 11 trustee.

58.    The SEC has been gathering evidence for at least 15 months and the Debtors have had only six days to respond to their allegations. Nonetheless, even assuming the Movants could

satisfy their burden to demonstrate by clear and convincing evidence that the unproven

allegations in the SEC Complaint and SEC Motion constitute fraud or misconduct on the part of

Mr. Shapiro, the Trustee Motions fail to mention that *current* management is solely responsible

for removing Mr. Shapiro's authority over the Debtors and causing the Debtors to cease the

alleged misconduct. Additionally, current management has done everything in their power to

cooperate with and support the SEC in their investigation of such alleged misconduct. This

includes (a) contacting the SEC immediately after the Petition Date to offer assistance,

(b) multiple meetings with the SEC, and (c) providing detailed information regarding the assets

of the Debtors and their non-Debtor affiliates. Of particular note, the current independent

management obtained emails from Mr. Shapiro and Nina Pedersen after threatening to file

turnover motions for such information with this Court. *See* Verified Compl., Exs. A, B.

Obviously, such behavior is completely inconsistent with the notion that the independent

management was appointed by Mr. Shapiro to further some nefarious scheme.

59.    Despite the Debtors cooperation with the SEC, the Committee contends that Mr.

Shapiro still "influence[s] if not technically control[s], every aspect of the business." Committee

Motion, at 2-3, 21. This contention is utterly false and unsupported by any evidence at all. The

Committee attempts to draw some inference in support of this contention based on four

contracts—the Contribution Agreement, the Beilinson Engagement Letter, the Consulting

Agreement, and the Forbearance Agreement (the "Agreements"). Notwithstanding the

Committee's conclusory allegations, a review of these Agreements, combined with the Debtors'

actions since WGC Independent Manager gained control demonstrates the precise opposite—that

Mr. Beilinson and Mr. Perkins wrested as much control as possible from Mr. Shapiro prepetition

and, postpetition, have effectively leveraged the Debtors' bankruptcy to provide complete

transparency into the Debtors' management structure and to eliminate Mr. Shapiro's involvement in or benefit from the Chapter 11 Cases.

60.    The Trustee Motions also attempt to use Mr. Shapiro's invocation of his Fifth Amendment rights as evidence of wrongdoing on the part of current management that would constitute cause to appoint a chapter 11 trustee. *See* Committee Motion at ¶ 100; SEC Motion at ¶ 41. The only case the Committee provides in support of this, *In re Ondova Ltd. Co.*, Case No. 09-34784 (SGJ) (Bankr. N.D. Tex.), involved that debtor's current management's use of the Fifth Amendment. Moreover, the *Ondova* court also court relied on other evidence of current management's prepetition and postpetition misconduct, and not on the invocation of the Fifth Amendment alone.[14]

61.    Of interest is a case cited by both Trustee Motions, although not in this context. In the *In re PRS Ins. Grp., Inc.* case, the court stated that it did *not* rely on current management's use of the Fifth Amendment as evidence that cause existed to appoint a trustee. *See* 274 B.R. 381, 387 (Bankr. D. Del. 2001) (stating that "[w]e are not" appointing a chapter 11 trustee based on current management's use of the Fifth Amendment). Instead, the *PRS* court relied on an internal report prepared by the debtor in response to an investigation by a state insurance agency that showed evidence of "significant diversion of assets from [the debtor's subsidiary] through other corporations to [current management] personally" and that this report was "compelling evidence" of misconduct by management. *Id.* at 385. Even if Mr. Shapiro's use of the Fifth Amendment could serve as evidence of management's fraud or misconduct, at most it would

---

[14]    Specifically, the *Ondova* court appointed a trustee primarily due to concerns that the debtor's current management was focused on protecting the personal interests of Mr. Baron, the debtor's principal and head of management. *Id.*, Dkt Nos. 85 (finding that cause exists to appoint a trustee "including debtor mismanagement"), 810 ("At the commencement of the Bankruptcy Case, Baron . . . was acting as management. . . Pursuant to an order of the Bankruptcy Court . . . Baron was removed and the Trustee was appointed" quoting from debtor's Disclosure Statement).

provide limited evidence of prior management's misconduct. Neither Mr. Beilinson nor Mr.

Perkins have refused to answer questions regarding the Debtors; in fact, both have worked

diligently to provide transparency to the Debtors' operations and have given depositions in

advance of the hearing.[15] In the context of the appointment of a chapter 11 trustee, the Movants

have not identified one decision where a bankruptcy court, based on the invocation of the Fifth

Amendment by current management alone, appointed a chapter 11 trustee. Thus, the invocation

of the Fifth Amendment by Mr. Shapiro does not justify the appointment of a chapter 11 trustee,

especially given how cooperative current management has been.

62.    Recognizing that there are no allegations of fraud or misconduct against Mr.

Beilinson and Mr. Perkins, the SEC goes a step further, arguing that the very existence of the

Consulting Agreement combined with the fact that Mr. Shapiro retains a limited right to remove

WGC Independent Manager makes Mr. Shapiro part of current management. *See* SEC Motion, at

¶ 45. This ignores the fact that, since the Petition Date, the LLC Agreement was amended such

that now, Mr. Shapiro must obtain an order of the Court finding cause to authorize such removal.

---

[15]    The Committee fails to note the *Solyndra* case, in which the Committee's current counsel represented the *Solyndra* debtors. *In re Solyndra, LLC*, 11-12799 (MFW) (Bankr. D. Del. 2012). In that case, the U.S. Trustee sought the appointment of a chapter 11 trustee because the debtors' current management was under criminal investigation, and thus the debtor's CEO and CFO invoked the protections of the Fifth Amendment. *Id.*, Dkt. No. 219 at ¶¶ 27-28. Despite that, the debtors filed an objection to the motion to appoint a trustee arguing that the appointment of a CRO (just six days before the chapter 11 trustee motion) was sufficient to obviate the need for a chapter 11 trustee, notwithstanding the fact that the debtor's CFO did not resign and remained a member of *current* management. *Id.*, at ¶ 57 ("The fact that one remaining officer of the Debtors ([the CFO]) has asserted the Fifth Amendment in the context of a Congressional hearing does not come close to satisfying the heightened standard for appointment of a chapter 11 trustee"). The court agreed and entered an order denying the trustee motion without analysis. *Id.*, D.I. 266. In a contemporaneous news report, Judge Walrath was quoted as stating "it's clear that this case does not rise to the level of failure to disclose that would mandate the appointment of a trustee." https://www.reuters.com/article/us-solyndra-trustee/court-refuses-to-replace-solyndra-management-idUSTRE79G72C20111017. Neither the Committee nor the SEC complain of current management's inability—or even reluctance—to disclose, notwithstanding the invocation of the Fifth Amendment by Mr. Shapiro.

Moreover, "cause" for removal mirrors the exacting standards identified in section 1112(b)(4) of the Bankruptcy Code.[16]

63.     The SEC Motion further asserts that Mr. Shapiro continues "to have access to the Debtors' computer systems and business records." SEC Motion, at ¶ 40. This is inaccurate. Mr. Shapiro has no access to the Debtors' information. The O'Quinn Letter (i) formally suspended all payments to him and services from him, and (ii) explicitly informed him that he will have no access to the Debtors' documents or information. *See* Ex. G. Accordingly, the SEC Motion's assertion that Mr. Shapiro is part of *current* management is completely false.

**ii.     No Negative Inferences Can Be Drawn From The Prepetition Agreements**

64.     Before addressing some of the specific contract terms challenged in the Trustee Motions, it is important to understand the Agreements as a whole, the negotiations with Mr. Shapiro leading to the commencement of the Chapter 11 Cases and the leverage provided to independent management as fiduciaries once the Chapter 11 Cases were commenced. These are not secret contracts. To the contrary, the Debtors disclosed each of these Agreements in the First Day Declaration for the careful scrutiny of the U.S. Trustee, the SEC, all parties in interest and

---

[16]     Even if the LLC Agreement had not been amended, and Mr. Shapiro could remove the Debtors' WGC Independent Manager without cause, that would still not be enough to establish that Mr. Shapiro was a part of management. As the Court suggested at the First Day Hearing, such an action by Mr. Shapiro in these Chapter 11 Cases would be scrutinized closely:

> [MR. BADDLEY (counsel for the SEC):] …. But in the operating agreement that is attached to the first-day affidavit, there is a section in that operating agreement, on Page 121 of ECF 12, that provides Mr. Shapiro's ability to do that. Granted, while this bankruptcy case is pending, his ability to do so requires some sort of form and notice.

> THE COURT: His wisdom of doing so also requires further consideration . . . My point is the consequences in a proceeding like this might not be so good for him, if he were to exercise that option. But again, as you say, it's an issue for another day.

Ex. C, at 32:12-33:4.

the Court. *See* First Day Decl. Ex. B (Consulting Agreement), Ex. C (Forbearance Agreement), Ex. F at 129 (Beilinson Engagement Letter); Ex. H (Contribution Agreement). Not surprisingly, at the First Day Hearing, both the SEC and the U.S. Trustee drew the Court's attention to certain contract terms that they argued could affect current management's independence from Mr. Shapiro. *See, e.g.,* Ex. C, at 32:8-17, 76:9-14.

65.     All of the Agreements were entered into before the petitions were filed. The Committee alleges that because the WGC Independent Manager did not extract the Committee's preferred contract terms from Mr. Shapiro, the WGC Independent Manager must be "implement[ing] Mr. Shapiro's scheme." Committee Motion, at ¶ 30. While not all of the contract terms are in the WGC Independent Manager's favor, considering the relative bargaining positions of the parties at the time of negotiation, it is impressive that WGC Independent Manager gained the concessions it did. For instance, through the Contribution Agreement, Mr. Beilinson and Mr. Perkins convinced Mr. Shapiro as a condition to their appointment to cede control of and contribute valuable assets to the Debtors that would have otherwise remained under control of Mr. Shapiro. Without securing these assets, the Debtors would have no access to DIP Financing. In addition, as prepetition agreements, they are subject to rejection if supported by the business judgment of the Debtors. And, to the extent claims are asserted by Mr. Shapiro in respect of the Agreements if rejected, such claims would be subject to equitable subordination under 510(c). Finally, prepetition payments made to Mr. Shapiro under the Agreements are also subject to the Debtors' avoidance powers. Accordingly, given all of the protections the Debtors managed to obtain—not the least of which was the power to commence these Chapter 11 Cases, placing the substantial majority of the Woodbridge Group's assets under the protection of the Court—criticism of the Agreements as falling short of being "perfect" ring hollow.

66.    When negotiating the Agreements, Mr. Beilinson and Mr. Perkins—both

seasoned restructuring professionals—understood the power of this Court. They understood that

getting obtaining control of the Debtors, and then subjecting the Debtors to the transparency of

the bankruptcy forum, is a powerful way to force additional concessions from Mr. Shapiro. *See*

Committee Motion, at ¶ 61 (arguing that "Beilinson and Perkins wanted and expected Mr.

Shapiro to be 'under the tent' throughout the bankruptcy process"). Not only would the

Agreements be subject to scrutiny by interested parties and amendment by the Court, but if the

WGC Independent Manager chooses to break the prepetition executory Agreements to Mr.

Shapiro's detriment, Mr. Shapiro cannot enforce the Agreements against the Debtors without

presenting his case before this Court and as the Debtors have recently informed him, any alleged

damages claim arising from them may be subject to equitable subordination. *See* Ex. A ("The

Debtors reserve all legal and equitable rights, including, without limitation, the right to seek

equitable subordination of claims" asserted by Mr. Shapiro). Indeed, during the First Day

hearing, this Court noted how powerful the bankruptcy process can be in ensuring transparency

and independence of current management. *See* Ex. C, at 36:3-5 ("I mean, the other good news for

[the SEC] is that this is a forum that generally works on transparency ….").

67.    The Committee argues that if the WGC Independent Manager was "truly

independent, they would have either (a) insisted that their appointments be unconditional; or

(b) sought immediate approval from the Court and the estates interested parties before entering

into the foregoing agreements." Committee Motion, at ¶ 3. That is unrealistic considering the

relative bargaining positions of the WGC Independent Manager and Mr. Shapiro when entering

into the Agreements. Furthermore, it could have resulted in the estates being forced to consider

assumption of these Agreements before all parties has a chance to evaluate these arrangements and form their own views.

68.    The Committee's proposed course of action would have imposed unacceptable risks on the Debtors' investors. If WGC Independent Manager refused the Agreements' terms and failed to successfully navigate the Debtors into chapter 11, one of two things would have happened, both of which the Committee has agreed would be deeply harmful to the estate and its creditors: (1) Mr. Shapiro would still be operating Woodbridge while under SEC investigation with millions of additional investor dollars being placed at risk, or (2) the SEC would have had another court appoint a receiver, a process rejected by the Committee as value destructive, which was recently stayed because of the commencement of the Chapter 11 Cases. *See* Committee Motion, at ¶ 8.

69.    The prepetition negotiations with Mr. Shapiro resulted in the Contribution Agreement, the Forbearance Agreement, and the Consulting Agreement. By virtue of these agreements, Mr. Beilinson and Mr. Perkins were able to remove the Debtors and hundreds of millions of dollars in assets from Mr. Shapiro's control and provide the Debtors with Court supervision and transparency that would not otherwise have been possible. An apt comparison to these negotiations is a debtor's prepetition negotiation with a prospective postpetition lender. When negotiating postpetition financing, a debtor attempts to gain the best possible terms prepetition, while both parties recognize the debtor must have the financing to preserve or enhance the value of estate assets. Invariably, during the course of the negotiations, it is clear that the financial institution has most of the leverage in the negotiation. Then, a debtor can leverage the bankruptcy process to improve an agreement reached prepetition for the benefit of the estates. This is precisely what occurred here, Mr. Beilinson and Mr. Perkins negotiated a

process that allowed them to wrest control from Mr. Shapiro and file petitions for each of the

Debtors. From the Petition Date on, they have worked tirelessly to improve upon this

arrangement, including (i) eliminating Mr. Shapiro's involvement with the Debtors entirely and

(ii) extracting additional entities and assets from Mr. Shapiro's control that would have provided

substantial additional value to the estates if the SEC had not instituted its asset freeze.

70.    Not only is the Committee's overarching argument that the Agreements, taken as

a whole, indicate fraud under section 1104(a)(1) utterly false, it surely does not provide the

"clear and convincing" evidence sufficient to overcome the strong presumption that the Debtors

remain in possession. Rather, the facts demonstrate the WGC Independent Manager's effective

use of the bankruptcy process to assert complete independence from Mr. Shapiro.

### iii.    The Specific Allegations Made Regarding Prepetition Agreements are Misguided and Do Not Prove Misdeeds by Current Management

71.    Similarly, the specific issues raised in the Trustee Motions fail to provide the clear

and convincing evidence of fraud or misconduct on the part of current management required to

appoint a trustee under section 1104(a)(1).

72.    For instance, the Committee Motion repeatedly asserts that the WGC Independent

Manager cannot be truly independent, noting that the initial version of the WGC Operating

Agreement allowed Mr. Shapiro, through the RS Protection Trust, to remove the WGC

Independent Manager upon notice but without cause. *See* Committee Motion, at ¶ 13. Yet the

Committee Motion summarily dismisses the WGC Independent Manager's postpetition

amendment of the Operating Agreement to explicitly provide that it can now only be removed

through the Court finding "cause" under Section 1112(b)(4), an exceedingly high standard.[17] *See*

---

[17]    The Committee's Motion ignores that it is questionable at best whether, even prior to the amendment Mr. Shapiro could have terminated independent management without Court approval, at least not without facing negative consequences from the Court, particularly given the 10 day notice requirement. *See* Ex. C,

Committee Motion at 13 (stating that the amendment "only highlights how malleable and 'accommodate[ing]' Beilinson and Perkins were in the first place because they accepted their 'independent' appointments knowing that they could be terminated by Shapiro for no reason at all"). *Id*. Rather than showing complicity with Mr. Shapiro, WGC Independent Manager's move to amend the Operating Agreement is exactly the kind of action to be expected from experienced bankruptcy professionals using the bankruptcy forum to leverage further concessions from former management.

73.    Similarly, the Committee Motion points to alleged obligations to Mr. Shapiro under the Consulting Agreement as evidence of current management's complicity. As a general matter, such agreements are important to retain institutional knowledge early on so that new management could effectively transition. But here, WGC Independent Manager has not made any payment under the Consulting Agreement since the Petition Date. *See* Ex. C., at 52:11-24; 76:10-12. WGC Independent Manager went even further on December 28, 2017, by suspending both services and compensation under the Consulting Agreement indefinitely in light of the allegations in the SEC's complaint, and "neither Mr. Shapiro nor WFS shall have access to any document or information of WGC or any of its affiliated debtor entities." Ex. A.

74.    Similarly, the Trustee Motions each allege that independent management has purposefully excluded certain assets from the estate. *See* Committee Motion, at ¶ 30; SEC Motion. These allegations are false, and are belied by the fact that postpetition, but for the SEC's inadvisable actions, WGC Independent Manager would have successfully brought all additional assets, valued at approximately $30 million, under the authority of the Court rather than Mr.

---

32:8-33:12 (Noting that, should Mr. Shapiro exercise his power to terminate WGC Independent Manager under the initial contract, doing so would "require[] further consideration" by the Court).

Shapiro for the benefit of the estates and all parties in interest.[18] As explained during the
December 21, 2017 hearing before this Court, WGC Independent Manager used the transparency
provided by the bankruptcy forum to negotiate with Mr. Shapiro to take custody of those assets
and place them into the estate, but on the eve of filing petitions to do so, the SEC took custody
through an asset freeze. Ex. A, at 13:11-19. To argue that the Debtors should have done that
sooner fundamentally misconstrue Mr. Beilinson's and Mr. Perkins's negotiating position; WGC
Independent Manager only has authority over Woodbridge and the other Debtors, and was
attempting to bring additional assets into the estate, assets and entities that were under the sole
control of Mr. Shapiro. *See* First Day Decl., Ex. A, Schedule A-2. Accordingly, WGC
Independent Manager lacked the power to decide to "exclude" anything. The Movants would let
their perfect ideal be the enemy of investor protection.

75.     The Committee Motion also argues that the fee structure in the Beilinson
Engagement Letter incentivizes Beilinson Advisory Group to favor the interests of Mr. Shapiro
over those of the Debtors' estates and creditors. *See* Committee Motion, at ¶¶ 4, 43-44. Under
the Beilinson Engagement Letter, Beilinson Advisory Group is entitled to (i) a guaranteed fee of
$480,000 (the "Guaranteed Fee") and (ii) an unspecified success fee (the "Success Fee") that
Beilinson Advisory Group may request from Woodbridge "upon confirmation of a plan of
reorganization or upon the occurrence of a significant milestone to be later defined and
determined" and "approved and agreed to by [Woodbridge] . . . ***subject to approval by the
Bankruptcy Court***." *See* First Day Decl. Ex. F, ¶3 (emphasis added).

76.     The Guaranteed Fee is precisely that, guaranteed; it simply provides Mr.
Beilinson with a minimum fee if the Success Fee's financial goals are unattainable. It provides

---

[18]     *Supra* at 47-48.

no incentive for Beilinson Advisory Group or Mr. Beilinson to act in the interests of Mr.

Shapiro. Indeed, it also provides Mr. Beilinson the appropriate incentive to make all decisions

free of an economic interest in them.

77.    Regarding the Success Fee, the Committee Motion asserts that "Shapiro's

approval is a condition to Beilinson Advisory Group's recovery of any 'success fee.'" This is

factually incorrect: the Success Fee is payable only upon approval by both Woodbridge (the

entity) and the Court. *See* First Day Decl. Ex F, ¶3. While no one can predict the future, at least

as of right now, the prospect of Mr. Shapiro being the head of reorganized Woodbridge after the

confirmation of a chapter 11 plan seems, at best, dim. But even if that were not true, post-

bankruptcy management of Woodbridge is subject to approval by the Court under section

1129(a).[19] In fact, Mr. Beilinson's best chance of obtaining a Success Fee is achieving

confirmation of a chapter 11 plan that provides for robust recoveries for stakeholders.

78.    The Trustee Motions repeatedly characterize the agreements summarized above

as "concessions" made by Mr. Beilinson and Mr. Perkins to Mr. Shapiro. *See, e.g.*, Committee

Motion, at ¶ 64 ("in yet another concession to Shapiro, Beilinson and Perkins inexplicably gave

the unidentified tenants the right to terminate either or both of the leases …."); *id.* at 63 (noting

that Mr. Shapiro has been given the right to occupy two of the estates' properties during

bankruptcy proceeding); SEC Motion at 41 ("once again Shapiro demanded concessions, to

which the bankruptcy team agreed"). Again, it bears repeating that terming these agreements as

---

[19]    The Committee concludes that the Debtors intend to install Mr. Shapiro back in control of the
Debtors based on nothing more than a statement at the first day hearing that Mr. Shapiro "has no longer a
management role with the business for the time being," Committee Motion, at ¶ 44 (quoting First Day Hearing Tr. at
19:18-20), ignoring both independent management's numerous subsequent actions to remove Mr. Shapiro from any
involvement with the Debtors and that Court approval would be necessary for Mr. Shapiro to regain control of the
Debtors. It also assumes that independent management knew of the SEC's allegations prior to the commencement of
the Chapter 11 Cases. Those were only disclosed in late December. Recall that, as late as September 2017, the SEC
publicly announced that it had not found that Mr. Shapiro had committed any wrongdoing.

"concessions" on the part of independent management is a misnomer and reflects the Movants'

failure to understand how independent management has expertly used the bankruptcy process to

the estates' advantage against Mr. Shapiro. Prior to these agreements, Mr. Shapiro enjoyed

unfettered control over all of the Debtors' assets; Mr. Beilinson and Mr. Perkins did not have

authority to "concede" anything. Since the prepetition agreements were reached granting them

authority over the Debtors, Mr. Beilinson and Mr. Perkins have used the Court process to extract

dramatic additional concessions from Mr. Shapiro and completely cut off his involvement with

the Debtors. None of this would have been possible outside the bankruptcy process.

iv.    **There Are No Credible Allegations of Fraud or Misconduct By Current Management, Which Is Completely Independent From Mr. Shapiro**

79.    In addition to the Agreements, the Motions rely extensively on SEC allegations of

fraudulent activity of Mr. Shapiro before December 1, 2017. *See, e.g.*, Committee Motion at 8-

12; SEC Motion at 7-37. These arguments ignore the requirement of section 1104(a)(1) that the

fraud be perpetrated by *current management*. *See* 11 U.S.C. § 1104(a)(1) ("fraud, dishonesty,

incompetence, or gross mismanagement of the affairs of the debtor *by current management*")

(emphasis added); *In re The 1031 Tax Grp. LLC*, 48 B.R. 78, 86 (S.D.N.Y. 2007) ("[T]he fact

that the debtor's prior management might have been guilty of fraud, dishonesty, incompetence, or

gross mismanagement does not necessarily provide grounds for the appointment of a trustee

under § 1104(a)(1), as long as a court is satisfied that the current management is free from the

taint of prior management.").

80.    Tellingly, all of the cases cited by the Committee in support of appointing a

trustee due to prepetition conduct involve allegations where the individuals involved in the

prepetition conduct remained as *current management* during the bankruptcy proceedings, or do

not even involve a motion to appoint a trustee.[20] This is equally true of *In re Ondova*, to which

the Committee Motion devotes four paragraphs.[21] In stark contrast, in this case, WGC

Independent Manager had absolutely no participation in the alleged wrongdoing and ensured that

such conduct ceased *immediately* upon obtaining managerial authority, have ensured that Mr.

Shapiro cannot remove them without a determination by the Court that "cause" exists to do so,

and have ceased all payments to Mr. Shapiro under the Consulting Agreement, so that Mr.

Shapiro will not benefit from estate assets without court approval. The Movants conveniently

ignore that courts routinely decline to appoint trustees where, as here, the debtor has installed

independent management to lead the debtor through reorganization or wind-up.[22] In fact, in many

---

[20]      *In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 617-19 (Bankr. D. Wyo. 1995) (noting courts view a trustee appointment as an "extraordinary step", but appointing a trustee because, among other reasons, current management "showed a pattern of disregard for court orders" and "*cannot even come to [the forum] for fear he will be arrested*") (emphasis added); *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989) (appointing trustee due to current management's "pre-petition conduct, post-petition non-disclosures and misrepresentation, and non-compliance with statutory requirements"); *Euro-American Lodging Corp.*, 365 B.R. 421, 426 (Bankr. S.D.N.Y. 2007) (appointing a trustee due to dishonesty and gross mismanagement of current management); *Okla. Refining Co. v. Blaik (In re Okla. Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) (upholding appointment of trustee due to current management's prepetition conduct); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56, 105 S.Ct. 1986, 85 L.Ed. 2d 372 (1985) (holding that trustee of a corporation in bankruptcy has the power to waive attorney-client privilege); *In re William H. Vaughan & Co.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (appointing trustee because the debtor's current president could not be trusted to pursue an avoidance claim for a prepetition transfer the debtor had made to its current president); *In re PRS Ins. Grp., Inc.,* 274 B.R. 381, 391 (Bankr. D. Del. 2001) (appointing trustee due to allegations against current management); *In re Marvel*, 140 F.3d at 471 (appointing a trustee in part because of conflicts of interest due to current management's status as a substantial creditor); *In re Microwave Prods. Of Am., Inc.*, 102 B.R. 666, 668 (Bankr. W.D. Tenn. 1989) (finding cause exists "based on fraud, dishonesty, incompetence and gross mismanagement" by current management); *In re Sunbum5 Enters., LLC*, 2011 WL 4529648 at *25 (M.D. Fla. Sept. 30, 2011) (deciding whether law firm could represent chapter 7 trustee); *In re Ondova Ltd. Co.*, Case No. 09-34784 (SGJ), Dkt. No. 56 (Bankr. N.D. Tex. Sept. 2, 2009) (allegations of prepetition and postpetition misconduct against current management).

[21]      *See In re Ondova Ltd. Co.*, Case No. 09-34784 (SGJ) (Bankr. N.D. Tex.); Committee Motion, at ¶¶ 97-100. As discussed above, in *Ondova*, the court appointed a trustee due to concerns that current management was more concerned about protecting the personal interests of its sole owner and manager, rather than invocations of the Fifth Amendment.

[22]      *See, e.g., In re The 1031 Tax Grp.*, 48 B.R. at 89-90 (declining to appoint a trustee where "organizational changes have confirm-ed what has been true since the outset of these cases, namely that Okun has effectively insulated current management from his management authority and control"); *In re Tanglewood Farms, Inc.*, Nos. 10-06719-8-JRL, 10-06745-8-JRL, 2011 WL 606820, at *2 (Bankr. E.D.N.C. Feb. 10, 2011) (denying motion for appointment of a trustee in part because a CRO had been appointed and "the broad powers given to the CRO insure[d] that current operations [were] in compliance with chapter 11"); *In re Appleridge Ret. Cmty., Inc.,*

of the cases, a motion to appoint a trustee was denied even though the allegations of fraud or

misconduct were made against the debtor's management in place at the time the motion was

filed, and no attempt to appoint independent management was made until *after* the motion to

appoint a trustee was filed.[23]

81.    The SEC Motion incorporates the Committee Motion's facts and legal arguments

to avoid duplication, SEC Motion, at ¶ 46, and adds little additional substance to the argument

that "cause" exists. Most notably, the SEC's assertion that current management "allowed the

fraudulent sale of securities to continue," SEC Motion at 40, is factually incorrect. Current

management caused the Debtors to cease their fundraising efforts immediately upon gaining

control—something the SEC was unable to accomplish during its investigation that spanned at

least 15 months. The only evidence the SEC Motion provides in support of this allegation is that

one investor purchased a note from Woodbridge on November 20, 2017, SEC Motion at n. 11.

However, Mr. Beilinson and Mr. Perkins did not gain control over the Debtors until December 1,

2017. On November 20, 2017, Mr. Perkins had been retained only as an advisor to Gibson Dunn

---

422 B.R. 383, 393 (Bankr. W.D.N.Y. 2010) (noting that the court had denied a motion to appoint a trustee because, "[a]mong [other] reasons . . . a Chief Restructuring Officer was involved in the management of the Debtor"); *In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. 897, 901 (Bankr. M.D. Fla. 2008) (denying motion to appoint trustee after debtor's current President appointed CRO and "agreed to withdraw from all management functions"); *In re Shotwell Landfill, Inc.*, 2014 WL 43777321, at *8 (E.D.N.C. 2014) (denying motion to appoint trustee after CRO was appointed even though management retained authority to operate business); *In re LHC, LLC*, 497 B.R. 281, n. 23 (Bankr. N.D. Ill. 2013) (denying motion to appoint trustee and declining to "place blame on current management for the actions of previous management"); *In re Solyndra, LLC*, 11-12799 (MFW) (Bankr. D. Del. Oct. 24, 2011), Dkt. Nos. 247, 266 (denying motion to appoint trustee after motion to appoint CRO was filed); *In re RNI Wind Down Corp.*, Case No. 06-10110 (Sontchi, J.) (Transcript of September 16, 2006 Hr'g at 77) (denying a motion to appoint a trustee on the basis that the U.S. Trustee failed to meet its burden of establishing cause where there was no showing that the debtor's current management had committed fraud because upon learning of the potential fraud committed by the debtor's sole officer, the debtor's board replaced the officer with an independent interim CEO against whom no such allegations had been made).

[23]    *In re Blue Stone Real Estate, Constr. & Dev. Corp.*, 392 B.R. at 899 (CRO motion filed after trustee motion); *In re Shotwell Landfill, Inc.*, 2014 WL 43777321, at *2 (Bankr. E.D.N.C. 2014) (same); *In re Solyndra, LLC*, 11-12799 (MFW) (Bankr. D. Del. Oct. 17, 2011), Dkt. No 247, ¶¶ 42, 47 (Committee's counsel, then representing the debtors, filed a motion to appoint CRO filed six days prior to hearing on trustee motion after two officers invoked the protections of the Fifth Amendment, one of whom remained with the debtor).

and had no control over the Debtors, and Mr. Beilinson had no authority to control WGC

Independent Manager or any other affiliated entities until December 1, 2017. This argument is a

transparent—and futile—attempt to graft a taint on current management through the alleged

wrongdoing of prior management when the evidence reveals the precise opposite, that current

management was the only party responsible for ending the Debtors fundraising activities, placing

the assets in a forum that fully illuminated the situation and creating an ever-growing wall

between the business and the alleged wrongdoers.

82.     Furthermore, the new independent management team had no involvement with

the Debtors, including any past fundraising operations and alleged securities law violations. The

Debtors are in the process of reviewing the involvement of any employees or contractors in prior

fundraising, and will act appropriately to ensure that all of the Debtors' employees are

complying and cooperating with all regulatory requirements and inquiries. In the course of this

review, the Debtors may place certain employees or contractors on administrative leave or take

other appropriate actions pending an investigation of their involvement in this activity. Indeed,

on January 5, 2017, the Debtors enacted a reduction inforce that terminated the employment of a

substantial portion of the Debtors' sales and marketing staff. As demonstrated through the

Debtors' actions since the Petition Date, this applies with equal force to Mr. Shapiro in his

capacity as a consultant for the Debtors. WGC Management has already suspended all payments

under the Consulting Agreement with Mr. Shapiro based on SEC allegations, depriving him of

any role in the restructuring process and any future payments until the SEC investigation is

resolved. *See* Ex. A.

83.     Far from satisfying their burden to demonstrate "cause" by clear and convincing

evidence, the Committee has not alleged any wrongdoing whatsoever on the part of current

management, and any evidence in the Motion purporting to show that current management is somehow beholden to Mr. Shapiro is either factually inaccurate or demonstrates the precise opposite—that current management is independent from Mr. Shapiro and has been acting in the interest of the Debtors' estates and their creditors, often to the detriment of Mr. Shapiro. These facts make this case similar to *Blue Stone*, where the court held that the appointment of a CRO, who was "authorized to have sole control of the management of the Debtors without interference" made the appointment of a trustee unnecessary. 392 B.R. at 905.

84.    In *Blue Stone*, a motion to appoint a trustee was filed with allegations of fraud and mismanagement both prepetition and postpetition against *current* management, including that the debtor did not account for prepetition transfers that the debtor's principal, Mr. De Maria caused the debtor to make to himself personally, and Mr. DeMaria's failure to disclose certain transfers both in the debtor's statements of financial affairs and in response to direct questioning at the meeting of creditors. *Id.* at 900. Mr. DeMaria did not attempt to retain a CRO until after an emergency motion to appoint a trustee was filed. *Id.* at 899-900. Further, Mr. DeMaria did not agree to withdraw from all management functions until the hearing on the CRO motion in response to an argument that the CRO "would be controlled or directed by Mr. De Maria." *Id.* at 901. Despite this, the court found that:

> [The CRO's] substantial experience with the bankruptcy process, both as a trustee and an authorized professional with various functions or expertise, would be extremely beneficial to these Debtors, especially if the allegations of the Trustee Motion are true. [The CRO] is a respected and 'well known quantity' to the Court …
>
> ***On whole, the contentions that [the CRO] is not or cannot be independent, is not disinterested, and cannot perform as effectively as a Chapter 11 trustee are not credible and border on being frivolous***. These arguments are without any basis in fact or law and are rejected by the Court.

*Id*. at 901-02 (emphasis added). Like in *Blue Stone*, the SEC's and the Committee's contentions that Mr. Beilinson and Mr. Perkins are not or cannot be independent are not credible and border

on being frivolous. Accordingly, this Court should make the same finding based on the facts in

this case, and, for that reason, determine that cause does not exist to appoint a trustee under

section 1104(a)(1) of the Bankruptcy Code.

**B.**     **Appointing a Trustee Is Not in The Best Interests of Creditors or Any Other Interests of the Debtors' Estates and Will Harm the Interests of the Majority of Investors**

85.     As stated above, trustee appointment under section 1104(a)(2) of the Bankruptcy

Code requires that the appointment be "in the interests of creditors, any equity security holders,

and other interests of the estate." 11 U.S.C. § 1104(a)(2). Section 1102(a)(2) is a difficult

standard to satisfy, as it requires a showing that a trustee appointment is in the interests of

essentially all interested constituencies—i.e., the appointment must benefit the estate generally,

and not merely one constituency such as a creditor group. *See* 7 Collier ¶ 1104.02[3][d][i]

(section 1104(a)(2) "requires a finding that the appointment of a trustee would be in the interest

of essentially all interested constituencies"); *In re Sletteland*, 260 B.R. at 672 ("[A] creditor

group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply

by alleging that it would be in its interests. It must show that the appointment is in the interests of

all those with a stake in the estate, which in this case would include the Debtor.").[24]

86.     The Movants propose similar arguments under the "best interests" standard of

section 1104(a)(2) as they did arguing satisfaction of "cause" under section 1104(a)(1). *See*

Committee Motion, at ¶ 36; SEC Motion, at ¶ 49. As explained above, the Agreements and SEC

allegations that form the basis of the Movants' arguments actually indicate the WGC

Independent Manager's independence. Besides the Agreements openly disclosed and scrutinized

---

[24]     Contrary to a parenthetical citation included in the Committee Motion, Section 1104(a)(2) is not a "lesser" standard than Section 1104(a)(1). Both are exceedingly difficult to satisfy. *See In re Five Rivers Petroleum LLC*, No. 11–25202–JAD, 2013 WL 656026, at *8 (Bankr. W.D. Pa. Feb. 22, 2013) (explaining that trustee appointment under Section 1104(a)(2)'s "best interests" standard is still an "extraordinary remedy which should not be granted lightly") (citation omitted).

during the First Day Hearing and Debtors' efforts to bring 13 entities under control of the estate

(only to be thwarted by the SEC's own asset freeze), the Movants do not identify a single

specific "material conflict of interest" or "questionable transaction" by current management

during the restructuring process. *See* Committee Motion at ¶¶ 36-38, 23. The cases cited in the

Motions are therefore all distinguishable, including *Ondova Limited*, discussed above.[25]

87.    Nor do the Movants provide a single declaration or example in support of their

argument that unidentified "creditors" lack confidence in the Debtors. *See* Committee Motion, at

¶ 38-39; SEC Motion, at ¶ 23. First, the Committee, which consists of the only two noteholders

known to have waived their liens and one trade creditor, is not in a position to opine on the best

interests of all parties. As far as the Debtors are aware, of the thousands of noteholders in the

Chapter 11 Cases, the Committee represents the interests of the only two willing to waive their

liens. Additionally, the total value of the unsecured claims represented by the Committee is

approximately $9 million without these two noteholders, compared to unitholders' estimated

interests of $226 million and noteholders' estimated claims of $750 million. First Day Decl. ¶¶

17-18; D.I. 85, at 12. Moreover, several ad hoc noteholder and unitholder groups, holding vastly

more claims than those creditors on the Committee, strongly believe that the Committee does not

represent their respective constituents interests and have moved for separate official

representation. *See* D.I. 85, at 2 (arguing that the "Official Committee of Unsecured Creditors

(the 'UCC') appointed at the Formation is structured to be directly adverse to the interests of the

Noteholders"); D.I. 198, at 1 ("[N]oteholders do not see the Creditors' Committee as

representing their interests.");  D.I. 144 (notice of appearance of Unitholders Group).

---

[25]        *See also In re PRS Ins. Grp., Inc.*, 274 B.R. at 391 (appointing trustee due to allegations against
current management); *In re Microwave Prods. Of Am., Inc.*, 102 B.R. at 668 (finding cause exists "based on fraud,
dishonesty, incompetence and gross mismanagement" by current management); *In re L.S. Good & Co.*, 8 B.R. 312,
315 (Bankr. N.D. W. Va. 1980) (current management alleged to have been involved in over a million suspect inter-
company transfers).

88.     Similarly, the SEC is poorly positioned to determine what is in the best interests of creditors given their value destructive actions in the Chapter 11 Cases to date. These include (i) commencing the Receivership Action, which could cause a default under the Debtors' DIP Financing Agreement and has been roundly criticized by all the estate's creditors (including the Committee) as value destructive, and (ii) obtaining the TRO Asset Freeze Order which prevented assets worth approximately $30 million from becoming part of the Debtors' estates. The SEC Motion, which fails to even mention that appointment of a trustee would cause a default under the Debtors' DIP Financing Agreement, is further evidence that the SEC has failed to consider the implications of its actions on the Debtors' estates, creditors, and other parties in interest.

89.     More importantly, the current facts indicate that creditors are comfortable doing business with the WGC Independent Manager, as creditor-contractors continue work on major projects while two seasoned bankruptcy professionals continue to guide Debtors through the chapter 11 process. Moving forward, once the Debtors' business plan is finalized and their real estate assets stabilized, the WGC Independent Manager will investigate Debtors' prepetition transactions in accordance with its fiduciary duties and aggressively seek to preserve (or pursue) any and all litigation claims the estates may have.

**i.      Appointment of a Trustee Will Cause the Debtors to Default Under the DIP Financing Agreement**

90.     Appointing a trustee would jeopardize the DIP Financing that is, in the Committee's own words, "required … to continue construction, to maximize value." Ex. A, at 123:5-7. Pursuant to section 11.1(k)(v) of the DIP Financing Agreement (D.I. 130-1), "[t]he entry of an order appointing an interim or permanent trustee, or an examiner having enlarged powers …" constitutes an Event of Default. Upon the occurrence of that Event of Default, the DIP Lender may "declare any Obligations immediately due and payable," (§ 11.2(a)), may

"terminate … any Commitment" (§ 11.2(b)), and may "exercise any other rights or remedies afforded," including taking possession and selling 28 properties that constitute the real estate collateral and which form a significant portion of the estate's value. The occurrence of an Event of Default under the DIP Credit Agreement also "constitutes an event of default under" the Second Interim DIP Order. *See* Second Interim DIP Order § 4.1(b).

91.    On more than one occasion, the Bankruptcy Court for the Southern District of New York has severely criticized motions to appoint a trustee when such appointment would result in default under a DIP agreement. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 441 B.R. 6, 20 (Bankr. S.D.N.Y. 2010) (denouncing a "motion to appoint a chapter 11 trustee . . . when that would result in a default under the DIP financing facility"); *In re DBSD N. Am., Inc.*, 421 B.R. 133, 141 (Bankr. S.D.N.Y. 2009) (describing as "disgraceful," a group of investors' motion to appoint a trustee, "knowing that such would cause a default on the Debtors' DIP financing facility and a default on the sale of the company upon which all of the creditors' recoveries would rest").[26]

92.    As even the Committee acknowledges, the DIP Financing is necessary to preserve the value of the Debtors' real estate assets. *See* Ex. A, at 123:5-16. Given that fact, it cannot be in the best interests of creditors to appoint a chapter 11 trustee, which would jeopardize the Debtors access to that liquidity.

---

[26]    It is particularly reckless that the Committee has moved for a chapter 11 trustee on an emergency basis, so that it would be heard on what was going to be the Debtors' standard "Second Day" hearing. It is not credible that the Committee has gotten access to facts and information in the first three weeks of its existence to justify jeopardizing the DIP Financing. Regrettably, however, the filing and prosecuting of the Committee's trustee motion was a fait accompli. The Committee has repeatedly rebuffed the Debtors' management's offers to meet with them in person to discuss issues in the Chapter 11 Cases and familiarize the Committee with the Debtors and their operations.

ii.     **The Best Interests of All Creditors Are Served by Allowing WGC Independent Manager to Continue Oversight of the Restructuring Process**

93.     Appointing a trustee would also interrupt the progress that the WGC Independent Manager has made in continuing construction to maximize value. The nature of the Debtor's business requires an intimate working knowledge of properties under construction, the steps needed to get those properties into saleable condition, and the key relationships to continue work on those properties including developers, contractors and architects. The WGC Independent Manager has already come up to speed, cemented relationships, and taken crucial steps to maximize estate value. As just one example, it has worked closely with Plus Development to undertake a preliminary analysis of properties under construction. If construction was ceased or even delayed in order to accommodate a trustee, contractors would sit idle or walk away from projects, buyers would move on other properties, and the rainy season would wreck properties' grounds. Appointing a trustee at this stage would thus destroy the value of Debtor's key assets and sap the goodwill that the WGC Independent Contractor has established.

94.     The importance of allowing current management to continue its course cannot be overstated, and Congress indicated as much when it explained that "very often the creditors will be benefitted by continuation of the debtor in possession, both because the expense of a trustee will not be required, and the debtor, who is familiar with his business, will be better able to operate it during the reorganization case." H.R.Rep. No. 595, 95th Cong., 1st Sess. 233 (1977), reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6192; *see also Schuster v. Dragone*, 266 B.R. 268, 271 (D. Conn. 2001) ("[T]he process of rehabilitation is generally most effective under current management who are familiar with the operation of the business involved.") (citation omitted); *In re F. A. Potts & Co., Inc.*, 20 B.R. 3, 7 (E.D. Pa. 1981)

(declining to appoint a trustee where, in a "complex" industry, "Mr. Goos is experienced, competent, has built up good will, and has able associates in management positions").

95.    In a preliminary opposition to the Assumption Motion that is not currently before the Court, the Committee raises concerns about the terms of the Assumed Contracts. D.I. 135 at 3-4. It now attempts to leverage those concerns in support of its current motion. *See* Committee Motion at ¶ 3, 35. Importantly, the Committee recognizes the import of such contracts in that it contends that the Debtors should instead seek relief under a critical vendor motion over a month into the case. The Committee is effectively, and unrealistically, recommending that the Debtors assume 90% of the trade claims through a critical vendor motion instead of assuming certain contracts. The appropriate venue to pursue such concerns are directly with the Debtors and, if necessary, through the standard motion process. Further, the Debtors have withdrawn the Assumption Motion, which renders this argument moot. In any event, it is clear that the Debtors' decision whether to assume or reject executory contracts is a decision subject to the Debtors business judgment and bankruptcy court approval. *See, e.g.*, *In re Pinnacle Brands, Inc.*, 259 B.R. 46, 53-54 (Bankr. D. Del. 2001) ("The Debtor's decision to assume or reject an executory contract is based upon its business judgment."); *In re Dura Automotive Systems, Inc.*, 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (approving debtors' decision to assume agreements and stating that, under the business judgment standard, "a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion"). While the Committee is free to contest the Debtors' business judgment if and when another assumption or rejection motion is filed, the fact that the Debtors filed a motion to assume certain contracts to protect relationships with key contractors that they determined were critical to the completion of construction projects is not evidence to appoint a trustee.

96.    In determining what is in the best interests of creditors, this Court should consider

the consequences of appointing a trustee or trustees. It is important to recognize that these estates

include 279 separate debtors with some separate and some overlapping creditor

constituencies. Upon entry of an order appointing a trustee, the Committee or any other party in

interest could, within 30 days, request that a trustee be elected by the creditors. 11 U.S.C. §

1104(b)(1). There is little doubt that in these cases, numerous such requests would be

made.  Upon such a request, the United States trustee is required to "convene a meeting of

creditors for the purpose of electing one disinterested person to serve as trustee" and such

election shall be conducted as provided by section 702 of the Bankruptcy Code. *Id*. Section

702(a)(1) provides that only an "allowable, undisputed, fixed liquidated, unsecured claim" may

vote in such an election. 11 U.S.C. § 702(a)(1). This may lead to disputes over whether the

noteholders that have not waived their liens would be able to vote and whether other claims are

disputed, which could delay the election process and lead to uncertainty over who will be

managing the Debtors and their estates. Moreover, it places the estates in the very position they

currently reside, where approximately 99% of the creditor constituency are not currently

considered unsecured, but are the primary parties whose interests are at stake in these cases. This

potential for uncertainty and delay may threaten the Debtors' ability to successfully reorganize

and is not in the best interests of creditors or the estates.

97.    Finally, Debtors have a limited number of assets from which to satisfy their debt.

Every dollar administering the estates is a dollar taken out of the hands of creditors. The SEC is

already investigating the prepetition conduct of the Debtors and their prior management. The

Debtors have unequivocally stated that an independent investigation would be conducted, upon

consultation with the other creditor constituencies and after the business operations are

stabilized. Appointing a chapter 11 trustee will only serve to delay the business stabilization and duplicate the SEC and other efforts to investigate the prepetition conduct. *See In re Bayou Grp., LLC*, 564 F.3d 541, 546-47 (2d Cir. 2009) (quotation marks and citations omitted) ("In determining whether a § 1104 appointment is warranted or in the best interests of creditors, the bankruptcy court must bear in mind that the appointment of a trustee may impose a substantial financial burden on a hard pressed debtor seeking relief under the Bankruptcy Code, by incurring the expenditure of substantial administrative expenses…."); *In re Anchorage Boat Sales, Inc.*, 4 B.R. 635, 644 (Bankr. E.D.N.Y. 1980) ("[T]he Court may utilize its broad equity powers to engage in a cost-benefit analysis in order to determine whether the appointment of a trustee would be in the interests of creditors, equity security holders, and other interests of the estate."); *In re Liberal Market, Inc.*, 11 B.R. 742, 744 (Bankr. S.D. Ohio 1981) ("Since the economic and financial conditions are so desperate and critical, it is obvious that the appointment of a statutory trustee with full powers, authority and duties would be ill-advised, if not foolhardy, because of the consequent, overwhelming drain on assets for the nonproductive, administrative expenses of a trustee….").

## **CONCLUSION**

The Debtors therefore respectfully request that the Court deny the Trustee Motions in their entirety.

Dated:   January 8, 2018
      Wilmington, Delaware     */s/ Sean M. Beach*

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean M. Beach (No. 4070)
Edmon L. Morton (No. 3856)
Ian J. Bambrick (No. 5455)
Allison S. Mielke (No. 5934)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:   (302) 571-1253

-and-

GIBSON, DUNN & CRUTCHER LLP
Samuel A. Newman (CA No. 217042)
Oscar Garza (CA No. 149790)
Daniel B. Denny (CA No. 238175)
333 South Grand Avenue
Los Angeles, California 90071
Tel:    (213) 229-7000
Fax:   (213) 229-7520

-and-

J. Eric Wise (NY No. 3000957)
Matthew K. Kelsey (NY No. 4250296)
Matthew P. Porcelli (NY No. 5218979)
200 Park Avenue
New York, New York 10166
Tel:    (212) 351-4000
Fax:   (212) 351-4035

*Proposed Counsel to the Debtors and Debtors in Possession*