## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered)<br><br>*Requested* **Hearing Date:**<br>    Feb. 13, 2018 at 1:00 p.m. (ET)<br>*Requested* **Objection Deadline:**<br>    Feb. 8, 2018 at 4:00 p.m. (ET) |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE SALE OF 8692 FRANKLIN AVENUE, LOS ANGELES, CALIFORNIA PROPERTY OWNED BY THE DEBTORS IN FEE SIMPLE FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (II) APPROVING THE RELATED PURCHASE AGREEMENT; AND (III) GRANTING RELATED RELIEF

Woodbridge Group of Companies, LLC and its affiliated debtors and debtors in

possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11

Cases") hereby move the court (this "Motion") for entry of an order (the "Sale Order"),

substantially in the form attached hereto as Exhibit A, pursuant to sections 105(a) and 363 of title

11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rule 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules") (i) authorizing the sale (the "Sale") of certain real

property owned by the Debtor Centershot Investments, LLC (the "Seller") in fee simple located

at 8692 Franklin Avenue, Los Angeles, California (the "Land"), together with Seller's right, title,

---

[1]        The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14225 Ventura Boulevard #100, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of this information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

and interest in and to the buildings located thereon and any other improvements and fixtures located thereon (collectively, the "Improvements" and together with the Land, the "Real Property"), and any and all of the Seller's right, title, and interest in and to the tangible personal property and equipment remaining on the Real Property as of the date of the Closing (collectively, the "Personal Property" and, together with the Real Property, the "Property") on an "as is, where is" basis, free and clear of any and all liens, claims, encumbrances, and other interests to Cross Country Holdings Partnership (the "Purchaser") pursuant to the terms and conditions of that certain Residential Purchase Agreement and Joint Escrow Instructions dated as of November 27, 2017 (as may be amended, supplemented, or otherwise modified from time to time, the "Purchase Agreement") by and between the Seller and the Purchaser, a copy of which is attached as Exhibit 1 to the Sale Order; (ii) authorizing and approving the terms of the Purchase Agreement, and (iii) granting certain related relief. In support of the Motion, the Debtors respectfully represent as follows:

**JURISDICTION AND VENUE**

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief

requested herein are 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rule 6004, and Local

Rules 2002-1, 4001-2, and 6004-1.

## CASE BACKGROUND

2.      On December 4, 2017 (the "Petition Date"), each of the Debtors commenced a

voluntary case under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108

of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors

in possession.

3.      The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule

1015(b) and Local Rule 1015-1. As of the date hereof, no trustee or examiner has been appointed

in the Chapter 11 Cases. An official committee of unsecured creditors (the "Committee") was

appointed in the Chapter 11 Cases on December 14, 2017 [D.I. 79]. On January 23, 2018, the

Court approved a settlement providing for the formation of an ad hoc noteholder group (the

"Noteholder Group") and an ad hoc unitholder group (the "Unitholder Group") [D.I. 357].

4.      Information regarding the Debtors' history and business operations, capital

structure, and the events leading up to the commencement of the Chapter 11 Cases can be found

in the *Declaration of Lawrence R. Perkins in Support of the Debtors' Chapter 11 Petitions and

Requests First Day Relief* (the "First Day Declaration") [D.I. 12].[2]

## THE SALE

5.      The Property. As further detailed in the *Declaration of Bradley D. Sharp in

Support of Debtor's Motion to Sell 8692 Franklin Avenue, Los Angeles, California Property*

filed on the date hereof (the "Sharp Declaration"), the Seller purchased the Property in 2014 with

the intention of improving the Land through excavating the Land, constructing a new high-end

---

[2]      Capitalized terms used but not defined herein have the meanings assigned to such terms in the First Day
Declaration.

residential home thereon, and selling the Property as a fully-developed residential real property. Following the purchase, however, initial analyses by the Debtors' architects indicated that the costs of developing and improving the Property would likely significantly exceed initial estimates. The Debtors thus determined that selling the Property on an "as is" basis, rather than investing in its improvement, best maximized the value of the Property; the Debtors' current management concurs with this conclusion. *See* Sharp Declaration, ¶ 4. Discussions with potential purchasers through the Debtors' marketing efforts further supported this conclusion. Of the offers that the Seller received for the Property, the Purchaser's offer under the Purchase Agreement was the highest and otherwise best. Accordingly, the Debtors determined that selling the property on an "as is" basis to the Purchaser is the best way to maximize value of the Property.

6.     <u>The Debtors' Business</u>. The Debtors' principal business is purchasing, developing, improving, and selling high-end luxury homes. In the ordinary course of their business, the Debtors both (a) purchase and improve existing homes and (b) purchase undeveloped land and build new homes thereon. Specifically, through their principal operating company, Woodbridge Group of Companies, LLC, the Debtors manage their relationships with a network of architects, contractors, and construction companies to develop hundreds of desirable high-end properties, primarily in California and Colorado.[3] Over the past six months, prior to the Petition Date, the Debtors closed nine sales generating total revenues of approximately $47 million, with an average sale price of approximately $5.2 million. Both before and after the Petition Date, the Debtors have pursued potential sales of the Property in the ordinary course of their business.

---

[3]     Approximately (a) 63% of the Debtors' properties are located in Colorado, (b) 36% in California, and (c) 1% in New York.

7.      Sale Contracts. In the vast majority of their property sales, the Debtors enter into a standard form of home sale contract, modified on a case-by-case basis, in part, to comply with jurisdictional requirements. Each such contract typically contains terms including, but not limited to, the payment of a deposit, the purchase price, design options for a home, procedures for paying closing costs, and inspection rights. As of the date of this Motion, none of the Debtors is a party to any sale contract other than the Purchase Agreement.

8.      The Debtors believe that they are authorized to honor the Purchase Agreement and to close the Sale in the ordinary course of business without the need for an order of the Court. Nevertheless, the title insurance company for the Property, Fidelity National Title Insurance Company (the "Title Insurer"), has informed the Debtors that it requires a court order to proceed with the closing of the Sale. Thus, out of an abundance of caution, and to provide assurances to the Title Insurer to allow the Sale to close in manner satisfactory to the Purchaser, the Debtors seek authority to close the Sale once conditions for closing are satisfied.

9.      The Purchase Agreement. On November 21, 2017, the Purchaser signed the Purchase Agreement with an initial offer of $1,450,000. On November 29, 2017, the Seller countersigned the Purchase Agreement subject to a counteroffer, which the Purchaser made on November 30, 2017 in the amount of $1,500,000. The Debtors believe that this purchase price provides significant value and, accordingly, accepted the counteroffer on December 3, 2017. Following the Petition Date, because the Sale had not been closed prior to the original closing date of December 22, 2017, the Purchaser and Seller agreed to extend the term of the Purchase Agreement to March 15, 2018. Under the Purchase Agreement, the Purchaser agreed to purchase the Property for $1,500,000, with a $50,000 initial cash deposit, a $200,000 down payment and

the balance of $1,250,000 provided through private financing. The deposit is being held by

Portfolio Escrow, Inc. as escrow agent.[4]

       10.    <u>Broker's Fees</u>. In connection with marketing the Property, the Debtors worked

with Mercer Vine, Inc. ("<u>Mercer Vine</u>"), a non-Debtor affiliated brokerage company pursuant to

a pre-petition contractual arrangement.[5] On July 13, 2017, the Seller entered into that certain

Vacant Land Listing Arrangement agreement (the "<u>Broker Agreement</u>") with Mercer Vine. A

true and correct copy of the Broker Agreement is attached hereto as <u>Exhibit B</u>. The Broker

Agreement provided Mercer Vine with the exclusive and irrevocable right to market the Property

for a fee in an amount of up to 5% of the contractual sale price (the "<u>Seller's Broker Fee</u>"), while

authorizing Mercer Vine to compensate a cooperating purchaser's broker participating through

the multiple listing service by contributing a share of the Seller's Broker Fee in an amount equal

to up to 2.5% of the purchase price (the "<u>Purchaser's Broker Fee</u>" and, collectively with the

Seller's Broker Fee, the "<u>Broker Fees</u>") to the purchaser's broker. The Broker Agreement, which

expired on October 13, 2017, was extended by the Seller on November 5, 2017 through February

13, 2018 pursuant to an extension agreement (the "<u>Extension Agreement</u>"). A true and correct

copy of the Extension Agreement is attached hereto as <u>Exhibit C</u>. The Purchase Agreement is

---

[4]      The Debtors are seeking to have this Motion heard on an expedited basis because the Title Insurer informed the Debtors that it would be unable to release escrow until 14 days after the entry of an order.

[5]      Prior to the Petition Date, the Debtors primarily relied on two non-Debtor affiliates for brokerage services: Mercer Vine and Woodbridge Realty of Colorado, LLC (collectively, the "<u>Affiliated Brokerage Entities</u>"). The Affiliated Brokerage Entities are majority-owned and controlled by Robert Shapiro, and are subject to an asset freeze order (the "<u>Asset Freeze</u>") obtained by the United States Securities and Exchange Commission from the District Court for the Southern District of Florida. *SEC v. Shapiro et al.*, No. 17-cv-24625 (MGC), Dkt. No. 13 (S.D. Fla. Dec. 20, 2017) (the "<u>SEC Action</u>"). Accordingly, the Debtors have transitioned away from working with the Affiliated Brokerage Entities in favor of exclusive reliance on non-affiliated third-party brokers.

While the Debtors were under contract with Mercer Vine with respect to listings for six properties at the time the SEC Action was commenced, the Debtors have ceased working with the Affiliated Brokerage Entities, will not work with them on a go-forward basis, and are not seeking authority to make any payments to the Affiliated Brokerage Entities hereunder. For the avoidance of doubt, none of the Debtors are seeking authority to make any payments inconsistent with the terms of the Asset Freeze. Mercer Vine will be provided with notice of the Sale, and the Seller's Broker Fee (as defined below) will be held in escrow pending a further order of this Court.

signed by Mercer Vine as listing firm and Sergio Ramirez as cooperating broker (the "Purchaser's Broker").

11.     In the Debtors' business judgment, closing the Sale with Purchaser pursuant to the Purchase Agreement is the best way to maximize value for the Debtors' estates and is more favorable than engaging in costly litigation to reject the Purchase Agreement or Broker Agreement. Thus, in light of the exclusive terms of the Broker Agreement and the delay and expense that would result from seeking early termination or rejection of the Broker Agreement, the Debtors seek authority to pay the Broker Fees by setting aside the appropriate portion of proceeds of the Sale in the Proceeds Account (as defined below), paying the Purchaser's Broker Fee out of such proceeds, and holding the Seller's Broker Fee pending the resolution of the Asset Freeze or further order of this Court.

12.     Other Closing Costs. In addition to the Broker Fees, the Seller must also satisfy certain required costs associated with the sale and transfer of title of the Property to comply with the Purchase Agreement (the "Other Closing Costs"). The Other Closing Costs include, but are not limited to, recording fees, title insurance policy costs, and property taxes. The Debtors also rely on outside vendors for escrow and title services in connection with property sales. In general, vendors are mutually agreed on by the applicable Debtors and a purchaser prior to the acceptance of an offer.

13.     Absent authority to pay Other Closing Costs, the Seller will be unable to close the Sale and receive sale proceeds for the Seller's estate. If the Seller is unable to make these payments, the Purchaser may be entitled to rescind the Purchase Agreement or assert other remedies that could lead to additional and unnecessary claims. Accordingly, the Debtors seek the ability to pay Other Closing Costs in connection with the Sale in the ordinary course of business.

01:22821962.4

14.    <u>The Proceeds Account</u>. All net proceeds of the Sale and the Broker Fees shall be held in a segregated escrow account held by Woodbridge Group of Companies, LLC, which shall be designated by the Debtors' officers in advance of the closing of the Sale (the "<u>Proceeds Account</u>"). Such proceeds shall be held in the Proceeds Account pending further order of the Court, except that the Purchaser's Broker Fee shall be paid out of the Proceeds Account in connection with the closing of the Sale.[6]

15.    <u>The Fund Liens</u>. The Property is subject to certain liens for the benefit of Woodbridge Mortgage Investment Fund 2, LLC (the "<u>Fund</u>", and such liens, the "<u>Fund Liens</u>"), which secure indebtedness of the Seller to the Fund in connection with the purchase and improvement of the Property. Through the Debtors' current management, the Fund has consented to the sale of the Property free and clear of the Fund Liens.

16.    <u>Operational Liens</u>. As part of their operations, the Debtors rely upon, routinely contract with, and are obligated to a number of third parties (collectively, the "<u>Operational Lien Claimants</u>") that may be able to assert liens against or otherwise encumber the Debtors' property to secure payment for certain goods and services delivered or provided to the Debtors, or for other claims (collectively, the "<u>Operational Lien Claims</u>"). Certain of the Operational Lien Claimants may have a right or interest, whether or not such right or interest has been exercised, under applicable law to assert and/or to perfect construction, materialmen's, mechanics', or other statutory or common law liens (the "<u>Operational Liens</u>").

---

[6]    As further detailed in the DIP Motion, the noteholders of certain of the Debtors (the "<u>Noteholders</u>") are secured by a pledge of the underlying loan documents for mortgage loans extended from such Debtors to the Debtor entities that individually own the Debtors' properties. While the Debtors believe that such Noteholders have not taken proper steps to perfect their interests in such underlying loan documents, the Debtors shall hold the proceeds of the Sale in the Proceeds Account pending a future resolution of the Noteholders' rights.

17.     Based on diligence conducted prior to and after the Petition Date, the Debtors do not believe that the Property is subject to any Operational Liens or Operational Lien Claims. Nonetheless, to the extent that any entity purports to hold a valid and enforceable Operational Lien or Operational Lien Claim with respect to the Property, such entity may send notice (an "Operational Lien Notice") of such claim to the Debtors, the Debtors' counsel, counsel to the Committee, the Noteholder Group, and the Unitholder Group.[7] Any such Demand must be received by the foregoing parties no later than fourteen (14) days from the entry of the Sale Order. Such Demand must (i) state the amount of the asserted claim, (ii) describe, with particularity, the basis for any valid and enforceable Operational Lien or Operational Lien Claim against the Property, and (iii) attach documentation (e.g., invoices or purchase orders) or other information sufficient to demonstrate that a valid and enforceable Operational Lien Claim exists or could otherwise be asserted and perfected. The Debtors, in consultation with the Committee, the Noteholder Group, and the Unitholder Group, will promptly review any Operational Lien Notices and, if determined to be appropriate in the Debtors' business judgment, the Debtors will pay such claims with the proceeds of the Sale held in the Proceeds Account.

## **RELIEF REQUESTED**

18.     Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Debtors request entry of the Sale Order substantially in the of Exhibit A hereto (i) authorizing the closing of the

---

[7]     Specifically, any Operational Lien Notices should be sent to (i) the Debtors, Woodbridge Group of Companies, LLC, 14225 Ventura Boulevard #100, Sherman Oaks, California 91423 (Attn: Lawrence R. Perkins); (ii) counsel to the Debtors, (a) Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, California 90071 (Attn: Samuel A. Newman, Esq. and Daniel B. Denny, Esq.) and (b) Young, Conaway, Stargatt & Taylor, LLP, 1000 North King Street, Rodney Square, Wilmington, DE 19801 (Attn: Sean M. Beach, Esq., Edmon L. Morton, Esq., and Ian J. Bambrick, Esq.); (iii) counsel to the Committee, Pachulski Stang Ziehl & Jones, 10100 Santa Monica Boulevard, Los Angeles, California 90067 (Attn: Richard M. Pachulski, Esq. and Jeffrey N. Pomerantz, Esq.); (iv) counsel to the Noteholder Group, Drinker Biddle & Reath LLP, 222 Delaware Ave., Ste. 1410, Wilmington, Delaware 19801 (Attn: Steven K. Kortanek); and (vi) counsel to the Unitholder Group, Venable, LLP, 1270 Avenue of the Americas, 24th Floor, New York, NY 10020 (Attn: Jeffrey S. Sabin).

Sale pursuant to the Purchase Agreement, (ii) authorizing and approving the Purchase

Agreement, and (iii) granting related relief.

19.     The Debtors further request that filing of a copy of an order granting the relief

sought herein in Los Angeles County may be relied upon by the Title Insurer to issue title

insurance policies on the Property.

20.     The Debtors further request authority to pay the Broker Fees in an amount not to

exceed an aggregate amount of 5% of gross sale proceeds by setting the applicable amount of

proceeds of the Sale into the Proceeds Account, paying the Purchaser's Broker Fee out of such

account, and holding the Seller's Broker Fee in such account pending resolution of the Asset

Freeze or upon order of the Court.

## BASIS FOR RELIEF REQUESTED

### I.     Section 363 of the Bankruptcy Code Authorizes the Proposed Sale

21.     The Debtors believe that they are authorized to continue to sell properties,

including the Property, postpetition in the ordinary course of business. Nevertheless, the Debtors

are seeking the relief requested herein to provide assurances to the Title Insurer and the

Purchaser.[8]

22.     Section 363(c)(1) of the Bankruptcy Code provides that where, as here, the

Debtors are authorized to operate their business under section 1108 of the Bankruptcy Code, the

Debtors may enter into transactions, including the sale of property of the estate, in the ordinary

course of business, without notice or a hearing. 11 U.S.C. § 363(c)(1). Because the Debtors

---

[8]     Though the original Purchase Agreement was a pre-petition agreement, following the Petition Date the Purchase Agreement was extended to include a new closing date of March 15, 2018. Accordingly, the Debtors believe that the Purchase Agreement is a post-petition agreement and is not subject to section 365 of the Bankruptcy Code. However, even if section 365 of the Bankruptcy Code were to apply, as the Debtors demonstrate below, honoring the Purchase Agreement is a reasonable exercise of the Debtors' business judgment, such that the standard for assumption of a pre-petition executory contract would be satisfied.

believe that the Sale is within the ordinary course of their business of selling residential real

estate properties, the Sale should be approved pursuant to section 363(c)(1).[9]

23.     For the same reason, the Debtors do not believe that section 363(b)(1), which

authorizes the sale of property of the estate other than in the ordinary course of business, applies

to the Sale. Even if section 363(b)(1) did apply, however, authorization of the Sale would be

appropriate because the Debtors have a sound business justification for the Sale. *See, e.g.*, *Myers*

*v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal

circumstances, courts defer to a trustee's judgment concerning use of property under section

363(b) when there is a legitimate business justification); *In re Lionel Corp.*, 722 F.2d 1063, 1069

(2d Cir. 1983) ("Section 363(b) of the Code seems on its face to confer upon the bankruptcy

judge virtually unfettered discretion to authorize the use, sale or lease, other than in the ordinary

course of business, of property of the estate).

24.     In determining whether a sale satisfies the business judgment standard, courts in

the Third Circuit require: (i) that there be sound business reasons for the sale; (ii) that accurate

and reasonable notice of the sale be given; (iii) that the sale yield an adequate price, i.e., one that

is fair and reasonable; and (iv) that the parties to the sale have acted in good faith. *See*, *e.g.*,

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr.

W.D. Pa. 1991).

25.     Even if section 363(b) applied, the proposed sale would be justified thereunder

because it unquestionably satisfies all of the factors under the "sound business purpose test."

First, the sale is supported by sound business reasons: following extensive marketing efforts, the

Debtors have concluded that given the significant costs associated with further improvement of

---

[9]     As discussed above, the Debtors are seeking a court order approving the Sale notwithstanding their belief
that the Sale is within the ordinary course of their business because the Title Insurer has informed the Debtors that it
cannot proceed with closing without an authorizing court order.

the Property, selling the Property on an "as is" basis better maximizes recoveries for the Debtors'

estates. Moreover, the costs and delay attendant to rejecting the Purchase Agreement and Broker

Agreement substantially outweigh the benefits thereof. <u>Second</u>, the Debtors have provided

reasonable and adequate notice of the sale to interested parties by serving notice of this Motion

in accordance with Local Rule 9013-1(m), and submit that no other or further notice is

necessary. Indeed, prior to filing this Motion, the Debtors have consulted with FTI Consulting,

who is not only the Committee's financial advisor, but is also expected to provide certain

analytical assistance to the Noteholder Group and Unitholder Group, and the Debtors believe that

FTI Consulting agrees with the Debtors' assessment that the Sale is in the best interests of the

estates. <u>Third</u>, the Debtors believe that the Purchase Agreement and purchase price reflected

therein represent a fair and reasonable offer for the Property, which the Seller is selling for a

price exceeding its purchase price by $100,000 (i.e., approximately 7%), and which the Debtors

have determined is a reasonable sale price relative to comparable properties in the market in

which the Property is located. The Debtors were unable to obtain a better purchase price after

showing the property to interested parties approximately 55 times. <u>Fourth</u>, the Debtors submit

that the Purchase Agreement was the product of good faith, arms'-length negotiations between

the Purchaser and the Seller. The Purchaser is not related to or an affiliate of the Debtors or any

of their insiders or former insiders. Aside from Mercer Vine, Adam Rosenfeld, and Kyle Giese,

no non-debtor affiliate or current or former officer, director, employee, managing member or

affiliate of any of the Debtors was involved in the Sale. Accordingly, the Debtors believe that the

Purchaser should be entitled to the protections of section 363(m) of the Bankruptcy Code.

## II.    The Debtors Should Be Permitted to Sell the Property Free and Clear

26.    Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims, encumbrances, and other interests if any one of the following conditions is satisfied:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(2)    the [lienholder or claimholder] consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    [the lienholder or claimholder] could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

27.    Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed Sale of the Property.[10] *See Folger Adam Sec. Inc. v. De Matties/McGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000) (discussing how section 363(f) authorizes the sale of a debtor's assets free and clear if all liens, claims, and interests if "any one of [the] five prescribed conditions" is satisfied); *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) (property may be sold "free and clear" if at least one of

---

[10]    Moreover, if a holder of a lien, claim, encumbrance, or other interest receives the requisite notice of this Motion and does not object within the prescribed time period, such holder will be deemed to have consented to the proposed Sale, and the Property may then be sold free and clear of such holder's liens, claims, encumbrances, and other interests pursuant to the terms proposed herein. *See, e.g., Veltman v. Whetzel*, 93 F.3d 517, 521 (8th Cir. 1996) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of section 363 of the Bankruptcy Code); *In re Enron Corp.*, No. 01-16034 (AJG), 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. Feb. 5, 2004) (same); *Hargrave v. Pemberton (In re Tabore, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same); *In re Christ Hosp.*, 502 B.R. 158, 174 (Bankr. D.N.J. 2013), *aff'd*, No. CIV.A. 14-472 ES, 2014 WL 4613316 (D.N.J. Sept. 12, 2014) ("Given adequate notice, failure to object to a § 363 sale has been found to constitute consent per § 363(f)(2) to a "free and clear" sale of the non-objector's interests in property being sold.") (citations omitted).

the subsections of section 363(f) is met); *In re DVI, Inc.*, 306 B.R. 496, 504 (Bankr. D. Del.

2004) (upholding sale of debtors' property free and clear where there was a bona fide dispute).

28.     In connection with the Sale, at least one of the five conditions set forth in section

363(f) of the Bankruptcy Code is satisfied with respect to each lien, claim, encumbrance, or other

interest in the Property. First, the Debtors will satisfy section 363(f)(2) with respect to the Fund

Liens. The Fund will consent to the Sale free and clear of all liens, because the Sale provides the

most effective, efficient, and timely approach to maximizing value with respect to the Property.

Moreover, the Funds' liens in the Property will attach to the proceeds of the Sale, which will be

held in the Proceeds Account.

29.     Second, to the extent that any Operational Lien Claimants assert claims, such

claimants may be required to accept money damages in exchange for their interests such that

section 363(f)(5) of the Bankruptcy Code will be satisfied. *See In re Trans World Airlines*, 322

F.3d 283, 290-91 (3d Cir. 2003) (property sold free and clear of interests when claims were

subject to monetary valuation and satisfaction). This is especially true with respect to any

Operational Liens, which exist solely to secure a monetary debt owed and are usually

dischargeable upon payment of such debt. *See Statsky v. U.S.*, 993 F. Supp. 1027, 1029 (S.D.

Tex. 1998) (statutory lien is charge on property for payment of a monetary debt).[11]

30.     Further, section 363(f)(4) may apply to the extent the Debtors dispute the validity

and/or enforceability of any alleged Operational Lien, or any other claim regarding the Property.

---

[11]     Indeed, the Property will be sold for an amount that the Debtors, in the exercise of their business judgment, believe approximates at least its fair market value, and the holders of any liens thereon therefore could be compelled to accept money in satisfaction of their liens. See In re WPRV-TV, Inc., 143 B.R. 315, 321 (D.P.R. 1991), vacated on other grounds, 165 B.R. 1 (D.P.R. 1992), aff'd in part, rev'd in part on other grounds, 983 F.2d 336 (1st Cir. 1993) (where "properties … sold for the best price obtainable under the circumstances, and the liens will attach to the sale proceeds, the proposed sale [satisfies section 363(f)(5)] and may be approved").

31.     Accordingly, the Debtors submit that at least one (if not more) of the subsections of section 363(f) of the Bankruptcy Code will be satisfied here such that the Court should approve the sale of the Property free and clear of liens, claims, encumbrances, and other interests as requested herein. Further, because the proceeds of the Sale shall be held in the Proceeds Account pending further order of the Court, neither the Operational Lien Claimants nor any other entities will be prejudiced by the closing of the Sale.

32.     Absent the relief sought herein, the Purchaser and Title Insurers may not proceed with the closing of the Sale.

### III.     The Debtors Should Be Permitted to Escrow the Broker Fees and Pay the Purchaser's Broker Fee

33.     Section 105(a) of the Bankruptcy Code empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code." The purpose of section 105(a) of the Bankruptcy Code is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy 105.01 (15th rev. ed. 1997); *see also In re Casse*, 198 F.3d 327, 336 (2d Cir. 1999) (same). Further, under the "necessity of payment rule" or the "doctrine of necessity,"[12] courts often allow the immediate payment of prepetition claims. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824, 826 (Bankr. D. Del. 1999) (allowing payment of pre-petition vendor claims because such claims were "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (applying the necessity of payment doctrine in evaluating payment of prepetition obligations). Indeed, courts in this District and elsewhere have invoked the equitable

---

[12]     This doctrine, first articulated by the United States Supreme Court in *Miltenberger v. Logansport, C&S W. R. Co.*, 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor to pay pre-petition claims in certain situations.

powers available under section 105(a) and the doctrine of necessity to authorize the postpetition

payment of prepetition claims where payment is necessary to preserve the going concern value of

a debtor's business.

34.     The Debtors submit that escrowing of the ordinary course Broker Fees in the

Proceeds Account and payment of the Purchaser's Broker Fee is essential to the Debtors' efforts

to maximize value with respect to the Property. Without the ability to close the Sale in short

order, the Debtors would likely lose the Purchaser, would potentially face claims under the

Purchase Agreement, and would be forced to begin a search for a replacement purchaser.

Further, the Debtors are constrained through February 12, 2018 by the terms of the exclusive

Broker Agreement, and have determined in their business judgment that the cost of pursuing

rejection of the Broker Agreement and Purchase Agreement is outweighed by the value of

closing the Purchase Agreement in the near-term.

### REQUEST FOR WAIVER OF STAY

35.     For the reasons set forth above, any delay in implementing the relief sought herein

would disrupt the Debtors' normal business operations and therefore would be detrimental to the

Debtors, their creditors, and their estates. Accordingly and to successfully implement the

foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a)

and the 14-day stay of any order authorizing the use, sale, or lease of property under Bankruptcy

Rule 6004(h).

### NOTICE

36.     The Debtors have provided notice of this Motion to: (i) the Office of the United

States Trustee for the District of Delaware; (ii) counsel to the DIP Lender; (iii) counsel for the

Committee; (iii) counsel for the Noteholder Group, (iv) counsel for the Unitholder Group, (v) all

Noteholders known by the Debtors to have interests in any loan documents associated with the Property; (vi) all contractors and contract counterparties known by the Debtors to have been associated with the Property; (vii) the Title Insurer, (viii) Mercer Vine, and (ix) all parties that have requested notice in these Chapter 11 Cases pursuant to Local Rule 2002-1. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order

substantially in the form filed herewith, granting the relief requested herein and such other and

further relief as may be just and proper under the circumstances.

Dated:   February 1, 2018           */s/ Ian J. Bambrick*
         Wilmington, Delaware       YOUNG CONAWAY STARGATT & TAYLOR, LLP
                                    Sean M. Beach (No. 4070)
                                    Edmon L. Morton (No. 3856)
                                    Ian J. Bambrick (No. 5455)
                                    Allison S. Mielke (No. 5934)
                                    Rodney Square, 1000 North King Street
                                    Wilmington, Delaware 19801
                                    Tel:    (302) 571-6600
                                    Fax:    (302) 571-1253

                                    -and-

                                    GIBSON, DUNN & CRUTCHER LLP
                                    Samuel A. Newman (CA No. 217042)
                                    Oscar Garza (CA No. 149790)
                                    Daniel B. Denny (CA No. 238175)
                                    333 South Grand Avenue
                                    Los Angeles, California 90071

                                    -and-

                                    J. Eric Wise (NY No. 3000957)
                                    Matthew K. Kelsey (NY No. 4250296)
                                    Matthew P. Porcelli (NY No. 5218979)
                                    200 Park Avenue
                                    New York, New York 10166
                                    Tel:    (212) 351-4000
                                    Fax:    (212) 351-4035

                                    *Counsel to the Debtors and Debtors in Possession*