**<u>Exhibit I</u>**

**Proposed Fourth Interim DIP Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket Nos. 22, 56, 59, 130, & 363** |

### FOURTH INTERIM ORDER ON DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF

On February 13, 2018, a hearing (the "Fourth Interim Hearing") was held before this Court, the Honorable Kevin J. Carey presiding, regarding *Debtors' Motion for Entry of Interim and Final Orders (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 Authorizing Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C); and (IV) Granting Related Relief* (the "Motion")[2] filed by Woodbridge Group of Companies, LLC ("Woodbridge") and its affiliates, as debtors and debtors in possession (collectively, "Debtors")

---

[1] The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603.  The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein.  A complete list of such information may be obtained on the website of Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for Debtors.

[2] Defined terms herein are used with the same meaning as defined in the Motion unless otherwise noted.

on behalf of their respective bankruptcy estates (the "Estates") in their respective bankruptcy cases (the "Cases").[3]

Upon the record made by Debtors before and at the Fourth Interim Hearing, including the Motion and the declarations, pleadings, and papers filed with the Court relating to the Cases, and good and sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW:

A.    Procedural Findings.

1.    Petitions.  On December 4, 2017 (the "Petition Date"), Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code")[4] commencing the Cases.  Debtors continue to operate their businesses and manage their assets as "debtors in possession" pursuant to sections 1107(a) and 1108.

2.    Jurisdiction, Venue.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    Committee.  An official committee of unsecured creditors (the "Committee"), as provided for under section 1102, has been appointed in the Cases as of December 14, 2017, and an Official Committee of Unitholders (the "Unitholder Group") and Official Committee of Noteholders (the "Noteholder Group") have been appointed in the Cases as of January 23, 2018.

---

[3] On December 5, 2017, the Court entered an Order Directing the Joint Administration of Debtors' Chapter 11 Cases [ECF 45].

[4] Statutory references herein are to the Bankruptcy Code unless otherwise noted.

4.    <u>Notice</u>.  The notice of the Motion and the Fourth Interim Hearing has been provided by Debtors to certain parties-in-interest, including: (a) the Office of the United States Trustee for the District of Delaware; (b) the United States Securities and Exchange Commission; (c) the Office of the United States Attorney General for the District of Delaware; (d) the Internal Revenue Service; (e) the Committee, the Noteholder Group, and the Unitholder Group; (f) counsel to Hankey Capital, LLC as agent and lender ("<u>Lender</u>"); (g) Debtors' cash management banks; (h) those creditors holding the thirty (30) largest unsecured claims against Debtors' estates (on a consolidated basis); and (h) all parties who have requested notice in the Cases pursuant to Bankruptcy Rule 2002 (collectively, the "<u>Notice Parties</u>").  Under the exigent circumstances, such notice constitutes sufficient and appropriate notice thereof.

B.    <u>Findings Supporting the Postpetition Financing</u>.

1.    <u>Postpetition Financing</u>.  Debtors have requested from Lender loans, advances, and other financial accommodations on and after the Petition Date (the "<u>Postpetition Financing</u>") upon the findings of fact and conclusions of law made herein and upon the terms and conditions of the Loan and Security Agreement dated as of December 7, 2017, between Lender and certain specified Debtors (the "<u>Obligors</u>") on behalf of their Estates, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Loan Agreement</u>," and collectively with this Order and other documents related to and in furtherance of the Loan Agreement and the Postpetition Financing, the "<u>Loan Documents</u>");

2.    <u>Need for Postpetition Financing</u>.  Debtors have an immediate need to obtain the funds to be provided by the Postpetition Financing pursuant to the Loan Documents in order to, among other tasks, permit the orderly continuation of the operation of Debtors' businesses, minimize the disruption of their business operations, and manage and preserve the

assets of the Estates, the absence of which would immediately and irreparably harm Debtors, the

Estates, and their stakeholders;

3.      No Credit Available on Other Terms.  Debtors are unable to obtain

financing on more favorable terms to the Estates from sources other than as contemplated under

the Postpetition Financing pursuant to, and for the purposes set forth in, this Order and the Loan

Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1)

of the Bankruptcy Code as an administrative expense.  Debtors also are unable to obtain secured

credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy

Code without Debtors granting the Liens (as defined in paragraph 3.1.1 below) and the

Superpriority Claims (as defined in paragraph 3.2 below), in each case, on the terms and

conditions set forth in this Order and the Loan Documents.

4.      Business Judgment and Good Faith Pursuant to Section 364(e).  The terms

of the Postpetition Financing pursuant to the Loan Documents are fair, just, and reasonable under

the circumstances, are ordinary and appropriate for secured financing to a debtor in possession

on behalf of its bankruptcy estate, are supported by reasonably equivalent value and

consideration, reflect Debtors' exercise of their prudent business judgment consistent with their

fiduciary duties, and have been negotiated in good faith and at arms' length by and between

Lender and Debtors.  Therefore, the Postpetition Financing and credit extended under the terms

of the Loan Documents are extended in good faith by Lender as that term is used in section

364(e).

5.      Lender Adequate Protection.  The proceeds of the Collateral (defined

herein) (the "Cash Collateral") constitute "cash collateral" of Lender within the meaning of

section 363(a).  Lender is entitled to adequate protection of its interests in the Collateral pursuant

to section 361 in connection with or as a consequence of Debtors' use of the Cash Collateral, the Postpetition Financing, and the imposition of the automatic stay.  The adequate protection in favor of Lender as set forth in this Order (the "Lender Adequate Protection") and the use of the Cash Collateral as authorized by this Order are fair and reasonable; provided, however, nothing herein is an acknowledgment or recognition that the Lender Adequate Protection is in fact sufficient, or limits Lender's rights to seek additional or different adequate protection or to contest whether the Lender Adequate Protection constitutes sufficient "adequate protection" within the meaning of section 361.

    6.    Consent to Priming.  As of the Petition Date, liens of record and interests exist on the Collateral, which includes 28 parcels of real estate owned by 27 Obligors set forth in Schedule 7.4.1 to the Loan Agreement, in favor of certain Woodbridge affiliates who are also Debtors in the Cases including those Debtors identified on Exhibit B (collectively, the "Funds"). All of the Funds have consented to the priming of their liens and interests in the Collateral by the Postpetition Financing.  While the Postpetition Financing will prime liens and interests of the Funds in the Collateral, the Funds have recognized that the provision of the Postpetition Financing in and of itself provides adequate protection to the Funds because only through priming can the Funds gain access to the substantial liquidity necessary to preserve and enhance the value of the properties that serve as collateral for the Funds' primary assets.  Debtors need not, therefore, satisfy the more stringent standard for obtaining authority to grant a priming lien with respect to the liens held by and interests of the Funds in the Collateral.

    7.    Priming Lien Adequate Protection.  Woodbridge has raised funds for its operations by certain of the Woodbridge affiliates borrowing funds pursuant to promissory notes from investors including without limitation those investors set forth on Exhibit C hereto

01:22621324.15

(collectively, the "Investors").  Certain of the Investors and their successors and assigns may assert or have a lien or interest, whether directly or indirectly, in the Collateral (the "Noteholders").  Debtors are making available "conditional" adequate protection pursuant to sections 361 and 364(d) of the Bankruptcy Code to those Noteholders by providing such Noteholders with "conditional" liens and claims on Debtors' non-Collateral properties described on Exhibit D hereto (the "Adequate Protection Properties") to the extent of any diminution of any valid, unavoidable interests such Noteholders may have in the Collateral as of the Petition Date.  Debtors are also reserving funds sufficient to pay interest on any obligations owing to such Noteholders to the extent the same are found to have valid, enforceable, and unavoidable liens or interests on or in the Collateral as of the Petition Date entitled to payment of interest.

       C.      Prior Interim Orders.  On December 6, 2017, the Court entered its *Corrected Interim Order on Emergency Motion For:  Entry of Interim Order (I) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 Authorizing Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) and 4001(C); and (IV) Granting Related Relief* [ECF 59] (the "First Interim Order").  On December 21, 2017, the Court entered its *Second Interim Order on Emergency Motion For: Entry of Interim Order (i) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 Authorizing Debtors to (a) Obtain Postpetition Secured Financing, (b) Use Cash Collateral, (c) Grant Adequate Protection to Prepetition Secured Parties; (ii) Modifying the Automatic Stay; (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (iv) Granting Related Relief* [ECF 130] (the "Second Interim Order"). On January 23, 2018, the Court entered its *Third Interim Order on Emergency Motion For: Entry of Interim*

*Order (i) Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552 Authorizing Debtors to (a) Obtain Postpetition Secured Financing, (b) Use Cash Collateral, (c) Grant Adequate Protection to Prepetition Secured Parties; (ii) Modifying the Automatic Stay; (iii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c); and (iv) Granting Related Relief* [ECF 363] (the "<u>Third Interim Order</u>" and collectively with the First Interim Order and the Second Interim Order, the "<u>Interim Orders</u>").

D.    <u>Good Cause</u>.  The Postpetition Financing and relief and rights granted or acknowledged pursuant to this Order are necessary, essential, and appropriate and are in the best interest of and will benefit Debtors, their creditors, and the Estates as their implementation will, among other effects, provide Debtors on behalf of the Estates with the necessary liquidity to minimize disruption to Debtors' businesses and ongoing operations, preserve and maximize the value of the Estates for the benefit of all creditors thereof, and avoid immediate irreparable harm to Debtors, their creditors, businesses, employees, and the Estates.

E.    <u>Immediate Entry</u>.  Based upon the evidence presented in the declarations filed in the Cases and on the record, sufficient cause exists for immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).

NOW, THEREFORE, upon the record made by Debtors before and at the Fourth Interim Hearing, including the Motion and the pleadings and papers filed with the Court, having made the findings of fact and conclusions of law as set forth herein, and after due consideration and good and sufficient cause appearing therefore;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

Section 1.    <u>Authorization of Postpetition Financing.Motion Granted</u>.  The Motion is granted, and the Interim Orders are approved, on a further interim basis pursuant to sections 364,

363, and 362, and Bankruptcy Rule 4001(c)(2), on the terms and conditions of this

Order.Authorization to Borrow.  Obligors are authorized and empowered to borrow under the

Postpetition Financing and jointly and severally incur obligations to Lender on or after the

Petition Date (the "Obligations") pursuant to, and subject to the additional limitations of, the

terms and conditions of the Loan Documents and this Order, in the maximum amount of

$56,000,000 for the period commencing on the Petition Date through the date of the hearing set

forth in paragraph 6.7 hereof (the "Fourth Interim Period").

      1.3    Loan Documents.

      1.3.1    Authorization.  Debtors are authorized and empowered to enter

into, execute, deliver, perform, and comply with all of the terms, conditions, and covenants of

the Loan Documents and make all the representations therein.

      1.3.2    Approval.  The Loan Documents, and the terms, conditions,

covenants, and provisions therein, are approved and constitute sufficient and conclusive evidence

of the Postpetition Financing, the Obligations (including the Postpetition Charges (defined

herein)), the Liens, and the other rights, interests, claims, and remedies afforded to or for the

benefit of Lender pursuant to the Loan Documents.

      1.3.3    Amendments.  Lender and Obligors may amend, modify,

supplement, or waive any term, condition, covenant, or provision of any Loan Document (a

"Loan Document Modification"), which Loan Document Modification is deemed to be approved

by this Order, as follows:  (a) with respect to a Loan Document Modification that is considered

non-material or technical in nature by Debtors and Lender in their business judgment ("Non-

Material Loan Document Modification"), by further agreement of Lender and Debtors without

advance notice, motion, or further order; provided however, that Debtors shall file a notice of the

Non-Material Loan Document Modification promptly after execution thereof, and (b) with respect to a Loan Document Modification that is not a Non-Material Loan Document Modification, or other modifications to and under the DIP Documents for which no objection is made as set forth in the proviso to this paragraph; provided, however, that a copy of any such amendment, waiver, consent, or other modification shall be filed by Debtors with this Court and served by Debtors on the U.S. Trustee and the respective counsel to the Committee, if and when appointed, each of whom shall have five (5) business days from the date of such notice within which to object in writing to any such amendment, waiver, consent, or modification.  Any such amendment, waiver, consent, or modification shall only be permitted pursuant to an order of this Court.

1.4    Obligations.  The Loan Documents constitute and evidence the Obligations, which obligations are binding and enforceable against (a) Obligors, and their successors and assigns, trustees, and representatives, (b) the Estates, and any successors or representatives thereof (including without limitation a bankruptcy trustee), and (c) guarantors.

1.5    Application of Proceeds.  Lender may apply all proceeds of the Collateral, including Cash Collateral, and all other payments and consideration delivered or received by Lender in accordance with the Loan Documents to be applied by Lender to pay and satisfy Obligations.

1.6    Payments.  Obligors are authorized and required to make all payments and transfers of interests in property to Lender as provided, permitted, or required under the Loan Documents (including without limitation the transfer and deposit of funds, payments, and proceeds of the Collateral (as defined in the Loan Agreement) into a lock box or other deposit account if requested by Lender) or as otherwise required pursuant to the Loan Documents.

Lender is entitled to advance, make payment, and deduct for any fees, costs, expenses, and other charges as may be recoverable or reimbursable to Lender, or as otherwise provided in the Loan Documents (the "Postpetition Charges"), including without limitation the immediate payment and reimbursement to Lender of all present and future reasonable attorneys' fees, professionals' fees, and other fees, costs, and expenses paid or incurred by Lender, all of which constitute part of the principal amount of the Obligations. Debtors, the Committee, the Noteholder Group, the Unitholder Group, and the U.S. Trustee may object to the reasonableness of the fees, costs, and expenses included in any professional fee invoice submitted by Lender; provided that, any such objection shall be filed with this Court and served on counsel to Lender no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice; and further provided, in the event of a timely objection to any such invoice, Debtors shall nonetheless pay the entire invoice minus the amount at issue, subject to the rights of the objecting parties to have a hearing on final disposition.

     1.7     Use of Postpetition Financing and Collateral.

     1.7.1     No Use for Adverse Lender Challenges. Neither loans, advances, or other proceeds of the Postpetition Financing nor the Collateral, including Cash Collateral, can be used by Debtors or any party for any purpose relating to or in furtherance of an Adverse Lender Challenge (as defined in the Loan Agreement), including without limitation the payment of fees and costs incurred by professionals retained by Debtors or the Committee.

     Section 2.     Authorization and Conditions to Use Cash Collateral.

     2.1     Authorization to Use Cash Collateral. Debtors are authorized to use Cash Collateral during the Fourth Interim Period to satisfy the Obligations as required or provided under the Loan Documents and this Order.

01:22621324.15

2.2    <u>Procedure for Use of Cash Collateral</u>.  All Cash Collateral is to be delivered directly to Lender pursuant to the Loan Documents, or otherwise deposited by Debtors in a segregated debtor in possession account (the "<u>Cash Collateral Account</u>"), from which such Cash Collateral is to be transferred to Lender pursuant to the Loan Documents.  The Cash Collateral Account is encumbered by and subject to the Liens in favor of Lender by this Order.

2.3    <u>Reserve</u>.  In addition, although Debtors assert that the Noteholders do not have a direct interest in the Collateral or claims against Obligors, or that to the extent that the Noteholders have such an interest, such interest of the Noteholders is avoidable, pending notice to the Noteholders and further order of this Court, Debtors shall reserve in a segregated account the proceeds of payment of the Noteholders' notes and cash constituting adequate protection payments to the Noteholders provided in section 3.1.2.4 of this Order.

Section 3.    <u>Liens; Superpriority Expense Status; Adequate Protection</u>.

3.1    <u>Liens</u>.

3.1.1    <u>Liens</u>.  Subject only to the Carve Out (defined below), Lender is granted a lien on and security interest in all Collateral (as defined in the Loan Agreement) (the "<u>Collateral</u>"), including Collateral that is property of the Estates, which includes 28 parcels of real estate owned by 27 Obligors set forth in Schedule 7.4.1 to the Loan Agreement: (a) pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority priming security interest and lien on the Collateral that primes and is senior to any and all liens, interests, and claims in favor of the Funds (the "<u>Funds Liens</u>") and the Noteholders (the "<u>Noteholders Liens</u>"), whether such Funds Liens and Noteholders Liens arise or exist on or after the Petition Date and however arising or existing, which Funds Liens and Noteholders Liens are junior in priority and subordinate in all respects to the Liens (defined herein); (b) pursuant to Section 364(c)(2) of the

Bankruptcy Code, a perfected first and senior priority security interest and lien on the Collateral

to the extent such Collateral is not subject to valid, perfected, and non-avoidable liens existing as

of the Petition Date; (c) subject to clauses (a) and (b) above, pursuant to Section 364(c)(3) of the

Bankruptcy Code, a perfected priority security interest and lien on the Collateral junior only to

valid, perfected, and unavoidable liens in favor of third parties that were in existence

immediately prior to the Petition Date (other than the Funds Liens and the Noteholders Liens,

which are being primed by this Order and are junior in priority and subordinate in all respects to

the Liens) (the "Prepetition Third Party Liens"), subject only as to priority to such Prepetition

Third Party Liens (the security interests and liens in favor of Lender described in (a) through (c)

above, the "Financing Liens"); and (d) as replacement liens pursuant to sections 361 and 363 to

provide adequate protection of Lender's interest in the Collateral to the extent of any diminution

in value of the Collateral as a consequence of the use of Cash Collateral, the Postpetition

Financing, the imposition of the automatic stay, and any other consequence of the Cases (the

"Replacement Liens," and collectively with the Financing Liens, the "Liens"); provided,

however, that the Collateral does not include any claim or cause of action arising under sections

502(d), 542, 544, 547, 548, 550, or 551, and any recoveries thereof (collectively, "Avoidance

Claims"), but does include claims and causes of action arising under section 549 and any

recoveries thereof, and the proceeds realized by the Estates from the assumption and assignment,

or rejection, of any executory contract or unexpired lease under section 365.

   3.1.2 Adequate Protection of Noteholders.  Conditional on any

Noteholder establishing that it holds a valid, unavoidable, perfected lien in an Obligor's property,

each such Noteholder is hereby granted, pursuant to sections 361, 363(c)(2), 364(d)(1)(b), and

363(e) of the Bankruptcy Code, adequate protection of their respective interests, if any, in the

Collateral in an amount equal to the aggregate diminution in value thereof occurring on or after

the Petition Date, including without limitation, any such diminution resulting from the use by

Obligors of the Cash Collateral and any Lien on Collateral and the imposition of the automatic

stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Adequate

Protection Obligations") as provided in sections 3.1.2.1, 3.1.2.2, 3.1.2.3, and 3.1.2.4 below (the

"Noteholders Adequate Protection"); provided, that the Noteholders Adequate Protection, in

each case, is expressly and permanently primed, subject to, subordinate, and junior in priority in

all respects to the Liens, the Carve Out, and all other rights, interests, remedies, benefits,

consents, claims, and obligations of Lender, and that the Noteholders shall take no action and

shall have no rights of enforcement and are prohibited from exercising any right or remedy

against any Collateral other than the right to receive proceeds of Collateral only after the

payment in full of the Obligations, and shall immediately deliver to Lender any payment,

distribution, security, or proceeds received by such Noteholder on account of any Collateral

(including without limitation any payment, property, security, or distributions on account of

Collateral in the Cases, whether pursuant to a chapter 11 Plan of Reorganization or otherwise)

until the Obligations owed to Lender are paid in full, and shall hold such payment, distribution,

security, or proceeds in trust for Lender until delivered to Lender:

        3.1.2.1 Adequate Protection Liens on Collateral:  continuing valid,

binding, enforceable, and perfected, liens and security interests in and on all of the Collateral to

the extent of the Adequate Protection Obligations (the "Collateral Adequate Protection Liens").

        3.1.2.2 Additional Adequate Protection Replacement Liens: valid,

binding, enforceable, and perfected replacement liens and security on the Adequate Protection

Properties to the extent of the Adequate Protection Obligations (the "Replacement Adequate

Protection Liens" and together with the Collateral Adequate Protection Liens, the "Adequate Protection Liens"). The Adequate Protection Liens shall be conditional on the Noteholders having a valid, enforceable, and unavoidable lien on the Collateral.  Further, to the extent that the Noteholders' liens are avoided, the Noteholders are hereby authorized to seek to assert unsecured claims under section 502(h) of the Bankruptcy Code against the Estate that includes the property that was encumbered by such avoided lien.

     3.1.2.3 507(b) Claims:  an allowed super-priority administrative expense claim subject to proof against each Obligor and its respective Estate pursuant to and as provided under Section 507(b) (the "507(b) Claims").  The 507(b) Claims shall be conditional on the Noteholders having a valid, enforceable, and unavoidable lien on the Collateral.

     3.1.2.4 Adequate Protection Payments:  subject to the conditions set forth in section 3.1.2, Debtors shall promptly pay into a reserve fund all interest accruing on the obligations owing to the Noteholders, which shall be released to the Noteholders as their interests may appear when and to the extent that the Noteholders are found to have valid, enforceable, and unavoidable liens on the Collateral, but only to the extent of the diminution in value of their interest in the Collateral.

     3.1.3 Lien Priority.  Subject to the Carve-Out and, on an interim basis, the Prepetition Third Party Liens, the Liens are and will continue to be first and senior in priority to all other liens, claims, and interests of every kind and nature, whether existing or arising before or after the Petition Date, or whether created consensually, by an order of any court including this Court, or otherwise, including without limitation (a) the Funds Liens and the Noteholders Liens, irrespective of the time of recording or filing of an instrument or document or occurrence of any other act evidencing or perfecting the Funds Liens and the Noteholders Liens

01:22621324.15

and irrespective of the priorities as would otherwise be determined by reference to the Uniform

Commercial Code or other applicable laws, and (b) liens or interests granted or acknowledged in

favor of any other person or entity in conjunction with section 363, 364, or any other section of

the Bankruptcy Code.  This Order establishes, and serves as sufficient evidence of, the priority of

the Liens as senior in priority to the Funds Liens, the Noteholders Liens, and the Noteholders

Adequate Protection, and the subordination and junior priority of the Funds Liens, the

Noteholders Liens, and the Noteholders Adequate Protection to the Liens and Superpriority

Claims (defined herein), and insurers of title insurance may rely on this Order with respect to

such subordination.

           3.1.4    Lien Perfection.  This Order is sufficient and conclusive evidence

of the validity, perfection, and priority of the Liens, effective as of the date and time of entry of

the First Interim Order, without any further act that may be otherwise required, acknowledged, or

permitted under federal, state, or local ordinances, requirements, or law requiring notice, filing,

registration, recording, control, or possession of assets or other act to evidence, notice, validate,

or perfect a security interest or lien (each, a "Perfection Act").  Notwithstanding the foregoing,

Lender is authorized, but not required, to perform a Perfection Act, and Debtors are authorized

and directed to perform such act to the extent requested by Lender, including without limitation

deeds of trust, mortgages, fixture filings, deposit account control agreements, and UCC financing

statements, and in such event, the subject filing or recording office or agency is authorized to

accept, file, or record any document in regard to such act in accordance with applicable law, in

which event all such documents shall be deemed to have been filed or recorded at the time and

on the date of entry of the First Interim Order.

01:22621324.15

3.2     Superpriority Claim.   In addition to and without limiting the Liens, the Obligations constitute an allowed superpriority administrative expense priority claim in favor of Lender with senior priority in payment afforded by section 364(c)(1), which has priority in right of payment senior to all other obligations, liabilities, indebtedness, and claims of any kind and nature, now in existence or hereafter incurred by Debtors, including without limitation any and all administrative expenses of the kinds specified or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 364, 365, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 726, 1103, 1104, 1113, 1114, and other sections of the Bankruptcy Code, including those resulting from the conversion of any of the Cases pursuant to section 1112, and at all times are senior to the rights of Debtors, the Estates, any bankruptcy trustee, the claims and obligations in favor of the Funds and the Noteholders, any creditor or other party in interest in the Cases or any subsequent proceedings under the Bankruptcy Code (the "Superpriority Financing Claim"). Subject to entry of a Final Order, the Superpriority Claims include all rights in and are not reduced by Avoidance Claims.  In addition, Lender retains its right to a claim under section 507(b) (collectively with the Superpriority Financing Claim, the "Superpriority Claims").

3.3     Carve-Out.  The Liens, the Superpriority Claims, and the Noteholder Adequate Protection shall be subject only to ((a) through (d), the "Carve Out"): (a) any unpaid fees due to the United States Trustee pursuant to section 1930 of title 28 of the United States Code or otherwise and any fees due to the Clerk of the Court of the United States Bankruptcy Court for the District of Delaware; (b) all reasonable fees and expenses incurred by a trustee under section 726(b) in an amount not exceeding $100,000; (c) the reasonable expenses of members of any statutory committee (excluding fees and expenses of professional persons employed by such committee members individually); (d) to the extent allowed at any time, all

01:22621324.15

16

unpaid fees and expenses allowed by the Court of professionals or professional firms retained

pursuant to section 327 or 1103 (the "Professional Persons") through the date of the acceleration

of the maturity of the Postpetition Financing; provided that the reimbursement of out-of-pocket

expenses allowed by the Court and incurred by the members of any committee and the

Professional Persons shall not exceed the sum of: (x) prior to the delivery of a Carve-Out Trigger

Notice (defined below) the accrued amount of such professional fees and Committee expenses,

in each case, incurred prior to the delivery of such Carve-Out Trigger Notice (defined below),

plus (y) $2,000,000 for all such fees and expenses (the "Post Carve-Out Notice Trigger Cap")

incurred from and after the delivery of a written notice provided by Lender to Debtors following

the occurrence and during the continuance acceleration of the Obligations under the Loan

Documents (the "Carve-Out Trigger Notice").  The Carve-Out shall exclude any fees and

expenses incurred in connection with an Adverse Lender Challenge.

Section 4.    Default; Rights and Remedies; Relief from Stay.

4.1    Events of Default.  The occurrence of any of the following events

constitutes an "Event of Default" under this Order:

(a)    A breach, default, or failure to perform with respect to any term,

condition, covenant, or obligation under any Loan Document (including without limitation this

Order and any Interim Order);

(b)    An "Event of Default" as defined in the Loan Agreement; or

(c)    The termination, expiration, restriction, or curtailment of any

Debtor's or Estate's authority or ability to borrow the Postpetition Financing or Lender's

commitment to provide the Postpetition Financing, whether automatically or upon exercise or

notice by Lender in accordance with the Loan Documents (a "Termination Event").

01:22621324.15

4.2    <u>Rights and Remedies upon Event of Default</u>. Notwithstanding the

occurrence of an Event of Default, Obligors and the Estates of the Obligors remain liable for all

Obligations and obligated to perform and abide by all terms, conditions, covenants, and

obligations of the Loan Documents and remain bound by all restrictions and prohibitions

provided, acknowledged, or authorized under the Loan Documents, and subject to any applicable

cure periods, Lender may elect any and all consequences of such Event of Default and is entitled

to take any act or exercise any right or remedy provided in any Loan Document subject to the

this Order.  Notwithstanding the foregoing, Lender has no obligation to make loans, advances, or

provide other financial accommodations or otherwise perform its obligations under the Loan

Documents or on behalf of Debtors or the Estates immediately upon or after the occurrence of an

Event of Default or an act, event, or condition that with the giving of notice or the passage of

time, or both, would constitute an Event of Default, pursuant to the terms of the Loan

Documents.

4.3    <u>Relief from Automatic Stay</u>.  The automatic stay pursuant to section 362 is

terminated, modified, lifted, and vacated without further notice, motion, or order, and without the

14-day stay provided under Bankruptcy Rule 4001(a)(3) (which is waived by this Order), as

follows:

4.3.1    <u>Non-Default</u>.  Effective immediately (a) to implement the

Postpetition Financing pursuant to the Loan Documents, (b) to take or permit any Perfection Act,

and (c) to assess, charge, advance, deduct, and receive payments with respect to the Obligations,

and apply such payments to the Obligations pursuant to the Loan Documents, and

4.3.2    <u>Post-Default</u>.  Upon either the maturity of the Postpetition

Financing or the occurrence of an Event of Default and subject to any applicable cure periods,

01:22621324.15

after obtaining relief from this Court from the automatic stay upon hearing and five (5) business days' prior notice to respective counsel to Debtors, the Committee, the Noteholder Group, and the Unitholder Group, and the U.S. Trustee, Lender shall be entitled and empowered:

4.3.2.1 Immediately to take actions and exercise rights as provided in any Loan Document, including without limitation terminating Debtors' use of Cash Collateral otherwise authorized by this Order, directing Debtors and any account debtors or other parties that may have possession of Cash Collateral to deliver such Cash Collateral directly to Lender, withholding its consent to Debtors' use of Cash Collateral, declaring all Obligations immediately due and payable, ceasing to provide further advances, loans, and financial accommodations to or on behalf of Debtors or the Estates, setting off any Obligations with all or any portion of the Collateral or proceeds thereof, and terminating Lender's commitment to provide any further advances, loans, and financial accommodations to for the benefit of Debtors, but not including Collateral Enforcement Rights (defined herein); and

4.3.2.2 Upon Debtor's failure to cure an Event of Default within a five (5) business day period after the delivery of a notice of an Event of Default to Debtors, counsel for Debtors, the Committee, the Noteholder Group, and the Unitholder Group, and the U.S. Trustee referred to in paragraph 4.3.2, and upon the maturity of the Postpetition Financing, to take actions and exercise rights and remedies with respect to the Collateral, including foreclosing upon or conducting a sale of any Collateral ("Collateral Enforcement Rights"). Notwithstanding the foregoing, Debtors may seek an order of the Court on an emergency basis extending the automatic stay to stay such exercise by Lender for "cause." Upon Lender's request, the Court shall enter a further Order with respect to the termination of the automatic stay and the grant of relief from the automatic stay consistent with the terms of this Order, although the entry

of such further order does not limit the effectiveness of such relief as provided and granted in this Order.

        4.4    <u>Right to Credit Bid</u>.  Lender has the right to use any or all of the Obligations owed to Lender to credit bid with respect to any sale of all or any portion of the Collateral pursuant and subject to section 363(k).

        4.5    <u>No Duty to Marshall</u>. Upon entry of a Final Order, neither Lender nor the Collateral is subject to the doctrine of marshaling with respect to the Collateral.

        Section 5.    <u>Representations; Covenants; and Waivers</u>.

        5.1    <u>Debtors' Waivers</u>.  Debtors irrevocably waive any rights (a) to seek authority prior to satisfaction of the Obligations in full, to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) other than from Lender unless such authority results in the Obligations being indefeasibly paid in full, in cash, (b) to challenge the application of any payments authorized by this Order pursuant to section 506(b), and (c) to propose or support a plan of reorganization that does not provide for the indefeasible payment of all Obligations owed to Lender in full, in cash, upon the effective date of such plan of reorganization or is otherwise inconsistent with the Loan Documents unless Lender consents.

        5.2    <u>Section 506(c) Waiver</u>.  Upon entry of a Final Order, no costs or expenses of administration incurred in the Cases during the Fourth Interim Period may be charged against Lender or the Collateral pursuant to sections 105, 326, 327, 330, 331, 503(b), 506(c), 507(a), or the "equity exception" in section 552(b), section 726, or any other provision of the Bankruptcy Code, or any similar principle of law without the prior written consent of Lender, and no such consent shall be implied from any other action, inaction or acquiescence by Lender.

01:22621324.15

5.3     Liens Senior to Certain Other Liens.  Without prejudice to seeking a lien pursuant to section 364(d) in connection with a Final Order on the Motion, the Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, mechanics' liens, materialmens' liens, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of Debtors. For the avoidance of doubt, the Liens and the Superpriority Claims, in each case, in respect of all Obligations, shall be neither subject nor subordinate to disgorgement or to any other rights, claims, or remedies asserted or assertable by the Securities and Exchange Commission or any other governmental unit, person or entity.

Section 6.     Other Rights and Obligations.

6.1     No Modification or Stay of this Order.  Notwithstanding any other order of the Court or act by any party, the acts taken by Lender in accordance with this Order, the Obligations, and all rights, interests, remedies, benefits, consents, claims, and obligations, including without limitation the Obligations, the Liens, and the Superiority Claims, shall not be modified, amended, reduced, or restricted without the express consent of Lender, shall be governed in all respects by the original provisions of this Order, and shall remain valid, effective, authorized, and in full force and effect pursuant to section 364(e).  If any or all of the provisions of this Order are reversed, modified, vacated, or stayed for any reason, such reversal, modification, vacation, or stay does not affect (a) the validity and existence of any Obligations owing to Lender, including obligations arising from loans, advances, or other financial accommodations provided by Lender incurred prior to the actual receipt by Lender, as

01:22621324.15

applicable, of written notice of the effective date of such reversal, modification, vacation, or stay, or (b) the validity or enforceability of any Lien or Superpriority Claim.  For purposes of section 364(e), "appeal" shall include any proceeding for reconsideration, amending, vacating, rehearing, or re-evaluation of this Order by this Court or any other tribunal.

   6.2 <u>Power to Waive Rights; Duties to Third Parties</u>.  Lender has the right to waive any interest, claim, right, remedy, or privilege in favor of Lender provided for or acknowledged in any Loan Document including without limitation this Order and any Interim Order (collectively, "<u>Lender Rights</u>"), and has no obligation or duty to any other party with respect to or by reason of Lender's exercise or enforcement, or delay or failure to exercise or enforce, any Lender Right.

   6.3 <u>Reservation of Rights</u>.  This Order is in addition to and without prejudice to the rights of Lender to pursue any and all rights and remedies under the Bankruptcy Code, the Loan Documents, any other contract, at law, or in equity.

   6.4 <u>"Responsible Person."</u>  By accepting any budget submitted by Debtors or by taking any actions pursuant to or authorized by the Loan Documents, Lender is not deemed to be (a) in control of the operations or liquidation of Debtors, or (b) a "responsible person" with respect to the operation, management, or liquidation of Debtors.

   6.5 <u>Binding Effect</u>.  This Order is and continues to be binding upon Debtors, all parties in interest in the Cases (including without limitation landlords, lessors, and other parties asserting an interest of real property where Collateral may be located), and each of their respective successors and assigns, including any trustee, notwithstanding any further order, including dismissal of any of the Cases or conversion of any of the Cases to a case under another chapter of the Bankruptcy Code.

01:22621324.15

6.6    <u>Survival of Order</u>.  The provisions of this Order, the Liens granted and acknowledged by this Order, the priorities afforded to the Liens and claims in favor of Lender, and any actions taken pursuant thereto (a)  survive the entry of any order: (i) confirming any plan of reorganization in the Cases, (ii) converting any of the Cases to a cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Cases; and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, liens, and security interests granted pursuant to this Order maintain its priority as provided by this Order until all of the Obligations are indefeasibly paid in full and discharged in accordance with the terms of the Loan Documents.  The Obligations shall not be discharged by the entry of any order confirming any plan of reorganization in the Cases unless such Obligations are satisfied in full, in cash, pursuant to such plan of reorganization, and Debtors waives, and is deemed to have waived any such discharge pursuant to section 1141(d)(4).

6.7    <u>Final Hearing and Response Date</u>.  A final hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) (the "<u>Final Hearing</u>") for entry of an order granting the motion on a "final basis" (the "<u>Final Order</u>") shall be held on March 8, 2018, at 10:00 a.m. before this Court. The proposed Final Order will (i) be filed before the Final Hearing, (ii) contain, among other forms of relief, (a) a waiver of the right of any party pursuant to section 506(c) of the Bankruptcy Code or otherwise to surcharge any costs or expenses of administration of the Cases against or recovered from or against Lender, without the prior written consent of Lender, as applicable; (b) a waiver of the application of the equitable doctrine of "marshalling" or any other similar doctrine as against Lender with respect to any of the Collateral, as applicable; (c) provisions regarding the right of Lender to credit bid Obligations with respect to any sale of all or any portion of the Collateral pursuant to section 363(k); and (d) upon the entry of a Final Order, provisions that provide that the Liens granted hereunder as adequate protection and to secure the Obligations owing to Lender shall attach to and be perfected with respect to, and the

super-priority claims owing in respect of adequate protection and to Lender in respect of the

Obligations shall be payable from, the proceeds of Avoidance Claims.

Notwithstanding the entry of this Fourth Interim Order, any and all rights of the

Committee and the Noteholder Group, and the Unitholder Group to object to the terms of the

Final Order are expressly preserved and nothing herein shall be construed as an admission or

waiver of any such rights, specifically including, without limitation, any unpaid closing fees

payable under the Loan Documents in connection with the Final Order.

Within three (3) business days of entry of this Order, Debtors shall serve, by

United States mail, first-class postage prepaid, (such notice constituting adequate notice of the

Final Hearing), notice of the entry of this Order (the "Final Hearing Notice") upon the

Noteholders, the Notice Parties, and counsel for the Committee and the Noteholder Group, and

the Unitholder Group.

The Final Hearing Notice shall state that any party in interest objecting to the

entry of the proposed Final Order shall file a written objection with the Clerk of the Court no

later than March 1, 2018, which objection shall be served so that it is actually received on or

before 4:00 p.m. (prevailing Eastern time) on such date by: (a) counsel for Debtors, Gibson,

Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071-3197; Attn: Samuel

Newman; Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York 10166; Attn:

J. Eric Wise; Young Conway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street,

Wilmington, DE 19801, Attn: Sean Beach and Edmon Morton; (c) counsel for Lender,

Buchalter, 1000 Wilshire Boulevard, Suite 1500, Los Angeles, CA 90017-1730; Attn: William

Brody; Richards Layton & Finger, LLP, One Rodney Square, 920 North King Street,

Wilmington, DE 19801, Attn: John Knight; (d) counsel for the Committee, Pachulski Stang Ziehl

& Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, CA 90067-4003; Attn:

Richard Pachulski; (e) counsel to the Noteholder Group, Drinker Biddle & Reath LLP, 222

Delaware Ave., Ste. 1410, Wilmington, Delaware 19801 (Attn: Steven K. Kortanek); (f) counsel

to the Unitholder Group, Venable, LLP, 1270 Avenue of the Americas, 24th Floor, New York,

NY 10020 (Attn: Jeffrey S. Sabin) (g) the Office of the United States Trustee for the District of

Delaware and shall be filed with the Clerk of the United States Bankruptcy Court for the District

of Delaware.

Dated: February 13, 2017
      Wilmington, DE

_____
Kevin J. Carey
United States Bankruptcy Judge

**Exhibit A**

**Loan Agreement**

## SENIOR SECURED DEBTOR IN POSSESSION
## LOAN AND SECURITY AGREEMENT

Dated as of December 7, 2017

### WOODBRIDGE GROUP OF COMPANIES, LLC,

### AND

### THE SUBSIDIARIES OF PARENT IDENTIFIED ON THE SIGNATURE PAGES HEREOF

as Borrowers

### HANKEY CAPITAL, LLC,

as Agent

### AND

### THE LENDERS THAT ARE PARTIES HERETO

as the Lenders

**Table of Contents**

Page

SECTION 1.    DEFINITIONS; RULES OF CONSTRUCTION ...............................................1

1.1    Definitions ...............................................................................................1
1.2    Accounting Terms .................................................................................15
1.3    Uniform Commercial Code ..................................................................15
1.4    Certain Matters of Construction ...........................................................15

SECTION 2.    CREDIT FACILITIES ...............................................................................15

2.1    Term Loan Commitment .......................................................................15

SECTION 3.    INTEREST, FEES AND CHARGES .........................................................16

3.1    Interest ..................................................................................................16
3.2    Closing Fees ..........................................................................................16
3.3    Computation of Interest, Fees, Yield Protection ..................................17
3.4    Reimbursement Obligations .................................................................17
3.5    [Reserved] .............................................................................................17
3.6    [Reserved] .............................................................................................17
3.7    Increased Costs; Capital Adequacy ......................................................17
3.8    Mitigation ..............................................................................................18
3.9    [Reserved] .............................................................................................18
3.10   Maximum Interest .................................................................................18

SECTION 4.    LOAN ADMINISTRATION ......................................................................18

4.1    Manner of Borrowing and Funding Term Loans ..................................18
4.2    Defaulting Lender .................................................................................19
4.3    [Reserved] .............................................................................................19
4.4    Borrower Agent .....................................................................................19
4.5    One Obligation ......................................................................................19
4.6    Effect of Termination ...........................................................................20

SECTION 5.    PAYMENTS ...............................................................................................20

5.1    General Payment Provisions .................................................................20
5.2    [Reserved] .............................................................................................20
5.3    Repayment of Term Loans ....................................................................20
5.4    Payment of Other Obligations ..............................................................21
5.5    Marshaling; Payments Set Aside ..........................................................21
5.6    Application and Allocation of Payments ...............................................21
5.7    [Reserved] .............................................................................................22
5.8    Account Stated .......................................................................................22
5.9    Taxes ......................................................................................................22
5.10   Lender Tax Information .........................................................................23
5.11   Nature and Extent of Each Borrower's Liability ..................................25

SECTION 6.    CONDITIONS PRECEDENT .....................................................................27

6.1    Conditions Precedent to Initial Loans ..................................................27
6.2    Conditions Precedent to All Credit Extensions ....................................27
6.3    Conditions Subsequent ..........................................................................27

BN 31491395v6

**Table of Contents**
(continued)

|  |  | Page |
|---|---|---|
| SECTION 7. | COLLATERAL | 28 |
| 7.1 | Grant of Security Interest | 28 |
| 7.2 | Deposit Accounts | 28 |
| 7.3 | Cash Collateral | 29 |
| 7.4 | Real Estate Collateral | 29 |
| 7.5 | [Reserved] | 30 |
| 7.6 | Limitations | 30 |
| 7.7 | Further Assurances | 30 |
| 7.8 | Foreign Subsidiary Stock | 31 |
| 7.9 | Release of Collateral | 31 |
| SECTION 8. | COLLATERAL ADMINISTRATION | 31 |
| 8.1 | [Reserved] | 31 |
| 8.2 | [Reserved] | 31 |
| 8.3 | [Reserved] | 31 |
| 8.4 | [Reserved] | 31 |
| 8.5 | [Reserved] | 31 |
| 8.6 | General Provisions | 31 |
| 8.7 | Power of Attorney | 32 |
| SECTION 9. | REPRESENTATIONS AND WARRANTIES | 33 |
| 9.1 | General Representations and Warranties | 33 |
| 9.2 | Complete Disclosure | 36 |
| SECTION 10. | COVENANTS AND CONTINUING AGREEMENTS | 36 |
| 10.1 | Affirmative Covenants | 36 |
| 10.2 | Negative Covenants | 38 |
| SECTION 11. | EVENTS OF DEFAULT; REMEDIES ON DEFAULT | 41 |
| 11.1 | Events of Default | 41 |
| 11.2 | Remedies upon Default | 43 |
| 11.3 | License | 44 |
| 11.4 | Setoff | 44 |
| 11.5 | Remedies Cumulative; No Waiver | 44 |
| SECTION 12. | AGENT | 44 |
| 12.1 | Appointment, Authority and Duties of Agent | 44 |
| 12.2 | Agreements Regarding Collateral and Borrower Materials | 45 |
| 12.3 | Reliance By Agent | 46 |
| 12.4 | Action Upon Default | 46 |
| 12.5 | Ratable Sharing | 46 |
| 12.6 | Indemnification | 46 |
| 12.7 | Limitation on Responsibilities of Agent | 47 |
| 12.8 | Successor Agent and Co-Agents | 47 |
| 12.9 | Due Diligence and Non-Reliance | 48 |
| 12.10 | Remittance of Payments and Collections | 48 |

BN 31491395v6

**Table of Contents**
(continued)

|  |  | Page |
|---|---|---|
| 12.11 | Individual Capacities | 48 |
| 12.12 | Titles | 49 |
| 12.13 | [Reserved] | 49 |
| 12.14 | No Third Party Beneficiaries | 49 |
| SECTION 13. | BENEFIT OF AGREEMENT; ASSIGNMENTS | 49 |
| 13.1 | Successors and Assigns | 49 |
| 13.2 | Participations | 49 |
| 13.3 | Assignments | 50 |
| 13.4 | Replacement of Certain Lenders | 51 |
| SECTION 14. | MISCELLANEOUS | 51 |
| 14.1 | Consents, Amendments and Waivers | 51 |
| 14.2 | Indemnity | 52 |
| 14.3 | Notices and Communications | 52 |
| 14.4 | Performance of Borrowers' Obligations | 53 |
| 14.5 | Credit Inquiries | 53 |
| 14.6 | Severability | 53 |
| 14.7 | Cumulative Effect; Conflict of Terms | 53 |
| 14.8 | Counterparts; Execution | 53 |
| 14.9 | Entire Agreement | 54 |
| 14.10 | Relationship with Lenders | 54 |
| 14.11 | No Advisory or Fiduciary Responsibility | 54 |
| 14.12 | Confidentiality | 54 |
| 14.13 | GOVERNING LAW | 55 |
| 14.14 | Consent to Forum; Bail-In of EEA Financial Institutions | 55 |
| 14.15 | Waivers by Borrowers | 56 |
| 14.16 | Patriot Act Notice | 56 |
| 14.17 | NO ORAL AGREEMENT | 56 |

BN 31491395v6

## TABLE OF CONTENTS

### LIST OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Assignment |
| Exhibit B | Assignment Notice |
| Exhibit C | Form of Interim Financing Order |
| Exhibit D | Form of Final Financing Order |
| | |
| Schedule 1.1 | Commitments of Lenders |
| Schedule 7.4.1 | Schedule of Real Estate Collateral (& Legal Descriptions) |
| Schedule 8.6.1 | Business Locations |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9.1.13 | Environmental Matters |
| Schedule 9.1.15 | Litigation |
| Schedule 10.2.2 | Existing Liens |
| Schedule 10.2.17 | Existing Affiliate Transactions |

BN 31491395v6

# SENIOR SECURED DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of December 7, 2017, among **WOODBRIDGE GROUP OF COMPANIES, LLC**, a Delaware limited liability company ("Parent"), and certain of the Subsidiaries of Parent identified on the signature pages hereof, and their respective Estates (such Subsidiaries, together with Parent, as debtors in possession on behalf of respective Estates (defined below), are referred to hereinafter each individually as a "Borrower", and individually and collectively, jointly and severally, as "Borrowers"), the entities party to this Agreement from time to time as Lenders, and **HANKEY CAPITAL, LLC**, a California limited liability company ("Hankey Capital"), as agent for the Lenders (in such capacity, "Agent").

## R E C I T A L S :

WHEREAS, Borrowers have commenced the Bankruptcy Cases, and retain possession of their assets and are authorized under the Bankruptcy Code to continue the operation of their businesses each as a debtor-in-possession;

WHEREAS, subject to entry of the Applicable Financing Orders in the Bankruptcy Cases, the Borrowers shall be authorized to execute and deliver this Agreement and to incur indebtedness to the Agent and Lenders, and Agent and Lenders may provide loans, advances and other financial accommodations to the Borrowers after the Petition Date secured by virtually all assets and properties of the Borrowers; and

WHEREAS, Borrowers have requested that Agent and Lenders provide a credit facility to Borrowers to finance their mutual and collective business enterprise. Agent and Lenders are willing to provide the credit facility on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** for valuable consideration hereby acknowledged, the parties agree as follows:

## SECTION 1.    DEFINITIONS; RULES OF CONSTRUCTION

1.1    **Definitions**. As used herein, the following terms have the meanings set forth below:

Adverse Lender Challenge: (a) an assertion or act in furtherance of any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek an order, judgment, determination, or similar relief: (i) challenging or contesting the legality, validity, priority, amount, or enforceability of the Obligations, (ii) challenging or contesting the legality, validity, priority, or enforceability, or seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, any lien or interest in favor of Agent or any Lender in the Collateral, or (iii) seeking to prevent, hinder, or delay the assertion or enforcement by Agent or any Lender of any right, remedy, claim, benefit, or privilege of, or lien or interest in favor of Lender in the Collateral or realization upon any Collateral, (b) a request to use cash collateral without such party's consent, except as provided in the Loan Agreement, (c) any negotiation, solicitation, or attempt to obtain Borrowed Money on or after the Petition Date (other than Borrowed Money that would be used to pay all Obligations in full or otherwise permitted hereunder) pursuant to section 364(c) or (d) of the Bankruptcy Code other than from Agent and Lenders or such other party without Agent's consent, (d) the commencement, prosecution, participation, or support of any action or proceeding with respect to any claim, cause of action, or defense against Agent or any Lender, or any of its officers, directors, employees, agents, attorneys, affiliates, assigns, successors and representatives, including without limitation any attempt to recover on an Avoidance Action from any such party, or (e) any act which has the effect of materially modifying or compromising any right, remedy, claim, benefit, or privilege of Agent or any Lender.

1

**Affiliate**: with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have correlative meanings.

**Agent Indemnitees**: Agent and its officers, directors, employees, Affiliates, agents and attorneys.

**Agent Professionals**: attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Agent.

**Allocable Amount**: as defined in **Section 5.11.3**.

**Anti-Terrorism Law**: any law relating to terrorism or money laundering, including the Patriot Act.

**Applicable Financing Order**: the Interim Financing Order, until such time as it is superseded by the Final Financing Order, at which time "Applicable Financing Order" will mean the Final Financing Order.

**Applicable Law**: all laws, rules, regulations and governmental guidelines applicable to the Person or matter in question, including statutory law, common law and equitable principles, as well as provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

**Applicable Margin**: five percent (5.0%) per annum.

**Asset Disposition**: a sale, lease, license, consignment, transfer or other disposition of Property of an Obligor, including any disposition in connection with a sale-leaseback transaction or synthetic lease.

**Assignment**: an assignment agreement between a Lender and Eligible Assignee, in the form of **Exhibit A** or otherwise satisfactory to Agent.

**Avoidance Actions**: claims, actions, causes of action, and proceeds thereof arising pursuant to sections 544, 545, 547, 548, 549, 550, or 551 of the Bankruptcy Code and, to the extent applicable under the foregoing, section 550 of the Bankruptcy Code, but specifically excluding claims, actions, or causes of action under section 549.

**Bail-In Action**: the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

**Bail-In Legislation**: with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

**Bankruptcy Cases**: collectively, the cases commenced by each Borrower and each Obligor under Chapter 11 of the Bankruptcy Code before the Bankruptcy Court, bearing case nos. Woodbridge Group of Companies, LLC; Case No. 1:17-bk-12560 KJC; Addison Park Investments, LLC; Case No. 1:17-bk-12563 KJC; Bluff Point Investments, LLC; Case No. 1:17-bk-12722 KJC; Summit Cut Investments, LLC; Case No. 1:17-bk-12640 KJC; Lilac Meadow Investments, LLC; Case No. 1:17-bk-12728 KJC; Diamond Cove Investments, LLC; Case No. 1:17-bk-12705 KJC; Heilbron Manor Investments, LLC; Case No. 1:17-bk-12681 KJC; Thornbury Farm Investments, LLC; Case No. 1:17-bk-12651 KJC; Sagebrook Investments, LLC; Case No. 1:17-bk-12830 KJC; Imperial Aly Investments, LLC; Case No. 1:17-bk-12708 KJC; Gravenstein Investments, LLC; Case No. 1:17-bk-12632 KJC; ; Silver Maple

Investments, LLC; Case No. 1:17-bk-12836 KJC; Goosebrook Investments, LLC; Case No. 1:17-bk-12617 KJC; Elstar Investments, LLC; Case No. 1:17-bk-12782 KJC; Hornbeam Investments, LLC; Case No. 1:17-bk-12694 KJC Silk City Investments, LLC; Case No. 1:17-bk-12834 KJC; Hollyline Owners, LLC; Case No. 1:17-bk-12688 KJC; Crowfield Investments, LLC; Case No. 1:17-bk-12660 KJC; Centershot Investments, LLC; Case No. 1:17-bk-12586 KJC; Graeme Park Investments, LLC; Case No. 1:17-bk-12622 KJC; Mason Run Investments, LLC; Case No. 1:17-bk-12751 KJC; Pinney Investments, LLC; Case No. 1:17-bk-12808 KJC; Drawspan Investments, LLC; Case No. 1:17-bk-12767 KJC; Doubleleaf Investments, LLC; Case No. 1:17-bk-12755 KJC; White Birch Investments, LLC; Case No. 1:17-bk-12702 KJC; Lincolnshire Investments, LLC; Case No. 1:17-bk-12733 KJC; Arlington Ridge Investments, LLC; Case No. 1:17-bk-12576 KJC; and Bay Village Investments, LLC; Case No. 1:17-bk-12604 KJC, and jointly administered under case No.: Woodbridge Group of Companies, LLC; Case No. 1:17-bk-12560 KJC.

Bankruptcy Code: Title 11 of the United States Code.

Bankruptcy Court: the United States Bankruptcy Court for the District of Delaware or any such other court before which the Bankruptcy Cases are pending.

Bankruptcy Parties: each Obligor and each other party that is a debtor in the Bankruptcy Cases.

Base Rate: for any day, a per annum rate equal to the Prime Rate for such day.

Base Rate Loan: any Loan that bears interest based on the Base Rate.

Board of Governors: the Board of Governors of the Federal Reserve System.

Borrowed Money: with respect to any Obligor, without duplication, its (a) Debt that (i) arises from the lending of money by any Person to such Obligor, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), or (iv) was issued or assumed as full or partial payment for Property; (b) Capital Leases; (c) letter of credit reimbursement obligations; and (d) guaranties of any of the foregoing owing by another Person.

Borrower Agent: as defined in **Section 4.4**.

Borrower Materials: information, reports, financial statements and other materials delivered by Borrowers hereunder, as well as other Reports and information provided by Agent to Lenders.

Borrowing: a group of Loans that are made on the same day.

Borrowing Base: means, on any date of determination, an amount equal to the lesser of (a) the aggregate Term Loan Commitments or (b) the Real Estate Formula Amount.

Business Day: any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, California.

Capital Lease: any lease required to be capitalized for financial reporting purposes in accordance with GAAP.

Carve Out: has the meaning set forth in the Applicable Financing Orders.

Cash Collateral: the cash rents, issues, profits, products, and proceeds of the Collateral, of any kind and nature, within the meaning of section 363(a) of the Bankruptcy Code.

CERCLA: the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 9601 *et seq*.).

Change in Law: the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; provided, however, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, rules, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

Claims: all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs, reasonable attorneys' fees and Extraordinary Expenses) at any time (including after Full Payment of the Obligations or replacement of Agent or any Lender) incurred by any Indemnitee or asserted against any Indemnitee by any Obligor or other Person, in any way relating to (a) any Loans, Loan Documents, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Obligor to perform or observe any terms of any Loan Document after taking into account all applicable notice, cure and/or grace periods, in each case including all costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

Closing Date: as defined in **Section 6.1**.

Code: the Internal Revenue Code of 1986.

Collateral: all Property described in **Section 7.1,** the Real Estate Collateral, all Property described in any Security Documents as security for any Obligations, and all other Property that now or hereafter secures (or is intended to secure) any Obligations.

Committee: any official committee appointed in any Bankruptcy Case under section 1102 of the Bankruptcy Code.

Commitment: for any Lender, the aggregate amount of such Term Loan Commitment. "Commitments" means the aggregate amount of all Term Loan Commitments.

Connection Income Taxes: Other Connection Taxes that are imposed on or measured by net income (however denominated), or are franchise or branch profits Taxes.

Contingent Obligation: any obligation of a Person arising from a guaranty, indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("primary obligations") of another obligor ("primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase Property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary

4

obligation against loss in respect thereof. The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto.

CWA: the Clean Water Act (33 U.S.C. §§ 1251 *et seq.*).

Debt: as applied to any Person, without duplication, (a) all obligations for Borrowed Money and all obligations evidenced by bonds, debentures, notes, loan agreements or other similar instruments, including Capital Leases, (b) all obligations of such Person to pay the deferred purchase price of property or services, excluding trade payables incurred and being paid in the Ordinary Course of Business; (c) all Contingent Obligations; (d) all reimbursement obligations in connection with letters of credit issued for the account of such Person; and (e) in the case of a Borrower, the Obligations. The Debt of a Person shall include any recourse Debt of any partnership in which such Person is a general partner.

Default: an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

Default Rate: for any Obligation (including, to the extent permitted by law, interest not paid when due), 3% plus the interest rate otherwise applicable thereto.

Defaulting Lender: any Lender that (a) has failed to comply with its funding obligations hereunder, and such failure is not cured within two Business Days; (b) has notified Agent or any Borrower that such Lender does not intend to comply with its funding obligations hereunder or under any other credit facility, or has made a public statement to that effect; (c) has failed, within three Business Days following request by Agent or any Borrower, to confirm in a manner satisfactory to Agent and Borrowers that such Lender will comply with its funding obligations hereunder; or (d) has, or has a direct or indirect parent company that has, become the subject of an Insolvency Proceeding (including reorganization, liquidation, or appointment of a receiver, custodian, administrator or similar Person by the Federal Deposit Insurance Corporation or any other regulatory authority) or Bail-In Action; provided, however, that a Lender shall not be a Defaulting Lender solely by virtue of a Governmental Authority's ownership of an equity interest in such Lender or parent company unless the ownership provides immunity for such Lender from jurisdiction of courts within the United States or from enforcement of judgments or writs of attachment on its assets, or permits such Lender or Governmental Authority to repudiate or otherwise to reject such Lender's agreements.

Designated Jurisdiction: a country or territory that is the subject of a Sanction.

Distribution: any declaration or payment of a distribution, interest or dividend on any Equity Interest (other than payment-in-kind); distribution, advance or repayment of Debt to a holder of Equity Interests; or purchase, redemption, or other acquisition or retirement for value of any Equity Interest.

Dollars: lawful money of the United States.

EEA Financial Institution: (a) any credit institution or investment firm established in an EEA Member Country that is subject to the supervision of an EEA Resolution Authority; (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) above; or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in the foregoing clauses and is subject to consolidated supervision with its parent.

EEA Member Country: any of the member states of the European Union, Iceland, Liechtenstein and Norway.

EEA Resolution Authority: any public administrative authority or any Person entrusted with public administrative authority of an EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

Eligible Assignee: a Lender or an Affiliate of a Lender.

Enforcement Action: any action to enforce any Obligations or Loan Documents or to exercise any rights or remedies relating to any Collateral, whether by judicial action, self-help, notification of Account Debtors, setoff or recoupment, credit bid, deed in lieu of foreclosure, action in an Insolvency Proceeding or otherwise.

Entry: means notation of a document or event on the docket relating to any Bankruptcy Case maintained by the Bankruptcy Court.

Environmental Laws: Applicable Laws (including programs, permits and guidance promulgated by regulators) relating to public health (other than occupational safety and health regulated by OSHA) or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

Environmental Notice: a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

Environmental Release: a release as defined in CERCLA or under any other Environmental Law.

Equity Interest: the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest.

ERISA: the Employee Retirement Income Security Act of 1974.

ERISA Affiliate: any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

ERISA Event: (a) a Reportable Event with respect to a Pension Plan; (b) withdrawal of an Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) complete or partial withdrawal of an Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) filing of a notice of intent to terminate, treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, or institution of proceedings by the PBGC to terminate a Pension Plan; (e) determination that a Pension Plan is considered an at-risk plan or a plan in critical or endangered status under the Code or ERISA; (f) an event or condition that constitutes grounds under Section 4042 of ERISA for termination of, or appointment of a trustee to administer, any Pension Plan; (g) imposition of any liability on an Obligor or ERISA Affiliate under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA; or (h) failure by an Obligor or ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or to make a required contribution to a Multiemployer Plan.

Estates: the estates created pursuant to section 541 of the Bankruptcy Code with respect to the Bankruptcy Cases, which includes all assets and interests in assets contained therein.

6

EU Bail-In Legislation Schedule: the EU Bail-In Legislation Schedule published by the Loan Market Association, as in effect from time to time.

Event of Default: as defined in **Section 11**.

Excluded Assets: as defined in **Section 7.1**.

Excluded Taxes: (a) Taxes imposed on or measured by a Recipient's net income (however denominated), franchise Taxes and branch profits Taxes (i) as a result of such Recipient being organized under the laws of, or having its principal office or applicable Lending Office located in, the jurisdiction imposing such Tax, or (ii) constituting Other Connection Taxes; (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to its interest in a Loan or Commitment pursuant to a law in effect when the Lender acquires such interest (except pursuant to an assignment request by Borrower Agent under **Section 13.4**) or changes its Lending Office, unless the Taxes were payable to its assignor immediately prior to such assignment or to the Lender immediately prior to its change in Lending Office; (c) Taxes attributable to a Recipient's failure to comply with **Section 5.10**; and (d) U.S. federal withholding Taxes imposed pursuant to FATCA. In no event shall "Excluded Taxes" include any withholding Tax imposed on amounts paid by or on behalf of a foreign Obligor to a Recipient that has complied with **Section 5.10.2**.

Extraordinary Expenses: all reasonable and documented costs, expenses or advances that Agent or any Lender may incur during an Event of Default, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Agent or any Lender in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Agent's Liens with respect to any Collateral), Loan Documents or Obligations, including any lender liability or other Claims; (c) the exercise of any rights or remedies of Agent in, or the monitoring of, the Bankruptcy Cases; (d) settlement or satisfaction of taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; and (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations. Such costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, legal fees, appraisal fees, brokers' and auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors, in each case, in liquidating any Collateral, and any related travel expenses.

FATCA: Sections 1471 through 1474 of the Code (including any amended or successor version if substantively comparable and not materially more onerous to comply with), and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

Final Financing Order: a Financing Order after a final hearing pursuant to Bankruptcy Rule 4001(c)(2).

Financing Order(s): individually and collectively, orders of the Bankruptcy Court entered in any Bankruptcy Case, and related findings of fact and conclusions of law in support thereof, authorizing the incurrence of indebtedness by a Borrower and its Estate to Secured Parties, the provision of Loans, and other financial accommodations from Secured Parties to or for the benefit of a Borrower and its Estate, the granting and approving of liens, interests, priority claims, and other rights in favor of Secured Parties pursuant to the Loan Documents, on an emergency, interim, final, or other basis pursuant to section 364 of the Bankruptcy Code and other applicable sections of the Bankruptcy Code as may be issued or entered in the Bankruptcy Case, each and all in form and substance acceptable to Secured Parties in their sole and absolute discretion, as the same may be amended, supplemented, or otherwise modified from time to time with the express written consent of Borrowers and Secured Parties as may be required to approve such

modifications, and that is not subject to any stay or injunction pending any appeal or petition for certiorari, review, rehearing, or reconsideration, or otherwise.

FLSA: the Fair Labor Standards Act of 1938.

Foreign Lender: any Lender that is not a U.S. Person.

Foreign Plan: any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Obligor.

Foreign Subsidiary: a Subsidiary that is a "controlled foreign corporation" under Section 957 of the Code, such that a guaranty by such Subsidiary of the Obligations or a Lien on the assets of such Subsidiary to secure the Obligations would result in material tax liability to Borrowers.

Full Payment: with respect to any Obligations, the full and permanent cash payment thereof, including any interest, fees and other charges accruing during an Insolvency Proceeding (whether or not allowed in the proceeding), other than contingent indemnification obligations for which no claim has been made. No Loans shall be deemed to have been paid in full unless all Commitments related to such Loans are terminated. "Paid in Full" shall have a correlative meaning.

GAAP: generally accepted accounting principles in effect in the United States from time to time.

Governmental Approvals: all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities.

Governmental Authority: any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, central bank, or other entity or officer exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions for any governmental, judicial, investigative, regulatory or self-regulatory authority (including the Financial Conduct Authority, the Prudential Regulation Authority and any supra-national bodies such as the European Union or European Central Bank).

Guarantor Payment: as defined in **Section 5.11.3**.

Guarantors: each other Person that guarantees payment or performance of Obligations.

Guaranty: each guaranty agreement executed by a Guarantor in favor of Agent and the Lenders.

Hankey Capital Indemnitees: Hankey Capital and its officers, directors, employees, Affiliates, agents and attorneys.

Indemnified Taxes: (a) Taxes, other than Excluded Taxes, imposed on or relating to any payment of an Obligation; and (b) to the extent not otherwise described in clause (a), Other Taxes.

Indemnitees: Agent Indemnitees, Lender Indemnitees and Hankey Capital Indemnitees.

Initial Term Loan Draw: as defined in **Section 2.1**.

Insolvency Proceeding: any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

8

Intellectual Property: all intellectual and similar Property of a Person, including inventions, designs, patents, copyrights, trademarks, service marks, trade names, trade secrets, confidential or proprietary information, customer lists, know-how, software and databases; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

Intellectual Property Claim: any claim or assertion (whether in writing, by suit or otherwise) that a Borrower's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other Property violates another Person's Intellectual Property.

Interest Rate Floor: means nine and one-half percent (9.50%) per annum.

Interim Financing Order: a Financing Order entered after a hearing held within 15 days after service of a motion requesting issuance and entry of a Financing Order under Bankruptcy Rule 4001(b)(2) and (c)(2).

Inventory: as defined in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in a Borrower's business (but excluding Equipment).

IRS: the United States Internal Revenue Service.

Lender Indemnitees: Lenders and their officers, directors, employees, Affiliates, agents and attorneys.

Lenders: lenders party to this Agreement and any Person who hereafter becomes a "Lender" pursuant to an Assignment, including any Lending Office of the foregoing.

Lending Office: the office (including any domestic or foreign Affiliate or branch) designated as such by a Lender by notice to Agent and Borrower Agent.

License: any license or agreement under which an Obligor is authorized to use Intellectual Property in connection with any manufacture, marketing, distribution or disposition of Collateral, any use of Property or any other conduct of its business.

Licensor: any Person from whom an Obligor obtains the right to use any Intellectual Property.

Lien: a Person's interest in Property securing an obligation owed to, or a claim by, such Person, including any lien, security interest, pledge, hypothecation, assignment, trust, reservation, encroachment, easement, right-of-way, covenant, condition, restriction, lease, or other title exception or encumbrance.

Loan: a Term Loan.

Loan Documents: this Agreement, Other Agreements and Security Documents.

Loan Year: each 12 month period commencing on the Closing Date or an anniversary thereof.

Margin Stock: as defined in Regulation U of the Board of Governors.

Material Adverse Effect: the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, has or could be reasonably expected to have a material adverse effect (a) on the business operations, Properties or financial condition of Obligors, taken as a

whole, (b) on the enforceability of any Loan Documents, (c) on the validity or priority of Agent's Liens on any Collateral, (d) the ability of the Obligors, taken as a whole, to perform their obligations under the Loan Documents, including repayment of any Obligations; or (e) otherwise impairs the ability of Agent or any Lender to enforce or collect any Obligations or to realize upon any Collateral; provided, however, that neither (i) the commencement or existence of the Bankruptcy Cases, nor (ii) the failure to pay any obligations that arose prior to the Petition Date, in and of themselves, shall constitute a Material Adverse Effect.

Material Contract: any agreement or arrangement to which a Borrower is party (other than the Loan Documents) (a) that is deemed to be a material contract under any securities law applicable to such Person, including the Securities Act of 1933; (b) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect; or (c) that relates to Borrowed Money in an aggregate amount of $250,000 or more.

Moody's: Moody's Investors Service, Inc. or any successor acceptable to Agent.

Mortgage: a mortgage or deed of trust in which an Obligor grants a Lien on its Real Estate Collateral to Agent, as security for its Obligations.

Multiemployer Plan: any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which an Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

Multiple Employer Plan: a Plan that has two or more contributing sponsors, including an Obligor or ERISA Affiliate, at least two of whom are not under common control, as described in Section 4064 of ERISA.

Net Proceeds: with respect to an Asset Disposition, proceeds (including, when received, any deferred or escrowed payments) received by a Borrower in cash from such disposition, net of (a) reasonable and customary costs and expenses actually incurred in connection therewith, including legal fees, prorations, title insurance costs, transfer taxes, and sales commissions; (b) amounts applied to repayment of Debt secured by a Permitted Lien senior to Agent's Liens on Collateral sold; (c) transfer or similar taxes; and (d) reserves for indemnities, until such reserves are no longer needed.

Notice of Borrowing: a request by Borrower Agent for a Borrowing of Term Loans, in form satisfactory to Agent.

Obligations: all (a) principal of and premium, if any, on the Loans, (b) interest, expenses, fees, indemnification obligations, Extraordinary Expenses and other amounts payable by Obligors under the Loan Documents, and (c) other Debts, obligations and liabilities of any kind owing by Obligors pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

Obligor: each Borrower, Guarantor or other Person that is liable for payment of any Obligations or that has granted a Lien on its assets in favor of Agent to secure any Obligations.

OFAC: Office of Foreign Assets Control of the U.S. Treasury Department.

Ordinary Course of Business: the ordinary course of business of any Borrower or Obligor, undertaken in good faith and consistent with Applicable Law and past practices.

Organic Documents: with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

OSHA: the Occupational Safety and Hazard Act of 1970.

Other Agreement: each fee letter, Related Real Estate Document, or other note, document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter delivered by an Obligor or other Person to Agent or a Lender in connection with any transactions relating hereto.

Other Connection Taxes: Taxes imposed on a Recipient due to a present or former connection between it and the taxing jurisdiction (other than connections arising from the Recipient having executed, delivered, become party to, performed obligations or received payments under, received or perfected a Lien or engaged in any other transaction pursuant to, enforced, or sold or assigned an interest in, any Loan or Loan Document).

Other Taxes: all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a Lien under, or otherwise with respect to, any Loan Document, except Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 13.4(c)**).

Parent Collateral: the proceeds of the Loans and Net Proceeds of the sale of any Real Estate Collateral. For the avoidance of doubt, the parties acknowledge that the Net Proceeds of the sale of any Real Estate Collateral is required to be paid to Agent to an account designated by Agent as described in **Section 5.3.2**.

Participant: as defined in Section 13.2.

Patriot Act: the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

Payment Item: each check, draft or other item of payment payable to a Borrower, including those constituting proceeds of any Collateral.

PBGC: the Pension Benefit Guaranty Corporation.

Pension Funding Rules: Code and ERISA rules regarding minimum required contributions (including installment payments) to Pension Plans set forth in, for plan years ending prior to the Pension Protection Act of 2006 effective date, Section 412 of the Code and Section 302 of ERISA, both as in effect prior to such act, and thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

Pension Plan: any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

Permitted Asset Disposition: (a) as long as Bankruptcy Court approval is obtained and all Net Proceeds are remitted to Agent, an Asset Disposition that is a sale of Real Estate Collateral in an arms-length transaction with commercially reasonable terms; (b) an Asset Disposition that is a sale of Real Estate that is not Real Estate Collateral, (c) granting of Permitted Liens, (d) use of cash and cash

equivalents in a manner not prohibited hereunder, (e) and any disposition of any property that is worn-out, obsolete, or no longer used or useful in the business of the Obligors and (f) an Asset Disposition approved in writing by Agent and Required Lenders.

Permitted Contingent Obligations: Contingent Obligations (a) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (b) existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (c) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (d) arising from customary indemnification or similar obligations incurred in the Ordinary Course of Business including without limitation the providing of customary affidavits and/or indemnities to a title company in order to induce such title company to issue a title policy with respect to a Permitted Asset Disposition; or (e) arising under the Loan Documents; or (f) of any obligation of a Bankruptcy Party.

Permitted Lien: as defined in **Section 10.2.2.**

Person: any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, Governmental Authority or other entity.

Petition Date: December 4, 2017, the date Borrowers filed their voluntary petitions commencing the Bankruptcy Cases.

Plan: an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of an Obligor or ERISA Affiliate, or to which an Obligor or ERISA Affiliate is required to contribute on behalf of its employees.

Plan of Reorganization: means a plan of reorganization and all documents related thereto filed in the Bankruptcy Cases pursuant to chapter 11 of the Bankruptcy Code.

Platform: as defined in **Section 14.3.3.**

Prime Rate: The Prime Rate reported in the Wall Street Journal from time to time.

Professional Persons: any and all attorneys, accountants, advisors, consultants, appraisers, brokers, investment bankers, and other professionals retained or employed under section 327 or 1103(a) by any Borrower or any Committee.

Pro Rata: with respect to any Lender, a percentage (rounded to the ninth decimal place) determined (a) by dividing the amount of such Lender's Term Loan by the aggregate outstanding Term Loans; or (b) following termination of the Term Loan Commitments, by dividing the amount of such Lender's Loans by the aggregate outstanding Loans or, if all Loans have been Paid in Full, by dividing such Lender's and its Affiliates' remaining Obligations by the aggregate remaining Obligations.

Properly Contested: with respect to any obligation of an Obligor, (a) the obligation is being properly contested in good faith by appropriate proceedings promptly instituted and diligently pursued; (b) appropriate reserves have been established in accordance with GAAP; (c) non-payment could not have a Material Adverse Effect, nor result in forfeiture or sale of any Real Estate Collateral of the Obligor; (e) no Lien (other than inchoate Liens arising by operation of law with respect to which payment is not yet due) is imposed on Real Estate Collateral of the Obligor, unless bonded and stayed to the satisfaction of Agent; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

Property: any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

BN 31491395v6

Purchase Money Debt: (a) Debt (other than the Obligations) for payment of any of the purchase price of fixed assets; (b) Debt (other than the Obligations) incurred within 10 days before or after acquisition of any fixed assets, for the purpose of financing any of the purchase price thereof; and (c) any renewals, extensions or refinancings (but not increases) thereof.

Purchase Money Lien: a Lien that secures Purchase Money Debt, encumbering only the fixed assets acquired with such Debt and constituting a Capital Lease or a purchase money security interest under the UCC.

RCRA: the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i).

Real Estate: all right, title and interest (whether as owner, lessor or lessee) in any real Property or any buildings, structures, parking areas or other improvements thereon.

Real Estate Collateral: all Real Estate described on **Schedule 7.4.1** and all property described in **Section 7.4.2**, **Section 7.4.3** and **Section 7.4.4** in which Borrowers have granted a Lien in favor of Agent for the benefit of Secured Parties to secure the Obligations.

Real Estate Formula Amount: 50% of the "as-is" value of the Real Estate Collateral, which "as-is" values for each parcel of Real Estate Collateral are set forth on **Schedule 7.4.1**. For the avoidance of doubt, only the value of Real Estate Collateral for which Agent has received and approved a title report in accordance with **Section 6.2(d)** may be included in the calculation of the Real Estate Formula Amount.

Recipient: Agent, any Lender or any other recipient of a payment to be made by an Obligor under a Loan Document or on account of an Obligation.

Refinancing Conditions: (a) the Refinancing Debt is in an aggregate principal amount that does not exceed the principal amount of the Debt being extended, renewed or refinanced; (b) it has a final maturity no sooner than, a weighted average life no less than, and an interest rate no greater than, the Debt being extended, renewed or refinanced; (c) it is subordinated to the Obligations at least to the same extent as the Debt being extended, renewed or refinanced; (d) no additional Lien is granted to secure it; (e) no additional Person is obligated on such Debt; and (f) upon giving effect to it, no Default or Event of Default exists.

Refinancing Debt: Borrowed Money that is the result of an extension, renewal or refinancing of Debt permitted under **Section 10.2.1(b)**, **(d)** or **(f)**.

Related Real Estate Documents: with respect to all Real Estate Collateral, the following, in form and substance satisfactory to Agent: (a) a duly recorded abstract of the Applicable Financing Order followed by a duly recorded Mortgage, and (b) either: (i) a mortgagee title policy (or binder therefor) covering Agent's interest under the Mortgage, by an insurer acceptable to Agent, which must be fully paid on such effective date, or (ii) the entry of a Final Financing Order providing for a first priority senior Lien pursuant to section 364(d) of the Bankruptcy Code.

Report: as defined in **Section 12.2.3**.

Reportable Event: any event set forth in Section 4043(c) of ERISA, other than an event for which the 30 day notice period has been waived.

Required Lenders: Secured Parties holding more than 50% of (a) the aggregate outstanding Term Loans; or (b) after termination of the aggregate outstanding Loans or, upon Full Payment of all Loans, the aggregate remaining Obligations; provided, however, that Commitments, Loans and other Obligations held by a Defaulting Lender and its Affiliates shall be disregarded in making such calculation.

13

S&P: Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., or any successor acceptable to Agent.

Sanction: any sanction administered or enforced by the U.S. Government (including OFAC), United Nations Security Council, European Union, Her Majesty's Treasury or other sanctions authority.

Secured Parties: Agent and Lenders.

Security Documents: the Mortgages, all Applicable Financing Orders, and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

Senior Officer: the chairman of the board, president, chief executive officer or chief financial officer of a Borrower or, if the context requires, an Obligor.

Subordinated Debt: Debt incurred by a Borrower that is contractually subordinate and junior in right of payment to Full Payment of all Obligations, and is on terms (including maturity, interest, fees, repayment, covenants and subordination) reasonably satisfactory to Agent.

Subsidiary: any entity at least 50% of whose voting securities or Equity Interests is owned by a Borrower or combination of Borrowers (including indirect ownership through other entities in which a Borrower directly or indirectly owns 50% of the voting securities or Equity Interests).

Taxes: all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

Term Loan: as defined in **Section 2.1.1**.

Term Loan Availability: means, as of any date of determination, the difference of (A) the greater of (1) the Borrowing Base and (2) $5,000,000 plus the Carve Out, minus (B) the aggregate outstanding amount of the Term Loan.

Term Loan Commitment: for any Lender, the obligation of such Lender to make a Term Loan hereunder, up to the principal amount shown on **Schedule 1.1**. "Term Loan Commitments" means the aggregate amount of such commitments of all Lenders.

Term Loan Maturity Date: the date one (1) year from the Closing Date (December 7, 2018).

Transferee: any actual or potential Eligible Assignee, Participant or other Person acquiring an interest in any Obligations.

UCC: the Uniform Commercial Code as in effect in the State of California or, when the laws of any other jurisdiction govern the perfection or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

U.S. Person: "United States Person" as defined in Section 7701(a)(30) of the Code.

U.S. Tax Compliance Certificate: as defined in **Section 5.10.2(b)(iii)**.

Write-Down and Conversion Powers: the write-down and conversion powers of the applicable EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which powers are described in the EU Bail-In Legislation Schedule.

14

**1.2**    **Accounting Terms**. Under the Loan Documents (except as otherwise specified therein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent audited financial statements of Borrowers delivered to Agent before the Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrowers' certified public accountants concur in such change, the change is disclosed to Agent, and all relevant provisions of the Loan Documents are amended in a manner satisfactory to Required Lenders to take into account the effects of the change.

**1.3**    **Uniform Commercial Code**. As used herein, the following terms are defined in accordance with the UCC in effect in the State of California from time to time: "Account," "Account Debtor," "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

**1.4**    **Certain Matters of Construction**. The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding." The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of ejusdem generis shall not be applicable to limit any provision. Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document. All references to (a) laws include all related regulations, interpretations, supplements, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section mean, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day mean time of day at Agent's notice address under **Section 14.3.1**; or (g) discretion of Agent or any Lender mean the sole and absolute discretion of such Person exercised at any time. All determinations made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time. Borrowers shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Agent or any Lender under any Loan Documents. No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision. Reference to a Borrower's "knowledge" or similar concept means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.

## SECTION 2.  CREDIT FACILITIES

**2.1**    **Term Loan Commitment**.

     2.1.1    Term Loans. Subject to and upon the terms and conditions of this Agreement, each Lender with a Term Loan Commitment agrees severally, on a Pro Rata basis up to its Term Loan Commitment to make one or more term loans (collectively, all such term loans by all such Lenders, the "Term Loan") to Borrowers. The Term Loan may be made pursuant to 2 or more draws by Borrowers (each a "Term Loan Draw"). The first Term Loan Draw (the "Initial Term Loan Draw") shall be funded on the Closing Date and shall be no greater than an amount equal to $5,000,000 plus the amount of the Carve Out. Subject to satisfaction of the conditions set forth in **Section 6.2** hereof, Borrowers may request additional Term Loan Draws at any time after the Closing Date through and including the Term Loan Maturity Date to the extent permitted by the Applicable Financing Order, provided that the aggregate

amount of Term Loan Draws may not in any event exceed $25,000,000 prior to the entry of the Final Financing Order. After the entry of the Final Financing Order, the aggregate outstanding amount of all Term Loan Draws shall not exceed the Term Loan Commitment. The maximum amount of any Term Loan Draw may not exceed, when funded, the Term Loan Availability on such date. Each Term Loan Draw shall be in a minimum amount of $1,000,000 and integral multiples of $500,000 in excess thereof, or the remaining unfunded amount of the Term Loan.

2.1.2    Notes. Loans and interest accruing thereon shall be evidenced by the records of Agent and the applicable Lender. At the request of a Lender, Borrowers shall deliver promissory note(s) to such Lender, evidencing its Loans.

2.1.3    Use of Proceeds. The proceeds of Term Loans shall be used by Borrowers solely (a) to satisfy existing Debt; (b) to pay fees and transaction expenses associated with the closing of this credit facility; (c) to pay Obligations in accordance with this Agreement, including administration costs incurred in connection with the Bankruptcy Cases; and (d) for lawful corporate purposes of Borrowers, including relating to the construction, renovation, marketing and sale of Real Estate and other assets of the Borrowers and their respective Affiliates; provided, however, that in no event may the proceeds of any Term Loans or any Collateral (including cash collateral), be used to pay any fee or cost incurred by any person or professional (including without limitation, a Professional Person) in connection with or relating to an Adverse Lender Challenge. Borrowers shall not, directly or indirectly, use any Loan proceeds, nor use, lend, contribute or otherwise make available any Loan proceeds to any Subsidiary, joint venture partner or other Person, (i) to fund any activities of or business with any Person, or in any Designated Jurisdiction, that, at the time of funding of the Loan, is the subject of any Sanction; or (ii) in any manner that would result in a violation of a Sanction by any Person (including any Secured Party or other individual or entity participating in any transaction); or (iii) for any purpose that would breach the U.S. Foreign Corrupt Practices Act of 1977, UK Bribery Act 2010 or similar law in any jurisdiction.

## SECTION 3.    INTEREST, FEES AND CHARGES

3.1    Interest.

3.1.1    Rates and Payment of Interest.

(a)    The Obligations shall bear interest at the greater of: (i) the Base Rate in effect from time to time, plus the Applicable Margin, and (ii) the Interest Rate Floor.

(b)    During any Event of Default if Agent or Required Lenders in their discretion so elect, Obligations shall bear interest at the Default Rate (whether before or after any judgment), payable **on demand**.

(c)    Interest shall accrue from the date a Loan is advanced or Obligation is incurred or payable, until paid in full by Borrowers, and shall in no event be less than zero at any time. Interest accrued on the Loans shall be due and payable in arrears, (i) on the first day of each month; (ii) on any date of prepayment, with respect to the principal amount being prepaid; and (iii) on the Term Loan Maturity Date. Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents or, if no payment date is specified, **on demand**.

3.2    Closing Fees. On the Closing Date, Borrowers shall pay to Agent a fully earned (as of the Closing Date) and non-refundable closing fee in the amount of $2,750,000, which shall be payable to Agent for the Pro Rata benefit of Lenders as follows:

(a)    On the Closing Date, $1,500,000; and

(b)    $1,250,000 on the earliest of (i) the Term Loan Maturity Date, (ii) the date when the Obligations are Paid in Full, (iii) and the date on which the Obligations have become due and payable (whether at stated maturity, on demand, upon acceleration or otherwise), and (iv) the termination of all Commitments.

The foregoing closing fee is deemed earned in full on the Closing Date hereof notwithstanding the timing of its required payment as herein provided above.

3.3    **Computation of Interest, Fees, Yield Protection**.  All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days.  Each determination by Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.  All fees payable under **Section 3.2** are compensation for services and are not, and shall not be deemed to be, interest or any other charge for the use, forbearance or detention of money.  A certificate as to amounts payable by Borrowers under **Section 3.4, 3.7,** or **5.9**, submitted to Borrower Agent by Agent or the affected Lender shall be final, conclusive and binding for all purposes, absent manifest error, and Borrowers shall pay such amounts to the appropriate party within 10 days following receipt of the certificate.

3.4    **Reimbursement Obligations**.  Subject to any applicable order of the Bankruptcy Court, Borrowers shall pay all Extraordinary Expenses.  Borrowers shall also reimburse Agent for all reasonable and documented legal and appraisal fees and expenses incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) any examination or appraisal with respect to any Obligor or Collateral by Agent's personnel or a third party.  All amounts payable by Borrowers under this Section shall be due within 10 Business Days of the presentment of a reasonably detailed invoice therefor.

3.5    **[Reserved]**.

3.6    **[Reserved]**.

3.7    **Increased Costs; Capital Adequacy**.

3.7.1    Increased Costs Generally.  If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)    subject any Recipient to Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and (iii) Connection Income Taxes) with respect to any Loan, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)    impose on any Lender or interbank market any other condition, cost or expense affecting any Loan, Commitment or Loan Document;

and the result thereof shall be to increase the cost to a Lender of making or maintaining any Loan or Commitment, or converting to or continuing any interest option for a Loan, or to increase the cost to a Lender or to reduce the amount of any sum received or receivable by a Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Borrowers will pay to it such additional amount(s) as will compensate it for the additional costs incurred or reduction suffered.

17

3.7.2    [Reserved].

3.7.3    Compensation.    Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrowers shall not be required to compensate a Lender for any increased costs or reductions suffered more than nine months (plus any period of retroactivity of the Change in Law giving rise to the demand) prior to the date that the Lender notifies Borrower Agent of the applicable Change in Law and of such Lender's intention to claim compensation therefor.

**3.8    Mitigation**.    If any Lender gives a notice under **Section 3.5** or requests compensation under **Section 3.7**, or if Borrowers are required to pay any Indemnified Taxes or additional amounts with respect to a Lender under **Section 5.9**, then at the request of Borrower Agent, such Lender shall use reasonable efforts to designate a different Lending Office or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate the need for such notice or reduce amounts payable or to be withheld in the future, as applicable; and (b) would not subject the Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to it or unlawful.    Borrowers shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**3.9    [Reserved]**.

**3.10    Maximum Interest**.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law ("maximum rate").    If Agent or any Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrowers. In determining whether the interest contracted for, charged or received by Agent or a Lender exceeds the maximum rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**SECTION 4.    LOAN ADMINISTRATION**

**4.1    Manner of Borrowing and Funding Term Loans**.

4.1.1    Notice of Borrowing.

(a)    To request Term Loans (other than the initial Term Loan on the Closing Date), Borrower Agent shall give Agent a Notice of Borrowing by 11:00 a.m. on the date 2 Business Days prior to the requested funding date.    Notices received by Agent after such time shall be deemed received on the next Business Day.    Each Notice of Borrowing shall be irrevocable and shall specify (A) the Borrowing amount and (B) the requested funding date (which must be a Business Day).

(b)    Unless payment is otherwise made by Borrowers, the becoming due of any Obligation (whether principal, interest, fees or other charges, including Extraordinary Expenses and Cash Collateral) shall be deemed to be a request for a Base Rate Loan on the due date in the amount due and the Loan proceeds shall be disbursed as direct payment of such Obligation.

4.1.2    Fundings by Lenders.    Agent shall endeavor to notify Lenders of each Notice of Borrowing (or deemed request for a Borrowing) by 1:00 p.m. 2 Business Days before a proposed funding of a Term Loan.    Each Lender shall fund its Pro Rata share of a Borrowing in immediately available funds not later than 3:00 p.m. on the requested funding date, unless Agent's notice is received after the times provided above, in which case Lender shall fund by 11:00 a.m. on the next Business Day.    Subject to its

18

receipt of such amounts from Lenders, Agent shall disburse the Borrowing proceeds in a manner directed by Borrower Agent and acceptable to Agent. Unless Agent receives (in sufficient time to act) written notice from a Lender that it will not fund its share of a Borrowing, Agent may assume that such Lender has deposited or promptly will deposit its share with Agent, and Agent may disburse a corresponding amount to Borrowers. A Lender may fulfill its obligations under Loan Documents through one or more Lending Offices, and this shall not affect any obligation of Obligors under the Loan Documents or with respect to any Obligations.

**4.2**    **Defaulting Lender**. Notwithstanding anything herein to the contrary:

4.2.1    Reallocation of Pro Rata Share; Amendments. For purposes of determining Lenders' obligations or rights to fund, participate in or receive collections with respect to Loans, Agent may in its discretion reallocate Pro Rata shares by excluding a Defaulting Lender's Commitments and Loans from the calculation of shares. A Defaulting Lender shall have no right to vote on any amendment, waiver or other modification of a Loan Document, except as provided in **Section 14.1.1**.

4.2.2    Payments; Fees. Agent may, in its discretion, receive and retain any amounts payable to a Defaulting Lender under the Loan Documents, and a Defaulting Lender shall be deemed to have assigned to Agent such amounts until all Obligations owing to Agent, non-Defaulting Lenders and other Secured Parties have been Paid in Full. Agent may use such amounts to cover the Defaulting Lender's defaulted obligations, to readvance the amounts to Borrowers or to repay Obligations. A Lender shall not be entitled to receive any fees accruing hereunder while it is a Defaulting Lender.

4.2.3    Status; Cure. Agent may determine in its discretion that a Lender constitutes a Defaulting Lender and the effective date of such status shall be conclusive and binding on all parties, absent manifest error. Borrowers and Agent may agree in writing that a Lender has ceased to be a Defaulting Lender, whereupon Pro Rata shares shall be reallocated without exclusion of the reinstated Lender's Commitments and Loans. Unless expressly agreed by Borrowers and Agent, or as expressly provided herein with respect to Bail-In Actions and related matters, no reallocation of Commitments and Loans to non-Defaulting Lenders or reinstatement of a Defaulting Lender shall constitute a waiver or release of claims against such Lender. The failure of any Lender to fund a Loan or otherwise to perform obligations hereunder shall not relieve any other Lender of its obligations under any Loan Document. No Lender shall be responsible for default by another Lender.

**4.3**    **[Reserved]**.

**4.4**    **Borrower Agent**. Each Borrower hereby designates Parent ("Borrower Agent") as its representative and agent for all purposes under the Loan Documents, including requests for and receipt of Loans, designation of interest rates, delivery or receipt of communications, delivery of Borrower Materials, payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with Agent or any Lender. Borrower Agent hereby accepts such appointment. Secured Parties shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any notice of borrowing) delivered by Borrower Agent on behalf of any Borrower. Secured Parties may give any notice or communication with a Borrower hereunder to Borrower Agent on behalf of such Borrower. Each of Agent and Lenders shall have the right, in its discretion, to deal exclusively with Borrower Agent for all purposes under the Loan Documents. Each Borrower agrees that any notice, election, communication, delivery, representation, agreement, action, omission or undertaking by Borrower Agent shall be binding upon and enforceable against such Borrower.

**4.5**    **One Obligation**. Subject to the limitations on Parent's obligations set forth in Section 5.11.1, the Loans and other Obligations constitute one general obligation of Borrowers and are secured by Agent's Lien on all Collateral; provided, however, that Agent and each Lender shall be deemed to be a

creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

**4.6**    **Effect of Termination**. On the effective date of the termination of all Commitments, the Obligations shall be immediately due and payable. Until Full Payment of the Obligations, all undertakings of Borrowers contained in the Loan Documents shall continue, and Agent shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents. Agent shall not be required to terminate its Liens unless it receives Cash Collateral or a written agreement, in each case satisfactory to it, protecting Secured Parties from dishonor or return of any Payment Item previously applied to the Obligations. **Sections 3.4, 3.7, 5.5, 5.9, 5.10, 12, 14.2**, this Section, and each indemnity or waiver given by an Obligor or Lender in any Loan Document, shall survive Full Payment of the Obligations.

## SECTION 5.  PAYMENTS

**5.1**    **General Payment Provisions**. All payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free and clear of (and without deduction for) any Taxes, and in immediately available funds, not later than 12:00 noon on the due date. Any payment after such time shall be deemed made on the next Business Day. Borrowers agree that Agent shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against the Obligations, in such manner as Agent deems advisable.

**5.2**    **[Reserved]**.

**5.3**    **Repayment of Term Loans**.

5.3.1    Payment of Principal. The principal amount of the Term Loans shall be repaid in full on the Term Loan Maturity Date, on which date all principal, interest and other amounts owing with respect to the Term Loans shall be due and payable in full. Once repaid, whether such repayment is voluntary or required, Term Loans may not be reborrowed. Any prepayment of Term Loans shall be accompanied by all interest accrued thereon.

5.3.2    Mandatory Prepayments.

(a)    Concurrently with any Permitted Asset Disposition of Real Estate Collateral, Borrowers shall prepay Term Loans in an amount equal to the Net Proceeds of such disposition by causing the applicable escrow holder (or purchaser of the Real Estate Collateral, as the case may be) to make payment of all Net Proceeds directly to Agent to an account designated by Agent at such time;

(b)    Concurrently with the receipt of any proceeds of insurance or condemnation awards paid in respect of any Real Estate Collateral, Borrowers shall prepay Term Loans in an amount equal to such proceeds, subject to **Section 8.6.2**; and

(c)    On the Term Loan Maturity Date, Borrowers shall prepay all Term Loans (unless sooner repaid hereunder).

5.3.3    Optional Prepayments. Borrowers may, at their option from time to time, prepay Term Loans, which prepayment must be at least $1,000,000, plus any increment of $500,000 in excess thereof. Borrowers shall give written notice to Agent of an intended prepayment of Term Loans, which notice shall specify the amount of the prepayment, shall be given at least 3 Business Days prior to the date of the proposed prepayment and shall be effective as of the first day of the next month. Any such notice may be conditioned upon the effectiveness of other credit facilities or the receipt of proceeds from the issuance of other Debt or the consummation of another transaction, in which case such notice may be

20

revoked by the Borrowers (by notice to the Agent on or prior to 11:00 a.m. on the specified effective date) if such condition is not satisfied.

       5.4    **Payment of Other Obligations**.  Subject to any applicable order of the Bankruptcy Court, Obligations other than Loans, including Extraordinary Expenses, shall be paid by Borrowers as provided in the Loan Documents or, if no payment date is specified, within 10 Business Days of the presentment of a reasonably detailed invoice therefor.

       5.5    **Marshaling; Payments Set Aside**.  None of Agent or Lenders shall be under any obligation to marshal any assets in favor of any Obligor or against any Obligations. If any payment by or on behalf of Borrowers is made to Agent or any Lender, or if Agent or any Lender exercises a right of setoff, and any of such payment or setoff is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Agent or a Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment or setoff had not occurred.

       5.6    **Application and Allocation of Payments**.

       5.6.1    Application. Payments made by Borrowers hereunder shall be applied (a) first, as specifically required hereby; (b) second, to Obligations then due and owing; (c) third, to other Obligations specified by Borrowers; and (d) fourth, as determined by Agent in its discretion.

       5.6.2    Post-Default Allocation. Notwithstanding anything in any Loan Document to the contrary, during an Event of Default under **Section 11.1(j)**, or during any other Event of Default at the discretion of Agent or Required Lenders, monies to be applied to the Obligations, whether arising from payments by Obligors, realization on Collateral, setoff or otherwise, shall be allocated as follows:

       (a)    first, to all fees, indemnification, costs and expenses, including Extraordinary Expenses, then due and payable to Agent;

       (b)    second, to all other amounts owing to Agent, including Loans and participations that a Defaulting Lender has failed to settle or fund;

       (c)    third, to all Obligations constituting fees, indemnification, costs or expenses then due and payable to Lenders;

       (d)    fourth, to all Obligations constituting interest; and

       (e)    last, to all remaining Obligations (other than contingent indemnification obligations for which no claim has been made or cannot be reasonably identified).

Amounts shall be applied to payment of each category of Obligations only after Full Payment of amounts payable from time to time under all preceding categories. If amounts are insufficient to satisfy a category, they shall be paid ratably among outstanding Obligations in the category. If the provider fails to deliver the calculation within five days following request, Agent may assume the amount is zero. The allocations set forth in this Section are solely to determine the rights and priorities among Secured Parties, and may be changed by agreement of the affected Secured Parties, without the consent of any Obligor. This Section is not for the benefit of or enforceable by any Obligor, and each Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds subject to this Section.

       5.6.3    Erroneous Application. Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been paid shall

21

be to recover the amount from the Person that actually received it (and, if such amount was received by a Secured Party, the Secured Party agrees to return it).

**5.7**     **[Reserved]**.

**5.8**     **Account Stated**.  Agent shall maintain, in accordance with its customary practices, loan account(s) evidencing the Debt of Borrowers hereunder.  Any failure of Agent to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrowers to pay any amount owing hereunder.  Entries made in a loan account shall constitute presumptive evidence of the information contained therein.  If any information contained in a loan account is provided to or inspected by any Person, the information shall be conclusive and binding on such Person for all purposes absent manifest error, except to the extent such Person notifies Agent in writing within 30 days after receipt or inspection that specific information is subject to dispute.

**5.9**     **Taxes**.

5.9.1     Payments Free of Taxes; Obligation to Withhold; Tax Payment.

(a)     All payments of Obligations by Obligors shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If Applicable Law requires the deduction or withholding of any Tax from any such payment by Agent or an Obligor, then Agent or such Obligor shall be entitled to make such deduction or withholding based on information and documentation provided pursuant to **Section 5.10**.

(b)     If Agent or any Obligor is required by the Code to withhold or deduct Taxes, including backup withholding and withholding taxes, from any payment, then (i) Agent shall pay the full amount that it determines is to be withheld or deducted to the relevant Governmental Authority pursuant to the Code, and (ii) to the extent the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Obligor shall be increased as necessary so that the Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(c)     If Agent or any Obligor is required by any Applicable Law other than the Code to withhold or deduct Taxes from any payment, then (i) Agent or such Obligor, to the extent required by Applicable Law, shall timely pay the full amount to be withheld or deducted to the relevant Governmental Authority, and (ii) to the extent the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Obligor shall be increased as necessary so that the Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

5.9.2     Payment of Other Taxes.  Without limiting the foregoing, Borrowers shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at Agent's option, timely reimburse Agent for payment of, any Other Taxes.

5.9.3     Tax Indemnification.

(a)     Each Borrower shall indemnify and hold harmless, on a joint and several basis (provided that the Obligations of Parent shall be limited as set forth in **Section 5.11.1**), each Recipient against any Indemnified Taxes (including those imposed or asserted on or attributable to amounts payable under this Section) payable or paid by a Recipient or required to be withheld or deducted from a payment to a Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Each Borrower shall indemnify and hold harmless Agent against any amount that a Lender fails for any reason to pay to Agent as required pursuant to this Section.  Each Borrower shall make payment within 10 days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender

22

(with a copy to Agent), or by Agent on its own behalf or on behalf of any Recipient, shall be conclusive absent manifest error.

(b)    Each Lender shall indemnify and hold harmless, on a several basis, (i) Agent against any Indemnified Taxes attributable to such Lender (but only to the extent Borrowers have not already paid or reimbursed Agent therefor and without limiting Borrowers' obligation to do so), (ii) Agent and Obligors, as applicable, against any Taxes attributable to such Lender's failure to maintain a Participant register as required hereunder, and (iii) Agent and Obligors, as applicable, against any Excluded Taxes attributable to such Lender that are payable or paid by Agent or an Obligor in connection with any Obligations, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. Each Lender shall make payment within 10 days after demand for any amount or liability payable under this Section. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error.

5.9.4    Evidence of Payments. As soon as practicable after payment by an Obligor of any Taxes pursuant to this Section, Borrower Agent shall deliver to Agent the original or a certified copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any return required by Applicable Law to report the payment or other evidence of payment reasonably satisfactory to Agent.

5.9.5    Treatment of Certain Refunds. Unless required by Applicable Law, at no time shall Agent have any obligation to file for or otherwise pursue on behalf of a Lender, nor have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of a Lender. If a Recipient determines in its discretion that it has received a refund of Taxes that were indemnified by Borrowers or with respect to which a Borrower paid additional amounts pursuant to this Section, it shall pay the amount of such refund to Borrowers (but only to the extent of indemnity payments or additional amounts actually paid by Borrowers with respect to the Taxes giving rise to the refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient and without interest (other than interest paid by the relevant Governmental Authority with respect to such refund). Borrowers shall, upon request by the Recipient, repay to the Recipient such amount paid over to Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) if the Recipient is required to repay such refund to the Governmental Authority. Notwithstanding anything herein to the contrary, no Recipient shall be required to pay any amount to Borrowers if such payment would place it in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. In no event shall Agent or any Recipient be required to make its tax returns (or any other information relating to its taxes that it deems confidential) available to any Obligor or other Person.

5.9.6    Survival. Each party's obligations under **Sections 5.9** and **5.10** shall survive the resignation or replacement of Agent or any assignment of rights by or replacement of a Lender, the termination of the Commitments, and the repayment, satisfaction, discharge or Full Payment of any Obligations.

**5.10    Lender Tax Information**.

5.10.1    Status of Lenders. Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments of Obligations shall deliver to Borrowers and Agent properly completed and executed documentation reasonably requested by Borrowers or Agent as will permit such payments to be made without or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrowers or Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrowers or Agent to enable them to determine whether

23

such Lender is subject to backup withholding or information reporting requirements. Notwithstanding the foregoing, such documentation (other than documentation described in **Sections 5.10.2(a), (b)** and **(d)**) shall not be required if a Lender reasonably believes delivery of the documentation would subject it to any material unreimbursed cost or expense or would materially prejudice its legal or commercial position.

        5.10.2 <u>Documentation</u>.  Without limiting the foregoing, if any Borrower is a U.S. Person,

        (a)     Any Lender that is a U.S. Person shall deliver to Borrowers and Agent on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or Agent), executed copies of IRS Form W-9, certifying that such Lender is exempt from U.S. federal backup withholding Tax;

        (b)     Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or Agent), whichever of the following is applicable:

        (i)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BENE establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (y) with respect to other payments under the Loan Documents, IRS Form W-8BENE establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

        (ii)     executed copies of IRS Form W-8ECI;

        (iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in form satisfactory to Agent to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code ("<u>U.S. Tax Compliance Certificate</u>"), and (y) executed copies of IRS Form W-8BENE; or

        (iv)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BENE, a U.S. Tax Compliance Certificate in form satisfactory to Agent, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if the Foreign Lender is a partnership and one or more of its direct or indirect partners is claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate on behalf of each such partner;

        (c)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Borrowers or Agent to determine the withholding or deduction required to be made; and

        (d)     if payment of an Obligation to a Lender would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code), such

Lender shall deliver to Borrowers and Agent, at the time(s) prescribed by law and otherwise upon reasonable request, such documentation prescribed by Applicable Law (including Section 1471(b)(3)(C)(i) of the Code) and such additional documentation as may be appropriate for Borrowers or Agent to comply with their obligations under FATCA and to determine that such Lender has complied with its obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date hereof.

5.10.3  Redelivery of Documentation.  If any form or certification previously delivered by a Lender pursuant to this Section expires or becomes obsolete or inaccurate in any respect, such Lender shall promptly update the form or certification or notify Borrowers and Agent in writing of its inability to do so.

**5.11    Nature and Extent of Each Borrower's Liability.**

5.11.1  Joint and Several Liability.  Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Secured Parties the prompt payment and performance of, all Obligations; provided, however, that notwithstanding anything to the contrary in this Agreement or the Loan Documents, with respect to the Obligations of Parent, the recourse of Secured Parties shall be limited to the Parent Collateral, and Secured Parties shall look solely to the Parent Collateral with respect to the Obligations of Parent and shall not seek any deficiency or money judgment against Parent.  Each Borrower agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and not of collection, that such obligations shall not be discharged until Full Payment of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Agent or any Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for any Obligations or any action, or the absence of any action, by Agent or any Lender in respect thereof (including the release of any security or guaranty); (d) the insolvency of any Obligor; (e) any election by Agent or any Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Agent or any Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of the Obligations.

5.11.2  Waivers.

(a)      Each Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, including in the Bankruptcy Cases, to compel Agent or Lenders to marshal assets or to proceed against any Obligor, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Borrower.  Each Borrower waives all defenses available to a surety, guarantor or accommodation co-obligor other than Full Payment of Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of Obligations as long as it is a Borrower.  It is agreed among each Borrower, Agent and Lenders that the provisions of this **Section 5.11** are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Secured Parties would decline to make Loans.  Each Borrower acknowledges that its guaranty pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

25

(b)    Secured Parties may, in their discretion, pursue such rights and remedies as they deem appropriate, including realization upon Collateral or any Real Estate by judicial foreclosure or nonjudicial sale or enforcement, without affecting any rights and remedies under this **Section 5.11**. If, in taking any action in connection with the exercise of any rights or remedies, Agent or any Lender shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Borrower or other Person, whether because of any Applicable Laws pertaining to "election of remedies" or otherwise, each Borrower consents to such action and waives any claim based upon it, even if the action may result in loss of any rights of subrogation that any Borrower might otherwise have had. Any election of remedies that results in denial or impairment of the right of Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations. Each Borrower waives all rights and defenses arising out of an election of remedies, such as nonjudicial foreclosure with respect to any security for Obligations, even though that election of remedies destroys such Borrower's rights of subrogation against any other Person. Agent may bid Obligations, in whole or part, at any foreclosure, trustee or other sale, including any private sale, and the amount of such bid need not be paid by Agent but shall be credited against the Obligations. The amount of the successful bid at any such sale, whether Agent or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this **Section 5.11**, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

5.11.3    <u>Extent of Liability; Contribution</u>.

(a)    Notwithstanding anything herein to the contrary, each Borrower's liability under this **Section 5.11** shall not exceed the greater of (i) all amounts for which such Borrower is primarily liable, as described in clause (c) below, and (ii) such Borrower's Allocable Amount.

(b)    If any Borrower makes a payment under this **Section 5.11** of any Obligations (other than amounts for which such Borrower is primarily liable) (a "Guarantor Payment") that, taking into account all other Guarantor Payments previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payments in the same proportion that such Borrower's Allocable Amount bore to the total Allocable Amounts of all Borrowers, then such Borrower shall be entitled to receive contribution and indemnification payments from, and to be reimbursed by, each other Borrower for the amount of such excess, ratably based on their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. The "<u>Allocable Amount</u>" for any Borrower shall be the maximum amount that could then be recovered from such Borrower under this **Section 5.11** without rendering such payment voidable under Section 548 of the Bankruptcy Code or under any applicable state fraudulent transfer or conveyance act, or similar statute or common law.

(c)    **Section 5.11.3(a)** shall not limit the liability of any Borrower to pay or guarantee Loans made directly or indirectly to it (including Loans advanced hereunder to any other Person and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower), and other related Obligations with respect thereto, for which such Borrower shall be primarily liable for all purposes hereunder. Secured Parties shall have the right, at any time in their discretion, to condition Loans upon a separate calculation of borrowing availability for each Borrower and to restrict the disbursement and use of Loans to a Borrower based on that calculation.

5.11.4    <u>Joint Enterprise</u>.    Each Borrower has requested that Secured Parties make this credit facility available to Borrowers on a combined basis, in order to finance Borrowers' business most efficiently and economically. Borrowers' business is a mutual and collective enterprise, and the successful operation of each Borrower is dependent upon the successful performance of the integrated

26

group. Borrowers believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease administration of the facility, all to their mutual advantage. Borrowers acknowledge that Agent's and Lenders' willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Borrowers and at Borrowers' request.

5.11.5 <u>Subordination</u>. Each Borrower hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Obligor, howsoever arising, to the Full Payment of its Obligations.

## SECTION 6.    CONDITIONS PRECEDENT

**6.1    <u>Conditions Precedent to Initial Loans</u>**. In addition to the conditions set forth in **Section 6.2**, Lenders shall not be required to fund any requested Loan, including the Initial Term Loan Draw or otherwise extend credit to Borrowers hereunder, until the date ("<u>Closing Date</u>") that each of the following conditions has been satisfied:

(a)    This Agreement shall have been duly executed and delivered to Agent by each of the signatories thereto, and each Obligor shall be in compliance with all terms thereof.

(b)    The Interim Financing Order has been entered by the Bankruptcy Court in the Bankruptcy Cases and is in full force and effect, and not subject to any stay, reconsideration, or appeal.

(c)    Borrowers shall have paid all fees and expenses to be paid to Agent and Lenders on the Closing Date.

**6.2    <u>Conditions Precedent to All Credit Extensions</u>**. Agent and Lenders shall in no event be required to make any credit extension hereunder (including funding any Loan, or granting any other accommodation to or for the benefit of any Borrower), if the following conditions are not satisfied on such date and upon giving effect thereto:

(a)    No Default or Event of Default exists;

(b)    The representations and warranties of each Obligor in the Loan Documents are true and correct in all material respects (except for representations and warranties that relate solely to an earlier date); and

(c)    Other than the commencement of the Bankruptcy Cases, no event has occurred or circumstance exists that has or could reasonably be expected to have a Material Adverse Effect.

(d)    Agent shall have received a title report with respect to the Real Estate Collateral in the Borrowing Base supporting such credit extension, which title report shall be in form and content acceptable to Agent.

(e)    With respect to any credit extensions that would cause the aggregate outstanding amount of the Term Loans to exceed $25,000,000 Term Loan, the Final Financing Order shall have been entered by the Bankruptcy Court in the Bankruptcy Cases, and is not subject to any stay, reconsideration, or appeal.

Each request (or deemed request) by a Borrower for any credit extension shall constitute a representation by Borrowers that the foregoing conditions are satisfied on the date of such request and on the date of the credit extension.

**6.3    <u>Conditions Subsequent</u>**.

(a)    On or before 120 days following the Closing Date, or such later date as Agent shall agree, Agent shall have received the Related Real Estate Documents for all Real Estate Collateral.

## SECTION 7.    COLLATERAL

7.1    **Grant of Security Interest**.  In accordance with the Applicable Financing Orders, to secure the prompt payment and performance of its Obligations, each Borrower hereby grants to Agent, for the benefit of Secured Parties, a continuing security interest in and Lien upon all personal Property of such Borrower, including all of the following Property, whether now owned or hereafter acquired, and wherever located:

(a)    all Accounts;

(b)    all Chattel Paper, including electronic chattel paper;

(c)    all Commercial Tort Claims, including those shown on **Schedule 9.1.15**;

(d)    all Deposit Accounts;

(e)    all Documents;

(f)    all General Intangibles, including Intellectual Property;

(g)    all Goods, including Inventory, Equipment and fixtures;

(h)    all Instruments;

(i)    all Investment Property;

(j)    all Letter-of-Credit Rights;

(k)    all Supporting Obligations;

(l)    all monies, whether or not in the possession or under the control of Agent, a Lender, or a bailee or Affiliate of Agent or a Lender, including any Cash Collateral;

(m)    all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(n)    all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing;

provided, however, that no Lien shall be granted on, and Collateral shall not include (1) the cash or other proceeds of the sale of any Real Estate that is not Real Estate Collateral, (2) any assets of Parent other than the Parent Collateral, and (3) any assets excluded from Collateral pursuant to the Applicable Financing Orders (collectively, the "Excluded Assets").

7.2    **Deposit Accounts**.  To further secure the prompt payment and performance of its Obligations, each Borrower hereby grants to Agent, for the benefit of the Secured Parties, a continuing security interest in and Lien upon all amounts (other than Excluded Assets) credited to any Deposit Account of such Borrower, including sums in any blocked, lockbox, sweep or collection account.  Each Borrower hereby authorizes and directs each bank or other depository to deliver to Agent, upon request,

all balances in any Deposit Account maintained for such Borrower, without inquiry into the authority or right of Agent to make such request.

**7.3**    **Cash Collateral**.    Cash Collateral may be invested, at Agent's discretion (with the consent of Borrowers, provided no Event of Default exists), but Agent shall have no duty to do so, regardless of any agreement or course of dealing with any Borrower, and shall have no responsibility for any investment or loss.    As security for its Obligations, each Borrower hereby grants to Agent, for the benefit of the Secured Parties, a security interest in and Lien upon all Cash Collateral delivered hereunder from time to time, whether held in a segregated cash collateral account or otherwise.    Agent may apply Cash Collateral to payment of such Obligations as they become due as provided in Section 5.6.

**7.4**    **Real Estate Collateral**.

7.4.1    Lien on Real Estate.    In accordance with the Applicable Financing Orders, the Obligations shall also be secured by first priority Liens in favor of Agent upon the Real Estate Collateral owned by certain Borrowers set forth on **Schedule 7.4.1**. In accordance with the requirements of **Section 6.3** hereof, Mortgages on such Real Estate Collateral shall be duly recorded, at Borrowers' expense, in each office where such recording is required to constitute a fully perfected Lien on the Real Estate covered thereby.

7.4.2    Grant of Lien in Real Estate.    In accordance with the Applicable Financing Orders, to secure the prompt payment and performance of its Obligations, each Borrower hereby grants to Chicago Title Company, as trustee, in trust for the benefit Agent, for the benefit of Secured Parties, **with power of sale** and right of entry and possession, all estate, right, title and interest which Borrowers now has or may later acquire in the following property:

(a)    The Real Estate Collateral;

(b)    All buildings, structures, improvements, fixtures and appurtenances now or hereafter placed on the Real Estate Collateral, and all apparatus and equipment now or hereafter attached in any manner to the Real Estate Collateral or any building on the Real Estate Collateral, including all pumping plants, engines, pipes, ditches and flumes, and also all gas, electric, cooking, heating, cooling, air conditioning, lighting, refrigeration and plumbing fixtures and equipment (collectively, the "Improvements");

(c)    All easements and rights of way appurtenant to the Real Estate Collateral; all crops growing or to be grown on the Real Estate Collateral (including all such crops following severance from the Real Estate Collateral); all standing timber upon the Real Estate Collateral (including all such timber following severance from the Real Estate Collateral); all development rights or credits and air rights; all water and water rights (whether riparian, appropriative, or otherwise, and whether or not appurtenant to the Real Estate Collateral) and shares of stock pertaining to such water or water rights, ownership of which affect the Real Estate Collateral; all minerals, oil, gas, and other hydrocarbon substances and rights thereto in, on, under, or upon the Real Estate Collateral;

(d)    All existing and future leases, subleases, subtenancies, licenses, occupancy agreements and concessions relating to the use and enjoyment of all or any part of the Real Estate Collateral or the Improvements, and any and all guaranties and other agreements relating to or made in connection with any of the foregoing;

(e)    All proceeds, including all claims to and demands for them, of the voluntary or involuntary conversion of any of the Real Estate Collateral, Improvements, or the other property described above into cash or liquidated claims, including proceeds of all present and future fire, hazard or casualty insurance policies, whether or not such policies are required by Beneficiary, and all

29

condemnation awards or payments now or later to be made by any public body or decree by any court of competent jurisdiction for any taking or in connection with any condemnation or eminent domain proceeding, and all causes of action and their proceeds for any breach of warranty, misrepresentation, damage or injury to, or defect in, the Real Estate Collateral, Improvements, or the other property described above or any part of them; and

(f)　　All proceeds of, additions and accretions to, substitutions and replacements for, and changes in any of the property described above.

7.4.3　<u>Assignment of Leases and Rents</u>.　To secure the prompt payment and performance of its Obligations, each Borrower hereby irrevocably, absolutely, presently and unconditionally assigns to Agent for the benefit of Secured Parties all rents, royalties, issues, profits, revenue, income and proceeds of the Real Estate Collateral, whether now due, past due or to become due, including all prepaid rents and security deposits (collectively, the "<u>Rents</u>"), and confers upon Agent the right to collect such Rents with or without taking possession of the Real Estate Collateral.　In the event that anyone establishes and exercises any right to develop, bore for or mine for any water, gas, oil or mineral on or under the surface of the Real Estate Collateral, any sums that may become due and payable to any Borrower as bonus or royalty payments, and any damages or other compensation payable to such Borrower in connection with the exercise of any such rights, shall also be considered Rents assigned under this Section.　THIS IS AN ABSOLUTE ASSIGNMENT, NOT AN ASSIGNMENT FOR SECURITY ONLY.

7.4.4　<u>Assignment of Construction Contracts and Permits</u>. To secure the prompt payment and performance of its Obligations, each Borrower hereby irrevocably, absolutely, presently and unconditionally assigns to Agent for the benefit of Secured Parties all of each Borrower's right, title, interest, privilege, benefit and remedies in, to and under the following relating to the Real Estate Collateral:

(a)　　all construction contract, architect contract(s), engineer contract(s), development contract(s), management  and any other agreements;

(b)　　all other agreements now or hereafter entered into by any Borrower with any parties in connection with construction and development of or on any portion of the Real Estate Collateral;

(c) all other agreements now or hereafter entered into by any Borrower with any architect, engineer, or other consultant in connection with design, engineering, construction of or on, or management of the Real Estate Collateral; and

(d)　　all governmental approvals, permits, consents or licenses owned or held by any Borrower relating in any manner to the ownership, operation, development and/or construction relating to the Real Estate Collateral.

**7.5**　　**[Reserved]**.

**7.6**　　**Limitations**.　The Lien on Collateral granted hereunder is given as security only and shall not subject Agent or any Lender to, or in any way modify, any obligation or liability of Borrowers relating to any Collateral.

**7.7**　　**Further Assurances**.　All Liens granted to Agent under the Loan Documents are for the benefit of Secured Parties.　Promptly upon request, Borrowers shall deliver such instruments and agreements, and shall take such actions, as Agent deems appropriate under Applicable Law to evidence or perfect its Lien on any Collateral, or otherwise to give effect to the intent of this Agreement.　Each Borrower authorizes Agent to file any financing statement that describes the Collateral as "all assets" or

30

"all personal property" of such Borrower, or words to similar effect, and ratifies any action taken by Agent before the Closing Date to effect or perfect its Lien on any Collateral.

**7.8    Foreign Subsidiary Stock**.  Notwithstanding **Section 7.1**, the Collateral shall include only 65% of the voting stock of any Foreign Subsidiary.

**7.9    Release of Collateral**.    Agent shall release any Lien on any Collateral (a) upon Full Payment of the Obligations; (b) that is the subject of a disposition or Lien that Borrowers certify in writing is a Permitted Asset Disposition (and Agent may rely conclusively on such certificate without further inquiry) so long as Agent receives the mandatory payment (if any) required pursuant to **Section 5.3.2**; or (c) subject to **Section 14.1**, with the consent of Required Lenders.  Agent shall, at the Borrowers' expense, deliver such release documents reasonably requested by any Borrower to evidence any such release of the Liens.

## SECTION 8.    COLLATERAL ADMINISTRATION

**8.1    [Reserved]**.

**8.2    [Reserved]**.

**8.3    [Reserved]**.

**8.4    [Reserved]**.

**8.5    [Reserved]**.

**8.6    General Provisions**.

8.6.1    Location of Collateral.  All tangible items of Collateral, other than Inventory in transit and other than non-material amounts of equipment, shall at all times be kept by Borrowers at the business locations set forth in **Schedule 8.6.1**, except that Borrowers may (a) make sales or other dispositions of Collateral in accordance with **Section 10.2.6**; and (b) move Collateral to another location in the United States, upon 10 Business Days prior written notice to Agent.

8.6.2    Insurance of Collateral; Condemnation Proceeds.

(a)    Each Borrower shall maintain insurance with respect to the Collateral, covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best rating of at least A+, unless otherwise approved by Agent in its discretion) satisfactory to Agent.  All proceeds under each policy shall be payable to Agent.  From time to time upon request, Borrowers shall deliver to Agent the originals or certified copies of its insurance policies and updated flood plain searches.  Unless Agent shall agree otherwise, each policy shall include satisfactory endorsements (i) showing Agent as loss payee; and (ii) requiring 30 days prior written notice to Agent in the event of cancellation of the policy for any reason whatsoever.  If any Borrower fails to provide and pay for any insurance, Agent may, at its option, but shall not be required to, procure the insurance and charge Borrowers therefor.  Each Borrower agrees to deliver to Agent, promptly as rendered, copies of all reports made to insurance companies.  While no Event of Default exists, Borrowers may settle, adjust or compromise any insurance claim, as long as the proceeds are delivered to Agent.  If an Event of Default exists, only Agent shall be authorized to settle, adjust and compromise such claims.

(b)    Any proceeds of insurance (other than proceeds from workers' compensation or D&O insurance) and any awards arising from condemnation of any Collateral shall be paid to Agent.  Any proceeds or awards that relate to Real Estate shall be applied first to Term Loans and then to other Obligations.

31

(c)    If requested by Borrowers in writing within 15 days after Agent's receipt of any insurance proceeds or condemnation awards relating to any loss or destruction of Equipment or Real Estate, Borrowers may use such proceeds or awards to repair or replace such Equipment or Real Estate (and until so used, the proceeds shall be held by Agent as Cash Collateral) as long as (i) no Default or Event of Default exists; (ii) such repair or replacement is promptly undertaken and concluded in accordance with plans reasonably satisfactory to Agent; (iii) replacement buildings are constructed on the sites of the original casualties and are of comparable size, quality and utility to the destroyed buildings; (iv) the repaired or replaced Property is free of Liens, other than Permitted Liens that are not Purchase Money Liens; (v) Borrowers comply with disbursement procedures for such repair or replacement as Agent may reasonably require; and (vi) the aggregate amount of such proceeds or awards from any single casualty or condemnation does not exceed $1,000,000.

8.6.3    <u>Protection of Collateral</u>.    All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Agent to any Person to realize upon any Collateral, shall be borne and paid by Borrowers.  Agent shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Agent's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrowers' sole risk.

8.6.4    <u>Defense of Title</u>.  Each Borrower shall defend its title to Collateral and Agent's Liens therein against all Persons, claims and demands, except Permitted Liens which Borrower may accomplish by causing any title insurer that has provided title insurance to such Borrower defend same.

**8.7    Power of Attorney**.  Each Borrower hereby irrevocably constitutes and appoints Agent (and all Persons designated by Agent) as such Borrower's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section.  Agent, or Agent's designee, may, upon the occurrence and during the continuance of an Event of Default, without notice and in either its or a Borrower's name, but at the cost and expense of Borrowers:

(a)    Endorse a Borrower's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Agent's possession or control; and

(b)    (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Agent deems advisable; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign a Borrower's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to a Borrower, and notify postal authorities to deliver any such mail to an address designated by Agent; (vii) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use a Borrower's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use information contained in any data processing, electronic or information systems relating to Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which a Borrower is a beneficiary; and (xii) take all other actions as Agent deems appropriate to fulfill any Borrower's obligations under the Loan Documents.

32

## SECTION 9.    REPRESENTATIONS AND WARRANTIES

**9.1**    **General Representations and Warranties**.  To induce Agent and Lenders to enter into this Agreement and to make available the Commitments, Loans, each Borrower represents and warrants that:

9.1.1    Organization and Qualification.  Subject to the Entry of the Applicable Financing Order, each Borrower and each other Obligor is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Borrower and each other Obligor is duly qualified, authorized to do business and in good standing as a foreign corporation in each jurisdiction where failure to be so qualified could reasonably be expected to have a Material Adverse Effect.  No Obligor is an EEA Financial Institution.

9.1.2    Power and Authority.  Subject to the Entry of the Applicable Financing Order, each Obligor is duly authorized to execute, deliver and perform its Loan Documents.  Subject to the Entry of the Applicable Financing Order, the execution, delivery and performance of the Loan Documents have been duly authorized by all necessary action, and do not (a) require any consent or approval of any holders of Equity Interests of any Obligor, except those already obtained; (b) contravene the Organic Documents of any Obligor; (c) violate or cause a default under any Applicable Law or Material Contract; or (d) result in or require imposition of a Lien (other than Permitted Liens) on any Obligor's Property.

9.1.3    Enforceability.  Subject to the Entry of the Applicable Financing Order, each Loan Document is a legal, valid and binding obligation of each Obligor party thereto, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

9.1.4    Capital Structure.  **Schedule 9.1.4** shows, for each Obligor, its name, jurisdiction of organization, authorized and issued Equity Interests, holders of its Equity Interests, and agreements binding on such holders with respect to such Equity Interests.

9.1.5    Title to Properties; Priority of Liens.  Each Borrower and each other Obligor has good and insurable title to (or valid leasehold interests in) all of its Real Estate Collateral, free of Liens except Permitted Liens.  Each Borrower and each other Obligor has paid and discharged all lawful claims that, if unpaid, could become a Lien on its Properties, other than Permitted Liens.  Subject to the Entry of the Applicable Financing Order, all Liens of Agent in the Collateral are duly perfected, first priority Liens, subject only to those Liens identified in clauses (b), (c), (d), (e) (solely with respect to any mechanics' Liens and materialmens' liens existing prior to the Closing Date) and (g) of the definition of Permitted Liens.

9.1.6    [Reserved].

9.1.7    Taxes.  Each Borrower and each other Obligor has filed all federal, state and material local tax returns and other reports that it is required by law to file, and has paid prior to delinquency, or made provision for the payment of, all Taxes upon it, its income and its Properties, except to the extent being Properly Contested.  The provision for Taxes on the books of each Borrower and each other Obligor is adequate for all years not closed by applicable statutes, and for its current Fiscal Year.

9.1.8    Brokers.  There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents.

9.1.9    Intellectual Property. Each Borrower and each other Obligor owns or has the lawful right to use all Intellectual Property necessary for the conduct of its business, without conflict with any rights of others.  There is no pending or, to any Borrower's knowledge, threatened Intellectual

BN 31491395v6

Property Claim with respect to any Borrower, any other Obligor or any of their Property (including any Intellectual Property).

9.1.10    Governmental Approvals.  Other than (1) approval of the financing and terms of this Agreement, (2) the entry of the Applicable Financing Orders, (3) as could not be reasonably expected to result in a Material Adverse Effect, and (4) as otherwise disclosed with respect to the pending SEC investigation, each Borrower and each other Obligor has, is in compliance with, and is in good standing with respect to, all Governmental Approvals necessary to conduct its business and to own, lease and operate its Properties.  All necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and Borrowers and Subsidiaries have complied with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.

9.1.11    Compliance with Laws.   Each Borrower and each other Obligor has duly complied, and its Properties and business operations are in compliance, in all material respects with all Applicable Law, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  There have been no citations, notices or orders of material noncompliance issued to any Borrower or other Obligor under any Applicable Law, as could not be reasonably expected to result in a Material Adverse Effect, and as otherwise disclosed with respect to the pending SEC investigation.  No Inventory has been produced in violation of the FLSA.

9.1.12    Compliance with Environmental Laws.  Except as disclosed on **Schedule 9.1.13**, no Borrower's or other Obligor's past or present operations, Real Estate or other Properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up.  No Borrower or other Obligor has received any Environmental Notice that could reasonably be expected to result in a Material Adverse Effect.  No Borrower or other Obligor has any contingent liability with respect to any Environmental Release, environmental pollution or hazardous material on any Real Estate now or previously owned, leased or operated by it that could reasonably be expected to result in a Material Adverse Effect.

9.1.13    Burdensome Contracts.  No Borrower or other Obligor is a party or subject to any contract, agreement or charter restriction that could reasonably be expected to have a Material Adverse Effect.

9.1.14    Litigation.   Except for the Bankruptcy Cases and as otherwise shown on **Schedule 9.1.15**, there are no proceedings or investigations pending or, to any Borrower's knowledge, threatened against any Borrower or Other Obligor, or any of their businesses, operations, Properties, prospects or conditions, that (a) relate to any Loan Documents or transactions contemplated thereby; or (b) could reasonably be expected to have a Material Adverse Effect if determined adversely to any Borrower or Other Obligor.  No Borrower or Other Obligor is in default with respect to any order, injunction or judgment of any Governmental Authority.

9.1.15    No Defaults.  No event or circumstance has occurred or exists that constitutes a Default or Event of Default.  Other than defaults relating to the commencement of the Bankruptcy Cases, no Borrower or Other Obligor is in default, and no event or circumstance has occurred or exists that with the passage of time or giving of notice would constitute a default, under any Material Contract or in the payment of any Borrowed Money.  Other than defaults relating to the commencement of the Bankruptcy Cases, no default has occurred under any Material Contract which would permit any party (other than a Borrower or Subsidiary) to terminate a Material Contract prior to its scheduled termination date.

9.1.16    ERISA.   Except as could not reasonable be expected to result in a Material Adverse Effect:

34

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code, and other federal and state laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification. Each Obligor and ERISA Affiliate has met all applicable requirements under the Code, ERISA and the Pension Protection Act of 2006, and no application for a waiver of the minimum funding standards or an extension of any amortization period has been made with respect to any Plan.

(b)     There are no pending or, to the knowledge of Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.

(c)     (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least 60%; and no Obligor or ERISA Affiliate knows of any reason that such percentage could reasonably be expected to drop below 60%; (iii) no Obligor or ERISA Affiliate has incurred any liability to the PBGC except for the payment of premiums, and no premium payments are due and unpaid; (iv) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; and (v) no Pension Plan has been terminated by its plan administrator or the PBGC, and no fact or circumstance exists that could reasonably be expected to cause the PBGC to institute proceedings to terminate a Pension Plan.

(d)     With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

9.1.17    [Reserved].

9.1.18    [Reserved].

9.1.19    [Reserved].

9.1.20    Not a Regulated Entity. No Obligor is (a) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or (except as it related to the Bankruptcy Cases) any other Applicable Law regarding its authority to incur Debt.

9.1.21    Margin Stock. No Borrower or Other Obligor is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. No Loan proceeds will be used by Borrowers to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

9.1.22  <u>OFAC</u>.  No Borrower, Subsidiary, or any director, officer, employee, agent, affiliate or representative thereof, is or is owned or controlled by any individual or entity that is currently the subject or target of any Sanction or is located, organized or resident in a Designated Jurisdiction.

9.1.23  <u>Anti-Corruption Laws</u>.  Each Borrower and Subsidiary has conducted its business in accordance with applicable anti-corruption laws and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

9.1.24  <u>Commencement of Bankruptcy Cases</u>.  The Bankruptcy Cases were commenced on December 4, 2017, in accordance with applicable law.  Notice of the commencement of the Bankruptcy Cases and of the motion and hearing for the approval of the Interim Financing Order has been given, both as identified in the certificate of service, filed in the Bankruptcy Cases, in scope acceptable to the Agent.

**9.2**    **Complete Disclosure**.  No Loan Document contains any untrue statement of a material fact, nor fails to disclose any material fact necessary to make the statements contained therein not materially misleading.  There is no fact or circumstance that any Obligor has failed to disclose to Agent in writing that could reasonably be expected to have a Material Adverse Effect.

## SECTION 10.  COVENANTS AND CONTINUING AGREEMENTS

**10.1**    **Affirmative Covenants**.  As long as any Commitments or Obligations (other than contingent indemnification obligations) are outstanding, each Borrower shall, and shall cause each other Obligor to:

10.1.1  <u>Inspections; Appraisals</u>.

(a)    Permit Agent from time to time, subject (unless a Default or Event of Default exists) to reasonable notice and normal business hours, and subject to the rights of tenants, to visit and inspect the Properties of any Borrower or other Obligor, inspect, audit and make extracts from any Borrower's or other Obligor's books and records, and discuss with its officers, employees, agents and advisors such Borrower's or other Obligor's business, financial condition, assets, prospects and results of operations; provided, that unless an Event of Default has occurred and is continuing, Borrowers shall have no obligation to reimburse Agent or any Lender for the fees and costs of any such visit or inspection. Lenders may participate in any such visit or inspection, at their own expense.  Secured Parties shall have no duty to any Obligor to make any inspection, nor to share any results of any inspection, appraisal or report with any Obligor.  Borrowers acknowledge that all inspections, appraisals and reports are prepared by Secured Parties for their purposes, and Borrowers shall not be entitled to rely upon them.

(b)    Reimburse Agent for all its reasonable and documented out-of-pocket costs and expenses in connection with appraisals of Real Estate Collateral, up to one time per Loan Year; <u>provided, however</u>, that if an examination or appraisal is initiated during a Default or Event of Default, all charges, costs and expenses relating thereto shall be reimbursed by Borrowers without regard to such limits. Borrowers shall pay Agent's reasonable and documented out-of-pocket costs and expenses incurred in examination activities.

10.1.2  <u>Financial and Other Information</u>.  Keep adequate records and books of account with respect to its business activities, in which proper entries are made in accordance with GAAP reflecting all financial transactions; and furnish to Secured Parties:

(a)    as soon as available, and in any event within 30 days after the end of each month, reports of Asset Dispositions, sales status of Real Estate not yet sold, and summary of construction update on Real Estate under development;

(b)     promptly after the sending or filing thereof, copies of any proxy statements, financial statements or reports that any Borrower has made generally available to its shareholders; copies of any regular, periodic and special reports or registration statements or prospectuses that any Borrower files with the Securities and Exchange Commission or any other Governmental Authority, or any securities exchange; and copies of any press releases or other statements made available by a Borrower to the public concerning material changes to or developments in the business of such Borrower;

(c)     promptly after the sending or filing thereof, copies of any annual report to be filed in connection with each Plan or Foreign Plan; and

(d)     such other financial reports and information as Agent may request from time to time in connection with any Collateral or any Borrower's or other Obligor's financial condition or business.

10.1.3   <u>Notices</u>.  Notify Secured Parties in writing, promptly after a Borrower's obtaining knowledge thereof, of any of the following that affects an Obligor:  (a) the threat or commencement of any proceeding or investigation which would reasonably be expected to have a Material Adverse Effect; (b) any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract which would reasonably be expected to have a Material Adverse Effect; (c) any default under or termination of a Material Contract; (d) the existence of any Default or Event of Default; (e) any judgment in an amount exceeding $250,000; (f) the assertion of any Intellectual Property Claim which would reasonably be expected to have a Material Adverse Effect; (g) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), which would reasonably be expected to have a Material Adverse Effect; (h) any Environmental Release by an Obligor or on any Property owned, leased or occupied by an Obligor; or receipt of any Environmental Notice; or (i) the occurrence of any ERISA Event.

10.1.4   [Reserved].

10.1.5   <u>Compliance with Laws</u>.  Comply with all Applicable Laws, including ERISA, Environmental Laws, FLSA, OSHA, Anti-Terrorism Laws, and laws regarding collection and payment of Taxes, and maintain all Governmental Approvals necessary to the ownership of its Properties or conduct of its business, unless failure to comply (other than failure to comply with Anti-Terrorism Laws) or maintain could not reasonably be expected to have a Material Adverse Effect.  Without limiting the generality of the foregoing, if any Environmental Release occurs at or on any Real Estate Collateral of any Borrower or other Obligor, it shall act promptly and diligently to investigate and report to Agent and all appropriate Governmental Authorities the extent of, and to make appropriate remedial action to eliminate, such Environmental Release, whether or not directed to do so by any Governmental Authority.

10.1.6   <u>Taxes</u>.  Pay and discharge all Taxes prior to the date on which they become delinquent or penalties attach, unless such Taxes are being Properly Contested.

10.1.7   <u>Insurance</u>.  In addition to the insurance required hereunder with respect to Collateral, maintain insurance with insurers (with a Best rating of at least A+, unless otherwise approved by Agent in its discretion) reasonably satisfactory to Agent, with respect to the Properties and business of Borrowers and Subsidiaries of such type (including product liability, workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are customary for companies similarly situated with deductibles and subject to an endorsement or assignment reasonably satisfactory to Agent.

10.1.8   <u>Licenses</u>.  Keep each License affecting any Collateral (including the manufacture, distribution or disposition of Inventory) or any other material Property of Borrowers and Subsidiaries in full force and effect.

10.1.9    [Reserved].

10.1.10    Anti-Corruption Laws. Conduct its business in compliance with applicable anti-corruption laws and maintain policies and procedures designed to promote and achieve compliance with such laws.

10.1.11    Bankruptcy Matters.

(a)    Financing Orders. Take all reasonable acts and make reasonable effort to request and obtain approval by the Bankruptcy Court in the Bankruptcy Cases of the Loan Documents, and the transactions, rights, interests, claims, remedies, privileges, waivers, and protections contemplated or provided thereunder, and entry of the Applicable Financing Orders.

(b)    Bankruptcy Documents.  Promptly furnish to counsel for Agent all documents filed in the Bankruptcy Cases.

(c)    [Reserved].

(d)    Additional Reporting.  In addition to all covenants providing for reporting in the Agreement, timely provide Agent with all documents and information submitted by Borrower to the United States Trustee.

**10.2    Negative Covenants.** As long as any Commitments or Obligations are outstanding, each Borrower shall not, and shall cause each other Obligor not to:

10.2.1    Permitted Debt.  Create, incur, guarantee or suffer to exist any Debt, except:

(a)    the Obligations;

(b)    Subordinated Debt;

(c)    Borrowed Money (other than the Obligations and Subordinated Debt), but only to the extent outstanding on the Closing Date and not satisfied with proceeds of the initial Loans;

(d)    Debt that is in existence when a Person becomes an Obligor or that is secured by an asset when acquired by a Borrower or other Obligor, as long as such Debt was not incurred in contemplation of such Person becoming an Obligor or such acquisition, and does not exceed $250,000 in the aggregate at any time;

(e)    Permitted Contingent Obligations;

(f)    Refinancing Debt as long as each Refinancing Condition is satisfied;

(g)    Debt that is not included in any of the preceding clauses of this Section, is not secured by a Lien and does not exceed $250,000 in the aggregate at any time;

(h)    Intercompany Debt among the Bankruptcy Parties; and

(i)    any Debt not otherwise constituting Borrowed Money.

10.2.2    Permitted Liens.  Create or suffer to exist any Lien upon any of its Property, except the following (collectively, "Permitted Liens"):

(a)    Liens in favor of Agent;

38

(b)        Liens for Taxes not yet delinquent or being Properly Contested;

(c)        easements, rights-of-way, restrictions, covenants or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not interfere with the Ordinary Course of Business;

(d)        the Carve Out;

(e)        statutory Liens in existence as of the date hereof arising in the Ordinary Course of Business encumbering or attaching to the Real Estate Collateral, but only if (i) payment of the obligations secured thereby is not yet delinquent or is being Properly Contested, and (ii) such Liens do not materially impair operation of the business of any Borrower or other Obligor;

(f)        Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of government tenders, bids, contracts, statutory obligations and other similar obligations;

(g)        normal and customary rights of setoff upon deposits in favor of depository institutions, and Liens of a collecting bank on Payment Items in the course of collection

(h)        existing Liens shown on **Schedule 10.2.2**; and

(i)        Liens on assets securing Debt permitted by Section 10.2.1(f).

10.2.3    [Reserved].

10.2.4    [Reserved].

10.2.5    [Reserved].

10.2.6    Disposition of Assets.  Make any Asset Disposition, except a Permitted Asset Disposition.

10.2.7    Loans.  Make any loans or other advances of money to any Person, except (a) advances to an officer or employee for salary, travel expenses, commissions and similar items in the Ordinary Course of Business; (b) prepaid expenses and extensions of trade credit made in the Ordinary Course of Business; (c) deposits with financial institutions permitted hereunder; and (d) as long as no Default or Event of Default exists, intercompany loans among any Bankruptcy Parties.

10.2.8    Restrictions on Payment of Certain Debt.  Make any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to any (a) Subordinated Debt, except (i) regularly scheduled payments of principal, interest and fees, payments with the proceeds of any sale of Real Estate that is not Real Estate Collateral, and any other payments permitted under any subordination agreement relating to such Debt and (ii) intercompany debt owing to any Obligor; or (b) Borrowed Money (other than the Obligations and intercompany loans among Bankruptcy Parties) prior to its due date under the agreements evidencing such Debt as in effect on the Closing Date (or as amended thereafter with the consent of Agent).

10.2.9    Fundamental Changes.  Change its name or conduct business under any fictitious name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate, wind up its affairs or dissolve itself; or merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions, except for mergers or consolidations of a wholly-owned Subsidiary with another wholly-owned Subsidiary or into an Obligor.

10.2.10 [Reserved].

39

10.2.11 <u>Organic Documents</u>.  Amend, modify or otherwise change any of its Organic Documents, except in connection with a transaction permitted under **Section 10.2.9**.

10.2.12 [Reserved].

10.2.13 <u>Accounting Changes</u>.  Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year.

10.2.14 <u>Restrictive Agreements</u>.  Become a party to any Restrictive Agreement, except a Restrictive Agreement (a) in effect on the Closing Date; (b) relating to secured Debt permitted hereunder, as long as the restrictions apply only to collateral for such Debt; or (c) constituting customary restrictions on assignment in leases and other contracts.

10.2.15 [Reserved].

10.2.16 <u>Conduct of Business</u>.  Engage in any business, other than its business as conducted on the Closing Date and any activities incidental thereto.

10.2.17 <u>Affiliate Transactions</u>.  Enter into or be party to any transaction with an Affiliate, except (a) transactions expressly permitted by the Loan Documents; (b) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities; (c) transactions solely among Bankruptcy Parties; (d) transactions with Affiliates consummated prior to the Closing Date, as shown on **Schedule 10.2.17**; and (e) transactions with Affiliates in the Ordinary Course of Business, upon fair and reasonable terms fully disclosed to Agent and no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate.

10.2.18 <u>Plans</u>.  Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Closing Date.

10.2.19 <u>Amendments to Subordinated Debt</u>.  Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt (other than intercompany Debt), if such modification (a) increases any required payment of principal or interest; (b) accelerates the date on which any installment of principal or any interest is due, or adds any additional redemption, put or prepayment provisions; (c) shortens the final maturity date or otherwise accelerates amortization; (d) increases the interest rate; (e) increases or adds any fees or charges; or (f) results in the Obligations not being fully benefited by the subordination provisions thereof.

10.2.20 <u>Bankruptcy Matters</u>.

(a)    <u>Financing Orders</u>.  Request, seek, support, or consent to, and not oppose and contest (unless otherwise consented to by Agent), any amendment, modification, stay, or vacating of any Applicable Financing Order or Loan Document.

(b)    <u>Other Postpetition Debt</u>.  Request, seek, support, or consent to, and not oppose and contest (unless otherwise consented to by Agent), the incurrence or approval of any postpetition loan or other financial accommodation or indebtedness from any other Person other than Lender pursuant to section 364(c) or (d) of the Bankruptcy Code unless such loan or financing results in the contemporaneous payment and satisfaction of all Obligations owed to Lenders, in full, in cash.

(c)    <u>Other Administrative Priority Expenses</u>.  Request, seek, support, or consent to, and not oppose and contest (unless otherwise consented to by Secured Parties), the incurrence, approval, or granting of any administrative expense priority claim or any other claim (now existing or hereafter

40

arising of any kind or nature whatsoever) that is equal or superior in priority to the liens and superpriority administrative claims of Lender in respect of the Obligations owed to Lenders.

(d)    <u>Use of Proceeds and Cash Collateral</u>.   Use the Loans, or the proceeds of Collateral, including Cash Collateral, for any purpose relating to or in furtherance of an Adverse Lender Challenge, including without limitation the payment of fees and costs incurred by Professionals.

(e)    <u>Plan</u>.   File, support, or consent to, and not oppose and contest (unless otherwise consented to by Lender), a chapter 11 Plan of Reorganization in the Bankruptcy Case that does not provide for the simultaneous indefeasible payment and satisfaction of all Obligations owed to Lenders, in full, in cash, unless otherwise expressly agreed to by Secured Parties or otherwise treats Lenders as unimpaired under any such plan.

(f)    <u>Cash Collateral</u>.   In the event of the termination of Lenders' commitment to make or extend Loans, or other financial accommodations to or for the benefit of Borrowers and their Estates, under the Loan Agreement, request or support any request for the use of Cash Collateral pursuant to section 363 of the Bankruptcy Code or other applicable law without Agent's express written consent.

(g)    <u>Surcharge Waiver</u>.   After entry of the Final Financing Order, seek or support any request to surcharge the Collateral under section 506(c) of the Bankruptcy Code

## SECTION 11.  EVENTS OF DEFAULT; REMEDIES ON DEFAULT

**11.1    Events of Default**.   Each of the following shall be an "<u>Event of Default</u>" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

(a)    Any Borrower fails to pay its Obligations when due (whether at stated maturity, on demand, upon acceleration or otherwise);

(b)    Any representation, warranty or other written statement of an Obligor made in connection with any Loan Documents or transactions contemplated thereby is incorrect or misleading in any material respect when given;

(c)    A Borrower breaches or fail to perform any covenant contained in **8.6.2, 10.1.2, or 10.2**;

(d)    An Obligor breaches or fails to perform any other covenant contained in any Loan Documents, and such breach or failure is not cured within 15 days after a Senior Officer of such Obligor has knowledge thereof or receives notice thereof from Agent, whichever is sooner;

(e)    A Guarantor repudiates, revokes or attempts to revoke its Guaranty; an Obligor or third party denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to Agent; or any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Secured Parties);

(f)    Any breach or default of an Obligor occurs after the petition date under any instrument or agreement to which it is a party or by which it or any of its Properties is bound, relating to any Borrowed Money (other than the Obligations) in excess of $250,000, if the maturity of or any payment with respect to such Borrowed Money may be accelerated or demanded due to such breach;

(g)    Any judgment or order for the payment of money is entered against an Obligor in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors, $250,000 (net of insurance coverage therefor that has not been denied by the insurer), unless a stay of enforcement of such judgment or order is in effect;

(h)    An Obligor is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any material part of its business; an Obligor suffers the loss, revocation or termination of any material license, permit, lease or agreement necessary to the business of the Obligors, taken as a whole; there is a cessation of any material part of an Obligor's business for a material period of time; an Obligor agrees to or commences any liquidation, dissolution or winding up of its affairs;

(i)    Except for the Bankruptcy Cases, an Insolvency Proceeding is commenced by an Obligor; a trustee is appointed to take possession of any substantial Property of or to operate any of the business of an Obligor; or an Insolvency Proceeding is commenced against an Obligor and: the Obligor consents to institution of the proceeding, the petition commencing the proceeding is not timely contested by the Obligor, the petition is not dismissed within 30 days after filing, or an order for relief is entered in the proceeding;

(j)    An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of an Obligor to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan; an Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan; or

(k)    Bankruptcy Matters:

(i)    The entry of an order in any Bankruptcy Case amending, supplementing, staying, reversing, vacating, or otherwise modifying any Applicable Financing Order in a manner adverse to Lenders, any Loan Document, or any right, interest, lien, security interest, claim, benefit, privilege, or remedy in favor of Secured Parties;

(ii)    The entry of an order in any Bankruptcy Case authorizing any Borrower in such Bankruptcy Case to incur indebtedness or additional financing under section 364(c) or (d) of the Bankruptcy Code other than from Secured Parties, or without the express prior written consent of Agent, unless such loan or financing results in the contemporaneous payment and satisfaction of all Obligations owed to Secured Parties, in full, in cash;

(iii)    The entry of an order in any Bankruptcy Case authorizing any costs or expenses under section 506(c) of the Bankruptcy Code as a surcharge against the Collateral;

(iv)    The entry of an order in any Bankruptcy Case authorizing the use of Cash Collateral under section 363(c) of the Bankruptcy Code without Agent's prior written consent or except as otherwise permitted in the Loan Agreement or the Applicable Financing Orders;

(v)    The entry of an order in any Bankruptcy Case appointing an interim or permanent trustee, or an examiner having enlarged powers relating to the operation of the business or assets of Borrower under section 1106(b) of the Bankruptcy Code;

(vi)    The entry of an order dismissing any Bankruptcy Case or converting any Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code;

(vii)    The entry of an order in any Bankruptcy Case authorizing or granting relief from, terminating, annulling, or modifying the automatic stay of section 362 of the Bankruptcy Code to permit a party to execute upon or enforce a lien on or exercise any right with respect to any material portion of the Collateral or to the extent it would result in a material adverse effect on Borrower, assets of Borrower and its Estate, or Borrower's financial condition or business operations;

(viii)    The entry of an order in any Bankruptcy Case approving or granting priority for any administrative expense priority claim or any other claim (now existing or hereafter arising of any kind or nature whatsoever) that is equal or superior in priority to the liens and superpriority administrative claims of Secured Parties in respect of the Obligations owed to Secured Parties;

(ix)    The filing (whether by Borrower or any other party) of a chapter 11 Plan of Reorganization or entry of an order confirming a chapter 11 Plan of Reorganization in the Bankruptcy Case that does not provide for the simultaneous indefeasible payment and satisfaction of all Obligations owed to Secured Parties, in full, in cash, unless otherwise expressly agreed to by Agent;

(x)    The occurrence of any condition or event that would be a breach of or a default under any Applicable Financing Order, or that would entitle Lenders to exercise or pursue enforcement of any right or remedy granted, authorized, acknowledged, or recognized in a Applicable Financing Order, including, without limitation, any "Default" or "Event of Default" as provided in the Applicable Financing Orders;

(xi)    The demand, termination, or expiration, or an event that would permit or result in the occurrence of the demand, termination, or expiration of any commitment, obligation, or liability of Lenders to make or extend Loans, and other financial accommodations from Lenders to or for the benefit of Borrower and its Estate, or any Applicable Financing Order;

(xii)    The occurrence or threat of the occurrence of any restriction, limitation, or cessation of either the validity, scope, existence, first and senior priority, perfection, or enforceability of the Lien in favor of Lenders securing the Obligations for any reason.

**11.2    Remedies upon Default**. Subject to the Applicable Financing Order, if an Event of Default described in **Section 11.1(i)** occurs with respect to any Borrower, then to the extent permitted by Applicable Law, all Obligations shall become automatically due and payable and all Commitments shall terminate, without any action by Agent or notice of any kind.  In addition, or if any other Event of Default exists, Agent may in its discretion (and shall upon written direction of Required Lenders) do any one or more of the following from time to time:

(a)    declare any Obligations immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrowers to the fullest extent permitted by law;

(b)    terminate, reduce or condition any Commitment; and

(c)    exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise, including the rights and remedies of a secured party under the UCC.  Such rights and remedies include the rights to (i) take possession of any Collateral; (ii) require Borrowers to assemble Collateral, at Borrowers' expense, and make it available to Agent at a place designated by Agent; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by a Borrower, Borrowers agree not to charge for such storage); and (iv) subject to the Applicable Financing Order, sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by Applicable Law, in lots or in bulk, at such locations, all as Agent, in its discretion, deems advisable.  Each Borrower agrees that 10 days notice of any proposed sale or other disposition of Collateral by Agent shall be reasonable, and that any sale conducted on the internet or to a licensor of Intellectual Property shall be commercially reasonable.  Agent may conduct sales on any Obligor's premises, without charge, and any sale may be adjourned from time to time in accordance with Applicable Law.  Agent shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and Agent may purchase any Collateral at public or, if permitted by

43

law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations.

**11.3    License**. Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all Intellectual Property of Borrowers, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral during an Event of Default.

**11.4    Setoff**. At any time during an Event of Default, Agent, Lenders, and any of their Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Agent, such Lender or such Affiliate to or for the credit or the account of an Obligor against its Obligations, whether or not Agent, such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Agent, such Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 4.2.2 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders. The rights of Agent, each Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.

**11.5    Remedies Cumulative; No Waiver**.

11.5.1    Cumulative Rights. All agreements, warranties, guaranties, indemnities and other undertakings of Obligors under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of Secured Parties under the Loan Documents are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations.

11.5.2    Waivers. No waiver or course of dealing shall be established by (a) the failure or delay of Agent or any Lender to require strict performance by any Obligor under any Loan Document, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by Agent or any Lender of any payment or performance by an Obligor under any Loan Documents in a manner other than that specified therein. Any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

# SECTION 12.  AGENT

**12.1    Appointment, Authority and Duties of Agent**.

12.1.1    Appointment and Authority. Each Secured Party appoints and designates Hankey Capital LLC as Agent under all Loan Documents. Agent may, and each Secured Party authorizes Agent to, enter into all Loan Documents to which Agent is intended to be a party and accept all Security Documents. Any action taken by Agent in accordance with the provisions of the Loan Documents, and the exercise by Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Secured Parties. Without limiting the generality of the foregoing, Agent shall have the sole and exclusive authority to (a) act as the

44

disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (d) manage, supervise or otherwise deal with Collateral; and (e) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, Applicable Law or otherwise. Agent alone shall be authorized to determine whether to impose or release any reserve, or whether any conditions to funding have been satisfied, which determinations and judgments, if exercised in good faith, shall exonerate Agent from liability to any Secured Party or other Person for any error in judgment.

12.1.2 <u>Duties</u>. The title of "Agent" is used solely as a matter of market custom and the duties of Agent are administrative in nature only. Agent has no duties except those expressly set forth in the Loan Documents, and in no event does Agent have any agency, fiduciary or implied duty to or relationship with any Secured Party or other Person by reason of any Loan Document or related transaction. The conferral upon Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

12.1.3 <u>Agent Professionals</u>. Agent may perform its duties through agents and employees. Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

12.1.4 <u>Instructions of Required Lenders</u>. The rights and remedies conferred upon Agent under the Loan Documents may be exercised without the necessity of joining any other party, unless required by Applicable Law. In determining compliance with a condition for any action hereunder, including satisfaction of any condition in **Section 6**, Agent may presume that the condition is satisfactory to a Secured Party unless Agent has received notice to the contrary from such Secured Party before Agent takes the action. Agent may request instructions from Required Lenders or other Secured Parties with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its satisfaction from Secured Parties of their indemnification obligations against Claims that could be incurred by Agent. Agent may refrain from any act until it has received such instructions or assurances, and shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon all Secured Parties, and no Secured Party shall have any right of action whatsoever against Agent as a result of Agent acting or refraining from acting pursuant to instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in **Section 14.1.1**. In no event shall Agent be required to take any action that it determines in its discretion is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to liability.

**12.2    <u>Agreements Regarding Collateral and Borrower Materials</u>.**

12.2.1 <u>Lien Releases; Care of Collateral</u>. Secured Parties authorize Agent to release any Lien on any Collateral (a) upon Full Payment of the Obligations; (b) that is the subject of a disposition or Lien that Borrowers certify in writing is a Permitted Asset Disposition or a Permitted Lien entitled to priority over Agent's Liens (and Agent may rely conclusively on such certificate without further inquiry); (c) that does not constitute a material part of the Collateral; or (d) subject to **Section 14.1**, with the consent of Required Lenders. Secured Parties authorize Agent to subordinate its Liens to any Purchase Money Lien or other Lien entitled to priority hereunder. Agent has no obligation to assure that any Collateral exists or is owned by an Obligor, or is cared for, protected or insured, nor to assure that Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral.

12.2.2  <u>Possession of Collateral</u>.  Agent and Secured Parties appoint each Secured Party as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in Collateral held or controlled by it, to the extent such Liens are perfected by possession or control.  If a Secured Party obtains possession or control of any Collateral, it shall notify Agent thereof and, promptly upon Agent's request, deliver such Collateral to Agent or otherwise deal with it in accordance with Agent's instructions.

12.2.3  <u>Reports</u>.  Agent shall promptly provide to Lenders, when complete, any field examination, audit or appraisal report prepared for Agent with respect to any Obligor or Collateral ("Report").  Reports and other Borrower Materials may be made available to Lenders by providing access to them on the Platform, but Agent shall not be responsible for system failures or access issues that may occur from time to time.  Each Lender agrees (a) that Reports are not intended to be comprehensive audits or examinations, and that Agent or any other Person performing an audit or examination will inspect only limited information and will rely significantly upon Borrowers' books, records and representations; (b) that Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials and shall not be liable for any information contained in or omitted from any Borrower Materials, including any Report; and (c) to keep all Borrower Materials confidential and strictly for such Lender's internal use, not to distribute any Report or other Borrower Materials (or the contents thereof) to any Person (except to such Lender's Participants, attorneys and accountants), and to use all Borrower Materials solely for administration of the Obligations.  Each Lender shall indemnify and hold harmless Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Borrower Materials, as well as from any Claims arising as a direct or indirect result of Agent furnishing same to such Lender, via the Platform or otherwise.

**12.3  <u>Reliance By Agent</u>**.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy, e-mail or other electronic means) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person.  Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

**12.4  <u>Action Upon Default</u>**.  Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in **Section 6**, unless it has received written notice from a Borrower or Required Lenders specifying the occurrence and nature thereof.  If a Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify Agent and the other Lenders thereof in writing.  Each Secured Party agrees that, except as otherwise provided in any Loan Documents or with the written consent of Agent and Required Lenders, it will not take any Enforcement Action, accelerate Obligations or assert any rights relating to any Collateral.

**12.5  <u>Ratable Sharing</u>**.  If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its ratable share of such Obligation, such Lender shall forthwith purchase from Secured Parties participations in the affected Obligation as are necessary to share the excess payment or reduction on a Pro Rata basis or in accordance with **Section 5.6.2**, as applicable.  If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.  Notwithstanding the foregoing, if a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the full amount thereof to Agent for application under **Section 4.2.2** and it shall provide a written statement to Agent describing the Obligation affected by such payment or reduction.

**12.6  <u>Indemnification</u>.  EACH SECURED PARTY SHALL INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES TO THE EXTENT NOT REIMBURSED BY OBLIGORS, ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH INDEMNITEE, PROVIDED THAT ANY CLAIM AGAINST**

AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR AGENT (IN THE CAPACITY OF AGENT). In Agent's discretion, it may reserve for any Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Secured Parties. If Agent is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to Agent by each Secured Party to the extent of its Pro Rata share.

    **12.7**    <u>**Limitation on Responsibilities of Agent**</u>. Agent shall not be liable to any Secured Party for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by Agent's gross negligence or willful misconduct. Agent does not assume any responsibility for any failure or delay in performance or any breach by any Obligor, Lender or other Secured Party of any obligations under the Loan Documents. Agent does not make any express or implied representation, warranty or guarantee to Secured Parties with respect to any Obligations, Collateral, Liens, Loan Documents or Obligor. No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents or Borrower Materials; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Obligor or Account Debtor. No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Obligor of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

    **12.8**    <u>**Successor Agent and Co-Agents**</u>.

    12.8.1   <u>Resignation; Successor Agent</u>. Agent may resign at any time by giving at least 30 days written notice thereof to Lenders and Borrowers. Required Lenders may appoint a successor that is (a) a Lender or Affiliate of a Lender; or (b) a financial institution reasonably acceptable to Required Lenders and (provided no Default or Event of Default exists) Borrowers. If no successor is appointed by the effective date of Agent's resignation then on such date, Agent may appoint a successor acceptable to it in its discretion (which shall be a Lender unless no Lender accepts the role) or, in the absence of such appointment, Required Lenders shall automatically assume all rights and duties of Agent. The successor Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Agent without further act. The retiring Agent shall be discharged from its duties hereunder on the effective date of its resignation, but shall continue to have all rights and protections available to Agent under the Loan Documents with respect to actions, omissions, circumstances or Claims relating to or arising while it was acting or transferring responsibilities as Agent or holding any Collateral on behalf of Secured Parties, including the indemnification set forth in **Sections 12.6** and **14.2**, and all rights and protections under this **Section 12**. Any successor to Hankey Capital by merger or acquisition of stock or this loan shall continue to be Agent hereunder without further act on the part of any Secured Party or Obligor.

    12.8.2   <u>Co-Collateral Agent</u>. If appropriate under Applicable Law, Agent may appoint a Person to serve as a co-collateral agent or separate collateral agent under any Loan Document. Each right, remedy and protection intended to be available to Agent under the Loan Documents shall also be vested in such agent. Secured Parties shall execute and deliver any instrument or agreement that Agent may request to effect such appointment. If any such agent shall die, dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of the agent, to the extent permitted by Applicable Law, shall vest in and be exercised by Agent until appointment of a new agent.

**12.9    Due Diligence and Non-Reliance**.  Each Lender acknowledges and agrees that it has, independently and without reliance upon Agent or any other Lenders, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of each Obligor and its own decision to enter into this Agreement and to fund Loans hereunder.  Each Secured Party has made such inquiries as it feels necessary concerning the Loan Documents, Collateral and Obligors.  Each Secured Party acknowledges and agrees that the other Secured Parties have made no representations or warranties concerning any Obligor, any Collateral or the legality, validity, sufficiency or enforceability of any Loan Documents or Obligations.  Each Secured Party will, independently and without reliance upon any other Secured Party, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in making Loans, and in taking or refraining from any action under any Loan Documents.  Except for notices, reports and other information expressly requested by a Lender, Agent shall have no duty or responsibility to provide any Secured Party with any notices, reports or certificates furnished to Agent by any Obligor or any credit or other information concerning the affairs, financial condition, business or Properties of any Obligor (or any of its Affiliates) which may come into possession of Agent or its Affiliates.

**12.10    Remittance of Payments and Collections**.

12.10.1 Remittances Generally.  Payments by any Secured Party to Agent shall be made by the time and date provided herein, in immediately available funds.  If no time for payment is specified or if payment is due on demand and request for payment is made by Agent by 1:00 p.m. on a Business Day, then payment shall be made by the Secured Party by 3:00 p.m. on such day, and if request is made after 1:00 p.m., then payment shall be made by 11:00 a.m. on the next Business Day.  Payment by Agent to any Secured Party shall be made by wire transfer, in the type of funds received by Agent.  Any such payment shall be subject to Agent's right of offset for any amounts due from such payee under the Loan Documents.

12.10.2 Failure to Pay.  If any Secured Party fails to deliver when due any amount payable by it to Agent hereunder, such amount shall bear interest, from the due date until paid in full, at the greater of the Base Rate or the rate determined by Agent as customary for interbank compensation for two Business Days and thereafter at the Default Rate for Base Rate Loans.  In no event shall Borrowers be entitled to credit for any interest paid by a Secured Party to Agent, nor shall a Defaulting Lender be entitled to interest on amounts held by Agent pursuant to **Section 4.2**.

12.10.3 Recovery of Payments.  If Agent pays an amount to a Secured Party in the expectation that a related payment will be received by Agent from an Obligor and such related payment is not received, then Agent may recover such amount from the Secured Party.  If Agent determines that an amount received by it must be returned or paid to an Obligor or other Person pursuant to Applicable Law or otherwise, then Agent shall not be required to distribute such amount to any Secured Party.  If Agent is required to return any amounts applied by it to Obligations held by a Secured Party, such Secured Party shall pay to Agent, **on demand**, its share of the amounts required to be returned.

**12.11    Individual Capacities**.  As a Lender, Hankey Capital shall have the same rights and remedies under the Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include Hankey Capital in its capacity as a Lender.  Agent, Lenders and their Affiliates may accept deposits from, lend money to, act as financial or other advisor to, and generally engage in any kind of business with, Obligors and their Affiliates, as if they were not Agent or Lenders hereunder, without any duty to account therefor to any Secured Party.  In their individual capacities, Agent, Lenders and their Affiliates may receive information regarding Obligors, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and shall have no obligation to provide such information to any Secured Party.

48

**12.12    Titles**.  Each Lender, other than Hankey Capital, that is designated in connection with this credit facility as an "Arranger," "Bookrunner" or "Agent" of any kind shall have no right or duty under any Loan Documents other than those applicable to all Lenders, and shall in no event have any fiduciary duty to any Secured Party.

**12.13    [Reserved]**.

**12.14    No Third Party Beneficiaries**.  This **Section 12** is an agreement solely among Secured Parties and Agent, and shall survive Full Payment of the Obligations.  This **Section 12** does not confer any rights or benefits upon Borrowers or any other Person.  As between Borrowers and Agent, any action that Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Secured Parties.

## SECTION 13.  BENEFIT OF AGREEMENT; ASSIGNMENTS

**13.1    Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of Borrowers, Agent, Lenders, Secured Parties, and their respective successors and assigns, except that (a) no Borrower shall have the right to assign its rights or delegate its obligations under any Loan Documents; and (b) any assignment by a Lender must be made in compliance with **Section 13.3**.  Agent may treat the Person which made any Loan as the owner thereof for all purposes until such Person makes an assignment in accordance with **Section 13.3**.  Any authorization or consent of a Lender shall be conclusive and binding on any subsequent transferee or assignee of such Lender.

**13.2    Participations**.

13.2.1    Permitted Participants; Effect.  Subject to **Section 13.3.3**, any Lender may sell to an Eligible Assignee ("Participant") a participating interest in the rights and obligations of such Lender under any Loan Documents.  Despite any sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, it shall remain solely responsible to the other parties hereto for performance of such obligations, it shall remain the holder of its Loans and Commitments for all purposes, all amounts payable by Borrowers shall be determined as if it had not sold such participating interests, and Borrowers and Agent shall continue to deal solely and directly with such Lender in connection with the Loan Documents.  Each Lender shall be solely responsible for notifying its Participants of any matters under the Loan Documents, and Agent and the other Lenders shall not have any obligation or liability to any such Participant.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of **Section 5.9** unless Borrowers agree otherwise in writing.

13.2.2    Voting Rights.  Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, waiver or other modification of a Loan Document other than that which forgives principal, interest or fees, reduces the stated interest rate or fees payable with respect to any Loan or Commitment in which such Participant has an interest, postpones the Term Loan Maturity Date or any date fixed for any regularly scheduled payment of principal, interest or fees on such Loan or Commitment, or releases any Borrower, Guarantor or substantially all Collateral.

13.2.3    Participant Register.  Each Lender that sells a participation shall, acting as a non-fiduciary agent of Borrowers (solely for tax purposes), maintain a register in which it enters the Participant's name, address and interest in Commitments, Loans (and stated interest).  Entries in the register shall be conclusive, absent manifest error, and such Lender shall treat each Person recorded in the register as the owner of the participation for all purposes, notwithstanding any notice to the contrary.  No Lender shall have an obligation to disclose any information in such register except to the extent necessary to establish that a Participant's interest is in registered form under the Code.

13.2.4  <u>Benefit of Setoff</u>.  Each Participant shall have a right of set-off in respect of its participating interest to the same extent as if such interest were owing directly to a Lender, and each Lender shall also retain the right of set-off with respect to any participating interests sold by it.  By exercising any right of set-off, a Participant agrees to share with Lenders all amounts received through its set-off, in accordance with **Section 12.5** as if such Participant were a Lender.

**13.3**  <u>**Assignments**</u>.

13.3.1  <u>Permitted Assignments</u>.  A Lender may assign to an Eligible Assignee any of its rights and obligations under the Loan Documents, as long as (a) each assignment is of a constant, and not a varying, percentage of the transferor Lender's rights and obligations under the Loan Documents and, in the case of a partial assignment, is in a minimum principal amount of $250,000 (unless otherwise agreed by Agent in its discretion) and integral multiples of $100,000 in excess of that amount; (b) except in the case of an assignment in whole of a Lender's rights and obligations, the aggregate amount of the Commitments retained by the transferor Lender is at least $250,000 (unless otherwise agreed by Agent it its discretion); and (c) the parties to each such assignment (which shall include, if the assignee is an Eligible Assignee pursuant to clause (b) of the definition thereof, the Borrower Agent) shall execute and deliver an Assignment to Agent for acceptance and recording.  Nothing herein shall limit the right of Agent or a Lender to pledge or assign any rights under the Loan Documents to secure obligations of such Lender, including a pledge or assignment to a Federal Reserve Bank or any other party whether as collateral for a credit facility or otherwise; provided, however, that no such pledge or assignment shall release the Lender from its obligations hereunder nor substitute the pledge or assignee for such Lender as a party hereto.

13.3.2  <u>Effect; Effective Date</u>.  Upon delivery to Agent of an assignment notice in the form of **Exhibit B** and a processing fee of $3,500 (unless otherwise agreed by Agent in its discretion), the assignment shall become effective as specified in the notice, if it complies with this **Section 13.3**.  From such effective date, the Eligible Assignee shall for all purposes be a Lender under the Loan Documents, and shall have all rights and obligations of a Lender thereunder.  Upon consummation of an assignment, the transferor Lender, Agent and Borrowers shall make appropriate arrangements for issuance of replacement and/or new notes, if applicable.  The transferee Lender shall comply with **Section 5.10** and deliver, upon request, an administrative questionnaire satisfactory to Agent.

13.3.3  <u>Certain Assignees</u>.  No assignment or participation may be made to a Borrower, Affiliate of a Borrower, Defaulting Lender or natural person.  Agent shall have no obligation to determine whether any assignment is permitted under the Loan Documents.  Any assignment by a Defaulting Lender must be accompanied by satisfaction of its outstanding obligations under the Loan Documents in a manner satisfactory to Agent, including payment by the Defaulting Lender or Eligible Assignee of an amount sufficient upon distribution (through direct payment, purchases of participations or other methods acceptable to Agent in its discretion) to satisfy all funding and payment liabilities of the Defaulting Lender.  If any assignment by a Defaulting Lender (by operation of law or otherwise) does not comply with the foregoing, the assignee shall be deemed a Defaulting Lender for all purposes until compliance occurs.

13.3.4  <u>Register</u>.  Agent, acting as a non-fiduciary agent of Borrowers (solely for tax purposes), shall maintain (a) a copy (or electronic equivalent) of each Assignment and Acceptance delivered to it, and (b) a register for recordation of the names, addresses and Commitments of, and the Loans, interest owing to, each Lender.  Entries in the register shall be conclusive, absent manifest error, and Borrowers, Secured Parties shall treat each Person recorded in such register as a Lender for all purposes under the Loan Documents, notwithstanding any notice to the contrary.  Agent may choose to show only one Borrower as the borrower in the register, without any effect on the liability of any Obligor with respect to the Obligations.  The register shall be available for inspection by Borrowers or any Lender, from time to time upon reasonable notice.

13.4 <u>Replacement of Certain Lenders</u>. If a Lender (a) fails to give its consent to any amendment, waiver or action for which consent of all Lenders was required and Required Lenders consented, (b) is a Defaulting Lender, or (c) gave a notice under **Section 3.5** or requested payment or compensation under **Section 3.7** or **5.9** (and has not designated a different Lending Office pursuant to **Section 3.8**), then Agent or Borrower Agent may, upon 10 days notice to such Lender, require it to assign its rights and obligations under the Loan Documents to Eligible Assignee(s), pursuant to appropriate Assignment(s), within 20 days after the notice. Agent and Borrower Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment if the Lender fails to execute it. Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents through the date of assignment.

## SECTION 14.  MISCELLANEOUS

14.1 <u>Consents, Amendments and Waivers</u>.

14.1.1 <u>Amendment</u>. No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of Agent (with the consent of Required Lenders) and each Obligor party to such Loan Document; <u>provided</u>, <u>however</u>, that

(a) without the prior written consent of Agent, no modification shall alter any provision in a Loan Document that relates to any rights, duties or discretion of Agent;

(b) without the prior written consent of each affected Lender, no modification shall (i) increase the Commitment of such Lender; (ii) reduce the amount of, or waive or delay payment of, any principal, interest or fees payable to such Lender (except as provided in **Section 4.2**); (iii) extend the Term Loan Maturity Date applicable to such Lender's Obligations; or (iv) amend this clause (b); and

(c) without the prior written consent of all Lenders, no modification shall (i) alter **Section 5.6.2** or this **Section 14.1.1**; (ii) amend the definition of Real Estate Formula Amount (or any defined term used in such definition[s]) if the effect of such amendment is to increase borrowing availability, Pro Rata or Required Lenders; (iii) release all or substantially all Collateral; or (iv) except in connection with a merger, disposition or similar transaction expressly permitted hereby, release any Obligor from liability for any Obligations.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

14.1.2 <u>Limitations</u>. The agreement of Borrowers shall not be required for any modification of a Loan Document that deals solely with the rights and duties of Lenders and/or Agent as among themselves. Any waiver or consent granted by Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified.

14.1.3 <u>Payment for Consents</u>. No Borrower will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender (in its capacity as a Lender hereunder) as consideration for agreement by such Lender with any

51

modification of any Loan Documents, unless such remuneration or value is concurrently paid, on the same terms, on a Pro Rata basis to all Lenders providing their consent.

**14.2    Indemnity. EACH BORROWER SHALL INDEMNIFY AND HOLD HARMLESS THE INDEMNITEES AGAINST ANY CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE, INCLUDING CLAIMS ASSERTED BY ANY OBLIGOR OR OTHER PERSON OR ARISING FROM THE NEGLIGENCE OF AN INDEMNITEE.** In no event shall any party to a Loan Document have any obligation thereunder to indemnify or hold harmless an Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee.

**14.3    Notices and Communications.**

14.3.1    Notice Address. Subject to **Section 14.3.2**, all notices and other communications by or to a party hereto shall be in writing and shall be given to any Borrower, at Borrower Agent's address shown on the signature pages hereof, and to any other Person at its address shown on the signature pages hereof (or, in the case of a Person who becomes a Lender after the Closing Date, at the address shown on its Assignment), or at such other address as a party may hereafter specify by notice in accordance with this **Section 14.3**. Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to Agent pursuant to **Section 4.1.1** or **5.3.3** shall be effective until actually received by the individual to whose attention at Agent such notice is required to be sent. Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Borrower Agent shall be deemed received by all Borrowers.

14.3.2    Communications. Electronic and telephonic communications (including e-mail, messaging, voice mail and websites) may be used only in a manner acceptable to Agent. Secured Parties make no assurance as to the privacy or security of electronic or telephonic communications. E-mail and voice mail shall not be effective notices under the Loan Documents.

14.3.3    Platform. Borrower Materials shall be delivered pursuant to procedures approved by Agent, including electronic delivery (if possible) upon request by Agent to an electronic system maintained by Agent ("Platform"). Borrowers shall notify Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by Agent only upon its receipt of such notice. Borrower Materials and other information relating to this credit facility may be made available to Secured Parties on the Platform. The Platform is provided "as is" and "as available." Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in the Borrower Materials or any issues involving the Platform. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM. No Agent Indemnitee shall have any liability to Borrowers, Secured Parties or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform, including any unintended recipient, nor for delivery of Borrower Materials and other information via the Platform, internet, e-mail, or any other electronic platform or messaging system.

14.3.4  <u>Public Information</u>.  Obligors and Secured Parties acknowledge that "public" information may not be segregated from material non-public information on the Platform.  Secured Parties acknowledge that Borrower Materials may include Obligors' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to an Obligor's securities.

14.3.5  <u>Non-Conforming Communications</u>.  Secured Parties may rely upon any communications purportedly given by or on behalf of any Borrower even if they were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation.  Each Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses arising from any electronic or telephonic communication purportedly given by or on behalf of a Borrower.

**14.4**  **<u>Performance of Borrowers' Obligations</u>**.  Agent may, in its discretion at any time and from time to time, at Borrowers' expense, pay any amount or do any act required of a Borrower under any Loan Documents or otherwise lawfully requested by Agent to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien.  All payments, costs and expenses (including Extraordinary Expenses) of Agent under this Section shall be reimbursed to Agent by Borrowers, **on demand**, with interest from the date incurred until paid in full, at the Default Rate applicable to Base Rate Loans.  Any payment made or action taken by Agent under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**14.5**  **<u>Credit Inquiries</u>**.  Secured Parties may (but shall have no obligation to) respond to usual and customary credit inquiries from third parties concerning any Obligor or Subsidiary.

**14.6**  **<u>Severability</u>**.  Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law.  If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

**14.7**  **<u>Cumulative Effect; Conflict of Terms</u>**.  The provisions of the Loan Documents are cumulative.  The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided.  Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**14.8**  **<u>Counterparts; Execution</u>**.  Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement shall become effective when Agent has received counterparts bearing the signatures of all parties hereto.  Agent may (but shall have no obligation to) accept any signature, contract formation or record-keeping through electronic means, which shall have the same legal validity and enforceability as manual or paper-based methods, to the fullest extent permitted by Applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any similar state law based on the Uniform Electronic Transactions Act.  Upon request by Agent, any electronic signature or delivery shall be promptly followed by a manually executed or paper document.

**14.9     Entire Agreement**.  Time is of the essence with respect to all Loan Documents and Obligations.  The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

**14.10     Relationship with Lenders**.  The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender.  Amounts payable hereunder to each Lender shall be a separate and independent debt.  It shall not be necessary for Agent or any other Lender to be joined as an additional party in any proceeding for such purposes.  Nothing in this Agreement and no action of Agent, Lenders or any other Secured Party pursuant to the Loan Documents or otherwise shall be deemed to constitute Agent and any Secured Party to be a partnership, joint venture or similar arrangement, nor to constitute control of any Obligor.

**14.11     No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated by any Loan Document, Borrowers acknowledge and agree that (a)(i) this credit facility and any arranging or other services by Agent, any Lender, any of their Affiliates or any arranger are arm's-length commercial transactions between Borrowers and their Affiliates, on one hand, and Agent, any Lender, any of their Affiliates or any arranger, on the other hand; (ii) Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Borrowers are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrowers, their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) Agent, Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Borrowers and their Affiliates, and have no obligation to disclose any of such interests to Borrowers or their Affiliates.  To the fullest extent permitted by Applicable Law, each Borrower hereby waives and releases any claims that it may have against Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

**14.12     Confidentiality**.  Each of Agent and Lenders shall maintain the confidentiality of all Information (as defined below), except that Information may be disclosed (a) to its Affiliates, and to its and their partners, directors, officers, employees, agents, advisors and representatives (provided they are informed of the confidential nature of the Information and instructed to keep it confidential); (b) to the extent requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) to the extent required by Applicable Law or by any subpoena or other legal process; (d) to any other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) subject to an agreement containing provisions substantially the same as this Section, to any Transferee or any actual or prospective party (or its advisors) to any swap, derivative or other transaction under which payments are to be made by reference to an Obligor or Obligor's obligations; (g) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) is available to Agent, any Lender or any of its Affiliates on a nonconfidential basis from a source other than Borrowers; (h) on a confidential basis to a provider of a Platform; or (i) with the consent of Borrower Agent.  Notwithstanding the foregoing, Secured Parties may publish or disseminate general information concerning this credit facility for league table, tombstone and advertising purposes, and may use Borrowers' logos, trademarks or product photographs in advertising materials.  As used herein, "Information" means information received from an Obligor or Subsidiary relating to it or its business that is identified as confidential when delivered.  A Person required to maintain the confidentiality of Information pursuant to this Section shall be deemed to have complied if it exercises a degree of care similar to that accorded its own confidential information.  Each of Agent and Lenders acknowledges that (i) Information may include material non-public information; (ii) it has

developed compliance procedures regarding the use of such information; and (iii) it will handle the material non-public information in accordance with Applicable Law.

**14.13** <u>GOVERNING LAW</u>. **EXCEPT OT THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, UNLESS EXPRESSLY PROVIDED IN ANY LOAN DOCUMENT, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL CLAIMS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF CALIFORNIA, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW PRINCIPLES EXCEPT FEDERAL LAWS RELATING TO NATIONAL BANKS.**

**14.14** <u>Consent to Forum; Bail-In of EEA Financial Institutions</u>.

14.14.1 <u>Forum</u>. **EACH BORROWER HEREBY ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE GENERAL JURISDICTION AND VENUE OF THE BANKRUPTCY COURT (AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM EXERCISING, SUCH JURISDICTION, THE JURISDICTION OF ANY STATE OR FEDERAL COURT SITTING IN OR WITH JURISDICTION OVER LOS ANGELES, CALIFORNIA), IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS. EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1.** A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by Applicable Law.

14.14.2 <u>Other Jurisdictions</u>. Nothing herein shall limit the right of Agent or any Lender to bring proceedings against any Obligor in any other court, nor limit the right of any party to serve process in any other manner permitted by Applicable Law. Nothing in this Agreement shall be deemed to preclude enforcement by Agent of any judgment or order obtained in any forum or jurisdiction.

14.14.3 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among the parties, each party hereto (including each Secured Party) acknowledges that any liability arising under a Loan Document of any Secured Party that is an EEA Financial Institution, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority, and agrees and consents to, and acknowledges and agrees to be bound by, (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising under any Loan Documents which may be payable to it by any Secured Party that is an EEA Financial Institution; and (b) the effects of any Bail-in Action on any such liability, including (i) a reduction in full or in part or cancellation of any such liability; (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under any Loan Document; or (iii) the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

14.14.4 <u>Judicial Reference</u>. If any action, litigation or proceeding relating to any Obligations or Loan Documents is filed in a court sitting in or applying the laws of California, the court shall, and is hereby directed to, make a general reference pursuant to Cal. Civ. Proc. Code §638 to a referee (who shall be an active or retired judge) to hear and determine all issues in the case (whether fact

BN 31491395v6

or law) and to report a statement of decision. Nothing in this Section shall limit any right of Agent or any other Secured Party to exercise self-help remedies, such as setoff, foreclosure or sale of Collateral, or to obtain provisional or ancillary remedies from a court of competent jurisdiction before, during or after any judicial reference. The exercise of a remedy does not waive the right of any party to require judicial reference. At Agent's option, foreclosure under a mortgage or deed of trust may be accomplished either by exercise of power of sale thereunder or by judicial foreclosure.

**14.15** **Waivers by Borrowers.** **To the fullest extent permitted by Applicable Law, each Borrower waives (a) the right to trial by jury (which Agent and each Lender hereby also waive) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Agent on which a Borrower may in any way be liable, and hereby ratifies anything Agent may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Agent to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against Agent or any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof.** Each Borrower acknowledges that the foregoing waivers are a material inducement to Secured Parties entering into this Agreement and that they are relying upon the foregoing in their dealings with Borrowers. Each Borrower has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**14.16** **Patriot Act Notice.** Secured Parties hereby notify Borrowers that pursuant to the Patriot Act, Secured Parties are required to obtain, verify and record information that identifies each Borrower, including its legal name, address, tax ID number and other information that will allow Secured Parties to identify it in accordance with the Patriot Act. Secured Parties will also require information regarding any personal guarantor and may require information regarding Borrowers' management and owners, such as legal name, address, social security number and date of birth. Borrowers shall, promptly upon request, provide all documentation and other information as Agent or any Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

**14.17** **NO ORAL AGREEMENT.** **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.**

[Remainder of page intentionally left blank; signatures begin on following page]

BN 31491395v6

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date set forth above.

**BORROWERS:**

**WOODBRIDGE GROUP OF COMPANIES, LLC**, a Delaware limited liability company
**ADDISON PARK INVESTMENTS, LLC**, a Delaware limited liability company
**BLUFF POINT INVESTMENTS, LLC**, a Delaware limited liability company
**SUMMIT CUT INVESTMENTS, LLC**, a Delaware limited liability company
**LILAC MEADOW INVESTMENTS, LLC**, a Delaware limited liability company
**DIAMOND COVE INVESTMENTS, LLC**, a Delaware limited liability company
**HEILBRON MANOR INVESTMENTS, LLC**, a Delaware limited liability company
**THORNBURY FARM INVESTMENTS, LLC**, a Delaware limited liability company
**SAGEBROOK INVESTMENTS, LLC**, a Delaware limited liability company
**IMPERIAL ALY INVESTMENTS, LLC**, a Delaware limited liability company
**GRAVENSTEIN INVESTMENTS, LLC**, a Delaware limited liability company
**SILVER MAPLE INVESTMENTS, LLC**, a Delaware limited liability company
**GOOSEBROOK INVESTMENTS, LLC**, a Delaware limited liability company
**ELSTAR INVESTMENTS, LLC**, a Delaware limited liability company
**HORNBEAM INVESTMENTS LLC**, a Delaware limited liability company
**SILK CITY INVESTMENTS, LLC**, a Delaware limited liability company
**HOLLYLINE OWNERS, LLC**, a Delaware limited liability company
**CROWFIELD INVESTMENTS, LLC**, a Delaware limited liability company
**CENTERSHOT INVESTMENTS, LLC**, a Delaware limited liability company
**GRAEME PARK INVESTMENTS, LLC**, a Delaware limited liability company
**MASON RUN INVESTMENTS, LLC**, a Delaware limited liability company
**PINNEY INVESTMENTS, LLC**, a Delaware limited liability company
**DRAWSPAN INVESTMENTS, LLC**, a Delaware limited liability company
**DOUBLELEAF INVESTMENTS LLC**, a Delaware limited liability company
**WHITE BIRCH INVESTMENTS, LLC**, a Delaware limited liability company
**LINCOLNSHIRE INVESTMENTS, LLC**, a Delaware limited liability company
**ARLINGTON RIDGE INVESTMENTS, LLC**, a Delaware limited liability company
**BAY VILLAGE INVESTMENTS, LLC**, a Delaware limited liability company

By: WGC Independent Manager LLC
Its: Manager

By: _____
Name: Lawrence Perkins
Title: Chief Restructuring Officer

Address:

14140 Ventura Blvd. #203
Sherman Oaks, CA 91423
Attn:       Woodbridge
Telecopy: 213-808-5540

Senior Secured Debtor in Possession Loan and Security Agreement

**AGENT AND LENDERS:**

**HANKEY CAPITAL, LLC,**
as Agent and Lender

By:_____

Name: /s/ Scott Dobbins

Title:___President____

Address:

4751 Wilshire Boulevard # 110

Los Angeles, CA 90010

Attn:___Scott Dobbins____

Telecopy/email: dobbins@hiclp.com

EXHIBIT A

to

Senior Secured Debtor in Possession Loan and Security Agreement

## ASSIGNMENT AND ACCEPTANCE

Reference is made to the Senior Secured Debtor in Possession Loan and Security Agreement dated as of _____, 20__, as amended ("Loan Agreement"), among **WOODBRIDGE GROUP OF COMPANIES, LLC**, a Delaware limited liability company ("Parent"), and the Subsidiaries of Parent parties to the Loan Agreement as "Borrowers" (collectively, "Borrowers"), **HANKEY CAPITAL, LLC**, as agent ("Agent") for the entities from time to time party to the Loan Agreement ("Lenders"), and such Lenders.  Terms are used herein as defined in the Loan Agreement.

_____ ("Assignor") and _____ _____ ("Assignee") agree as follows:

1.      Assignor hereby assigns to Assignee and Assignee hereby purchases and assumes from Assignor a principal amount of $_____ of Assignor's outstanding Term Loan (the foregoing items being, collectively, "Assigned Interest"), together with an interest in the Loan Documents corresponding to the Assigned Interest.  This Agreement shall be effective as of the date ("Effective Date") indicated in the corresponding Assignment Notice delivered to Agent, provided such Assignment Notice is executed by Assignor, Assignee, Agent and Borrower Agent, if applicable.  From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date.

2.      Assignor (a) represents that as of the date hereof, prior to giving effect to this assignment, its Term Loan Commitment is $_____, and the outstanding balance of its Term Loans is $_____; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement or any other instrument or document furnished pursuant thereto, other than that Assignor is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim; and (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance by Borrowers of their obligations under the Loan Documents.  *[Assignor is attaching the promissory note[s] held by it and requests that Agent exchange such note[s] for new promissory notes payable to Assignee [and Assignor].]*

3.      Assignee (a) represents and warrants that it is legally authorized to enter into this Assignment; (b) confirms that it has received copies of the Loan Agreement and such other Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment; (c) agrees that it shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (d) confirms that it is an Eligible Assignee; (e) appoints and authorizes Agent to take such action as agent on its behalf and to exercise such powers under the Loan Agreement as are delegated to Agent by the terms thereof, together with such powers as are incidental thereto; (f) agrees that it will observe and perform all obligations that are required to be performed by it as a "Lender" under the Loan Documents; and (g) represents and warrants that the assignment evidenced hereby will not result in a non-exempt "prohibited transaction" under Section 406 of ERISA.

Exhibit A

1

4.    This Agreement shall be governed by the laws of the State of California. If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of this Agreement shall remain in full force and effect.

5.    Each notice or other communication hereunder shall be in writing, shall be sent by messenger, by telecopy or facsimile transmission, or by first-class mail, shall be deemed given when sent and shall be sent as follows:

    (a)    If to Assignee, to the following address (or to such other address as Assignee may designate from time to time):

        _____
        _____
        _____

    (b)    If to Assignor, to the following address (or to such other address as Assignor may designate from time to time):

        _____
        _____
        _____
        _____

Payments hereunder shall be made by wire transfer of immediately available Dollars as follows:

If to Assignee, to the following account (or to such other account as Assignee may designate from time to time):

        _____
        _____
        ABA No._____
        _____
        Account No._____
        Reference: _____

If to Assignor, to the following account (or to such other account as Assignor may designate from time to time):

        _____
        _____
        ABA No._____
        _____
        Account No._____
        Reference: _____

Exhibit A

2

**IN WITNESS WHEREOF,** this Assignment and Acceptance is executed as of _____.

_____
("Assignee")

By_____
    Title:

_____
("Assignor")

By_____
    Title:

Exhibit A
3

EXHIBIT B

to

Senior Secured Debtor in Possession Loan and Security Agreement

## ASSIGNMENT NOTICE

Reference is made to (1) the Senior Secured Debtor in Possession Loan and Security Agreement dated as of December __, 2017, as amended ("Loan Agreement"), among **WOODBRIDGE GROUP OF COMPANIES, LLC**, a _____ limited liability company ("Parent"), and the Subsidiaries of Parent parties to the Loan Agreement as "Borrowers" (collectively, "Borrowers"), **HANKEY CAPITAL, LLC**, as agent ("Agent") for the entities from time to time party to the Loan Agreement ("Lenders"), and such Lenders; and (2) the Assignment and Acceptance dated as of _____, 20__ ("Assignment"), between _____ ("Assignor") and _____ ("Assignee"). Terms are used herein as defined in the Loan Agreement.

Assignor hereby notifies Borrowers and Agent of Assignor's intent to assign to Assignee pursuant to the Assignment a principal amount of $_____ of Assignor's outstanding Term Loan (the foregoing items being, collectively, the "Assigned Interest"), together with an interest in the Loan Documents corresponding to the Assigned Interest. This Agreement shall be effective as of the date ("Effective Date") indicated below, provided this Assignment Notice is executed by Assignor, Assignee, Agent and Borrower Agent, if applicable. Pursuant to the Assignment, Assignee has expressly assumed all of Assignor's obligations under the Loan Agreement to the extent of the Assigned Interest, as of the Effective Date.

The address of Assignee to which notices and information are to be sent under the terms of the Loan Agreement is:

_____

_____

_____

_____

The address of Assignee to which payments are to be sent under the terms of the Loan Agreement is shown in the Assignment.

This Notice is being delivered to Borrowers and Agent pursuant to **Section 13.3** of the Loan Agreement. Please acknowledge your acceptance of this Notice by executing and returning to Assignee and Assignor a copy of this Notice.

**IN WITNESS WHEREOF,** this Assignment Notice is executed as of _____.

_____

("Assignee")

By:_____

     Title:

Exhibit B

1

_____
("Assignor")

By:_____
    Title:

ACKNOWLEDGED AND AGREED,
AS OF THE DATE SET FORTH ABOVE:

**BORROWER AGENT**:*

_____

By: WGC Independent Manager LLC,
Its: Manager

By_____
    Name:
    Title:

* No signature required if Assignee is a Lender or Affiliate of a Lender, or if an Event of Default exists.

**HANKEY CAPITAL, LLC,**
as Agent

By_____
Title:

Exhibit B
2

<u>Exhibit C</u>

<u>Form of Interim Financing Order</u>

*[To be attached]*

Exhibit C

1

BN 31491395v6

<u>Exhibit</u> D

<u>Form of Final Financing Order</u>

*[To be attached]*

BN 31491395v6

SCHEDULE 1.1

to

Senior Secured Debtor in Possession Loan and Security Agreement

## COMMITMENTS OF LENDERS

| Lender | Term Loan Commitment | Total Commitments |
|---|---|---|
| Hankey Capital, LLC | $100,000,000 | $100,000,000 |
| | | |
| | | |
| | | |

BN 31491395v6

SCHEDULE 7.4.1

to

Senior Secured Debtor in Possession Loan and Security Agreement

## SCHEDULE OF REAL ESTATE COLLATERAL
## (AND LEGAL DESCRIPTIONS)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Properties** | | | | |
| # | Code | Address | City | State | ZIP | Purchase Date | Purchase Price | Status | % Complete | As Is Value |
| 1 | PD74 | 642 N. St. Cloud | Bel Air | CA | 90077 | 12/15/2016 | $18,200,000 | Demo'd | 3% | $18,200,000 |
| 2 | PD41 | 9212 Nightingale Drive | Los Angeles | CA | 90069 | 1/15/2016 | $13,200,000 | Residence | 0% | $14,000,000 |
| 3 | PD73 | 385 Trousdale Place | Beverly Hills | CA | 90210 | 12/15/2016 | $10,500,000 | Residence | 0% | $10,500,000 |
| 4 | PD72 | 375 Trousdale Place | Beverly Hills | CA | 90210 | 11/15/2016 | $8,400,000 | Residence | 0% | $8,400,000 |
| 5 | PD28 | 9230 Robin Drive | Los Angeles | CA | 91423 | 2/15/2016 | $9,000,000 | Demo'd | 0% | $9,000,000 |
| 6 | PD105 | 1 Electra Court | Los Angeles | CA | 90046 | 6/15/2017 | $28,280,000 | Residence | 0% | $28,280,000 |
| 7 | PD100 | 2492 Mandeville Cyn | Brentwood | CA | 90049 | 6/15/2017 | $6,300,000 | Residence | 0% | $6,300,000 |
| 8 | PD85 | 7870 Granito | Los Angeles | CA | 90046 | 12/15/2014 | $2,462,500 | Raw Land | 0% | $4,000,000 |
| 9 | PD03 | 1258 Lago Vista | Beverly Hills | CA | 90210 | 4/28/2015 | $5,925,000 | Residence | 0% | $6,500,000 |
| 10 | PD101 | 633 N Foothill Rd | Beverly Hills | CA | 90210 | 7/15/2017 | $7,600,000 | Residence | 0% | $8,000,000 |
| 11 | PD37 | 24055 Hidden Ridge Road | Hidden Hills | CA | 91302 | 1/15/2016 | $4,755,000 | Develop | 27% | $6,000,000 |
| 12 | PD51 | 810 Sarbonne | Bel Air | CA | 90077 | 6/15/2017 | $6,500,000 | Residence | 0% | $10,000,000 |
| 13 | MR | 2600 Hutton | Beverly Hills | CA | 90210 | 5/1/2017 | $4,000,000 | Demo'd | 0% | $4,000,000 |
| 14 | PD40 | 1520 Carla Ridge | Beverly Hills | CA | 90210 | 2/15/2016 | $7,200,000 | Demo'd | 0% | $8,500,000 |

| # | Code | Address | City | State | ZIP | Purchase Date | Purchase Price | Status | % Complete | As Is Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 15 | PD56 | 1484 Carla Ridge | Beverly Hills | CA | 90210 | 5/15/2016 | $9,500,000 | Demo'd | 3% | $12,500,000 |
| 16 | PD38 | 25210 Jim Bridger Road | Hidden Hills | CA | 91302 | 1/15/2016 | $2,900,000 | Develop | 11% | $4,000,000 |
| 17 | MR | 3802 Hollyline Ave. | Sherman Oaks | CA | 91423 | 4/1/2014 | $1,499,000 | Raw Land | 100% | $1,500,000 |
| 18 | MR | 1241 Loma Vista | Beverly Hills | CA | 90210 | 4/14/2015 | $5,200,000 | Demo'd | 0% | $6,500,000 |
| 19 | PD18 | 8692 Franklin | Los Angeles | CA | 90069 | 10/10/2014 | $1,400,000 | Demo'd | 0% | $1,500,000 |
| 20 | PD99 | 1011 N. Hillcrest Road | Beverly Hills | CA | 90210 | 1/15/2017 | $9,500,000 | Residence | 0% | $10,500,000 |
| 21 | MR | 1962 Stradella Road | Los Angeles | CA | 90077 | 7/1/2015 | $2,600,000 | Done December 17,2017 | 0% | $3,200,000 |
| 22 | MR | 15655 Woodvale Drive | Encino | CA | 91436 | 5/1/2015 | $1,800,000 | Not on Market | 100% | $2,300,000 |
| 23 | MR | 3843 Hayvenhurst Ave | Encino | CA | 91436 | 8/14/2014 | $1,035,000 | Done this month | 100% | $1,600,000 |
| 24 | MR | 4030 Madelia Ave | Sherman Oaks | CA | 91403 | 10/25/2014 | $1,325,000 | Raw Land | 0% | $1,500,000 |
| 25 | PD39 | 25211 Jim Bridger Road | Hidden Hills | CA | 91302 | 1/15/2016 | $3,100,000 | Develop | 30% | $3,875,000 |
| 26 | MR | 1312 Beverly Grove Pl | Beverly Hills | CA | 90210 | 8/1/2014 | $3,100,000 | On Market | 0% | $4,700,000 |
| 27 | PD50 | 1357 Laurel Way | Beverly Hills | CA | 90210 | 7/15/2015 | $6,300,000 | Develop | 36% | $8,000,000 |
| 28 | PD32 | 1432 Tanager | Los Angeles | CA | 90069 | 12/15/2015 | $8,900,000 | Develop | 2% | $12,000,000 |
| | | | | | | | $190,481,500 | | 15% | $215,355,000 |

Schedule 7.4.1

BN 31491395v6

### 642 N. St. Cloud, Bel Air, California

APN: 4362-017-060

THE LAND REFERRED TO HEREIN BELOW IS SITUATED LOS ANGELES IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF LOTS 94, 95 AND 96 OF THE BEL AIR TRACT, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 75, PAGES 33 THROUGH 37, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY LYING SOUTHERLY AND WESTERLY OF THE FOLLOWING DESCRIBED LINES:

LINE "A":

BEGINNING AT A POINT ON THE CURVED SOUTHWESTERLY LINE OF SAID LOT 94, SAID CURVED LINE ALSO BEING THE NORTHERLY LINE OF SAINT CLOUD ROAD, 40 FEET WIDE, SAID CURVED LINE BEING SHOWN ON SAID MAP OF THE SAID BEL AIR TRACT AS BEING CONCAVE SOUTHERLY AND HAVING A RADIUS OF 140.00 FEET, SAID POINT BEING DISTANT 53.54 FEET NORTHWESTERLY ALONG SAID CURVE FROM THE SOUTHEASTERLY TERMINUS THEREOF, A RADIAL LINE TO SAID POINT BEARS NORTH 17° 44' 44" EAST; THENCE LEAVING SAID LINE NORTH 4° 29' 04" EAST 35.40 FEET; THENCE NORTH 37° 04' 35" WEST 98.47 FEET; THENCE NORTH 60° 00' 19" WEST 39.06 FEET; THENCE NORTH 16° 52' 40" WEST 23.23 FEET; THENCE NORTH 12° 59' 40" WEST 44.48 FEET; THENCE NORTH 29° 54' 09" WEST 20.48 FEET; THENCE NORTH 27° 19' 08" WEST 13.78 FEET; THENCE NORTH 62° 40' 52" EAST 0.94 FEET TO THE TRUE POINT OF BEGINNING FOR THIS DESCRIPTION; THENCE SOUTH 62° 40' 52" WEST 189.91 FEET, MORE OR LESS, TO A POINT ON THAT CERTAIN COURSE IN THE WESTERLY LINE OF SAID BEL AIR TRACT AS HAVING A BEARING OF NORTH 13° 25' 40" WEST AND A DISTANCE OF 67.79 FEET, SAID POINT BEING DISTANT 27.93 FEET NORTHERLY ALONG SAID LINE FROM THE SOUTHERLY TERMINUS THEREOF.

LINE "B":

BEGINNING AT THE PREVIOUSLY DESCRIBED TRUE POINT OF BEGINNING; THENCE SOUTH 27° 19' 08" EAST 50.55 FEET; THENCE SOUTH 10' 29' 08" EAST 22.98 FEET; THENCE SOUTH 69° 51' 57" EAST 30.45 FEET; THENCE SOUTH 37° 17' 08" EAST 216.51 FEET, MORE OR LESS, TO A LINE THAT BEARS NORTH 27° 54' 50" EAST FROM A POINT ON THAT CERTAIN COURSE IN THE SOUTHWESTERLY LINE OF SAID LOT 94 SHOWN ON THE SAID MAP OF THE BEL AIR TRACT AS HAVING A BEARING OF NORTH 50° 20' 30" WEST AND A DISTANCE OF 61.91 FEET, SAID POINT BEING DISTANT 48.27 FEET NORTHWESTERLY ALONG SAID SOUTHWESTERLY LINE FROM THE SOUTHEASTERLY TERMINUS THEREOF; THENCE SOUTH 27° 54' 50" WEST 15.20 FEET, MORE OR LESS, ALONG SAID LINE TO THE PREVIOUSLY DESCRIBED POINT ON SAID SOUTHWESTERLY LINE.

SAID LAND IS DESCRIBED IN THE CERTIFICATE OF COMPLIANCE RECORDED OCTOBER 18, 2016 AS INSTRUMENT NO. 20161275473 OF OFFICIAL RECORDS.

Schedule 7.4.1

## 9212 Nightingale Dr. Los Angeles, California

APN: 5561-007-028

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  WEST HOLLYWOOD IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 82 OF TRACT NO. 23753, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES. STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 630, PAGES 57 TO 63 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, ALL OIL, OIL RIGHTS, NATURAL GAS RIGHTS, MINERAL RIGHTS, ALL OTHER HYDROCARBON SUBSTANCES BY WHATSOEVER NAME KNOWN, AND ALL WATER, CLAIMS OR RIGHTS TO WATER, TOGETHER WITH APPURTENANT RIGHTS THERETO, WITHOUT, HOWEVER. ANY RIGHT TO ENTER UPON THE SURFACE OF SAID LAND NOR ANY PORTION OF THE SUBSURFACE LYING ABOVE A DEPTH OF 500 FEET, AS EXCEPTED OR RESERVED BY DEED RECORDED SEPTEMBER 16, 1958 IN BOOK D217. PAGE 635, OFFICIAL RECORDS.

Schedule 7.4.1

**385 Trousdale Place, Beverly Hills, California**

APN: 4391-015-016

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  BEVERLY HILLS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 25 OF TRACT 24483, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 645, PAGES 58 AND 59 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

375 Trousdale Place, Beverly Hills, California

APN: 4391-015-015

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  BEVERLY HILLS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 24, TRACT 24483, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 645, PAGES 58 AND 59 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

BN 31491395v6

9230 Robin Drive, Los Angeles, California

APN: 5561-006-017

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  WEST HOLLYWOOD IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT 100, TRACT NO. 23753, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 630 PAGES 57 TO 63 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS LYING IN AND UNDER A DEPTH OF 500 FEET BELOW THE SURFACE OF THE LAND DESCRIBED BELOW, BUT WITHOUT ANY RIGHT OF ENTRY UPON THE SURFACE OF SAID LAND.

PARCEL 2:

A PERPETUAL EASEMENT AND RIGHT OF WAY TO ESTABLISH, CONSTRUCT, RECONSTRUCT, PLACE, REPLACE, REPAIR, MAINTAIN AND USE A ROADWAY, TOGETHER WITH THE NECESSARY PUBLIC UTILITY AND OTHER FACILITIES AND APPURTENANCES, FOR THE PURPOSE OF PEDESTRIAN AND VEHICULAR INGRESS, EGRESS AND PASSAGE IN, ON, UNDER, OVER, ACROSS AND THROUGH A 12.00 FOOT AREA IN LOT 103, TRACT NO. 23753, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 630 PAGES 57 TO 63 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER, BEING 6.00 FEET ON EITHER SIDE OF A CENTER LINE WHICH IS MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHWESTERLY LINE OF SAID LOT 103, DISTANT ALONG SAID NORTHWESTERLY LINE SOUTH 67° 67' 49" WEST, 6.00 FEET FROM THE NORTHEASTERLY CORNER OF SAID LOT; THENCE SOUTHEASTERLY PARALLEL WITH AND DISTANCE 6.00 FEET MEASURED AT RIGHT ANGLES FROM THE EASTERLY LINE THEREOF, SOUTH 22° 02' 11" EAST, 65.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE NORTHWEST HAVING A RADIUS OF 63.00 FEET; THENCE SOUTHWESTERLY ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 76° 07' 48" A DISTANCE OF 83.71 FEET TO THE BEGINNING OF A REVERSE CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 126.84 FEET; THENCE ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 37° 14' 39" A DISTANCE OF 82.45 FEET; THENCE TANGENT TO SAID LAST MENTIONED CURVE SOUTH 61° 50' 58" WEST 19.26 FEET, MORE OR LESS, TO A POINT IN THE SOUTHWESTERLY LINE OF SAID LOT 103, DISTANT ALONG SAID LINE SOUTH 73° 09' 02" EAST, 33.00 FEET FROM THE SOUTHWESTERLY CORNER THEREOF.

Schedule 7.4.1

## 1 Electra Court, Los Angeles, California

APN: 5551-033-008

THE LAND REFERRED TO HEREIN BELOW IS SITUATED LOS ANGELES IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1 AS SHOWN ON LOT LINE ADJUSTMENT NO. 02-4785, AS EVIDENCED BY DOCUMENT RECORDED FEBRUARY 27, 2003 AS INSTRUMENT NO. 03-0575561 OF OFFICIAL RECORDS, BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 57, OF TRACT NO. 7842, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 92, PAGES 21 TO 23, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID LOT 57; THENCE EASTERLY ALONG THE NORTHERLY LINE OF SAID LOT 57, NORTH 88° 46' 20" EAST 435.00 FEET; THENCE PARALLEL TO THE WESTERLY LINE OF SAID LOT 57, SOUTH 00° 03' 20" EAST, 85.00 FEET; THENCE SOUTH 13° 56' 40" WEST 175.00; THENCE PARALLEL TO THE NORTHERLY LINE OF SAID LOT 57, SOUTH 88° 46' 20" WEST, 100.00 FEET; THENCE SOUTH 56° 53' 23" WEST, 295.42 FEET; THENCE PARALLEL TO THE NORTHERLY LINE OF SAID LOT 57, SOUTH 88° 46' 20" WEST 45.00 FEET TO THE WESTERLY LINE OF SAID LOT 57; THENCE NORTHERLY ALONG SAID WESTERLY LINE 410.00 FEET TO THE POINT OF BEGINNING.

EXCEPT THAT PORTION OF SAID LOT 57 DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF SAID LOT 57, THE SAME BEING THE SOUTHEASTERLY CORNER OF PARCEL B, PARCEL MAP L.A. NO. 4672, AS PER MAP FILED IN BOOK 138, PAGES 59 AND 60 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER; THENCE ALONG NORTHERLY LINE OF SAID LOT 57, NORTH 88° 46' 20" EAST, 42.00 FEET; THENCE SOUTH 01° 13' 40" EAST 27.00 FEET; THENCE SOUTH 88° 46' 20" WEST, 12.00 FEET; THENCE SOUTHERLY ALONG A TANGENT CURVE CONCAVE TO THE SOUTHEAST AND HAVING A RADIUS OF 18.00 FEET, THROUGH A CENTRAL ANGLE OF 90° 00' 00" AN ARC DISTANCE OF 28.27 FEET; THENCE SOUTH 88° 46' 20" WEST, 24 FEET; THENCE NORTH 01° 13' 40" WEST, 45.00 FEET TO THE NORTHERLY LINE OF SAID LOT 57; THENCE ALONG THE NORTHERLY LINE OF SAID LOT 57 NORTH 88° 46' 20" EAST, 12.00 FEET TO THE POINT OF BEGINNING.

Schedule 7.4.1

## 2492 Mandeville Canyon, Los Angeles, California

### APN: 4493-006-005

THE LAND REFERRED TO HEREIN BELOW IS SITUATED LOS ANGELES IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THOSE PORTIONS OF LOTS 9 AND 12 OF BOCA DE CANON, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 18 PAGE(S) 90 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, TOGETHER WITH A PORTION OF THAT CERTAIN UNNAMED ROAD, 40 FEET WIDE, AS SHOWN ON SAID MAP DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT A POINT IN THE NORTHWESTERLY TERMINUS OF THAT CENTER LINE OF THAT CERTAIN 40 FOOT EASEMENT, CONVEYED TO THE LOS ANGELES COUNTY FLOOD CONTROL DISTRICT BY DEED RECORDED IN BOOK 8211 PAGE 93 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE NORTH 33° 23' 26" EAST ALONG THE NORTHWESTERLY TERMINUS LINE OF SAID 40 FOOT EASEMENT, A DISTANCE OF 20 FEET TO THE MOST NORTHERLY CORNER OF SAID EASEMENT; THENCE NORTHWESTERLY ALONG A CURVE CONCAVE TO THE SOUTHWEST, TANGENT AT ITS POINT OF BEGINNING TO A LINE BEARING NORTH 56° 36' 34" WEST AND HAVING A RADIUS OF 657.32 FEET, A DISTANCE OF 116.81 FEET; THENCE NORTHWESTERLY ALONG A CURVE CONCAVE TO THE NORTHEAST, TANGENT AT ITS POINT OF BEGINNING TO SAID LAST MENTIONED CURVE AT ITS POINT OF ENDING AND HAVING A RADIUS OF 480 FEET, A DISTANCE OF 205.33 FEET, MORE OR LESS, TO THE MOST SOUTHERLY CORNER OF THE LAND DESCRIBED IN THE DEED TO JOHN J. HILL AND WIFE, RECORDED ON MAY 2,1955 AS INSTRUMENT NO. 358 IN BOOK 47644, PAGE 156 OF OFFICIAL RECORDS AND THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION, A RADIAL LINE OF SAID CURVE FROM SAID TRUE POINT OF BEGINNING BEARS NORTH 47° 40' 58" EAST; THENCE ALONG SAID NORTHWESTERLY LINE OF SAID LAST MENTIONED LAND, NORTH 56° 30' 05" EAST 50.99 FEET TO AN ANGLE POINT THEREIN; THENCE CONTINUING ALONG SAID NORTHWESTERLY LINE AND ALONG THE NORTHEASTERLY LINE OF SAID LAND, NORTH 67° 48' 41" EAST 176.51 FEET AND SOUTH 6° 56' 48" EAST 114.64 FEET TO THE MOST EASTERLY CORNER OF SAID LAND IN THE SOUTHEASTERLY LINE OF THE LAND DESCRIBED IN "THE DEED TO CHARLES WILSON AND WIFE, RECORDED JANUARY 16,1946 AS INSTRUMENT NO. 947 IN BOOK 22661. PAGE 306. OF OFFICIAL RECORDS. THENCE ALONG SAID SOUTHEASTERLY LINE, NORTH 77° 14' 12" EAST 150.63 FEET TO AN ANGLE POINT THEREIN; THENCE CONTINUING ALONG SAID SOUTHEASTERLY LINE, NORTH 29° 00'12" EAST 219.27 FEET TO THE MOST SOUTHERLY SOUTHEASTERLY CORNER OF THE LAND DESCRIBED IN THE DEED TO EDWARD J. CULBERTSON, SR., AND WIFE, RECORDED ON APRIL 28,1955 AS INSTRUMENT NO. 556 IN BOOK 47614, PAGE 155 OF OFFICIAL RECORDS; THENCE ALONG A SOUTHERLY LINE OF SAID LAST MENTIONED LAND, SOUTH 86° 47' 53" WEST 275.34 FEET TO AN ANGLE POINT THEREIN; THENCE SOUTH 86° 47' 53" WEST 279.94 FEET, MORE OR LESS, TO A POINT IN THE HEREINBEFORE MENTIONED CURVE THAT IS CONCAVE NORTHEASTERLY AND HAVING A RADIUS OF 480 FEET, A RADIAL LINE OF SAID CURVE FROM SAID POINT BEARS NORTH 59° 37' 10" EAST; THENCE SOUTHEASTERLY ALONG SAID CURVE, AN ARC DISTANCE OF 100 FEET, MORE OR LESS, TO THE TRUE POINT OF BEGINNING OF THIS DESCRIPTION.

Schedule 7.4.1

**7870 and 7876 Granito Drive, Los Angeles, California**

**APNs:  5551-005-006, 5551-005-007**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  LOS ANGELES IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT 6 OF TRACT NO. 7842, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 92, PAGES 21 THROUGH 23, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM ALL GAS, OIL, AND HYDROCARBONS LYING 500 FEET BELOW THE SURFACE OF THE LAND, BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED BY AUGUSTINE/SMITH, LTD., IN THE DEED RECORDED JULY 3, 1978 AS INSTRUMENT NO. 78-1210550, OFFICIAL RECORDS.

PARCEL 2:

LOT 7 OF TRACT NO. 7842, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 92, PAGES 21 THROUGH 23, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM ALL GAS, OIL, AND HYDROCARBONS LYING 500 FEET BELOW THE SURFACE OF THE LAND, BUT WITHOUT RIGHT OF SURFACE ENTRY, AS RESERVED  IN A  DEED RECORDED OCTOBER 31, 1978, AS INSTRUMENT NO. 78-1210543, OF OFFICIAL RECORDS.

Schedule 7.4.1

## 1258 Lago Vista Drive, Beverly Hills, California

APN: 4350-018-020

THE LAND REFERRED TO HEREIN BELOW IS SITUATED   BEVERLY HILLS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 21, AS SHOWN ON THAT CERTAIN MAP ENTITLED TRACT NO 13101, WHICH MAP WAS FILED IN THE OFFICE OF THE RECORDER OF THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA IN BOOK 280 OF MAPS PAGE(S) 1 TO 9.

TOGETHER WITH THAT PORTION OF LAGO VISTA DRIVE AS VACATED IN QUITCLAIM DEED RECORDED OCTOBER 25, 2004 AS INSTRUMENT NO. 2741703 OF OFFICIAL RECORDS AND DESCRIBED AS FOLLOWS;

BEGINNING AT A POINT IN THE SOUTHERLY LINE OF LOT 21 OF TRACT NO. 13101, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 280, PAGES 1 TO 9 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, AT NORTHERLY TERMINUS OF A LINE BEARING NORTH 22° 30' 00" WEST 56.89 FEET; THENCE NORTH 22° 17' 03" WEST 80.44 FEET TO A CURVE CONCAVE SOUTHERLY AND HAVING A RADIUS OF 7.48 FEET THROUGH A CENTRAL ANGLE OF 171° 27' 32", THENCE EASTERLY ALONG SAID CURVE 22.38 FEET, THENCE SOUTH 30° 49' 31" EAST 8.32 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE EASTERLY AND HAVING A RADIUS OF 97.96 FEET THROUGH A CENTRAL ANGLE OF 37° 03' 36", A RADIAL LINE TO SAID CURVE BEARS NORTH 61° 37' 06" EAST, THENCE SOUTHERLY ALONG SAID CURVE 63.36 FEET TO A POINT IN THE WESTERLY LINE OF SAID LOT 21, SAID POINT BEING THE SOUTHWESTERLY TERMINUS OF A CURVE HAVING A LENGTH OF 176.85 FEET AND A RADIUS OF 97.96 FEET, THENCE NORTHERLY, EASTERLY, SOUTHERLY AND WESTERLY ALONG THE BOUNDARY OF SAID LOT 21 TO POINT OF BEGINNING.

Schedule 7.4.1

**633 N. Foothill Road, Beverly Hills, California**

APN: 4341-024-017

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  BEVERLY HILLS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 17 IN BLOCK 1 OF TRACT NO. 1907, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 22, PAGE(S) 137 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Schedule 7.4.1

24055 Hidden Ridge Road, Hidden Hills, California

APN: 2049-045-017

THE LAND REFERRED TO HEREIN BELOW IS SITUATED CALABASAS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 4 OF TRACT NO. 054063, IN THE CITY OF HIDDEN HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN ON MAP FILED IN BOOK 1371, PAGES 72 THROUGH 78 INCLUSIVE, OF MAPS, IN THE OFFICE OF THE REGISTRAR-RECORDER/COUNTY CLERK OF THE COUNTY OF LOS ANGELES.

TOGETHER WITH THE FOLLOWING DESCRIBED PORTION OF LOT 5 OF SAID TRACT:

BEGINNING AT THE MOST NORTHERLY CORNER OF SAID LOT 5; THENCE ALONG THE EASTERLY LINE OF SAID LOT 5, SOUTH 00° 01' 08" EAST 66.71 FEET; THENCE LEAVING SAID EASTERLY LINE, NORTH 89° 50' 33" WEST 83.55 FEET; THENCE SOUTH 71° 49' 50" WEST 52.13 FEET; THENCE SOUTH 11° 52' 15" WEST 16.18 FEET; THENCE SOUTH 74° 49' 04" WEST 255.91 FEET TO THE NORTHWESTERLY LINE OF SAID LOT 5; THENCE ALONG SAID NORTHWESTERLY LINE, NORTH 37° 52' 49" EAST 4.33 FEET; THENCE CONTINUING ALONG SAID NORTHWESTERLY LINE, NORTH 66° 55' 38" EAST 413.81 FEET, MORE OR LESS, TO THE TRUE POINT OF BEGINNING.

Schedule 7.4.1

**810 Sarbonne Road, Bel Air, California**

APN: 4370-002-019

THE LAND REFERRED TO HEREIN BELOW IS SITUATED LOS ANGELES IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 12 IN BLOCK 5 OF TRACT 9745, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 141, PAGE 93 TO 96, INCLUSIVE, OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Schedule 7.4.1

## 2600 Hutton Dr, Beverly Hills, California

APN: 4384-002-015

PARCEL 1:

LOT 57, TRACT 13948, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 298 PAGES 30 TO 33 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 2:

AN EASEMENT FOR THE PURPOSES AS CONTAINED IN SECTION 2.2 AS SET FORTH IN THE EASEMENT AGREEMENT RECORDED MAY 11, 1992, AS INSTRUMENT NO. 92-844730, OF OFFICIAL RECORDS, UPON THE TERMS, CONDITIONS AND PROVISIONS AS THEREIN CONTAINED, OVER THAT PORTION OF LOT 4, SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND, DESCRIBED AS FOLLOWS:

THAT PORTION OF SAID LOT 4 DESCRIBED AS FOLLOWS:

COMMENCING AT THE MOST EASTERLY CORNER OF LOT 57 OF TRACT NO. 13948, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 298, PAGES 30 TO 33 INCLUSIVE OF MAPS, RECORDS OF SAID COUNTY;

THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LOT 57, SOUTH 60° 08' 15" WEST, A DISTANCE OF 72.63 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE WESTERLY HAVING A RADIUS OF 56.00 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 75° 07' 59" EAST;

THENCE SOUTHERLY ALONG SAID NON-TANGENT CURVE THROUGH A CENTRAL ANGLE OF 43° 07' 52" AN ARC LENGTH OF 42.16 FEET TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 80.00 FEET, A RADIAL LINE FROM THE 56.00 FOOT RADIUS BEARS SOUTH 61° 44' 09" EAST, A RADIAL LINE FROM THE 80.00 FOOT RADIUS BEARS NORTH 22° 34' 38" EAST TO SAID POINT;

THENCE WESTERLY ALONG SAID NON-TANGENT CURVE THROUGH A CENTRAL ANGLE OF 20° 00' 06" AN ARC LENGTH OF 27.93 FEET TO A POINT OF TANGENCY;

THENCE NORTH 87° 25' 28" WEST ALONG SAID TANGENT LINE 6.36 FEET;

THENCE NORTH 89° 22' 09" WEST 22.69 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY, HAVING A RADIUS OF 52.00 FEET;

THENCE WESTERLY ALONG SAID TANGENT CURVE THROUGH A CENTRAL ANGLE OF 33° 31' 36" AN ARC LENGTH OF 30.43 FEET TO THE SOUTHERLY LINE OF LOT 57, A RADIAL LINE TO SAID POINT BEARS SOUTH 34° 09' 27" WEST;

THENCE SOUTH 89° 28' 13" EAST ALONG THE SOUTHERLY LINE OF LOT 57 A DISTANCE OF 44.75 FEET TO AN ANGLE POINT THEREIN;

THENCE NORTH 60° 08' 15" EAST ALONG THE SOUTHEASTERLY LINE OF LOT 57 A DISTANCE OF 51.71 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

BN 31491395v6

AN EASEMENT FOR THE PURPOSES AS CONTAINED IN SECTION 2.3 AS SET FORTH IN THE EASEMENT AGREEMENT RECORDED MAY 11, 1992, AS INSTRUMENT NO. 92-844730, OF OFFICIAL RECORDS, UPON THE TERMS, CONDITIONS AND PROVISIONS AS THEREIN CONTAINED, OVER THAT PORTION OF LOT 4, SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND, DESCRIBED AS FOLLOWS:

A STRIP OF LAND 1.50 FEET WIDE AS MEASURED AT 90°, PARALLEL AND CONCENTRIC WITH AND LYING SOUTHERLY AND EASTERLY OF THE FOLLOWING DESCRIBED LINE:

COMMENCING AT THE MOST EASTERLY CORNER OF LOT 57 OF TRACT NO. 13948, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 298, PAGES 30 TO 33 INCLUSIVE OF MAPS, RECORDS OF SAID COUNTY;

THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LOT 57, SOUTH 60° 08' 15" WEST, A DISTANCE OF 72.63 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE WESTERLY HAVING A RADIUS OF 56.00 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 75° 07' 59" EAST;

THENCE SOUTHERLY ALONG SAID NON-TANGENT CURVE THROUGH A CENTRAL ANGLE OF 43° 07' 52" AN ARC LENGTH OF 42.16 FEET TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 80.00 FEET, A RADIAL LINE FROM THE 56.00 FOOT RADIUS BEARS SOUTH 61° 44' 09" EAST, A RADIAL LINE FROM THE 80.00 FOOT RADIUS BEARS NORTH 22° 34' 38" EAST TO SAID POINT;

THENCE WESTERLY ALONG SAID NON-TANGENT CURVE THROUGH A CENTRAL ANGLE OF 20° 00' 06" AN ARC LENGTH OF 27.93 FEET TO A POINT OF TANGENCY;

THENCE NORTH 87° 25' 28" WEST ALONG SAID TANGENT LINE 6.36 FEET;

THENCE NORTH 89° 22' 09" WEST 22.69 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY, HAVING A RADIUS OF 52.00 FEET;

THENCE WESTERLY ALONG SAID TANGENT CURVE THROUGH A CENTRAL ANGLE OF 33° 31' 36" AN ARC LENGTH OF 30.43 FEET TO THE SOUTHERLY LINE OF LOT 57, A RADIAL LINE TO SAID POINT BEARS SOUTH 34° 09' 27" WEST;

THE SIDELINES OF SAID 1.50 FOOT STRIP TO BE PROLONGED OR SHORTENED SO AS TO TERMINATE IN THE SOUTHERLY LINE OF SAID LOT 57.

PARCEL 4:

AN EASEMENT FOR THE PURPOSES AS CONTAINED IN SECTION 2.4 AS SET FORTH IN THE EASEMENT AGREEMENT RECORDED MAY 11, 1992, AS INSTRUMENT NO. 92-844730, OF OFFICIAL RECORDS, UPON THE TERMS, CONDITIONS AND PROVISIONS AS THEREIN CONTAINED, OVER THAT PORTION OF LOT 4, SECTION 2, TOWNSHIP 1 SOUTH, RANGE 15 WEST, SAN BERNARDINO MERIDIAN IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND, DESCRIBED AS FOLLOWS:

THE SOUTHERLY AND EASTERLY 1.00 FOOT STRIP OF A STRIP OF LAND 2.50 FOOT WIDE AS MEASURED AT 90', PARALLEL AND CONCENTRIC WITH AND LYING SOUTHERLY AND EASTERLY OF THE FOLLOWING DESCRIBED LINE:

COMMENCING AT THE MOST EASTERLY CORNER OF LOT 57 OF TRACT NO. 13948, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 298, PAGES 30 TO 33 INCLUSIVE OF MAPS, RECORDS OF SAID COUNTY;

THENCE ALONG THE SOUTHEASTERLY LINE OF SAID LOT 57, SOUTH 60° 08' 15" WEST, A DISTANCE OF 72.63 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE WESTERLY HAVING A RADIUS OF 56.00 FEET, A RADIAL LINE TO SAID POINT BEARS NORTH 75° 07' 59" EAST;

THENCE SOUTHERLY ALONG SAID NON-TANGENT CURVE THROUGH A CENTRAL ANGLE OF 430 07' 52" AN ARC LENGTH OF 42.16 FEET TO THE BEGINNING OF A NON-TANGENT CURVE, CONCAVE SOUTHERLY HAVING A RADIUS OF 80.00 FEET, A RADIAL LINE FROM THE 56.00 FOOT RADIUS BEARS SOUTH 61° 44' 09" EAST, A RADIAL LINE FROM THE 80.00 FOOT RADIUS BEARS NORTH 22° 34' 38" EAST TO SAID POINT;

THENCE WESTERLY ALONG SAID NON-TANGENT CURVE THROUGH A CENTRAL ANGLE OF 20° 00' 06" AN ARC LENGTH OF 27.93 FEET TO A POINT OF TANGENCY;

THENCE NORTH 87° 25' 28" WEST ALONG SAID TANGENT LINE 6.36 FEET;

THENCE NORTH 89° 22' 09" WEST 22.69 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHERLY, HAVING A RADIUS OF 52.00 FEET;

THENCE WESTERLY ALONG SAID TANGENT CURVE THROUGH A CENTRAL ANGLE OF 33° 31' 36" AN ARC LENGTH OF 30.43 FEET TO THE SOUTHERLY LINE OF LOT 57, A RADIAL LINE TO SAID POINT BEARS SOUTH 34° 09' 27" WEST;

THE SIDELINES OF SAID 1.00 FOOT STRIP TO BE PROLONGED OR SHORTENED SO AS TO TERMINATE IN THE SOUTHERLY LINE OF SAID LOT 57.

**\*\*\*END OF LEGAL DESCRIPTION\*\*\***

## 1520 Carla Ridge, Beverly Hills, California

APN: 4391-018-014

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  BEVERLY HILLS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

LOT 18 OF TRACT 21364, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 644, PAGES 23 AND 24 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

## 1484 Carla Ridge, Beverly Hills, California

APN: 4391-023-010

the real property in the City of Beverly Hills, County of Los Angeles, State of California, described as:

Lot 23, Tract 21306, in the City of Beverly Hills, County of Los Angeles, State of California, as per map recorded in Book 634, Page(s) 33 & 34 of Maps, in the Office of the County Recorder of said County.

BN 31491395v6

## 25210 Jim Bridger Road, Hidden Hills, California

APN: 2049-041-058

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  CALABASAS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

ALL OF PARCEL 3 AND A PORTION OF THE LAND SHOWN AS "NOT A PART", IN THE CITY OF HIDDEN HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER PARCEL MAP NO. 25216, FILED IN BOOK 290, PAGES 3 TO 5, INCLUSIVE OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF LOS ANGELES COUNTY, ALL OF WHICH DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF SAID PARCEL 3, THENCE ALONG THE BOUNDARY OF SAID PARCEL 3 BY THE FOLLOWING FOUR COURSES:

1ST: SOUTH 40°30'13" EAST 39.91 FEET TO THE BEGINNING OF A TANGENT CURVE, CONCAVE WESTERLY AND HAVING A RADIUS OF 46.00 FEET: THENCE,

2ND: SOUTHWESTERLY ALONG SAID CURVE AN ARC DISTANCE OF 29.92 FEET THROUGH A CENTRAL ANGLE OF 37°15'59"; THENCE RADIAL TO SAID CURVE, 

3RD: NORTH 86°45'46" EAST 11.80 FEET; THENCE,

4TH: SOUTH 40°30'13" EAST 169.81 FEET, ALONG THE SOUTHWESTERLY BOUNDARY OF SAID PARCEL 3 AND ITS SOUTHEASTERLY PROLONGATION, TO THE INTERSECTION WITH A LINE, PARALLEL WITH AND 26.00 FEET SOUTHEASTERLY OF, MEASURED AT RIGHT ANGLES, THE SOUTHEASTERLY BOUNDARY OF SAID PARCEL 3; THENCE ALONG SAID PARALLEL LINE,

5TH: NORTH 57°08'29" EAST 273.43 FEET TO THE INTERSECTION WITH THE WESTERLY LINE OF WALKER ROAD, AS DESCRIBED IN THE GRANT DEEDS RECORDED OCTOBER 2, 2009, AS DOCUMENT NO. 2009-1502853 AND DOCUMENT NO. 2009-1502851, BOTH OF OFFICIAL RECORDS OF LOS ANGELES COUNTY: THENCE ALONG THE BOUNDARY OF SAID WALKER ROAD BY THE FOLLOWING THREE COURSES:

6TH: NORTH 22°53'11" WEST 6.73 FEET; THENCE,

7TH: NORTH 24°01'56" WEST 100 02 FEET; THENCE,

8TH: NORTH 22°53'11" WEST 94.55 FEET TO THE INTERSECTION WITH THE NORTHWESTERLY BOUNDARY OF SAID PARCEL 3; THENCE ALONG SAID NORTHWESTERLY LINE,

9TH: SOUTH 64°32'08" WEST 341.70 FEET TO THE POINT OF BEGINNING OF THIS DESCRIPTION.


SAID DESCRIPTION IS PURSUANT TO A CERTIFICATE OF COMPLIANCE RECORDED ON DECEMBER 17, 2015 AS DOCUMENT NO. 2015-1590417, OFFICIAL RECORDS.

EXCEPT ONE-HALF OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN OR UNDER SAID LAND, WITHOUT THE RIGHT OF SURFACE ENTRY FOR EXPLORATION, DEVELOPMENT OR PRODUCTION THEREOF, AS RESERVED BY EARLE E. HURLBUTT AND FRANCES C. HURLBUTT, HUSBAND AND WIFE, IN DEED RECORDED SEPTEMBER 1, 1954 IN BOOK 45476 PAGE 132, OFFICIAL RECORDS.

Schedule 7.4.1

**3802 Hollyline Ave, Sherman Oaks, California**

APN: 2272-002-030

THE LAND REFERRED TO HEREIN BELOW IS SITUATED  SHERMAN OAKS IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

THAT PORTION OF LOT 11 IN BLOCK 10 OF TRACT 10731, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AS PER MAP RECORDED IN BOOK 202, PAGES 20 TO 23 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING NORTHERLY AND EASTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE SOUTHERLY LINE OF LOT 11 BEING DISTANT NORTH 88° 10' 03" WEST 223.74 FEET FROM THE SOUTHEASTERLY CORNER OF SAID LOT; THENCE NORTH 18° 00' 52" WEST, 213.98 FEET; THENCE NORTH 80° 30' 52" WEST 136.23 FEET; THENCE NORTH 30° 45' 52" WEST 131.20 FEET, MORE OR LESS, TO A POINT IN A LINE WHICH IS PARALLEL WITH AND DISTANT EASTERLY 15.00 FEET FROM THE WESTERLY LINE OF SAID LOT; THENCE NORTH 14° 14' 08" EAST TO A POINT IN THE SOUTHERLY LINE OF HOLLYLINE AVENUE, AS SHOWN ON THE MAP OF SAID TRACT.

**1241 Loma Vista, Beverly Hills, California**

APN: 4391-023-008

LOT 9 OF TRACT NO 21362, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 627, PAGE(S) 77 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**8692 Franklin Ave, Los Angeles, California**

APN: 5558-019-011

Lot(s) 19 of Tract No. 8183, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 112, Page(s) 71 and 72 of Maps, in the Office of the County Recorder of said County.

Except therefrom all oil, gas, minerals and other hydrocarbon substances, lying below a depth of 500 feet, without the right of surface entry.

Schedule 7.4.1

**1011 N Hillcrest Rd, Beverly Hills, California**

APN: 4391-031-059

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF BEVERLY HILLS, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

ALL OF LOT 69 AND THAT PORTION OF LOT 71 OF TRACT NO. 21360, IN THE CITY OF BEVERLY HILLS, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 587 PAGES 59 TO 63 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, LYING EAST AND NORTH OF THE FOLLOWING DESCRIBED LINES:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 71; THENCE SOUTH 15° 13'45" 141.44 FEET; THENCE SOUTH 00° 8' 6" WEST 8.66 FEET TO THE WESTERLY PROLONGATION OF THE SOUTHERLY LINE OF LOT 69 OF SAID TRACT NO. 21360; THENCE ALONG SAID SOUTHERLY PROLONGATION SOUTH 86° 43' 44" EAST 17.66 FEET TO THE SOUTHWEST CORNER OF SAID LOT 69.

SAID LAND IS SHOWN AS PARCEL B ON CERTIFICATE OF COMPLIANCE FOR LOT LINE ADJUSTMENT NO. PL 07-27074 RECORDED DECEMBER 2, 2008, AS INSTRUMENT NO. 20082117066, OFFICIAL RECORDS.

**1962 Stradella Rd, Los Angeles, California**

APN: 4377-038-029

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

LOT 114 OF TRACT NO, 23946, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 663 PAGES 58 TO 68 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING ALL METALS AND MINERALS, AND ALL PETROLEUM, NATURAL GAS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND AND THAT MAY BE PRODUCED FROM A DEPTH OF 500 FEET BENEATH THE SURFACE THEREOF, AS PROVIDED IN THE DECLARATION OF RESTRICTIONS, RECORDED IN BOOK M-766 PAGE 670, OFFICIAL RECORDS.

Schedule 7.4.1

**15655 Woodvale Rd, Encino, California**

APN: 2283-005-008

Lot 12 of Tract 12666, in the City of Los Angeles, County of Los Angeles, State of California, as per Map recorded in Book 277, Pages 33 to 36 inclusive of Maps, in the Office of the County Recorder of said County.

BN 31491395v6

**3843 Hayvenhurst Ave, Encino, California**

APN: 2287-014-034

The following described real property in the City of Los Angeles, County of Los Angeles, State of California:

Lot 22 of Tract 18531 in the City of Los Angeles, County of Los Angeles, State of California as per Map recorded in Book 454, Page(s) 38 to 41 inclusive of maps in the Office of the County Recorder of said County.

Schedule 7.4.1

**4030 Madelia Ave, Sherman Oaks, California**

APNs: 2276-034-028, 2276-034-029, 2276-034-011

The real property in the City of Los Angeles, County of Los Angeles, State of California described as:

Lots 26, 27 and 28 of Tract No. 9427, in the City of Los Angeles, County of Los Angeles, State of California as per Map recorded in Book 135, Page(s) 39 to 44 inclusive, of Maps, in the Office of the County Recorder of said County.

Schedule 7.4.1

**25211 Jim Bridger Road, Hidden Hills, California**

APN: 2049-041-038

PARCEL 1 OF PARCEL MAP NO. 25216, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 290 PAGE 3 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ONE-HALF OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN OR UNDER SAID LAND, WITHOUT THE RIGHT OF SURFACE ENTRY FOR EXPLORATION, DEVELOPMENT OR PRODUCTION THEREOF, AS RESERVED BY EARLE E. HURLBUTT AND FRANCES C. HURLBUTT, HUSBAND AND WIFE, IN DEED RECORDED SEPTEMBER 1, 1954 IN BOOK 45476 PAGE 132, OFFICIAL RECORDS.

Schedule 7.4.1

**1312 Beverly Grove Pl, Beverly Hills, California**

APN: 4356-021-029

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

PARCEL "B" OF PARCEL MAP NO. 5901, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 255 PAGES 13 AND 14 OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY

Schedule 7.4.1

**1357 Laurel Way, Beverly Hills, California**

APN: 4355-018-041

LOT 7 OF TRACT NO. 25195, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 666, PAGES 35 TO 38, INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THEREFROM ALL OIL, GAS, HYDROCARBON AND OTHER MINERALS LYING IN AND UNDER 500 FEET BELOW THE SURFACE OF SAID LAND, WITHOUT RIGHT OF SURFACE ENTRY, AS CONVEYED IN QUITCLAIM DEED RECORDED NOVEMBER 5, 1959 AS INSTRUMENT NO. 2629, IN BOOK D-655, PAGE 827, OFFICIAL RECORDS.

**1432 Tanager Way, Los Angeles, California**

APN: 5561-024-005

THE FOLLOWING REAL PROPERTY IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA:

LOT 9 OF TRACT NO. 19229, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 652 PAGES 34, 35 AND 36 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

Schedule 7.4.1

SCHEDULE 8.6.1
to
Senior Secured Debtor in Possession Loan and Security Agreement

## BUSINESS LOCATIONS

1.     Each Borrower currently has the following business locations:

Chief Executive Office: 14225 Ventura Blvd #100, Sherman Oaks, CA 91423

Other Locations: See Schedule 7.4.1


2.     Each Obligor currently has the following business locations:


Chief Executive Office: 14225 Ventura Blvd #100, Sherman Oaks, CA 91423

Other Locations: See Schedule 7.4.1


3.     In the five years preceding the Closing Date, Borrowers and Subsidiaries have had the following business locations in addition to those set forth above:

None


4.     The following bailees, warehouseman, similar parties and consignees hold inventory of a Borrower or other Obligor:

None

BN 31491395v6

SCHEDULE 9.1.4

to

Senior Secured Debtor in Possession Loan and Security Agreement

### NAMES AND CAPITAL STRUCTURE

1.  The corporate names, jurisdictions of incorporation, and authorized and issued Equity Interests of each Obligor are as follows:

| Name | Jurisdiction | Number and Class of Authorized Shares | Number and Class of Issued Shares |
|---|---|---|---|
| Woodbridge Group of Companies, LLC | Delaware | Membership interest | N/A |
| Addison Park Investments, LLC | Delaware | Membership interest | N/A |
| Bluff Point Investments, LLC | Delaware | Membership interest | N/A |
| Summit Cut Investments, LLC | Delaware | Membership interest | N/A |
| Lilac Meadow Investments, LLC | Delaware | Membership interest | N/A |
| Diamond Cove Investments, LLC | Delaware | Membership interest | N/A |
| Heilbron Manor Investments, LLC | Delaware | Membership interest | N/A |
| Thornbury Farm Investments, LLC | Delaware | Membership interest | N/A |
| Sagebrook Investments, LLC | Delaware | Membership interest | N/A |
| Imperial Aly Investments, LLC | Delaware | Membership interest | N/A |
| Gravenstein Investments, LLC | Delaware | Membership interest | N/A |
| Silver Maple Investments, LLC | Delaware | Membership interest | N/A |
| Goosebrook Investments, LLC | Delaware | Membership interest | N/A |
| Elstar Investments, LLC | Delaware | Membership interest | N/A |
| Hornbeam Investments, LLC | Delaware | Membership interest | N/A |
| Silk City Investments, LLC | Delaware | Membership interest | N/A |
| Hollyline Owners, LLC | Delaware | Membership interest | N/A |
| Crowfield Investments, LLC | Delaware | Membership interest | N/A |
| Centershot Investments, LLC | Delaware | Membership interest | N/A |

BN 31491395v6

| | | | |
|---|---|---|---|
| Graeme Park Investments, LLC | Delaware | Membership interest | N/A |
| Mason Run Investments, LLC | Delaware | Membership interest | N/A |
| Pinney Investments, LLC | Delaware | Membership interest | N/A |
| Drawspan Investments, LLC | Delaware | Membership interest | N/A |
| Doubleleaf Investments LLC | Delaware | Membership interest | N/A |
| White Birch Investments, LLC | Delaware | Membership interest | N/A |
| Lincolnshire Investments, LLC | Delaware | Membership interest | N/A |
| Arlington Ridge Investments, LLC | Delaware | Membership interest | N/A |
| Bay Village Investments, LLC | Delaware | Membership interest | N/A |

2.    The record holders of Equity Interests of each Obligor are as follows:

| Name | Class of Stock | Number of Shares | Record Owner |
|---|---|---|---|
| Woodbridge Group of Companies, LLC | Membership interest | 100% | Carbondal Doocy, LLC |
| Addison Park Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Bluff Point Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Summit Cut Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Lilac Meadow Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Diamond Cove Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Heilbron Manor Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Thornbury Farm Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Sagebrook Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Imperial Aly Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Gravenstein Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Silver Maple Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Goosebrook | Membership interest | 100% | Woodbridge Group of |

| Investments, LLC | | | Companies, LLC |
|---|---|---|---|
| Elstar Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Hornbeam Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Silk City Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Hollyline Owners, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Crowfield Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Centershot Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Graeme Park Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Mason Run Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Pinney Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Drawspan Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Doubleleaf Investments LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| White Birch Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Lincolnshire Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Arlington Ridge Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |
| Bay Village Investments, LLC | Membership interest | 100% | Woodbridge Group of Companies, LLC |

BN 31491395v6

SCHEDULE 9.1.13
to
Senior Secured Debtor in Possession Loan and Security Agreement

## ENVIRONMENTAL MATTERS

None.

SCHEDULE 9.1.15
to
Senior Secured Debtor in Possession Loan and Security Agreement

## LITIGATION

1.      Proceedings and investigations pending against Borrowers or Subsidiaries:

SEC investigation  and state regulatory actions and investigations as previously disclosed to Secured Parties.

2.      Threatened proceedings or investigations of which any Obligor is aware:

BN 31491395v6

SCHEDULE 10.2.2
to
Senior Secured Debtor in Possession Loan and Security Agreement

## EXISTING LIENS

Liens securing intercompany debt arrangements as described in more detail in the Debtors' Motion for Interim and Final Orders (I) Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, And 552 Authorizing Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) And 4001(C); and (IV) Granting Related Relief, filed with the Bankruptcy Court in connection with the Bankruptcy Cases.

BN 31491395v6

SCHEDULE 10.2.17

to

Senior Secured Debtor in Possession Loan and Security Agreement

## EXISTING AFFILIATE TRANSACTIONS

Intercompany debt arrangements as described in more detail in the Debtors' Motion for Interim and Final Orders (I) Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, And 552 Authorizing Debtors to (A) Obtain Postpetition Secured Financing, (B) Use Cash Collateral, (C) Grant Adequate Protection to Prepetition Secured Parties; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) And 4001(C); and (IV) Granting Related Relief, filed with the Bankruptcy Court in connection with the Bankruptcy Cases.

## Exhibit B

### Funds

1.  Woodbridge Mortgage Investment Fund 1, LLC

2.  Woodbridge Mortgage Investment Fund 2, LLC

3.  Woodbridge Mortgage Investment Fund 3, LLC

4.  Woodbridge Mortgage Investment Fund 3A, LLC

5.  Woodbridge Mortgage Investment Fund 4, LLC

6.  Woodbridge Commercial Bridge Loan Fund 1, LLC

7.  Woodbridge Commercial Bridge Loan Fund 2, LLC

# **Exhibit C**

## **Noteholders**

**EXHIBIT C**
**Other Secured Parties**

| | | |
|---|---|---|
| **1. 642 SAINT CLOUD, LOS ANGELES, CA - SENIOR** | MARIA & MIGUEL TABLADILLO | 25,000.00 |
| | PROV-JUDY TONG IRA | 65,000.00 |
| | MAINSTAR-JOANNE SOWELL | 38,863.45 |
| | DONALD GRIFFIN | 25,000.00 |
| | VERONICA MCDONALD | 25,000.00 |
| | PROV-DEREK MOORE IRA | 25,000.00 |
| | ALLAN MCDONALD | 50,000.00 |
| | NADINE GROSJEAN | 50,000.00 |
| | BARBARA CHADWICK | 50,000.00 |
| | RONALD & BETTY SCHROEDER | 25,000.00 |
| | BOBBY SANDERS FAMILY TRUST | 50,000.00 |
| | BARBARA KROPP | 40,000.00 |
| | CLARENCE WILLIAMS | 25,000.00 |
| | DARLENE WEINBERG | 40,000.00 |
| | DAVID DERRICK | 100,000.00 |
| | GREGORY & VIVIAN CARSON | 60,000.00 |
| | GREGORY & LINDA HARRISON | 30,000.00 |
| | KUANG-LEI & DIANA WU | 25,000.00 |
| | THE SCHMIDT FAMILY TRUST | 250,000.00 |
| | THE TRUST OF ANTONY MATARRESE | 200,000.00 |
| | FRED & ANN DAY | 25,000.00 |
| | RICHARD MAY | 50,000.00 |
| | DAVID KRZEMIEN | 30,000.00 |
| | WANDA & ARTHUR WILLIS | 33,000.00 |
| | CHARLES & MARY BEZZINA | 50,000.00 |
| | LISA NEAL | 50,000.00 |
| | JERRY & MELANIE SKARYD | 150,000.00 |
| | JOYCE KLINE | 25,000.00 |
| | RICHARD GRAINGER | 26,000.00 |
| | ATKINS FAMILY IRREVOCABLE TRUST | 190,000.00 |
| | WILMA HARPER | 30,000.00 |
| | THE GARY FITE REVOCABLE TRUST 10/13/09 | 1,000,000.00 |
| | MAINSTAR-ERIC RANDOLPH | 112,300.00 |
| | PROV-KEVIN BONAS IRA | 67,000.00 |
| | SUNWEST-BILLIE CANTER IRA (1 OF 2) | 193,500.00 |
| | BYRON BEALL | 150,000.00 |
| | MADOLYN CHANDLER | 31,391.79 |
| | WALTER & RUTH VEALE | 40,000.00 |
| | MAINSTAR-BRIAN ASTON | 60,000.00 |
| | MAINSTAR-DEE NICKOLS | 90,300.00 |
| | MAINSTAR-MELANIE JOSHUA | 100,000.00 |
| | MARIANNE KELLER | 200,000.00 |
| | PROV-PATRICIA JOHNSON IRA | 25,000.00 |
| | PROV-TIFFANY WIGGS TRADITIONAL IRA | 40,000.00 |
| | SHIRLEY SMEDLEY | 100,000.00 |
| | MICHAEL LEFKOWITZ LIVING TRUST | 100,000.00 |
| | EDWARD OSBORNE | 50,000.00 |
| | GEORGE & LYNNE MELLECKER | 75,000.00 |
| | CAROLE & HERBERT CAFARELLA | 100,000.00 |
| | ZHANA MAKSIMOV | 50,000.00 |
| | DANIEL STUDY | 100,000.00 |
| | SUNWEST-BILLIE CANTER IRA (2 OF 2) | 50,000.00 |
| | INDRA VIDAL | 50,000.00 |
| | GARY WRIGHT | 25,000.00 |
| | BETTY HAU | 25,000.00 |
| | BRUCE CECKA | 46,000.00 |
| | MAINSTAR-GEORGE GALE JR | 88,945.00 |
| | PROV-DAVID KEMP IRA | 161,170.00 |
| | PROV-GARY ACKERMAN IRA | 42,500.00 |
| | PROV-RICHARD WISE IRA | 53,000.00 |

| | | |
|---|---|---:|
| | PROV-MONIKA HUEY IRA | 62,500.00 |
| | FREDA ALFORD | 100,000.00 |
| | ABRAHAM KOLNIERZ 1999 TRUST | 25,000.00 |
| | PROV-KEITH NGUYEN | 110,000.00 |
| | DAVID & PATRICIA TOSHNER | 150,000.00 |
| | WILLIAM & JUDITH LUNSFORD | 45,000.00 |
| | MARY CASALE | 186,864.87 |
| | RICHARD CLAVERIA MD APC PENSION PLAN & TRUST | 50,000.00 |
| | CLAUDIA SYKES | 50,000.00 |
| | STEVEN PELZ | 75,000.00 |
| | FRED & KAREN RANDHAHN | 25,000.00 |
| | EVELYN TORKELSON | 25,000.00 |
| | PROV-BETTY LOU HARVEY ROTH IRA | 116,834.37 |
| | BOYD & BRENDA ARMSTRONG | 50,000.00 |
| | YURIKO & MICHAEL HENDERSON | 25,000.00 |
| | THOMAS VAUGHAN SR | 70,000.00 |
| | THE GERALD CARLSON LIVING TRUST | 25,000.00 |
| | THE ANDREW MYRICK REVOCABLE TRUST 05/18/17 | 125,000.00 |
| | MICHAEL REED | 25,000.00 |
| | PATSY RAE VELTING | 100,000.00 |
| | PROV-JERRY & KATHLEEN VERSEPUT ICA | 25,000.00 |
| | KARIN EICHHORN | 30,000.00 |
| | MIKHAIL MOROZOV TRUST | 100,000.00 |
| | THE ANDREA GRIGGS LIVING TRUST OF 2000 | 60,000.00 |
| | IRA SVC-JOYCE STOCK | 70,000.00 |
| | MICHAEL & CYNTHIA HALES | 72,000.00 |
| | PHAM FAMILY TRUST 05/09/02 | 25,000.00 |
| | GENEVIEVE COLEMAN | 50,000.00 |
| | MANUEL FAMILY REVOCABLE LIVING TRUST 02/07/03 | 100,000.00 |
| | PROV-GARY HANNABASS IRA | 50,330.00 |
| | PROV-WANDA HANNABASS IRA | 42,270.00 |
| | ROBERT OSTENDORFF JR & SHIRLEY COOPER | 50,000.00 |
| | GERALD & ELIZABETH SJAASTAD | 500,000.00 |
| | ROBERT BRAZEE | 75,000.00 |
| | THE HAENDEL TRUST 06/14/02 | 100,000.00 |
| | THE MARC & DENISE PIERRE FAMILY TRUST | 375,000.00 |
| | SHANE & KATHRYN LITZENBERGER | 50,000.00 |
| | DAVID & MARILYN BETTINGER | 250,000.00 |
| | BARBARA & TODD RUBENSTEIN T/O/D | 25,000.00 |
| | THE JEAN NISHIZU-SHIKATA TRUST 05/18/05 | 50,000.00 |
| | FRANCINE & ROBERT BOTWINICK | 25,000.00 |
| | RODNEY STAINBROOK | 25,000.00 |
| | PAULA MEYERSON | 50,000.00 |
| | LINDA WIRKUS | 135,000.00 |
| | CUSTRED FAMILY TRUST | 100,000.00 |
| | JEAN EICHOLTZ | 120,000.00 |
| | DAVID & JOHNEE MILLER FAMILY TRUST 07/15/02 | 75,000.00 |
| | PROV-GERALD STARY IRA | 33,150.00 |
| | BLACK FAMILY REVOCABLE TRUST 05/05/04 | 100,000.00 |
| | MARY COLLINS | 50,000.00 |
| | MICHAEL BROOKS | 100,000.00 |
| | PROV-ELIZABETH FREIDEL IRA | 84,600.00 |
| | CAUSTRITA TRUST 10/06/11 | 100,000.00 |
| | PATRICK MCMAHON | 50,000.00 |
| | BETTY SOLLENBERGER | 60,000.00 |
| | DEBORAH & DOUGLAS VAN GEMERT | 100,000.00 |
| | RALPH CLARK JR | 50,000.00 |
| | SHARI PROCOPIO | 50,000.00 |
| | ELIZABETH COLANTUONO REV LIVING TRUST | 25,000.00 |
| | RODNEY BLACK T/O/D | 100,000.00 |
| | SUZANNE ROON T/O/D | 33,000.00 |
| | IRA SVC-CLAUDIA DODGE | 88,000.00 |
| | GEORGE REITTER | 60,000.00 |

| | | |
|---|---|---:|
| | BONNIE HASH-STRUTHERS | 25,000.00 |
| | PROV-DELLA LINK IRA | 31,000.00 |
| | KENNETH LOUCK | 50,000.00 |
| | BRADLEY PETERSEN | 50,000.00 |
| | ALAN & ANDREA SCHOEN REVOCABLE TRUST | 35,000.00 |
| | EVERETTE & MARLENE GOODWYN LIVING TRUST 07/11/03 | 25,000.00 |
| | JAY & ALYSE MILLER LIVING TRUST 06/04/14 | 100,000.00 |
| | ROSE FEILNER | 50,000.00 |
| | PROV-IRENE OLIN IRA | 28,586.00 |
| | CAROL FONTANESE | 100,000.00 |
| | JOHN WEBER | 130,000.00 |
| | STEVEN & SHARON KOZAK | 32,000.00 |
| | ROGER & BETTY WISNER | 25,000.00 |
| | | |
| 1. 642 SAINT CLOUD, LOS ANGELES, CA - DEV | ERIC HUANG | 25,000.00 |
| | WILLIAM WORST JR | 30,000.00 |
| | WILLIAM MILES | 50,000.00 |
| | TOMMYE GAYLER | 55,000.00 |
| | CHALLIS FORD | 70,000.00 |
| | HERSHEY & FREDA BOWERS | 100,000.00 |
| | LYNDA LILLY | 37,000.00 |
| | ROBERT & NORMA ROWE | 1,000,000.00 |
| | JAMES HAMM | 100,000.00 |
| | MAINSTAR-RUSSELL MOSLEY | 37,315.95 |
| | PROV-THOMAS HEGER IRA | 49,500.00 |
| | IRA SVC-TERESA HORNFECK | 57,000.00 |
| | PROV-KIM ONESKO IRA | 50,000.00 |
| | CHARLES & ROSE DUNLAP | 25,000.00 |
| | DONALD HAZELTON & CONNIE FREED | 25,000.00 |
| | LUIS JARAMILLO | 100,000.00 |
| | WILLIAM KNUPP | 50,000.00 |
| | PROV-RICHARD GAWLIK IRA | 114,550.00 |
| | PROV-RICHARD WIRKUS IRA | 55,000.00 |
| | PROV-DOUG ONESKO IRA | 55,750.00 |
| | PROV-SYLVIA MANNING IRA | 99,000.00 |
| | MAINSTAR-ANNA SHAVER | 180,000.00 |
| | MARY HORNBAKER | 150,000.00 |
| | ROBERT & DAWN SHARKEY | 50,000.00 |
| | PROV-DWAUNE JONES IRA | 100,000.00 |
| | RACHELLE GEISSLER | 133,385.40 |
| | JARA GROUP II LLC | 42,935.00 |
| | PROV-DEAN GEILENKIRCHEN IRA | 25,570.00 |
| | MICHAEL TAYLOR | 25,000.00 |
| | JOSEPH & FRANCINE SPANIAL | 25,000.00 |
| | PROV-PENNY FRAZIER IRA | 44,000.00 |
| | NANCY TAYLOR | 80,000.00 |
| | MAINSTAR-SHAYNE MICKELS | 32,000.00 |
| | CRAIG OSBORNE | 30,000.00 |
| | DAVID & PEGGY HOLMES | 100,000.00 |
| | DAVID DAVIS | 150,000.00 |
| | KEITH JOHNSON | 60,000.00 |
| | IAIN BARCLAY | 25,000.00 |
| | CAROL LECHMAN LIVING TRUST 08/12/91 | 500,000.00 |
| | MAINSTAR-DAVID MILLER | 100,000.00 |
| | JHARNA DE | 83,000.00 |
| | PROV-GAIL AKARD IRA | 120,000.00 |
| | IRA SVC-JAMES YOUNG | 27,300.00 |
| | IDA HILL | 140,000.00 |
| | WALTER THOMPSON | 50,000.00 |
| | MARJORIE DIRKSEN | 30,000.00 |
| | CHALLIS & CARLENE FORD | 100,000.00 |
| | MORINE CARTER | 50,000.00 |
| | SHIRLEY STAHL | 65,000.00 |

| | | |
|---|---|---:|
| | ROSALINE LEE | 100,000.00 |
| | RONALD MOORE | 100,000.00 |
| | WILMA KEOWN | 192,854.78 |
| | MYAH ALI | 75,000.00 |
| | JEFF FORD ENTERPRISES INC | 200,000.00 |
| | LANITA & SAMUEL PETRE | 50,000.00 |
| | SAMUEL & LOIS PETRE | 150,000.00 |
| | MICHELLE DOYLE | 50,000.00 |
| | DENNIS SHAW TRUST 08/07/97 | 270,000.00 |
| | TYRUS & WENDY BARNES | 60,000.00 |
| | | |
| 2. 9212 NIGHTINGALE DR, LOS ANGELES, CA - SENIOR | MAINSTAR-RICHARD FILLINGER IRA | 186,000.00 |
| | WILMA COOPER | 36,000.00 |
| | CHRISTOPHER MCCARROLL | 50,000.00 |
| | FRIENDS OF TRAVIS FISHER HOUSE | 50,000.00 |
| | DELTIS & JUDITH MOORE | 50,000.00 |
| | THERESA MADDEN | 35,000.00 |
| | DELORES HOLMES | 70,000.00 |
| | ELIZABETH GORDON FAMILY TRUST | 50,000.00 |
| | TIMOTHY & DANIEL WILSON | 28,000.00 |
| | DOST FAMILY TRUST | 190,000.00 |
| | JONATHAN BRUCE | 25,000.00 |
| | RICHARD AND LOIS CARLI | 200,000.00 |
| | JASON & ELIZABETH LACHANCE | 50,000.00 |
| | JOSEPH LURGIO | 25,000.00 |
| | ROBYN HAMER | 50,000.00 |
| | THOMAS FRAZER REVOCABLE TRUST 8/20/09 | 120,000.00 |
| | CHERYL SPARKS | 150,000.00 |
| | CHING-YU MENG | 50,000.00 |
| | HORACE HOLLEY JR | 50,000.00 |
| | MAINSTAR-RICHARD CHAYKIN | 268,000.00 |
| | LLOYD GOWDY | 90,000.00 |
| | SHIRLEY & GORDON KIRSTEN | 200,000.00 |
| | MARK MOSHEIM | 100,000.00 |
| | PROV-MICHAEL TYSON IRA | 50,000.00 |
| | THE MARTIN LANTIN DE MESA FAMILY TRUST | 100,000.00 |
| | PROV-UPENDRA & SMITA KULKARNI ICA | 200,000.00 |
| | PROV-KAREN SMITH IRA | 80,000.00 |
| | JAMES PEACE | 90,000.00 |
| | MICHAEL WEINER MD PA PROFIT SHARING PLAN | 100,000.00 |
| | LINDA STEVENS | 50,000.00 |
| | KENNETH AND THERESA LYONS | 100,000.00 |
| | ADVANTA IRA SVCS-DONALD SCHEMAN IRA | 40,000.00 |
| | MARK CAINE | 25,000.00 |
| | PROV-GARY HANAK | 36,700.00 |
| | LYNNE FRIEND | 100,000.00 |
| | JOHN S BRANCKE REV TRUST | 30,000.00 |
| | STEPHEN SWAFFORD (1 OF 2) | 50,000.00 |
| | SUNWEST-ALI NAJAFI ROTH IRA | 57,143.00 |
| | LAURA SIMPSON | 180,597.00 |
| | EDWARD CONWAY | 30,000.00 |
| | TATYANA KAPLAN | 25,000.00 |
| | RON & DONNA ROHRER | 200,000.00 |
| | MAINSTAR-STEVE GIDDENS | 60,229.28 |
| | ALBERT G CYR TRUST | 100,000.00 |
| | HAROLD RUECKERT | 25,000.00 |
| | FRED AND LORRAINE HANWELL | 35,000.00 |
| | WILLETT DAIRY FARM & CATTLE CO | 100,000.00 |
| | THOMAS AND PATRICIA MOORE | 60,000.00 |
| | LUCIE POHL | 25,000.00 |
| | MICHAEL AND RITA ARNOLD | 75,000.00 |
| | JAMES MCGRANN | 29,000.00 |
| | DAVID TOWNLEY | 50,000.00 |

| | | |
|---|---|---:|
| | BOWERS FAMILY TRUST | 53,000.00 |
| | GARY RINGSDORF | 100,000.00 |
| | RONALD GARCIA & MICHELLE HERNANDORENA-GARCIA | 50,000.00 |
| | IRA SVCS-DONALD MCKENZIE | 50,000.00 |
| | MICHAEL GUBLER | 100,000.00 |
| | MARK BEGGS | 240,000.00 |
| | CHARLES & SUSAN NOBLE | 25,000.00 |
| | MAINSTAR-CAROL SAVIO | 48,000.00 |
| | PATRICIA VEATCH TRUST 11/09/16 | 100,000.00 |
| | ANDERSON FAMILY REV LIVING TRUST 09/25/07 | 25,000.00 |
| | LOUIS & JOYCE COSTANZA | 40,000.00 |
| | FAMILY TRUST OF JOSEPH & CAROL LIMA | 30,000.00 |
| | RONALD RIZER | 90,000.00 |
| | ANN DELAP | 100,000.00 |
| | CAROLE & ROBERT SHAPIRO | 25,000.00 |
| | PROV-HELEN SUE VON INS-ROPERS IRA | 82,600.00 |
| | PROV-ALAN SCHULZ IRA | 23,382.01 |
| | PROV-JOHN LEROY ERICKSON IRA | 50,000.00 |
| | BETTINA FAVATA | 50,000.00 |
| | ROXY FELGER | 100,000.00 |
| | THOMAS ROSE (2 of 2) | 50,000.00 |
| | PROV-LISA JACKSON ROTH IRA | 40,000.00 |
| | PROV-JOAN MILLER | 128,058.00 |
| | CAROL FELTON | 50,000.00 |
| | SUNWEST-JEFFREY JONES | 60,000.00 |
| | THOMAS ROSE (1 OF 2) | 50,000.00 |
| | STEVEN & SHARON KOZAK | 60,000.00 |
| | PATRICIA PEMBERTON | 50,000.00 |
| | ROLAND AND RITA KYOVSKY | 130,000.00 |
| | PROV-LEAH KEPLER IRA | 41,980.00 |
| | PROV-MICHELLE BOGGS IRA | 64,300.00 |
| | PROV-CRAIG MUENTER IRA | 75,000.00 |
| | KENNETH PANKONIEN | 50,000.00 |
| | MAINSTAR-GEORGE RIVERO | 35,000.00 |
| | ELAINE AND BERNARD NESENOFF | 25,000.00 |
| | PROV-KIM ROBB IRA | 25,000.00 |
| | JAMES & SUSAN SEWALD | 25,000.00 |
| | PROV-EILEEN SARICA IRA | 28,576.59 |
| | PROV-DANIEL FENDER IRA | 119,481.60 |
| | CAROL & CHAZZ SCHOENFELD | 50,000.00 |
| | DOYLE & MARCIA RUMSEY | 50,000.00 |
| | BKD SOLO 401K TRUST FBO ROBERT DESANTIS | 100,000.00 |
| | BRUCE ORCHARD | 42,000.00 |
| | CURTIS JORDAN | 30,000.00 |
| | DELWYN AND BETTY WAYNER | 25,000.00 |
| | THE E ELAINE SMETANA TRUST 8/17/94 AMENDED | 200,000.00 |
| | PATRICIA & DONALD KRAHN | 25,000.00 |
| | BRENDA BLACK | 30,000.00 |
| | MAY FAMILY RLT 7/8/2005 | 50,000.00 |
| | CAROLYN STRICKLAND | 60,000.00 |
| | ELIZABETH & ROBERT DAWSON | 25,000.00 |
| | PROV-DANNY LIME | 83,750.00 |
| | GREGORY & NANCY WALL | 100,000.00 |
| | WALTER & MARY JANE BROADWELL | 25,000.00 |
| | NANCY HEDRICKS | 25,000.00 |
| | STEPHEN SWAFFORD (2 OF 2) | 50,000.00 |
| | THE NEW CASTLE COUNTY BOARD OF REALTORS | 50,000.00 |
| | DAVE COOK | 35,000.00 |
| | BERTSCH VACATION HOMES LLC | 55,000.00 |
| | PROV-LINDA WEBB IRA | 26,500.00 |
| | DENNIS & PEGGY FETTING JOINT LIVING TRUST 10/08/09 | 25,000.00 |
| | BESSIE LONG | 25,000.00 |
| | IRENE OLIN TRUST 02/25/98 | 60,000.00 |

| | | |
|---|---|---|
| | ROBERT TIDLER | 25,000.00 |
| | | |
| **2. 9212 NIGHTINGALE DR, LOS ANGELES, CA - DEV** | SILING LI | 25,000.00 |
| | GAIL I KNITTER LIVING TRUST 11/10/11 | 25,000.00 |
| | GAYLE & JOSEPH BREWER | 40,000.00 |
| | ROBERT CASSIDY | 100,000.00 |
| | ELIZABETH MUNK | 100,000.00 |
| | IRA SVCS-AMY ANN FOOTE IRA | 34,500.00 |
| | MAINSTAR-GORDON KIRSTEN | 65,000.00 |
| | DANIEL & LINDA VALENTINE | 300,000.00 |
| | PROV-MICHAEL ALEXANDER IRA | 161,000.00 |
| | PATRICIA MCCUTCHEON | 25,000.00 |
| | PROV-MAREL SIGSWAY IRA | 120,000.00 |
| | | |
| **3. 385 TROUSDALE PLACE (TWO), BEVERLY HILLS, CA - SENIOR** | ALEXANDRA AYERS | 34,351.00 |
| | AUSTIN M FRISHMAN REVOCABLE LIVING TRUST | 25,000.00 |
| | JACK JACOBY | 100,000.00 |
| | STEVE GOLDFINGER | 100,000.00 |
| | MAINSTAR-DENNIS SEALEY (1 OF 2) | 150,000.00 |
| | JEFFREY & PATRICIA HOLMES | 50,000.00 |
| | MAINSTAR-MACLOVIA BLAKLEY | 149,000.00 |
| | MAINSTAR-WILLIAM BARRAUGH | 145,000.00 |
| | PROV-JANIS HOWELL IRA | 100,000.00 |
| | MAE & KIN LEONG | 50,000.00 |
| | VAL PECO | 25,000.00 |
| | MAINSTAR-SUSAN GLIEBE | 76,000.00 |
| | IRA SVCS-WOODROW WILSON | 125,000.00 |
| | HELENE WOLFLEY & RICHARD DIRICCO | 25,000.00 |
| | CHRISTINE PASSIGLIA | 50,000.00 |
| | THE GULDEN TRUST 12/18/90 | 100,000.00 |
| | CLAY BOOTHE | 27,000.00 |
| | MAINSTAR-MICHAEL THRANE | 31,956.87 |
| | SATYA MALLICK | 50,000.00 |
| | MAINSTAR-DENNIS SEALEY (2 OF 2) | 150,000.00 |
| | STEPHEN SWAFFORD | 50,000.00 |
| | R THOMAS & CHRISTINE IRWIN REVOCABLE TRUST | 50,000.00 |
| | MAINSTAR-PHILLIP POWELL | 50,000.00 |
| | KENT KELLERSBERGER | 25,000.00 |
| | MAINSTAR-GUANG MA | 73,921.25 |
| | LOUIS & GERALDINE HUNTEMAN | 30,000.00 |
| | ARMOND MINCEY | 25,000.00 |
| | JEFFREY & MERI LU MILLS | 60,000.00 |
| | THE BADER TRUST 02/01/17 | 100,000.00 |
| | MAINSTAR-TERRI WALKER | 41,570.37 |
| | ROBERT HOFFMAN | 40,000.00 |
| | JAMES BARON T/O/D | 100,000.00 |
| | FLORENCE & DOUGLAS NESAW | 50,000.00 |
| | FREDERICK & DONNA WILLIS | 50,000.00 |
| | JAMES & LORRAINE SHINDLER | 50,000.00 |
| | MARK & MAGDALENA DYSLIN | 50,000.00 |
| | RONALD SPRENGER | 200,000.00 |
| | DEBORAH MIELKE | 25,000.00 |
| | C JOAN & MARK ANDERSON | 175,000.00 |
| | LEONARD & SANDRA CAMERON | 559,013.00 |
| | GAIL BOUSUM | 25,000.00 |
| | KARIN SCOTT TRUST AGREEMENT 05/22/12 | 50,000.00 |
| | JOSEPH & JOAN HAWKINS | 200,000.00 |
| | ALFRED STEEN | 100,000.00 |
| | THE PORTER FAMILY TRUST | 25,000.00 |
| | RICHARD & LINDA CHELTEN (1 OF 2) | 43,892.08 |
| | BEN KOZAK | 25,000.00 |
| | DOUGLAS MCCLINTIC | 50,000.00 |
| | ROBERT & KAREN SCHROER | 200,000.00 |

| | | |
|---|---|---|
| | CAROLINA CRETELLA | 100,000.00 |
| | DOREEN LADE | 50,000.00 |
| | MUCKOM TRUST 08/08/16 | 50,000.00 |
| | IRA SVC-CAROL HOFMANN | 177,500.00 |
| | CONRAD & ELLEN HAUG | 50,000.00 |
| | MAINSTAR-ATAOLLAH ALEM | 31,884.00 |
| | RICHARD & LINDA CHELTEN (2 OF 2) | 63,999.65 |
| | MAINSTAR-JOHN PALSHA | 66,459.45 |
| | PROV-ANDREA BARRY IRA | 30,000.00 |
| | BEATRIZ HUBER & DEBORAH KURUPAS | 50,000.00 |
| | HORIZON-CLIFTON VALLEY TRAD IRA | 50,000.00 |
| | CHRISTOPHER POFFEL | 50,000.00 |
| | PROV-MYRON THOMPSON IRA | 60,000.00 |
| | PROV-JAMES JANIESCH IRA | 65,000.00 |
| | MERVIN & MARY HUMPHRIES | 50,000.00 |
| | JOAN WHITEHEAD IRREVOCABLE TRUST | 40,000.00 |
| | RICHARD & JANET GRONEMEYER JOINT TRUST AGREEMENT | 63,000.00 |
| | TSUN-SEN & MITZI FU | 100,000.00 |
| | SASSER TESTAMENTARY TRUST FOR VALERIE CATHERS 11/02/15 | 85,000.00 |
| | PROV-DAVID HOUSER IRA | 50,000.00 |
| | GREGORY & CAROL THOMPSON | 100,000.00 |
| | GLEN & DIANE PRINCE | 25,000.00 |
| | SUSAN BILLS | 25,000.00 |
| | MAINSTAR-FRANK BOLON | 220,265.27 |
| | LEIAH KITARE | 25,000.00 |
| | BONNIE HASH-STRUTHERS | 40,000.00 |
| | LAUREN WEST TRUST 12/11/12 | 100,000.00 |
| | OASIS LODGE NO 41 F&AM | 30,000.00 |
| | PAUL BRAND | 25,000.00 |
| | PROV-KENNETH HOLBROOK IRA | 100,000.00 |
| | CHUCK RASBACH | 100,000.00 |
| | STAN & DELILA LUMBARDY | 50,000.00 |
| | MAINSTAR-BOBBY MCDONALD | 119,903.54 |
| | DAVID & BARBARA EVERS | 100,000.00 |
| | FRANK GRIFFIN JR | 100,000.00 |
| | MARIANNE & JOHANNES KLAFFKE | 25,000.00 |
| | CLIVE & MAXINE PETERS | 50,000.00 |
| | ISRAEL & NILDA DIAZ | 25,000.00 |
| | JAMES & DIANE WAHL | 30,000.00 |
| | MAINSTAR-LUCRICIA JONES | 35,300.77 |
| | MAINSTAR-GLEN JONES | 31,504.00 |
| | ELIZABETH LOMBARDO REVOCABLE TRUST | 160,000.00 |
| | | |
| 3. 385 TROUSDALE PLACE (TROUSDALE TWO), BEVERLY HILLS, CA - DEV | KENNETH & ALEEN STANTON | 50,000.00 |
| | MONGE FAMILY TRUST 02/25/10 | 50,000.00 |
| | | |
| 4. 375 TROUSDALE PLACE, BEVERLY HILLS, CA - SENIOR | WILLIAM ELIA | 50,000.00 |
| | CALLAGHAN PUMP & CONTROLS INC | 50,000.00 |
| | IRA SVCS-CHUC LY | 80,000.00 |
| | JEFFREY SHAW | 50,000.00 |
| | IC AVIATION | 50,000.00 |
| | JARA GROUP II LLC | 50,000.00 |
| | THE JAMES & RHONDA KESTER LIVING TRUST 12/15/03 | 50,000.00 |
| | JOHN HACKMAN | 50,000.00 |
| | ELIZABETH SORIANO | 25,000.00 |
| | HORIZON-JUAN MACIAS IRA | 49,500.00 |
| | PROV-STEVEN SCHULTZ ROTH IRA | 42,000.00 |
| | JAMES & VALUAH WOODBY | 50,000.00 |
| | HORACE HOLLEY JR | 40,000.00 |
| | JAMES CASE | 40,000.00 |
| | PROV-LAURA SNITZER ROTH IRA | 82,602.14 |
| | PAUL & MARGARET GIAMMARCO | 25,000.00 |
| | MICHAEL HUWE | 50,000.00 |

| | | |
|---|---|---|
| | MAINSTAR-JOSEPH CENSOPLANO | 26,274.86 |
| | JUDITH NUSE | 25,000.00 |
| | KARNAIL SINGH | 25,000.00 |
| | MAINSTAR-LINDA SIEBE | 75,800.00 |
| | MARK & KATHY HOLMAN | 50,000.00 |
| | SANDRA SNYDER | 40,000.00 |
| | MARIA & LUIS MARES | 50,000.00 |
| | RANDEL LILLIE & JANET MAULIN | 80,000.00 |
| | RODGER MAYRAND | 40,000.00 |
| | JACK GWALTNEY | 25,000.00 |
| | REVOCABLE LIVING TRUST OF EMMETT & SHARON GIBSON 01/15/08 | 100,000.00 |
| | JOSEPH SIRIANNI FAMILY REV LVG TRUST | 50,000.00 |
| | GENEVIEVE COLEMAN | 50,000.00 |
| | DAVID ASHWORTH REVOCABLE LIVING TRUST | 300,000.00 |
| | PROV-MICHAEL CONCASCIA IRA | 53,300.00 |
| | BARBARA WOHLWEND LIVING TRUST 08/15/08 | 35,000.00 |
| | CURTIS & SHARON AYRES | 80,000.00 |
| | JAMES MCDONALD | 50,000.00 |
| | JAMES RICE | 150,000.00 |
| | SALLLIE RICE | 400,000.00 |
| | HENRY PIERSON | 25,000.00 |
| | MAINSTAR-ANTHONY INENDINO | 69,000.00 |
| | MAINSTAR-RUTH HODNE | 42,000.00 |
| | PHILIP GREENFIELD REV LVG TRUST | 50,000.00 |
| | STEPHEN & HEIDI FAMER | 25,000.00 |
| | THELMA WILSON | 100,000.00 |
| | NEAL & MELODY STUTEVILLE | 184,000.00 |
| | FRIEDA RACHT | 50,000.00 |
| | DAVID & MELINDA BESELER | 50,000.00 |
| | MAINSTAR-NORMA BERTRAND | 47,000.00 |
| | IRA SVC-MARC FRUCHTER | 50,000.00 |
| | BARRIE & LARRY DUBIN | 25,000.00 |
| | NICHOLE HENDERSON | 30,251.20 |
| | PROV-MILDRED OHLER IRA | 53,177.00 |
| | IRA SVC-MELINDA WHEELER | 52,000.00 |
| | STEPHANIE FERNANDEZ | 50,000.00 |
| | JEFFREY & PATRICIA HOLMES | 50,000.00 |
| | PROV-HENYA BONETSKY IRA | 60,000.00 |
| | EDUARD & IVETA DANEK | 150,000.00 |
| | DAVID & HARRIET SAYER | 50,000.00 |
| | DAVID & ALICE MCGINLEY | 50,000.00 |
| | MICHAEL WEINER MD PA PROFIT SHARING PLAN | 250,000.00 |
| | DARLENE MOUW | 25,000.00 |
| | DIANNE SPIROFF | 100,000.00 |
| | PROV-CONSTANCE BOATWRIGHT IRA | 27,780.00 |
| | PROV-RACHELLE ALBANESE ROTH IRA | 25,000.00 |
| | BERTSCH VACATION HOMES LLC | 55,000.00 |
| | BLINDBURY FAMILY TRUST 04/11/91 | 50,000.00 |
| | SNEHAL & NIPA SHAH | 50,000.00 |
| | MICHAEL KLINEMAN | 50,000.00 |
| | MAINSTAR-MURRAY MACKSON | 40,000.00 |
| | PROV-ROBERT REGNER IRA | 51,250.00 |
| | SUNWEST-SCOTT NEAL IRA | 50,000.00 |
| | CHRISTINA GALLAGHER | 30,000.00 |
| | MAINSTAR-DAVID ENGELBERT | 30,000.00 |
| | NOLA SHINABERRY | 25,000.00 |
| | JAMES MATTHEW | 50,000.00 |
| | PROV-THERESA CENTRONE IRA | 107,000.00 |
| | PROV-DIANNA AINSWORTH IRA | 40,000.00 |
| | LOUIS & MURIEL MORROW FAMILY TRUST | 30,000.00 |
| | JOAN & LOUIS GIOVACHINO REVOCABLE TRUST 12/30/07 | 25,000.00 |
| | | |
| 4. 375 TROUSDALE PLACE (TROUSDALE), BEVERLY HILLS, CA - DEV | IRA SVC-CHARLES BARNES | 90,000.00 |

| 5. 9230 ROBIN DR, LOS ANGELES, CA - FIRST | PAUL CYR | 50,000.00 |
|---|---|---|
| | JEFFREY GERRITSON | 25,000.00 |
| | THE JACQUELINE M CARLSON 2006 TRUST | 25,000.00 |
| | CULLEY O'MELIA TRUST | 33,538.06 |
| | ALFRED ORTENZO REVOCABLE TRUST | 100,000.00 |
| | RUTH FRANZER | 25,000.00 |
| | SUSAN MONACO | 25,000.00 |
| | KEITH HIGH | 25,000.00 |
| | PHILIP AND CYNTHIA DAVIS | 50,000.00 |
| | BETTY GRAVENS TRUST 4/15/96 | 25,000.00 |
| | ROBERT GRAVENS TRUST 4/15/96 | 25,000.00 |
| | MAINSTAR-MICHAEL KANE | 93,250.00 |
| | CLYDE & JANINE COFFMAN | 30,000.00 |
| | PROV-JOE MALONEY IRA | 63,219.00 |
| | BERTHOLD & ANITA SCHWARZ | 25,000.00 |
| | DAVID SLATER | 30,000.00 |
| | DEBORAH KUNKEL | 25,000.00 |
| | IRA SVC-ERNESTINE KORD | 24,000.00 |
| | ROSEMARY DORKO | 25,000.00 |
| | MAINSTAR-MARK FISHER | 149,801.00 |
| | PROV-DARRELL FINNEY IRA | 269,184.15 |
| | PROV-EDWIN YOUNG IRA | 60,000.00 |
| | IRA SVC-SANDIE SIMMONS | 279,000.00 |
| | PROV-KATHERINE MESSENGER IRA | 317,700.00 |
| | FELIPE & CRUZ GARCIA | 200,000.00 |
| | FRED & LUCIA POHLMAN | 75,000.00 |
| | JOHN T & JOAN F MURPHY LIVING TRUST | 50,000.00 |
| | ARTHUR AND REGINA FISCHER | 25,000.00 |
| | ROMAN AND MARLENE FULLENKAMP | 100,000.00 |
| | STEPHEN & MELINDA FULLENKAMP | 25,000.00 |
| | GEORGE AND ESTHER MILLER | 30,000.00 |
| | MELVIN AND JANET STEINBRUNNER | 30,000.00 |
| | LAVERN AND JOANNE STEINBRUNNER | 30,000.00 |
| | PAM ZEIER | 50,000.00 |
| | RAYMOND WADE PORTER REVOCABLE LIVING TRUST | 100,000.00 |
| | NORMAN HULL JR | 50,000.00 |
| | CHRISTY MCAFFEE | 30,000.00 |
| | CHRISTIAN & DINAH GOLDING | 100,000.00 |
| | HERCZOG FAMILY TRUST | 300,000.00 |
| | WALTER LINCOLN | 25,000.00 |
| | ROBERT LYONS | 26,000.00 |
| | PROV-TERRENCE GREGORY IRA | 388,000.00 |
| | PROV-MOLLIE ANDERSON IRA | 100,150.00 |
| | PAMELA & JOHN FISHER | 25,000.00 |
| | MAINSTAR-CEDRIC RANDOLPH | 25,664.19 |
| | NICOLE MARKS | 25,000.00 |
| | MAINSTAR-JONI SPOON | 30,000.00 |
| | LARRY & SANDRA TODD | 100,000.00 |
| | KENT BRITTON | 80,000.00 |
| | PROV-ROBERT MCKINNEY IRA | 78,163.00 |
| | RONALD & MARY LOU CLARK | 150,000.00 |
| | THE LEON PERLIN REVOCABLE TRUST AGREEMENT 12/12/06 | 50,000.00 |
| | PROV-VICTOR STRAPKO IRA | 50,260.00 |
| | PROV-SUSAN BRANTLEY IRA | 49,000.00 |
| | PROV-KAREN J TAYLOR | 70,000.00 |
| | DONALD & DONNA WEISE | 50,000.00 |
| | JAY & MARJORIE PARKER | 50,000.00 |
| | DANIEL & SUSAN HASTINGS | 50,000.00 |
| | AVIJIT & JASSY MUKHERJEE | 100,000.00 |
| | CAMPBELL FAMILY TRUST 10/30/02 | 50,000.00 |
| | RONALD & PATRICIA SANDHOFF | 25,000.00 |
| | REBECCA WOLLIN | 100,000.00 |
| | MAINSTAR-MARJORIE CENTORE IRA | 52,000.00 |

| | | |
|---|---|---|
| | EDWARD KAPLAN RESTATED & AMENDED TRUST 11/19/15 | 50,000.00 |
| | IRA SVCS-JOHANNA HIROTA IRA | 25,000.00 |
| | STEVEN GRAMLING | 25,000.00 |
| | NANCY HYDE | 55,000.00 |
| | DIANNE SPIROFF | 100,000.00 |
| | WEISE REVOCABLE TRUST 11/07/14 | 50,000.00 |
| | DAVID & AURA DILETTERA | 50,000.00 |
| | PROV-JIMMY CLAYTON IRA | 60,000.00 |
| | JAKE MURILLO | 25,000.00 |
| | THE BRIELLE ANDERSON REVOCABLE TRUST | 25,000.00 |
| | | |
| **5. 9230 ROBIN DR, LOS ANGELES, CA - SECOND** | NATALYA CHAYKOVSKY | 25,000.00 |
| | RAY PIIRA | 40,000.00 |
| | PROV-DOUGLAS VANCE IRA | 149,500.00 |
| | MAINSTAR-GARRETT GINGRICH | 90,000.00 |
| | RONALD LOONEY | 60,000.00 |
| | PROV-ROBERT CASSIDY IRA | 99,500.00 |
| | GLENNA COVER | 130,000.00 |
| | JAY & ILENE SMALL | 50,000.00 |
| | DAVID KELLEY TRUST 07/16/13 | 50,000.00 |
| | STEPHEN AMBROSE | 100,000.00 |
| | CARL & ANNA SITES | 50,000.00 |
| | PROV-JEFFERY SCHELINSKI IRA | 55,000.00 |
| | WILLIAM & BETTY GRIFFITH | 100,000.00 |
| | CARL ANDERSEN-JENSEN | 50,000.00 |
| | PROV-KEITH NGUYEN IRA | 100,000.00 |
| | | |
| **6. 1 ELECTRA COURT, LOS ANGELES, CA - SENIOR** | JEFFREY & COLLEEN BARKLEY | 50,000.00 |
| | ANTHONY WINTER | 25,000.00 |
| | BRUCE & TREVA BREMNER | 100,000.00 |
| | CAROL BERGLUND LIVING TRUST 03/31/16 | 100,000.00 |
| | CHARLES VANFOSSON | 30,000.00 |
| | ELLEN FUENTES REVOCABLE LIVING TRUST | 100,000.00 |
| | JAMES HAEN | 50,000.00 |
| | KEITH BERGLUND LIVING TRUST 03/31/16 | 100,000.00 |
| | MANFRED HEIPP | 50,000.00 |
| | RICHARD KOHLER REVOCABLE LIVING TRUST | 100,000.00 |
| | VELMA NIELSEN | 50,000.00 |
| | ADAM LENTNER | 100,000.00 |
| | ANGELA BAGLIONE-MANLEY | 25,000.00 |
| | ARLO & JEAN BAUMGARN | 25,000.00 |
| | DAVID & SANTA ANDERSON | 25,000.00 |
| | DIANE CONAWAY | 30,000.00 |
| | EDWARD QUINN | 60,000.00 |
| | GIUSEPPE & ROSA ISGRO | 25,000.00 |
| | JOSEPH PERFETTO | 100,000.00 |
| | LORI KOBETITSCH | 43,000.00 |
| | MICHAEL WEINER MD PA PROFIT SHARING PLAN | 500,000.00 |
| | ROBERT GLASS JR | 25,000.00 |
| | SANTA & DAVID ANDERSON | 25,000.00 |
| | BETSY HADDOCK & KIMBERLY BRADY | 80,000.00 |
| | IVAN GOLDBERG | 25,000.00 |
| | JENNIFER WEITZMAN | 100,000.00 |
| | KAREN KNUDSEN | 70,000.00 |
| | KARLA SCHMIDT COMMINS TRUST | 200,000.00 |
| | KATHLEEN MINKUS | 350,000.00 |
| | MARY E STRICKLAND & ARMOND MINCEY | 50,000.00 |
| | ROGER & ANITA PARADAY | 50,000.00 |
| | THE BETTY VEATCH TRUST 06/21/12 | 75,000.00 |
| | THE DON MORGAN TRUST 03/25/17 | 25,000.00 |
| | THE KAREN PAYNE LIVING TRUST 12/28/06 | 50,000.00 |
| | ANN FORD REVOCABLE TRUST | 650,000.00 |
| | CHRISTINE LIVINGSTON | 25,000.00 |

| | | |
|---|---|---|
| | DAVID CRAMER | 50,000.00 |
| | DEIRDRE & BENJAMIN FERNANDES | 148,000.00 |
| | KATHLEEN CARLON FAMILY TRUST | 100,000.00 |
| | MERVYN & JEAN ANDERSON | 50,000.00 |
| | PROV-JO CULLIGAN IRA | 25,000.00 |
| | PROV-LORI KOBETITSCH IRA | 22,824.56 |
| | PROV-MARILYN SULLIVAN | 46,975.00 |
| | ROGER BECK | 100,000.00 |
| | THE EXCEL REVOCABLE TRUST 05/01/06  E GARVIN GRANTOR | 50,000.00 |
| | ADRIAN & DREANA AIU | 100,000.00 |
| | COLUMBUS MEDICAL EQUIPMENT INC | 500,000.00 |
| | DALE & KATHRYN WIDEMAN | 50,000.00 |
| | GARLAND OLESEN | 25,000.00 |
| | HARRIS & MARION FREEMAN | 100,000.00 |
| | HARVEY & MARY WRYNN | 30,000.00 |
| | JOHANN LORIDON | 100,000.00 |
| | JUDY & GERALD JENISCH | 25,000.00 |
| | VITA DIPOLITO IRREVOCABLE TRUST | 50,000.00 |
| | BENJAMIN & AARON NIEDBALSKI | 100,000.00 |
| | DOLLY KELEPECZ | 75,000.00 |
| | DONALD FREYTAG | 30,000.00 |
| | HELEN & CHARLES CADDICK | 100,000.00 |
| | JOHN & KRISTINA ROSER | 50,000.00 |
| | JOHN ARCHIMEDE | 25,000.00 |
| | JOHN & WILMA REBUCK | 100,000.00 |
| | JOYCE KLINE | 45,000.00 |
| | JULIANNE BOLTZ | 25,000.00 |
| | LARRY DUHON | 50,000.00 |
| | MARLENE GREEN | 50,000.00 |
| | MICHAEL & LESLY BLEND | 50,000.00 |
| | SUNWEST-RUTH VAUGHT IRA | 200,000.00 |
| | THE FLAX FAMILY REVOCABLE TRUST 07/27/95 | 100,000.00 |
| | THE MORRILL FAMILY TRUST | 25,000.00 |
| | ANITA LEE | 25,000.00 |
| | BRUCE & LINDA KING | 250,000.00 |
| | DR PATRICK BERRYHILL TRUST 03/01/66 | 25,000.00 |
| | HERBERT FINNELL & GEORGEANNE BROWN | 25,000.00 |
| | IRA SVC-BARBARA SPESSARD | 27,200.00 |
| | JOHN BROWN | 50,000.00 |
| | LINDA FORBES | 25,000.00 |
| | MAINSTAR-RAMONA ROBINSON | 60,000.00 |
| | MAINSTAR-STEVEN WALGREN | 150,000.00 |
| | MARIE KEEFER | 25,000.00 |
| | MARILYN SCHUSTER | 120,000.00 |
| | ROGER & LAURIE SHOEMAKER | 55,000.00 |
| | VIRGILIA GILAM | 40,000.00 |
| | ANGELA CANNADA | 25,000.00 |
| | CAROLINA CRETELLA | 100,000.00 |
| | CHRISTOPHER KIRRIE | 100,000.00 |
| | JAMES & GERALDINE LINDSAY | 50,000.00 |
| | JOSEPH SILVA | 50,000.00 |
| | LEE BOWERS | 65,000.00 |
| | LEO & NORMA O'REILLY | 25,000.00 |
| | RICHARD BOWEN | 50,000.00 |
| | TRONG PHAM & HOA NGUYEN | 100,000.00 |
| | VINCENT, MERCEDES, & PATRICK ENRIQUEZ | 515,000.00 |
| | VIRGINIA & ALLAN WHEELER | 50,000.00 |
| | CATHY SHOTZBERGER | 25,000.00 |
| | CLIFFORD ALBERTSON REV LVG TRUST | 50,000.00 |
| | DAVID ASHWORTH REVOCABLE LIVING TRUST | 100,000.00 |
| | DOUGLAS KELLER 08/23/84 TRUST | 70,000.00 |
| | GAYLYNN MORTENSEN | 80,864.00 |
| | MARTHA GRANDES | 50,000.00 |

| | | |
|---|---|---|
| | MARY E AGREN LIVING TRUST | 180,000.00 |
| | PHYLLIS OWEN & DANIEL TIBBETS | 40,000.00 |
| | SUSAN BOUDREAUX | 50,000.00 |
| | WILLIAM BRYAN OWEN | 25,000.00 |
| | ALFRED NAI | 30,000.00 |
| | APRIL BROCKSON | 200,000.00 |
| | FLORENCE MARKGRAF REVOCABLE LIVING TRUST | 250,000.00 |
| | LESTER & TERRI KYLE | 20,000.00 |
| | MAINSTAR-STEVEN BEASLEY | 59,595.96 |
| | NANCY THOMAS | 200,000.00 |
| | SUSAN RUSSELL | 70,000.00 |
| | BRAD THOMPSON | 30,000.00 |
| | DON & CHERYL GABBITAS | 100,000.00 |
| | HELEN FARRIOR | 25,000.00 |
| | KAMELA MOHS & SHANNON HEMME | 50,000.00 |
| | MAINSTAR-CHARLES VAN FOSSON | 161,507.00 |
| | MAINSTAR-DIANE F CHONO | 41,500.00 |
| | MAINSTAR-KATHLEEN DEFORD | 68,500.00 |
| | PROV-CHRISTY IVEY IRA | 60,000.00 |
| | ROSALIE WISELY | 100,000.00 |
| | SUSAN MCCOY | 28,000.00 |
| | MAINSTAR-ESFIR VOLENBERG INHERITED IRA | 335,500.00 |
| | MAINSTAR-LINDA PERRY | 25,500.00 |
| | MAINSTAR-SAMUEL PERRY SR | 25,500.00 |
| | MAINSTAR-SANDRA HARRIS | 25,000.00 |
| | MAINSTAR-SHARON MROZ | 52,430.13 |
| | MAINSTAR-SUSAN GILLEN | 100,000.00 |
| | PETER & JUDITH CARAVELLA | 200,000.00 |
| | PROV-MARCINE TRAVIS IRA | 69,992.00 |
| | PROV-MUHAMMAD RAHMAN IRA | 100,000.00 |
| | PROV-RANDY HANSEN IRA | 48,768.32 |
| | PROV-RICKY VINSON IRA | 351,134.74 |
| | PROV-STEPHEN DEHNERT IRA | 59,500.00 |
| | THOMAS NEESER | 25,000.00 |
| | RITA MAVITY | 25,000.00 |
| | PROV-WILLIAM COX IRA | 218,800.00 |
| | MAINSTAR-PATRICK ENRIQUEZ | 485,000.00 |
| | MAINSTAR-DAVID BURT | 471,000.00 |
| | LINDA HUGHES REVOCABLE TRUST 01/15/04 | 120,000.00 |
| | JOHN & LYNN HODGE | 125,000.00 |
| | JAMES TOLSON JR | 60,000.00 |
| | HORIZON-DAVID RICH SEP IRA | 74,400.00 |
| | CELIA ADAMS | 25,000.00 |
| | MAINSTAR-BYRON CROMER | 75,000.00 |
| | MAINSTAR-JEREMY CORDONNIER | 41,807.33 |
| | MAINSTAR-VICKI FIRESTACK | 25,716.00 |
| | MAINSTAR-LINDA WILLIAMS | 155,000.00 |
| | MAINSTAR-MICHELE GALE | 33,414.00 |
| | IRA SVC-MICHAEL LIPSITZ IRA | 220,000.00 |
| | PROV-CHERYL MACEY IRA | 100,000.00 |
| | PROV-REBA CASLER IRA | 124,000.00 |
| | PROV-REBA CASLER ROTH IRA | 28,000.00 |
| | PROV-CRAIG JOYNER IRA | 80,000.00 |
| | MAINSTAR-BARBARA SUTTER | 49,000.00 |
| | PROV-DEAN BARNEY IRA | 42,500.00 |
| | KENT & PATRICIA FLETCHER | 50,000.00 |
| | THE WEARLEY FAMILY TRUST | 53,000.00 |
| | NANTANAPORN ENGBRECHT | 30,000.00 |
| | JEFFREY & THERESA WILKINSON | 30,000.00 |
| | AW FIELD LIVING TRUST 07/10/09 | 100,000.00 |
| | FIELD TRUST B 03/16/09 | 100,000.00 |
| | DAVID HENNESSEE | 100,000.00 |
| | BARBARA PAYNE | 25,000.00 |

| | | |
|---|---|---|
| | ROBERT INOUYE | 25,000.00 |
| | ROBERT & JACQUELINE BODELIN | 50,000.00 |
| | RANDAL & KRISTINE ULLMER | 25,000.00 |
| | JAMES & CHARLOTTE FARLEY | 250,000.00 |
| | KATHLEEN WATSON | 150,000.00 |
| | PROV-GEORGE GREEN IRA | 271,500.00 |
| | TREVOR LUKE | 50,000.00 |
| | WILLIAM & ELIZABETH JUE | 50,000.00 |
| | PROV-DAVID DAMON IRA | 50,000.00 |
| | PROV-EDWARD VANCE IRA | 50,000.00 |
| | PROV-GARY FITE IRA | 300,000.00 |
| | PROV-ROBERT GROSS JR IRA | 40,400.00 |
| | PROV-SUSAN SELLERS IRA | 71,000.00 |
| | RICHARD & CAROL ENSLOW | 100,000.00 |
| | JULIAN AGUINALDO | 25,000.00 |
| | DEE TROYER | 100,000.00 |
| | PAUL ONNINK LIVING TRUST 09/26/07 | 100,000.00 |
| | RON GRAHAM | 25,000.00 |
| | PATRICK & SUSAN HASLAM | 75,000.00 |
| | ROBERT JONES | 100,000.00 |
| | THE NUNEZ TRUST 06/15/96 | 30,000.00 |
| | KENT & BEVERLY KELLERSBERGER | 25,000.00 |
| | ALAN MCCARTHY | 50,000.00 |
| | ELDA ROSCOE-GUSTAFSON | 25,000.00 |
| | ADVANTA SVC-ANGELA ROBINSON IRA | 50,000.00 |
| | IRA SVC-JAMES MACE | 46,000.00 |
| | MAINSTAR-JOHN CANTLIN | 118,000.00 |
| | THE FRED & ANN HANSEN FAMILY TRUST | 25,000.00 |
| | MAINSTAR-BARRY BOSLEY | 25,000.00 |
| | RUBEN JR & RITA NOEL | 100,000.00 |
| | MAINSTAR-JESSICA CLIFTON | 116,500.00 |
| | PEDRO & DAISY TREJO | 100,000.00 |
| | W R LEMONS IRREV SUBTRUST # 2 FBO LAURA COPELAND | 50,000.00 |
| | ALAN MAYEDA | 50,000.00 |
| | LARRY MCKINNEY | 30,000.00 |
| | MAINSTAR-GAYLYNN MORTENSEN | 111,017.40 |
| | MAINSTAR-KENNETH FLITTON | 64,608.89 |
| | MAINSTAR-KENT KELLERSBERGER | 73,024.01 |
| | MARIPAZ BRAGADO | 50,000.00 |
| | MARK SCHABO | 25,000.00 |
| | OLIVER & SHARON ZIEMANN | 75,000.00 |
| | PEGGY SMITH | 35,000.00 |
| | DARLENE CETOLA PA | 50,000.00 |
| | IRA SVC-MICHAEL LIPSITZ ROTH IRA | 22,000.00 |
| | MAINSTAR-PAULA WILLIAMS ROTH IRA | 31,291.97 |
| | MYRIAM ALONSO | 25,000.00 |
| | RODNEY DOCKEN | 35,000.00 |
| | ROSEMARY HARRISON | 25,000.00 |
| | BARBARA LAGUD | 25,000.00 |
| | JAMES & LINDA KIRKENDALL | 25,000.00 |
| | MARGARET MICHAEL | 30,000.00 |
| | STEPHEN & ZOILA THOMPSON | 100,000.00 |
| | ZACK BOMSTA | 250,000.00 |
| | DARLENE DONATELLI | 50,000.00 |
| | JAMESPAUL LIMATO | 185,000.00 |
| | BRANDON LAWRENCE | 35,000.00 |
| | MAINSTAR-TERI MAGNOTTI | 272,000.00 |
| | MILAGROS BRAGADO | 150,000.00 |
| | SARAH CLINE & BRUCE DUBOIS | 80,000.00 |
| | BERNARD & CECILE TOBIN | 65,000.00 |
| | DAVID & BRENDA LANDWEHR | 90,000.00 |
| | DOROTHY PERRY | 132,923.00 |
| | PROV-JAMES SANDY IRA | 157,480.28 |

| | | |
|---|---|---|
| | HASSAN BOROUJERDI MD INC DEFINED BENEFIT PLAN TRUST | 250,000.00 |
| | ERMELINDA GUTIERREZ | 25,000.00 |
| | DAVID BAKAY | 40,000.00 |
| | THOMAS & LINDA PATTON | 35,000.00 |
| | CHARLES HARDISON JR & LIXIA ZHENG | 50,000.00 |
| | JACK & ROSE KILE | 225,000.00 |
| | BLACK FAMILY REVOCABLE TRUST 05/05/04 | 60,000.00 |
| | AIDEN PROPERTIES LLC | 50,000.00 |
| | JOYCE BURCKHOLTER | 50,000.00 |
| | VICKI ALMEIDA | 46,000.00 |
| | ROBERT OSTENDORFF JR & SHIRLEY COOPER | 50,000.00 |
| | MAINSTAR-ANDREA FARNSWORTH | 67,325.15 |
| | CANDICE GILLEN | 50,000.00 |
| | EUGENIA WEAVER REVOCABLE TRUST | 50,000.00 |
| | ELIZABETH CRUZ | 50,000.00 |
| | PROV-ROBERT REGNER IRA | 27,000.00 |
| | LORRAINE & WAYNE KELLY | 25,000.00 |
| | ALAN & DESIREE BAKER | 200,000.00 |
| | REBECCA MICHAELS | 50,000.00 |
| | DUWAYNE & BARBARA KUEHN | 100,000.00 |
| | CHARLES BICHT JR | 15,000.00 |
| | JENNIFER BICHT | 15,000.00 |
| | | |
| 7. 2492 MANDEVILLE CANYON, BRENTWOOD, CA - SENIOR | ALFRED ORTENZO REV TRUST | 100,000.00 |
| | MIKE & COLLEEN CHRISTENSEN | 218,000.00 |
| | ETHEL MARTIN | 55,000.00 |
| | RONALD JEFFREY | 35,000.00 |
| | VAL & TAMARA PECO | 100,000.00 |
| | CYNTHIA MARTINEZ & ROBERT BEUTLER | 67,000.00 |
| | CONRAD & JODY HARBUCK | 90,000.00 |
| | DORIS MCELWEE LIVING TRUST | 25,000.00 |
| | EDINA ALLEN | 100,000.00 |
| | ELEFTERIOS & SANDRA KONSTANTINIDIS | 50,000.00 |
| | FAMILY TRUST OF AINA FAE BARRY | 75,000.00 |
| | JANINE RIOUX & REX LAMEW | 50,000.00 |
| | LAURENCE WINGATE II | 25,000.00 |
| | NORM MEIER | 100,000.00 |
| | ABRAHAM & HILARY WOLF | 50,000.00 |
| | CURTIS & SHARON AYERS | 80,000.00 |
| | LOGAN & SARRAH NOLAN | 40,000.00 |
| | PROV-KATHRYN DISSELER IRA | 64,777.00 |
| | DEIRDRE & BENJAMIN FERNANDES | 75,000.00 |
| | LOLA HASSELQUIST | 25,000.00 |
| | WILLIAM & KAREN NUGENT | 300,000.00 |
| | SUVARCHALA SOMAYAJULA | 25,000.00 |
| | PANORAMA VILLAGE OF HEMET INC | 200,000.00 |
| | LOUISE C FAIVRE | 100,000.00 |
| | HORIZON-MARTHA DEUSTCH IRA | 75,826.00 |
| | MICHAEL ROCKS | 70,000.00 |
| | DAVID & BETH SJAASTAD | 100,000.00 |
| | PROV-JORDAN NAKATSUKA IRA | 47,000.00 |
| | RONALD PINCOUS REVOCABLE TRUST | 100,000.00 |
| | PROV-MARK BAKER IRA | 25,000.00 |
| | ALVIN & MARTHA WENDEL | 30,000.00 |
| | JOHN MEDEIROS TRUST 05/05/16 | 100,000.00 |
| | GOLDER-POTTKOTTER POST 6515 | 30,000.00 |
| | GLORIA CHERELSTEIN | 25,000.00 |
| | WAMPLER LIVING TRUST | 50,000.00 |
| | MARCIA FEDERER | 75,000.00 |
| | D KEVIN & MARTHA HASTING JOINT REVOCABLE TRUST | 50,000.00 |
| | NORMA WEINER LIVING TRUST 11/13/13 | 100,000.00 |
| | DUWAYNE & BARBARA KUEHN | 100,000.00 |
| | RICHARD HELLER | 100,000.00 |

| | | |
|---|---|---:|
| | GLORIA & FREDERICK FINE | 25,000.00 |
| | PROV-RENEE NORTON IRA | 30,000.00 |
| | PROV-CHARLES FRONTERA IRA | 137,856.00 |
| | PROV-WILLIAM HARDEE IRA | 160,000.00 |
| | PROV-MONICA REIFFER IRA | 53,000.00 |
| | HARMON FAMILY REVOCABLE FAMILY LIVING TRUST | 25,000.00 |
| | KENNETH & SHIRLEY RAMMEL | 25,000.00 |
| | PROV-EILEEN BANCROFT IRA | 51,854.00 |
| | IRA SVC-JOHN PLAISTED | 100,000.00 |
| | ALAN & RUTH MAICKI | 40,000.00 |
| | | |
| 7. 2492 MANDEVILLE CANYON, BRENTWOOD, CA - DEV | LAURA STERN & LARA POSNER-LEMONS | 50,000.00 |
| | MAINSTAR-DONALD PIERCE | 85,900.00 |
| | MAINSTAR-DAVIN LEBOEUF | 200,000.00 |
| | | |
| 8. 7870/7900/7956 GRANITO DR, LOS ANGELES, CA - FIRST | JACK & PATRICIA REITZEL | 25,000.00 |
| | BRYAN & DANETTE PYLES | 100,000.00 |
| | HENRI OR BARBARA JEANRENAUD | 111,551.00 |
| | DAVID & SANTA ANDERSON | 25,000.00 |
| | JENNIFER MCCRACKEN | 75,000.00 |
| | WILLIAM TUERKE IV | 50,000.00 |
| | KENT MARTIN | 50,000.00 |
| | PROV-MAURICE TRITT IRA | 22,350.00 |
| | IRA SVCS-SUZANNE NEAL IRA | 123,000.00 |
| | THE MIRIAM SERMAN 2010 TRUST | 100,000.00 |
| | SHELLY MELBY | 100,000.00 |
| | CHRISTINE LLOYD | 150,000.00 |
| | MAINSTAR-JOAN MESSIMER ROTH IRA | 61,280.00 |
| | STEPHANIE MIHALCZO | 40,000.00 |
| | JOHN & JEAN ALME | 50,000.00 |
| | FLOYD JONES | 250,000.00 |
| | PROV-DOUGLAS PARKINS IRA | 50,000.00 |
| | JEFFREY GERRITSON | 75,000.00 |
| | MICHAEL WEINER MD PA PROFIT SHARING PLAN | 150,000.00 |
| | ALBERT & MARIAN ELLIOTT LIVING TRUST 05/29/03 | 100,000.00 |
| | LARITA KAY MERRICK | 175,000.00 |
| | PROV-DORIENNE BAIDA IRA | 33,750.00 |
| | PROV-ROYAL WEST IRA | 159,000.00 |
| | RICHARD & MARY ANN STEPHENS | 25,000.00 |
| | PROV-NELLIE RUELOS IRA | 25,000.00 |
| | IRA SVC-KENNETH HOWDEN | 60,200.00 |
| | DOLORES HEINZ ESTATE | 200,000.00 |
| | EDWARD MEYER | 36,000.00 |
| | HORIZON-LOWELL KOENCK IRA | 51,000.00 |
| | JAN & NANCY BURBA | 50,000.00 |
| | CRAIG HORNER DDS PC PROFIT SHARING PLAN | 50,000.00 |
| | FRANK CEPULKOWSKI | 75,000.00 |
| | | |
| 8. 7870/7900/7956 GRANITO DR, LOS ANGELES, CA - SECOND | SANDRA PILKINGTON | 25,000.00 |
| | WILLIAM REPASKY | 25,000.00 |
| | EDWARD ANTONIO | 380,000.00 |
| | PROV-RICHARD GAWLIK IRA | 50,000.00 |
| | KURT & ELFRIEDE RITTER | 25,000.00 |
| | PROV-SUSAN FERBER IRA | 30,443.00 |
| | MARJORIE EVERS | 109,000.00 |
| | MAINSTAR-JACKIE PARKER | 200,000.00 |
| | RAY PIIRA | 100,000.00 |
| | GRAHAM MARTIN | 350,000.00 |
| | BROAD INSIGTS LLC CASH BALANCE PLAN | 230,000.00 |
| | JOYCE BURCKHOLTER | 50,000.00 |
| | MONICA NICHOLS T/O/D | 160,000.00 |
| | MARK HILDERLEY | 75,000.00 |
| | LELAND SHINABERY | 33,171.00 |

| | | |
|---|---|---|
| | MAHESH BALIKE | 25,000.00 |
| | HARRY BREYER REVOCABLE LIVING TRUST | 100,000.00 |
| | KEVIN KINZER | 33,500.00 |
| | KENNETH HANCOCK IRREVOCABLE TRUST UAD 01/24/95 | 80,000.00 |
| | KAY KELLER | 30,000.00 |
| | KEITH G LLC | 100,000.00 |
| | JHARNA DE | 30,000.00 |
| | | |
| 9. 1258 LAGO VISTA DR TWO, BEVERLY HILLS, CA - FIRST | BRUNK FAMILY TRUST | 20,000.00 |
| | WILLIAM KAGGERUD | 70,000.00 |
| | HUNG-CHANG HUANG | 25,000.00 |
| | J HAWKEYE RONDEAU | 25,000.00 |
| | LOLITA PATE | 15,000.00 |
| | WILLIAM & DEBORAH MICHAELS | 25,000.00 |
| | PHILIP & CYNTHIA DAVIS | 50,000.00 |
| | MAINSTAR-JEFFREY MCCLURG | 90,000.00 |
| | JODI HASKINS | 200,000.00 |
| | PROV-GEORGE UCCELLI IRA | 30,000.00 |
| | DONALD & KATHLEEN WEAVER | 100,000.00 |
| | ALUKAL & JOLLY ANTONY | 50,000.00 |
| | CAROL LASHINE | 70,000.00 |
| | LINUS & SANDRA CLUNE | 28,000.00 |
| | ROBERT & JACQUELINE REYNOLDS REV LIVING TR 6/5/03 | 30,000.00 |
| | MAX & SHELIA HUMBERT | 200,000.00 |
| | DAVID & JUDY ROGERS | 25,000.00 |
| | THE EWELL & BETTY BOURGEOIS REVOCABLE TRUST | 100,000.00 |
| | SHARON GREMILLION | 50,000.00 |
| | RYAH VAALER | 50,000.00 |
| | ROBERT & DOROTHY MCELROY | 25,000.00 |
| | RICHARD H MINETTI REVOCABLE TRUST 6/2/97 | 141,000.00 |
| | IRA SVC-LORI COLE | 33,500.00 |
| | PROV-JULIE GOODWIN IRA | 116,382.43 |
| | PROV-ELIZABETH SCHOENLEIN IRA | 68,000.00 |
| | JACK & BARBARA LAMPHIER | 100,000.00 |
| | ROXANNE LAWRENCE REVOCABLE TRUST 06/16/08 | 50,000.00 |
| | WILLIAM F BLEVINS | 200,000.00 |
| | HELEN & CHARLES CADDICK | 100,000.00 |
| | DENNIS SWENSON | 25,000.00 |
| | ARTHUR W ROBERTS JR EXEMPT TR UTD 11/05/97 | 130,000.00 |
| | DALE ZENK | 51,000.00 |
| | ROSEWOOD CAPITAL INVESTMENTS INC | 250,000.00 |
| | CLAYTON CAPITAL INVESTMENTS CORP | 250,000.00 |
| | DAVE & VICKIE CANDEL | 50,000.00 |
| | FLOYD BIRD | 25,000.00 |
| | MARIA KRAWIEC | 55,000.00 |
| | PROV-JULIO HERDOCIA IRA | 104,400.00 |
| | CATHERINE DERENZIS | 25,000.00 |
| | PAULA FREED | 55,000.00 |
| | MAINSTAR-SANDRA HARRIS | 25,000.00 |
| | MAINSTAR-SHARYL HARUGUCHI | 100,000.00 |
| | FLORENCE MARANUK | 75,000.00 |
| | BETTY L & NICK A PUTHOFF | 25,000.00 |
| | IRA SVC-KATHLEEN HOWDEN | 48,600.00 |
| | ANTHONY MANGIA | 100,000.00 |
| | CHARLES & MARIE MILLER | 25,000.00 |
| | MARY FORINGTON | 100,000.00 |
| | KELLY LANGE | 50,000.00 |
| | DAVID & CAROL WADE | 50,000.00 |
| | OMG HOLDING LLC | 50,000.00 |
| | HENRI & BARBARA JEANRENAUD | 65,000.00 |
| | | |
| 9. 1258 LAGO VISTA DR (TWO), BEVERLY HILLS, CA - SECOND | RANDALL & KELLY HUFFMAN | 100,000.00 |
| | NEUMANN REVOCABLE TRUST | 100,000.00 |

| | | |
|---|---|---|
| | IRA SVCS-HELEN CASTRO | 59,000.00 |
| | BRUCE DEWALD | 40,000.00 |
| | DAVID & JANEEN KAISER | 50,000.00 |
| | TED ITZOE | 25,000.00 |
| | IRA SVCS-CONNIE WHARTON-BURNS | 100,000.00 |
| | PROV-BETTY PUTHOFF IRA | 40,000.00 |
| | AARON VANHOVEN | 50,000.00 |
| | EMILY & MARTIN SAMUELS | 50,000.00 |
| | SHARON KIRK REVOCABLE LIVING TRUST | 25,000.00 |
| | PROV-DOUGLAS CHUN IRA | 102,000.00 |
| | MAINSTAR-RONNIE HUNG IRA | 175,000.00 |
| | PROV-CHARLES CONNORS IRA | 236,000.00 |
| | GEORGE SANDERS | 80,000.00 |
| | DEAN STRATSMA | 50,000.00 |
| | JEFFREY GIFT | 25,000.00 |
| | GERALD FEDDERS | 25,000.00 |
| | IRA SVC-DENISE EMMONS | 86,000.00 |
| | BOYAN CHI | 25,000.00 |
| | PROV-DONNA SCHMITT IRA | 103,000.00 |
| | THE PORTER FAMILY TRUST | 25,000.00 |
| | STEPHEN GARDNER | 25,000.00 |
| | | |
| **10. 633 FOOTHILL ROAD, BEVERLY HILLS, CA - SENIOR** | JOHN & JOAN RILEY REV TRUST 11/07/94 | 75,000.00 |
| | NORMAN LONG | 100,000.00 |
| | PAMELA MIDDLETON | 40,000.00 |
| | ROBERT MILLER | 35,000.00 |
| | THOMAS YASENSKY | 50,000.00 |
| | ALAN MORGAN | 350,000.00 |
| | DIANE SHEPARD | 50,000.00 |
| | GINNY COYLE | 25,000.00 |
| | JARA GROUP II LLC | 50,000.00 |
| | THE BETH BARBER LIVING TRUST 12/01/97 | 130,000.00 |
| | LEILA & JEFFREY PEPPERS | 25,000.00 |
| | MAURICE & THELMA NELSON | 100,000.00 |
| | MITCHELL & VICTORIA JOHNSON | 50,000.00 |
| | NELDON & ANNA WATSON REV LIV TRUST 09/07/10 | 100,000.00 |
| | ROBERT & BRADLEY BODINE | 250,000.00 |
| | ALLEN SHOEMAKER | 100,000.00 |
| | JOHN HART | 25,000.00 |
| | MAINSTAR-JOHN PRIOLETTI | 163,000.00 |
| | MAINSTAR-JOHN RILEY | 78,000.00 |
| | MAINSTAR-MYRA RYE-MYERS | 37,000.00 |
| | MAINSTAR-RICHARD MARSTON | 75,300.00 |
| | MAINSTAR-SANDRA GLUPKER | 229,000.00 |
| | MARINO & MERRILY CASSINA | 80,000.00 |
| | ELIZABETH BOTCHIS & JENNIFER HAWTHORNE | 50,000.00 |
| | GREGORY & JANE HOMAN | 50,000.00 |
| | JENNIFER HAWTHORNE & ELIZABETH BOTCHIS | 50,000.00 |
| | JULIA DENISON | 50,000.00 |
| | MANJULA KAPADIA | 150,000.00 |
| | MARIA & MIGUEL TABLADILLO | 30,000.00 |
| | MARY & WALTER ROLLERSON | 100,000.00 |
| | CHRISTOPHER POFFEL | 50,000.00 |
| | MYLES RUSCHE | 50,000.00 |
| | W MICHAEL & KAREN MICELE | 25,000.00 |
| | PROV-JOHN SIEGLER JR IRA | 65,500.00 |
| | LOIS BOLYARD | 49,000.00 |
| | VINCENT & HILDA ZOFREA | 50,000.00 |
| | JOHN SIEGLER JR | 100,000.00 |
| | MARY BAAR | 50,000.00 |
| | BRIAN LITT | 50,000.00 |
| | BOB STAHLECKER | 40,000.00 |
| | GARY ARNDT | 100,000.00 |

| | | |
|---|---|---|
| | FRED & DOYLENE TAYLOR | 100,000.00 |
| | ROY & MARTHA JONES | 100,000.00 |
| | CAROL LAMBERT & ANDREA DARWENT | 100,000.00 |
| | MAINSTAR-WANDA CAUDILL | 182,570.50 |
| | DAVID DERRICK | 100,000.00 |
| | JOHN TAPLEY | 50,000.00 |
| | MAINSTAR-DEBBIE LIKENS | 25,000.00 |
| | MAINSTAR-PAMELA MILLS | 54,400.00 |
| | JOHN G & SHIRLEY A SMITH | 150,000.00 |
| | MARK A BOOR | 25,000.00 |
| | JOAN & ROGER L OZINGA | 25,000.00 |
| | PROV-LILIAN PELTZ-PETOW IRA | 25,215.00 |
| | PATRICIA POLLARD | 85,000.00 |
| | ROBERT & CHERYL SCHLAGE | 100,000.00 |
| | LOIS SHANK | 53,000.00 |
| | IRA SVC-EUGENE SCHOOLS | 35,000.00 |
| | | |
| **10. 633 FOOTHILL RD, BEVERLY HILLS, CA - DEV** | STEVE & SHERRY CARTER | 75,000.00 |
| | IRA SVC-ROY DAUGHERTY | 25,000.00 |
| | WALES & JOAN BEATY | 100,000.00 |
| | | |
| **11. 24055 HIDDEN RIDGE RD (TWO), HIDDEN HILLS, CA - SENIOR** | DANIEL & DARYL BOWERS | 94,500.00 |
| | THE BEL AIR III CRUT | 25,000.00 |
| | CHELTEN FAMILY TRUST | 25,000.00 |
| | IRA SVCS-PETER RICHTER | 25,000.00 |
| | JAMES MCDONALD | 75,000.00 |
| | ADAM AND MARY FEIST | 50,000.00 |
| | KERMIT BREYER | 11,000.00 |
| | ROBERT AND SHEILA MCNEELEY | 50,000.00 |
| | DAVID AND JILL HARDIN | 75,000.00 |
| | JUDITH BYRUM | 30,000.00 |
| | DOUG AND MARION HORWOOD | 50,000.00 |
| | RANDY TRAINER | 40,000.00 |
| | PROV-BARBARA TOTH IRA | 106,000.00 |
| | PROV-DONALD PENDAGAST IRA | 27,500.00 |
| | SIDNEY AND MARY ANN ANDERSON | 100,000.00 |
| | JOYCE KRAVITSKY | 30,000.00 |
| | JEFFREY WOLK | 150,000.00 |
| | DARRELL AND SHARON VITTONE | 88,000.00 |
| | DONLIE SMITH | 75,000.00 |
| | MARY LOU & DAVID BRANDEBERY | 200,000.00 |
| | MICHAEL AND PATRICIA ONESKO | 25,000.00 |
| | MAINSTAR-MICHAEL MILLWARD ROTH IRA | 32,343.00 |
| | PROV-LEE GILBERT ROTH IRA | 49,100.00 |
| | GERALD ROY | 75,000.00 |
| | HIROYUKI GOSDEN | 25,000.00 |
| | KENT & PATRICIA FLETCHER | 50,000.00 |
| | FRANK CEPULKOWSKI | 50,000.00 |
| | PROV-DAVID HERMANSEN IRA | 159,764.00 |
| | PROV-GERALD ROETHLE JR IRA | 48,000.00 |
| | NANCY WRIGHT AND MATTHEW RADER | 100,000.00 |
| | LONNIE & CAROLYN THOROMAN | 50,000.00 |
| | GENEVIEVE COLEMAN | 50,000.00 |
| | COLTRIN BROTHERS LLC | 200,000.00 |
| | TERRANCE PELTON | 50,000.00 |
| | WEBESHETE ASEFA | 50,000.00 |
| | LOWELL PETERSON | 100,000.00 |
| | JEFFREY & BRENDA MILLER | 50,000.00 |
| | DAVID DAWSON | 50,000.00 |
| | THE E ELAINE SMETANA TRUST 08/17/94 AS AMENDED | 100,000.00 |
| | DANIEL RODRIGUEZ | 50,000.00 |
| | RONALD AUBLE | 50,000.00 |
| | KENNETH ROSTANT | 50,000.00 |

| | | |
|---|---|---|
| | HORIZON-MELINDA BROWN IRA | 58,202.00 |
| | | |
| **11. 24055 HIDDEN RIDGE RD (TWO), HIDDEN HILLS, CA - DEV** | MELCHERT FAMILY TRUST 3/18/05 | 25,000.00 |
| | ROBERT L SCHATTNER TRUST | 100,000.00 |
| | BRYAN & DANETTE PYLES | 100,000.00 |
| | PROV-WILLIAM CABLE INDIVIDUAL CASH ACCOUNT | 57,400.00 |
| | ESTELLE GORDON | 50,000.00 |
| | ALFRED & AIDA HART RESTATED & REV LVG TRUST | 25,000.00 |
| | MARIAN E GENNARO REVOCABLE TRUST | 50,000.00 |
| | REV TRUST RHODA BERMON 12/12/95 (2 OF 2) | 50,000.00 |
| | JEAN & CORONA LETHIECQ TRUST | 150,000.00 |
| | DELAINE KEMPE REVOCABLE TRUST 1/4/12 (2 OF 2) | 45,000.00 |
| | ZAKS ASSET MANAGEMENT TRUST | 39,000.00 |
| | KAREN & WILFORD OLSON | 50,000.00 |
| | RICHARD KIRK REVOCABLE LIVING TRUST | 50,000.00 |
| | ILENE PATTERSON | 25,000.00 |
| | ALVIN & DEANNA SACKER | 25,000.00 |
| | ROBERT KAMMES | 25,000.00 |
| | SHARON WOLK KIRK REVOCABLE LIVING TRUST | 50,000.00 |
| | DENNIS & KATHRYN PATTEN | 25,000.00 |
| | MARY THOMPSON | 50,000.00 |
| | PATTI DONNELLY | 50,000.00 |
| | KELLY BOEDDEKER | 25,000.00 |
| | MARIE & JULIE MARCHANTE | 25,000.00 |
| | PROV-SUE MOSHER IRA | 25,000.00 |
| | STEIGMAN INC | 100,000.00 |
| | ABRAHAM WORKMAN | 50,000.00 |
| | MAINSTAR-BARBARA REYNOLDS | 26,000.00 |
| | JEFFREY & MICHELLE AUGASON | 50,000.00 |
| | LEROY BUCKNER | 25,000.00 |
| | MENG SE & MARY TAING | 100,000.00 |
| | JEFF FORD ENTERPRISES | 50,000.00 |
| | SYLVIA & RICHARD RUGGIERO | 90,000.00 |
| | MAINSTAR-KELLI HUNTER | 500,000.00 |
| | PROV-ROGER PIETZ ROTH IRA | 85,600.00 |
| | DANIEL & BRENDA HOMAN REV LIVING TRUST | 116,500.00 |
| | PROV-STEVEN SCHULTZ ROTH IRA | 50,000.00 |
| | ESTHER & EUGENE EVANS | 100,000.00 |
| | BETTY & NICK PUTHOFF | 100,000.00 |
| | CATHY BAILEY | 117,000.00 |
| | ALBERT NORRIS | 100,000.00 |
| | PROV-DAVID LITTLEFIELD ROTH IRA | 34,464.00 |
| | GERALD ROETHLE JR | 50,000.00 |
| | MAINSTAR-WILLIAM PEAVEY | 70,000.00 |
| | PROV-JAMES FLETCHER IRA | 150,000.00 |
| | PROV-LINDA LENNARTZ IRA | 79,500.00 |
| | HUNTER EVANS | 50,000.00 |
| | DENNIS HELVEY | 100,000.00 |
| | PROV-JAG-JEFFREY UHLAND IRA | 107,000.00 |
| | ALEXANDER TOSI | 50,000.00 |
| | GERALD & BEVERLY LEHMAN | 340,000.00 |
| | XIAOLIN SHI & LAN DIWU | 25,000.00 |
| | PROV-HELEN BURNEY IRA | 250,000.00 |
| | PROV-BETTY BELIN IRA | 280,000.00 |
| | PROV-DAN HOVEN IRA | 39,200.00 |
| | ISAAC SHANK | 90,000.00 |
| | PROV-GAYLE REIFFER BRUGGINK ROTH IRA | 40,000.00 |
| | JOHN & JOAN O'NEILL | 250,000.00 |
| | TOMMYE GAYLER | 75,000.00 |
| | ADOLFO & XIOMARA REQUEJO | 200,000.00 |
| | ERVIN REIMER | 50,000.00 |
| | CHARLES COATE | 100,000.00 |
| | TANG SHIUN YEH | 50,000.00 |

| | | |
|---|---|---|
| | HEIDI POLITI | 100,000.00 |
| | MAINSTAR-BONITA GAINEY | 94,000.00 |
| | MAINSTAR-MINA BENNET | 115,000.00 |
| | MAINSTAR-JACK GRONKE SR | 100,000.00 |
| | KATHLEEN & DWIGHT DURYEA T/O/D D MURRAY & T DURYEA | 200,000.00 |
| | MARY PHILLIPS | 84,328.58 |
| | NELL ABSTON | 250,000.00 |
| | FRANCIS & PHYLLIS LINEBACK | 25,000.00 |
| | W KENNETH GREENWOOD FAMILY TRUST | 250,000.00 |
| | PROV-DONALD NOBLES IRA | 88,400.00 |
| | LEWIS & RUTH RACHMELL REV LIVING TRUST | 50,000.00 |
| | MARIE RECINE T/O/D | 25,000.00 |
| | JOSEPH & FRANCINE SPANIAL | 100,000.00 |
| | ARLENE & IRA GOLDSTEIN T/O/D | 50,000.00 |
| | | |
| 12. 810 SARBONNE RD, LOS ANGELES, CA - SENIOR | RUTH CAMP PERSONAL CARE TRUST | 52,000.00 |
| | BEVERLY BERNEDENE PETERS TRUST | 50,000.00 |
| | THE RUSSELL & DORIS HOKANSON LIVING TRUST | 100,000.00 |
| | JUDITH & ROBERT MALTZ | 50,000.00 |
| | LAURENCE POWER | 25,000.00 |
| | MAINSTAR-ROGER GRAYSON | 93,000.00 |
| | PROV-RICKY VOSS SEP IRA | 46,340.00 |
| | RICHARD & BEVERLY CROWE | 65,000.00 |
| | EDMUND & VIRGINIA NIMMOW | 40,000.00 |
| | MARK BAKER | 35,000.00 |
| | MARIA CELIZ | 25,000.00 |
| | KIMBAL AND JULIE RAGAN | 100,000.00 |
| | PROV-MARK BAKER IRA | 100,000.00 |
| | DONNA GOUDE | 122,535.00 |
| | THE JOHN J AND JANE A FUCHS REVOCABLE LIVING TRUST | 50,000.00 |
| | SEYMOUR GELDZAHLER | 100,000.00 |
| | ROSE-ELLEN HOPE | 75,000.00 |
| | FRED & HELEN HOLDENER | 100,000.00 |
| | RANDY BYRNES | 50,000.00 |
| | BRAD AND MARIA KAISER | 350,000.00 |
| | ALFRED J ORTENZO REV TRUST | 50,000.00 |
| | S&R KELLER FAMILY TRUST | 140,000.00 |
| | CHRISTINA GALLAGHER | 50,000.00 |
| | GARDEN CITY MASONIC F&AM #587 | 25,000.00 |
| | RONALD & HEIDI CLEMENS | 50,000.00 |
| | THE MAMO FAMILY TRUST 11/18/02 | 30,000.00 |
| | IRVIN JR & DIANE VARNER | 40,000.00 |
| | CINDY & RANDALL HUFFMAN | 25,000.00 |
| | MARIA HOLLAND | 365,000.00 |
| | SHERYL SIMPSON | 30,000.00 |
| | BETTY B HOLLAND LIVING TRUST 2/20/1998 | 100,000.00 |
| | RICHARD DRINKER JR | 25,000.00 |
| | CYNTHIA LEPPERT | 25,000.00 |
| | JOHN BIRKMEYER | 42,000.00 |
| | CLARENCE & PHYLLIS SMITH | 25,000.00 |
| | NORM MEIER | 100,000.00 |
| | PROV-ALFRED GROVES IRA | 71,000.00 |
| | PROV-BRUCE BINNS IRA | 100,000.00 |
| | PATRICIA ONNINK | 50,000.00 |
| | DEBRA JENKS-LATOUR | 30,000.00 |
| | WAYNE FORD | 50,000.00 |
| | PROV-JOYCE FRIEDMAN IRA | 85,000.00 |
| | PROV-JOHN APPLETON IRA | 372,000.00 |
| | JON AND KAY WILABY | 100,000.00 |
| | MAINSTAR-NANCY LANGDON | 37,200.00 |
| | ADVANTA SVC-DARLENE JANIESCH IRA | 39,000.00 |
| | MAINSTAR-GARY WOODS | 29,000.00 |
| | ALBERT BROWN | 50,000.00 |

| | | |
|---|---|---|
| | GARY MACPHERSON | 60,000.00 |
| | ALBERT EVENER | 22,000.00 |
| | MARIANNE HORNER TRUST | 50,000.00 |
| | KARYTA BARNES | 25,000.00 |
| | | |
| 12. 810 SARBONNE RD, LOS ANGELES, CA - DEV | MARTIN & JUDY ANDREWS | 100,000.00 |
| | LESTER CUMMINGS JR | 50,000.00 |
| | CORT GILLEN | 25,000.00 |
| | PROV-NORAH SOWA IRA | 116,500.00 |
| | DAVID & BRENDA LANDWEHR | 80,000.00 |
| | SHERRY CORDONNIER | 25,000.00 |
| | ROCCO FAVATA | 30,000.00 |
| | JAMES & DONNA COTTER | 50,000.00 |
| | CORNERSTONE GROWTH | 50,000.00 |
| | DAVID & GYL HANNA | 100,000.00 |
| | STEVEN & DIANA RAINS | 50,000.00 |
| | LINDA & RON EVERTS | 25,000.00 |
| | CORY THOMPSON | 25,000.00 |
| | JAMES TOLSON JR | 50,000.00 |
| | JEAN & EDWARD CONWAY REVOCABLE TRUST | 30,000.00 |
| | CLAIRE MUMMERT | 50,000.00 |
| | MAINSTAR-RAYMOND SANDERS | 50,000.00 |
| | PROV-LARRY LOGERO IRA | 130,000.00 |
| | SUNWEST-LAUREL CHASE IRA | 70,342.93 |
| | THE MARIE MARCHANTE FAMILY TRUST 08/21/00 | 50,000.00 |
| | INDRA & BHARATI PATEL | 100,000.00 |
| | PETER & ELIZABETH AUCOIN | 50,000.00 |
| | MAINSTAR-LOIS HAIGAZIAN | 50,000.00 |
| | WILLIAM MILES | 20,000.00 |
| | LARRY MORGAN | 25,000.00 |
| | MAINSTAR-JAMES FODOR | 399,000.00 |
| | LOUIS & KATHRYN STROTHMAN | 110,000.00 |
| | ALAN ROEKLE | 120,000.00 |
| | SHIRLEY ALTMAN REVOCABLE TRUST AGREEMENT | 25,000.00 |
| | DRURY IRREVOCABLE TRUST 06/25/09 | 100,000.00 |
| | GEORGE & NANNIE NICHOLS | 25,000.00 |
| | VICTOR JOHNSTON LIFE INSURANCE TRUST | 116,000.00 |
| | | |
| 13. 2600 HUTTON DRIVE, BEVERLY HILLS, CA - FIRST | SUSAN HUNT | 50,000.00 |
| | GARROULD FAMILY TRUST | 57,324.02 |
| | MAINSTAR-DOULGAS CLANCY JR | 50,000.00 |
| | ALFRED & AIDA HART R&A REV LIVING TRUST 6/18/13 | 100,000.00 |
| | JBJ FARM LLC | 25,000.00 |
| | THE MIRIAM SERMAN 2010 TRUST | 50,000.00 |
| | MAINSTAR-ROSALINA LAMCHEK | 88,252.48 |
| | PATRICIA MOELLER | 50,000.00 |
| | SUSAN HUNT | 40,000.00 |
| | JAMES MARS & ADRIENNE DRITZ-MARS | 60,000.00 |
| | MAINSTAR-ANN NEAL ROTH IRA | 100,000.00 |
| | MAINSTAR-THOMAS STREVELER | 98,549.69 |
| | PATRICK & SUSAN HASLAM | 25,000.00 |
| | WILLETT SMITH | 40,000.00 |
| | EDWIN & RUTHE RUSSELL | 50,000.00 |
| | GOLDEN BERRETT | 100,000.00 |
| | DONNA HOSKING | 70,000.00 |
| | ALBERT & FREDA LYNCH | 100,000.00 |
| | NORMA CHEATHAM | 25,000.00 |
| | PROV-LORI MOTTA IRA | 86,500.00 |
| | PROV-CHRIS FOX IRA | 50,000.00 |
| | PROV-RICHARD SNITZER IRA | 56,284.27 |
| | KEMP BENNETT | 50,000.00 |
| | JACQUELYN WOLFER | 150,000.00 |
| | C RON & ELIZABETH WOLTERS | 80,000.00 |

| | | |
|---|---|---|
| | YING MCCAW | 25,000.00 |
| | DOREL & ELIZABETH LOZNEANU | 46,000.00 |
| | MARILYN TOBIN | 74,000.00 |
| | DENNIS & PATRICIA MEYER | 50,000.00 |
| | RUSSELL FRAME | 25,000.00 |
| | BETTY BEERS IRREVOCABLE TRUST | 75,000.00 |
| | LEON SOUTH | 25,000.00 |
| | CRAIG & JANELLE GOELLNER | 25,000.00 |
| | HARRINGTON TAYLOR | 25,000.00 |
| | MAINSTAR-RACHEL BARNETT ROTH IRA | 25,000.00 |
| | RONALD & MARSHA CHU | 25,000.00 |
| | KATHY & WAYNE APPEL | 50,000.00 |
| | TONY & WENDY GOETTER | 25,000.00 |
| | MAINSTAR-TENITA COLLINS | 58,000.00 |
| | MAINSTAR-DAVID ENGELBERT | 75,000.00 |
| | JAMES MARTUZZO | 25,000.00 |
| | LINDA & JIM AUSTIN | 25,000.00 |
| | DOLORES POWERS | 30,000.00 |
| | PROV-DONNALOU ALEXANDER IRA | 52,750.00 |
| | | |
| **13. 2600 HUTTON DRIVE, BEVERLY HILLS, CA - SECOND** | PHILLIP II & SHARON ROLLINS | 30,000.00 |
| | DANIEL & CASSANDRA RHOADES | 80,000.00 |
| | PROV-DAN HOVEN IRA | 32,990.00 |
| | SUSAN MOSHER | 29,300.00 |
| | TRUST OF JANNEKE & HARRY REVILL REV LIV TRUST | 50,000.00 |
| | BUFORD & GAIL MANER | 100,000.00 |
| | PROV-PERRY ARCHULETA IRA | 105,500.00 |
| | GARY & PATRICIA POST | 500,000.00 |
| | IRA SVCS-CHRISTINA WILLIAMS | 22,800.00 |
| | IRA SVCS-DENISE RICHTER | 25,000.00 |
| | PROV-MARGUERITE CURRIE IRA | 100,000.00 |
| | JOHN & SHIRLEY SMITH | 50,000.00 |
| | ANNA-LISA FRELIN WILSON | 50,000.00 |
| | JARA GROUP II LLC | 25,000.00 |
| | RITA FISCHER TRUST | 25,000.00 |
| | KATHLEEN BINGAMAN | 28,000.00 |
| | DALE ZENK | 100,000.00 |
| | ROBERT WEINBERG | 50,000.00 |
| | MAINSTAR-JANICE ZIMMER | 68,000.00 |
| | IRA SVC-LLOYD BROWN | 69,000.00 |
| | JAMES LOCHTEFELD | 127,000.00 |
| | | |
| **14. 1520 CARLA RIDGE (TWO), BEVERLY HILLS, CA - SENIOR** | JOHN MEDEIROS TRUST | 100,000.00 |
| | THE HELEN CASTRO FAM LIV TRUST 8/6/14 | 150,000.00 |
| | MARILYN MASON | 100,000.00 |
| | MYONG KEITH | 30,000.00 |
| | LAURENCE POPOLIZIO | 55,000.00 |
| | GLENN ZAHLMANN | 50,000.00 |
| | HERMAN AND JOYCE ZEMKE | 100,000.00 |
| | EDGAR PROCTOR | 200,000.00 |
| | JAMES K POTTS LIVING TRUST 4/20/2000 | 50,000.00 |
| | ELLEN PARKER | 215,000.00 |
| | RUTH TRAMMELL | 300,000.00 |
| | IRENE PEIGLER | 35,000.00 |
| | PROV-KRASMIR TODOROV IRA | 40,000.00 |
| | IRA SVCS-LUCY TAYLOR | 100,000.00 |
| | HUIXIAN CHEN | 100,000.00 |
| | RICHARD LAROCHELLE | 50,000.00 |
| | SHAHEED MOHAMMED LIVING TRUST | 75,000.00 |
| | PROV-GARY SMITH IRA | 111,000.00 |
| | PROV-JOHN ERICKSON IRA | 50,000.00 |
| | PROV-CHERIE BONO IRA | 30,000.00 |
| | THE WHITE REVOCABLE TRUST | 90,000.00 |

| | | |
|---|---|---|
| | THOMAS SCHOENHERR | 100,000.00 |
| | PROV-NORMA FLEMING | 236,000.00 |
| | PROV-CRAIG PEARSALL IRA | 220,000.00 |
| | ENOLA & CLYDE ALLEN | 48,000.00 |
| | BANGALORE NEELAKANTIAH | 50,000.00 |
| | HERMENEGILDO AND ASUNCION KADILE | 60,000.00 |
| | PROV-MICHAEL BROWN IRA | 35,000.00 |
| | MICHAEL BROWN | 25,000.00 |
| | TIM & SHERRI MAKELA | 220,000.00 |
| | RICKIE AND DONNALOU ALEXANDER | 60,000.00 |
| | RICHARD FINDLEY | 25,000.00 |
| | WILLIAM & LOREEN FACKENTHALL | 50,000.00 |
| | WAYNE & BETTY STURTEVANT | 25,000.00 |
| | PROV-MARK MCKAY IRA | 205,000.00 |
| | MAINSTAR-STACEY MAXTED | 29,000.00 |
| | HERCZOG FAMILY TRUST | 350,000.00 |
| | PHYLLIS F PERLIN REV TRUST | 70,000.00 |
| | MARJORIE ALLEN | 100,000.00 |
| | PROV-CORRINE SANCHEZ IRA | 99,647.52 |
| | DARREL AND MARY LOU SPICER | 100,000.00 |
| | GREGORY BATUK | 60,000.00 |
| | BRUCE & CATHERINE TERRY | 25,000.00 |
| | SCOTT HEWETT | 75,000.00 |
| | | |
| 14. 1520 CARLA RIDGE (TWO), BEVERLY HILLS, CA - DEV | BENJAMIN & NICOLE BORCHELT | 50,000.00 |
| | ROBERT MCGOWAN | 50,000.00 |
| | LYNDA LILLY | 100,000.00 |
| | GG FAMILY TRUST | 50,000.00 |
| | CAROLYN TEAGUE | 25,000.00 |
| | PROV-CONSTANCE WILLIAMSON IRA | 25,000.00 |
| | ELISSA & JOSEPH BERLINGER | 25,000.00 |
| | RUSSELL GONNAM | 50,000.00 |
| | LYLE SHELLY | 50,000.00 |
| | PROV-ROBERT MOSHER IRA | 34,000.00 |
| | PROV-ROBERT TRYON IRA | 398,000.00 |
| | ROBERT LAYTON | 50,000.00 |
| | JAMES & JOYCE WOOD | 50,000.00 |
| | RICHARD & BETTY GAWLIK | 88,000.00 |
| | LEONARD FORTUNE | 100,000.00 |
| | IRA SVCS-GRADY WILLOUGHBY | 105,000.00 |
| | SANDRA SETTLEMIRE | 25,000.00 |
| | MAINSTAR-DONALD SPENCER | 35,000.00 |
| | ROBIN BLAIWES | 50,000.00 |
| | SUSAN MEYERS | 85,000.00 |
| | IRA SVC-DIANE VARNER | 86,500.00 |
| | LEOPOLDO RAMOS | 100,000.00 |
| | RONALD MYRICK SR REVOCABLE LIVING TRUST 02/12/07 | 50,000.00 |
| | JOHN & KATHY BERWICK | 25,000.00 |
| | IRA SVC-RAE CASH ROTH IRA | 25,000.00 |
| | VERNON HESS & DEBBI RAPPA | 30,000.00 |
| | JANE & HARRY BREYER T/O/D | 50,000.00 |
| | RANDALL CAMP | 25,000.00 |
| | LORI DONDIEGO | 25,000.00 |
| | ELAINE BROWER LIVING TRUST 10/01/03 | 180,000.00 |
| | FRANK DELORENZO JR | 50,000.00 |
| | | |
| 15. 1484 CARLA RIDGE (THREE), BEVERLY HILLS, CA - SENIOR | DAWN HAGGERTY | 26,000.00 |
| | VIVIAN SKIMINA | 25,000.00 |
| | PROV-BRUCE DEWALD ROTH IRA | 19,000.00 |
| | RUSSELL & TERRY BOEHM | 100,000.00 |
| | LORRAINE J MINETTI REVOCABLE TRUST 6/2/97 | 100,000.00 |
| | RICHARD & LINDA CHELTEN TTEES/CHELTEN FAMILY TRUST | 70,000.00 |
| | BERNARD & ELAINE NESENOFF | 25,000.00 |

| | | |
|---|---|---|
| | DELWYN & BETTY WAYNER | 25,000.00 |
| | VERA & BRYAN BRADFORD | 100,000.00 |
| | DONALD & DAWN DRENGUBA | 25,000.00 |
| | SAPONE REVOCABLE TRUST 2/23/10 | 25,000.00 |
| | BRIAN & MARY DISCHLER | 150,000.00 |
| | RONALD WOLFF | 100,000.00 |
| | MARGARET BAYLESS | 75,000.00 |
| | LAURA SCOTT | 50,000.00 |
| | SIEGFRIED SCHMIDT | 50,000.00 |
| | MARTHA CRAIG | 43,000.00 |
| | PROV-CARL OTTERNESS IRA | 60,000.00 |
| | TAM CHANG & MEI-SHE CHEN | 100,000.00 |
| | PROV-DAVID MCCOMAS IRA | 100,000.00 |
| | PROV-MICHAEL MOELLER IRA | 100,000.00 |
| | HORIZON-SARA MARSHALL | 200,000.00 |
| | PROV-ANTONETTE RENSHAW IRA | 45,000.00 |
| | PROV-JUDITH RENSHAW IRA | 50,000.00 |
| | PROV-JACKWAYS D KESLING INHERITED IRA | 200,000.00 |
| | PROV-SHARON FENDER IRA | 120,000.00 |
| | PROV-JEFFREY WILKINSON | 148,000.00 |
| | JEAN & JOHN ALME | 50,000.00 |
| | KENNETH & KAREN WELLMAN KEYSTONE TRUST | 50,000.00 |
| | ADAM & MARY FEIST | 50,000.00 |
| | FRANK GRASMUGG | 75,000.00 |
| | ROBERT & SARAH REBMAN | 50,000.00 |
| | JEFF THE GEEK LLC | 100,000.00 |
| | TIMOTHY HANSON & MAERENE LEWIS | 50,000.00 |
| | IRA SVCS-JOHN SEMON | 42,000.00 |
| | MAINSTAR-ELEANOR NADZAN | 131,500.00 |
| | PROV-JOHN LEROY ERICKSON IRA | 50,000.00 |
| | KATHLEEN KELLER | 25,000.00 |
| | THOMAS & BONNIE ZUBERBIER | 100,000.00 |
| | CRAIG PEARSALL | 225,000.00 |
| | PRATT FAMILY CABIN TRUST | 200,000.00 |
| | BARBARA INGEBRIGTSEN | 100,000.00 |
| | LINDA RACINE REVOCABLE TRUST 10/23/14 | 25,000.00 |
| | DONALD HILL | 25,000.00 |
| | PROV-WILLIAM & JO-ANN MCMILLAN REVOCABLE TRUST | 30,000.00 |
| | PROV-ANTHONY ELVAS IRA | 59,714.00 |
| | PROV-JAMES & SHEILA BRENTON ICA | 30,000.00 |
| | MAINSTAR-MICHAEL PAYTON | 109,538.00 |
| | PAUL & CONNIE BRYAN | 33,700.00 |
| | MARK BAKER (2 OF 2) | 25,000.00 |
| | PROV-ROGER VANDERSTEEN IRA | 51,000.00 |
| | RONALD RUDOWSKI | 25,000.00 |
| | ROBERT & MARION BUDZ | 90,000.00 |
| | PROV-DONALD DAILEY IRA | 33,500.00 |
| | THE KENNETH & ROSANNE BOEDEKER REVOCABLE LIVING TRUST 11/1/94 | 50,000.00 |
| | LADWIG FAMILY TRUST | 25,000.00 |
| | JOEL & BARBARA KING | 25,000.00 |
| | BUDDY JENKINS | 100,000.00 |
| | FRANK KISKO | 25,000.00 |
| | PATRICK LOMBARDY | 25,000.00 |
| | ISABELLA DIMARCO | 100,000.00 |
| | MONGE FAMILY TRUST 02/25/10 | 75,000.00 |
| | JAMES SANDY | 100,000.00 |
| | THE DILDA-ROSS REVOCABLE TRUST | 25,000.00 |
| | MICHAEL LENIHAN | 25,000.00 |
| | MAINSTAR-JAMES DEJARLAIS | 100,000.00 |
| | JANE BOSMA | 55,000.00 |
| | MAINSTAR-TAD JINGUJI | 40,500.00 |
| | JOHN FIRMISS | 50,000.00 |
| | ROBERT GRAVENS TRSUT 04/15/96 | 25,000.00 |

| | | |
|---|---|---|
| | RANDOLPH CLUNE | 80,000.00 |
| | IRA SVC-ROBERT CHATHAM III | 47,000.00 |
| | PROV-JOHN JASKO IRA | 107,500.00 |
| | MAINSTAR-CHARLES WHITLEDGE | 160,800.00 |
| | MAINSTAR-WARREN GRIFFIN | 25,430.28 |
| | PROV-KATHY LANE IRA | 90,810.00 |
| | FRANCIS & SUSAN GUIBERSON | 60,000.00 |
| | PROV-MORTON KUGELMAN IRA | 64,750.00 |
| | PROV-ROBERT LANE IRA | 28,400.00 |
| | | |
| **15. 1484 CARLA RIDGE (THREE), BEVERLY HILLS, CA - DEV** | PROV-STEVEN DUNNING IRA | 80,000.00 |
| | PROV-WILLIAM SHUSTOWSKI IRA | 110,000.00 |
| | MARY NITTMANN | 25,000.00 |
| | PROV-JOHN BOEDDEKER IRA | 31,000.00 |
| | JAMES HAMM | 25,000.00 |
| | SHEVAN DEMING | 65,000.00 |
| | MAINSTAR-RICHARD ZUIDERSMA | 26,000.00 |
| | RJK HILL FAMILY TRUST | 50,000.00 |
| | ROBERT SCHLICHTING | 50,000.00 |
| | TOMMYE GAYLER | 50,000.00 |
| | MAINSTAR-NATALIE RUBACHA ROTH IRA | 25,000.00 |
| | PAUL & ELLEN FEDYNA | 100,000.00 |
| | MAINSTAR-ROY DAVENPORT | 73,000.00 |
| | PROV-PATRICIA ONESKO IRA | 151,000.00 |
| | FILOMENA LAMONICA | 40,329.36 |
| | PROV-GARY VAN DYKE IRA | 25,000.00 |
| | EDWARD & CLARICE MAZZOLENI TRUST | 50,000.00 |
| | PROV-GAIL AKARD IRA | 200,000.00 |
| | PATRICK SPANGLER | 30,000.00 |
| | JEAN O'TOOLE | 100,000.00 |
| | MAINSTAR-KATHY WEST | 105,000.00 |
| | JOHN HERTVIK JR T/O/D | 65,000.00 |
| | WILLIAM GROODY | 105,000.00 |
| | KRISTI TRADER | 50,000.00 |
| | ROBERT & ANN GONCZ | 52,000.00 |
| | BASIL FRANKLIN JR | 25,000.00 |
| | MAINSTAR-DEE DEE BROOKS ROTH IRA | 50,000.00 |
| | RONALD MYRICK SR REVOCABLE LIVING TRUST 02/12/07 | 150,000.00 |
| | HARRY ROBERTSON JR | 25,000.00 |
| | PROV-GLEN GAMA IRA | 128,329.00 |
| | ELISSA & JOSEPH BERLINGER | 25,000.00 |
| | IRA SVC-ANN KEELAN | 104,000.00 |
| | IRA SVC-AUBREY STRICKLAND | 200,000.00 |
| | | |
| **16. 25210 JIM BRIDGER RD (ONE), HIDDEN HILLS, CA - FIRST** | JOAN STEELE | 25,000.00 |
| | RANDY DEMEL | 25,000.00 |
| | DEBORAH & DOUGLAS VAN GEMERT | 100,000.00 |
| | WILLIAM & MARYLOUISE WIDMAIER | 50,000.00 |
| | THOMAS VALDES | 25,000.00 |
| | DONALDA ADAM | 35,000.00 |
| | PROV-JAN BAILEY IRA | 42,332.00 |
| | COOPER LIVING TRUST 7/27/2000 | 50,000.00 |
| | MARIE T OSTERHOLT | 25,000.00 |
| | WANDA FRIZZA | 50,000.00 |
| | PROV-CHARLES NEWTON IRA | 50,000.00 |
| | MAINSTAR-JASON LEBLANC | 31,446.82 |
| | PROV-JOHN KEITH IRA | 75,000.00 |
| | MICHAEL & JILL BAUERLE | 200,000.00 |
| | BETTY FOSTER | 150,000.00 |
| | MARK AND JILL DZUBAY | 25,000.00 |
| | LINDA KING | 25,000.00 |
| | JAYANTI JAGANNATHAN | 25,000.00 |
| | RALPH OSTERBAUER REVOCABLE TRUST | 85,000.00 |

| | | |
|---|---|---|
| | WILLIAM HOLDEN JR | 40,000.00 |
| | CRAIG & MARIANNE HORNER | 50,000.00 |
| | RAYMOND & LINDA ZINSMASTER | 100,000.00 |
| | OSCAR LUENGO | 50,000.00 |
| | PROV-JOAN OPIELA IRA | 223,300.00 |
| | RONALD & MARY LOU CLARK | 50,000.00 |
| | MAINSTAR-NANNETTE WILLIS | 98,521.00 |
| | JOHN BOEDDEKER | 37,000.00 |
| | MARY DOWNING | 20,000.00 |
| | | |
| 16. 25210 JIM BRIDGER RD (ONE), HIDDEN HILLS, CA - SECOND | SUNWEST TR-SHERRY HAMILTON IRA | 50,000.00 |
| | PHILLIP II & SHARON ROLLINS | 50,000.00 |
| | MYRA CHERRY | 75,000.00 |
| | IRA SVCS-HELEN CASTRO | 60,000.00 |
| | LONSWAY FAMILY TRUST | 170,000.00 |
| | HENRY F COHAN LIVING TRUST | 100,000.00 |
| | CURTIS REYNOLDS | 50,000.00 |
| | RALPH & ANN PERRY | 100,000.00 |
| | IRA SVCS-AUBREY STRICKLAND IRA | 200,000.00 |
| | MAINSTAR-FRANK DEAN | 56,248.00 |
| | MAINSTAR-JOHN PARSONS | 100,000.00 |
| | LT MUHLENKAMP ENTERPRISES INC | 100,000.00 |
| | ANNA ROSENBLATT | 110,500.00 |
| | PHILIP & KAY KENT | 38,034.59 |
| | HEIDI POLITI | 100,000.00 |
| | MICHAEL & PATRICIA ONESKO | 25,000.00 |
| | THE ARLENE SIMON REVOCABLE TRUST | 100,000.00 |
| | MAINSTAR-LINDA JOHNSON | 150,000.00 |
| | PROV-HEINZ WARICH | 99,500.00 |
| | DON SWANSON | 50,000.00 |
| | MARIAN & PETER DEL GIORNO | 100,000.00 |
| | PROV-VALERIE WOOD IRA | 163,000.00 |
| | THE QUN HONG DOMISSY YIN LIVING TRUST | 30,000.00 |
| | JUSTIN TOSI | 30,000.00 |
| | IRA SVC-ROY ZEIS SR | 105,000.00 |
| | IRA SVC-TRACI COUGLE | 25,000.00 |
| | IRA SVC-MERRY DOCHERTY | 57,500.00 |
| | MAINSTAR-WILLIAM GRAVES | 83,231.39 |
| | DR KENNETH BLEHM | 135,000.00 |
| | LELA AVERITTE | 50,000.00 |
| | IRA SVC-DUANE SIPES | 77,000.00 |
| | IRA SVC-D JEAN SHOWALTER | 49,400.00 |
| | JOSEPH & RUTH BEAL | 25,000.00 |
| | CARROLL SWINNEY | 100,000.00 |
| | SUSAN KAPLAN T/O/D | 400,000.00 |
| | CONSTANCE COLLINS | 50,000.00 |
| | GREG ANDERSON | 29,200.00 |
| | IRA SVC-DALE STRITE | 73,000.00 |
| | IRA SVC-KIMBERLY STRITE | 49,700.00 |
| | WILLIAM & LINDA CRAWFORD | 100,000.00 |
| | EDWARD DRESWICK & BETH STERRETT | 100,000.00 |
| | RIA BAY & OLAF BELLSTEDT | 100,000.00 |
| | DIANE RODRIGUEZ | 50,000.00 |
| | MARVIN & CAROL TUENTE | 52,000.00 |
| | HAROUT & LENA SOGHOMONIAN | 100,000.00 |
| | | |
| 17. 3802 HOLLYLINE AVE, SHERMAN OAKS, CA - FIRST | ERNEST AND ESTELLA LANGLAIS | 49,750.00 |
| | JOHN FLETCHER | 62,250.00 |
| | | |
| 18. 1241 LOMA VISTA DR, BEVERLY HILLS, CA - FIRST | ADA SUE MCMAHAN | 25,000.00 |
| | REGINA ZAHLMANN | 50,000.00 |
| | GORDON HUBCHIK | 50,000.00 |
| | WILLIAM & MARIAN ERWIN | 50,000.00 |

| | | |
|---|---|---:|
| | WILLIAM & MARIAN ERWIN | 50,000.00 |
| | LINUS AND SANDRA CLUNE | 27,000.00 |
| | PROV-JEANINE VAN HOLLEBEKE IRA | 88,500.00 |
| | DLMC INC | 25,000.00 |
| | DAVID & LANA SABOT | 150,000.00 |
| | PROV-ANNE HAUPT ROTH IRA | 44,830.00 |
| | MAINSTAR-OWEN ALLEN | 125,000.00 |
| | THE JAMES A MCDONALD RLT 2/7/05 A&R 8/1/10 | 150,000.00 |
| | JOHN R DZUBAY SUPPLEMENTAL NEEDS TRUST | 100,000.00 |
| | MARY BELL | 54,403.52 |
| | ROBERT MICHEL IRREVOCABLE TRUST | 100,000.00 |
| | ARTHUR W ROBERTS JR EXEMPT TR UTD 11/5/97 | 120,000.00 |
| | PROV-SUSAN CARTER IRA | 99,270.00 |
| | JOHN & SANDRA BOWER | 50,000.00 |
| | JUNE HELMAN, ARTHUR ADLER & BARBARA LEDERER | 75,000.00 |
| | SCHLICHTING TRUST 04/03/17 | 25,000.00 |
| | SUNWEST-RICHARD FRITTS IRA | 110,000.00 |
| | MAINSTAR-FREDERICK LEBLANC | 30,000.00 |
| | CHRIST CHURCH WESTSHORE | 30,000.00 |
| | ELIZABETH SCHULTZ | 100,000.00 |
| | KENT & MARY TADLOCK | 50,000.00 |
| | MICHAEL WEINER MD PA PROFIT SHARING PLAN | 100,000.00 |
| | JOYCE SCARPA | 25,000.00 |
| | PEGGY FRANCIS | 50,000.00 |
| | VIKI SHAFFER | 50,000.00 |
| | MARIANNE LYNCH | 25,000.00 |
| | RUTH KUNTZ | 25,000.00 |
| | DRURY IRREVOCABLE TRUST 06/25/09 | 50,000.00 |
| | MARIA HOLLAND | 40,000.00 |
| | UNA DECOCK | 25,000.00 |
| | ARNOLD & HELEN BERMAN | 25,000.00 |
| | MAINSTAR-LAURA SIMPSON | 95,900.00 |
| | PROV-DONNA ROBERTS IRA | 142,000.00 |
| | ROGER SCHOUMACHER | 50,000.00 |
| | DEREK ROSTANT | 50,000.00 |
| | BRADLEY PETERSEN | 50,000.00 |
| | CHRISTIAN BITZ | 100,000.00 |
| | HORIZON-MARK KERSTING IRA | 54,900.00 |
| | LANNY & JUDI STROHMAN | 50,000.00 |
| | LARITA MERRICK | 330,000.00 |
| | | |
| 18. 1241 LOMA VISTA DR, BEVERLY HILLS, CA - SECOND | MARILYN & JONAS LINDE | 60,000.00 |
| | PROV-RICK ROUND IRA | 240,000.00 |
| | MARLYS KNELL | 50,000.00 |
| | PROV-MARY BORGES-PRATER IRA | 109,000.00 |
| | HERBERT & JOELLEN BEADLE CO-TTEES U/A 3/29/11 | 100,000.00 |
| | JAMES HAMM | 50,000.00 |
| | PROV-WILLIAM REPASKY IRA | 25,000.00 |
| | HARESH CHATNANI | 35,000.00 |
| | GROVER & WILMA KELLY LIVING TRUST | 50,000.00 |
| | | |
| 19. 8692 FRANKLIN AVE, LOS ANGELES, CA - FIRST | LAURA & DANIEL FLORES | 25,000.00 |
| | PROV-CAROLYN GRIFFIS IRA | 38,100.00 |
| | ARTHUR AND IRMA STERNBERG | 25,000.00 |
| | WANDA GAUTHIER | 50,000.00 |
| | STANLEY REED | 50,000.00 |
| | THE WILFRED AND BERNICE SKVARCH TRUST | 100,000.00 |
| | PROV-MARK CAMPBELL IRA | 46,450.00 |
| | WALTER AND MERIDITH BOSTIC | 50,000.00 |
| | PROV-MILTON BENDER ROTH IRA | 36,250.00 |
| | PROV-GEORGE BICKLEY IRA | 100,000.00 |
| | WALES & JOAN BEATY | 100,000.00 |

| | | |
|---|---|---|
| 19. 8692 FRANKLIN AVE, LOS ANGELES, CA - SECOND | DONALD CORNELIUS | 100,000.00 |
| | | |
| 20. 1011 HILLCREST ROAD, BEVERLY HILLS, CA - SENIOR | SIDNEY GELLER TRUST | 700,000.00 |
| | ALISON BEVER | 100,000.00 |
| | ELIZABETH BOTCHIS & JENNIFER HAWTHORNE | 50,000.00 |
| | REBECCA GRITTON & DEBORAH FERRIN | 25,000.00 |
| | RICHARD FRESHWATER | 50,000.00 |
| | VERLE & NORMA PYLE TRUST 07/11/83 | 100,000.00 |
| | BRIAN & MARY DISCHLER | 250,000.00 |
| | RICHARD & NANCY CAMPOLO LT 03/04/04 | 100,000.00 |
| | BETTY & BERNARD BUFFORD | 30,000.00 |
| | KENNETH & EMMA SATTLER | 100,000.00 |
| | LINDA & TIMOTHY NORDMAN | 100,000.00 |
| | PROV-JUDITH POLEY IRA | 70,000.00 |
| | MERRILY & MARINO CASSINA | 30,000.00 |
| | MLG FARMS INC | 50,000.00 |
| | CHARLES COOPRIDER | 100,000.00 |
| | CHARLES & MARY ANN MCDERMAND | 200,000.00 |
| | EDWIN & SANDY WILLIAMS | 25,000.00 |
| | IRA SVC-CHERYL PIRTLE | 42,000.00 |
| | MAINSTAR-JOHN MONTES | 180,000.00 |
| | MAINSTAR-ROSEANN ALVAREZ | 40,000.00 |
| | PROV-LINDA NORDMAN IRA | 139,000.00 |
| | CHASE FINANCIAL LLC | 100,000.00 |
| | JEFFREY TABIN | 50,000.00 |
| | LYNNE FRIEND | 200,000.00 |
| | MARTIN DUMLER | 25,000.00 |
| | NORMA & JAMES MIKKELSEN | 25,000.00 |
| | LINDA & JOHN SUTTON | 110,000.00 |
| | RANDY BOTWINICK | 125,000.00 |
| | GERALD ROY | 220,000.00 |
| | LINDA DONAHOE | 25,000.00 |
| | MAINSTAR-JUDITH SHERMAN | 40,431.00 |
| | MAINSTAR-STEVEN WEISZ | 40,000.00 |
| | MICHAEL WEINER MD PROFIT SHARING PLAN (1 OF 2) | 250,000.00 |
| | MICHAEL WEINER MD PROFIT SHARING PLAN (2 OF 2) | 326,000.00 |
| | LINDA BURTON | 25,000.00 |
| | MITCHELL & VICTORIA JOHNSON | 50,000.00 |
| | SHARLA & ROY FLYNN | 25,000.00 |
| | SARA MARSHALL | 500,000.00 |
| | PROV-SANDRA BARNES IRA | 24,500.00 |
| | PROV-KLAUS GERSDORF IRA | 100,250.00 |
| | MICHAEL & MARY MIRANDA | 200,000.00 |
| | PROV-MICHAEL DELEO IRA | 95,000.00 |
| | PROV-GAYLE REIFFER BRUGGINK IRA | 100,000.00 |
| | WILLIAM BOWEN | 60,000.00 |
| | RICHARD VALDEZ | 25,000.00 |
| | PROV-KELLIE HEIER IRA | 99,750.00 |
| | PROV-JANE BENDER IRA | 26,000.00 |
| | WILLIAM MCNINCH | 25,000.00 |
| | FREDRICK KRUEGER TRUST 11/23/99 | 100,000.00 |
| | CLEO & MERVIN TCHIDA | 25,000.00 |
| | BENTLEY FAMILY HOLDINGS LLC | 100,000.00 |
| | LEWIS & ERNA DRAPER | 50,000.00 |
| | JOHN & SUSAN BARTO | 50,000.00 |
| 20. 1011 HILLCREST ROAD, BEVERLY HILLS, CA - DEV | NONE | |
| | | |
| 21. 1962 STRADELLA RD TWO REFI, LOS ANGELES, CA - FIRST | CATHERINE MARX | 25,000.00 |
| | JOSEPH ESPOSITO | 25,000.00 |
| | JULIE BERTSCH | 25,000.00 |
| | PROV-ABEBECH DERESSE IRA | 38,120.00 |
| | DOLORES SCARDINE | 25,000.00 |

| | | |
|---|---|---:|
| | PROV-BEVERLY MARSHALL IRA | 30,350.00 |
| | EDWIN SIMONS | 25,000.00 |
| | ROBERT & GEORGIA TORSON | 50,000.00 |
| | MARGARET SIRACUSA IRREV TRUST | 65,000.00 |
| | HARVEY & GERALDINE BAER | 100,000.00 |
| | SUSAN MONACO | 25,000.00 |
| | TED TIFT | 100,000.00 |
| | LYNNE FRIEND | 50,000.00 |
| | FIC LLC | 25,000.00 |
| | HARVEY & BARBARA SOFEN REV TRUST 3/8/06 | 50,000.00 |
| | PROV-PERCY FORBING IRA | 79,004.00 |
| | PROV-RON FRASURE IRA | 25,000.00 |
| | HORIZON-KEVIN DOWNEY IRA | 53,824.24 |
| | MAINSTAR-BETTY GUNNOE | 102,742.10 |
| | MAINSTAR-NANCY FALCON | 100,000.00 |
| | JONI WILLIAMS | 25,000.00 |
| | PROV-THOMAS CURLER IRA | 50,000.00 |
| | PROV-GEORGE GARROULD IRA | 38,500.00 |
| | GARY L MCKINZIE REVOCABLE TRUST 7/24/02 | 150,000.00 |
| | JAMES YEE | 25,000.00 |
| | IRA SVC-LINDA HARVEY | 60,000.00 |
| | PROV-ANTONETTE RENSHAW IRA | 50,000.00 |
| | IRENE WISOR | 30,000.00 |
| | SHARRON RAIDER | 75,000.00 |
| | RAMIRO VILLALVAZO | 40,000.00 |
| | MICHAEL & MARY KAY HEIMBUCK | 100,000.00 |
| | CLARK SCHABO | 25,000.00 |
| | PAMELA GARTNER | 40,000.00 |
| | DALE MCINTIRE TRUST 01/20/11 | 100,000.00 |
| | STEPHANIE & KATHLEEN WASHKO | 44,000.00 |
| | KATHLEEN & BRIAN WASHKO | 69,000.00 |
| | PROV-JOHN ERICKSON IRA | 49,750.00 |
| | E PETE ADAMS | 50,000.00 |
| | CHARLES COOPRIDER | 50,000.00 |
| | MAINSTAR-BRIAN ZEEK | 120,700.00 |
| | KIMBERLY WENDEL | 100,000.00 |
| | DANIEL & MARLEEN EVERS | 80,000.00 |
| | PROV-KAREN GUIDRY IRA | 25,343.00 |
| | JUNE HOFFMAN | 40,000.00 |
| | | |
| **22. 15655 WOODVALE DR, ENCINO, CA - FIRST** | RICHARD & LINDA PATON | 30,000.00 |
| | VENTURE HILL ENTERTAINMENT LLC | 25,000.00 |
| | DOUGLAS SR & DONNA EVANS | 75,000.00 |
| | JOHN MICHOLLE | 35,000.00 |
| | SUNWEST-BRIAN FREDERICK | 185,000.00 |
| | JEFFREY CARRISH | 25,000.00 |
| | ARLENE WALKER | 100,000.00 |
| | DONALD BARSNESS | 50,000.00 |
| | PROV-DELLA LINK IRA | 100,000.00 |
| | CAROL CURTIS | 200,000.00 |
| | MARGARET & JOHN JR SPRUCEBANK | 40,000.00 |
| | JEANNE NILSEN | 125,000.00 |
| | LORIN & GABRIELLA CROSBY | 85,000.00 |
| | | |
| **22. 15655 WOODVALE DR, ENCINO, CA - SECOND** | JARA GROUP II LLC | 50,000.00 |
| | ANGELINA ROJO | 75,000.00 |
| | CHAD FALLER | 25,000.00 |
| | VIVIENNE SHEAR | 30,000.00 |
| | ROBERT NEDBALEK | 40,000.00 |
| | BARBARA MOORE | 119,000.00 |
| | ROBERT & ANN GONCZ | 52,000.00 |
| | HOWARD RUBIN | 100,000.00 |
| | ELISSA & JOSEPH BERLINGER | 25,000.00 |

| | | |
|---|---|---|
| | BARBARA & KEVIN MEEHAN | 60,000.00 |
| | LORI & LLOYD FELDMAN | 30,000.00 |
| | DONALD HAZELTON AND CONNIE FREED | 25,000.00 |
| | | |
| **23. 3843 HAYVENHURST AVE, ENCINO, CA - FIRST** | SANFORD & LAURA STERN REVOCABLE TRUST | 300,000.00 |
| | BRUCE & MAUREEN MILLER | 115,000.00 |
| | PROV-SUZANNE ROETHLE ROTH IRA | 23,000.00 |
| | MAINSTAR-NEAL LAXTON IRA | 21,350.50 |
| | GAYLE & CHRISTOPHER MATHE | 25,000.00 |
| | KEN & KENDRA HOOD | 50,000.00 |
| | THE BRUCE & KATHLEEN FORD TRUST | 25,000.00 |
| | DARLENE KRAMER | 100,000.00 |
| | RUSSELL TAYLOR | 50,000.00 |
| | | |
| **23. 3843 HAYVENHURST AVE, ENCINO, CA - SECOND** | PROV-ARNOLD BERMAN IRA | 100,000.00 |
| | JUDITH BYRUM | 150,000.00 |
| | LORETTA MITCHELL | 77,000.00 |
| | SHIRLEY CONTI | 40,000.00 |
| | PROV-KATHY MILLER IRA | 31,700.00 |
| | | |
| **24. 4030 MADELIA AVE, SHERMAN OAKS, CA - FIRST** | CAMC LLC | 50,000.00 |
| | HEALTH CORE TRUST 10/30/03 | 25,000.00 |
| | GRACE LAMONTAGNE | 100,000.00 |
| | MAINSTAR-WILLIAM SPIRKA | 400,000.00 |
| | DONALD AND DONNA WEISE | 50,000.00 |
| | HENRI & BARBARA JEANRENAUD | 29,000.00 |
| | | |
| **25. 25211 JIM BRIDGER RD (TWO), HIDDEN HILLS, CA - FIRST** | RONALD AND CAROLYN KELLER | 25,000.00 |
| | DEWEY & SHARLENE STEELE | 100,000.00 |
| | DANIEL & DOROTHY MCARTHUR | 50,000.00 |
| | SARA SMITH | 100,000.00 |
| | HERMAN STEINMILLER | 30,000.00 |
| | BRUCE W ELEY REVOCABLE TRUST 4/14/16 | 100,000.00 |
| | MARIE CRESPIN | 25,000.00 |
| | OTTAVIANO LIVING TRUST | 50,000.00 |
| | GERARD MICHELSEN | 25,000.00 |
| | GORDON BURGHARDT | 25,000.00 |
| | JOEL ARNOLD | 25,000.00 |
| | MAINSTAR-IZA SHIMANOVICH | 25,000.00 |
| | FRANK LUPI | 25,000.00 |
| | HEMANT AND MAMTA NANAVATY | 35,000.00 |
| | CAROL A STALEY REVOCABLE TRUST 5/5/93 | 50,000.00 |
| | VIRGINIA M MOLITERNO REVOCABLE LIVING TRUST | 50,000.00 |
| | MICHAEL AND MAY KAY HEIMBUCK | 100,000.00 |
| | JOHN AND ELLEN SCHVETZ | 100,000.00 |
| | BRUCE BENSON | 50,000.00 |
| | WALLACE & BARBARA JOHNSON | 50,000.00 |
| | PROV-DAVID MOBLEY IRA | 100,000.00 |
| | JEFFREY & MARY MORSCH LIVING TRUST DTD 8-26-2010 | 205,525.75 |
| | MARIA R MURRAY SECOND IRREVOCABLE TRUST/C MURRAY TTEE | 200,000.00 |
| | IRA SVCS-WOODROW WILSON | 45,000.00 |
| | CORNELIA ADAMS | 25,000.00 |
| | PROV-JUDY TONG IRA | 24,750.00 |
| | DAROLD & MARGARET ALLEN | 100,000.00 |
| | PROV-PATRICIA BENSON IRA | 55,700.00 |
| | CAROLS OLIVEROS | 60,000.00 |
| | | |
| **25. 25211 JIM BRIDGER RD (TWO), HIDDEN HILLS, CA - SECOND** | SHREE & ANU SHARMA | 68,000.00 |
| | SHARON THOMPSON | 25,000.00 |
| | THE MARSHALL FAMILY REV LIVING TRUST 3/26/15 | 100,000.00 |
| | MARVIN HILL | 100,000.00 |
| | ROBERT SCHLICHTING | 75,000.00 |

| | | |
|---|---|---|
| | STEPHEN AMBROSE | 105,000.00 |
| | CARLA GARGALA | 35,000.00 |
| | LAURIE GUERTIN | 50,000.00 |
| | RICHARD MAY | 75,000.00 |
| | PROV-LINDA STEINBRUNNER IRA | 75,000.00 |
| | KENT ROMINGER | 200,000.00 |
| | YEN HSU CHEN | 275,000.00 |
| | MICHAEL BALES | 25,000.00 |
| | PROV-WILLAM REPASKY | 25,000.00 |
| | LINDA HUBER & ROBERT HUBER JR | 25,000.00 |
| | MAINSTAR-BURL HECHTMAN | 200,000.00 |
| | PROV-CYNTHIA CHUN IRA | 85,000.00 |
| | STANLEY GABERLAVAGE & DOROTHY SOTERIOU | 100,000.00 |
| | JULIE GREENE | 100,000.00 |
| | DAN & CYNTHIA CARNAHAN | 25,000.00 |
| | LEONARD POLITI | 150,000.00 |
| | JOAN SHERIDAN | 25,000.00 |
| | IRA SVCS-KIMBERLY BOURGEOIS | 32,000.00 |
| | PROV-TROY GATTIS IRA | 200,000.00 |
| | CHRISTEL MORRIS LIVING TRUST | 100,000.00 |
| | RICHARD COUGHLIN | 150,000.00 |
| | SONIA RUDGE REV TRUST 12/15/09 | 100,000.00 |
| | MAINSTAR-MARTIN RILEY | 82,500.00 |
| | CLAUDINE PATE | 150,000.00 |
| | DALE & SHEREE MOHR | 30,000.00 |
| | PROV-SALVATORE POLLICITO IRA | 50,000.00 |
| | RICHARD & SANDRA MOWERY | 25,000.00 |
| | MARK BOLGEN | 200,000.00 |
| | GALEN & FERN BENEDICT | 160,000.00 |
| | KATHLEEN WENDEL | 50,000.00 |
| | MAINSTAR-GABRIELE BUSCHER | 100,000.00 |
| | PROV-KENNETH VAN AMERONGEN IRA | 75,000.00 |
| | SCHLATER FAMILY REVOCABLE LIVING TRUST | 50,000.00 |
| | MARILYN LINK | 50,000.00 |
| | ASSAD KAZEMINY | 50,000.00 |
| | MARIA MURRAY SECOND IRREVOCABLE TRUST | 180,000.00 |
| | NICKY CALHOUN | 50,000.00 |
| | | |
| **26. 1312 BEVERLY GROVE PL, BEVERLY HILLS, CA - FIRST** | WILLIAM ARNOLD FAM TRUST | 100,000.00 |
| | LEGACY 1 LLC | 160,000.00 |
| | MORGAN FAMILY TRUST HAROLD MORGAN | 50,000.00 |
| | FLORENCE MARANUK | 50,000.00 |
| | STEVEN BLANCHARD | 50,000.00 |
| | THE WAIT FAMILY REVOCABLE LIVING TRUST 3/9/99 | 25,000.00 |
| | BETTY J COLSON IRREVOCABLE TRUST | 60,000.00 |
| | THE MARSHALL FAMILY TRUST 5/26/14 | 25,000.00 |
| | CYNTHIA CHOQUETTE | 40,000.00 |
| | PAMELA HALL | 25,000.00 |
| | BEN & ELVIRA BALMENTI IRREVOCABLE TRUST | 200,000.00 |
| | THOMAS VASIL & FRANCES RAMIREZ | 35,000.00 |
| | PROV-MARIA PINEDA IRA | 97,500.00 |
| | THOMAS AND PATRICIA CYGAN | 70,000.00 |
| | RON DISMUKE | 35,000.00 |
| | MAINSTAR-DIRK SWART | 144,061.75 |
| | KAREN KENNA | 60,000.00 |
| | OLLIN & MARY UNDERWOOD | 60,000.00 |
| | JEFFERY FITCH | 60,000.00 |
| | LAVINIA BARNES | 220,000.00 |
| | TRINA BRUNS | 35,000.00 |
| | JOHN & DENECE BELANGER | 100,000.00 |
| | MARLA VERMILLION | 30,000.00 |
| | | |
| **26. 1312 BEVERLY GROVE PL, BEVERLY HILLS, CA - SECOND** | MARLENE BATES | 25,000.00 |

| | | |
|---|---|---|
| | HIA SOLO 401K TRUST FBO CHAD HARRIS | 31,225.00 |
| | LINDA WENDEL | 100,000.00 |
| | IRA SVC-ANDREW ANTONIO | 450,000.00 |
| | MAINSTAR-JOEL KING | 175,000.00 |
| | | |
| **27. 1357 LAUREL WAY (TWO), BEVERLY HILLS, CA - SENIOR** | RONALD HEBERT | 100,000.00 |
| | TODD & AMY KOVAL | 25,000.00 |
| | LILIAN PELTZ-PETOW | 25,000.00 |
| | CLAUDE PELTZ | 25,000.00 |
| | MONA HUSH | 70,000.00 |
| | GILBERT & CHARLENE PEICHEL | 25,000.00 |
| | KLAUS AND CECELIA GERSDORF | 80,000.00 |
| | DOROTHY J BAUMBACH IRREV TRUST | 50,000.00 |
| | INDRA & BHARATI PATEL | 50,000.00 |
| | THE JOHN & BETTY DUNNE FAMILY TRUST | 300,000.00 |
| | ROBERT MICHEL IRREVOCABLE TRUST | 50,000.00 |
| | SEMEN SHKRABOV AND ELENA KORABELNIKOVA | 50,000.00 |
| | PROV-MICHAEL BINKERD IRA | 230,100.00 |
| | PROV-WILLIAM JABLONSKI IRA | 40,631.00 |
| | CHIERIE L BONO REVOCABLE TRUST 12/2/05 | 50,000.00 |
| | CURTIS COOK | 100,000.00 |
| | PROV-JOHN WORDEN IRA | 19,000.00 |
| | ALBERT AND MARIAN ELLIOTT LIVING TRUST 5/29/03 | 100,000.00 |
| | GERALD AND ELIZABETH SJAASTAD | 150,000.00 |
| | JAMES AND LORRAINE SHINDLER | 50,000.00 |
| | IRENE CLAVERIA FAMILY LTD PARTNERSHIP | 50,000.00 |
| | WILLET DAIRY FARM & CATTLE CO | 100,000.00 |
| | VERNON & RITA LEMKE | 25,000.00 |
| | KEVIN AND LORI MOTES | 100,000.00 |
| | MICHAEL WEINER MD PA PROFIT SHARING PLAN | 50,000.00 |
| | LEGACY 1 LLC | 100,000.00 |
| | PROV-CHAD PIPPENGER IRA | 47,700.00 |
| | MORTON & FRANCYNE KUGELMAN | 60,000.00 |
| | IRENE SCHMIDT | 100,000.00 |
| | JOHN HAROLD FAGAN III & JOHN HAROLD FAGAN | 25,000.00 |
| | PROV-KENNETH HOLBROOK IRA | 80,000.00 |
| | PROV-WILLIAM MOORE IRA | 99,500.00 |
| | MAINSTAR-PAMELA MCGOWAN | 100,000.00 |
| | MAINSTAR-ROBERT MCGOWAN | 125,000.00 |
| | BRUCE AND SUSAN MAYFIELD | 55,000.00 |
| | JOHN AND SUSAN RUNKLE | 50,000.00 |
| | MAINSTAR-ROBERT MCGOWAN SEP IRA | 40,000.00 |
| | BOYD JR & BRENDA ARMSTRONG | 25,000.00 |
| | HERITAGE CONSULTING GROUP OF OHIP EMP 401K PLAN | 30,000.00 |
| | NORMA WEINER LIVING TRUST 11/13/13 | 200,000.00 |
| | EDWARD & ARLENE HORNUNG JOINT REVOCABLE TRUST | 25,000.00 |
| | THE LAWLESS TRUST | 50,000.00 |
| | PROV-PAMELA LAWRENCE IRA | 33,054.00 |
| | ROBERT MACDONALD | 25,000.00 |
| | EMMA SJAASTAD | 50,000.00 |
| | MICHAEL & ELIZABETH SMITH | 50,000.00 |
| | BARBARA ASHMORE | 70,000.00 |
| | LARRY BLACKBURN | 55,000.00 |
| | PROV-RICKIE ALEXANDER IRA | 63,500.00 |
| | | |
| **27. 1357 LAUREL WAY (TWO), BEVERLY HILLS, CA - DEV** | GERALD & CERESE SCHULTZ | 50,000.00 |
| | PROV-TERRY SCHACKOW IRA | 100,000.00 |
| | PROV-BRADLEY GIBSON IRA | 139,000.00 |
| | BRENDA PHILLIPS-TINGLE | 100,000.00 |
| | PROV-STEPHEN SCHEID IRA | 107,000.00 |
| | PROV-ROBERT SHARKEY IRA | 99,000.00 |
| | RALPH & BEVERLY EASTERHAUS | 35,000.00 |
| | MARILYN & JONAS LINDE | 75,000.00 |

| | | |
|---|---|---:|
| | PROV-PAULA BRIDGES IRA | 107,000.00 |
| | MAINSTAR-SUE FILLINGER | 71,000.00 |
| | JAMES LOCTHEFELD | 225,000.00 |
| | PROV-DOUG ONESKO IRA | 50,000.00 |
| | LYNDA LILLY (1 OF 2) | 58,000.00 |
| | MAINSTAR-DAWN SHAW | 59,000.00 |
| | TIMOTHY & MEREDITH HELTON | 300,000.00 |
| | MAINSTAR-PAUL CALAMARI | 61,351.00 |
| | MAINSTAR-PAUL MARNELL | 100,440.00 |
| | MARY ROWE | 100,000.00 |
| | ROBERT & NORMA ROWE | 1,000,000.00 |
| | JOHN & SHIRLEY SMITH | 200,000.00 |
| | JAMES & ROMA MURPHY | 50,000.00 |
| | SANDRA & JAMES O'BRIEN | 50,000.00 |
| | IRA SVCS-MARIANNE HERLONG | 50,000.00 |
| | FRANCIS ALBANESE | 30,000.00 |
| | MAINSTAR-ELEANOR AGUILAR | 173,708.00 |
| | PROV-CARLA HONIG IRA | 108,169.02 |
| | JAMES HAMM | 100,000.00 |
| | MAINSTAR-DANIEL SMITH | 30,000.00 |
| | MAINSTAR-LUCILLE FLAIL | 30,000.00 |
| | MAINSTAR-THERESA JACKSON | 108,000.00 |
| | MAINSTAR-PHILLIP GOEDECKE | 25,000.00 |
| | SHIRLEY KIRSTEN | 240,000.00 |
| | THE PHUONGANH BRENNAN REV LIVING TRUST | 200,000.00 |
| | PROV-MICHAEL MARKERT IFA | 67,216.00 |
| | RONALD VARNER | 50,000.00 |
| | JOHN & WILMA REBUCK | 150,000.00 |
| | ALLISON & ANTHONY MELOGRANO | 50,000.00 |
| | ELIO PESATO | 50,000.00 |
| | PROV-EDWARD VANCE IRA | 50,000.00 |
| | FRANK & CHRISTINE DIETRICH | 300,000.00 |
| | LYNDA LILLY (2 OF 2) | 60,000.00 |
| | JEFFREY WAYBRIGHT | 80,000.00 |
| | TOMMYE GAYLER | 75,000.00 |
| | SANDRA B HAYNES REVOCABLE LIVING TRUST | 250,000.00 |
| | JUDITH ROUTZAHN | 75,000.00 |
| | WILLIAM & DONNA ROBBINS | 70,000.00 |
| | PROV-CAROLYN DIEHL IRA | 25,000.00 |
| | PROV-MARCELLA PRICE IRA | 51,000.00 |
| | ROBIN MCBRIDE | 90,000.00 |
| | PROV-JAMES RIVENBURG IRA | 38,600.00 |
| | PROV-STEPHEN ESLINGER IRA | 32,300.00 |
| | DALE & PAULA FORD | 50,000.00 |
| | JAMES JOHNSON LIVING TRUST | 35,000.00 |
| | IRA SVC-TERESA HORNFECK | 53,000.00 |
| | PROV-LORRAINE SCHOCKET IRA | 200,000.00 |
| | BETTY JO BROWN | 100,000.00 |
| | MAINSTAR-BASIL FRANKLIN JR | 205,000.00 |
| | PROV-JEANNIE GRABINSKI IRA | 50,000.00 |
| | MAINSTAR-JERALD SCHULZE | 61,000.00 |
| | MAINSTAR-MELISSA BLAINE | 225,000.00 |
| | | |
| **28. 1432 TANAGER WAY, LOS ANGELES, CA - FIRST** | KLAUS AND CECELIA GERSDORF | 120,000.00 |
| | CONSTANCE JORDAN | 30,000.00 |
| | PROV-INDRA PATEL IRA | 40,000.00 |
| | TODD & MARY FREDRICK | 50,000.00 |
| | GEORGE AND ESTHER MILLER | 60,000.00 |
| | ALVIN AND MARTHA WENDEL | 55,000.00 |
| | CAROLE KEMP | 125,000.00 |
| | PROV-KENT ROMINGER IRA | 299,000.00 |
| | PROV-KENT ROMINGER ROTH IRA | 99,000.00 |
| | DAVID DERRICK | 50,000.00 |

| | | |
|---|---|---|
| | GREG SKOGSBERG | 25,000.00 |
| | MARGARITA SANCHEZ | 25,000.00 |
| | PEREA LIVING TRUST 10/11/94 | 100,000.00 |
| | RICHARD HERCZOG | 50,000.00 |
| | ROLAND & MARJORIE EVERS | 178,000.00 |
| | PROV-SHARON SILVER IRA | 50,000.00 |
| | IRA SVC-BETTY LOU TUCKER | 30,000.00 |
| | PROV-TIMOTHY BOST IRA | 133,000.00 |
| | LAURA SCOTT | 80,000.00 |
| | PROV-JUDITH MOWER IRA | 88,000.00 |
| | DELBERT L KAUFMAN | 30,000.00 |
| | THE JUANITA S LOPEZ TRUST 9/11/12 | 25,000.00 |
| | JUDITH KATZ | 25,000.00 |
| | LUCIA J BATTS | 50,000.00 |
| | THE MICHAEL DE MESA TRUST | 100,000.00 |
| | PROV-CONSTANCE JORDAN IRA | 94,850.00 |
| | SALLY KNOWLES | 50,000.00 |
| | LOUIS S MILLER | 50,000.00 |
| | MARIA MURRAY | 95,000.00 |
| | AGUS & DEVI CHEN | 100,000.00 |
| | THE BEL AIR CRUT | 25,000.00 |
| | ANNA SHAVER | 60,000.00 |
| | MICHAEL AND MARY KAY HEIMBUCK | 100,000.00 |
| | LINDA O'ROURKE | 100,000.00 |
| | PROV-DONNA HOAG IRA | 103,275.00 |
| | PROV-HARRIS GREENBERG IRA | 35,000.00 |
| | S PRIYADARSINI | 50,000.00 |
| | DAVID PUGH | 100,000.00 |
| | WILLIAM & LAVONNE DUNN | 60,000.00 |
| | MAINSTAR-JAMES STACY | 35,000.00 |
| | PROV-SCOTT FARWICK ROTH IRA | 80,500.00 |
| | PROV-DEBORAH CHALLENDER IRA | 184,000.00 |
| | IRA SVC-ANTHONY MORICE | 34,000.00 |
| | IRA SVC-TRUDY MORICE | 34,500.00 |
| | MAINSTAR-JEFFREY GAROUTTE | 100,000.00 |
| | PAUL CASTIGLIONE JR | 50,000.00 |
| | PROV-PAUL CASTIGLIONE IRA | 84,000.00 |
| | STEVEN & MARJORIE TANDLICH | 50,000.00 |
| | PROV-LEONARD SIMONS IRA | 85,247.00 |
| | PROV-MYRA SIMONS IRA | 48,674.00 |
| | JOHN DIMAIO | 80,000.00 |
| | GERALD ROY | 50,000.00 |
| | SYLVAN & TINA REEVES | 120,000.00 |
| | JAMES & DIXIE MCALLISTER | 250,000.00 |
| | MARY BEGLEY | 85,000.00 |
| | DONALD BARSNESS | 50,000.00 |
| | PROV-MARILYN MASON IRA | 50,500.00 |
| | JILL TINGEY | 25,000.00 |
| | ALBERTO & CARLOS CASIFORA | 50,000.00 |
| | KELLI & NANCY WELLS | 25,000.00 |
| | LARRY & MARILYN JACOBSON | 60,000.00 |
| | IRA SVC-PHILLIP LUCERO | 25,000.00 |
| | PROV-MICHAEL BROWN IRA | 15,000.00 |
| | RONALD & SHARON GOODYKE | 50,000.00 |
| | DAVID & PATRICIA TOSHNER | 125,000.00 |
| | MAINSTAR-BARBARA CLAIRE JACKSON IRA | 37,500.00 |
| | ALAN MAICKI | 50,000.00 |
| | SHAWN MCGRORY | 65,000.00 |
| | GAYLE G ROGERS | 165,000.00 |
| | FRED & HELEN HOLDENER | 100,000.00 |
| | HELEN TUCKER | 25,000.00 |
| | JOAN TAYLOR | 36,237.42 |
| | JOHN & GWENDOLYN GRIFFIN | 75,000.00 |

| | | |
|---|---|---|
| | REBECCA MONN | 30,000.00 |
| | KENNETH & SANDRA LANGE | 50,000.00 |
| | KENNETH & JULIE DUISENBERG | 125,000.00 |
| | RILEY PETSCH | 25,000.00 |
| | | |
| **28. 1432 TANAGER WAY, LOS ANGELES, CA - SECOND** | MAINSTAR-TIMOTHY CRETIN | 91,000.00 |
| | NANCY HUDSON TTEE L U HUDSON FAMILY TRUST 02/27/91 | 125,000.00 |
| | MARK BAKER | 40,000.00 |
| | CHARLES & ROSE DUNLAP | 25,000.00 |
| | KAREN TAYLOR | 150,000.00 |
| | ROSEMARY CULOTTA | 55,000.00 |
| | ROBERT & BARBARA MATTOX | 310,000.00 |
| | MAINSTAR-MARY SERAFANO | 1,000,000.00 |
| | TERESITA & FELIX GONZALEZ | 91,000.00 |
| | SALLY LAY | 50,000.00 |
| | MARGARET WYCKOFF | 50,000.00 |
| | MAINSTAR-RONALD TALLMAN ROTH | 159,447.00 |
| | PHILLIP II & SHARON ROLLINS | 50,000.00 |
| | GRAHAM MARTIN | 125,000.00 |
| | WILLIAM HELLER | 30,000.00 |
| | WILLIAM NESTO | 200,556.69 |
| | PROV-NAFEES COLEMAN IRA | 73,000.00 |
| | JOHN & DOROTHY CREAMER | 250,000.00 |
| | CHARLES & TRACY CONNORS | 100,000.00 |
| | MAINSTAR-ROBERT FISHER | 50,000.00 |
| | MAINSTAR-JAMES PETERS | 232,939.55 |
| | MAINSTAR-PETER HOLLER ROTH IRA | 50,000.00 |
| | HEIDI POLITI | 50,000.00 |
| | MAINSTAR-COLLEEN JONES | 203,000.00 |
| | RANDY & ESTER SCHREFFLER | 1,000,000.00 |
| | BARBARA & ROBERT HAJAS | 138,000.00 |
| | JAMES LOCHTEFELD | 300,000.00 |
| | | |

## Exhibit D

### Adequate Protection Properties

1.   10060 and 10100 West Sunset Boulevard & 141 South Carolwood Drive, Los Angeles, CA

2.   638 Siena Way, Los Angeles, CA

3.   25085 Ashley Ridge Road, Calabasas, CA

4.   7900 Granito, Los Angeles, CA

5.   Fountain & Fairfax, Los Angeles, CA

6.   2362 Apollo Drive, Los Angeles, CA

7.   24025 Hidden Ridge Road, Calabasas, CA

8.   9127 Thrasher Avenue, Los Angeles, CA

9.   711 Walden Drive, Beverly Hills, CA

10. 714 N. Oakhurst, Beverly Hills, CA

11. 9040 Alto Cedro Drive, Beverly Hills, CA

12. 10750 Chalon Road, Los Angeles, CA

**<u>Exhibit E</u>**

**Cash Flow Projections**

# Woodbridge Companies

**13 Week Cash Flow Projection**
*($ in thousands)*

| | 4-WEEK TOTAL | | Week 1 2/16/18 | Week 2 2/23/18 | Week 3 3/2/18 | Week 4 3/9/18 |
|---|---:|---|---:|---:|---:|---:|
| **BEGINNING CASH BALANCE @** | $ 3,151 | (a) | | | | |
| | | | | | | |
| **# OF PROPERTIES SOLD** | - | (b) | - | - | - | - |
| | | | | | | |
| **REVENUES** | | | | | | |
| Non-DIP Collateral Property Sales, Net | $ - | | - | - | - | - |
| DIP Collateral Property Sales, Net | - | | - | - | - | - |
| Colorado Asset Sales, Net | - | | - | - | - | - |
| Riverdale, Rental Properties & Other | - | | - | - | - | - |
| Retention for Warranty & Other | - | (d) | - | - | - | - |
| Subtotal before Reserves | - | | - | - | - | - |
| Asset Sale Reserves | - | | - | - | - | - |
| **Total Revenues, net of Reserves** | - | | - | - | - | - |
| | | | | | | |
| **COSTS, EXCLUDING FUNDS INTEREST** | | | | | | |
| Investment Related Costs | | | | | | |
| Construction - CA & NY | (11,058) | (e) | (2,566) | (3,435) | (2,287) | (2,770) |
| Construction - CO & Others | (579) | (f) | (579) | - | - | - |
| Property Tax, Ins. & HOA | (221) | (g) | (52) | (52) | (67) | (52) |
| Payroll, G & A & Other | (1,167) | (g) | (215) | (215) | (520) | (215) |
| Contingency | (494) | | (13.35) | (185) | (144) | (152) |
| **Total Costs, Excluding Funds Interest** | (13,520) | | (3,426) | (3,887) | (3,018) | (3,189) |
| | | | | | | |
| **NET CASH FLOW BEFORE FUNDS INTEREST** | (13,520) | | (3,426) | (3,887) | (3,018) | (3,189) |
| | | | | | | |
| **TOTAL FUNDS INTEREST PAYMENT RESERVE** | (5,927) | | - | - | (5,927) | - |
| | | | | | | |
| **NET CASH FLOW BEFORE FINANCING** | (19,447) | | (3,426) | (3,887) | (8,945) | (3,189) |
| | | | | | | |
| **DIP FINANCING** | | | | | | |
| Proceeds | 31,100 | (i) | - | 31,100 | - | - |
| Interest & Fees | (242) | (j) | - | - | (242) | - |
| Repayments | - | (k) | - | - | - | - |
| Net Financing | 30,858 | | - | 31,100 | (242) | - |
| | | | | | | |
| **NET CASH FLOW B/F RESTRUCTURING COSTS** | 11,411 | | (3,426) | 27,213 | (9,187) | (3,189) |
| | | | | | | |
| **RESTRUCTURING COSTS** | | | | | | |
| Debtor Restructuring Costs | (7,882) | | | (7,882) | | |
| Committees | (1,734) | | | (1,734) | | |
| Total Restructuring Costs | (9,616) | (l) | - | (9,616) | - | - |
| | | | | | | |
| **NET CASH FLOW** | 1,795 | | (3,426) | 17,597 | (9,187) | (3,189) |
| | | | | | | |
| **ENDING CASH BALANCE** | $ 4,946 | | $ (275) | $ 17,322 | $ 8,135 | $ 4,946 |

# Woodbridge Companies

13 Week Cash Flow Projection

| ($ in thousands) | 4-WEEK TOTAL | | Week 1 2/16/18 | Week 2 2/23/18 | Week 3 3/2/18 | Week 4 3/9/18 |
|---|---|---|---|---|---|---|
| **ENDING DIP BALANCE, NET OF REPAYMENTS** | $ 56,100 | (m) $ 25,000 | $ 56,100 | $ 56,100 | $ 56,100 | |
| **REMAINING / UNDRAWN DIP CAPACITY** | $ 43,900 | $ 75,000 | $ 43,900 | $ 43,900 | $ 43,900 | |
| **CUMULATIVE RESERVE BALANCES** | | | | | | |
| Funds Interest | $ 17,778 | 11,851 | 11,851 | 17,778 | 17,778 | |
| Asset Sales | 15,300 | 15,300 | 15,300 | 15,300 | 15,300 | |
| Cumulative Total Reserves | $ 33,078 | (n) 27,151 | 27,151 | 33,078 | 33,078 | |

**NOTES**

(a)  Actual cash balance per Sierra as of February 6, 2018, net of oustanding checks/deposits and Funds Interest reserve and inclusive of cash from prior asset sales.

(b)  No closings projected during the 4 week period.

(c)  Pending additional information.

(d)  Estimated costs for warranty repairs.

(e)  Estimate General Contractor and Plus Development costs based on Sierra provided information.  Pending receipt of updated budget from Plus Development.

(f)  Estimate based on Sierra.  Pending update from Woodbridge management.

(g)  Preliminary estimate based on information from Management and others.

(h)  None assumed paid during 13-week period.

(i)  Future funding assumed based on target minimum cash balance of approximatel $5 million.

(j)  Paid monthly.  Assumes 9.5% interest rate.

(k)  Repayment based on sale of DIP Collateral assets at 100% of Net Sales Proceeds, less retention for warranties.

(l)  Estimate as of February 9, 2018.

(m)  Additional interim approval.

(n)  Including cash from prior asset sales.