## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| WOODBRIDGE GROUP OF COMPANIES, LLC, et al.,[1] | ) Case No. 17-12560-(KJC) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Re Docket Nos. 22, 512, 514 |

**OBJECTION OF BETTY LU DUNNE, MARJORIE AND STEVEN TANDLICH, PATRICIA S. AND KENT A. FLETCHER, ELIZABETH CRUZ, LEONARD SIMONS, ROBERT SCHATTNER, LORI AND LLOYD FELDMAN TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C); (IV) GRANTING RELATED RELIEF; (V) AUTHORIZING DEBTORS TO (A) RETAIN DEVELOPMENT SPECIALISTS, INC. ("DSI") AS THEIR RESTRUCTUING ADVISOR, (B) DESIGNATE BRADLEY D. SHARP AS CHIEF RESTRUCTURING OFFICER, (C) UTILIZE ADDITIOINAL DSI PERSONNEL, AND (D) RETAIN FREDERICK CHIN AS CHIEF EXECUTIVE OFFICER**

Betty Lu Dunne, Marjorie and Steven Tandlich, Patricia S. and Kent A. Fletcher, Elizabeth Cruz, Leonard Simons, Robert Schattner, Lori and Lloyd Feldman (together the "Secured Creditors") through undersigned counsel, The Sarachek Law Firm, in support of their objection to the Debtors' motion to (i) obtain post-petition financing, use cash collateral, and grant adequate protection to prepetition secured parties, (ii) to retain Development Specialists, Inc., Bradley D.

---

[1]The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14225 Ventura Boulevard #100, Sherman Oaks California 91423. The complete list of Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the noticing and claims agent at www.gardencitygroup.com/cases/wgc.

Sharp, and additional DSI personnel and (v) retain Frederick Chin as Chief Executive Officer, states as follows:

### The Mortgage Noteholders Have Valid, Perfected Security Interests in Real Property

1. In the Woodbridge Group of Companies, LLC, et al. (the "Debtors") financing motion the Debtors' assert, and the Official Committee of Unsecured Creditors has agreed, that mortgage noteholders are unsecured creditors who do not hold perfected interests in real property (paragraphs 11-12 of the DIP financing motion).  The Secured Creditors do not agree with this assertion, and the facts will show the Secured Creditors hold valid, perfected security interests in the properties listed as the DIP on Schedule 7.3.1 to the Senior Secured Debtor In Possession Loan And Security Agreement (the "Schedule of Real Estate Collateral") attached hereto as Exhibit A.  These Secured Creditors' valid, perfected security interests are being primed to provide collateral for the Debtors' post-petition financing.

2. The Secured Creditors have priority for a variety of reasons, including the decision in *In Re First T.D. & Investment, Inc.*, a case from the United States Court of Appeals for the Ninth Circuit with a similar fact pattern that upholds the perfection of security interests similar to those of the Secured Creditors. A copy of the opinion, as well as California Business and Professional Code Secs. 10131.1 and 10233.2, are attached hereto as Exhibit B.

3. Betty Lu Dunne holds a perfected security interest in the property located at 1357 Laurel Way, Beverly Hills, CA  90210 (the "Laurel Property"). The Laurel Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral. Betty Lu Dunne filed a Proof of Claim ("POC") asserting a secured position (POC #282).

4. Marjorie and Steven Tandlich hold a perfected security interest in the property located at 1432 Tanager Way, Los Angeles  90069 (the "Tanager Property").  The Tanager Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral. The Tandlichs' filed a Proof of Claim asserting a secured position (POC #s 270 and 271).

5. Patricia S. Fletcher and Kent A. Fletcher hold a perfected security interest in the property located at 24055 Hidden Hills Rd, Hidden Hills, CA  91302 (the "Hidden Hills

Property"). The Hidden Hills Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral. The Fletchers filed a Proof of Claim asserting a secured position (POC #522).

6. Elizabeth Cruz holds a perfected security interest in the property located at 1 Electra Court, Los Angeles, CA 90046 (the "Electra Court Property"). The Electra Court Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral.  Elizabeth Cruz filed a Proof of Claim asserting a secured position (POC #339).

7. Leonard Simons holds a perfected security interest in the Tanager Property.  The Tanager Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral.

8. Robert Schattner holds a perfected security interest in the Hidden Hills Property. The Hidden Hills Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral.

9. Lori and Lloyd Feldman hold a perfected security interest in the property located at 15655 Woodvale Drive, Encino, CA  91436 (the "Woodvale Property"). The Woodvale Property is part of the Debtors' financing motion as mentioned in the Schedule of Real Estate Collateral.

**Mortgage Noteholders are Entitled to Adequate Protection**

10. As a result, the Debtors' must provide adequate protection pursuant to Bankruptcy Code Section 364 for the Secured Creditors.  Furthermore, the Secured Creditors object to the retention of the plethora of bankruptcy professionals, including DSI and Mr. Chin as they do not want prohibitive professional fees to further erode the value of the Secured Creditors collateral.

**The Court should limit retention of professionals**

11. While approximately 9,000 creditors are frozen from receiving necessary monthly interest payments, the bankruptcy professionals in the case are charging millions of dollars per month, all of which they expect to have paid out of the Debtor in Possession financing ahead of the mortgage noteholders.  Just a couple of weeks ago, it appeared that a Trustee would be appointed in this case to liquidate the real estate.  The Debtor's principal, Robert Shapiro, and Board were promptly removed.  Now, the bankruptcy

3

professionals have manufactured a "debtor" in which each of the three new Board members, each of whom is an expert in either restructuring or real estate, is set to receive $25,000 per month, the proposed Chief Executive Officer, Bradley Chin seeks to receive $110,000 per month, and the proposed Chief Restructuring Officer Bradley Sharpe seeks $675 per hour and more for his associates.  The Secured Creditors believe these services are duplicative and would rather have excess funds conserved for their benefit. The table below lists 15 separate professionals. This seems excessive for a case that is essentially a liquidation of real estate.

| Professional | Representing | Role | Hourly Rate | |
|---|---|---|---|---|
| Gibson Dunn | Debtors | Counsel | 320 - $1,380* | |
| Young Conway Stargatt & Taylor | Debtors | Co counsel | $285 - $845* | |
| Homer Bonner Jacobs | Debtors | Special Litigation Counsel | $295 - $695* | |
| Garden City Group | | Claims and Noticing | $45 - $295* | |
| Sierra Constellation | Debtors | Restructuring | $100 - $575* | |
| Province, Inc | Debtors | Valuations | $375 - $730* | |
| Pachulski Stang Ziehl & Jones | Creditors' Committee | Counsel | $2.95 $1,295* | |
| FTI Consulting | Creditors' Committee | Financial Advisory Services | $140 - $1,075* | |
| Berger Singerman | Creditors' Committee | Special Counsel | $455 - $695* | |
| Navigant Consulting, Inc. | Debtors | Electronic Discovery Litigation Support Provider | $150 - $325* | |
| Development Specialists, Inc.** | Debtors | Restructuring | $290 - $640* | |
| Bradley D. Sharp** | Debtors | CRO | $640* | |
| Frederick Chin** | Debtors | CEO | $110,000/mo* | |
| Moelis & Company** | Debtors | Investment Banker | $150,000/mo* | $5.5 million fee |
| **Not yet approved | | | | |

12. The Secured Creditors each hold Promissory Notes and Collateral Assignments in specific properties.  An example of one of these notes is attached as Exhibit C.  While the Debtor and Unsecured Creditors Committee argue that these creditors hold notes against a Woodbridge related fund, in fact, Woodbridge was a broker for these Secured Creditors and were holding the original note in that capacity for the Secured Creditors, similar to the *In Re First T.D.* case.

13. Furthermore, all Secured Creditors have either filed a Proof of Claim reflecting their secured status or will be filing proofs of claim.

14. This bankruptcy is really about 138 single assets. The Debtors do not need to reorganize in order to maximize the return for the Secured Creditors and others similarly situated. The Secured Creditors do not need all these professionals to realize on their collateral; one set of professionals would be sufficient.  Alternatively, the Secured Creditors are prepared to liquidate the collateral themselves.

For the aforementioned reasons, the Secured Creditors request that the professional retention applications before the Court be denied and that the Secured Creditors be granted adequate assurance.

Dated: February 12, 2018

**THE SARACHEK LAW FIRM**

*/s/ Joseph E. Sarachek*

Joseph E. Sarachek (NY Bar No. 2163228)[2]
The Sarachek Law Firm
101 Park Avenue, 27th Floor
New York, NY  10178
Telephone: (203) 539-1099
Facsimile: (646) 861-4950
Email: joe@saracheklawfirm.com

---

[2] Admitted in the Third Circuit Court of Appeals

**EXHIBIT A**

SCHEDULE 7.3.1

to

Senior Secured Debtor in Possession Loan and Security Agreement

## SCHEDULE OF REAL ESTATE COLLATERAL
## (AND LEGAL DESCRIPTIONS)

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Properties** | | | | | | | | | | |
| **#** | **Code** | **Address** | **City** | **State** | **ZIP** | **Purchase Date** | **Purchase Price** | **Status** | **% Complete** | **As Is Value** |
| 1 | PD74 | 642 N. St. Cloud | Bel Air | CA | 90077 | 12/15/2016 | $18,200,000 | Demo'd | 3% | $18,200,000 |
| 2 | PD41 | 9212 Nightingale Drive | Los Angeles | CA | 90069 | 1/15/2016 | $13,200,000 | Residence | 0% | $14,000,000 |
| 3 | PD73 | 385 Trousdale Place | Beverly Hills | CA | 90210 | 12/15/2016 | $10,500,000 | Residence | 0% | $10,500,000 |
| 4 | PD72 | 375 Trousdale Place | Beverly Hills | CA | 90210 | 11/15/2016 | $8,400,000 | Residence | 0% | $8,400,000 |
| 5 | PD28 | 9230 Robin Drive | Los Angeles | CA | 91423 | 2/15/2016 | $9,000,000 | Demo'd | 0% | $9,000,000 |
| 6 | PD105 | 1 Electra Court | Los Angeles | CA | 90046 | 6/15/2017 | $28,280,000 | Residence | 0% | $28,280,000 |
| 7 | PD100 | 2492 Mandeville Cyn | Brentwood | CA | 90049 | 6/15/2017 | $6,300,000 | Residence | 0% | $6,300,000 |
| 8 | PD85 | 7870 Granito | Los Angeles | CA | 90046 | 12/15/2014 | $2,462,500 | Raw Land | 0% | $4,000,000 |
| 9 | PD03 | 1258 Lago Vista | Beverly Hills | CA | 90210 | 4/28/2015 | $5,925,000 | Residence | 0% | $6,500,000 |
| 10 | PD101 | 633 N Foothill Rd | Beverly Hills | CA | 90210 | 7/15/2017 | $7,600,000 | Residence | 0% | $8,000,000 |
| 11 | PD37 | 24055 Hidden Ridge Road | Hidden Hills | CA | 91302 | 1/15/2016 | $4,755,000 | Develop | 27% | $6,000,000 |
| 12 | PD51 | 810 Sarbonne | Bel Air | CA | 90077 | 4/15/2016 | $6,500,000 | Residence | 0% | $10,000,000 |
| 13 | MR | 2600 Hutton | Beverly Hills | CA | 90210 | 5/1/2016 | $4,000,000 | Demo'd | 0% | $4,000,000 |
| 14 | PD40 | 1520 Carla Ridge | Beverly Hills | CA | 90210 | 2/15/2016 | $7,200,000 | Demo'd | 0% | $8,500,000 |

| **#** | **Code** | **Address** | **City** | **State** | **ZIP** | **Purchase Date** | **Purchase Price** | **Status** | **% Complete** | **As Is Value** |
|---|---|---|---|---|---|---|---|---|---|---|
| 15 | PD56 | 1484 Carla Ridge | Beverly Hills | CA | 90210 | 5/15/2016 | $9,500,000 | Demo'd | 3% | $12,500,000 |
| 16 | PD38 | 25210 Jim Bridger Road | Hidden Hills | CA | 91302 | 1/15/2016 | $2,900,000 | Develop | 11% | $4,000,000 |
| 17 | MR | 3802 Hollyline Ave. | Sherman Oaks | CA | 91423 | 4/1/2014 | $1,499,000 | Raw Land | 100% | $1,500,000 |
| 18 | MR | 1241 Loma Vista | Beverly Hills | CA | 90210 | 4/14/2015 | $5,200,000 | Demo'd | 0% | $6,500,000 |
| 19 | PD18 | 8692 Franklin | Los Angeles | CA | 90069 | 10/10/2014 | $1,400,000 | Demo'd | 0% | $1,500,000 |
| 20 | PD99 | 1011 N. Hillcrest Road | Beverly Hills | CA | 90210 | 1/15/2017 | $9,500,000 | Residence | 0% | $10,500,000 |
| 21 | MR | 1962 Stradella Road | Los Angeles | CA | 90077 | 7/1/2015 | $2,600,000 | Done December 17,2017 | 0% | $3,200,000 |
| 22 | MR | 15655 Woodvale Drive | Encino | CA | 91436 | 5/1/2015 | $1,800,000 | Not on Market | 100% | $2,300,000 |
| 23 | MR | 3843 Hayvenhurst Ave | Encino | CA | 91436 | 8/14/2014 | $1,035,000 | Done this month | 100% | $1,600,000 |
| 24 | MR | 4030 Madelia Ave | Sherman Oaks | CA | 91403 | 10/25/2014 | $1,325,000 | Raw Land | 0% | $1,500,000 |
| 25 | PD39 | 25211 Jim Bridger Road | Hidden Hills | CA | 91302 | 1/15/2016 | $3,100,000 | Develop | 30% | $3,875,000 |
| 26 | MR | 1312 Beverly Grove Pl | Beverly Hills | CA | 90210 | 8/1/2014 | $3,100,000 | On Market | 0% | $4,700,000 |
| 27 | PD50 | 1357 Laurel Way | Beverly Hills | CA | 90210 | 7/15/2015 | $6,300,000 | Develop | 36% | $8,000,000 |
| 28 | PD32 | 1432 Tanager | Los Angeles | CA | 90069 | 12/15/2015 | $8,900,000 | Develop | 2% | $12,000,000 |
| | | | | | | | $190,481,500 | | 15% | $215,355,000 |

SCHEDULE 7.3.1

**EXHIBIT B**

**In Re: First T.d. & Investment, Inc.; Joint Development, Inc., Debtors.r. Todd Neilson, Chapter 7 Trustee, Plaintiff-appellee, v. Angela Shiu Rong Chang; Angela Shiu Rong Chang, F/b/o the Angela Chang Family Trust; Cynthia L. Lien; Galaxy Industrial Corporation; Anna P. Jen Kin; Wen F. Kuo; Tsu C. Kuo; Sze Ming Ma; Cheng H. Ma; Irene Werner; Haitang Li; Ru Lin Wu; Hong Yang; Xiao Ping Sun; Steve Po-an Mu; Yang Ying Chang Mu; Rita Chwen-yi Tsai; Pei Ti Wan, Defendants-appellants.r. Todd Neilson, Chapter 7 Trustee, Plaintiff-appellee, v. Angela Shiu Rong Chang; Cynthia L. Lien; Galaxy Industrial Corporation; Anna P. Jen Kin; Wen F. Kuo; Tsu C. Kuo; Sze Ming Ma; Cheng H. Ma; Irene Werner; Haitang Li; Ru Lin Wu; Hong Yang; Xiao Ping Sun; Steve Po-an Mu; Yang Ying Chang Mu; Rita Chwen-yi Tsai; Pei Ti Wan; Ming Yeng Wang; Ping Yuan Liu; Ching I Liu; Catherine Chang; Peter L. Chang; Julie Shih; Simon Shih; Julijanti Lucie Moeis; Lin Chu Tsai; Hsiu Chuan Wang Chen; Chang a Lan Huang; Hsiu Ying Kuo; Hsien Huei Lin; Tsai Chu Lin; Chien Yueh O Lien; Accurate Escrow, Inc.; Angela Shiu Rong Chang, F/b/o the Angela Chang Family Trust, Defendants-appellants, 253 F.3d 520 (9th Cir. 2001)**

**US Court of Appeals for the Ninth Circuit - 253 F.3d 520 (9th Cir. 2001)**

# Argued and Submitted November 14, 2000Filed June 19, 2001

[Copyrighted Material Omitted]

Gregory M. Salvato, Parker, Milliken, Clark, O'Hara & Samuelian, Los Angeles, California, for defendants-appellants Chang et al.

Michael H. Weiss, Weiss Scolney Spees, Llp, Los Angeles, California, for plaintiff-appellee R. Todd Neilson.

Appeal from the United States District Court for the Central District of California Dean D. Pregerson, District Judge, Presiding, D.C. No. CV 98-3004 DDP; Bankr. Adv. No. AD 96-03493 TD; D.C. No. CV 98-8161 DDP; Bankr. Adv. No. AD 96-03493 TD

Before: William C. Canby, Jr., M. Margaret McKeown, and Richard A. Paez, Circuit Judges.

Paez, Circuit Judge

These two consolidated appeals concern a real estate mortgage investment scheme perpetrated by Debtors, First T.D. & Investment, Inc. ("FTD") and Joint Development, Inc. ("JDI").[1]  The trustee of their consolidated Chapter 7 bankruptcy estates, Appellee R. Todd Neilson ("the Trustee"), filed an adversary action against Defendants, 132 investors in FTD,[2] alleging that collateral notes and trust deeds ("security instruments") assigned by FTD to Defendants as security for their investments did not perfect their interests because Defendants did not have possession of the security instruments.

Twenty years ago, in a case with facts very similar to those here, we held that such security interests could not be perfected under California law without actual possession of the security instruments. See Greiner v. Wilke (In re Staff Mortgage & Inv. Corp.), 625 F.2d 281, 283 (9th Cir. 1980) ("Staff Mortgage") (citing Cal. Comm. Code § 9304(1)). More than a decade later, the California Legislature created an exception to this rule by enacting California Business and Professions Code § 10233.2, which, under limited circumstances, permits perfection without possession of the security instruments.

At issue here is whether the exception created by§ 10233.2 applies to the transactions between Defendants and FTD, such that Defendants' security interests are deemed perfected. The bankruptcy court found that § 10233.2 applies and granted summary judgment in favor of those Defendants who filed an answer in the adversary proceeding ("Answering Defendants"). The district court reversed. We have jurisdiction pursuant to 28 U.S.C. § 158(d). We hold that§

10233.2 applies to Defendants' security interests, and therefore the Trustee's attempt to avoid Defendants' priority status must fail. We also reject the Trustee's argument that we should impose a constructive trust to circumvent § 10233.2. Accordingly, we reverse in Case No. 99-55851 ("Chang Appeal").

In a related appeal, Case No. 99-55840 ("Appeal from Default Judgments"), Defendants who defaulted in the adversary proceeding ("Defaulting Defendants") challenge the bankruptcy court's entry of final default judgments under Federal Rule of Civil Procedure 54(b). Defaulting Defendants argue that the final default judgments were inconsistent with the bankruptcy court's earlier summary judgment ruling that Answering Defendants' security interests were deemed perfected under § 10233.2. Because we hold that§ 10233.2 applies to the investor transactions at issue here, we conclude that the bankruptcy court abused its discretion and reverse the judgment of the district court with instructions to reverse the entry of final default judgments.

Prior to its involuntary bankruptcy, FTD was in the business of investing in real estate mortgages. It initiated and purchased home loans evidenced by collateral notes and secured by trust deeds on real property owned by the borrowers ("borrowers").

FTD financed its investment scheme with approximately $35 million borrowed from hundreds of individual investors, typically Chinese-American immigrants in Southern California ("investors"). FTD secured its loans from investors by assigning to them the collateral notes and trust deeds ("security instruments") from its home loan portfolio. FTD recorded the assignments with the county recorder where the property was located, but FTD maintained possession at all times of the collateral notes and trust deeds.[3]

Additionally, FTD entered into a "Servicing Agreement" with each investor that authorized FTD, as a "real estate broker" acting as a "servicing agent," to collect all loan payments from borrowers and to take other actions necessary or convenient to servicing of the note. While many investors at the time mistakenly believed they had actually purchased the trust deeds, Defendants accept, for purposes of this appeal, that they were merely assigned the trust deeds in a security transaction.[4]

FTD, in violation of California law, commingled funds received from investors and borrowers, using funds from any source for any and all purposes to continue its operations. FTD frequently used payments from one investor to pay interest and other payments to another investor -- a classic Ponzi scheme.

The investment scheme ultimately unraveled. Petitions for involuntary bankruptcy against FTD and JDI were filed under Chapter 11 of the U.S. Bankruptcy Code on October 21, 1994, and November 2, 1994, respectively. The cases were subsequently consolidated and converted to Chapter 7 proceedings in April 1995. Appellee R. Todd Neilson was appointed as trustee to manage the consolidated bankruptcy estates.

Seeking to treat all creditors on an equal basis for asset distribution, the Trustee filed an adversary action in bankruptcy court against 132 of the investors who held recorded assignments of specific trust deeds ("Defendants"). The Trustee alleged that Defendants' security interests were unperfected under California law because Defendants never obtained possession of the original collateral notes or trust deeds. Under 11 U.S.C. § 544(a), unperfected security interests are avoidable and can be relegated to the status of general unsecured claims. In this way, the

Trustee sought to prevent Defendants from receiving priority in the distribution of FTD and JDI's assets.

On cross-motions for summary judgment with respect to 18 of the Answering Defendants, the bankruptcy court entered summary judgment on January 23, 1998, in their favor and against the Trustee. The bankruptcy court held that the transactions between FTD and Answering Defendants fell within the scope of § 10233.2 and thus, although they lacked actual possession of the security instruments, Answering Defendants' interests were deemed perfected. Chang, 218 B.R. at 94-95.

Because the issue of perfection under § 10233.2 was of such importance to the entire adversary proceeding, the bankruptcy court entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b). The Trustee appealed to the district court. The district court reversed, holding that the transactions at issue were not within the scope of § 10233.2.

B. Appeal of Default Judgments (No. 99-55840)

On April 30, 1997, prior to entry of summary judgment for Answering Defendants, the Trustee moved for entry of default and default judgment against the 88 Defaulting Defendants who had not answered the complaint in the above adversary proceeding.[5] The bankruptcy court granted the Trustee's motion, but the interlocutory order was not appealable.

In May 1998, four months after the bankruptcy court entered summary judgment for Answering Defendants, the Trustee moved to certify the default judgments as final under Federal Rule of Civil Procedure 54(b). Defaulting Defendants objected to entry of final judgments because the judgments were inconsistent with the bankruptcy court's earlier summary judgment ruling, holding that the security interests of Answering Defendants were perfected under § 10233.2. Chang, 218 B.R. at 95. In granting the Trustee's motion to certify, the bankruptcy court stated in the final default judgments that: "The Defaulting Defendants failed to perfect their security interest in the Collateral Notes and Deeds of Trust by failing to obtain possession of same."[6] Notwithstanding Defaulting Defendants' objections to the inconsistent rulings, the bankruptcy court entered the final judgments on June 1, 1998.

Defaulting Defendants appealed the entry of the final default judgments to the district court, which affirmed, citing its contemporaneous ruling reversing the bankruptcy court on the applicability of § 10233.2 to Answering Defendants.

Defendants contend that § 10233.2 applies to their loan transactions with FTD, and under the provisions of that statute, their security interests are deemed perfected. They seek reversal of the district court's decision to the contrary.

We review de novo a district court's judgment on appeal from a bankruptcy court. Gruntz v. County of Los Angeles (In re Gruntz), 202 F.3d 1074, 1084 n.9 (9th Cir. 2000) (en banc). We apply the same standard of review applied by the district court, reviewing the bankruptcy court's legal conclusions de novo and its factual determinations for clear error. Beaupied v. Chang (In re Chang), 163 F.3d 1138, 1140 (9th Cir. 1998), cert. denied, 526 U.S. 1149 (1999).

Relying on the text of the statute and established rules of statutory construction under California law, we conclude that § 10233.2 applies to the loan transactions in question, and accordingly, that Defendants' security interests are deemed perfected. The statute's legislative history provides further support for our conclusion.

Section 544 of the Bankruptcy Code, the "strong-arm clause," grants a trustee in bankruptcy "the rights and powers of a hypothetical creditor who obtained a judicial lien on all of the property in the estate at the date the petition in bankruptcy was filed." In re Commercial W. Fin. Corp., 761 F.2d 1329, 1331 n.2 (9th Cir. 1985) (citing 11 U.S.C.§ 544(a) (1)). "One of these powers is the ability to take priority over or `avoid' security interests that are unperfected under applicable state law . . . ." Id. Avoiding such interests relegates them to the status of a general unsecured claim. See 5 Collier on Bankruptcy ¶¶ 544.02, 544.05 (Lawrence P. King ed., 15th ed. rev. 2000).

The general rule in California requires the secured party to take possession of the security instrument in order to perfect the security interest. Cal. Com. Code § 9304(1). Section 10233.2, enacted in 1992 through California Senate Bill 1520, creates an exception to the normal rule requiring possession in certain types of transactions involving real estate brokers. 1992 Cal. Legis. Serv. Ch. 158 (West). Section 10233.2 deems a security interest perfected, without possession of the security instruments, provided five requirements are met: (1) a "broker, acting within the meaning of" California Business and Professions Code §§ 10131 or 10131.1 possesses the security instrument; (2) the broker has "arranged a loan" or "sold a promissory note or any interest therein"; (3) the broker "undertakes to service the promissory note"; (4) the trust deed or collateral documents in favor of the lender are"recorded in the office of the county recorder in the county in which the security property is located"; and (5) "the note is made payable to the lender or is endorsed or assigned to the purchaser."[7]

The Trustee does not dispute that the transactions between FTD and Defendants satisfy requirements one, three, four, and five. The Trustee concedes that FTD is a real estate broker within the meaning of §§ 10131 and 10131.1. The only dispute concerns whether FTD "arranged a loan " or "sold a promissory note or any interest therein" in its transactions with investors.

With the exception of the bankruptcy and district courts below, no state or federal court has had occasion to interpret § 10233.2. We therefore apply California's rules of statutory construction. See Fed. Sav. & Loan Ins. Corp. v. Butler, 904 F.2d 505, 510 (9th Cir. 1990) (construing Cal. Civil Code § 877). California Code of Civil Procedure§ 1859 provides that " [i]n the construction of a statute the intention of the Legislature . . . is to be pursued, if possible." The California Supreme Court has declared that the "ultimate task" in statutory interpretation "is to ascertain the legislature's intent." People v. Massie, 19 Cal. 4th 550, 569, 967 P.2d 29, 41 (1998), cert. denied, 526 U.S. 1113 (1999)."Ordinarily, the words of the statute provide the most reliable indication of legislative intent." Pacific Gas & Elec. Co. v. County of Stanislaus, 16 Cal. 4th 1143, 1152, 947 P.2d 291, 297 (1997). Courts should give the language of the statute "its usual, ordinary import and accord [ ] significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." Dyna-Med, Inc. v. Fair Employment & Hous. Comm'n, 43 Cal. 3d 1379, 1386-87, 743 P.2d 1323, 1326 (1987). When the wording of the statute is ambiguous, however, a court may consider extrinsic evidence of the legislature's intent, "including the statutory scheme of which the provision is a part, the history and background of the statute, the apparent purpose, and any considerations of constitutionality." Hughes v. Bd. of Architectural Exam'rs, 17 Cal. 4th 763, 776, 952 P.2d 641, 649 (1998).

The critical issue for our purposes in interpreting§ 10233.2 concerns the application of § 10131.1 to this statute, and specifically, its application to the word "sold" as used in "sold a promissory note or any interest therein" in § 10233.2. Section 10131.1 provides, in relevant part:

A real estate broker within the meaning of this part is also a person who engages as a principal in the business of buying from, selling to, or exchanging with the public, real property sales contracts or promissory notes secured directly or collaterally by liens on real property, or who makes agreements with the public for the collection of payments or for the performance of services in connection with real property sales contracts or promissory notes secured directly or collaterally by liens on real property.

As used in this section, "sale," "resale," and "exchange" include every disposition of any interest in a real property sales contract or promissory note secured directly or collaterally by a lien on real property, except the original issuance of a promissory note by a borrower or a real property sales contract by a vendor, either of which is to be secured directly by a lien on real property owned by the borrower or vendor.

We agree with the Trustee that the generally accepted definition of "sale" does not include the assignment of a security interest. See Milana v. Credit Disc. Co., 27 Cal. 2d 335, 339-40, 163 P.2d 869, 871 (1945); Golden State Lanes v. Fox, 232 Cal. App. 2d 135, 138, 42 Cal. Rptr. 568, 570 (1965); Black's Law Dictionary 1337 (6th ed. 1990) ("a `sale' is distinguished from a mortgage, in that the former is a transfer of the absolute property in the goods for a price, whereas a mortgage is at most a conditional sale of property as security for the payment of a debt or performance of some other obligation, subject to the condition that on performance title shall revest in the mortgagor").

Nonetheless, § 10131.1 provides an expansive definition of "sale," which "include [s] every disposition of any interest in a real property sales contract or promissory note secured directly or collaterally by a lien on real property" (emphasis added). We previously have held that this definition of "sale" includes the assignment of security interests by a real estate broker to investors. See Lucas v. Thomas (In re Thomas), 765 F.2d 926, 931 (9th Cir. 1985) (transaction by which investors in sole proprietorship delivered money to owner of proprietorship, a licensed real estate broker, in exchange for which broker issued promissory notes secured by deeds of trust on two condominiums that broker owned is a "sale" within meaning of § 10131.1).

The outcome of this case turns on which definition of "sale" or "sold" the California Legislature intended to adopt when it included the phrase "sold a promissory note or any interest therein" in § 10233.2.[8]  If it intended to adopt the conventional definition of "sold" (and thus limit the application of § 10131.1 exclusively to the term "broker" in § 10233.2), then § 10233.2 would not apply to FTD's assignment of security interests to Defendants. Consequently, Defendants' interests would be unperfected under California law, and the Trustee could avoid them under 11 U.S.C. § 544. If, however, the legislature intended to adopt the more expansive definition of "sale" from § 10131.1, then § 10233.2 would apply to the assignment of security interests, rendering Defendants' interests perfected and therefore not avoidable by the Trustee.

The text of § 10233.2 suggests that it adopts the definitions of both "broker" and "sold" provided by § 10131.1. Section 10233.2 states, in relevant part: "when a broker, acting within the meaning of subdivision (d) or (e) of Section 10131 or Section 10131.1, has arranged a loan or sold a promissory note or any interest therein." Although placement of the clause immediately after "broker" might normally indicate that the clause modifies only this term, use of the words "acting within" suggests that §§ 10131 and 10131.1 apply not only to define broker but also to define the type of broker transactions -- i.e., "arranged a loan" or "sold a promissory note or any interest therein" -- covered by § 10233.2.

We see no reason why the California Legislature would incorporate two different definitions of "sold " into § 10233.2: a broad one to define broker and a narrow one to define the type of broker transactions covered under the statute. " [I]t is generally presumed that when a word is used in a particular sense in one part of a statute, it is intended to have the same meaning if it appears in another part of the same statute." People v. Dillon, 34 Cal. 3d 441, 467, 668 P.2d 697, 712 (1983). It follows that the legislature intended to use a single definition of "sale" throughout § 10233.2, as applied to both the term "broker" and the term "sold."

We find unconvincing the Trustee's argument that the restrictive language of § 10131.1 ("As used in this section . . .") limits the expansive definition of sale to "broker." Such restrictive language cannot bar a newer statute, such as § 10233.2, from incorporating through reference the definition in an older statute. See Collection Bureau v. Rumsey, 24 Cal. 4th 301, 310, 6 P.3d 713, 719 (2000) ("If conflicting statutes cannot be reconciled, later enactments supersede earlier ones . . . .") Here, the California Legislature's use of the phrase "acting within the meaning of [§§ 10131 or 10131.1]" evidences its intent to use the same definition throughout § 10233.2.

We also reject the Trustee's argument that the expansive definition of sale would render the terms "arranged a loan" and "sold a promissory note" superfluous. Without these terms, all types of broker transactions would be included within the scope of § 10233.2, including situations where a broker services a note without having participated in the origination, assignment, or sale of the note. The terms "arranged" and "sold," even when broadly defined, restrict the universe of included broker transactions and are therefore not redundant.

For all these reasons, we read § 10233.2 to incorporate the definition of "sale" in § 10131.1 to apply to both "broker" and "sold" in § 10233.2.

The legislative history of § 10233.2 provides further support for our conclusion that this statute applies to the transactions between FTD and Defendants.

Section 10233.2 was enacted in 1992 through California Senate Bill 1520, under sponsorship by the California Independent Mortgage Brokers Association ("CIMBA"). 1992 Cal. Legis. Serv. Ch. 158 (West). The Senate Committee on Business and Professions described the bill as follows:

This bill is sponsored by the California Independent Mortgage Brokers Association (CIMBA) to specify that the technical requirements of the Commercial Code for perfection of a lender's real property security interest . . . are deemed to have been completed under specified conditions where the real estate broker maintains physical possession of the note under a servicing contract in accordance with provisions of the Real Estate Law.

Committee Report for 1991 California Senate Bill No. 1520, Senate Committee on Bus. & Professions, 1991-92 Reg. Sess. 2 (Apr. 27, 1992) ("Committee Hearing"). This description alone is of little help because it refers merely to "specified conditions," which, when defined, use the same "arranged" and "sold" language as in the statute. See id.

The most revealing passages of the legislative history are the references to our earlier decision in Staff Mortgage, 625 F.2d 281. The real estate investment scheme at issue in Staff Mortgage strongly resembles the one here.[9]  Appellants in Staff Mortgage argued that recordation of the assignments should provide constructive possession of the trust deeds sufficient to perfect their security interests under California Commercial Code § 9304(1). Id. at 283. We held, however, that California law at that time was clear: "Perfection of a security interest in an instrument

[could] only occur with the actual possession of the instrument by the secured party or by an agent or bailee on his behalf." Id. We commented that " [h]ad the legislature intended to allow perfection by methods proposed by appellants, they could have done so. " Id. at 284.

Twelve years later, CIMBA acted on this suggestion and sponsored Senate Bill 1520 to change the possession requirement to protect private lenders from loss of their security should the servicing broker file for bankruptcy. In a statement to the California Legislature in support of the bill, CIMBA wrote:

In the case of [In] Re Staff Mortgage and Inv. Corp., 625 F [.]2d 281, the court in denying that recording could perfect, said "Had the legislature intended to allow perfection (that way) . . . they could have done so." This bill follows that suggestion.

S.B. 1520 (Johnston), Delivery of Trust Deeds, A Statement of Support on Behalf of California Independent Mortgage Brokers Association (Apr. 21, 1992).

By itself, CIMBA's statement oF. Supp. ort is unhelpful since we may not assume that its intention in sponsoring the bill was the same as the legislature's intention in passing the bill. See Delaney v. Superior Court, 50 Cal. 3d 785, 801 n. 12, 789 P.2d 934, 943 n. 12 (1990) (courts may not "consider the motives or understandings of an individual legislator even if he or she authored the statute"). However, the Senate Committee on Business and Professions acknowledged CIMBA's position in support of the bill:

The sponsor notes that there have been several recent situations of the bankruptcy of the servicing mortgage loan broker where the bankruptcy court has held that the lender's loan is unsecured, and the lender is an unsecured creditor of the broker, only because the current technical requirement of the Commercial Code for delivery of the note to the lender has not occurred. In these cases, the lender loses, although the position of the borrower and the bankrupt servicing mortgage loan broker is unchanged. This bill was introduced to provide an exception to the technical delivery requirement in specified broker servicing situations that are in accordance with provisions of the real estate licensing laws.

Committee Hearing at 2. While the Committee does not cite Staff Mortgage, its reference to "several recent situations" noted by " [t]he sponsor" strongly suggests that Senate Bill 1520 was intended, at least in part, to eliminate the technical requirement of possession in situations like those in Staff Mortgage.

As noted above, the facts here are nearly identical to those in Staff Mortgage (where the bankrupt party borrowed money secured by assignment of promissory notes and recorded trust deeds). It follows that the legislature intended that § 10233.2 should apply here.

In sum, the text of § 10233.2 and its legislative history lead us to conclude that § 10233.2 incorporates the broad definition of "sale" from § 10131.1. We therefore hold that § 10233.2 applies to the transactions between Defendants and FTD. Defendants have perfected secured interests in the collateral notes and trust deeds, which the Trustee may not avoid under the "strong-arm clause" of 11 U.S.C.§ 544.

We reject the Trustee's argument that, even if § 10233.2 applies, imposition of a constructive trust on the trust deeds under a policy of equitable distribution is warranted. "The extent of the Trustee's rights as a judicial lien creditor . . . is measured by the substantive law of the jurisdiction governing the property in question." 5 Collier on Bankruptcy ¶ 544.02, p. 544-5 (Lawrence P. King ed., 15th ed. rev. 2000). Nothing in California law supports imposing a

constructive trust under these circumstances. The Trustee cannot avoid valid, perfected security interests.

Neither of the two cases cited by the Trustee support his argument here. The Trustee relies on Elliott v. Bumb, 356 F.2d 749, 755 (9th Cir. 1966), for the proposition that " [i]f state law is contrary to federal bankruptcy law, the state law must yield." Yet the Trustee fails to show how the perfection rules of § 10233.2 are contrary to federal bankruptcy law.

The other case the Trustee cites, Hatoff v. Lemons & Assocs., Inc. (In re Lemons & Assocs., Inc.), 67 B.R. 198 (Bankr. D. Nev. 1986), is no more helpful. Lemons involved a situation similar to the instant case, in which the debtor defrauded its investors and commingled their funds. Id. at 210-212. Unlike FTD, the debtor sold mortgage notes to investors but never transferred legal title to them. See id. at 209-10. The investors made an equitable claim for these notes, but the court refused to impose a "constructive trust" because no investor could trace his or her investment to any specific note. Id. at 213. Here, it may be true that Defendants cannot trace their investments to show that the funds they lent to FTD were used to purchase or originate the collateral notes assigned to them. But, unlike in Lemons, Defendants have recorded, perfected security interests in identified collateral notes and trust deeds. Defendants are not asking for an equitable remedy. Rather, it is the Trustee who seeks to impose a constructive trust to avoid the secured interests. Lemons provides no support for such relief.

B. Appeal from Default Judgments (No. 99-55840)

Having concluded that § 10233.2 applies to the transactions between investors and FTD, we next address whether the bankruptcy court properly certified the default judgments against Defaulting Defendants as final under Federal Rule of Civil Procedure 54(b).

Rule 54(b) specifies that "when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the . . . parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." We review a certification of an interlocutory judgment under Rule 54(b) for abuse of discretion. Texaco, Inc. v. Ponsoldt, 939 F.2d 794, 797 (9th Cir. 1991).

We conclude that the bankruptcy court abused its discretion by certifying as final default judgments against Defaulting Defendants that were inconsistent with the bankruptcy court's earlier summary judgment ruling that the security interests of Answering Defendants were deemed perfected under § 10233.2.

The leading case on the subject of default judgments in actions involving multiple defendants is Frow v. De La Vega, 82 U.S. 552 (1872). The Court held in Frow that, where a complaint alleges that defendants are jointly liable and one of them defaults, judgment should not be entered against the defaulting defendant until the matter has been adjudicated with regard to all defendants.[10] Id. at 554. It follows that if an action against the answering defendants is decided in their favor, then the action should be dismissed against both answering and defaulting defendants. Id.

The Eleventh Circuit has extended the rule in Frow to apply to defendants who are similarly situated, even if not jointly and severally liable. See Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc., 740 F.2d 1499, 1512 (11th Cir. 1984); accord 10A Charles Alan Wright et al., Federal Practice and Procedure § 2690, (3d ed. 1998). The plaintiff in Gulf Coast was a distributor of ceiling fans that filed a lawsuit for breach of contract against both the U.S.-based

importer and the Hong Kong-based exporter with which it did business. 740 F.2d at 1505. The plaintiff had obtained a default judgment against the exporter but lost at trial against the importer, when the jury found that it was the plaintiff who had breached the contract. Id. at 1505-06. The court noted that, under Frow, the plaintiff would not have been able to obtain a default judgment against the exporter had it claimed that the importer and exporter were jointly liable. Id. at 1512. Although defendants were not jointly liable, the court vacated the default judgment against the exporter because " [i]t would be incongruous and unfair to allow [the plaintiff] to collect a half million dollars from [the defaulting defendant] on a contract that a jury found was breached by [the plaintiff]." Id.

It would likewise be incongruous and unfair to allow the Trustee to prevail against Defaulting Defendants on a legal theory rejected by the bankruptcy court with regard to the Answering Defendants in the same action. The bankruptcy court justified the conflicting outcomes on the basis that FTD and Defendants were involved in many individual transactions, not simply one transaction with many parties. Nevertheless, each transaction between FTD and Defendants followed an identical pattern with almost identical legal documents. The Trustee filed a single complaint against all 132 investors. More importantly, the central legal issue concerning each transaction was the same. A result in which the bankruptcy court finds § 10233.2 applies to certain Defendants and not to others is both incongruous and unfair. We therefore hold that the bankruptcy court violated the Frow principle and abused its discretion by entering final default judgments, pursuant to Fed. R. Civ. P. 54(b), that directly contradicted its earlier ruling in the same action.[11]

For the foregoing reasons,

In Case No. 99-55851 ("Chang Appeal"), we reverse the judgment of the district court and remand with instructions to affirm the bankruptcy court's grant of summary judgment for Answering Defendants.

In Case No. 99-55840 ("Appeal from Default Judgments"), we reverse the judgment of the district court and remand with instructions to reverse the bankruptcy court's entry of final default judgment against Defaulting Defendants and remand for proceedings consistent with this opinion.

REVERSED and REMANDED.

**1**
There are four consolidated appeals involving Debtors FTD and JDI. We address two of them, Nos. 99-55840 and 99-55851, in this opinion. We address the other two, Nos. 99-55828 and 99-56060, in an unpublished memorandum filed concurrently with this opinion.

**2**
Defendants' transactions were primarily with FTD. Because the parties do not draw any meaningful distinction between FTD and JDI, we refer only to FTD unless otherwise noted.

**3**
The parties agree that " [t]he loans from the Defendants [investors] were documented by a Secured Promissory Note, a Corporation Assignment of Trust Deed, [a] Security Agreement and Pledge of FTD, an Assignment of Note By and Between FTD and the Defendant [investor], a Loan Servicing Agreement, and an unrecorded UCC-1 Financing Statement." Neilson v. Chang (In re First T.D. & Inv., Inc.), 218 B.R. 92, 94 (Bankr. C.D. Cal. 1998) (findings of fact and conclusions of law in support of summary judgment in favor of Defendants) ("Chang").

**4**

According to Defendants, investors were permitted to select from a list of trust deeds on specific properties, after receiving a prospectus, often written in Mandarin, containing an appraisal of the real property, legal description, property address, photographs of the property, and term sheets describing the interest rate, maturity date, and loan-to-value ratio for the particular proposed loan.

**5**

Only 32 of the 88 Defaulting Defendants have appealed to this court. They include some investors who had answered the complaint and defended the action, but who believed that specific judgments would impact their own lien interests.

**6**

The original default judgments contained the same statement. Upon granting the Trustee's motion to certify, the bankruptcy court added the following: "There being no just reason for delay, this judgment entered in favor of the Trustee is hereby deemed a final judgment upon its entry by the Court."

**7**

Cal. Bus. & Prof. Code § 10233.2 states in full:

For the purposes of Division 3 (commencing with Section 3101) and Division 9 (commencing with Section 9101) of the Commercial Code, when a broker, acting within the meaning of subdivision (d) or (e) of Section 10131 or Section 10131.1, has arranged a loan or sold a promissory note or any interest therein, and thereafter undertakes to service the promissory note on behalf of the lender or purchaser in accordance with Section 10233, delivery, transfer, and perfection shall be deemed complete even if the broker retains possession of the note or collateral instruments and documents, provided that the deed of trust or an assignment of the deed of trust or collateral documents in favor of the lender or purchaser is recorded in the office of the county recorder in the county in which the security property is located, and the note is made payable to the lender or is endorsed or assigned to the purchaser.

**8**

The parties also dispute the meaning of the phrase "arranged a loan" in § 10233.2. Because we conclude that the phrase "sold a promissory note or any interest therein" includes the transactions between FTD and Defendants, we need not address the meaning of "arranged a loan."

**9**

The court described the facts in Staff Mortgage as follows:

As a part of its business activity, the bankrupt, Staff Mortgage & Investment Corporation (Staff), would borrow money and execute its note to evidence the loan. To secure its loan, Staff would pledge one or more promissory notes secured by trust deeds which it had in its inventory. The promissory notes and trust deeds were assigned to the lenders. To effectuate the assignments, documents entitled "Collateral Assignment of Note" and "Corporation Assignment of Deed of Trust" were attached to the respective instruments. The "Corporation Assignment of Deed of Trust" was then recorded in the county wherein the real property covered by trust deed was located. The documents, except Staff's note to evidence the loan, remained in the possession and control of Staff.

Appellants are persons who had loaned money to Staff under the above-described procedures. When Staff went into bankruptcy, appellants sought to have the promissory notes and trust deeds turned over to them. The trustee in bankruptcy refused . . . .

625 F.2d at 282.

**10**

Justice Bradley wrote (quoting from a lower court): "It would be unreasonable to hold, that because one defendant had made default, the plaintiff should have a decree even against him, where the court is satisfied from the proofs offered by the other, that in fact the plaintiff is not entitled to a decree." Id. at 554 (internal quotation marks and citation omitted).

**11**

On the record before us, we cannot address the Trustee's contention that recent developments render this appeal moot. The Trustee may pursue his mootness argument before the bankruptcy court on remand.

# California Business and Professions Code Section 10131.1

**10131.1.** (a) A real estate broker within the meaning of this part is also a person who engages as a principal in the business of making loans or buying from, selling to, or exchanging with the public, real property sales contracts or promissory notes secured directly or collaterally by liens on real property, or who makes agreements with the public for the collection of payments or for the performance of services in connection with real property sales contracts or promissory notes secured directly or collaterally by liens on real property.

(b) As used in this section:

(1) In the business means any of the following:

(A) The acquisition for resale to the public, and not as an investment, of eight or more real property sales contracts or promissory notes secured directly or collaterally by liens on real property during a calendar year.

(B) The sale to or exchange with the public of eight or more real property sales contracts or promissory notes secured directly or collaterally by liens on real property during a calendar year. However, no transaction negotiated through a real estate licensee shall be considered in determining whether a person is a real estate broker within the meaning of this section.

(C) The making of eight or more loans in a calendar year from the person s own funds to the public when those loans are held or resold and are secured directly or collaterally by a lien on residential real property consisting of a single dwelling unit in a condominium or cooperative or on any parcel containing only residential buildings if the total number of units on the parcel is four or less. However, no transaction negotiated through a real estate broker who meets the criteria of subdivision (a) or (b) of Section 10232 shall be considered in determining whether a person is a real estate broker within the meaning of this section.

(2) Sale, resale, and exchange include every disposition of any interest in a real property sales contract or promissory note secured directly or collaterally by a lien on real property, except the original issuance of a promissory note by a borrower or a real property sales contract by a vendor, either of which is to be secured directly by a lien on real property owned by the borrower or vendor.

(3) Own funds means either of the following:

(A) Cash, corporate capital, or warehouse credit lines at commercial banks, savings banks, savings and loan associations, industrial loan companies, or other sources that are liability items on the person s financial statements, whether secured or unsecured.

(B) Cash, corporate capital, or warehouse credit lines at commercial banks, savings banks, savings and loan associations, industrial loan companies, or other sources that are liability items on the financial statement of an affiliate of the person, whether secured or unsecured.

(4) Own funds does not include funds provided by a third party to fund a loan on condition that the third party will subsequently purchase or accept an assignment of the loan.

# 2011 California Code
# Business and Professions Code
# DIVISION 4. REAL ESTATE [10000 - 11506]
# ARTICLE 5. Transactions in Trust Deeds and Real Property Sales Contracts
# Section 10233.2

**Universal Citation:** CA Bus & Prof Code § 10233.2 (through 2012 Leg Sess)

For the purposes of Division 3 (commencing with Section 3101) and Division 9 (commencing with Section 9101) of the Commercial Code, when a broker, acting within the meaning of subdivision (d) or (e) of Section 10131 or Section 10131.1, has arranged a loan or sold a promissory note or any interest therein, and thereafter undertakes to service the promissory note on behalf of the lender or purchaser in accordance with Section 10233, delivery, transfer, and perfection shall be deemed complete even if the broker retains possession of the note or collateral instruments and documents, provided that the deed of trust or an assignment of the deed of trust or collateral documents in favor of the lender or purchaser is recorded in the office of the county recorder in the county in which the security property is located, and the note is made payable to the lender or is endorsed or assigned to the purchaser.

**EXHIBIT C**

Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%



## PROMISSORY NOTE

March 17, 2017
Sherman Oaks, California

$300,000.00

**FOR VALUE RECEIVED**, the undersigned, **WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**, a Delaware limited liability company having an office and a mailing address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423 (hereinafter referred to as the "Borrower") does hereby promise to pay to the order of **THE JOHN J & BETTY L DUNNE FAMILY TRUST**, an entity having an address of 150 Cortona Way, Apartment 216, Brentwood, California 94513 (hereinafter referred to as "Lender"), at such place as the Lender may designate by written notice to Borrower, the principal sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00), together with interest on all unpaid balances beginning as of the date hereof, at the fixed rate per annum as set forth in Section 1 hereof.

1. **Interest Rate.** The unpaid balance of the principal sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00) shall bear interest from the date hereof through May 1, 2018, at a fixed rate of interest equal to five and 00/100 percent (5.00%) per annum. After May 1, 2018, the unpaid balance of this Note shall bear interest at a fixed rate equal to nine and 00/100 percent (9.00%) per annum. The rate of interest charged hereunder shall never exceed the maximum amount, if any, allowable by law. Interest shall be charged on the principal balance from time to time outstanding on the basis of the actual number of days elapsed computed on the basis of a 360 day year.

2. **Default Interest Rate.** During the continuance of any Event of Default (as more particularly defined in Paragraph 6 below) under this Note by acceleration or otherwise, interest shall accrue from and after such Event of Default at four (4) percentage points above the interest rate then in effect hereunder (the "Default Interest Rate").

3. **Repayment.** Borrower promises to pay the interest and principal on this Note, as set forth below:

> Monthly payments of interest shall be made commencing on April 1, 2017 and continuing on the same day of each and every month to occur thereafter, both before and after maturity by acceleration or otherwise.

> The entire principal balance plus accrued and unpaid interest thereon, and all other sums and charges due to the Lender hereunder, unless sooner sooner paid, shall be due and payable on May 1, 2018 (the "Maturity Date"). Upon and after the eighth (8th) day following Borrower's receipt of written notice from Lender of Borrower's failure to pay the entire principal balance plus accrued and unpaid interest on the Maturity Date as required, any outstanding amounts due under this Note shall bear interest at a fixed rate of twenty-four and 00/100 percent (24.00%) per annum.

4. **Application of Payments.** All payments pursuant to this Note shall be made in legal tender of the United States of America and shall be applied first to the payment of delinquency or late charges, if any; second, to the payment of accrued and unpaid interest on this Note; and third, the balance on account of the principal of this Note.

5. **Cure Period and Notice of Default.** Failure of Borrower to pay by its due date any installment of the principal or of interest within thirty (30) days from the date the same becomes due and payable, shall constitute a "Payment Default" under this Note. Borrower shall have a cure period of not less

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

than thirty (30) days after receipt of written notice ("Notice of Default") of any alleged breach or Payment Default under the terms of this Note to cure the same.

6.  **Event of Default.** Any alleged breach or Payment Default under this Note that is not fully cured following the expiration of the applicable cure period specified in a given Notice of Default shall constitute an event of default ("Event of Default") under this Note.

7.  **Waiver of Rights.**

   a.  BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY COURT AND IN ANY SUIT ACTION OR PROCEEDING OR ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE FINANCING TRANSACTIONS OF WHICH THIS NOTE OR THE COLLATERAL ASSIGNMENT DOCUMENTS (AS DEFINED BELOW) ARE A PART AND/OR THE ENFORCEMENT OF ANY OF LENDER'S RIGHTS AND REMEDIES. BORROWER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, VOLUNTARILY AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER.

   b.  Borrower hereby waives diligence, demand, presentment for payment, protest and notice of protest, and notice of any renewals or extensions of this Note, and agrees that the time for payment of this Note may be changed and extended at Lender's sole discretion, without impairing its liability thereon, and further consents to the release of any party liable for this obligation, or the release of all or any part of the collateral given as security for the payment of this Note, without affecting its liability with respect hereto.

8.  **Lender's Rights.** Lender's rights hereunder shall be cumulative and not exclusive and may be exercised at the sole discretion of Lender with respect to priority, order and type of collateral or security realized upon or applied toward the indebtedness evidenced hereby until this Note and all accrued and unpaid interest and other sums and charges due hereunder shall have been paid in full. Further, no failure on the part of Lender to exercise any right or remedy hereunder, whether before or after the occurrence of an Event of Default hereunder, shall constitute a waiver thereof, and no waiver of any past default shall constitute waiver of any future default or of any other default.

9.  **Prepayment.** The Borrower shall have the right to prepay this Note in whole or in part at any time without penalty.

10. **Binding Effect.** This Note shall bind the successors and assigns of Borrower and shall inure to the benefit of the Lender, its successors and assigns.

11. **Captions and Section Headings.** The captions and section headings used in this Note are for convenience only and shall not be used to interpret, modify or affect in any way the covenants and agreements herein contained.

12. **Severability.** In the event that any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part, or in any respect, or in the event that any one or more of the provisions of this Note shall operate or would prospectively operate, to invalidate this Note, then the remaining provisions of this Note shall remain operative and in full force and effect, shall be valid, legal and enforceable and shall in no way be affected, prejudiced or disturbed thereby.

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

13. **Governing Law.** This Note shall be governed by and construed in accordance with the laws of the State of Delaware.

14. **No Assignment.** Neither this Note, the Loan Agreement of even date herewith between Borrower and Lender, nor all other instruments executed or to be executed in connection therewith (collectively, the "Collateral Assignment Documents") are assignable by Lender without the Borrower's written consent and any such attempted assignment without such consent shall be null and void.

15. **Commercial Transaction.** Lender and Borrower each acknowledge and stipulate that the Loan is a commercial transaction.

16. **Security.** This Note will be secured inter alia by the Collateral Assignment Documents upon execution thereof.


WOODBRIDGE MORTGAGE
INVESTMENT FUND 3, LLC

By: _____
Robert Reed
Its Authorized Representative


Accepted and Agreed to by Lender:

THE JOHN J & BETTY L DUNNE
FAMILY TRUST

By: _Betty L Dunne_
Name: BETTY L DUNNE
Title: TRUSTEE

3

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") made on this March 17, 2017, by and between **THE JOHN J & BETTY L DUNNE FAMILY TRUST**, an entity having an address of 150 Cortona Way, Apartment 216, Brentwood, California 94513 (hereinafter referred to as the "Lender") and **WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**, a Delaware limited liability company, having an office at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423 ("Woodbridge").

### WITNESSETH:

**WHEREAS,** Lender wishes to make a loan (the "Loan") to Woodbridge to fund, in part, a loan to a third-party borrower, as more fully defined below (the "Pledged Loan"); and

**WHEREAS,** Lender advanced to Woodbridge a portion of the funds that, with other funds from Woodbridge, will be used to make the Pledged Loan; and

**WHEREAS,** Lender acknowledges that Woodbridge has executed or intends to execute other notes and loan agreements to fund the Pledged Loan on a pari passu basis with other lenders; and

**WHEREAS,** Woodbridge and Lender have agreed to the foregoing transaction on the terms and conditions and in reliance upon the representations and warranties of Woodbridge and Lender hereinafter set forth:

**NOW, THEREFORE,** in consideration of the foregoing and in further consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1. Lender has agreed to lend Woodbridge the sum of Three Hundred Thousand and 00/100 Dollars ($300,000.00). The foregoing obligation shall be evidenced by Woodbridge's promissory note to Lender, in the original principal amount of Three Hundred Thousand and 00/100 Dollars ($300,000.00), in the form of Exhibit A hereto and made a part hereof (as the same may be amended or modified from time to time, the "Note"), with appropriate insertion of dates.

The Note shall bear interest at a rate equal to five and 00/100 percent (5.00%) per annum, subject to such default rates as may be set forth in the Note; provided, however, that the rate of interest charged thereunder shall never exceed the maximum amount, if any, allowable by law. Interest shall be payable as provided in the Note and shall be charged on the daily outstanding principal balance on the basis of the actual days elapsed and on a three hundred sixty (360) day year.

Interest shall be payable as provided in the Note. The entire outstanding principal balance of the Note shall be due and payable in full on May 1, 2018 unless sooner prepaid. Woodbridge may prepay the Note without penalty at any time.

2. **Security Interest.** Woodbridge hereby grants to the Lender a security interest in all of the Woodbridge's present and future right, title and interest in and to any and all of the following (the "Collateral"):

    **(a)** That certain loan in the principal amount of Four Million Four Hundred Ten Thousand and 00/100 Dollars ($4,410,000.00) (the "Pledged Loan") extended or to be extended to Arlington Ridge Investments, LLC (the "Borrower") secured by a first priority lien on the real property located at 1357 Laurel Way, Beverly Hills, California 90210 (the "Premises");

    **(b)** The promissory note evidencing the Pledged Loan (the "Underlying Note");

    **(c)** The mortgage or deed of trust securing the Pledged Loan with an interest in the Premises (the

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

"Underlying Mortgage"); and

**(d)** Title insurance policies and such other instruments or documentation as may be executed and delivered to Woodbridge in conjunction with the Pledged Loan (said Underlying Note, Underlying Mortgage and other associated loan documents collectively hereafter referred to as the "Loan Documents").

**(e)** Upon the consummation of the Pledged Loan, Woodbridge will execute and deliver to Lender collateral assignment documents substantially in the form attached hereto as Exhibits B and C.

**(f)** Lender acknowledges that they are only providing the financing for a portion of the Pledged Loan and, therefore, Woodbridge retains the right to execute other notes, loan agreements, assignments, and collateral assignments in favor of other lenders as may be necessary to fund the Pledged Loan secured by the Collateral on a pari passu basis with such other lenders. Lender further agrees that it, and any such other lenders, shall execute an Intercreditor Agreement substantially in the form attached hereto as Exhibit D in order to confirm that their interests in the Collateral are of equal priority.

## 3. Representations and Warranties.

**(a)** Woodbridge represents and warrants to Lender that Woodbridge has or will have good and marketable title to the Pledged Loan and the Collateral free from any adverse liens, security interests or encumbrances on record as of the date of the Pledged Loan.

**(b)** The execution and delivery of the Note, this Agreement, and every other agreement, instrument or document executed and delivered to Lender by Woodbridge pursuant to the terms hereof, are valid, legal and binding upon it and enforceable in accordance with their respective terms.

**(c)** All information furnished or to be furnished by Woodbridge pursuant to the terms hereof will not, at the time the same is furnished, contain any untrue statement of a material fact and will not omit to state a material fact necessary to make the information so furnished, in the light of the circumstances under which such information is furnished, not misleading.

**(d)** Lender represents and warrants to Woodbridge that: (i) the Loan Documents and the Pledged Loan they evidence constitute a commercial loan transaction and are not for investment purposes; and (ii) Lender has reviewed the Loan Documents and the associated other information on the Borrower of the Pledged Loan, and has had the opportunity to review said documents and information with its own legal counsel, and has had sufficient access to all of said documents and information to allow it to make its own credit decision with respect to the Pledged Loan, and has, in fact, made its own credit decision in making the Loan.

## 4. General Provisions.

**(a)** This Agreement is an integrated document and all terms and provisions are embodied herein and shall not be varied by parol;

**(b)** This Agreement is made, executed and delivered in the State of Delaware and it is the specific desire and intention of the parties that it shall in all respects be construed under the laws of the State of Delaware;

**(c)** The captions for the paragraphs contained in this Agreement have been inserted for convenience only and form no part of this Agreement and shall not be deemed to affect the meaning or construction of any of the covenants, agreements, conditions or terms hereof;

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

(d) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Lender shall not assign, voluntarily, by operation of law or otherwise, any of its rights hereunder without the prior written consent of Woodbridge and any such attempted assignment without such consent shall be null and void;

(e) No delay or failure of Lender in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise preclude any further exercise thereof or the exercise of any other rights, powers or privileges; and

(f) This Agreement, the security interest hereby granted to Lender by Woodbridge and every representation, warranty, covenant, promise and other then herein contained shall survive until the Note has been paid in full.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK, SIGNATURE PAGE TO FOLLOW]**

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands and seals, the day and year first above written.

Signed, Sealed, and Delivered
in the Presence of:


_____
(Witness)

_____
(Witness)


**THE JOHN J & BETTY L DUNNE FAMILY TRUST**

By: _____
Name: BETTY DUNNE
Title: TRUSTEE


_____


**WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**

By: _____
Robert Reed
Its Authorized Representative

4

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

## EXHIBIT LIST

EXHIBIT A        Note from Woodbridge to Lender

EXHIBIT B        Form of Assignment

EXHIBIT C        Form of Collateral Assignment

EXHIBIT D        Form of Intercreditor Agreement

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

## EXHIBIT A

## Note from Woodbridge to Lender

Property ID : Laurel Way Two – Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%

## EXHIBIT B

## Form of Assignment

### ASSIGNMENT OF PROMISSORY NOTE AND MORTGAGE

THIS ASSIGNMENT OF PROMISSORY NOTE AND MORTGAGE (this "**Assignment**") made as of the ___ day of _____, 20__, by **WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**, a Delaware limited liability company with an office and a mailing address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423 (the "**Assignor**"), in favor of _____, having an address of _____ (the "**Assignee**").

**WHEREAS**, Assignee has extended a term loan (the "Loan") in the original principal amount of *300* Hundred Thousand and 00/100 Dollars ($*300*.000.00) to Assignor (the obligations of Assignor in respect of the Promissory Note evidencing said Loan being hereinafter referred to as the "**Obligations**"); and

**WHEREAS**, it is a condition of Assignee's agreement to extend such Loan that Assignor assign to Assignee its interest in certain documents hereinafter described, and the indebtedness related thereto, as security for the Obligations;

**NOW, THEREFORE**, as security for the Obligations, and as an inducement to Assignee to extend the Loan and in consideration therefor, and in consideration of Ten Dollars ($10.00) to Assignor paid, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby grants, bargains, sells, assigns, conveys, transfers and sets over unto Assignee a security interest in and lien upon, all of Assignor's right, title and interest in, to and under: (a) a certain Mortgage from _____, dated ____, 20__, in favor of Assignor (the "**Assigned Mortgage**"), encumbering certain real and personal property described therein, (b) a certain Promissory Note in the principal amount of ____ Hundred Thousand and 00/100 Dollars ($*300*,000.00), dated _____, 20__, made by _____ and payable to the order of Assignor (the "**Assigned Note**"), and all proceeds thereof and all other documents securing or guarantying the same (the Assigned Mortgage, the Assigned Note, and all other documents or instruments securing or guarantying the same being hereinafter referred to collectively as the "**Assigned Documents**").

Assignor further covenants and agrees as follows:

1.   The occurrence of an "Event of Default" under the Promissory Note evidencing the Loan, or under the Collateral Assignment dated of even date herewith, beyond the applicable notice and cure period shall constitute an "**Event of Default**" under this Assignment. So long as no Event of Default shall have occurred, Assignor shall be entitled to collect all payments of interest and all scheduled payments of principal (collectively, "**Scheduled Payments**") on the Assigned Documents.

2.   In the event of any payment (other than Scheduled Payments or pre-payments) under the Assigned Note, the obligor under the Assigned Documents ("**Borrower**") is hereby irrevocably authorized and directed to make such payment directly to Assignee or to such person as Assignee shall otherwise direct. Assignor shall immediately pay over to Assignee any such payment received directly from Borrower.

3.   Upon written notice from Assignee that an Event of Default exists, Borrower shall thereafter make, and is hereby irrevocably authorized and directed to make, all payments under the Assigned Documents directly to Assignee or to such person as Assignee shall otherwise direct, to be applied against the Obligations until such Obligations are satisfied. Upon satisfaction of such Obligations, all remaining payments under the Assigned Documents, if any, shall resume to be made and directed to Assignor.

4.   Upon the occurrence of an Event of Default, Assignor will not grant any waivers, indulgences, modifications, extensions or other departures by Borrower from or of the obligations required to be performed by Borrower under the Assigned Documents and any security or other agreement executed in connection therewith, without the prior written consent of Assignee. At Assignee's request, Assignor shall also provide to Assignee such other information regarding the Borrower or the Premises secured by the Assigned Mortgage as Assignor may have in its possession.

7

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal  : $300,000.00
Int. Rate  : 5.00%
```

5.   This Assignment is executed only as security for the Obligations. The execution and delivery of this Assignment shall not subject Assignee to, or transfer or pass to Assignee, or in any way affect or modify, the liability of Assignor under any or all of the Assigned Documents.

6.   In the exercise of its powers hereunder or under any documents relating to the Obligations, no liability shall be asserted or enforced against Assignee, all such liability being hereby expressly waived and released by Assignor. Assignor hereby agrees to indemnify Assignee, and hold it harmless, from any and all liabilities, losses, or damages which Assignee shall incur by reason of this Assignment or the Assigned Documents and from any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or, undertakings required to be performed by Assignor in connection with the Assigned Documents.

7.   Assignor hereby agrees and acknowledges that neither the acceptance of this Assignment by Assignee nor the exercise of, or failure to exercise, any right, power or remedy in this instrument conferred upon Assignee shall be deemed or construed to obligate Assignee, or its successors or assigns, to pay any sum of money, take any action or incur any liability in connection with any of the Assigned Documents. It is further agreed and understood by Assignor that neither Assignee nor its successors or assigns shall be liable in any way for any costs, expenses or liabilities connected with, or any charges or liabilities resulting from, any of the Assigned Documents.

8.   This Assignment shall be binding upon Assignor and its successors and assigns, and shall inure to the benefit of Assignee and its successors and assigns. Notwithstanding anything contained herein, however, neither the Note nor the other Loan Documents are assignable by Assignee without the Assignor's written consent, and any such attempted assignment without such consent shall be null and void. This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Delaware.

9.   (a)  Any notice, report, demand, request or other instrument or communication authorized or required under this Assignment to be given to Assignor, Assignee or Borrower shall be deemed given if addressed to the party intended to receive the same, at the address of such party set forth below, (i) when delivered at such address by hand or by overnight delivery service, or (ii) three (3) days after the same is deposited in the United States mail as first class certified mail, return receipt requested, postage paid, whether or not the same is actually received by such party:

Assignor:            Woodbridge Mortgage Investment Fund 3, LLC
                     14225 Ventura Boulevard
                     Suite 100
                     Sherman Oaks, California 91423

Assignee:            _____
                     _____
                     _____

(b)  Any party may change the address to which any such notice, report, demand, request or other instrument or communication to such party is to be delivered or mailed, by giving written notice of such change to the other parties, but no such notice of change shall be effective unless and until received by such other parties.

10.  Upon full payment and performance of the Obligations, this Assignment shall terminate and shall be of no further force and effect. Upon such termination, Assignee shall indorse the Assigned Note to the order of Assignor (or otherwise as Assignor may direct), without recourse, warranty or representation, and Assignee shall deliver the Assigned Note to Assignor.

11.  Notwithstanding anything to the contrary set forth in this Assignment, unless and until Assignee shall have exercised its rights under paragraph 3 above, Assignor shall be entitled to foreclose the Assigned Mortgage.  The proceeds of such foreclosure shall be applied to payment of the Obligations before being used for any other purpose.

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

**IN WITNESS WHEREOF**, the Assignor has executed this Assignment as of the date first written above.

Assignor:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3, LLC**

By: _____
    Robert Reed
    Its Authorized Representative

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

## EXHIBIT C

## Form of Collateral Assignment

### COLLATERAL ASSIGNMENT OF NOTE, MORTGAGE, AND OTHER LOAN DOCUMENTS

THIS COLLATERAL ASSIGNMENT OF NOTE, MORTGAGE, AND OTHER LOAN DOCUMENTS (this "Assignment"), dated as of this _____ day of _____ 20__, is made and given by **WOODBRIDGE MORTGAGE INVESTMENT FUND 3, LLC**, a Delaware limited liability company ("Borrower"), having an address at 14225 Ventura Boulevard, Suite 100, Sherman Oaks, California 91423, and in favor of _____, having an address of _____, his or her successors and assigns ("Lender").

### Background:

Lender has agreed to make, and Borrower has agreed to accept, a loan in the original maximum principal amount of **300** Hundred Thousand and 00/100 Dollars ($ **300** ,000.00) (the "Loan") upon the terms and conditions set forth in that certain Promissory Note, dated _____, in the original principal amount of _____ Hundred Thousand and 00/100 Dollars ($**300** ,000.00) made by Borrower and payable to Lender (as the same may be amended or modified from time to time, the "Note").

Lender understands that Borrower shall utilize the proceeds of the Loan to fund a loan to a third party borrower, such loan to be made pursuant to the "Underlying Documents" more particularly described in Section 2.1.1 below. As a condition to making the Loan, Lender has required Borrower to assign to Lender, as additional security for the Loan, all of Borrower's right, title and interest in and to the promissory notes, security instruments and other loan documents conveyed including without limiting the generality of the foregoing, all rights to receive payments under such collateral.

### Statement of Agreement

**NOW, THEREFORE,** for valuable consideration, separate and distinct from the consideration given by Lender with respect to the Loan, the receipt and adequacy of which are hereby acknowledged, Borrower agrees as follows:

1. **Recitals.** The Recitals are incorporated herein by this reference.

2. **Assignment.** As security for the performance of all obligations of Borrower to Lender under the Note, the Assignment of Promissory Note and Mortgage, and all other documents now or hereafter evidencing, securing or related to the Loan (collectively, the "Loan Documents"), Borrower hereby assigns and transfers to Lender, on a non-exclusive basis, all of its right, title and interest in and to the following collateral (the "Collateral"):

    2.1.1. All right, title, interest, claims or rights of Borrower now or hereafter in and to the notes, deeds to secure debt, security instruments, guaranties and other loan documents (collectively, the "Underlying Documents") described on **Exhibit "A"** attached hereto and incorporated herein by this reference; and

    2.1.2. Any and all proceeds of a casualty or condemnation, repayment of loans, proceeds of foreclosure sales, and payments of any kind or nature whatsoever, now or hereafter distributable or payable to Borrower by reason of Borrower's ownership of the Underlying Documents; and

    2.1.3. All accounts, contract rights, security entitlements, investment property and general intangibles now or hereafter evidencing, arising from or relating to any of the foregoing; and

    2.1.4. All right of Borrower to collect and enforce payments pursuant to the terms of the Underlying Documents; and

    2.1.5. All documents, writings, leases, books, files, records, computer tapes, programs, ledger books and ledger pages arising from or used in connection with any of the foregoing; and

    2.1.6. All renewals, extensions, additions, substitutions or replacements of any of the foregoing; and

    2.1.7. All powers, options, rights, privileges and immunities pertaining to any of the foregoing; and

Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%

2.1.8. All proceeds of any of the foregoing and all cash, security or other property distributed on account of any of the foregoing.

3.  **Representations and Warranties.** Borrower hereby represents and warrants that: (a) Borrower is or will be the true owner of the interests under the Underlying Documents; (b) Borrower has not assigned or granted a security interest in the Collateral to any person or entity that is or will be superior to that of the Lender; and (c) to Borrower's knowledge, (i) Borrower's interest in the Collateral is not and will not be subject to any claims, setoffs, encumbrances or deductions, and (ii) the Loan Documents constitute and will constitute valid and binding obligations of Borrower.

4.  **No Assumption by Lender and Covenants of Borrower.** Neither this Assignment nor any action or actions on the part of Lender after the date hereof shall constitute an assumption by Lender of any obligations under the Underlying Documents, and Borrower shall continue to be liable for all obligations thereunder arising after the date hereof. Borrower agrees to perform punctually any and all obligations it may have under the Underlying Documents, to take such steps as it may deem necessary or appropriate to secure performance by the obligor(s) and guarantor(s) of the Underlying Documents thereon of all of its obligations under the applicable Underlying Documents.

5.  **Benefits Conditionally Retained by Borrower.** Lender hereby grants Borrower the right to continue to receive the benefits of, and exercise the rights under, the Underlying Documents unless an Event of Default (as described in Section 14 below) exists, in which event such rights may be revoked at any time thereafter at the option of Lender.

6.  **Action by Lender Following Event of Default.** Lender shall have the right, but not an obligation, at any time while an Event of Default exists, without notice and without taking possession of the Property or any part thereof, to take in Lender's name or in the name of Borrower such action as Lender may, at any time or from time to time, reasonably determine to be necessary to cure any default under the Underlying Documents or to protect or exercise the rights of Borrower or Lender thereunder, and may otherwise exercise any other rights or remedies Lender has under the Loan Documents. Lender shall incur no liability if any action taken by it or on its behalf pursuant to this Assignment shall prove to be in whole or in part inadequate or invalid; and Borrower hereby agrees to indemnify, defend, and hold Lender free and harmless from and against any loss, costs, liability or reasonable expense (including, without limitation, reasonable attorneys' and accountants' fees and expenses, court costs and investigation expenses) actually incurred by Lender in connection with its actions under this Section 6.

7.  **Power of Attorney.** Borrower hereby irrevocably constitutes and appoints Lender as its true and lawful agent and attorney-in-fact, with full power of substitution, to demand, receive and enforce all rights of Borrower under the Underlying Documents, following the occurrence and during the continuance of an Event of Default, to modify, supplement and terminate the Underlying Documents, to transfer the Underlying Documents to Lender, to give appropriate releases, receipts for or on behalf of Borrower in connection with the Underlying Documents, to file, pursue, receive payment and acquittances for or otherwise compromise each and every claim Borrower has or may have against the obligor(s) and guarantor(s) of the Underlying Documents for payment or otherwise under the Underlying Documents, all in the name, place and stead of Borrower or in Lender's name, with the same force and effect as Borrower could have if this Assignment had not been made. Borrower authorizes any third party to rely exclusively on the certificate of an officer of Lender or its successor for the establishment of an Event of Default and hereby waives and releases any claim Borrower may have against such third party for such reliance. Borrower hereby agrees to deliver to Lender, upon Lender's written demand and after the occurrence and during the continuance of an Event of Default, all instruments and documents as Lender may reasonably require in order to permit Lender's succession to the right, title and interest of Borrower in and to the Underlying Documents as provided herein. Borrower appoints Lender as its attorney-in-fact to execute any and all such documents on Borrower's behalf upon any failure of Borrower to so execute such documents, it is hereby recognized that the power of attorney herein granted is coupled with an interest and is irrevocable. At Lender's option, Lender may record this Assignment in the recording office. By acceptance of this Assignment, Lender agrees that it shall not exercise the power of attorney granted herein unless there shall have occurred and be continuing an Event of Default.

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

**8.  Binding Effect.** This Assignment shall be binding upon Borrower and its successors and assigns, and shall inure to the benefit of Lender and its successors and assigns, including without limitation any purchaser upon foreclosure of the lien and security interests created by the Underlying Documents or under a deed in lieu of such foreclosure and any receiver in possession of the Property.

**9.  No Release or Termination.** The taking of this Assignment by Lender shall not affect the release of any other collateral now or hereafter held by Lender as security for the obligations of Borrower under the Loan Documents, nor shall the taking of additional security for any such obligations hereafter effect a release or termination of this Assignment, or any terms or provisions hereof.

**10. No Waiver.** No failure or delay on the part of Lender in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies hereunder are cumulative and may be exercised by Lender either independently of or concurrently with any other right, remedy or power contained herein or in any instrument executed in connection with the Loan Documents.

**11. Captions.** The section titles or captions contained in this Assignment are for convenience only and shall not be deemed to define, limit or otherwise modify the scope or intent of this Assignment.

**12. Variation in Pronouns.** All the terms and words used in this Assignment, regardless of the number and gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, as the context or sense of this Assignment or any paragraph or clause herein may require, the same as if such word had been fully and properly written in the correct number and gender.

**13. Notices.** Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be given in the manner required by the Loan Documents.

**14. Event of Default.** The occurrence of an Event of Default under the Note or any of the other Loan Documents beyond the applicable notice and cure period shall constitute an "Event of Default" under this Assignment.

**15. Successors and Assigns.** This Assignment shall be binding upon Borrower and its successors and assigns and shall insure to the benefit of the Lender and Lender's successors; provided, however, and notwithstanding anything contained herein, neither the Note nor the Loan Documents are assignable by Lender, in whole or in part, and any such attempted assignment shall be null and void.

**16. Governing Law.** The parties hereby acknowledge, consent and agree this Assignment and the rights of all parties mentioned herein shall be governed by the laws of the State of Delaware.

*[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS]*

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

**IN WITNESS WHEREOF**, the Borrower, acting by its duly authorized officer, has signed, sealed and delivered this Assignment on the date above written.

BORROWER:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3, LLC**

By:_____

    Robert Reed
    Its Authorized Representative

STATE OF CONNECTICUT    )
                      )   ss.
COUNTY OF TOLLAND      )

On this ___ of _____, 20__, before me, the undersigned notary public, personally appeared Robert Reed, Authorized Representative of Woodbridge Mortgage Investment Fund 3, LLC, a Delaware limited liability company, to me known and known by me to be the party executing the foregoing Collateral Assignment of Note, Mortgage and Other Loan Documents instrument on behalf of said limited liability company, in favor of _____, and acknowledged said instrument and the execution thereof, to be his free act and deed as such officer and the free act and deed of said limited liability company.

Notary Public _____
Printed Name:_____
My commission expires _____
(Notary Seal)

EXHIBIT A TO COLLATERAL ASSIGNMENT

1. That certain Mortgage from _____, dated _____, in favor of Woodbridge Mortgage Investment Fund 3, LLC, encumbering certain real and personal property described therein.

2. That certain Promissory Note in the original principal amount of _____ Hundred Thousand and 00/100 Dollars ($___,000.00), dated _____, 20__, made by _____ and payable to the order of Woodbridge Mortgage Investment Fund 3, LLC.

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

## EXHIBIT D

## Form of Intercreditor Agreement

### INTERCREDITOR AGREEMENT (PARI PASSU)

THIS INTERCREDITOR AGREEMENT ("Agreement") is entered into by and between _____, having an address at _____ ("First Party") and _____, having an address at _____ ("Second Party") (First Party and Second Party are sometimes herein referred to collectively as the "Lenders" and individually as a "Lender"), as of the date written below.

W I T N E S S E T H

**WHEREAS,** the Lenders have agreed collectively to lend $_____ to Woodbridge Mortgage Investment Fund 3, LLC, a Delaware limited liability company ("Woodbridge"), and

**WHEREAS,** in return for the loans by the Lenders, Woodbridge will execute and deliver to each of them promissory notes each in the original principal amount of $_____ (the "Notes"), and

**WHEREAS,** Woodbridge intends to use the funds (the "Loans") provided by Lenders to finance a mortgage loan in the principal amount of $_____ to _____, to be evidenced by a promissory note and secured by a mortgage on property located at _____ (the "Underlying Note" and the "Mortgage" respectively), and

**WHEREAS,** upon closing of the Loans, Woodbridge will deliver to each of the Lenders a collateral assignment of the Underlying Note and Mortgage as security for the Notes (the "Collateral Assignments"); and

**WHEREAS,** the Lenders wish that each of them shall be treated equally with reference to the payment under the respective Notes and/or enforcement of the Collateral Assignments; and

**WHEREAS,** this Agreement shall be effective and bind the parties hereto.

**NOW THEREFORE,** the parties hereto agree as follows:

1.  The above recitals are hereby made a part of this Agreement.

2.  Unless explicitly agreed to the contrary in writing, the Lenders shall have equal rights of enforcement, priorities, duties, and obligations under the Notes, and the Collateral Assignments and any other documentation executed and delivered in connection therewith (the "Loan Documents").

3.  In the event of a default under any of the Notes, the Collateral Assignments or other Loan Documents, all of the Notes shall be in default, and shall be due and payable at the option of the Lenders acting in concert.

4.  If any of the Lender(s) desire to exercise any rights it may have under the Loan Documents, it shall notify the other Lender(s) as soon as practicable.

5.  All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by fax (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by nationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and fax numbers as set forth below (or to such other addresses and fax numbers as a party may designate by notice to the other parties):

> LENDERS:
>
> First Party
>
> and
>
> Second Party

6.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this

```
Property ID : Laurel Way Two - Beverly Hills, CA
Principal   : $300,000.00
Int. Rate   : 5.00%
```

Agreement may be brought against any of the parties in the courts of the State of Delaware, or, if it has or can acquire jurisdiction, in the United States District Court for the District of Delaware, and each of the parties consents to the jurisdiction of such courts (and of the appropriate Appellate Courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

7.   This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the Agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

8.   If any provision of this Agreement is held invalid or unenforceable by any court or competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

9.   This Agreement will be governed by the laws of the State of Delaware without regard to conflicts of interest principles.

10.  This Agreement may be executed in any number of counterparts, each of which taken together shall constitute a single agreement.

     **IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Agreement as of the _____ day of _____, 20___.

LENDER(S):

_____

FIRST PARTY

_____

SECOND PARTY

Acknowledged and Agreed to by:

**WOODBRIDGE MORTGAGE
INVESTMENT FUND 3, LLC**

By: _____
    Robert Reed
    Its Authorized Representative