# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, et al.,[1] | Case No. 17-12560 (KJC) |
| Debtors. | (Jointly Administered) D.I. 1563 |

## OPINION[2]

**BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Debtors' Objection to Contrarian Funds, LLC's ("Contrarian") Proof of Claim No. 1216 (the "Claim Objection"). At issue is: (I) whether an anti-assignment clause contained in a promissory note is a valid restriction on assignment rights under Delaware law;[3] (II) whether a non-breaching party to a promissory note in payment default is still bound by an anti-assignment clause while also seeking to enforce the note in bankruptcy through a proof of claim; and (III) whether the Uniform Commercial Code ("UCC") overrides and nullifies an anti-assignment clause in a promissory note. For the following reasons, the Court finds that the anti-assignment clause in the promissory notes in question is enforceable under Delaware law, the tenets of contract law, and the UCC. Accordingly, the Debtors' Claim Objection will be sustained.

---

[1] Due to the large number of debtors in these cases, which are jointly administered for procedural purposes, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, by contacting counsel for the Debtors, or through the Court docket.

[2] This Opinion constitutes findings of fact and conclusions of law required by Fed. R. Bankr. P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

[3] Delaware law governs the Promissory Notes.

## BACKGROUND[4]

On December 4, 2017, hundreds of the Debtors filed for bankruptcy under chapter 11, with additional affiliated Debtors filing in the following months. The Debtors continue as debtors in possession and, collectively, the chapter 11 cases are being jointly administered. The Official Committee of Unsecured Creditors was appointed on December 14, 2017.[5] Shortly thereafter, the Court approved a settlement providing for the formation of an Ad Hoc Noteholder Group and an Ad Hoc Unitholder Group.[6] Together, the two ad hoc committees represent nearly 9,000 investors.

Prior to the bankruptcy, in 2016 and 2017, Debtor Woodbridge Mortgage Investment Fund 3A, LLC (the "Fund") issued three promissory notes to Elissa and Joseph Berlinger in the principal amount of $25,000 each (the "Promissory Notes"). The Promissory Notes contain the following Anti-Assignment Clause:

> 14. <u>No Assignment</u>. Neither this Note, the Loan Agreement of even date herewith between Borrower and Lender, nor all other instruments executed or to be executed in connection therewith (collectively, the "Collateral Assignment Documents") are assignable by Lender without the Borrower's written consent and any such attempted assignment without such consent shall be null and void.

As one of the Collateral Assignment Documents, the Loan Agreement, executed between the Debtors and the Berlingers, contains supplementary language in § 4(d):

> (d) This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Lender shall not assign, voluntarily, by operation of law or otherwise, any of its rights hereunder without the prior written consent of Woodbridge and any such attempted assignment without such consent shall be null and void....

On February 13, 2018, the Berlingers and Contrarian entered into an agreement, in which the Berlingers would "sell, convey, transfer and assign" the Promissory Notes and rights

---

[4] No material facts are in dispute.
[5] D.I. 79.
[6] D.I. 357.

2

thereunder to Contrarian (the "Note Transfer"). On March 1, 2018, Contrarian filed proof of claim number 1216 (the "Proof of Claim"), asserting a secured claim against the Fund in the amount of $75,000.[7] On March 21, 2018, the Debtors filed the Notice Regarding Transfers of Units or Notes, "providing notice that they will impose a temporary moratorium on consideration of consent to any Transfer of Units or Notes for the next ninety (90) days" (the "Moratorium Notice").[8]

On April 16, 2018, the Debtors filed the Claim Objection pursuant to 11 U.S.C. § 502(a);[9] the Court held a hearing on the matter on June 5, 2018. Subsequently, the Court took this matter under advisement.

## DISCUSSION

### I. Delaware Law Permits Anti-Assignment Clauses that Restrict the Power to Transfer.

The first issue before the Court is whether the Anti-Assignment Clause is consistent with Delaware law and public policy. The modern claims trading industry is robust and fruitful, allowing for, among others, liquidity for noteholders on the one hand and profitability for traders on the other.[10] Stated over fifteen years ago, "[p]erhaps nothing has changed the face of bankruptcy in the last decade as much as the newfound liquidity in claims."[11] As I explained in my previous

---

[7] *See* Claim No. 1216. The Note Transfer is appended to the Proof of Claim.
[8] D.I. 799, at 2.
[9] The Ad Hoc Noteholder Group and Ad Hoc Committee of Unitholders filed statements in support of the Debtors' Claim Objection. *See* D.I. 1900 & 1907. The Unsecured Creditors Committee filed a Joinder in support of the Debtors' reply to Contrarian's response to the Debtors' Claim Objection. *See* D.I. 1910. Argo Partners filed a response to the Debtors' Objection to Contrarian's Proof of Claim, but the late-filed response was not considered in this Opinion. *See* D.I. 1926.
[10] *See* Eric Winston, *Understanding the Reasons Traders Buy Bankruptcy Claims*, LAW360 (Jan. 8, 2014), https://www.law360.com/articles/498711/understanding-the-reasons-traders-buy-bankruptcy-claims.
[11] Glenn E. Siegel, *Introduction: ABI Guide to Trading Claims in Bankruptcy*, ABI Committee on Public Companies and Trading Claims, 11 AM. BANKR. INST. L. REV. 177 (2003); *see also* Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 BROOK J. CORP. FIN. & COM. L. 67 (2009); Michelle M. Harner, *Trends in Distressed Debt Investing: An Empirical Study of Investors' Objectives*, 16 AM. BANKR. INST. L. REV. 69 (2008).

decision in *In re KB Toys, Inc.*, today's "[b]uyers of debt, in the Court's experience, are highly sophisticated entities fully capable of performing due diligence before any acquisition."[12] Contrarian has consistently argued that neither the Debtors nor the Court should attempt to police the claims trading market.[13]

While Rule 3001(e) of the Federal Rules of Bankruptcy Procedure recognizes that claims trading occurs and provides for certain procedures governing such transfers, I am aware of no provision in the Bankruptcy Code or of any overarching bankruptcy policy which impairs the Court's authority to determine and enforce applicable non-bankruptcy law concerning contract provisions which may restrict transfers of claims. Neither am I convinced – and the record does not support – any insistence that to sustain the Claim Objection would cause disruption in the claims trading market.[14]

Delaware courts, while "recogniz[ing] the validity of clauses limiting a party's ability to assign its rights, generally construe such provisions narrowly because of the importance of free assignability."[15] However, as the Debtors here put it, there is a big difference between narrow construction and 'wholesale obliteration.' In *Southeastern*, which is heavily cited by Contrarian, the Delaware Superior Court went through an analysis of whether the anti-assignment clause in a purchase agreement was a valid contractual restriction.[16] The Court explained that the "modern

---

[12] *In re KB Toys, Inc.*, 470 B.R. 331, 342 (Bankr. D. Del. 2012), *aff'd sub nom.*, 736 F.3d 247 (3d Cir. 2013).
[13] *See, e.g.*, Motion to Quash of Contrarian Funds, LLC, D.I. 1585, at ¶¶ 4, 5 (the "Motion to Quash").
[14] *See, e.g.*, *id.* at 342 ("The assertion that subjecting transferred claims to § 502(d) disallowance would cause disruption in the claims trading market is a hobgoblin without a house to haunt.").
[15] *Southeastern Chester Cty. Refuse Authority v. BFI Waste Servs. of Penn., LLC*, 2017 WL 2799160 (Del. Super. Ct. June 27, 2017) [hereinafter, "*Southeastern*"].
[16] *Id.*

4

approach to assignment clauses is to distinguish between the *power* to assign and the *right* to assign."[17] This distinction does not exist solely under Delaware law.[18]

The Court in *Southeastern* explained:

> When a provision restricts a party's power to assign, it renders any assignment void. However, in order for a court to find that a contract's clause prohibits the power to assign, there must be express language that any subsequent assignment will be void or invalid. Without such express language, the contract merely restricts the right to assign. When a contract limits a party's right to assign instead of the power to do so, the assignment is valid and enforceable but generates a breach of contract action that the non-assigning party may bring against the party assigning its interest.[19]

Because the anti-assignment clause in the purchase agreement in *Southeastern* failed to contain any language providing that any assignment would be void, the Court found that the clause merely restricted the right to assign but not the power to assign.[20] Accordingly, the assignment of such agreement constituted a breach of contract, but was not void; it remained an enforceable assignment.[21]

Despite consistently referring to the Note Transfer, in its recent Motion to Quash, as a purchase of the Promissory Note itself,[22] Contrarian argued for the first time in its response to the Claim Objection that it instead had purchased only the Promissory Notes' underlying "claims" or

---

[17] *Id.* at *5 (citing *Bel-Ray Co. v. Chemrite (Pty.) Ltd.*, 181 F.3d 435, 442 (3d Cir. 1999)).
[18] *See, e.g., Cedar Point Apartments, Ltd. v. Cedar Point Inv. Corp.*, 693 F.2d 748 (8th Cir. 1982); *Pro Cardiaco Pronto Socorro Cardiologica, S.A. v. Trussell*, 893 F. Supp. 135 (S.D.N.Y. 1994); *Univ. Mews Assoc's v. Jeanmarie*, 471 N.Y.S. 2d 457 (1984) ("[A] contractual clause forbidding or restricting an assignment of rights thereunder… must specifically eliminate the power as well as the right to assign the contract in violation of its bar or restrictions, otherwise the original obligor is given only the right to damages for its breach, but does not render the assignment ineffective."); *Paul v. Chromalytics Corp.*, 343 A.2d 622 (Del. Super. Ct. 1975); *Rumbin v. Utica Mut. Ins. Co.*, 254 Conn. 259, 268–70 (2000) (collecting cases).
[19] *Southeastern*, at *5 (internal citations omitted).
[20] *Id.* at *6.
[21] *Id.*
[22] *See* D.I. 1585. Repeatedly in the Motion to Quash, Contrarian asserts that it had rightly purchased the Promissory Notes themselves.

"causes of action."[23] Contrarian asserts that this distinction is important because § 322(1) of the Restatement (Second) of Contracts (the "Restatement") "limits the Berlingers' ability to delegate any duties in connection with the [Promissory] Notes and Related Agreements, but, it does not bar them from transferring their rights, claims or causes of action under those agreements."[24] I disagree.

The Court in *Southeastern* also looked to the Restatement. First, the Reporter's Note to § 322 of the Restatement provides that subsection (1), which is new, is based upon UCC § 2-210(3), which applies to contracts for the sale of goods. Under § 9-102(a) of the UCC, the definition of "Promissory Note" is "an instrument that evidences a promise to pay a monetary obligation, does not evidence an order to pay, and does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds."[25] The term "Goods" does not include instruments.[26] Ergo, § 322(1) is not applicable here.

Second, Comment a. to § 322 of the Restatement provides some clarity about the purpose of this section:

> a. *Rationale*. In the absence of statute or other contrary public policy, the parties to a contract have power to limit the rights created by their agreement. The policy against restraints on the alienation of property has limited application to contractual rights. *Compare* Restatement of Property §§ 404–17. A term in a contract prohibiting assignment of the rights created may resolve doubts as to whether assignment would materially change the obligor's duty or whether he has a substantial interest in personal performance by the obligee (*see* §§ 317–19); or it may serve to protect the obligor against conflicting claims and the hazard of double liability (*see* §§ 338–43). But as assignment has become a common practice, the policy which limits the validity of restraints on alienation has been applied to the

---

[23] *See* D.I. 1826; *see contra* D.I. 1585. This argument is also inconsistent with Contrarian's position with regard to the UCC issue. *See infra* Section III.
[24] D.I. 1826, at ¶ 19. § 322(1) of the Restatement states, "Unless the circumstances indicate the contrary, a contract term prohibiting assignment of 'the contract' bars only the delegation to an assignee of the performance by the assignor of a duty or condition."
[25] UCC § 9-102(a)(65).
[26] UCC § 9-102(a)(44).

construction of contractual terms open to two or more possible constructions. *Compare* Restatement of Property §§ 418–23.

As is readily ascertainable from this language, and as argued by the Debtors, § 322 of the Restatement distinguishes contract law from property law, and requires clear, concise language to prevent ambiguity.

Lastly, even assuming that Contrarian purchased the rights under the Promissory Notes instead of the Promissory Notes themselves, § 322(2) of the Restatement supports a finding that the Anti-Assignment Clause is valid. Section 322(2) states:

> (2) A contract term prohibiting assignment of rights under the contract, *unless a different intention is manifested*,
>     (a) does not forbid assignment of a right to damages for breach of the whole contract or a right arising out of the assignor's due performance of his entire obligation....[27]

The Anti-Assignment Clause cross-references the Loan Agreement. Under § 4(d) of the Loan Agreement, the Berlingers were prohibited from assigning "any of [their] rights hereunder without the prior written consent of Woodbridge and any such attempted assignment without such consent shall be null and void...."[28] The language of both the Anti-Assignment Clause and the Loan Agreement manifests both a clear intention to forbid the assignment of the Promissory Note itself, and any rights thereunder.

The Anti-Assignment Clause and the Loan Agreement are clear and unambiguous. Any assignment of the Promissory Note or of any rights thereunder, absent the Fund's written consent, is null and void. In accordance with Delaware law and the Restatement, the express language of the Anti-Assignment Clause provides a clear intent to restrict the *power* to assign as opposed to restricting only the *right* to assign. Accordingly, the Note Transfer is void.

---

[27] Restatement § 322(2) (emphasis added).
[28] Due to the additional restriction on the rights underlying the Promissory Note, Contrarian's case law regarding the "assignment of claims" is inapposite.

## II. The Debtors' Breach of the Promissory Notes does Not Render the Anti-Assignment Clause Unenforceable.

Contrarian's next argument is that, even if the Anti-Assignment Clause is legally valid, the Debtors may not enforce the Promissory Note because of its prior breach. As explained below, this argument fails.

In *S & R Corp. v. Jiffy Lube Int'l, Inc.*, the Third Circuit explained:

> Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits.[29]

It is axiomatic that a non-breaching party may not emerge post-breach with more rights than it had pre-breach.

This principle is highlighted by *In re Diamondhead Casino Corp.*[30] In that case, among other issues, Judge Silverstein examined an identical issue to the case at hand – whether one party's material breach of a promissory note rendered unenforceable its provisions, including any assignment restriction contained in the note.[31] While not expressly deciding the discrete issue before me, Judge Silverstein rejected the argument that a party's breach could modify or improve a noteholder's contractual rights, determining that such an argument is untenable.[32]

---

[29] 968 F.2d 371, 376 (3d Cir. 1992) (emphasis in original); *see also McCausland v. Wagner*, 78 A.3d 1093, 1102 (Pa. Super. 2013) ("In a breach of contract suit, the plaintiff either may rescind the contract and seek restitution or enforce the contract and recover damages based on expectation. In such a case, the inconsistent nature of those actions is obvious – one cannot attempt to terminate his contractual obligations and, at the same time, seek to enforce the contract and enjoy its full benefits in an action for breach."); *Chilton Ins. Co. v. Pate & Pate Enters.*, 930 S.W.2d 877 (Tex. App. 1996).
[30] 2016 WL 3284674 (Bankr. D. Del. June 7, 2016).
[31] *Id.* at *15.
[32] *Id.*

In opposition, Contrarian relies on two cases in particular. First, Contrarian relies upon the Delaware Chancery Court's decision in *BioLife Sols., Inc. v. Endocare, Inc.* for the proposition that "[a] party is excused from performance under a contract if the other party is in material breach thereof."[33] In *Endocare*, the Court analyzed, among other issues, whether BioLife's breach of agreement in question was a "material" breach as to warrant reciprocal nonperformance and the Court concluded that BioLife's non-delivery of certain assets may have given rise to a damages claim, but did not rise to a material breach of the Agreement, which would have excused Endocare from filing a registration statement.[34] Because the case at hand is not a fight over materiality over the Fund's breach – it could hardly be argued that the failure to make interest payments is an immaterial breach – *Endocare* is inapplicable.

Second, Contrarian also looks to *Hipcricket, Inc. v. mGage LLC* for support.[35] In *Hipcricket*, the Chancery Court considered whether a non-breaching party had to abide by, among others, a non-compete clause upon a debtor's rejection of an executory contract in bankruptcy. The Court concluded that, "based upon a straightforward application of Washington law, that Hipcricket's breach... excused Stansbury from any further obligations he owed under that agreement, including the [non-compete agreement]."[36] The Court reasoned it would, of course, be inequitable to allow an employer to reject an employment agreement and subsequently seek to estop the terminated employee from seeking future employment.[37]

---

[33] 838 A.2d 268, 278 (Del. Ch. 2003), *as revised* (Oct. 6, 2003) ("The converse of this principal is that a slight breach by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract.").
[34] *Id.* at 281.
[35] 2016 WL 3910837 (Del. Ch. July 15, 2016).
[36] *Id.* at *13.
[37] *Id.*

9

*Hipcricket* is distinguishable. A non-compete clause is much different from an anti-assignment provision. Before entering into an agreement containing a non-compete clause, a prospective employee is free to pursue employment without restriction; post-entrance, she is restrained. However, before entering into an agreement containing an anti-assignment provision, a party necessarily has nothing to assign. So, these devices are significantly dissimilar. Further, the Debtors here are not seeking any affirmative relief, as was the case in *Hipcricket*. Rather, the Debtors are simply defending against Contrarian's proof of claim. There is no inequity here.

Neither the Berlingers nor any assignee were able to emerge post-breach with more rights than they had pre-breach. This conclusion is consistent with my decision in *In re KB Toys, Inc.* In that case, I examined whether 11 U.S.C. § 502(d) requires that a disability travel with a transferred claim. Answering in the affirmative, I concluded that "a trade claim purchaser holds that claim subject to the same rights and disabilities under Bankruptcy Code § 502(d) as does the original trade claimant."[38] Here, a "disability" can be said to have arisen under the Promissory Note as a result of the Berlinger's violation of the Anti-Assignment Clause. Accordingly, such "disability" travelled with the transferred claim into the hands of Contrarian, and therefore, Contrarian did not have the right to file the Proof Claim.

### III. The UCC does Not Override the Anti-Assignment Provision.

Contrarian's last argument in an effort to escape the Anti-Assignment Provision is that UCC § 9-408 overrides and nullifies any contractual provision that restricts the assignment of or

---

[38] *In re KB Toys, Inc.*, 470 B.R. at 343. The Third Circuit subsequently affirmed my decision.

"requires the consent of the maker of a promissory note before the note may be transferred."[39]

UCC § 9-408 provides:

> (a) [Term restricting assignment generally ineffective.]
>
> Except as otherwise provided in subsection (b), a term in a promissory note or in an agreement between an account debtor and a debtor which relates to a health-care-insurance receivable or a general intangible, including a contract, permit, license, or franchise, and which term prohibits, restricts, or requires the consent of the person obligated on the promissory note or the account debtor to, the assignment or transfer of, or creation, attachment, or perfection of a security interest in, the promissory note, health-care-insurance receivable, or general intangible, is ineffective to the extent that the term:
>
>> (1) Would impair the creation, attachment, or perfection of a security interest; or
>> (2) Provides that the assignment or transfer or the creation, attachment, or perfection of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the promissory note, health-care-insurance receivable, or general intangible.
>
> (b) [Applicability of subsection (a) to sales of certain rights to payment.]
>
> Subsection (a) applies to a security interest in a payment intangible or promissory note only if the security interest arises out of a sale of the payment intangible or promissory note.

The Debtors argue that this section prohibits only restrictions on the assignment of a security interest in a promissory note, as opposed to the promissory note itself, as Contrarian argues. As an initial matter, there is very little decisional case law on this issue to provide guidance. Accordingly, the statute itself and the associated comments will instruct this Court's decision.

Contrarian's primary argument revolves around the definition of "security interest" in UCC § 1-201(b)(35), which includes "any interest of a... buyer of... a promissory note in a transaction that is subject to Article 9," and the scope of Article 9 under UCC § 9-109. Quoting extensively from Official Comment 5 of § 9-109, Contrarian asserts that the drafters of the UCC intended that

---

[39] D.I. 1826, at ¶ 28.

a sale of promissory notes would automatically create a security interest. However, Contrarian's selective quoting fails to reveal the full picture necessary to understanding this complicated section.

For example, Contrarian states, "neither this Article nor the definition of 'security interest' in Section 1-201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation. This Article applies to both types of transactions."[40] Missing from Contrarian's assertion is the prefatory clause, "as mentioned in Comment 4."[41] Official Comment 4 explains, "Although this Article occasionally distinguishes between outright sales of receivables and sales that secure an obligation, neither this Article nor the definition of 'security interest' (Section 1-201(37)) delineates how a particular transaction is to be classified. *That issue is left to the courts.*"[42]

If, as Contrarian assumes, the drafters of the UCC intended for there to be a bright line rule, classifying all sales of promissory notes as security interests, the courts would have nothing to decide; courts would simply apply the rule and move on. Taking this to its logical end, no promissory note could ever contain an anti-assignment clause. Thus, the plethora of cases, including cases discussed above, which analyze the validity of anti-assignment clauses on other grounds, would effectively be pointless.

In further support of this Court's decision, as the Debtors rightfully point out, reading § 9-408 as Contrarian desires would render § 9-406 superfluous. Section 9-406 provides:

---

[40] D.I. 1826, at ¶ 31 (emphasis removed).
[41] Official Comment 5 to UCC § 9-109.
[42] Official Comment 4 to UCC § 9-109 (emphasis added).

> (d) [Term restricting assignment generally ineffective.]
>
> Except as otherwise provided in subsection (e) and Sections 2A-303 and 9-407, and subject to subsection (h), a term in an agreement between an account debtor and an assignor or in a promissory note is ineffective to the extent that it:
>
>> (1) prohibits, restricts, or requires the consent of the account debtor or person obligated on the promissory note to the assignment or transfer of, or the creation, attachment, perfection, or enforcement of a security interest in, the account, chattel paper, payment intangible, or promissory note; or
>> (2) provides that the assignment or transfer or the creation, attachment, perfection, or enforcement of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the account, chattel paper, payment intangible, or promissory note.
>
> (e) [Inapplicability of subsection (d) to certain sales.]
>
> Subsection (d) does not apply to the sale of a payment intangible or promissory note, other than a sale pursuant to a disposition under Section 9-610 or an acceptance of collateral under Section 9-620.

In short, § 9-406 endorses the enforceability of anti-assignment provisions in the sale, or assignability, of promissory notes, whereas § 9-408 is applicable only to grants of security interests. Reading § 9-408 as eclipsing § 9-406 would violate the canon against surplusage.[43]

Contrarian does not hold, nor even assert that it holds, a security interest in the Promissory Notes. It has not lent any money to the Berlingers, let alone money to which repayment would be secured by an interest in the Promissory Notes. Accordingly, based upon the above statutory analysis, the Court finds that UCC § 9-408 is inapplicable here.

---

[43] *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

## CONCLUSION

For the foregoing reasons, the Court finds that the Anti-Assignment Clause is legally valid; the Note Transfer is void; and UCC § 9-408 is inapplicable. Accordingly, the Claim Objection will be sustained. An appropriate order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED: June 20, 2017