## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| | (Jointly Administered) |
| Debtors. | **Objection Deadline: August 1, 2018 at 4:00 p.m. (ET)**<br>**Hearing Date: August 8, 2018 at 2:00 p.m. (ET)** |

### JOINT MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE AD HOC NOTEHOLDER GROUP PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) FOR ENTRY OF AN ORDER APPROVING (A) PROCEDURES RELATING TO PROPOSED NOTEHOLDER LIQUIDITY FACILITY AND (B) RELATED EXCLUSIVITY PROVISIONS

The Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Ad

Hoc Noteholder Group (the "Noteholder Group" and together with the Creditors' Committee, the

"Movants") appointed in the chapter 11 cases of Woodbridge Group of Companies, LLC and its

affiliated debtors (collectively, the "Debtors") hereby jointly submit this motion (this "Motion")

pursuant to sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy

Code") for an order approving (a) procedures relating to a proposed up to $215 million

noteholder liquidity facility (the "Noteholder Liquidity Facility") that would be made available

to the holders of notes issued by the Debtors (each a "Noteholder" and together, the

"Noteholders") for the purpose of providing loans equal to 30% of each Noteholder's allowed

net claim against the Debtors (except as otherwise may be mutually agreed by the parties, as set

forth in the Term Sheet), plus, as may be mutually agreed by the parties, an additional or greater

---

[1] The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

percentage of such allowed net claim amount and (b) related exclusivity provisions ensuring that the Debtors and the Movants and their representatives shall not solicit, encourage, entertain, negotiate or pursue any alternative pre-confirmation debt or pre-confirmation equity financing or refinancing transaction with respect to loans directly to Noteholders and will immediately cease any discussions regarding any such transactions with other parties.[2] Attached hereto as **Exhibit A** is a term sheet for the Noteholder Liquidity Facility (the "Term Sheet"). The Movants intend to supplement this Motion with additional definitive documents governing the Noteholder Liquidity Facility, in substantially the form that will be offered to Noteholders. *The Movants are informed that the Debtors and the Ad Hoc Committee of Unitholders have no opposition to this Motion.* Notwithstanding the foregoing, and as set forth in the Term Sheet, while the Debtors do not object to the Motion, the Debtors are not recommending or endorsing the Noteholders Liquidity Facility. In further support of this Motion, the Movants respectfully represent as follows:

### Preliminary Statement

1.      At least since August 2012, it appears that the Debtors were operated by their founder and principal, Robert Shapiro, as a Ponzi scheme. Investor victims of the Debtors' scheme were often told that they were investing money in particular properties owned by third parties and would have the benefit of a stream of regular payments from such third parties backed by security interests and/or mortgages against such third-party properties. In fact, the Debtors commingled investor money on a prepetition basis and used such funds however they saw fit through a complex web of affiliated companies controlled by Mr. Shapiro.

---

[2] For the avoidance of doubt, nothing in the Term Sheet shall limit Debtor Parties' (as defined in the Term Sheet) ability to solicit, encourage, entertain, negotiate or pursue financing for the Debtors or any liquidation trust or any wind down entity created under a chapter 11 plan.

Unfortunately, many unsuspecting investors contributed their life savings or "nest egg" into the Woodbridge fraud.

        2.      The purpose of this Motion is to provide an avenue for investor victims who are Noteholders to obtain access to immediate funding. ***Unitholders in the Debtors are not affected by this Motion.*** The proposed Noteholder Liquidity Facility is the product of the joint efforts of the Creditors' Committee and the Ad Hoc Noteholder Group to provide a source of urgently-needed cash for the Noteholders most hard-hit by the Debtors' scheme.

        3.      Under the proposed Noteholder Liquidity Facility, Noteholders will have the option to receive a 30% distribution on their allowed net claims against the Debtors in accordance with the Term Sheet.[3] ***Such funding is entirely optional for Noteholders.*** Each Noteholder will be given an opportunity to decide whether he or she wishes to participate in the Noteholder Liquidity Facility.[4] If so, then such Noteholder will receive a loan through the Noteholder Liquidity Facility and, in consideration thereof, will agree that the first dollars payable to such Noteholder by the Debtors on account of its allowed net claim will go to repay such Noteholder's obligations under the Noteholder Liquidity Facility, plus interest and fees that will total no less than 16.00% per annum in year 1 and 15.50% in years 2 and 3.[5] After repayment of each Noteholder's obligations under the Noteholder Liquidity Facility in full, such Noteholder's remaining allowed net claim against the Debtors will be unaffected and each such

---

[3] The allowed amount of a Noteholder's claim will be "net" of any prior distributions or payments (other than return of principal) that he or she may have received from Woodbridge.
[4] Noteholders who are insiders of the Debtors or Excluded Parties (as such term will be defined in a chapter 11 plan) will not be eligible to participate in the Noteholder Liquidity Facility.
[5] The interest rate payable under the Noteholder Liquidity Facility could be higher if the prime rate exceeds the prime rate floor of 4.75% per annum under the facility – the prime rate is currently 5.00%. The facility has a "soft" maturity of three years, with a further increase of the interest rate by another 1.50% per annum if the loan is not repaid by then. Further, there is a minimum 6-month interest charge under the facility. Noteholders will be apprised in the offering documents of the interest rates they may incur under at least two different annual yield examples, with at least one of the interest yield examples calculated based on an assumed initial distribution from the Debtors' estates by December 31, 2018.

Noteholder will continue to receive any additional distributions that may become available from the Debtors' estates. If, on the other hand, distributions from the Debtors' estates ultimately result in less than a 30% recovery on allowed net claims, the Noteholder Liquidity Lenders (as defined below) take that risk.[6] The obligations under the Noteholder Liquidity Facility are non-recourse as to Noteholders personally. The only recourse for the Noteholder Liquidity Lenders is against each participating Noteholder's rights to collect distributions from the Debtors' estates.

4.    The capital provider under the Noteholder Liquidity Facility is Axar Capital Management LP or one of its affiliates (together, the "Noteholder Liquidity Lenders"), along with an appropriate institution for purposes of solicitation, underwriting, origination and/or servicing. The Movants believe that the Noteholder Liquidity Lenders have adequate financial resources on hand and administrative and servicing capacity in order to satisfy their obligations under the Noteholder Liquidity Facility. Further, the Noteholder Liquidity Lenders have no prior relationship whatsoever with the Debtors, Mr. Shapiro, or any of his relatives or controlled affiliates.

5.    The Movants believe that the Noteholder Liquidity Facility provides the best available economic option to those Noteholders who need to quickly liquidate a portion of their claims against the Debtors' estates. The Movants have marketed this opportunity to various funding sources, and the Noteholder Liquidity Facility presents the most advantageous terms to Noteholders. Not all Noteholders will make the choice to participate in the Noteholder Liquidity Facility. The Debtors are targeting an initial distribution of approximately 10% of a Noteholder's allowed claim will be made by the end of this year, but that assumes that a chapter 11 plan providing for such a distribution is confirmed and rendered effective by then and there

---

[6] The risk to the Noteholder Liquidity Lenders should be low given that the Committee previously estimated in its statement in support of the Plan Term Sheet that the recovery to Noteholders in these cases may be between 62%-76% over a period of one to three years following the effective date of a chapter 11 plan.

are no other unforeseen hurdles to overcome to the structure or timing of a bankruptcy exit. The Noteholder Liquidity Facility is targeted to those Noteholders who may have invested a significant portion of their life savings with Woodbridge and need immediate cash flow, as well as to provide a near-term option for liquidity which they otherwise have been deprived of since the commencement of these cases.

6.       The Movants submit that the Noteholder Liquidity Facility will impose few burdens. Through this Motion, the Movants seek authority to make the Noteholder Liquidity Facility available to Noteholders as set forth in the Term Sheet. Further, the Noteholder Liquidity Facility requires an exclusivity commitment from the Debtors and the Movants that they will not solicit, encourage, entertain, negotiate or pursue any alternative pre-confirmation debt or pre-confirmation equity financing or refinancing transaction with respect to loans directly to Noteholders and will immediately cease any discussions regarding any such transactions with other parties.[7] The Movants believe such exclusivity provision is completely reasonable given the time and resources committed by the Noteholder Liquidity Lenders to providing immediate liquidity to participating Noteholders.

7.       In sum, the Noteholder Liquidity Facility provides a source of immediate funding to those Noteholders who need such funding right away. An amount equal to 30% of each Noteholder's allowed net claim will be payable under the Noteholder Liquidity Facility. In order to provide such financing option to the Noteholders, the Movants urge the Court to approve this Motion and make the Noteholder Liquidity Facility available to Noteholders as set forth in the Term Sheet

---

[7] For the avoidance of doubt, nothing in the Term Sheet shall limit Debtor Parties' ability to solicit, encourage, entertain, negotiate or pursue financing for Debtors or any liquidation trust or any wind down entity created under a chapter 11 plan.

5

## Jurisdiction and Venue

8.      This Court has jurisdiction over this action under 28 U.S.C. § 157(a) and

1334.  This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue

is proper in this District pursuant to 28 U.S.C. § 1408 and 1409.

9.      The statutory predicates for the relief requested herein are sections 105(a)

and 363(b) of the Bankruptcy Code.

## Background

10.     Beginning on December 4, 2017 and on various dates thereafter

(collectively, the "Petition Dates"), the Debtors each commenced a case by filing a voluntary

petition for relief under chapter 11 of the Bankruptcy Code.

11.     The Debtors are operating their businesses and managing their properties

as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These

cases are being jointly administered for procedural purposes pursuant to Rule 1015(b) of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  No trustee or examiner has

been appointed in these cases.

12.     On December 14, 2017, the Office of United States Trustee appointed the

Creditors' Committee.  The Noteholder Group was created pursuant to a Settlement Order, dated

January 23, 2018 [D.I. 357] entered by this Court in these chapter 11 cases.

13.     As of December 4, 2017, the Debtors' principal assets consisted of a

portfolio of over 200 real estate properties in various stages of development or renovation.

14.     Prior to December 4, 2017, the Debtors raised money from thousands of

Noteholders by selling investments referred to as notes.  Investors were often told that they were

investing money in particular properties owned by third parties and would have the benefit of a

stream of regular payments from such third parties backed by security interests and/or mortgages against such third-party properties. In fact, since at least August 2012, the Debtors were operated by their founder and principal, Robert Shapiro, as a Ponzi scheme.

15.    As of December 4, 2017, the Debtors were collectively indebted under approximately 9,328 notes, with a cumulative total outstanding amount of the notes of approximately $778,418,972. Certain Noteholders invested their life savings or "nest egg" with Woodbridge, leaving them with little or nothing when the Debtors collapsed.

16.    In order to provide such Noteholders with some relief, the Movants sought funding sources for a liquidity facility and commenced a marketing effort, followed by extensive negotiations amongst a variety of prospective lenders. Ultimately, the Movants concluded that the Noteholder Liquidity Facility proposed by the Noteholder Liquidity Lenders offered the most advantageous economic terms for Noteholders – providing for an immediate 30% distribution to participating Noteholders.

### Proposed Noteholder Liquidity Facility

17.    The principal terms of the Noteholder Liquidity Facility are encompassed in the Term Sheet and set forth below.[8]  The Movants intend to supplement this Motion with additional definitive documents governing the Noteholder Liquidity Facility, in substantially the form that will be offered to Noteholders, which definitive documents will be consistent in all respects with the Term Sheet. The Debtors are not paying the fees or expenses of the Noteholder Liquidity Lenders.

Commitment Amount:              Up to $215 million, with an initial commitment of $50
                                million. To the extent Noteholders (as defined below) elect
                                to participate in an amount in excess of $50 million in
                                borrowings, Lenders (as defined below) shall have the right

---

[8]  To the extent of any inconsistency between this Motion and the Term Sheet, the Term Sheet governs in all respects.

to make such amounts available (including in excess of $215 million). To the extent such right to fund up to the full $215 million is not exercised by Lenders, the Committees shall be permitted to identify an alternative third party lender to add this incremental loan capacity and share *pro rata* in all loans made under this facility.

Eligible Borrowers:    Noteholders (each, a "Noteholder" or "Borrower" and together, "Noteholders" or "Borrowers") of Woodbridge Group of Companies, LLC, *et al.* ("Debtors"), excluding any prepetition insider of any of Debtors, any non-debtor affiliates of Debtors or insider of any such non-debtor affiliates, and any prepetition employee of any of Debtors or other person involved in any way in the marketing or sale of notes or units.

Lenders:    Axar Capital Management LP or one of its affiliates ("Axar" or "Lenders") as capital provider by, with and/or through an appropriate institution for purposes of solicitation, underwriting, origination and/or servicing.

Administrative Agent:    An institution to act as the administrative and collateral agent on behalf of Lenders to be determined.

Advance Rate:    30% of allowed net claim amount plus, as may be mutually agreed by the parties, an additional or greater percentage of such allowed net claim amount.

Interest Rate:    Year 1: P + 6.25% (with 475bps Prime Rate Floor) plus 5% origination fee due and payable out of the loan proceeds at origination

Years 2-3: P+10.75% with 475bps Prime Rate Floor

Use of Proceeds:    Cash Distribution to Borrowers: 95% of loan amount.

As an example: If Borrower's loan amount is $100,000, at loan closing, Borrower will receive $95,000 and $5,000 will be charged as origination fee.

Mandatory Payment:    Binding first priority on any distributions, payments and/or other consideration whatsoever ("Distributions") from Debtors (and their successors or assigns including, without limitation, a Chapter 7 trustee, Chapter 11 trustee, examiner, liquidation trustee acting on behalf of a liquidation trust, plan administrator, reorganized debtor, liquidation trust or wind-

down entity whether pursuant to a plan or otherwise) to Borrowers until all outstanding amounts to Lenders are paid by Borrower or any transferee of Borrower; usual and customary covenants by Borrowers to ensure that first priority is maintained. All Distributions to the Lenders shall be final and irrevocable.

| | |
|---|---|
| Prepayment Premium / Call Protection: | 6 month minimum interest charge for each Noteholder loan. Interest will never be greater than the maximum permissible amount under the law. |
| Maturity Date: | 3 year soft maturity. Default on maturity results in rate step up of 150 bps. |
| Non-Recourse / Limited Representations and Warranties: | Loans are non-recourse to Borrowers other than with respect to Distributions by Debtors provided representations and warranties made by Borrowers are not materially false. Representations and warranties strictly limited to matters within the knowledge and control of Borrowers. |
| Entities Paying Lenders: | Debtors, when and to the extent Distributions are available. |
| Transfer / Encumbrance: | No transfer (other than as required by applicable law upon death) or encumbrance by a Noteholder/Borrower of his or her note, claim or liquidation trust interest will be permitted until Lenders have been paid in full. |
| Committees' Support: | Each of the Committees signatory hereto, until Lenders have been paid in full, will not propose or support any plan or other treatment which impairs or is inconsistent with the facility. |
| Extent of Debtors' Involvement: | Debtors to i) provide contact information available to Debtors in connection with Noteholders; ii) honor notice to pay instructions jointly executed by Lenders and Borrowers with no requirement on the part of Debtors to verify such information; iii) in no way oppose bankruptcy court approval of the proposed structure set forth herein and entry of an order reasonably satisfactory to Lenders; iv) provide Debtors' proposed allowed net claim amount due and owing to each eligible Noteholder, when available, taking into account any prepetition payments or distributions (other than return of principal) made by Debtors to such Noteholder (each Noteholder would consent as part of his or her participation in this facility with Lenders to the amount of his or her claim as proposed by Debtors); and v) provide Lenders with the |

same information that is made available to all Noteholders generally, with such information to be provided to the Lenders at the same time and with the same frequency as such information is provided to Noteholders.

Bankruptcy Court Order

The Committees shall promptly file a joint motion requesting a bankruptcy court order with respect to this facility. Such order will authorize Debtors to honor the provisions hereof, as applicable to Debtors, and will provide that (a) any notice to pay instructions provided to Debtors shall be irrevocable and may not be modified, superseded or rescinded absent express written consent of Lenders, (b) Debtors will not recognize any transfers or encumbrances of notes, underlying claims, or liquidation trust interests inconsistent with the terms and conditions herein, and (c) Lenders have standing to appear and be heard in connection with their rights, remedies and benefits under the bankruptcy court order approving the proposed structure set forth herein.

Due Diligence / Conditions to Funding:

i) Evidence that each eligible Noteholder has a valid, undisputed eligible note which has not been transferred or encumbered; ii) approval of proposed structure set forth herein by bankruptcy court and entry of an order (in form, substance and otherwise) satisfactory to Lenders; iii) no fees shall be paid, directly or indirectly, by Lenders or Borrowers to any parties or individuals affiliated with Debtors or any of the three committees or any professionals retained by Debtors or any of the three committees in connection with the facility; iv) final / closing legal due diligence; v) minimum aggregate Noteholder opt-in of $10 million of the commitment amount, provided that Lenders cannot terminate the facility on this basis later than seventy-five (75) days after entry of an order approving the facility and Lenders' receipt of contact information and claim-related information relating to Borrowers from Debtors as set forth herein.

Governing Law:

New York.

Exclusivity:

Upon acceptance of the terms herein, none of Debtors, their advisors, or any of their respective directors, officers, employees, agents, advisors, etc. ("Debtor Parties") will solicit, encourage, entertain, negotiate or pursue any alternative pre-confirmation debt or pre-confirmation equity financing or refinancing transaction with respect to loans directly to Borrowers and will immediately cease any discussions regarding any such transactions with other

parties. For the avoidance of doubt, nothing herein shall limit Debtor Parties' ability to solicit, encourage, entertain, negotiate or pursue financing for Debtors or any liquidation trust or any wind down entity created under a chapter 11 plan.

Notice to Borrowers:    The notice/offering solicitation to eligible Noteholders with respect to this financing shall clearly set forth (1) the interest rate to be paid by Noteholders, with at least two different annual yield examples depending on when distributions are made by Debtors/liquidation trust, and (2) that Debtors are not recommending or endorsing the facility.

Borrowers' Rights in Cases:    Each Borrower's rights to participate in Debtors' chapter 11 cases, and to vote on any proposed chapter 11 plan, shall not be impaired, directed, restricted, or limited in any way by such Borrower's participation in this facility (subject to Lenders' rights and remedies as set forth in any loan documentation consistent with the terms hereof).

Non-Binding:    Except for the sections titled Governing Law and Exclusivity, which sections are intended to create binding obligations through the date on which the motion seeking approval of this term sheet is decided upon, it is understood that no legal obligation or liability will be created by this Summary Term Sheet.

## Relief Requested

18.    The Movants hereby request that this Court enter an order (a) approving procedures relating to the Noteholder Liquidity Facility as set forth in the Term Sheet, including authorizing the Debtors to (i) provide contact information available to the Debtors in connection with Noteholders; (ii) honor notice to pay instructions jointly executed by the Noteholder Liquidity Lenders and the participating Noteholders with no requirement on the part of the Debtors to verify such information; (iii) provide the Debtors' proposed allowed net claim amount due and owing to each eligible Noteholder, when available, taking into account any prepetition payments or distributions (other than return of principal) made by the Debtors to such Noteholder (each Noteholder would consent as part of his or her participation in the facility to

the amount of his or her net claim as proposed by the Debtors); and (iv) provide the Noteholder

Liquidity Lenders with the same information that is made available to all Noteholders generally,

with such information to be provided to the Noteholder Facility Lenders at the same time and

with the same frequency as such information is provided to Noteholders, and (b) approving

related exclusivity provisions as described above and as set forth in the Term Sheet.

## Basis for Relief

19.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of th[e

Bankruptcy Code]." 11 U.S.C. § 105(a).  Section 105(a) is "consistent with the traditional

understanding that bankruptcy courts, as courts of equity, have broad authority to modify

creditor-debtor relationships," *U.S. v. Energy Res. Co.*, 495 U.S. 545, 549 (1990), and to

otherwise "act in a manner that will prevent injustice or unfairness in the administration of

bankruptcy estates," *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 340 (3d Cir. 2006).  To this

end, the Court "may, when necessary, eschew mechanical rules . . . and craft flexible remedies

that, while not expressly authorized by the Bankruptcy Code, effect the result the Code was

designed to obtain." *Kaiser*, 456 F.3d at 340 (internal quotation marks, citations omitted).

20.     Section 726 of the Bankruptcy Code provides a comprehensive priority

scheme for the distribution of property of the bankruptcy estate. *See* 11 U.S.C. § 726.  As a

general proposition, and absent creditors' assent to contrary treatment, any chapter 11 plan that

would be confirmed in these chapter 11 cases would need to abide by the distribution and

priority scheme in section 726. *See* 1129(a)(7)(A)(ii) ("best interests" test requiring non-

accepting creditors to receive at least as much as they would receive in a chapter 7 liquidation

governed by section 726).  Noteholders are the primary creditor constituency in these chapter 11

cases by number and dollar amount, and in any conceivable resolution of these chapter 11

cases—whether by confirmation of a plan based on the Term Sheet, confirmation of a different

plan, or conversion to chapter 7—Noteholders will be entitled to meaningful distributions on

their acknowledged claims against the Debtors, regardless whether those claims are ultimately

treated as secured or unsecured.[9] *See* 11 U.S.C. § 726. But many Noteholders are presently

suffering great hardship because of the inherent *delay* in obtaining their ultimate distribution,

which is an unfortunate, but unavoidable consequence of the bankruptcy process. Under these

circumstances, use of the Court's broad equitable powers under 105(a) to mitigate this hardship

by approving the Noteholder Liquidity Facility is entirely proper, insofar as it "prevent[s]

injustice or unfairness in the administration of [the Debtors'] bankruptcy estates." *Kaiser*, 456

F.3d at 340.

    21. To the extent that the relief sought herein implicates a use of property of

the Debtors' estates, section 363(b)(1) of the Bankruptcy Code provides that a debtor-in-

possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate." 11 U.S.C. § 363(b)(1). A court can authorize a debtor to

use property of the estate pursuant to section 363(b)(1) when such use is an exercise of the

debtor's sound business judgment and when such use is proposed in good faith. *In re Delaware

& Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *see also Dai-Ichi Kangyo Bank, Ltd. v.

Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153

(Bankr. D. Del. 1999) (trustee need only have a "sound business purpose" to justify use of estate

property pursuant to section 363(b)).

---

[9] The secured-versus-unsecured status of the Noteholders' claims is disputed among the primary case
constituencies, but is one of several issues that would be mooted by confirmation of the chapter 11 plan
contemplated by the Term Sheet.

22.    Here, the Movants have sought and obtained an opportunity for Noteholders who may need access to immediate liquidity to receive a distribution under the Noteholder Liquidity Facility of 30% of their allowed net claims, except as otherwise may be mutually agreed to by the parties, as set forth in the Term Sheet.[10] *Participation in the Noteholder Liquidity Facility is entirely optional for any Noteholder.* And not every Noteholder will make the choice to borrow funds under the Noteholder Liquidity Facility given that the cost will be no less than 16.00% per annum of the amounts borrowed. The Noteholder Liquidity Facility also has a six-month minimum interest charge for each Noteholder loan thereunder. Hence, if the Debtors make an interim distribution by the end of this year of approximately 10% of Noteholder claims, then the effective interest rate that will be charged to participating Noteholders will be higher, and the Noteholder Liquidity Lenders could receive the entirety of such initial distribution from the estates in order to repay a portion of each Noteholder loan.[11] On the other hand, there is no certainty that the Debtors will make a distribution at the end of this year or the amount of such distribution if it is made. Moreover, given that the Noteholder loans are non-recourse to Noteholders personally (except as to their distributions from the estates), the Noteholders Liquidity Lenders are taking the risk that distributions in these cases ultimately will not exceed 30% of Noteholder claims.[12] The Noteholder Facility Lenders could face a loss under such circumstances. Although no one expects such a scenario, the

---

[10] As noted above, the allowed amount of a Noteholder's claim will be "net" of any prior distributions or payments that he or she may have received from Woodbridge.

[11] As noted above, the interest rate payable under the Noteholder Liquidity Facility could be higher if the prime rate exceeds the prime rate floor of 4.75% per annum under the facility – the prime rate is currently 5.00%. The facility has a "soft" maturity of three years, with a further increase of the interest rate by another 1.50% per annum if the loan is not repaid by then. Noteholders will be apprised in the offering documents of the interest rates they may incur under at least two different annual yield examples, with at least one of the interest yield examples calculated based on an assumed initial distribution from the Debtors' estates by December 31, 2018.

[12] As noted above, the risk to the Noteholder Liquidity Lenders should be low given that the Committee previously estimated in its statement in support of the Plan Term Sheet that the recovery to Noteholders in these cases may be between 62%-76% over a period of one to three years following the effective date of a chapter 11 plan.

bottom line is that the Noteholder Liquidity Facility provides an option for those Noteholders, who need it and choose to take it, of immediate cash flow equal to 30% of their allowed net claim.

23.    The Noteholder Liquidity Lenders require a minimum aggregate Noteholder opt-in of $10 million of the commitment amount of up to $215 million, provided that the Noteholder Liquidity Lenders cannot terminate the facility on this basis later than seventy-five (75) days after entry of an order approving this Motion and the Noteholder Liquidity Lenders' receipt of contact information and claim-related information relating to Noteholders from the Debtors as set forth in the Term Sheet. Hence, there is a possibility that the Noteholder Liquidity Facility is not implemented if Noteholder participation is particularly low. The Movants, however, believe that Noteholders should at least be given the option of liquidating a portion of their claims, particularly those Noteholders who have invested their life savings or "nest egg" in Woodbridge. Notably, each Noteholder's rights to participate in the Debtors' chapter 11 cases, including the right to vote on any proposed chapter 11 plan, shall not, directly or indirectly, be impaired, restricted, directed, or limited in any way by such Noteholder's participation in the Noteholder Liquidity Facility.

24.    The Movants further submit that the economic terms of the Noteholder Liquidity Facility are the best available under the circumstances. The Movants have engaged in a comprehensive marketing effort and have conducted extensive negotiations with various parties. The Noteholder Liquidity Facility is the result of such good faith and arms' length negotiations. The Movants believe that the Noteholder Liquidity Lenders have adequate financial resources on hand in order to satisfy their obligations under the Noteholder Liquidity Facility. Further, the Noteholder Liquidity Lenders have no prior relationship whatsoever with

the Debtors, Mr. Shapiro, or any of his relatives or controlled affiliates. And, as noted above, the Debtors are not paying the fees and expenses of the Noteholder Liquidity Lenders.

25.    In consideration of the benefits to be offered to Noteholders under the Noteholder Liquidity Facility, the Noteholder Facility Lenders require an exclusivity commitment from the Debtors and the Movants that they will not solicit, encourage, entertain, negotiate or pursue any alternative pre-confirmation debt or pre-confirmation equity financing or refinancing transaction with respect to loans directly to Noteholders and will immediately cease any discussions regarding any such transactions with other parties.[13] The Movants submit that such exclusivity provision is appropriate under the circumstances (1) because the Debtors have indicated they are not exploring and do not intend to explore facilities for loans directly to Noteholders and (2) given the time and resources committed by the Noteholder Liquidity Lenders to providing immediate liquidity to participating Noteholders.

26.    Based on the foregoing, the Movants urge the Court to approve this Motion and authorize making the Noteholder Liquidity Facility available to Noteholders as set forth in the Term Sheet.

### Notice

27.    This Motion has been served on (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors and their counsel; (c) counsel to the Ad Hoc Committee of Unitholders; and (d) all entities that have filed a request for service of filings pursuant to Bankruptcy Rule 2002.

---

[13] For the avoidance of doubt, nothing in the Term Sheet shall limit Debtor Parties' ability to solicit, encourage, entertain, negotiate or pursue financing for Debtors, the Liquidation Trust, or the Wind Down Entity (as such entities are defined in a chapter 11 plan).

**No Prior Request**

28.     No prior application for the relief sought in this Motion has been made to this or any other court in connection with these chapter 11 cases.

**WHEREFORE**, the Movants request that the Court enter an order, substantially in the form annexed hereto, (a) approving procedures relating to the Noteholder Liquidity Facility, (b) approving related exclusivity provisions, and (c) providing the Movants with such other and further relief as the Court may deem just, proper and equitable.

*[signature page follows]*

17

Dated:  July 12, 2018                        PACHULSKI STANG ZIEHL & JONES LLP

                                             */s/ Colin R. Robinson*
                                             Richard M. Pachulski (CA Bar No. 90073)
                                             James I. Stang (CA Bar No. 94435)
                                             Jeffrey N. Pomerantz (CA Bar No. 143717)
                                             Bradford J. Sandler (DE Bar No. 4142)
                                             Colin R. Robinson (DE Bar No. 5524)
                                             919 North Market Street, 17th Floor
                                             P.O. Box 8705
                                             Wilmington, DE  19899 (Courier 19801)
                                             Telephone: 302-652-4100
                                             Facsimile:  302-652-4400
                                             E-mail:  rpachulski@pszjlaw.com
                                                      jstang@pszjlaw.com
                                                      jpomerantz@pszjlaw.com
                                                      bsandler@pszjlaw.com
                                                      crobinson@pszjlaw.com

                                             Counsel for the Official Committee of Unsecured
                                             Creditors


                                             DRINKER BIDDLE & REATH LLP

                                             */s/ Steven K. Kortanek*
                                             Steven K. Kortanek (Del. Bar No. 3106)
                                             Patrick A. Jackson (Del. Bar No. 4976)
                                             Joseph N. Argentina, Jr. (Del. Bar No. 5453)
                                             222 Delaware Avenue, Suite 1410
                                             Wilmington, Delaware 19801
                                             Telephone:  (302) 467-4200
                                             Facsimile:  (302) 467-4201
                                             steven.kortanek@dbr.com
                                             patrick.jackson@dbr.com

                                             -and-

                                             James H. Millar
                                             1177 Avenue of the Americas, 41st Floor
                                             New York, New York 10036-2714
                                             Telephone: (212) 248-3140
                                             Facsimile: (212) 248-3141
                                             james.millar@dbr.com

                                             Counsel to the Ad Hoc Noteholder Group