# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

FILED
2018 AUG -9  AM 8:00

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

| In re: | Chapter 11 |
|---|---|
| WOODBRIDGE GROUP OF COMPANIES, LLC, et al.,[1] | Case No. 17-12560 (KJC) |
| | (Jointly Administered) |
| Debtors. | Hearing Date: August 21, 2018, at 1:00 p.m. (ET) |
| | Objection Deadline: August 3, 2018, at 4:00 p.m. (ET) |

NO: 2313
2300

Brill asks that the Court please accept the attached **EXHIBIT A** for insertion in the Brill reply filing after the Bankruptcy Numbered Page 6. It is the "**Financing Fraud Steps Exhibit A**" that was referenced in the filing in direct support of Brill's **OBJECTIONS REPLY**. It was accidently omitted from his filing as a result of the hacking damage done to his computer systems and the resulting confusion.

It is worth accepting and using as a further helpful reference to the contents.

Brill apologizes to all Parties.

---

*As omitted section was introduced >>>>>*
1. Please review the attached statement of this Case's FINANCING FRAUD STEPS attached hereto (**EXHIBIT A**) and the sub-exhibits in examples of significant proof of each of the sections of the **EXHIBIT A**.
2. Such exhibit will substantively give support to the wrongdoings and fraud in this case with the damages caused on Brill and in particular present the CONTRACTUAL UNDERSTANDINGS that have been violated. There will be nothing relating to Whiteacre (except for its anticipatory formation) until after the fraud on Brill has been consummated.

---

Notices being filed with the Court and Debtors' Counsel

Date: August 8, 2018

Respectfully Presented,

*[signature]*

Alan R. Brill, Pro Se
420 NW Fifth Street, Ste 1-B
Evansville, Indiana 47708

Preferred | P.O. Box 3353
Evansville, IN 47732
Email: alanbrill@brillmedia.com
Tele: 812-423-6200

## EXHIBIT A

**FINANCING FRAUD** STEPS [**DOCUMENTED**] ON ALAN R BRILL ("**BRILL**") By RIVERDALE FUNDING LLC ("**RIVERDALE**")/WOODBRIDGE MORTGAGE INVESTMENT FUND 2., LLC ("**FUND2**") and THEIR RELATED **DEBTOR** ENTITIES and THEIR CONTROLLING AND OWNERSHIP INDIVIDUAL PERSONS ROBERT SHAPIRO ("**SHAPIRO**"), JOSEPH HUGHIS ("**HUGHIS**") and ROBERT REED ("**REED**") in THE PERIOD OF JANUARY 20, 2014 TO FEBRUARY 21, 2014; with STOLEN PROPERTY CONTINUING TO BE HELD TO PRESENT IN THE AFTER-THE-FACT DEPOSITORY WHITEACRE FUNDING LLC ("**WHITEACRE**") and MEANWHILE ACCUMULATING FURTHER **DAMAGES** ON BRILL AND ON THE PROPERTY OF **MILLIONS OF DOLLARS.**

*[SEE ATTACHED EXHIBIT PACKAGES FOR EACH OF THESE SETS OF STEPS – IN PARTICULARLY THE COMMITMENT CONTRACT IN EXHIBIT 11]*

1. Brill on 1/20/14, by Riverdale web site, was enticed to contact Riverdale regarding commercial real estate asset-based lending with a national competent lender doing 65% LTV on smaller mortgages in the million dollar range.   *A-1*

2. On same day on communication response with Riverdale executive Tony Coffman, Brill very professionally and comprehensively laid out his need for refinancing his fine fully renovated historical office building in Evansville Indiana as follows:   *A-2*

    a. Building had valued as high as $3.7 Million

    b. Generating $400,000 in annual cash-flow income

    c. Now, valued and cash-flow reduced by loss of major tenant in the dire national financial and economic environment experienced over the last several years.

    d. It was now being formally appraised by a national appraiser Integra for another pending lender at a FMV of about $1.3 Million, with an expectation that upon recovering substantial tenant occupancy that the FMV would increase back to the $3.4 Million range.

    e. A chart at 65% LTV at several potential FMV levels showed considerable ample flexibility for Brill's requirements (Exhibit "e")

    d. In such dire environment of desperation by many financial institutions, a default was called on the present mortgage of several million dollars and the the mortgage was also sold 4 times at increasingly lower prices to new holders by the prior holders (large sophisticated Mortgage holders).

*A1 A2 A3 A4*

e. In 2011 it was held in a project fund by Joe Temm and Cohen Financial with the objective of marketing their mortgages back to the original makers at prices of only a fraction of the mortgage claim but still permitting Tamm to profit handsomely over the incredibly lower price that his fund had paid for their distress mortgages; and by selling to the original makers on only a fraction of the claim he had a very happy ready market of people welcoming the recovery opportunity to save their businesses; and for Temm without strangling in costly and damaging and time consuming legal foreclosure and then still requiring a sale process;.

f. Temm entered into a formal fixed contract with Brill, for BRILL or his designees only, to be able to PURCHASE (not necessarily payoff) the Old Mortgage (purchase made the debt forgiveness income tax issue much more manageable) for a price of $950,000 (subsequently reduced by circumstances and fees-paid to the final $740,000);

g. Brill needed to borrow $750,000 (for Brill to purchase the Old Mortgage) by a refinancing of ERC in which Brill would leave the Old Mortgage as addition collateral for the New Loan which would wrap around the old Mortgage and the Old Mortgage would be rendered passive with all the terms and power, absent default, resting in the New Mortgage on ERC. Brill would also welcome additional borrowing up to $900,000 or a million with the additional funds used for other cost and maintenance and informal loan payoff issues of ERC; however if additional loan funds would not be available Brill would manage those needs from his other sources.

h. An ABSOLUTE requirement by Brill was the absolute and critical features for the deal was the inseparability of the collateral Old Mortgage and the New Loan; that is, that the conveyance of the Old Mortgage was to be totally subject solely to the making of the New Loan, and if the New loan was made, only then would the collateral Old Mortgage be permitted in the process. Furthermore the collateral Old Mortgage, on payoff of the New Loan was to be returned solely to Brill's personally designated recipient.

3. Over the next two days Coffman continued full communications orally and by email with much more additional professional due-diligence information delivered to Coffman by Brill and discussed, Brill having the experience to know all that Riverdale should need and to get it to them without waiting for a request.

A-3

4. On the third day 1/22/14 Coffman handed the telephone call over to Hughis who introduced himself as Coffman's boss and the person in charge of the Riverdale mortgage operation (he was also the VP of compliance (?) of all the Woodbridge companies and he was the direct link to Shapiro). Hughis conducted a very knowledgeable and skillful interview of Brill about the deal for over an hour and

A-4

2

then retuned the telephone call to Coffman. In hindsight it was clear that he was proving and assessing the presentation of the deal that Coffman had given him.

5. The next day 1/23/14 Coffman called Brill to tell him that he was emailing to Brill the Loan Approval Letter for a loan of $900,000, but he wanted to call Brill first to tell Brill to not be concerned that it specified an appraisal requirement of $1.5 Million, but they knew the appraisal was less and this requirement was only a formality and they would get the deal done.

6. Coffman instructed Brill that if the Approval Letter was satisfactory he should send it to their Hartford CT outside lawyer Richard Roberts to prepare the Loan Commitment and pay a preparation fee.

7. Based on Coffman's straightforward communication about the appraisal issue and their considerable knowledge and professionalism to date, Brill sent the Approval Letter to Roberts on Friday 1/25/14 with a cover letter again outlining the deal, outlined the comfort that the reputation of his firm gave Brill in dealing with the unknown Riverdale, and that he could check on Brill with several other outstanding law firms in that market who had previously worked with Brill on complex major asset-based financings that were very successful.

8. Roberts expressed to Brill and to Coffman and Hughis some concern that buying the Old Mortgage was not normal, and he would like verification of that structure approval.

9. Brill followed that up with an email to Robert a day or two later containing a suggested draft of the portions of the Loan Agreement that would apply to the treatment of the collateral Old Mortgage holding.

10. On Wednesday January 26, Hughis sent to Brill the Commitment Letter that Roberts had prepared. Brill was to sign it and send the $9,000 Commitment Fee.

11. Brill reviewed the Commitment which was mostly well done as had been discussed but he made 5 brief clarifying handwritten change additions to the Commitment Letter and initialed them and on January 31 he returned the Commitment with a Fee check by Federal Express to Hughis and with an email to all the parties. Two of the changes by Brill were further certain clarification of the inseparability of the Old Mortgage collateral and the New Loan and that the Old Mortgage, on payoff of the New Loan was to be returned to Brill personally or to his personal designee.

12. On Tuesday 2/4 Bril sent an email to Hughis et al. saying that in all good faith to all parties he had stopped his closing with Chang and would be dedicated to completing the this deal with Riverdale and it showed on the email Chang's message to Brill

3

expressing his disappointment especially as their were finalizing their documents for reclosing this week. Unfortunately this told the Riverdale people that he now had no choice in the short term but to deal with them and make their stealing easier.

13. In mid-afternoon Brill received a call from Woodbridge Associate Counsel Robert Reed in the CT office telling Brill that they needed to get the Old Mortgage transferred by Wednesday 2/5 in order that they could close the Loan by Friday 2/7, and he needed information of whom to communicate with to get that done. Brill gave him Joe Temm/Cohen contact information and told him Joe was the person he need to work with.

14. Monday and Tuesday there was a uproar forming among them and arising on Brill on Tuesday from Reed that Temm would not talk to him. Brill talked to Temm and Temm was resistant with all kinds of excuses to dealing with these people and sought to get Brill to drop them and go back to Chang  In hindsight he was trying to stop Brill from dealing with these sharks.  Finally Bril directed Temm to deal with them as he had the deal set up and Temm did.

15. On Friday 2/7 Temm called Brill to say that they were getting close to doing the transfer but he needed IN HAND from Brill a signed authorization and direction for him to do the deal. He had to have it in hand before he would act on Tuesday 2/11. On Monday Brill signed it and sent it by Federal Express for him to have Tuesday when he closed the Transfer.

16. On Friday 2/7  Reed called Brill to tell him that they needed a signed and notarized Estopple to close the collateral transfer. Hughis sent the estopple to Brill to sign and Brill made minor changes and signed and  had it notarized and sent it back for Tuesday Delivery. Brill made sure that it provided waivers only up to time of signing the Estoppel before the transfer, but granting nothing of waivers for issues thereafter nor against their actions in any way; signed and dated on 2/10.

17. Coffman in his affidavit gave sworn testimony that as he was quitting his job, in his last conversation with Hughis, Hughis told him in the week if 2 10-14 that the Brill deal was dead. *This was the same week that Hughis was having the Old Mortgage "collateral" transferred to Woodbridge; so Hughis had already planned to steal the collateral without fulfilling the contractual obligation to make the new Loan.*

18. Coincidently with the anticipated closing date, on Friday 2/7 in Delaware, Shapiro had formed an LLC , Whiteacre Funding, LLC) to be his safety hole to steal the Old Mortgage  away from other entangling assets of Fund2 if Brill should pursue fighting them for their theft of his Old Mortgage.

19. On Wed 2/12 Kiefer sent Brill his BPO valuation at $1,475,000 and Brill forwarded it to Hughis. Brill found the result satisfactory but did not like the presentation

4

categorization of some of the numbers and, for clarification, asked Kiefer to modify the presentation use of his numbers. He did.

20. The Integra appraisal had come in at $1.34 Million as is, and growing to $3.4 Million with increased occupancy. This was totally in line that was sold them since the first day, and of which we had continuing discussion and which was the number known to Hughis when Hughis himself engaged Integra.

    A-14

21. On 2/17 Hughis started complaining that Kiefer BPO was wrong because it was using FMV. He demanded that it had to show a "fire sale" (Brill's term, but synonymous with reality) valuation. Which would only be $700,000 to $900,000. Kiefer refused but finally gave in that if you want to know what the fire sale value might be without waiting and without any marketing, etc. I will add that. And he did. He made a of point of leaving the rest of his 24 page report at a FMV appraisal of $1.475 MILLION BPO UNTOUCHED, BUT ONLY ADDED AT THE VERY END ISOLATED IN A SMALL SINGLE PARAGRAPH: "BUT IF YOU INSIST ON A [FIRE SALE] with a no time and marketing transaction you will get only $700,000 to $900,000, WHICH IS nonsensible. I stand by my original FMV BPO because that is what I was engaged to produce and it is the correct answer.

    A-22

22. With a lot of arguing by Hugh of insufficient value over the weekend, on the 19th he emailed Brill that "because of the values we will not do the loan". We will be returning to you your commitment fee pursuant to paragraph 19.1. of the commitment contract.

    A-22

23. Brill replied OK, but what happens to my Old Mortgage?? Brill never got any response to that question asked several times.

    A-22

24. On 2/26 Brill received a settlement offer notice from new Indianapolis fronting attorney offering to sell the Old Mortgage back to Brill for $856,000 which was an 18% increase over what they had paid for it only 2 weeks earlier. Furthermore the offered detained that it had to be a cash settlement in the day and a half after Bril read the offer. Otherwise they would foreclose on their holding of the Old Mortgage. Beside the false price, the offer was knowingly impossible for Brill to fulfill even if he wanted to do so. By their own review of all Brill's information they knew that Brill did not have arability of that kind of cash; otherwise he would not have been talking with them. In addition it was mechanically impossible for the transaction, even with the cash in hand, to have been able to be completed in the day after next.

    A-24

    Further communication efforts By Brill with Hammond went nowhere.

25. The next that Brill heard was on April 3 when another Indianapolis attorney (Hammond had resigned form representation of them) Waller sent Bril a notice from

the Court of Whiteacre filing for foreclosure of the Property by the collateral Old Mortgage

26. After understanding that they would have a fight with Brill they transferred the holding of the Old Mortgage to Whiteacre from Fund2 in order that it would be protected in the new holder in isolation from any other assets with which it might get entangled in a fight. Whiteacre was setup for this purpose it was discovered on Friday 2/7 when the Loan was originally supposedly schedule to close.   A-36

27. We now find from the Bankruptcy Financial reports that Fund2 in a further fraud in a non-arm's length accounting sold the Old Mortgage to Whiteacre for $1.8 million, a profit to show on Fund2 to their Ponzi investors who would amazed by this evidence of great deal making; and on the Whiteacre books it now shows an asset value of $1.8 million as a much greater million cost than their 740,000 cost as a more valuable asset to invest in for their Ponzi scheme investor suckers.   A-36

28. On November 14, 2014 Brill sent an email to Shapiro directly from an email address he had discovered and suggested "maybe you could encourage your people to return the investment of mine that they are wrongly holding on to." And then Brill sent another one that said "maybe this might be of interest." It was a copy of the FBI Summary of its prosecution of the USA v Remington Capital et al. scheme on 1,900 victims in the amount of $26 million and 6 Remington Principals being sentenced to prison for up to 18 years.   A-28

4 days later 3 of the tires on Brill's car in his office parking lot were flattened. The tire shop said there was nothing wrong with the tires.

3 days after that 3 tires were again flattened in the office parking lot. The following week on a Thursday night, when Bril came out of his house to go the office he found his car under his roofed parking area of his house with all 4 tires flat.

Brill did not appreciate that message of intimidation from Shapiro. Though it was better than the bullets intimidation that he received in an earlier corporate bankruptcy brawl fighting the crooked Debtor Professionals he had engaged who decided stealing $50 million in fake fees was more worthwhile than representing their client ... and of course the Judge did not have the balls to crack his judicial buddies for wrongdoing (not only on this shooting but many other acts of clear malfeasance)

29. Eventually Whiteface filed for foreclosure and a court fight for foreclosure proceeded between ERC and Whiteacre. Brill personally was not a party in that legal action and Whiteacre was not a party to the stealing of the Mortgage. Whitacre was only the after-the-fact depository of the stolen Olds Mortgage.

30. The court at the Trail level and the appeal court in reliance on the Trial court granted the foreclosure which was effected in November 2017 and the foreclosed property is now in badly diminished condition is remains as property of the Woodbridge Group lodged in Whiteacre and presently being pushed for sale at the unsalable fraudulently inflated $1.8 "cost" that is shown on the Whitacre books, such price inflations frauds unknown to the presort Debtor Professionals as it was done 4 years ago and they do not look that far back to verify the source of the accounting balances presently on the Debtors' books,

A-36

31. The foreclosure granted by the courts is another clear example (first exemplified to Brill in the USA vs Remington Capital Case) that such complex commercial litigation cases are beyond the capability of most local courts to comprehend. In this case it was even worse and reason of when the local's court cannot comprehend the Trial judge for her stupidity could not comprehend anything and was more inserted getting away from the case so she would not would not have to worry about the scary unknowns that she did not know have no idea how to handle. If shown her "1+1" and ask her what this is she would be unable to say "2" but would even be further unsure about what is this you are showing me supposed to be about.

Further in actuality she tried to quote from a section of the commitment to support her decision butt her written quote was backward to what was actually written in the commitment, and then she still came jump for a diffident rational to support her decisions that could not have come from either writing of the commitment section she might use use. She is a disgrace.

Then even worse the lawyer representing ERC was not able to comprehend the relationship of the issues and even more, since he was before her frequently in the local court, did not want to get on her bad side by perhaps disgracing her by dealing with her idiocy.

32. Yes the Whiteacre vs ERC case turned wrong for ERC, even though it tried to show and some of the wrongs by Riverdale and Fund2 et al, was not relevant to the crimes of the preceding stealers and holders of the Old Mortgage. Brill was not named a party to that action. Brill is an appropriate party to this action as it is about the stealing of the Old Mortgage which contract to acquire it was essentially his personal property by contact with Temm and by that personal property he was essentially the owner of the property in ERC which was instead foreclosed on because he was shut out of an action as a proper defendant by the ineptness of the judge and the ERC attorney.

7

************************************

33. Now in their false defense, Riverdale/Woodbridge/Fund2 will try to argue:

   1, That the values were not sufficient to do the deal; and

   2. That they bought the Old Mortgage on the Open Market

   BOTH DEFENSES TOTALLY AT ODDS WITH MUCH ORAL AND WRITTEN EVIDENCE AND COMMON SENSE. THIS THEFT WAS ANOTHER STEALING AND CRIMINAL ACTION JUST LIKE THEIR NOW MORE VISIBLE AND ATTENTION-GETTING PONZI SCHEME SCAMMING.   A-1-5  AB-16

34. **Among other evidence otherwise:**

   **Sufficiency of value**

   1. They knew from presentation and discussion with them of facts from the very beginning

      And repeated throughout that appraisal would be only about $1.3 Million.   A-1-6  A-6

   2. Hughis himself engaged the appraisal already fully certainly knowing the appraisal would show only about $1.3 Million

   3. Coffman's Affidavit is sworn evidence that they new the appraisal was less than the $1.5 Mallon appraisal requirement even when they write the requirement   A-33

   4. Reed sworn deposition Testimony is aggressively and repeatedly that they NEVER use the BPO to hurt a deal.' They only use it to help a deal where the appraisal is weak.   A-34

   5. Redd swore that their loans are made at 65% loan to value.   A-34

   6. See Riverdale Website chart of loan parameter LTV level of 65%   A1-45

   7. She chart for loan amount for various relevant appraisal values.   A-45

   **Open market sale it was Not**

   7. Brill had contract that was strictly for him and binding between him and Cohen.   AB-16

8

8. Temm refused to deal with them in any open market way; DEMANDING WRITTEN AUTHORIZATION FROM BRILL FOR HIM TO EVEN TALK WITH THEM.

**Documents**

9. Written contacts are definitive in the inseparability of New Loan and Old Mortgage

*******************************************
## CONCLUSION

**34. Without question the Old Mortgage was stolen from Brill by Defendants in well planned/coordinated/executed fraud by the three personal defendants operating under the direction of Shapiro and through the now Debtor companies [in the same classic way as found in the case of <u>USA v Remington Capital et al</u>; except this on the individual theft against Brill is much/much bigger in stealing the collateral rather than as in the Remington Case merely the $5,000 to $40,000 good faith fees or deposits of the Remington frauds [not minimizing the impact on many of those victim of those lesser amounts].**

35. Brill should be awarded direct damages for his lost collateral in the amount of the underlying Property at the time of theft and other damages arising from legal fees, lost income, deterioration of the Property, expenditures in good faith to assist in preserving the property which were not reimbursed.

36. For reason of Fraud, Damages award to Brill should be trebled

37. Additional damages for time and turmoil and fraud, which for reason of fraud under Indiana law the damages are made triple.

38. In addition Punitive damages should be asserted against defennaaats in the maximum amount allowed by law in Indiana.

Respectfully Submitted

_____
Alan R Brill, Pro Se