## EXHIBIT 1

**Confirmation Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered) |

**NOTICE OF (I) APPROVAL OF DISCLOSURE STATEMENT, (II) ESTABLISHMENT OF VOTING RECORD DATE, (III) HEARING ON CONFIRMATION OF PLAN AND PROCEDURES AND DEADLINE FOR OBJECTING TO CONFIRMATION OF PLAN, AND (IV) PROCEDURES AND DEADLINE FOR VOTING ON PLAN**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     *Approval of Disclosure Statement*. By order dated [_____], 2018 (the "Disclosure Statement Order"), the United States Bankruptcy Court for the District of Delaware (the "Court"), having jurisdiction over the chapter 11 cases of the above-captioned debtors (the "Debtors"), approved the *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. [\_\_]] (as it may be amended, supplemented, or modified from time to time, the "Disclosure Statement") as containing adequate information within the meaning of section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), and authorized the Debtors to solicit votes to accept or reject the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. [\_\_]] (as it may be amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan"),[2] a copy of which is annexed as Exhibit A to the Disclosure Statement.

2.     *Deadline for Voting on the Plan*. By the Disclosure Statement Order, the Bankruptcy Court established **October 8, 2018 at 4:00 p.m. (ET)** (the "Voting Deadline") as the deadline by which Ballots accepting or rejecting the Plan must be received. Only Holders of Claims in Classes 3, 4, 5, and 6 under the Plan are entitled to vote on the Plan and will receive Ballots for casting such votes. To be counted, original Ballots must **actually be received** on or before the Voting Deadline by Garden City Group, LLC (the "Voting Agent") at:

If by First Class Mail:
Woodbridge Group of Companies, LLC
c/o Garden City Group, LLC

If by Overnight Mail or Hand Delivery:
Woodbridge Group of Companies, LLC
c/o Garden City Group, LLC

---

[1]     The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

[2]     All capitalized terms used but not otherwise defined herein shall have the meaning provided to them in the Plan.

01:23454513.5

P.O. Box 10545                          5151 Blazer Parkway, Suite A
Dublin, Ohio 43017-0208                 Dublin, Ohio 43017

Ballots cast by e-mail, facsimile, or any other electronic format will **not** be counted, unless otherwise approved by the Debtors.  Holders of Unimpaired Claims under the Plan and Classes that are deemed to reject the Plan are not entitled to vote on the Plan and will receive a Notice of Non-Voting Status rather than a Ballot.

3.    *Confirmation Hearing.*  A hearing (the "Confirmation Hearing") will be held before the Honorable Kevin J. Carey, United States Bankruptcy Judge, on **October 24, 2018 at 10:00 a.m. (ET)**, in Courtroom 5 of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 5th Floor, Wilmington, Delaware 19801, to consider confirmation of the Plan, and for such other and further relief as may be just or proper.  The Confirmation Hearing may be continued from time to time without further notice other than the announcement of the adjourned date(s) at the Confirmation Hearing or any continued hearing or on the applicable hearing agenda.  The Plan may be modified in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Plan, and applicable law, without further notice, prior to or as a result of the Confirmation Hearing.  If the Court enters an order confirming the Plan, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all parties to the fullest extent permitted by the Bankruptcy Code.

4.    *Deadline for Objections to Confirmation of Plan.*  Objections, if any, to confirmation of the Plan (including, without limitation, objections to the classification of any Claim under the Plan) must (i) be in writing; (ii) state the name and address of the objecting party and the nature of the claim or interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection or response; and (iv) be filed with the Bankruptcy Court and served on the following parties so as to be actually received **by 4:00 p.m. (ET) on October 8, 2018**: (1) counsel to the Debtors, (a) Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067, Attn: Michael L. Tuchin, Esq., mtuchin@ktbslaw.com, and David A. Fidler, Esq., dfidler@ktbslaw.com; and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach, Esq., sbeach@ycst.com, and Edmon L. Morton, Esq., emorton@ycst.com; (2) counsel to the Unsecured Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067, Attn: Richard M. Pachulski, Esq., rpachulski@pszjlaw.com, and 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899, Attn: Colin R. Robinson, Esq., crobinson@pszjlaw.com; (3) counsel to the Noteholder Committee, Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn: Joseph N. Argentina, Jr., Esq., joseph.argentina@dbr.com; (4) counsel to the Unitholder Committee, Venable LLP, 1201 N. Market Street, Suite 1400, Wilmington, Delaware 19801, Attn: Jamie L. Edmonson, Esq., jledmsonson@venable.com, and 1270 Avenue of the Americas, New York, New York, Attn: Jeffrey S. Sabin, Esq., jssabin@venable.com; and 5) the U.S. Trustee, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy Jay Fox, Jr., Esq., timothy.fox@usdoj.gov.  Objections to the Plan may be submitted by any parties in interest in the Debtors' Chapter 11 Cases.

5.    *Releases, Discharges, Injunctions, and Exculpations.*  **FOLLOWING CONFIRMATION, SUBJECT TO ARTICLE IX OF THE PLAN, THE PLAN WILL BE SUBSTANTIALLY CONSUMMATED ON THE EFFECTIVE DATE.  AMONG OTHER THINGS, CERTAIN RELEASE, INJUNCTION, EXCULPATION, AND DISCHARGE PROVISIONS SET FORTH IN SECTIONS 11.10, 11.11, 11.12, AND 11.13 OF THE PLAN WILL BECOME EFFECTIVE.  IT IS IMPORTANT TO READ THESE PROVISIONS OF THE PLAN CAREFULLY SO THAT YOU UNDERSTAND HOW CONFIRMATION AND SUBSTANTIAL CONSUMMATION OF THE PLAN — WHICH EFFECTUATES SUCH PROVISIONS — WILL AFFECT YOU.**

01:23454513.5

Specifically, the releases in Section 11.11 of the Plan bind the "Releasing Parties," which the Plan defines as "Collectively, (a) the Debtors, (b) the Estates, and (c) any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, the Remaining Debtors Manager, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise."

The Plan defines "Released Parties" as "Collectively, (a) the Debtors, (b) the New Board, (c) the Committees, and (d) each of the preceding's respective Related Parties; *provided, however*, that the Released Parties shall not include any Excluded Party."

The releases, discharges, injunctions, and exculpations provide for the following:

**Non-Discharge of the Debtors; Injunction.**

**In accordance with Bankruptcy Code section 1141(d)(3)(A), the Plan does not discharge the Debtors. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests against the Debtors. As such, no Person holding a Claim or an Equity Interest may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Person under the Plan. As of the Effective Date, all Persons are precluded and barred from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

**Releases and Related Matters.**

**(a)     On the Effective Date, for good and valuable consideration, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however*, that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.**

**(b)     Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.**

(c)      Notwithstanding any provision herein to the contrary or an abstention from voting on the Plan, no provision of the Plan, or any order confirming the Plan, (i) releases any non-debtor Person from any Cause of Action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Causes of Action, proceedings, or investigations against any non-debtor Person in any forum.

Exculpation and Limitation of Liability.

On the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, to the maximum extent permitted by law, none of the Exculpated Parties shall have or incur any liability to any Person, including to any Holder of a Claim or an Equity Interest, for any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the formulation, negotiation, preparation, dissemination, solicitation of acceptances, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with the Plan, or the administration of the Plan or the property to be distributed under the Plan; *provided, however,* that nothing in this Section 11.12 shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order; and *provided, further,* that the exculpation provisions of this Section 11.12 shall not apply to acts or omissions constituting actual fraud or willful misconduct by such Exculpated Party as determined by a Final Order. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute actual fraud or willful misconduct unless the approval of the Bankruptcy Court was obtained by fraud or misrepresentation, and in all respects, the Exculpated Parties shall be entitled to rely on the written advice of counsel with respect to their duties and responsibilities under, or in connection with, the Chapter 11 Cases, the Plan, and administration thereof. The Confirmation Order shall serve as a permanent injunction against any Person seeking to enforce any Causes of Action against the Exculpated Parties that are encompassed by the exculpation provided by this Section 11.12 of the Plan.

Term of Injunctions or Stays.

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant as of the Confirmation Hearing (excluding any injunctions or stays contained in or arising from the Plan or the Confirmation Order), shall remain in full force and effect through and inclusive of the Effective Date.

6.      *Additional Copies of Documents*.  Copies of the Plan are available for review free of charge at http://cases.gardencitygroup.com/wgc/.  In addition, copies of the Plan are available upon written request to the Debtors' Voting Agent at Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio 43017-0208, or by contacting the Voting Agent via email to WGCInfo@choosegcg.com with "Woodbridge Solicitation" referenced in the subject line.

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 576-3266
Fax:    (302) 571-1253

KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Tel:    (310) 407-4000
Fax:    (310) 407-9090

*Counsel for the Debtors and Debtors in Possession*

01:23454513.5

**EXHIBIT 2**

**Forms of Ballots**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES,<br>LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered) |

**BALLOT FOR HOLDERS OF CLASS 3 STANDARD NOTE CLAIMS FOR ACCEPTING
OR REJECTING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS**

> **TO BE COUNTED, YOUR VOTE MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY GARDEN CITY GROUP,
> LLC BY OCTOBER 8, 2018 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

This ballot (the "Ballot") is being provided to you by the above-captioned debtors and debtors in possession (the "Debtors") to solicit your vote to accept or reject the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan")[2] proposed by the Debtors and described in the related *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time, the "Disclosure Statement") that was approved by an order [Docket No. ___] of the United States Bankruptcy Court for the District of Delaware (the "Court"). The Disclosure Statement describes the Plan and provides information to assist you in deciding how to vote your Ballot. Court approval of the Disclosure Statement does not indicate Court approval of the Plan. If you do not have a Disclosure Statement or Plan, you may obtain a copy free of charge at the Debtors' restructuring website maintained by Garden City Group, LLC (the "Voting Agent") at http://cases.gardencitygroup.com/wgc/. Copies of the Disclosure Statement and Plan are also available: (i) for a fee, on the Court's website, www.deb.uscourts.gov (a PACER account is required); (ii) upon written request to the Voting Agent at Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio 43017-0208; or (iii) by contacting the Voting Agent via email to WGCInfo@choosegcg.com with "Woodbridge Solicitation" referenced in the subject line or via telephone at 1-888-735-7613.

---

[1]    The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

[2]    All capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan.

---

**IMPORTANT**

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your Claim has been placed in Class 3 – Standard Note Claims under the Plan.

If your Ballot is not <u>actually</u> <u>received</u> by the Voting Agent on or before October 8, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Voting Deadline</u>"), and such deadline is not extended by the Debtors or order of the Court, your vote will not count as either an acceptance or a rejection of the Plan. If the Plan is confirmed by the Court, it will be binding on you whether or not you vote and regardless of how you vote.

You may return your Ballot in the return envelope provided in your package or send it to:

*If by First Class Mail:*              or       *If by Overnight Mail or Hand Delivery:*
**Woodbridge Group of Companies, LLC**          **Woodbridge Group of Companies, LLC**
**c/o Garden City Group, LLC**                  **c/o Garden City Group, LLC**
**P.O. Box 10545**                              **5151 Blazer Parkway, Suite A**
**Dublin, Ohio 43017-0208**                     **Dublin, Ohio 43017**

---

## ACCEPTANCE OR REJECTION OF THE PLAN

**Item 1.  Applicable Debtor(s).**  For purposes of voting to accept or reject the Plan, as of December 4, 2017 (the "<u>Voting Record Date</u>"), the undersigned (the "<u>Claimant</u>") was a Holder of a Class 3 Standard Note Claim against the Debtor(s) set forth below in the Outstanding Principal Amount(s) set forth below.

| Debtor | Outstanding Principal Amount |
|---|---|
| Woodbridge Mortgage Investment Fund 1, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 2, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 3, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 3a, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 4, LLC | [GCG to insert] |
| Woodbridge Commercial Bridge Loan Fund 1, LLC | [GCG to insert] |
| Woodbridge Commercial Bridge Loan Fund 2, LLC | [GCG to insert] |

**Item 2.  Vote on Plan.  CHECK ONE BOX ONLY:**

☐      **ACCEPTS (votes FOR) the Plan.**

☐      **REJECTS (votes AGAINST) the Plan.**

**Item 3.   Calculation of Net Note Claim Amounts and Election to Become Disputing Claimant.**
Under the Plan, Distributions to Holders of Class 3 Standard Note Claims will be based on, among other
things, the amount of such Holder's Net Note Claim.  The term "Net Note Claim" is based on the
Outstanding Principal Amount of your Note Claim, minus the aggregate amount of all Prepetition
Distributions received by you (*i.e.*, all amounts you were paid on account of Notes before the bankruptcy
filing, other than the return or repayment of principal).  Based on their books and records, the Debtors
have prepared a "Schedule of Principal Amounts and Prepetition Distributions" (the amounts calculated
for your Net Note Claim are set forth below and a copy of the full schedule is attached to the Disclosure
Statement) that lists the Debtors' calculation of the Net Note Claim associated with your Claim and all
other Note Claims.  **Unless you check the box in this Item 3 indicating that you disagree with the
Debtors' calculation, the Net Note Claim set forth in the Schedule of Principal Amounts and
Prepetition Distributions will be the amount of your Net Note Claim for purposes of Distributions
under the Plan.**  As set forth in the Schedule of Principal Amounts and Prepetition Distributions, the
Debtors have calculated the amount of your Net Note Claim as follows:

|  |  |  |
|---|---|---|
|  | Outstanding Principal Amount: | $ [GCG to insert] |
| *Minus* | Total Prepetition Distributions: | $ [GCG to insert] |
| *Equals* | **Net Note Claim:** | **$ [GCG to insert]** |

If you agree with the Net Note Claim amounts set forth above, then you do not need to take any
action with respect to this Item 3, and Distributions to you under the Plan will be calculated based on such
Net Note Claim amounts.

If you disagree with the Net Note Claim amounts set forth in the Schedule of Principal Amounts
and Prepetition Distributions, then you have the option to check the box below and dispute such amount.
**If you check the box below in this Item 3 and disagree with the Net Note Claim amounts set forth
above, this will significantly delay the timing of Distributions (if any) to you, and other Holders of
Class 3 Claims that have not elected to become Disputing Claimants will receive Distributions
before you.  The Debtors reserve all rights to object to the validity, amount, or any other aspect of
any Claim held by a Disputing Claimant who disputes the Net Note Claim amounts set forth above.
In addition, the Debtors reserve any Liquidation Trust Actions that may exist regarding the
particular Disputing Claimant, all of which the Liquidation Trust may determine to pursue against
the particular Disputing Claimant as part of post-Confirmation litigation relating to the correct Net
Note Claim amounts and related matters.**

☐      **The undersigned Claimant <u>DISPUTES</u> the Net Note Claim amounts set forth in the
Schedule of Principal Amounts and Prepetition Distributions.**

**Item 4.  Contributed Claim Election.**  You may own Contributed Claims, which are defined in the Plan
as "all Causes of Action that a Noteholder or Unitholder has against any Person that is not a Released
Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any
Excluded Parties."  The Plan provides that you may agree to contribute your Contributed Claims, if any,
to the Liquidation Trust.  By electing such option, you agree that, subject to the occurrence of the
Effective Date and the formation of the Liquidation Trust, you will be deemed to have, among other

things, contributed your Contributed Claims to the Liquidation Trust. In such case, you will no longer be permitted to pursue your Contributed Claims on your own behalf (including if you are a member of any class action lawsuit), and any recovery received on account of such Contributed Claims will be Liquidation Trust Assets to be distributed to all Liquidation Trust Beneficiaries in accordance with the Plan. If you check the box below, then your relative share of Liquidation Trust recoveries will be enhanced by having the amount that otherwise would be your Net Note Claim increased by the Contributing Claimants Enhancement Multiplier (*i.e.*, 105%). You also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner. If you do not elect to contribute your Contributed Claims, you will remain able to pursue such claims (at your own cost and expense) in an appropriate forum; your success or failure on any such claims that you retain may affect your rights against other parties. The Debtors encourage anyone not contributing their Contributed Claims to consult with their own counsel about any such claims and related matters.

**By checking the box below, you agree to contribute your Contributed Claims, if any, to the Liquidation Trust. Checking the box below means that you will receive the benefit of the Contributing Claimants Enhancement Multiplier, which will result in you receiving a larger proportional recovery than other Holders of Class 3 Claims who do not make this election.**

☐     **The undersigned Claimant elects to (OPTS IN to) contribute its Contributed Claims to the Liquidation Trust.**

By checking the foregoing box, the undersigned Claimant represents and warrants that its Contributed Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Claimant's ability to contribute such Contributed Claims to the Liquidation Trust.

## IMPORTANT INFORMATION REGARDING THE RELEASES

Following confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, certain release, injunction, exculpation, and discharge provisions set forth in Sections 11.10, 11.11, 11.12, and 11.13 of the Plan will become effective. In determining how to cast your vote on the Plan, it is important to read these provisions of the Plan carefully so that you understand how confirmation and substantial consummation of the Plan — which effectuates such provisions — will affect you.

Specifically, the releases in Section 11.11 of the Plan bind the "Releasing Parties," which the Plan defines as "Collectively, (a) the Debtors, (b) the Estates, and (c) any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, the Remaining Debtors Manager, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise." The releases provide for, among other things, the following:

**Releases and Related Matters.**

(a)     **On the Effective Date, for good and valuable consideration, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or**

**unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct;** *provided, however,* **that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.**

> **(b)     Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.**

<u>**Item 5.  Certification**</u>.  By signing this Ballot, the Claimant certifies that: (i) on the Voting Record Date, it was the Holder of the Class 3 Standard Note Claim to which this Ballot pertains or an authorized signatory for such Holder; (ii) it has full power and authority to (x) vote to accept or reject the Plan, (y) determine whether to dispute the Net Note Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions and make the Contributed Claims election, and (z) execute and return the Ballot; and (iii) it has reviewed the Voting Instructions set forth below and received a copy of the Disclosure Statement, the Plan, and other solicitation materials.  The undersigned understands that an otherwise properly completed, executed, and timely returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted.  The undersigned also certifies that its vote on the Plan is subject to all the terms and conditions set forth in the Plan and the Disclosure Statement.

Name of Claimant: _____

Signature: _____

Name (if different from Claimant): _____

Title: _____

Address: _____

_____

_____

Dated: _____

**Please make sure you have provided all information requested in this Ballot.  Please read and follow the instructions set forth in the attached Voting Instructions carefully.  Please complete, sign, and date this Ballot and return it by mail, hand delivery, or overnight courier so that it is received by the Voting Agent by the Voting Deadline on October 8, 2018 at 4:00 p.m. (prevailing Eastern Time).**

01:23509781.1

## VOTING INSTRUCTIONS

1.     In order for your vote to count, you must:

   (i)     In the boxes provided in Item 2 of the Ballot, indicate <u>either</u> acceptance or rejection of the Plan by checking the appropriate box; and

   (ii)    Review and sign the certifications in Item 5 of the Ballot.  Please be sure to sign and date your Ballot.  Your signature is required for your vote to be counted.  If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing.  If the Standard Note Claim is held by an entity, your Ballot must be executed in the name of an authorized signatory.  In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

2.     Review the Calculation of Net Note Claim Amounts and Election to Become Disputing Claimant disclosure in Item 3, and determine whether to check the box in Item 3.

3.     Review the Contributed Claims election disclosure in Item 4, and determine whether to check the box in Item 4.

4.     **To have your vote counted and for any elections made in this Ballot to be effective, you must complete, sign, and return this Ballot so that it is <u>actually</u> <u>received</u> by the Voting Agent not later than 4:00 p.m. (prevailing Eastern Time) on October 8, 2018.**

5.     Return the completed Ballot to the Voting Agent in the pre-addressed, postage pre-paid return envelope enclosed with this Ballot or return it to:

   <u>If by First Class Mail</u>:                        <u>If by Overnight Mail or Hand Delivery</u>:
   Woodbridge Group of Companies, LLC        Woodbridge Group of Companies, LLC
   c/o Garden City Group, LLC                c/o Garden City Group, LLC
   P.O. Box 10545                            5151 Blazer Parkway, Suite A
   Dublin, Ohio 43017-0208                   Dublin, Ohio 43017

   DO NOT SUBMIT YOUR BALLOT BY FAX, EMAIL, OR ELECTRONIC TRANSMISSION. A Ballot submitted by fax, email, or electronic transmission will not be counted, unless approved by the Debtors or otherwise ordered by the Court.

6.     A Ballot that either indicates both acceptance and rejection of the Plan or fails to indicate either an acceptance or a rejection of the Plan will not be counted.

7.     You must vote all your Claims within a single Class under the Plan either to accept or to reject the Plan.  A Ballot that partially rejects and partially accepts the Plan will not be counted.

8.     **If you have previously delivered a valid Ballot for the acceptance or rejection of the Plan, you may revoke such Ballot and change your vote or any attendant election or preference by delivering to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect your intent and shall supersede and revoke any earlier received Ballot.  If you cast multiple Ballots on account of the same Claim, which are**

01:23509781.1

**received by the Voting Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.**

9.    Any Ballot that is illegible or that contains insufficient information to permit the identification of the Claimant will not be counted.

10.    This Ballot does not constitute, and shall not be deemed to be, a proof of claim against any of the Debtors or an assertion or admission of a Claim by any of the Debtors.

11.    It is important that you vote. The Plan can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount <u>and</u> more than one-half in number of the Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of section 1129(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan: (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting Class, the Court also must find that at least one Impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

12.    NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

13.    PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT OR THESE VOTING INSTRUCTIONS, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE VOTING AGENT BY CALLING (888)-735-7613 OR EMAILING WGCInfo@choosegcg.com.

PLEASE NOTE THAT THE VOTING AGENT IS NOT PERMITTED TO PROVIDE LEGAL ADVICE.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES,<br>LLC, *et al.*,[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered) |

**BALLOT FOR HOLDERS OF CLASS 4 GENERAL UNSECURED CLAIMS FOR ACCEPTING
OR REJECTING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS**

> **TO BE COUNTED, YOUR VOTE MUST BE <u>ACTUALLY</u> <u>RECEIVED</u> BY GARDEN CITY GROUP,
> LLC BY OCTOBER 8, 2018 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

　　　　This ballot (the "Ballot") is being provided to you by the above-captioned debtors and debtors in possession (the "Debtors") to solicit your vote to accept or reject the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan")[2] proposed by the Debtors and described in the related *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time, the "Disclosure Statement") that was approved by an order [Docket No. ___] of the United States Bankruptcy Court for the District of Delaware (the "Court"). The Disclosure Statement describes the Plan and provides information to assist you in deciding how to vote your Ballot. Court approval of the Disclosure Statement does not indicate Court approval of the Plan. If you do not have a Disclosure Statement or Plan, you may obtain a copy free of charge at the Debtors' restructuring website maintained by Garden City Group, LLC (the "Voting Agent") at http://cases.gardencitygroup.com/wgc/. Copies of the Disclosure Statement and Plan are also available: (i) for a fee, on the Court's website, www.deb.uscourts.gov (a PACER account is required); (ii) upon written request to the Voting Agent at Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio 43017-0208; or (iii) by contacting the Voting Agent via email to WGCInfo@choosegcg.com with "Woodbridge Solicitation" referenced in the subject line or via telephone at 1-888-735-7613.

---

[1]　　The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

[2]　　All capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan.

---

**IMPORTANT**

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your Claim has been placed in Class 4 – General Unsecured Claims under the Plan.

If your Ballot is not <u>actually</u> <u>received</u> by the Voting Agent on or before October 8, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Voting Deadline</u>"), and such deadline is not extended by the Debtors or order of the Court, your vote will not count as either an acceptance or a rejection of the Plan. If the Plan is confirmed by the Court, it will be binding on you whether or not you vote and regardless of how you vote.

You may return your Ballot in the return envelope provided in your package or send it to:

| *If by First Class Mail:* | or | *If by Overnight Mail or Hand Delivery:* |
|---|---|---|
| **Woodbridge Group of Companies, LLC** | | **Woodbridge Group of Companies, LLC** |
| **c/o Garden City Group, LLC** | | **c/o Garden City Group, LLC** |
| **P.O. Box 10545** | | **5151 Blazer Parkway, Suite A** |
| **Dublin, Ohio 43017-0208** | | **Dublin, Ohio 43017** |

---

## ACCEPTANCE OR REJECTION OF THE PLAN

**Item 1.  Vote Amount.**  For purposes of voting to accept or reject the Plan, as of August 21, 2018 (the "<u>Voting Record Date</u>"), the undersigned (the "<u>Claimant</u>") was a Holder of a Class 4 General Unsecured Claim in the aggregate amount set forth below against the Debtor set forth below.

Amount: $_____[GCG/DSI to insert]_____

Applicable Debtor _____[GCG/DSI to insert]_____

**Item 2.  Vote on Plan.  CHECK ONE BOX ONLY:**

☐     **ACCEPTS (votes FOR) the Plan.**

☐     **REJECTS (votes AGAINST) the Plan.**

### IMPORTANT INFORMATION REGARDING THE RELEASES

Following confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, certain release, injunction, exculpation, and discharge provisions set forth in Sections 11.10, 11.11, 11.12, and 11.13 of the Plan will become effective. In determining how to cast your vote on the Plan, it is important to read these provisions of the Plan carefully so that you understand how confirmation and substantial consummation of the Plan — which effectuates such provisions — will affect you.

Specifically, the releases in Section 11.11 of the Plan bind the "Releasing Parties," which the Plan defines as "Collectively, (a) the Debtors, (b) the Estates, and (c) any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, the Remaining Debtors Manager, and any other successor to the Debtors or any other estate representative that is or could be appointed or

selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise." The releases provide for, among other things, the following:

**Releases and Related Matters.**

(a)    On the Effective Date, for good and valuable consideration, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however,* that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.

(b)    Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

**Item 3. Certification.** By signing this Ballot, the Claimant certifies that: (i) on the Voting Record Date, it was the Holder of the Class 4 General Unsecured Claim to which this Ballot pertains or an authorized signatory for such Holder; (ii) it has full power and authority to vote to accept or reject the Plan and execute and return the Ballot; and (iii) it has reviewed the Voting Instructions set forth below and received a copy of the Disclosure Statement, the Plan, and other solicitation materials. The undersigned understands that an otherwise properly completed, executed, and timely returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted. The undersigned also certifies that its vote on the Plan is subject to all the terms and conditions set forth in the Plan and the Disclosure Statement.

Name of Claimant: _____

Signature: _____

Name (if different from Claimant): _____

Title: _____

Address: _____

_____

_____

Dated: _____

Please make sure you have provided all information requested in this Ballot.  Please read and follow the instructions set forth in the attached Voting Instructions carefully.  Please complete, sign, and date this Ballot and return it by mail, hand delivery, or overnight courier so that it is received by the Voting Agent by the Voting Deadline on October 8, 2018 at 4:00 p.m. (prevailing Eastern Time).

## VOTING INSTRUCTIONS

1.    In order for your vote to count, you must:

  (i)    In the boxes provided in Item 2 of the Ballot, indicate <u>either</u> acceptance or rejection of the Plan by checking the appropriate box; and

  (ii)   Review and sign the certifications in Item 3 of the Ballot.  Please be sure to sign and date your Ballot.  Your signature is required for your vote to be counted.  If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing.  If the General Unsecured Claim is held by an entity, your Ballot must be executed in the name of an authorized signatory.  In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

2.    **To have your vote counted and for any elections made in this Ballot to be effective, you must complete, sign, and return this Ballot so that it is <u>actually received</u> by the Voting Agent not later than 4:00 p.m. (prevailing Eastern Time) on October 8, 2018.**

3.    Return the completed Ballot to the Voting Agent in the pre-addressed, postage pre-paid return envelope enclosed with this Ballot or return it to:

| If by First Class Mail: | If by Overnight Mail or Hand Delivery: |
|---|---|
| Woodbridge Group of Companies, LLC | Woodbridge Group of Companies, LLC |
| c/o Garden City Group, LLC | c/o Garden City Group, LLC |
| P.O. Box 10545 | 5151 Blazer Parkway, Suite A |
| Dublin, Ohio 43017-0208 | Dublin, Ohio 43017 |

4.    DO NOT SUBMIT YOUR BALLOT BY FAX, EMAIL, OR ELECTRONIC TRANSMISSION.  A Ballot submitted by fax, email, or electronic transmission will not be counted, unless approved by the Debtors or otherwise ordered by the Court.

5.    A Ballot that either indicates both acceptance and rejection of the Plan or fails to indicate either an acceptance or a rejection of the Plan will not be counted.

6.    You must vote all your Claims within a single Class under the Plan either to accept or to reject the Plan.  A Ballot that partially rejects and partially accepts the Plan will not be counted.

7.    **If you have previously delivered a valid Ballot for the acceptance or rejection of the Plan, you may revoke such Ballot and change your vote or any attendant election or preference by delivering to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect your intent and shall supersede and revoke any earlier received Ballot.  If you cast multiple Ballots on account of the same Claim, which are received by the Voting Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.**

8.    Any Ballot that is illegible or that contains insufficient information to permit the identification of the Claimant will not be counted.

01:23509780.1

170042.4

9.  This Ballot does not constitute, and shall not be deemed to be, a proof of claim against any of the Debtors or an assertion or admission of a Claim by any of the Debtors.

10. It is important that you vote. The Plan can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of the Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of section 1129(a) of title 11 of the United States Code (the "Bankruptcy Code"). If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan: (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting Class, the Court also must find that at least one Impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

11. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

12. PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT OR THESE VOTING INSTRUCTIONS, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE VOTING AGENT BY CALLING (888)-735-7613 OR EMAILING WGCInfo@choosegcg.com.

PLEASE NOTE THAT THE VOTING AGENT IS NOT PERMITTED TO PROVIDE LEGAL ADVICE.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES,<br>LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered) |

### BALLOT FOR HOLDERS OF CLASS 5 UNIT CLAIMS FOR ACCEPTING
### OR REJECTING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF
### WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS

---

**TO BE COUNTED, YOUR VOTE MUST BE _ACTUALLY RECEIVED_ BY GARDEN CITY GROUP, LLC BY OCTOBER 8, 2018 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

---

This ballot (the "Ballot") is being provided to you by the above-captioned debtors and debtors in possession (the "Debtors") to solicit your vote to accept or reject the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan")[2] proposed by the Debtors and described in the related *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time, the "Disclosure Statement") that was approved by an order [Docket No. ___] of the United States Bankruptcy Court for the District of Delaware (the "Court"). The Disclosure Statement describes the Plan and provides information to assist you in deciding how to vote your Ballot. Court approval of the Disclosure Statement does not indicate Court approval of the Plan. If you do not have a Disclosure Statement or Plan, you may obtain a copy free of charge at the Debtors' restructuring website maintained by Garden City Group, LLC (the "Voting Agent") at http://cases.gardencitygroup.com/wgc/. Copies of the Disclosure Statement and Plan are also available: (i) for a fee, on the Court's website, www.deb.uscourts.gov (a PACER account is required); (ii) upon written request to the Voting Agent at Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio 43017-0208; or (iii) by contacting the Voting Agent via email to WGCInfo@choosegcg.com with "Woodbridge Solicitation" referenced in the subject line or via telephone at 1-888-735-7613.

---

[1]   The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

[2]   All capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan.

---

**IMPORTANT**

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your Claim has been placed in Class 5 – Unit Claims under the Plan.

If your Ballot is not <u>actually received</u> by the Voting Agent on or before October 8, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Voting Deadline</u>"), and such deadline is not extended by the Debtors or order of the Court, your vote will not count as either an acceptance or a rejection of the Plan. If the Plan is confirmed by the Court, it will be binding on you whether or not you vote and regardless of how you vote.

You may return your Ballot in the return envelope provided in your package or send it to:

<table>
<tr><td><u><i>If by First Class Mail</i></u>:</td><td><i>or</i></td><td><u><i>If by Overnight Mail or Hand Delivery</i></u>:</td></tr>
<tr><td>Woodbridge Group of Companies, LLC</td><td></td><td>Woodbridge Group of Companies, LLC</td></tr>
<tr><td>c/o Garden City Group, LLC</td><td></td><td>c/o Garden City Group, LLC</td></tr>
<tr><td>P.O. Box 10545</td><td></td><td>5151 Blazer Parkway, Suite A</td></tr>
<tr><td>Dublin, Ohio 43017-0208</td><td></td><td>Dublin, Ohio 43017</td></tr>
</table>

---

## ACCEPTANCE OR REJECTION OF THE PLAN

**Item 1.  Applicable Debtor(s)**.  For purposes of voting to accept or reject the Plan, as of December 4, 2017 (the "Voting Record Date"), the undersigned (the "Claimant") was a Holder of a Class 5 Unit Claim against the Debtor(s) set forth below in the Outstanding Principal Amount(s) set forth below.

| Debtor | Outstanding Principal Amount |
|---|---|
| Woodbridge Mortgage Investment Fund 1, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 2, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 3, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 3a, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 4, LLC | [GCG to insert] |
| Woodbridge Commercial Bridge Loan Fund 1, LLC | [GCG to insert] |
| Woodbridge Commercial Bridge Loan Fund 2, LLC | [GCG to insert] |

<u>**Item 2. Vote on Plan**</u>.  **CHECK ONE BOX ONLY:**

      ☐        **ACCEPTS (votes FOR) the Plan.**

      ☐        **REJECTS (votes AGAINST) the Plan.**

<u>**Item 3.  Calculation of Net Unit Claim Amounts and Election to Become Disputing Claimant**</u>.
Under the Plan, Distributions to Holders of Class 5 Unit Claims will be based on, among other things, the amount of such Holder's Net Unit Claim.  The term "Net Unit Claim" is based on the Outstanding Principal Amount of your Unit Claim, minus the aggregate amount of all Prepetition Distributions received by you (*i.e.*, all amounts you were paid on account of Units before the bankruptcy filing, other than the return or repayment of principal).  Based on their books and records, the Debtors have prepared a "Schedule of Principal Amounts and Prepetition Distributions" (the amounts calculated for your Net Unit Claim are set forth below and a copy of the full schedule is attached to the Disclosure Statement) that lists the Debtors' calculation of the Net Unit Claim associated with your Claim and all other Unit Claims.  **Unless you check the box in this Item 3 indicating that you disagree with the Debtors' calculation, the Net Unit Claim set forth in the Schedule of Principal Amounts and Prepetition Distributions will be the amount of your Net Unit Claim for purposes of Distributions under the Plan.**  As set forth in the Schedule of Principal Amounts and Prepetition Distributions, the Debtors have calculated the amount of your Net Unit Claim as follows:

|          | Outstanding Principal Amount:      | $ [GCG to insert] |
|----------|------------------------------------|-------------------|
| *Minus*  | Total Prepetition Distributions:   | $ [GCG to insert] |
| *Equals* | **Net Unit Claim:**                | **$ [GCG to insert]** |

      If you agree with the Net Unit Claim amounts set forth above, then you do not need to take any action with respect to this Item 3, and Distributions to you under the Plan will be calculated based on such Net Unit Claim amounts.

      If you disagree with the Net Unit Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions, then you have the option to check the box below and dispute such amount.  **If you check the box below in this Item 3 and disagree with the Net Unit Claim amounts set forth above, this will significantly delay the timing of Distributions (if any) to you, and other Holders of Class 5 Claims that have not elected to become Disputing Claimants will receive Distributions before you.  The Debtors reserve all rights to object to the validity, amount, or any other aspect of any Claim held by a Disputing Claimant who disputes the Net Unit Claim amounts set forth above.  In addition, the Debtors reserve any Liquidation Trust Actions that may exist regarding the particular Disputing Claimant, all of which the Liquidation Trust may determine to pursue against the particular Disputing Claimant as part of post-Confirmation litigation relating to the correct Net Unit Claim amounts and related matters.**

      ☐        **The undersigned Claimant <u>DISPUTES</u> the Net Unit Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions.**

<u>**Item 4.  Contributed Claim Election**</u>.  You may own Contributed Claims, which are defined in the Plan as "all Causes of Action that a Noteholder or Unitholder has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties."  The Plan provides that you may agree to contribute your Contributed Claims, if any, to the Liquidation Trust.  By electing such option, you agree that, subject to the occurrence of the Effective Date and the formation of the Liquidation Trust, you will be deemed to have, among other

things, contributed your Contributed Claims to the Liquidation Trust. In such case, you will no longer be permitted to pursue your Contributed Claims on your own behalf (including if you are a member of any class action lawsuit), and any recovery received on account of such Contributed Claims will be Liquidation Trust Assets to be distributed to all Liquidation Trust Beneficiaries in accordance with the Plan. If you check the box below, then your relative share of Liquidation Trust recoveries will be enhanced by having the amount that otherwise would be your Net Unit Claim increased by the Contributing Claimants Enhancement Multiplier (*i.e.*, 105%). You also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a more efficient and effective manner. If you do not elect to contribute your Contributed Claims, you will remain able to pursue such claims (at your own cost and expense) in an appropriate forum; your success or failure on any such claims that you retain may affect your rights against other parties. The Debtors encourage anyone not contributing their Contributed Claims to consult with their own counsel about any such claims and related matters.

**By checking the box below, you agree to contribute your Contributed Claims, if any, to the Liquidation Trust. Checking the box below means that you will receive the benefit of the Contributing Claimants Enhancement Multiplier, which will result in you receiving a larger proportional recovery than other Holders of Class 5 Claims who do not make this election.**

☐    **The undersigned Claimant elects to (OPTS IN to) contribute its Contributed Claims to the Liquidation Trust.**

By checking the foregoing box, the undersigned Claimant represents and warrants that its Contributed Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Claimant's ability to contribute such Contributed Claims to the Liquidation Trust.

### IMPORTANT INFORMATION REGARDING THE RELEASES

Following confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, certain release, injunction, exculpation, and discharge provisions set forth in Sections 11.10, 11.11, 11.12, and 11.13 of the Plan will become effective. In determining how to cast your vote on the Plan, it is important to read these provisions of the Plan carefully so that you understand how confirmation and substantial consummation of the Plan — which effectuates such provisions — will affect you.

Specifically, the releases in Section 11.11 of the Plan bind the "Releasing Parties," which the Plan defines as "Collectively, (a) the Debtors, (b) the Estates, and (c) any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, the Remaining Debtors Manager, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise." The releases provide for, among other things, the following:

**Releases and Related Matters.**

      (a)      **On the Effective Date, for good and valuable consideration, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or**

unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however,* that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.

(b)     Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

<u>Item 5.  Certification</u>.  By signing this Ballot, the Claimant certifies that: (i) on the Voting Record Date, it was the Holder of the Class 5 Unit Claim to which this Ballot pertains or an authorized signatory for such Holder; (ii) it has full power and authority to (x) vote to accept or reject the Plan, (y) determine whether to dispute the Net Unit Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions and make the Contributed Claims election, and (z) execute and return the Ballot; and (iii) it has reviewed the Voting Instructions set forth below and received a copy of the Disclosure Statement, the Plan, and other solicitation materials.  The undersigned understands that an otherwise properly completed, executed, and timely returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted.  The undersigned also certifies that its vote on the Plan is subject to all the terms and conditions set forth in the Plan and the Disclosure Statement.

Name of Claimant: _____

Signature: _____

Name (if different from Claimant): _____

Title: _____

Address: _____

_____

_____

Dated: _____

**Please make sure you have provided all information requested in this Ballot.  Please read and follow the instructions set forth in the attached Voting Instructions carefully.  Please complete, sign, and date this Ballot and return it by mail, hand delivery, or overnight courier so that it is received by the Voting Agent by the Voting Deadline on October 8, 2018 at 4:00 p.m. (prevailing Eastern Time).**

## VOTING INSTRUCTIONS

1.  In order for your vote to count, you must:

    (i)   In the boxes provided in Item 2 of the Ballot, indicate <u>either</u> acceptance or rejection of the Plan by checking the appropriate box; and

    (ii)  Review and sign the certifications in Item 5 of the Ballot. Please be sure to sign and date your Ballot. Your signature is required for your vote to be counted. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing. If the Unit Claim is held by an entity, your Ballot must be executed in the name of an authorized signatory. In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

2.  Review the Calculation of Net Unit Claim Amounts and Election to Become Disputing Claimant disclosure in Item 3, and determine whether to check the box in Item 3.

3.  Review the Contributed Claims election disclosure in Item 4, and determine whether to check the box in Item 4.

4.  **To have your vote counted and for any elections made in this Ballot to be effective, you must complete, sign, and return this Ballot so that it is <u>actually</u> <u>received</u> by the Voting Agent not later than 4:00 p.m. (prevailing Eastern Time) on October 8, 2018.**

5.  Return the completed Ballot to the Voting Agent in the pre-addressed, postage pre-paid return envelope enclosed with this Ballot or return it to:

    | <u>If by First Class Mail</u>: | <u>If by Overnight Mail or Hand Delivery</u>: |
    |---|---|
    | Woodbridge Group of Companies, LLC | Woodbridge Group of Companies, LLC |
    | c/o Garden City Group, LLC | c/o Garden City Group, LLC |
    | P.O. Box 10545 | 5151 Blazer Parkway, Suite A |
    | Dublin, Ohio 43017-0208 | Dublin, Ohio 43017 |

6.  DO NOT SUBMIT YOUR BALLOT BY FAX, EMAIL, OR ELECTRONIC TRANSMISSION. A Ballot submitted by fax, email, or electronic transmission will not be counted, unless approved by the Debtors or otherwise ordered by the Court.

7.  A Ballot that either indicates both acceptance and rejection of the Plan or fails to indicate either an acceptance or a rejection of the Plan will not be counted.

8.  You must vote all your Claims within a single Class under the Plan either to accept or to reject the Plan. A Ballot that partially rejects and partially accepts the Plan will not be counted.

9.  **If you have previously delivered a valid Ballot for the acceptance or rejection of the Plan, you may revoke such Ballot and change your vote or any attendant election or preference by delivering to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect your intent and shall supersede and revoke any**

earlier received Ballot. **If you cast multiple Ballots on account of the same Claim, which are received by the Voting Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.**

10.    Any Ballot that is illegible or that contains insufficient information to permit the identification of the Claimant will not be counted.

11.    This Ballot does not constitute, and shall not be deemed to be, a proof of claim against any of the Debtors or an assertion or admission of a Claim by any of the Debtors.

12.    It is important that you vote. The Plan can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount <u>and</u> more than one-half in number of the Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of section 1129(a) of title 11 of the United States Code (the "Bankruptcy Code"). If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan: (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting Class, the Court also must find that at least one Impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

13.    NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

14.    PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT OR THESE VOTING INSTRUCTIONS, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE VOTING AGENT BY CALLING (888)-735-7613 OR EMAILING WGCInfo@choosecg.com.

PLEASE NOTE THAT THE VOTING AGENT IS NOT PERMITTED TO PROVIDE LEGAL ADVICE.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>WOODBRIDGE GROUP OF COMPANIES,<br>LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12560 (KJC)<br><br>(Jointly Administered) |

**BALLOT FOR HOLDERS OF CLASS 6 NON-DEBTOR LOAN NOTE CLAIMS FOR**
**ACCEPTING OR REJECTING THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF**
**LIQUIDATION OF WOODBRIDGE GROUP OF COMPANIES, LLC**
**AND ITS AFFILIATED DEBTORS**

---

**TO BE COUNTED, YOUR VOTE MUST BE ACTUALLY RECEIVED BY GARDEN CITY GROUP,**
**LLC BY OCTOBER 8, 2018 AT 4:00 P.M. (PREVAILING EASTERN TIME).**

---

This ballot (the "Ballot") is being provided to you by the above-captioned debtors and debtors in possession (the "Debtors") to solicit your vote to accept or reject the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan")[2] proposed by the Debtors and described in the related *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time, the "Disclosure Statement") that was approved by an order [Docket No. ___] of the United States Bankruptcy Court for the District of Delaware (the "Court"). The Disclosure Statement describes the Plan and provides information to assist you in deciding how to vote your Ballot. Court approval of the Disclosure Statement does not indicate Court approval of the Plan. If you do not have a Disclosure Statement or Plan, you may obtain a copy free of charge at the Debtors' restructuring website maintained by Garden City Group, LLC (the "Voting Agent") at http://cases.gardencitygroup.com/wgc/. Copies of the Disclosure Statement and Plan are also available: (i) for a fee, on the Court's website, www.deb.uscourts.gov (a PACER account is required); (ii) upon written request to the Voting Agent at Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio

---

[1]    The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

[2]    All capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan.

43017-0208; or (iii) by contacting the Voting Agent via email to WGCInfo@chooseccg.com with "Woodbridge Solicitation" referenced in the subject line or via telephone at 1-888-735-7613.

---

**IMPORTANT**

**You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and your classification and treatment under the Plan. Your Claim has been placed in Class 6 – Non-Debtor Loan Note Claims under the Plan.**

**If your Ballot is not <u>actually received</u> by the Voting Agent on or before October 8, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Voting Deadline</u>"), and such deadline is not extended by the Debtors or order of the Court, your vote will not count as either an acceptance or a rejection of the Plan. If the Plan is confirmed by the Court, it will be binding on you whether or not you vote and regardless of how you vote.**

**You may return your Ballot in the return envelope provided in your package or send it to:**

| | | |
|---|---|---|
| **<u>*If by First Class Mail*</u>:** | *or* | **<u>*If by Overnight Mail or Hand Delivery*</u>:** |
| **Woodbridge Group of Companies, LLC** | | **Woodbridge Group of Companies, LLC** |
| **c/o Garden City Group, LLC** | | **c/o Garden City Group, LLC** |
| **P.O. Box 10545** | | **5151 Blazer Parkway, Suite A** |
| **Dublin, Ohio 43017-0208** | | **Dublin, Ohio 43017** |

---

## <u>ACCEPTANCE OR REJECTION OF THE PLAN</u>

**Item 1.  Applicable Debtor(s)**.  For purposes of voting to accept or reject the Plan, as of December 4, 2017 (the "<u>Voting Record Date</u>"), the undersigned (the "<u>Claimant</u>") was a Holder of a Class 6 Non-Debtor Loan Note Claim against the Debtor(s) set forth below in the Outstanding Principal Amount(s) set forth below.

| Debtor | Outstanding Principal Amount |
|---|---|
| Woodbridge Mortgage Investment Fund 1, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 2, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 3, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 3a, LLC | [GCG to insert] |
| Woodbridge Mortgage Investment Fund 4, LLC | [GCG to insert] |
| Woodbridge Commercial Bridge Loan Fund 1, LLC | [GCG to insert] |
| Woodbridge Commercial Bridge Loan Fund 2, LLC | [GCG to insert] |

<u>Item 2.  Vote on Plan</u>.  **CHECK ONE BOX ONLY:**

      ☐      **ACCEPTS (votes FOR) the Plan**.

      ☐      **REJECTS (votes AGAINST) the Plan**.

<u>Item 3.  Election to Reclassify as Class 3 Claim</u>.  Under the Plan, a "Non-Debtor Loan Note Claim" is a Note Claim against a Woodbridge Fund Debtor that is or was purportedly secured by a security interest in a loan between the applicable Fund Debtor and a non-Debtor borrower (by contrast, the Standard Note Claims are or were purportedly secured by loans extended by a Fund Debtor to another Debtor, which Intercompany Liens are eliminated under the Plan).  The Debtors dispute that any Class 6 Non-Debtor Loan Note Claim is actually secured by a perfected Lien, and no Class 6 Claim will be Allowed in any respect under the Plan.  Instead, the Liquidation Trust may litigate against any Claimant holding a Non-Debtor Loan Note Claim who does not check the box below to have its Claim reclassified as a Class 3 Claim (i) any disputes about the secured or unsecured status, amount, and priority of such Non-Debtor Loan Note Claim; (ii) any Liquidation Trust Actions that may exist against such Noteholder; and (iii) any other matters pertaining to such Noteholder's rights against the Debtors or the Estates.

**In order to settle and avoid such potential litigation, this Item 3 provides an opportunity for you to affirmatively consent to reclassification of your Claim as a Class 3 Claim.  <u>If you check the box below</u>, then (a) your Claim will be treated as if such Claim had always been part of Class 3, including for distribution and voting purposes, and the amount of your Claim will be based on the applicable amount set forth in Item 4 below (to which amount you will have agreed and be bound); and (b) you will have agreed to release all purported Liens against any assets or property of the Debtors' Estates.**

**Before checking the box below, please review the calculation of your Net Note Claim in Item 4 below.  Checking the box below will BOTH (1) reclassify your Class 6 Claim as a Class 3 Claim and (2) bind you to the Net Note Claim amount set forth in Item 4.**

      ☐      **The undersigned Claimant consents to (OPTS IN to) reclassification of its Class 6 Claim as a Class 3 Claim.**

**Item 4. Calculation of Net Note Claim Amounts**. Under the Plan, Distributions to Holders of Class 3 Standard Note Claims (and Holders of Class 6 Non-Debtor Loan Note Claims who consent to reclassification of their Claims as Class 3 Claims or who have their Claims reclassified as Class 3 Claims after litigation with the Liquidation Trust) will be based on, among other things, the amount of such Holder's Net Note Claim. The term "Net Note Claim" is based on the Outstanding Principal Amount of your Note Claim, *minus* the aggregate amount of all Prepetition Distributions received by you (*i.e.*, all amounts you were paid on account of Notes before the bankruptcy filing, other than the return or repayment of principal). Based on their books and records, the Debtors have prepared a "Schedule of Principal Amounts and Prepetition Distributions" (the amounts calculated for your Net Note Claim are set forth below and a copy of the full schedule is attached to the Disclosure Statement) that lists the Debtors' calculation of the Net Note Claim associated with your Claim and all other Note Claims. As set forth in the Schedule of Principal Amounts and Prepetition Distributions, the Debtors have calculated the amount of your Net Note Claim as follows:

|  | Outstanding Principal Amount: | $ [GCG to insert] |
|---|---|---|
| *Minus* | Total Prepetition Distributions: | $ [GCG to insert] |
| *Equals* | **Net Note Claim:** | **$ [GCG to insert]** |

**If you affirmatively consent in Item 3 above to have your Class 6 Claim reclassified as a Class 3 Claim, then you shall have also agreed to be bound by the Net Note Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions and you are prohibited from disputing the amount of your Net Note Claim as set forth in the Schedule of Principal Amounts and Prepetition Distributions.**

If you do not check the box above in Item 3, either because you do not agree to reclassify your Class 6 Claim as a Class 3 Claim or because you disagree with the Net Note Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions, you will be a Disputing Claimant. **This will significantly delay the timing of Distributions (if any) to you. The Debtors reserve all rights to object to the validity, amount, or any other aspect of any Claim held by a Disputing Claimant. In addition, the Debtors reserve any Liquidation Trust Actions that may exist regarding the particular Disputing Claimant, all of which the Liquidation Trust may determine to pursue against the particular Disputing Claimant as part of post-Confirmation litigation relating to the correct Net Note Claim amounts and related matters.**

**Item 5. Contributed Claim Election**. You may own Contributed Claims, which are defined in the Plan as "all Causes of Action that a Noteholder or Unitholder has against any Person that is not a Released Party and that are related in any way to the Debtors, their predecessors, their respective affiliates, or any Excluded Parties." The Plan provides that you may agree to contribute your Contributed Claims, if any, to the Liquidation Trust. By electing such option, you agree that, subject to the occurrence of the Effective Date and the formation of the Liquidation Trust, you will be deemed to have, among other things, contributed your Contributed Claims to the Liquidation Trust. In such case, you will no longer be permitted to pursue your Contributed Claims on your own behalf (including if you are a member of any class action lawsuit), and any recovery received on account of such Contributed Claims will be Liquidation Trust Assets to be distributed to all Liquidation Trust Beneficiaries in accordance with the Plan. If you check the box below and your Claim is classified and treated as a Class 3 Claim, then your relative share of Liquidation Trust recoveries will be enhanced by having the amount that otherwise would be your Net Note Claim increased by the Contributing Claimants Enhancement Multiplier (*i.e.*, 105%). You also may choose to make such election because aggregating all Contributed Claims and similar Liquidation Trust Actions may enable the pursuit and settlement of such litigation claims in a

more efficient and effective manner. If you do not elect to contribute your Contributed Claims, you will remain able to pursue such claims (at your own cost and expense) in an appropriate forum; your success or failure on any such claims that you retain may affect your rights against other parties. The Debtors encourage anyone not contributing their Contributed Claims to consult with their own counsel about any such claims and related matters.

**By checking the box below, you agree to contribute your Contributed Claims, if any, to the Liquidation Trust. Checking the box below means that, to the extent that your Class 6 Claim is classified and treated as a Class 3 Claim, you will receive the benefit of the Contributing Claimants Enhancement Multiplier, which will result in you receiving a larger proportional recovery than other Holders of Class 3 Claims who do not make this election.**

☐    **The undersigned Claimant elects to (OPTS IN to) contribute its Contributed Claims to the Liquidation Trust.**

By checking the foregoing box, the undersigned Claimant represents and warrants that its Contributed Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition or encumbrance of any kind that would adversely affect in any way such Claimant's ability to contribute such Contributed Claims to the Liquidation Trust.

## IMPORTANT INFORMATION REGARDING THE RELEASES

Following confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, certain release, injunction, exculpation, and discharge provisions set forth in Sections 11.10, 11.11, 11.12, and 11.13 of the Plan will become effective. In determining how to cast your vote on the Plan, it is important to read these provisions of the Plan carefully so that you understand how confirmation and substantial consummation of the Plan — which effectuates such provisions — will affect you.

Specifically, the releases in Section 11.11 of the Plan bind the "Releasing Parties," which the Plan defines as "Collectively, (a) the Debtors, (b) the Estates, and (c) any Person that has sought or could seek to exercise any rights of the Estates, including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise." The releases provide for, among other things, the following:

### Releases and Related Matters.

(a)    **On the Effective Date, for good and valuable consideration, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however,* that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.**

(b)    Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

**Item 6.  Certification**.  By signing this Ballot, the Claimant certifies that: (i) on the Voting Record Date, it was the Holder of the Class 6 Non-Debtor Loan Note Claim to which this Ballot pertains or an authorized signatory for such Holder; (ii) it has full power and authority to (x) vote to accept or reject the Plan, (y) determine whether to dispute the Net Note Claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions, make the Contributed Claims election, and make the election to consent to reclassification as a Class 3 Claim, and (z) execute and return the Ballot; and (iii) it has reviewed the Voting Instructions set forth below and received a copy of the Disclosure Statement, the Plan, and other solicitation materials.  The undersigned understands that an otherwise properly completed, executed, and timely returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted.  The undersigned also certifies that its vote on the Plan is subject to all the terms and conditions set forth in the Plan and the Disclosure Statement.

Name of Claimant: _____

Signature: _____

Name (if different from Claimant): _____

Title: _____

Address: _____

_____

_____

Dated: _____

**Please make sure you have provided all information requested in this Ballot.  Please read and follow the instructions set forth in the attached Voting Instructions carefully.  Please complete, sign, and date this Ballot and return it by mail, hand delivery, or overnight courier so that it is received by the Voting Agent by the Voting Deadline on October 8, 2018 at 4:00 p.m. (prevailing Eastern Time).**

## VOTING INSTRUCTIONS

1. In order for your vote to count, you must:

   (i) In the boxes provided in Item 2 of the Ballot, indicate <u>either</u> acceptance or rejection of the Plan by checking the appropriate box; and

   (ii) Review and sign the certifications in Item 6 of the Ballot. Please be sure to sign and date your Ballot. Your signature is required for your vote to be counted. If you are completing the Ballot on behalf of an entity, indicate your relationship with such entity and the capacity in which you are signing. If the Non-Debtor Loan Note Claim is held by an entity, your Ballot must be executed in the name of an authorized signatory. In addition, please provide your name and mailing address if different from that set forth on the attached mailing label or if no such mailing label is attached to the Ballot.

2. Review the Election to Reclassify as Class 3 Claim disclosure in Item 3 and the Calculation of Net Note Claim Amounts in Item 4, and determine whether to check the box in Item 3.

3. Review the Calculation of Net Note Claim Amounts disclosure in Item 4.

4. Review the Contributed Claims election disclosure in Item 5, and determine whether to check the box in Item 5.

5. **To have your vote counted and for any elections made in this Ballot to be effective, you must complete, sign, and return this Ballot so that it is <u>actually received</u> by the Voting Agent not later than 4:00 p.m. (prevailing Eastern Time) on October 8, 2018.**

6. Return the completed Ballot to the Voting Agent in the pre-addressed, postage pre-paid return envelope enclosed with this Ballot or return it to:

   <u>If by First Class Mail:</u>
   Woodbridge Group of Companies, LLC
   c/o Garden City Group, LLC
   P.O. Box 10545
   Dublin, Ohio 43017-0208

   <u>If by Overnight Mail or Hand Delivery:</u>
   Woodbridge Group of Companies, LLC
   c/o Garden City Group, LLC
   5151 Blazer Parkway, Suite A
   Dublin, Ohio 43017

7. DO NOT SUBMIT YOUR BALLOT BY FAX, EMAIL, OR ELECTRONIC TRANSMISSION. A Ballot submitted by fax, email, or electronic transmission will not be counted, unless approved by the Debtors or otherwise ordered by the Court.

8. A Ballot that either indicates both acceptance and rejection of the Plan or fails to indicate either an acceptance or a rejection of the Plan will not be counted.

9. You must vote all your Claims within a single Class under the Plan either to accept or to reject the Plan. A Ballot that partially rejects and partially accepts the Plan will not be counted.

10. **If you have previously delivered a valid Ballot for the acceptance or rejection of the Plan, you may revoke such Ballot and change your vote or any attendant election or preference by delivering to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. If you cast more than one Ballot**

01:23509777.1

170504.5                  7

voting the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect your intent and shall supersede and revoke any earlier received Ballot.  If you cast multiple Ballots on account of the same Claim, which are received by the Voting Agent on the same day and at the same time, but which are voted inconsistently, such Ballots shall not be counted.

11.    Any Ballot that is illegible or that contains insufficient information to permit the identification of the Claimant will not be counted.

12.    This Ballot does not constitute, and shall not be deemed to be, a proof of claim against any of the Debtors or an assertion or admission of a Claim by any of the Debtors.

13.    It is important that you vote.  The Plan can be confirmed by the Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in amount <u>and</u> more than one-half in number of the Claims in each impaired Class who vote on the Plan and if the Plan otherwise satisfies the applicable requirements of section 1129(a) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").  If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan: (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting Class, the Court also must find that at least one Impaired Class has accepted the plan, with such acceptance being determined without including the acceptance of any "insider" in such Class.

14.    NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

15.    PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THE BALLOT OR THESE VOTING INSTRUCTIONS, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE VOTING AGENT BY CALLING (888)-735-7613 OR EMAILING WGCInfo@choosegcg.com.

PLEASE NOTE THAT THE VOTING AGENT IS NOT PERMITTED TO PROVIDE LEGAL ADVICE.

01:23509777.1

170504.5

**EXHIBIT 3**

**Notice of Non-Voting Status**

01:23454513.4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| Debtors. | (Jointly Administered) |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF
CLAIMS AND EQUITY INTERESTS IN CLASSES 1, 2, 7, AND 8**

PLEASE TAKE NOTICE THAT the above-captioned debtors and debtors in possession (the "Debtors") submitted the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time pursuant to the terms thereof, the "Plan"),[2] which is described in the related *Disclosure Statement for the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. ___] (as it may be amended, supplemented, or modified from time to time, the "Disclosure Statement") that was approved by an order [Docket No. ___] (the "Disclosure Statement Order") of the United States Bankruptcy Court for the District of Delaware (the "Court"). The Disclosure Statement Order authorizes the Debtors to solicit votes to accept or reject the Plan, from the Holders of Claims in Voting Classes that are entitled to receive Distributions under the Plan.

**YOU ARE OR MIGHT BE THE HOLDER OF CLAIMS OR EQUITY INTERESTS IN THE FOLLOWING CLASSES OF UNIMPAIRED CLAIMS OR IMPAIRED CLAIMS AND EQUITY INTERESTS UNDER ARTICLE II OF THE PLAN THAT, IN EITHER CASE, ARE NOT ENTITLED TO VOTE ON THE PLAN:**

| Class | Description of Class | Treatment |
|---|---|---|
| 1 | Other Secured Claims | Unimpaired; Deemed to Accept Plan |
| 2 | Priority Claims | Unimpaired; Deemed to Accept Plan |
| 7 | Subordinated Claims | Impaired; Deemed to Reject Plan |
| 8 | Equity Interests | Impaired; Deemed to Reject Plan |

**UNDER THE TERMS OF THE PLAN, HOLDERS OF CLAIMS IN CLASSES 1 AND 2 ARE UNIMPAIRED UNDER THE PLAN AND, THEREFORE, PURSUANT TO BANKRUPTCY**

---

[1]     The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC, or by contacting the undersigned counsel for the Debtors.

[2]     All capitalized terms used but not otherwise defined herein have the meanings set forth in the Plan.

**CODE SECTION 1126(f), ARE (I) PRESUMED TO HAVE ACCEPTED THE PLAN AND (II) NOT ENTITLED TO VOTE ON THE PLAN.**

      **UNDER THE TERMS OF THE PLAN, THE DEBTORS HAVE DETERMINED NOT TO SOLICIT THE VOTES OF THE HOLDERS OF ANY CLASS 7 CLAIMS, AND SUCH HOLDERS SHALL BE DEEMED TO HAVE REJECTED THE PLAN AND, THEREFORE, SUCH HOLDERS ARE NOT ENTITLED TO VOTE ON THE PLAN.**

      **UNDER THE TERMS OF THE PLAN, HOLDERS OF EQUITY INTERESTS IN CLASS 8 ARE IMPAIRED UNDER THE PLAN AND ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY ON ACCOUNT OF THEIR EQUITY INTERESTS AND, THEREFORE, PURSUANT TO BANKRUPTCY CODE SECTION 1126(g), ARE (I) DEEMED TO HAVE REJECTED THE PLAN AND (II) NOT ENTITLED TO VOTE ON THE PLAN.**

      The deadline for filing and serving Plan Objections (including, without limitation, any objections to (i) assumption and/or cure payment amounts, and (ii) the classification of any Claim under the Plan) shall be [_____], 2018 at 4:00 p.m. (ET) (the "**Plan Objection Deadline**"). Plan Objections must (i) be in writing; (ii) state the name, address, and nature of the Claim or Equity Interest of the objecting or responding party; (iii) state with particularity the legal and factual basis and nature of any Plan Objection; and (iv) be filed with the Court and served on the following parties by the Plan Objection Deadline: (i) counsel to the Debtors, (a) Klee, Tuchin, Bogdanoff & Stern LLP, 1999 Avenue of the Stars, 39th Floor, Los Angeles, California 90067, Attn: Michael L. Tuchin, Esq., mtuchin@ktbslaw.com, and David A. Fidler, Esq., dfidler@ktbslaw.com; and (b) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn: Sean M. Beach, Esq., sbeach@ycst.com, and Edmon L. Morton, Esq., emorton@ycst.com; (ii) counsel to the Unsecured Creditors' Committee, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067, Attn: Richard M. Pachulski, Esq., rpachulski@pszjlaw.com, and 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899, Attn: Colin R. Robinson, Esq., crobinson@pszjlaw.com; (iii) counsel to the Noteholder Committee, Drinker Biddle & Reath LLP, 222 Delaware Avenue, Suite 1410, Wilmington, Delaware 19801, Attn: Joseph N. Argentina, Jr., Esq., joseph.argentina@dbr.com; (iv) counsel to the Unitholder Committee, Venable LLP, 1201 N. Market Street, Suite 1400, Wilmington, Delaware 19801, Attn: Jamie L. Edmonson, Esq., jledmsonson@venable.com, and 1270 Avenue of the Americas, New York, New York, Attn: Jeffrey S. Sabin, Esq., jssabin@venable.com; and (v) the U.S. Trustee, J. Caleb Boggs Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn: Timothy Jay Fox, Jr., Esq., timothy.fox@usdoj.gov.

### IMPORTANT INFORMATION REGARDING THE RELEASES

Following confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, certain release, injunction, exculpation, and discharge provisions set forth in Sections 11.10, 11.11, 11.12, and 11.13 of the Plan will become effective. It is important to read these provisions of the Plan carefully so that you understand how confirmation and substantial consummation of the Plan — which effectuates such provisions — will affect you.

Specifically, the releases in Section 11.11 of the Plan bind the "Releasing Parties," which the Plan defines as "Collectively, (a) the Debtors, (b) the Estates, and (c) any Person exercising or seeking to exercise any rights of the Estates (but solely in that capacity), including each of the Committees (but not their individual members), the Wind-Down CEO, the Liquidation Trustee, the Remaining Debtors Manager, and any other successor to the Debtors or any other estate representative that is or could be appointed or selected pursuant to Bankruptcy Code section 1123(b)(3) or otherwise." The releases provide for, among other things, the following:

01:23521849.1

2

**Releases and Related Matters**

(a)     On the Effective Date, for good and valuable consideration, each of the Releasing Parties shall be deemed to have forever released, waived, and discharged each of the Released Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities whatsoever, whether known or unknown, whether foreseen or unforeseen, whether liquidated or unliquidated, whether fixed or contingent, whether matured or unmatured, existing or hereafter arising, at law, in equity, or otherwise, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the conduct of the Debtors' business, the Chapter 11 Cases, or the Plan, except for acts or omissions that are determined in a Final Order to have constituted actual fraud or willful misconduct; *provided, however*, that nothing in Section 11.11 of the Plan shall release or otherwise affect any Person's rights under the Plan or the Confirmation Order.

(b)     Entry of the Confirmation Order shall constitute (i) the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in Section 11.11 of the Plan; and (ii) the Bankruptcy Court's findings that such releases are (1) in exchange for good and valuable consideration provided by the Released Parties (including performance of the terms of the Plan), and a good-faith settlement and compromise of the released claims, (2) in the best interests of the Debtors, the Estates, and any Holders of Claims that are Releasing Parties, (3) fair, equitable, and reasonable, (4) given and made after due notice and opportunity for hearing, and (5) a bar to any of the Releasing Parties asserting any released claim against any of the Released Parties.

To request a copy of the Plan, Disclosure Statement, or Disclosure Statement Order, contact the Debtors' Voting Agent, Garden City Group, LLC, via email to WGCInfo@choosegcg.com with "Woodbridge Solicitation" referenced in the subject line, in writing at Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio 43017-0208, or via telephone at 1-888-735-7613. Please be advised that the Voting Agent cannot provide legal advice. Copies of the Plan, the Disclosure Statement, the Disclosure Statement Order, and other materials are available online for free at http://cases.gardencitygroup.com/wgc/. Alternatively, these documents may be accessed for a fee through the Court's "pacer" website, https://ecf.deb.uscourts.gov. A pacer password and login are needed to access documents on the Court's "pacer" website. A pacer password can be obtained at http://www.pacer.gov.

Dated: _____, 2018
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean M. Beach (No. 4070)
Edmon L. Morton (No. 3856)
Ian J. Bambrick (No. 5455)
Betsy L. Feldman (No. 6410)
Rodney Square, 1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 576-3266
Fax:    (302) 571-1253

-and-

KLEE, TUCHIN, BOGDANOFF & STERN LLP
Kenneth N. Klee (*pro hac vice*)
Michael L. Tuchin (*pro hac vice*)
David A. Fidler (*pro hac vice*)
Jonathan M. Weiss (*pro hac vice*)
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Tel:    (310) 407-4000
Fax:    (310) 407-9090

*Counsel to the Debtors and Debtors in Possession*

01:23521849.1

4

**EXHIBIT 4**

**Plan Summary**

## WOODBRIDGE BANKRUPTCY PLAN – GENERAL OVERVIEW AND SUMMARY

You are receiving a solicitation package that contains the following materials:

- A printed copy of this General Overview and Summary;
- A printed notice with details about confirmation of the proposed chapter 11 plan of liquidation (the "Plan") on which you are being asked to vote;
- A printed form of Ballot for voting on the Plan (instructions for voting on the Plan are contained in the Ballot and should be read and followed in their entirety);
- A letter from each of the three official committees appointed in the Woodbridge bankruptcy cases articulating their views regarding why you should vote in favor of the Plan;
- A pre-addressed, postage pre-paid return envelope for your Ballot; and
- A CD (computer disc) that contains PDF copies of a disclosure statement regarding the Plan (the "Disclosure Statement"), which includes the entire Plan as an exhibit as well as several other exhibits and schedules.

The Disclosure Statement is an important document that describes in detail the historical background that led to the bankruptcy cases of Woodbridge Group of Companies, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors"), explains what has happened in the months since the Debtors commenced their bankruptcy cases, and sets forth the treatment of creditors including Noteholders and Unitholders in the proposed Plan.

This General Overview and Summary highlights the main points discussed in the Disclosure Statement, and it should be read in conjunction with the entirety of the Disclosure Statement, including its exhibits and schedules. This General Overview and Summary is qualified by the express terms of the Disclosure Statement and the Plan.

### 1. Historical Background of the Debtors

These bankruptcy cases arise out of a massive, multi-year fraudulent scheme perpetrated by Robert Shapiro between (at least) 2012 and 2017.[1] As part of this fraud, Shapiro, through the Woodbridge entities, raised over one billion dollars from approximately 10,000 investors—as either Noteholders or Unitholders—and used approximately $368 million of new investor funds to pay existing investors—a typical characteristic of Ponzi schemes. Importantly, Shapiro, as described more fully below, is *no longer involved* in any capacity with the control of the Debtors or of these bankruptcy cases.

While he was in control of the prepetition Debtors, Shapiro deceived investors in order to obtain their money. He told investors that their money would be used to make high-interest loans

---

[1]  The Plan will acknowledge and admit that the Debtors operated as a Ponzi scheme since at least August 2012, which scheme was discovered no later than December 2017 when the SEC unsealed its action against Robert Shapiro and others and alleged facts evidencing such Ponzi scheme. To the extent that the Bankruptcy Court does not confirm the Plan, the Debtors and each of the three "Committees" reserve all of their respective rights (and/or defenses) respecting the characterization and the ramifications of the massive fraud upon investors and other creditors.

1

to unrelated, third-party borrowers and gave Noteholders documents referencing a specific property for which their funds were allegedly being used. Shapiro also told Noteholders that their notes were backed by mortgages on those specific properties, which, if true, would typically mean that investors could recover their investments from the proceeds of a sale of that property.

In reality, these were lies on a massive scale. Investors' money was nearly entirely *not* used to make high-interest loans to unrelated, third-party borrowers, and investors' money was *not* used for the specific property that may have been identified in any particular investor's documentation from the prepetition Debtors. Instead, Shapiro created disguised affiliates to which money was "loaned," which entities had no ability to service debt. Shapiro further took nearly all of the investors' money and commingled it into one central bank account. The funds used for property purchases from this central, pooled account generally cannot be traced to any particular Woodbridge "fund" entity or its investors. Moreover and unfortunately, payments from that central, pooled account were not used only for property purchases. Shapiro also used investor money to pay approximately $64.5 million in commissions to sales agents who sold these fraudulent "investments" and used investor money to pay at least $21.2 million for Shapiro's personal benefit (including, for example, purchasing luxury items, travel, wine, and the like). Additionally and critically, in the absence of any meaningful cash inflows into the prepetition Debtors from sources other than investors, Shapiro and the prepetition Debtors, which he controlled, used approximately $368 million of new investor funds to pay "interest" and "principal" to existing investors.

By late 2017, Shapiro was being investigated by the United States Securities and Exchange Commission (the "SEC") and numerous state regulatory agencies. As a result, Shapiro found it difficult to raise new investor money. As Shapiro's use of funds reflects, the prepetition Debtors were reliant on money from new investors to make the payments promised to existing investors. When new investments dried up, the prepetition Debtors could no longer make these payments to existing investors, and therefore Shapiro's web of deceit quickly unraveled.

## 2. Debtors' Bankruptcy Cases

Shapiro hired new outside managers for the prepetition Debtors on or about December 1, 2017, who commenced the many of the Debtors' bankruptcy cases on December 4, 2017. On December 14, 2017, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Unsecured Creditors' Committee").

On December 20, 2017, the SEC filed a complaint in Florida federal court against Shapiro and his affiliates, including the Debtors, detailing much of the massive fraud perpetrated by Shapiro prepetition. The SEC asked the Florida court to appoint a receiver who would displace the Debtors' management in these bankruptcy cases, but the court declined to immediately act on this request in light of the Debtors' pending bankruptcy cases.

On December 28, 2017, the Unsecured Creditors' Committee filed a motion seeking appointment of a chapter 11 trustee to replace the Debtors' management team, arguing that the team was "hand-picked by Shapiro, and ha[d] done his bidding both before and after the filing of these cases." The SEC later made a similar request, arguing that the new "independent" management team was "completely aligned [with Shapiro] in controlling this bankruptcy."

Around this time, certain groups of Noteholders and a group of Unitholders sought appointment of official committees of Noteholders and Unitholders, respectively. One of the Noteholder groups actively opposed the trustee motions, expressing concern that such appointment, without official representation for Noteholders, could set in motion a series of events that could ultimately prove harmful to Noteholders' interests in the cases.

On January 23, 2018, following several days of evidentiary hearings on the trustee motions, the Debtors, the Unsecured Creditors' Committee, the SEC, as well as groups of Noteholders and Unitholders, reached a settlement of the trustee motions and the motions for appointment of official Noteholder and Unitholder committees. The settlement provided, among other things:

**I.** A new board of managers—with no ties whatsoever to Shapiro—was formed to govern the Debtors (the "New Board").

**II.** The New Board was empowered to select a chief executive officer or chief restructuring officer—and shortly thereafter selected and employed individuals for both of those positions.

**III.** The New Board was empowered to select new counsel for the Debtors—and, upon consultation with the SEC, in mid-February did select new bankruptcy co-counsel.

**IV.** Noteholders were permitted to form a single six-to-nine-member fiduciary Noteholder committee to advocate for the interests of Noteholders in the cases (the "Noteholder Committee"), with a professional fee budget, to be funded by the Debtors, through January 1, 2019.

**V.** Unitholders were permitted to form a single one-to-two-member fiduciary Unitholder committee to advocate for the interests of Unitholders in the cases (the "Unitholder Committee"), with a professional fee budget, to be funded by the Debtors, through January 1, 2019.

Beginning in at least late January 2018, Shapiro had and still has no control over the Debtors whatsoever. Instead, the Debtors were, and are, managed by a new and independent board of managers and new management, none of whom had any prior involvement with Shapiro.

The Debtors and their new management and advisors have worked diligently with all of the creditor representatives—the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee—to ensure that investors can recover as much money as possible, and that the Debtors' funds are not squandered by years of litigation between and among the Debtors' creditor constituencies.

Ultimately, the Debtors and all of these creditor constituencies reached a settlement—which settlement is fully described in the Disclosure Statement and is embodied in the accompanying Plan. The settlement recognizes certain unfortunate realities: that Shapiro ran a fraudulent scheme (which the Plan will acknowledge and admit was operated as a Ponzi scheme), that he did not use investor money as he claimed he would, that he misrepresented the nature of the security provided to Noteholders, and that he did not take appropriate legal steps to protect the Noteholders' interests with respect to any such security.

01:23540497.1

3

### 3. **Debtors' Proposed Bankruptcy Plan**

The Debtors deeply regret these realities, and they have worked diligently to maximize investor recoveries. To that end, the Plan provides for the creation of two entities: (i) a Wind-Down Entity, which will own many of the Debtors' assets (including the Debtors' real properties) and will sell those assets to generate cash, and (ii) a Liquidation Trust, which will own the Wind-Down Entity and receive cash generated by the Wind-Down Entity and will distribute that (and other) cash to creditors (including to investors). The Liquidation Trust will also own litigation claims against third parties and may generate cash through prosecution or settlement of those claims. However, the estimated recoveries to creditors set forth below and in the Disclosure Statement do not take into account potential proceeds of these litigation claims because they are unpredictable and highly contingent.

Critically, the Debtors have ensured that creditors have indirect control over the decisions that will be made by the Liquidation Trust. The proposed Liquidation Trustee, Mr. Michael Goldberg, was the SEC's designee to, and is a current member of, the Debtors' New Board of Managers, and he was unanimously selected to be the Liquidation Trustee by the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee. In addition, the Liquidation Trust Supervisory Board will consist of five members—three selected by the Unsecured Creditors' Committee, and one each selected by the Noteholder Committee and the Unitholder Committee.

Cash will be distributed by the Liquidation Trust to Noteholders, Unitholders, and other creditors both up-front and over time (as the Wind-Down Entity sells properties). Noteholders, Holders of General Unsecured Claims, and Unitholders initially will be paid at the same time by each receiving Class A Liquidation Trust Interests that entitle them to cash distributions. But, the settlement addresses the disputes regarding whether the Units actually are "claims," or instead are "equity" (ownership interests) in the Debtors (in which case Unitholders could be entitled to be paid nothing), and whether the Notes are validly secured (either directly or indirectly) by the subject real properties. Rather than spend significant time and money litigating these very complicated issues, the parties negotiated and settled upon allowance of claims for Unitholders at a 27.5% discount as compared to Noteholders' claims. Thus, Unitholders will initially receive 72.5% of what Noteholders receive in terms of relative distributions against their respective net investments. This aspect of the settlement is accomplished by affording Noteholders Class A Liquidation Trust Interests for 100% of their Net Note Claims and affording Unitholders Class A Liquidation Trust Interests for only 72.5% of their Net Unit Claims. (Unitholders also get Class B Liquidation Trust Interests for the other 27.5% of their Net Unit Claims, so that if there is more money available after payment of the Net Note Claims, Allowed General Unsecured Claims, and Net Unit Claims represented by the Class A Liquidation Trust Interests, then Unitholders will receive cash distributions on their Class B Liquidation Trust Interests until the remaining Net Unit Claims are paid.)[2]

---

[2]    Noteholders and Unitholders also are afforded on their Ballots the opportunity to elect to become Contributing Claimants, and have such amounts increased by multiplying them by the Contributing Claimants Enhancement Multiplier (i.e., 105%), as more fully described in Section I.A.2 of the Disclosure Statement.

Further, the Plan provides for "substantive consolidation" of all Woodbridge Fund Debtors (*i.e.*, the ones that raised money from investors) into one entity and all other Debtors (including those that own the subject real properties) into a second entity in order to effectuate the distributions explained above. Substantive consolidation generally refers to the pooling of assets and liabilities of several entities. In other words, if Entity A holds $100 of assets and owes $0 of liabilities, and Entity B holds $0 of assets and owes $100 of liabilities, and if those two entities are substantively consolidated, the resulting entity will hold $100 of assets and owe $100 of liabilities.

The Plan also incorporates a "netting" mechanism where distributions of Liquidation Trust Interests will be made based on the Net Note Claim or the Net Unit Claim. These net amounts are calculated based on the Outstanding Principal Amount of a Note Claim or a Unit Claim, *minus* the aggregate amount of all Prepetition Distributions received by the claimholder. As discussed further in the Disclosure Statement, the Plan provides for this "netting" because of the conclusion that the Debtors operated as a Ponzi scheme (as acknowledged in the Plan and if approved by the Court), in which case any Prepetition Distributions to Noteholders or Unitholders (representing, for example, purported interest) could be avoided and recovered for the benefit of other investors under state and federal "fraudulent transfer" laws. Based on their books and records, the Debtors have prepared a "Schedule of Principal Amounts and Prepetition Distributions" (a copy of which is attached to the Disclosure Statement) that lists the Debtors' calculation of the Net Note Claims and the Net Unit Claims. The specific amounts applicable to you are set forth in your Ballot. If you agree with the net claim amounts set forth in your Ballot, then you do not need to take any action with respect to that item of the Ballot and will have agreed to (and have Allowed Claims based on) the amounts set forth in the Schedule of Principal Amounts and Prepetition Distribution. If you disagree with the net claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions, then you have the option to check a box on your Ballot and dispute such amount. **If you check this box on your Ballot, this may significantly delay the timing of Distributions (if any) to you. The Debtors reserve all rights to object to the validity, amount, or any other aspect of any Claim held by a Disputing Claimant who disputes the amounts set forth on their Ballot. In addition, the Debtors reserve any Liquidation Trust Actions that may exist regarding the particular Disputing Claimant, all of which the Liquidation Trust may determine to pursue against the particular Disputing Claimant as part of post-confirmation litigation relating to the correct Net Note Claim or Net Unit Claim amounts and related matters.**

The Debtors estimate the following recoveries for Noteholders and Unitholders (and general unsecured creditors) under the Plan:

| Class 3 | Standard Note Claims | 60%-70% of Net Amounts |
|---------|---------------------|------------------------|
| Class 4 | General Unsecured Claims | 60%-70% of Allowed Amounts |

| Class 5 | Unit Claims | 40%-50% of Net Amounts |
| Class 6 | Non-Debtor Loan Note Claims | 60%-70% of Net Amounts[3] |

\*         \*         \*

The Debtors deeply regret these circumstances, and understand the precarious financial position that many investors are in as a result of Shapiro's fraudulent scheme and its sudden collapse last December. However, the Debtors believe that the settlement described above and reflected in the Plan, which is the result of extensive negotiations with significant investor input, represents the best outcome of these unfortunate circumstances, and importantly, provides the best prospect for investors to receive distributions as soon as possible.

The Debtors again encourage you to read the Disclosure Statement in its entirety to learn more about these bankruptcy cases and the Plan. The Debtors further urge you to vote in favor of the Plan by reading, completing, and returning the enclosed Ballot based on the instructions included with the Ballot.

---

[3] Although a higher recovery is theoretically possible if the Bankruptcy Court ultimately finds that any of these Noteholders are secured by a properly perfected, unavoidable, and enforceable security interest, the Debtors do not believe such an outcome is likely. Instead, the Debtors believe that all Noteholders currently classified in Class 6 will ultimately be reclassified into Class 3, either on a consensual basis or after litigation.

01:23540497.1

**EXHIBIT 5**

**Committees' Support Letter**

Re:    **In re Woodbridge Group Of Companies, LLC, et al. Case No. 17-12560 (KJC)**

Dear Noteholders, Unitholders and Holders of General Unsecured Claims against Woodbridge:

We are writing to you with respect to the *First Amended Joint Chapter 11 Plan Of Liquidation Of Woodbridge Group Of Companies, LLC And Its Affiliated Debtors (dated August 3, 2018)* (the "Plan"),[1] which you are receiving from the Debtors in the same package as this letter.[2]  We are the official committee of unsecured creditors as contemplated under Bankruptcy Code section 1102 (the "Unsecured Creditors' Committee")[3] appointed to represent the interests of Noteholders, Unitholders and Holders of General Unsecured Claims in the bankruptcy cases of the Woodbridge Group of Companies, LLC and certain of its affiliates ("Woodbridge" or the "Debtors").

The Unsecured Creditors' Committee believes that the best way to maximize value for Noteholders, Unitholders and Holders of General Unsecured Claims in light of relevant risks is for there to be an orderly liquidation of the Debtors' assets and prompt distribution of the proceeds to creditors.  Still, there are many issues and uncertainties relating to Woodbridge and the claims of its creditors and investors, the resolution of which could be expensive and delay distributions.  To ensure that creditors and investors recover as much money as soon as possible, your Unsecured Creditors' Committee reached agreement to propose to you the Plan that includes a settlement among the various creditor constituencies (and with the successor management of the Debtors put in place during the bankruptcy case)—which settlement is fully described in the Disclosure Statement and is embodied in the Plan.

To become effective, the Bankruptcy Court must approve (confirm) the Plan and will consider your votes to ACCEPT or REJECT it.  Before voting, all creditors are strongly urged to carefully read and review in their entirety the Plan and the Disclosure Statement, including the discussion of the risk factors related to the Plan, and all other documents submitted to you.  Voting is by Class.  The Classes into which Claims are divided depend on the type of your Claim:  Note Claims are classified in Class 3 (Standard Note Claims) or Class 6 (Non-Debtor Loan Note Claims); Unit Claims are classified in Class 5; and other unsecured Claims without priority are classified in Class 4.  The treatment provisions for Classes 3, 4, 5, and 6 are set forth in Sections 3.4 through 3.7 of the Plan.  Summary information regarding recoveries for Classes 3, 4, 5, and 6, including recovery estimates, are set forth in Sections I.A.3. and IV.E. of the Disclosure Statement. **Moreover, to further assist you and anticipate your questions, the Unsecured Creditors' Committee has prepared and attaches a "Questions and Answers" document relevant to the Plan and to voting on it. If, after your review of these documents, you still have questions,** please share your questions with Pachulski Stang Ziehl & Jones LLP by email to woodbridge@pszjlaw.com or by telephone at (310) 203-4271.

---

[1] Capitalized terms not defined herein have the meanings ascribed in the Plan.
[2] This letter cannot and does not vary the terms of the Plan, which controls.  Also, if any facts or descriptions herein differ from those in the Disclosure Statement, you should rely upon the facts or description therein.
[3] The Unsecured Creditors' Committee appointed by the Bankruptcy Court on December 14, 2017. Its members are:  G3 Group LA, Inc., Lynn Myrick, and John J. O'Neill. The Unsecured Creditors' Committee retained the law firm of Pachulski Stang Ziehl & Jones LLP as its general bankruptcy counsel, FTI Consulting as its financial advisors and Berger Singerman LLP to serve as special counsel for any and all matters related to the SEC Action.

To:   Noteholders, Unitholders and Holders
      of General Unsecured Claims against
      Woodbridge in the Woodbridge
      Bankruptcy Case


      **The Unsecured Creditors' Committee believes that the Plan provides the best possible recoveries to creditors under the circumstances, that creditor acceptance of the Plan is in the best interests of all creditors, and that any alternative would result in unnecessary delay, uncertainty, and expense.  Based on the Plan and Disclosure Statement and consistent with the attached "Question and Answer" document, the Unsecured Creditors' Committee encourages each of you:**

      **(1) To vote and check the box to ACCEPT the Plan (which vote is on all Ballots);**

      **(2) <u>Not</u> to check the box disputing your Net Note Claim or Net Unit Claim amounts (which election is on Class 3 and Class 5 Ballots);**

      **(3) To check the box and agree to reclassify any Class 6 Claim as a Class 3 Claim (which election is on the Class 6 Ballot only and only applicable if you receive that Ballot);**

      **(4) To check the box and agree to assign your Contributed Claims to the Liquidation Trust (which election is on the Class 3 Ballot, Class 5 Ballot and Class 6 Ballot and only applicable if you receive one of those Ballots);and**

      **(5) To return the Ballot that you received by the [_____  __], 2018 deadline.**


Very truly yours,




_____

By: _____, Chairman of the
Unsecured Creditors' Committee of Woodbridge

**In re Woodbridge Group of Companies, LLC, et al.**

**Questions and Answers Regarding the Plan**

The following 16 questions are discussed and answered below:

1.     Who is sending me these documents?

2.     What is the Plan and Disclosure Statement and why have I received these documents?

3.     I invested money in Woodbridge.  Where did my money go?

4.     I invested money in Woodbridge.  How is the amount I will get paid calculated under the Plan?

5.     I reviewed the amount of my net claim on Schedule 3 of the Disclosure Statement and on the Ballot.  Now, what do I do?

6.     What will happen if the Plan is approved by the Bankruptcy Court?

7.     I thought I purchased secured Notes from Woodbridge.  Will I be entitled to recover my collateral?

8.     Will I be entitled to recover my collateral if my Notes are among the small number that relate to real estate actually owned by third parties?

9.     I am a Noteholder of Woodbridge.  What will I receive under the Plan?

10.    I purchased Units in Woodbridge.  What will I receive under the Plan and will I be treated differently from Noteholders?

11.    When will distributions under the Plan be made to Noteholders and Unitholders?

12.    What happens to claims and causes of action that I may have against others related to the Debtors?

13.    If I hold a General Unsecured Claim, will I receive any recovery?

14.    Will Robert Shapiro or any of his relatives or controlled affiliates recover anything under the Plan?

15.    What happens if I don't vote in favor of the Plan or the Plan is not approved?

16.    How do I vote on the Plan?

Enclosed with this Questions & Answers document, among other things, is the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors*, dated as of August 3, 2018, 2018 (the "Plan"), and a Disclosure Statement in

1

support of the Plan. Although the purpose of this Questions & Answers document is to answer general questions that you may have with respect to the Plan and the Disclosure Statement, you are urged to read the Plan and the Disclosure Statement, including their exhibits and schedules, in their entirety. If you have further questions after reading the Plan and the Disclosure Statement, please share your questions with Pachulski Stang Ziehl & Jones LLP by email to woodbridge@pszjlaw.com or by telephone at (310) 203-4271.

1.    **Who is sending me these documents?**

This "Question and Answer" document and an accompanying letter are being sent to you by the official, government formed and appointed Unsecured Creditors' Committee, mandated by law to represent the interests of unsecured creditors in these Chapter 11 Cases (hereafter, the "Unsecured Creditors' Committee"). All of the Unsecured Creditors' Committee's members are creditors who volunteered to serve.

The Plan, Disclosure Statement and other documents are being sent to you by the Debtors (the Woodbridge Group of Companies, LLC, et al.). The Debtors are controlled by a New Board,[1] approved or supported by the Unsecured Creditors' Committee. The Plan and Disclosure Statement describe in detail how the Debtors, under the control of the New Board, are proposing to complete the sale and/or construction of Woodbridge's real property and other assets in a timely and value maximizing manner in order to pay creditors of Woodbridge.

2.    **What is the Plan and Disclosure Statement and why have I received these documents?**

You have received the Plan and the Disclosure Statement because you are entitled to vote on the Plan. The Unsecured Creditors' Committee worked with the Debtors and others in negotiating and drafting the Plan, and recommends that you vote to accept it. To vote on the Plan you will need to indicate on the enclosed Ballot your acceptance or rejection of the Plan and return it to the Debtors by the voting deadline set forth in the Ballot. Information personalized to you may be included on your Ballot and certain other elections also may be available to you on your Ballot. Please follow the instructions set forth in the Ballot for its proper completion and delivery.

The Plan details how the Debtors will be structured and how their Assets will be liquidated after the Plan goes into effect.. The Plan sets forth the entities to be formed, including a Liquidation Trust of which the creditors will be the sole beneficiaries. It also describes the distributions to be made to creditors and the order of priority applicable in making them. The Disclosure Statement is designed to provide creditors with information sufficient to enable them to decide whether to vote to accept the Plan.

***The Plan has the support of the principal creditor and investor constituents in these cases, including the Unsecured Creditors' Committee.***

---

[1] Robert Shapiro, who essentially had been the ultimate owner of the Debtors and had lead prior management, is *no longer involved* in any capacity with the Debtors, has had nothing to do with sending these documents to you and has no authority to remove the New Board's members.

2

**3.    I invested money in Woodbridge.  Where did my money go?**

Whether you purchased Units in Woodbridge as a Unitholder, purchased Notes from Woodbridge as a Noteholder, or a combination of both, you are among approximately ten thousand individuals who were unsuspecting victims of a massive, multi-year Ponzi scheme perpetrated by Robert Shapiro between (at least) 2012 and 2017.  As part of this fraud, Shapiro, through the Woodbridge entities, deceived investors with lies on a massive scale.  Shapiro and the Woodbridge entities raised over $1 billion from investors that were made part of a pot of commingled funds used for a variety of purposes other than just making loans. Undoubtedly to hide that there were no meaningful cash inflows into the Debtors from sources other than investors, very substantial amounts of new investor funds were used to pay old investors - a typical characteristic of Ponzi schemes. Also, investor funds were used to pay overhead of the Woodbridge entities, to pay commissions to sales agents who sold these fraudulent investments, and to pay Shapiro's personal expenses.  As indicated above, Shapiro is *no longer involved* in any capacity with the Debtors.

**4.    I invested money in Woodbridge.  How is the amount I will get paid calculated under the Plan?**

Under the Plan, subject to a reduction for Unitholders relative to Noteholders for the reasons addressed in answers to Questions ## 7 and 10 below, you, as a Unitholder or Noteholder, will receive a share of monies available for distributions essentially *pro rata* with other Noteholders and Unitholders based on the amount of your claim. Your claim will be calculated *"net"* of any prior distributions or payments that you may have received from Woodbridge in connection with any Notes or Units other than return of principal or capital which already has been applied to reduce your claim. (As set forth in answer to Question #12, Noteholders and Unitholders who contribute certain claims to the Liquidation Trust also may get a small enhancement in their distributions.)

The netting referred to above is required in order to treat all investors fairly in light of the fact that Woodbridge was operated as a Ponzi scheme.  When a Ponzi scheme occurs, the law is designed to prevent some investors from realizing a profit while others are left to suffer a loss, and the Plan accounts for that.  For example, if you invested $1,000 in Notes or Units issued by Woodbridge, and were paid $100 in interest prior to the commencement of the Woodbridge bankruptcy cases, then your "net" claim for purposes of the Plan would be $900.  If, on the other hand, you invested $1,000 in Notes or Units issued by Woodbridge, and were paid nothing in the past by Woodbridge, then your "net" claim for purposes of the Plan would be the full $1,000 that you invested.

Based on their books and records, the Debtors have prepared a "Schedule of Principal Amounts and Prepetition Distributions" (a copy of which is attached to the enclosed Disclosure Statement at Schedule 3) that lists the components and result of the Debtors' calculation of the amount of Noteholder and Unitholder claims.  The specific amounts applicable to you are also set forth in your Ballot.

5.      **I reviewed the amount of my net claim on Schedule 3 of the Disclosure Statement and on the Ballot.  Now, what do I do?**

If you agree with the net claim amounts set forth in your Ballot, then you do not need to take any action with respect to that item of the Ballot and you will be deemed to have agreed to the amounts set forth in the Schedule of Principal Amounts and Prepetition Distribution.  (You still will need to indicate if you are voting to accept the Plan and contribute certain claims on the applicable sections of the Ballot.)

If you disagree with the net claim amounts set forth in the Schedule of Principal Amounts and Prepetition Distributions, then you have the option to check a box on your Ballot and dispute such amounts, making yours a disputed claim.  If your claim is disputed, the Liquidation Trust will likely file an objection to your claim and there will be litigation in the Bankruptcy Court concerning the amount of your claim.  Moreover, if your claim is disputed, the Debtors and the Liquidation Trust will reserve and may pursue any claims or rights that they may have against you that otherwise would not be pursued and would be released under the Plan.  **Thus, if you check the box on your Ballot to indicate that you disagree with the listed amounts for you, your claim will be treated as a disputed claim, you will not receive any distributions otherwise payable under the Plan until your claim is resolved and allowed, and you ultimately may receive less than if you had not disagreed with the listed amounts.**

6.      **What will happen if the Plan is approved by the Bankruptcy Court?**

The Plan contemplates a prompt and efficient liquidation of Woodbridge's assets and distribution of any and all available net proceeds in accordance with the Plan, which abides by the payment priorities required by bankruptcy law.

The Debtors' assets primarily consist of real estate, cash-on-hand, and potential claims and litigation with various parties.  The Plan provides for the creation of two entities: (i) a Wind-Down Entity, which will own many of the Debtors' assets (including the Debtors' real properties) and will sell those assets over time to generate cash, and (ii) a Liquidation Trust, which will own the Wind-Down Entity and receive cash generated by the Wind-Down Entity and will distribute that (and other) cash to creditors and investors.  The Liquidation Trust also will own and control litigation claims against third parties and may generate cash through prosecution or settlement of those claims.[2]  The Liquidation Trust will make distributions to creditors from its cash on hand, the excess cash generated by the sale of real estate assets through the Wind-Down Entity, and the liquidation of any other assets, including litigation claims and causes of action.  Mr. Goldberg, a member of the New Board, has been selected by the Unsecured Creditors' Committee and two other creditor groups to serve as trustee of the Liquidation Trust. Mr. Chin, who currently is serving as CEO of the Debtors, has been selected by the Unsecured Creditors' Committee and two other creditor groups to serve as Chief Executive Officer of the Wind-Down Entity.

Because the distributions to creditors are not expected to exceed the total of all claims, the Plan addresses and provides for and, if approved, would implement a settlement of certain

---

[2] The Debtors have not estimated recoveries to creditors from these litigation claims because such recoveries, if any, are unpredictable and highly contingent.

4

legal and factual issues that otherwise could delay and reduce the aggregate amount of distributions, including, among other issues, whether Units represent equity investments or debt (if equity investments, Unitholders' Claims would be paid only after Noteholder claims were paid in full) and whether or not Noteholders received perfected mortgages or security interests in connection with their investments that are not subject to avoidance under the bankruptcy laws, which could affect the priority of distributions. The settlement of these issues is described below in the answers to Questions ## 7 and 10.

**7.    I thought I purchased secured Notes from Woodbridge. Will I be entitled to recover my collateral?**

Under the Plan, no for most Noteholders (those holding Standard Note Claims).[3] The Notes and related documents generated by Shapiro are based on the *fiction* that Woodbridge loaned the specific funds of an investor to a specific, unrelated third party, the repayment of which was purportedly secured by real estate, and that such third party would pay interest and principal to Woodbridge (or else Woodbridge would foreclose on the properties). In reality, investor funds were commingled and almost no money flowed directly from Woodbridge to unrelated third parties. Shapiro created affiliates to which some of the money was loaned and which purchased real estate, but these affiliates had no source of cash to make monthly interest payments prior to the property's sale—thus leaving Woodbridge, prior to sales, without any significant source of revenue to pay investors.

There is pending litigation brought by a few Noteholders taking the position that they are properly secured in certain assets. Nonetheless, the Debtors believe that no Noteholder holds a claim that is actually secured by a valid, perfected mortgage on any real property because, among other things: (a) no Noteholder took the necessary steps to legally perfect such a security interest and (b) the Notes were issued as part of an intercompany sham whereby invested funds were just part of a pot of commingled funds that were used for a variety of purposes other than making loans. As more fully described below and in the Disclosure Statement, the Plan's compromise elevates somewhat the payment priority of the claims of Noteholders relative to Unitholders, which thereby benefits Noteholders.

**8.    Will I be entitled to recover my collateral if my Notes are among the small number that relate to real estate actually owned by third parties?**

A small number of Notes are purportedly secured by the small number of loans actually made to unaffiliated third parties by Woodbridge. These Noteholders' claims are referred to under the Plan as "Non-Debtor Loan Note Claims" and these Noteholders will receive the Class 6 Ballot for such Non-Debtor Loan Note Claims (and not the Class 3 Ballot for Standard Note Claims). Although the alleged security interests held by this small group also are not believed to be valid, enforceable and capable of withstanding challenge, under the Plan, the Holders of Non-

---

[3] Nor do the Debtors believe that Noteholders ultimately would be able to recover any of the purported collateral under any alternative to the Plan. But, as described in Question #8 below, for the small group of Noteholders that receive Class 6 Ballots (because the Notes relate to real estate actually owned by third parties) and hold Non-Debtor Loan Note Claims, the opportunity to litigate the validity, enforceability and perfection of their security interests are preserved under the Plan.

Debtor Loan Note Claims are offered the opportunity to establish that their alleged security interests or mortgages are valid, enforceable, and timely perfected. Yet because the Debtors do not believe such an outcome is likely and to avoid additional hardships, costs and delays for victims of Woodbridge's fraud as well as potentially costly and time-consuming litigation, the Debtors encourage all recipients of a Class 6 Ballot to elect on their Ballots to have their Claims reclassified in Class 3. Absent making this election, the Liquidation Trust may assert (likely, successfully in the Debtors' views) the Estates' "strong arm" powers to avoid any security interest a Holder of a Class 6 Non-Debtor Loan Note Claim may assert, could dispute the amount of such Claim, and could prosecute against the Holder of such Claim any lawsuits that may exist. If the reclassification election is made: (a) a Class 6 Non-Debtor Loan Note Claim will be treated as if such Claim had always been part of Class 3, including for distribution and voting purposes, and the amount of such Claim will be based on the applicable amount set forth in Item 4 of the Class 6 Ballot (to which amount the Holder will have agreed and be bound if it makes the reclassification election); (b) the Class 6 Claim Holder will have agreed to release all purported Liens against any assets or property of the Debtors' Estates; and (c) disputes would be resolved and litigation avoided as to amounts of the Claim, avoidance of the security interest, and avoidance and recovery of various prepetition payments made to the Claim Holder.

9.    **I am a Noteholder of Woodbridge.  What will I receive under the Plan?**

You, as a Noteholder, will receive interests in the Liquidation Trust entitling you to cash distributions of your *pro rata* share, depending on the amount of your net claim, of proceeds from the liquidation of the Debtors. As more fully described below and in the Disclosure Statement, the Plan proposes to treat Noteholders in accordance with a compromise that elevates somewhat the payment priority of claims of Noteholders relative to Unitholders, and thereby benefits Noteholders. The Debtors project that Noteholders will recover approximately 60% to 70% of their net claim amounts under the Plan (before attributing any value to the unknown recoveries on any litigation claims including Contributed Claims), subject to the various assumptions and risk factors set forth in the Disclosure Statement (*see* Article V thereof). Such risk factors that may affect the ability to achieve the estimated distribution percentages and that will affect the timing of distributions include, among others:  (1) delays in the projected timing of sales of real estate, (2) higher costs incurred prior to real estate sales, (3) overall declines in the real estate market, (4) the time and cost to analyze, object to and complete the claim objection process, (5) the amount of claims that share in or receive distributions, (6) the time and cost to analyze and prosecute potential litigation claims, and (7) the net proceeds realized on litigation claims.

10.    **I purchased Units in Woodbridge.  What will I receive under the Plan and will I be treated differently from Noteholders?**

Similar to Noteholders, you, as a Unitholder, will receive interests in the Liquidation Trust entitling you to cash distributions at the same time as Noteholders of your *pro rata* share, depending on the amount of your net claim, of proceeds from the liquidation of the Debtors. But, recognizing that Units are in certain respects more like equity investments than debt (if equity investments, Unitholders' Claims would be paid only after Noteholder claims were paid in full), as more fully described in the Disclosure Statement, the Plan proposes to treat Unitholders in accordance with a compromise that reduces somewhat the payment priority of claims of Unitholders relative to Noteholders.

6

The treatment of Unitholder claims versus Noteholder claims is one of the complex and uncertain issues resolved through the Plan. Unitholders will *initially* receive a lower amount (72.5 cents for every $1 in recovery that Noteholders receive). If and when Noteholders are repaid in full on the principal amount of their net claims and Unitholders are repaid 72.5% of what Unitholders are owed on the principal amount of their net claims, Unitholders will be entitled to any remaining distributions, which will be paid up to the full principal amount of Unitholders' remaining unpaid net claims (through Class B Liquidation Trust interests).

Absent such settlement, the dispute over whether the Units are "claims" or "equity" (ownership interests) would have to be litigated and there would be a risk that Unitholders would be paid nothing until all Noteholders are paid in full. Rather than spend significant time and money litigating this complex issue, the parties negotiated a compromise affording Unitholders initial distributions at 72.5% of what Noteholders receive and providing them Class B Liquidation Trust Interests that offer the potential for a 100% recovery depending on the amount of distributions ultimately made. Subject to the same risk factors described in answer to Question #9 as to Noteholder recoveries, the Debtors project that Unitholders will recover approximately 40% to 50% of their net claim amounts under the Plan (before attributing any value to the unknown recoveries on any litigation claim).

**11.    When will distributions under the Plan be made to Noteholders and Unitholders?**

The parties are targeting an initial distribution in the range of $42.5 million to $85 million in the aggregate by December 31, 2018. The parties do not yet know when or how often further distributions will be made to Noteholders and Unitholders. Note that the amount and timing of the distributions are subject to the same risk factors described in answer to Question #9 as to Noteholder recoveries.

**12.    What happens to claims and causes of action that I may have against others related to the Debtors?**

You can either pursue any such claims on your own at your own expense or contribute them to the Liquidation Trust. Under the Plan, each Noteholder and Unitholder has the option to assign to the Liquidation Trust all claims and causes of action that the Noteholder or Unitholder has against any person that is not released under the Plan and that are related in any way to the Debtors. If you elect to contribute such claims to the Liquidation Trust (as contributed, the "Contributed Claims"), then your allowed net Noteholder or Unitholder claim will be increased by 5% (*i.e.*, your otherwise net claim will be multiplied by 105%), thereby entitling you to a larger share of the distributions you otherwise would receive. Also, by making this election you further benefit because the Liquidation Trustee will be able to aggregate, pursue and settle all litigation claims in a more efficient and effective manner than you otherwise could on your own, leading to quicker and larger recoveries.

**13.    If I hold a General Unsecured Claim, will I receive any recovery?**

Yes. Under the Plan, holders of General Unsecured Claims will receive interests in the Liquidation Trust entitling each holder to cash distributions of a *pro rata* share, depending on the amount of the holder's claim, of proceeds from the liquidation of the Debtors. Subject to the

7

same risk factors described in answer to Question #9 as to Noteholder recoveries, the Debtors project that Holders of General Unsecured Claims will recover approximately 60% to 70% of their claims under the Plan (before attributing any value to the unknown recoveries on any litigation claims).

**14.    Will Robert Shapiro or any of his relatives or controlled affiliates recover anything under the Plan?**

No, not without a fight.  The Plan reflects that, once it is approved, it is expected that the Liquidation Trustee will object to any claims of Shapiro and of any persons or entities related to him.  The Plan itself does not void Shapiro's claims by just saying so, but it is structured to ensure Shapiro and his related parties get no distribution while the Liquidation Trustee works to build his case against them.  Moreover, the Plan also preserves any and all available, affirmative claims and causes of action that may be brought by Woodbridge *against* Shapiro and his relatives or affiliates.  Any recoveries from such litigation will be made available to creditors and investors under the Plan.

The Debtors' assets will be administered under the authority of a new Liquidation Trust. The proposed Liquidation Trustee, Michael Goldberg, is a current member of the Debtors' board of managers and was jointly selected to be the Liquidation Trustee by the Unsecured Creditors' Committee and two other creditor groups (the Noteholder Group and the Unitholder Group).  In addition, the Liquidation Trust Supervisory Board will consist of five members—three selected by the Unsecured Creditors' Committee, and one each by the Noteholder Committee and the Unitholder Committee.  Robert Shapiro and his relatives and controlled affiliates will have no role or participation whatsoever with the Debtors or the Liquidation Trust on a going forward basis.

**15.    What happens if I don't vote in favor of the Plan or the Plan is not approved?**

The single fastest way to distribute money to creditors is for the Plan to be approved. Approval of the Plan at this time will substantially reduce legal and professional fees and associated litigation expenses and minimize delays in distributions to creditors.  If the Plan is not approved, the Debtors or other constituents will be required to propose an alternative chapter 11 plan (with no distributions to creditors unless such plan is approved in the future), which could involve significant multi-year litigation of the issues described above and others, or the Debtors' cases may be converted to a chapter 7 case, which necessarily involves another change in control to a chapter 7 trustee.  In any scenario, less money will be made available for distributions to creditors due to the substantial costs, risks, and delays imposed by switching course and litigating matters that otherwise are now resolved under the proposed Plan.

*Accordingly, the Debtors and the Unsecured Creditors' Committee recommend that you vote in favor of the Plan.*

**16.    How do I vote on the Plan?**

To vote and make the needed decisions or elections, please complete the Ballot that you received with this mailing and return it by mail by the voting deadline in the return envelope that

has been provided. If you did not receive a Ballot or misplaced it and believe that you are eligible to vote on the Plan, please contact: Woodbridge Group of Companies, LLC, c/o Garden City Group, LLC, P.O. Box 10545, Dublin, Ohio 43017-0208, or via email to WGCInfo@choosegcg.com (the Solicitation Agent). Your ballot indicates the Class and type of Claim it is for. Specific guidlines for completing each type of Ballot follow:

Guideline 1 (All Ballots): For creditors that receive a Class 3 Ballot, Class 4 Ballot, Class 5 Ballot or Class 6 Ballot, with respect to *Ballot Item 2* ("Vote on Plan"), the Unsecured Creditors' Committee recommends you *check the box next to* "ACCEPTS (votes for) the Plan." Additional guidelines are set forth below for the Class 3 Ballot, Class 5 Ballot and Class 6 Ballot because they also have additional items with elections or decisions to make.

Guideline 2 (Class 3 and 5 Ballots): For creditors who receive a Class 3 Ballot or a Class 5 Ballot, besides voting on Ballot Item 2, as to:

(a) *Ballot Item 3 (Calculation of Net Note Claim Amounts and Election to Become Disputing Claimant):* As more fully set forth in Question #5 above, *if you agree with the net claim amounts set forth in your Ballot, then you do not need to take any action* (and you should not check the box in Ballot Item 3); and

(b) *Ballot Item 4 (Contributed Claim Election):* As more fully set forth in Question #12 above, *check the box if you wish to assign your Contributed Claims* to the Liquidation Trust (in exchange for having your allowed net Note or Unit claim increased by 5%).

Guideline 3 (Class 6 Ballots): For creditors who receive a Class 6 Ballot, besides voting in Ballot Item 2, as to:

(a) *Ballot Item 3 (Election to Reclassify as Class 3 Claim):* For the reasons described in Question #8 above, *the Debtors and Unsecured Creditors' Committee encourage all recipients of a Class 6 Ballot to check the box* next to the statement, "The undersigned Claimant consents to (OPTS IN to) reclassification of its Class 6 Claim as a Class 3 Claim" (in which event their treatment as holders of Class 3 Claims will be based on their Net Note Claim amounts set forth in Ballot Item 4 of their Class 6 Ballots);

(b) *Ballot Item 4 (Calculation of Net Note Claim Amounts and Election to Become Disputing Claimant):* Item 4 does not offer a box to check or decision or election to make. But, the impact of the amounts set forth in this *Ballot Item 4* is more fully set forth in Question #5 above and, if you check the box in *Ballot Item 3* of the Class 6 Ballot to reclassify your Class 6 Claim as a Class 3 Claim, then, you automatically will be agreeing with such amounts set forth in this Ballot Item 4; and

(c) *Ballot Item 5 (Contributed Claim Election):* As more fully set forth in Question #12 above, *check the box if you wish to assign your Contributed Claims* to the Liquidation Trust (in exchange for having your allowed net Note claim increased by 5%).

9

Re:    **In re Woodbridge Group of Companies, LLC, et al., Case No. 17-12560 (KJC)**

Dear Woodbridge Unitholders:

We write to you with respect to the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors (dated August 3, 2018)* (the "Plan"),[1] which you are receiving from the Debtors and which is contained on the CD that is in the same package as this letter.[2] We are the official ad hoc committee of unitholders (the "Unitholders Committee") appointed to represent the interests of Unitholders in the bankruptcy cases of the Woodbridge Group of Companies, LLC and certain of its affiliates ("Woodbridge" or the "Debtors").

The Unitholders Committee agrees with the Debtors, the Official Committee of Unsecured Creditors, and the Noteholders Committee that the best way to maximize value for Unitholders (and all creditors in these cases) in light of relevant risks is for there to be an orderly liquidation of the Debtors' assets and prompt distribution of the proceeds to creditors.  Still, there are many issues and uncertainties relating to Woodbridge and the claims of its creditors and investors, the resolution of which could be expensive and delay distributions.  To ensure that creditors and investors recover as much money as soon as possible, your Unitholders Committee reached agreement to propose to you the Plan that includes a settlement among the various creditor constituencies (and with the Debtors, acting through the successor board and management put in place during the bankruptcy cases)—which settlement is fully described in the Disclosure Statement and is embodied in the Plan.

To become effective, the Bankruptcy Court must approve (confirm) the Plan and will consider your votes to ACCEPT or REJECT it.  Before voting, all creditors are strongly urged to carefully read and review in their entirety the Plan and the Disclosure Statement, including the discussion of the risk factors related to the Plan, and all other documents submitted to you.  Voting is by Class.  The Classes into which Claims are divided depend on the type of your Claim: Unit Claims are classified in Class 5.  The treatment provisions for all Classes entitled to vote on the Plan are set forth in Sections 3.4 through 3.7 of the Plan.  Summary information regarding recoveries for Class 5, including recovery estimates, are set forth in Sections I.A.3. and IV.E. of the Disclosure Statement.  Additional information is available on the Unitholders Committee's website, www.woodbridgeunitholders.com, including a copy of the Official Committee of Unsecured Creditors' Questions and Answers and information and details regarding timing of anticipated conference calls for Woodbridge Unitholders regarding voting on the Plan.  **If, after your review of these documents, you still have questions,** please contact: Jeffrey Sabin, Venable LLP, 202-503-0672, jssabin@venable.com.

**The Unitholders Committee believes that the Plan provides the best possible recoveries to creditors under the circumstances, that creditor acceptance of the Plan is in the best interests of all creditors, and that any alternative would result in unnecessary delay, uncertainty, and expense.  Based on the Plan and Disclosure Statement, the Unitholders Committee urges each of you:**

      (1) **To vote and check the box to ACCEPT the Plan (which vote is on all Ballots);**

      (2) **<u>Not</u> to check the box disputing your Net Unit amount (which election is on Class 5 Ballots);**

      (3) **To check the box and agree to assign your Contributed Claims to the Liquidation Trust (which election is on the Class 5 Ballot and only applicable if you receive one of those Ballots); and**

      (4) **To return the Ballot that you received by the _____, 2018 deadline.**

Very truly yours,

*/s/ Dr. Raymond Blackburn*
Dr. Raymond Blackburn, Chair of the Official
Unitholders Committee of Woodbridge

---

[1] Capitalized terms not defined herein have the meanings ascribed in the Plan.
[2] This letter cannot and does not vary the terms of the Plan, which controls.  Also, if any facts or descriptions herein differ from those in the Disclosure Statement, you should rely upon the facts or description therein.

# The Ad Hoc Noteholder Group

**Re:**    **In re Woodbridge Group of Companies, LLC, et al. Case No. 17-12560 (KJC)**

To the Noteholder Victims of the Woodbridge Fraud:

We write on behalf of the Noteholder Group to urge that you vote in favor of the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors (dated August 3, 2018)* (the "Plan"). You are receiving this letter as part of package that includes the Plan (contained on the CD that is in the same package as this letter), the Bankruptcy Court-approved Disclosure Statement concerning the Plan (also on the CD), and one or more Class 3 or Class 6 Ballots for you as Noteholder. Please note that nothing in this letter is a substitute for a careful review of the Disclosure Statement in considering your vote on the Plan—as a legal matter, the Plan and Disclosure Statement are the operative documents. The purpose of this letter is to briefly explain, in the Noteholder Group's own words, why the Noteholder Group recommends that you vote in favor of the Plan.

First we want you to know that the Noteholder Group is made up of nine members who, like you, invested significantly in the Woodbridge fraudulent scheme. Our members' note investments total $9.8 million. A detailed disclosure of the Noteholder Group's membership and investments is attached (this information was filed with the Bankruptcy Court on May 2, 2018, at Docket No. 1707). Importantly, membership in the Noteholder Group was carefully limited to avoid any potential conflicts of interest, such as with brokers or Woodbridge "unit" investors.

Turning next to the Plan, we want to highlight some key points for your consideration. We firmly believe that the Plan reflects the best settlement for Noteholder victims that could be achieved in this highly complex situation. The settlement that forms the central core of the Plan was achieved on March 22, 2018, following a very thorough and hard-fought negotiation among the three committees in the Woodbridge Chapter 11 cases—the Unsecured Creditors' Committee, the Noteholder Group, and the Unitholder Group (the "Committees")—and the Debtors. The Noteholder Group forcefully put forth numerous arguments in favor of the secured status (i.e., lien rights) of Noteholders, as well as arguments as to the seniority in right of payment of Noteholder investments (which were in the form of debt instruments) versus Unitholder investments (which were in the form of limited liability company member interests). The other parties to the settlement negotiation ably put forth competing positions. We believe the economic terms of the resulting settlement fairly and fully account for the secured-status arguments and debt-versus-equity arguments, when taking into account the potential ramifications of the Woodbridge fraud.

The lien rights promised to Noteholders—and indeed, reflected in the language of Noteholders' loan documents—were hollow promises that were part of the massive fraud perpetrated by Robert Shapiro, who formerly controlled Woodbridge, all as detailed by the Woodbridge Debtors in the Disclosure Statement. A fundamental reason for the existence of the Noteholder Group has been to pursue the most appropriate treatment of Noteholder victims with respect to the lien rights that each Noteholder was led to believe they have. The Noteholder Group exhaustively reviewed the legal and factual issues involved in any pathway to attempting strict legal enforcement of lien rights for Noteholders. But it was readily apparent that there is no workable path for any such lien enforcement. The pervasive nature of the Woodbridge fraud makes the asserted liens and underlying collateral the subject of major litigation risk. The reasons for this are complex, can be summed up as follows: (i) Woodbridge did not structure its note investment products in a manner consistent with its sales

Page 1

To:   Noteholder Victims of the
      Woodbridge Fraud

pitch; (ii) even as structured, Woodbridge did not take the proper legal steps that a legitimate, competent investment company would have taken to validate its noteholder investors' lien rights; and (iii) even if a Noteholder could prevail in validating its lien rights on one of the theories identified by the Noteholder Group, there is a substantial risk that Woodbridge's grant of those lien rights could be "avoided" (i.e., rendered unenforceable) based on Woodbridge's fraud and the applicable law.  (Indeed, this latter point is the subject of a lawsuit the Official Creditors' Committee has already prepared and would presumably pursue if the Plan is not confirmed.)  It *cannot be overemphasized* how important it was for all Noteholders that these issues would be settled promptly, as has been done in the Woodbridge cases.  Absent the March 22 settlement, and the collaborative work by the Debtors and the three Committees to propose the Plan, there would have been costly and prolonged litigation at the Bankruptcy Court and in appeals, spanning many months and perhaps years, all of which would dilute and delay any recoveries for Noteholders who have not received any income from their Woodbridge investments since at least November 2017.

Another extremely important factor in terms of any attempt to strictly enforce asserted liens is that such a path would cause perhaps thousands of Noteholders to receive little or no recovery.  Again, Woodbridge perpetrated a massive fraud.  The fraud and lies did not conveniently stop at any particular boundary so as to permit a workable lien enforcement scheme.  There are many Noteholder victims who were fraudulently induced to lend against (i) properties that Woodbridge did not yet own, and in fact never acquired, and (ii) underlying mortgages that Woodbridge did not yet have, and in fact never received.  If asserted lien rights were strictly enforced, then such Noteholder victims (who may not even know who they are) would be catastrophically impacted by receiving little or no recovery simply because they happened to have notes for which no collateral even arguably exists.  One of the core principles of the settlement embodied in the Plan is that Noteholder victims should not be treated differently based on the happenstance of which property they thought they were lending against.  Rather, Noteholders will be treated fairly and equally, all sharing in a very meaningful amount of Woodbridge's total distributable assets.

Another major element of the settlement in the Plan is the allocation of Woodbridge's distributable asset value between Noteholder victims and Unitholder victims.  The projections prepared by the Debtors and detailed in the Disclosure Statement estimate up to $579 million in total value distributable to creditors from the sales of Woodbridge real property (with some properties being developed further prior to sale).  By our calculations, depending how large other allowed unsecured claims ultimately are, Class 3 Noteholders as a group are expected to receive between about $457 to $480 million of that total distributable value from Woodbridge's assets, while Unitholders are expected to receive between about $85 to $90 million of that total distributable value.  While the biggest driver of this difference is the relative amount of Noteholder investments (approximately $750 million) versus Unitholder investments (approximately $200 million), the settlement embodied in the Plan has two components that favorably allocate distributable value to Noteholders.  The first is the 27.5% discount of Unitholder net claims to Noteholder net claims.  The second is the netting of prepetition interest payments from the allowed amount of Noteholder and Unitholder claims, which on the whole affects the Unitholder claims more than it affects the Noteholder claims (because the unit investments had a higher interest).  These components of the settlement result in an increase in Noteholders' overall share of distributable value, to the point where Noteholder victims are by far the predominant recipients of distributable value.  As set forth in the Disclosure Statement, Noteholder recoveries are projected to be between 60-70% while Unitholder recoveries are projected to be between 40-50%—a result that, as noted above, fairly and fully accounts for the secured-status arguments and debt-versus-equity arguments, when taking into account the potential ramifications of the Woodbridge fraud.

To:    Noteholder Victims of the
       Woodbridge Fraud


The Unsecured Creditors' Committee, in consultation with the Noteholder Group and the Unitholder Group, has prepared a "Questions and Answers" document which is also included in the Plan and Disclosure Statement package.  If you have any other questions, please call [_____] or email us at [_____].  The Noteholder Group believes that the Plan will provide Noteholders with the best financial recovery possible under the circumstances.  Importantly, if creditors do not vote in favor of the Plan, then Noteholders and other creditors will likely be subject to significant delay and substantial litigation costs, as there is no current alternative to the Plan and the global settlement upon which the Plan is based.  The Noteholder Group urges all Noteholders to take action to support the Plan by taking the following actions:

(1) Vote by checking the box to ACCEPT the Plan on all Ballots you receive (if you hold "unit" investments you should receive a Class 5 Ballot in addition to your Class 3 Ballot and/or Class 6 Ballot);

(2) Do not check the box disputing your Net Note Claim or Net Unit Claim amounts (which election is on the Class 3 Ballot and the Class 5 Ballot);

(3) If applicable, check the box to OPT IN to reclassify your Class 6 Claim to a Class 3 Claim (which election is only on the Class 6 Ballot);

(4) Consider checking the box and agreeing to assign your Contributed Claims to the Liquidation Trust, which would provide you a 5% increase in your net allowed Claim (which election is on the Class 3 Ballot, the Class 5 Ballot, and the Class 6 Ballot); and

(5) Return your completed Ballot(s) no later than the _____, 2018 voting deadline.


Very truly yours,



_____          _____
By:   Marc Fruchter, Co-Chair of the          By:   Jay Beynon, Co-Chair of the
Noteholder Group                              Noteholder Group

Page 3

93767345.5

To:  Noteholder Victims of the
     Woodbridge Fraud

## Membership of the Ad Hoc Noteholder Group

1.    Dr. Michael Weiner –Boca Raton, Florida.  Dr. Weiner holds $4,150,760 in notes. Dr. Weiner did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

2.    Jane Breyer – Delray Beach, Florida.  Ms. Breyer holds $50,000 in notes personally, and $500,000 as attorney-in-fact for her mother, Lorraine Schocket, as well as $2,600,000 in notes indirectly as beneficiary of the Harry Breyer Revocable Living Trust. Ms. Breyer and Mr. Breyer did not act as a broker or financial advisor with respect to Woodbridge investment products, and they do not have any "unit" holdings.

3.    Richard Carli – Clayton, North Carolina.  Mr. Carli holds $430,000 in notes personally (Traditional IRA), $575,000 in notes jointly with Lois M. Carli, and $70,000 in notes as attorney-in-fact for Lois M. Carli (Roth IRA).  Mr. Carli did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

4.    Jay Beynon –El Segundo, California.  Mr. Beynon holds $500,000 in notes as trustee of the Jay Beynon Family Trust.  Mr. Beynon did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

5.    Kathleen Washko – Littleton, Colorado.  Ms. Washko holds a total of $460,041 in notes ($286,041 individually, $130,000 jointly with Brian Washko, and $44,000 jointly with Stephanie Washko).  Ms. Washko did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

6.    Ali Heidari Saeid – Ladera Ranch, California.  Mr. Heidari holds $150,000 in notes.  Mr. Heidari did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

7.    Marc Fruchter  – Greenville, South Carolina.  Mr. Fruchter holds $150,000 in notes.  Mr. Fruchter did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

8.    David Ellingson – Ventura, California.  Mr. Ellingson holds $100,000 in notes.  Mr. Ellingson did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

9.    Richard Doss – Rancho Santa Margarita, California.  Mr. Doss holds $60,000 in notes.  Mr. Doss did not act as a broker or financial advisor with respect to Woodbridge investment products, and does not have any "unit" holdings.

93767345.5