IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| | : | |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et al.*[1] | : | Case No. 17-12560 (KJC) |
| | : | (Re: D.I. 2721, 2397) |
| Debtors. | : | |

## OPINION ON CONFIRMATION[2]

Before the Court is the Debtors' Motion for Approval of Certain Compromises and Settlements, Partial Substantive Consolidation, and Related Relief with Respect to the Plan (D.I. 2721) (the "Motion"), and the Debtors' request for confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors (D.I. 2397) (the "Plan"). The Debtors have resolved all objections to confirmation of the Plan, except for the Objection (D.I. 2767) (the "Objection") filed on behalf of Lise La Rochelle and others (the "Dissenting Creditors").[3]

A hearing was held on October 24, 2018, at which a joint record was made regarding the Motion and confirmation of the Plan. The following items in support of the Motion and Plan confirmation were admitted into the record:

---

[1] The Woodbridge Group of Companies, LLC and many of its affiliated companies filed chapter 11 petitions in this Court on December 4, 2017, and the Debtors' chapter 11 cases are being jointly administered pursuant to the Order dated December 5, 2017 (D.I. 45), which contains a list of those Debtors. Additional affiliated Debtors filed chapter 11 petitions in 2018, which cases are also being jointly administered (collectively, the "Debtors").

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide these matters pursuant to 28 U.S.C. § 157 and § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (L).

[3] The Dissenting Creditors also filed a Reservation of Rights (D.I. 2839) with respect to the Motion, which reiterates that objection to the Plan.

(i)     Declaration of Bradley D. Sharp in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors (D.I. 2829), along with the attached Declaration of Soneet R. Kapila;[4]

(ii)    Declaration of Frederick Chin in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors (D.I. 2832);[5]

(iii)   Declaration of Soneet R. Kapila (D.I. 2834);

(iv)    Declaration of Emily Young of Epiq Certifying the Methodology for the Tabulation of Votes on and Results of Voting with Respect to the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors (D.I. 2836) and the Errata to the Declaration of Emily Young (D.I. 2855).[6]

Counsel for the Dissenting Creditors cross-examined Mr. Sharp, Mr. Kapila and Ms. Young at the hearing. After argument, I took the matters under advisement. For the reasons set forth below, the Objection will be overruled, the Motion will be granted, and the Plan will be confirmed.

FACTUAL BACKGROUND

On December 4, 2017, a total of 279 Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. Thereafter, on February 9, 2018, March 9, 2018, March 23, 2018 and March 27, 2018, additional affiliated Debtors (27 in total) commenced voluntary cases under chapter 11 of the Bankruptcy Code. The bankruptcy cases arise out of a massive, multi-year

---

[4] Bradley D. Sharp is Chief Restructuring Officer of WGC Independent Manager LLC, a Delaware limited liability company, which is the sole manager of debtor Woodbridge Group of Companies, LLC, a Delaware limited liability company and an affiliate of each of the Debtors, as well as the CRO of each of the Debtors. Soneet R. Kapila is the founding partner at KapilaMukamal, LLP, which was retained by the United States Securities and Exchange Commission (the "SEC") to conduct a forensic accounting investigation of certain Woodbridge entities, as described in his Declaration.

[5] Frederick Chin is the Chief Executive Officer of WGC Independent Manager LLC, a Delaware limited liability company, which is the sole manager of debtor Woodbridge Group of Companies, LLC, a Delaware limited liability company and an affiliate of each of the debtors, as well as the CEO of each of the Debtors.

[6] Emily Young is a senior consultant with Epiq Class Action and Claims Solutions, Inc., which acquired Garden City Group, LLC, the court-appointed Administrative Advisor for the Debtors.

fraudulent scheme perpetrated by Robert Shapiro between (at least) 2012 and 2017.[7]  As part of this fraud, through the Woodbridge entities, Shapiro raised over one billion dollars from approximately 10,000 investors – as either Noteholder or Unitholders – and used approximately $368 million of new investor funds to pay existing investors - - a typical characteristic of Ponzi schemes.[8]

After the bankruptcy cases were filed, the SEC filed a complaint in Florida federal court against Shapiro and his affiliates, including the Debtors, detailing much of the massive fraud perpetrated by Shapiro prepetition.[9]  The SEC asked the Florida court to appoint a receiver who would displace the Debtor's management.[10]

On December 14, 2017, an official committee of unsecured creditors (the "Unsecured Creditors' Committee") was appointed.  On January 23, 2018, the Court approved a settlement among the Debtors, the SEC and the creditor constituencies providing for the formation of an official ad hoc noteholder group (the "Noteholder Committee"), and an official ad hoc unitholder group (the "Unitholder Committee"), as well as a replacement board (the "New Board") and management for the Debtors.

Immediately following the appointment of the New Board, the Debtors focused on bringing the chapter 11 cases to a rapid consensual resolution, so as to return as much money as possible, as promptly as possible, to creditors.[11]  In March 2018, Debtors' counsel hosted several all-day negotiating sessions attended by the parties and their professionals.[12]  On March 22, 2018, the Debtors, the Unsecured Creditors' Committee, the Noteholders Committee, and the Unitholders

---

[7] Disclosure Statement (D.I. 2398) at 1.
[8] Id.
[9] Id. at 2.
[10] Id.
[11] Sharp Decl., ¶ 6.
[12] Sharp Decl., ¶ 7.

Committee signed a Summary Plan Term Sheet that memorialized an agreement in principle containing the fundamental terms of a chapter 11 plan.[13]  The parties continued to negotiate extensively the details of a plan, and on July 9, 2018, the Debtors filed the initial versions of the Plan and Disclosure Statement.

<u>The Ponzi Scheme Summary</u>

The Sharp and Kapila Declarations contain detailed findings based on their separate investigations and analyses of the Debtors' prepetition operations to support their conclusions that Shapiro conducted a significant Ponzi scheme through the Debtors.[14]

Under Shapiro's control and during the period from August 2012 through December 1, 2017, the prepetition Debtors raised more than $1.29 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products: five-year Units and twelve- to eighteen-month Notes.[15]  The prepetition Debtors claimed the Notes would be repaid based on the purported revenues the Debtors would receive from issuing short-term loans to unrelated third-party property owners.[16]   In reality, there was no robust and safe cash flow stream from third-party borrowers, as a very small fraction of investor money flowed form the prepetition Fund Debtors to unrelated third parties.[17]  Rather, Shapiro created disguised affiliates (the PropCos and MezzCos, which are defined in the Motion) to which money was loaned.[18]  These "borrowers" did not even have bank accounts, and they had no ability to service the required interest payments on an ongoing basis.[19]  In addition, they had no ability to retire the debt when due, other than through

---

[13] Sharp Decl., ¶ 8.
[14] Sharp Decl. ¶ 20.
[15] Sharp Decl. ¶ 21.
[16] Sharp Decl. ¶ 22.
[17] Sharp Decl. ¶ 23.
[18] *Id.*
[19] *Id.*

the sale of real estate, which did not appear to be contemplated and was not effectuated.[20] The annual cash flow from sales of real property was well below the amount of principal and interest paid by Shapiro to investors.[21]

The prepetition Debtors used funds received primarily from new investors to make payments of approximately $425 million of "interest" and "principal" to existing investors.[22] Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold the fraudulent "investments" and used investor money to pay at least $30 million for the benefit of Shapiro and his wife, as well as their related entities (including, for example, purchasing luxury items, travel, wine and the like).[23] While funds from the commingled account were used to purchase the Debtors' real properties, these purchases were directly contrary to material representations made to investors.[24]

Moreover, investments were solicited, and payments of "interest" were made to existing investors, without regard to whether such investors' investments realized value (or even existed).[25] For example, on certain occasions, Shapiro issued Notes for properties that the Debtor never actually acquired, including properties at 778 Sarbonne Road in Los Angeles and 53 Huron Street in Brooklyn.[26] And much like the famous play "The Producers," the Debtors purchased the "Owlwood Estate" (an iconic luxury residence in the Los Angeles, California area) in September 2016 for $90 million, but signed notes to the Fund Debtors for alleged borrowings in the aggregate amount of $112 million - - well above the purchase price of the property.[27]

---

[20] *Id.*
[21] Sharp Decl. ¶ 24.
[22] Sharp Decl. ¶25.
[23] *Id.*
[24] *Id.*
[25] Sharp Decl. ¶ 26.
[26] *Id.*
[27] *Id. See also* Tr. 10/24/2018 at 53:10 – 53:22.

In late 2017, Shapiro's fraudulent scheme unraveled.[28] As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors.[29] When new investment dried up, the inability to make the required servicing payments on the Notes and the Units became inevitable; indeed, the prepetition Debtors were unable to make the December 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases.[30]

<u>Plan Summary</u>

The Plan contemplates liquidating each of the Debtors. The Debtors' assets consist largely of approximately 189 real properties, cash and the "Liquidation Trust Actions."[31] The Plan proposes to substantively consolidate (i) the Fund Debtors[32] into Woodbridge Mortgage Investment Fund 1, LLC, and (ii) the Other Debtors into Woodbridge Group of Companies, LLC ("WGC").[33]

To liquidate and distribute the proceeds of the assets, the Plan provides for the creation of two entities: (i) a Wind-Down Entity, which will own many of the Debtors' assets (including the

---

[28] Sharp Decl. ¶27.

[29] *Id.*

[30] *Id.*

[31] Disclosure Statement at 6. The number of real properties was approximate as of the date of the Disclosure Statement. "The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates." *Id.* The estimated recoveries to creditors in the Disclosure Statement do not take into account potential proceeds of the Liquidation Trust Actions because they are unpredictable and highly contingent. *Id.*

[32] The "Fund Debtors" are defined in the Plan as Woodbridge Mortgage Investment Fund 1, LLC, Woodbridge Mortgage Investment Fund 2, LLC, Woodbridge Mortgage Investment Fund 3, LLC, Woodbridge Mortgage Investment Fund 3a, LLC, Woodbridge Mortgage Investment Fund 4, LLC, Woodbridge Commercial Bridge Loan Fund 1, LLC, and Woodbridge Commercial Bridge Loan Fund 2, LLC. Plan, § 1.64. These are the entities that raised money from the investors. Disclosure Statement at 4.

[33] Sharp Decl., ¶ 11. The "Other Debtors" are defined in the Plan as "[a]ll Debtors other than the Fund Debtors." Plan, §1.100.

Debtors' real properties) and will sell those assets to generate cash, and (ii) a Liquidation Trust, which will own the Wind-Down Entity and receive cash generated by the Wind-Down Entity and will distribute that (and other) cash to creditors.[34] The Unsecured Creditors' Committee, the Noteholders Committee and the Unitholders Committee unanimously selected Mr. Michael Goldberg (the SEC's designee to the Debtors' New Board) to serve as the proposed Liquidation Trustee.[35] The Liquidating Trust Supervisory Board will consist of five members - - three selected by the Unsecured Creditors' Committee, and one each selected by the Noteholder Committee and the Unitholder Committee.[36]

The Plan incorporates certain settlements, including resolution of disputes about whether the Units are claims against or equity in the Debtors (if the Units are equity they would not be entitled to payments), and whether the Notes are validly secured (either directly or indirectly) by the subject real properties.[37] Rather than spend significant time and money litigating these complicated issues, the parties negotiated and settled upon allowance of claims for Unitholders at a 27.5% discount as compared to Noteholders' claims.[38] Thus, the settlement is accomplished by affording Noteholders Class A Liquidation Trust Interests for 100% of the Net Note Claims, and affording Unitholders Class A Liquidation Trust Interests for only 72.5% of their Net Unit Claims.[39] Unitholders also get Class B Liquidation Trust Interests for the other 27.5% of their Net Unit Claims, so that they may receive an additional payment if there is any money remaining after payment of all of the other creditor claims contemplated under the Plan.[40]

---

[34] Disclosure Statement at 3.
[35] Disclosure Statement at 3.
[36] Disclosure Statement at 4.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.*

The Plan also incorporates a "netting" mechanism so that distributions of Liquidation Trust Interests will be made based on the Net Note Claim or Net Unit Claim. These net amounts are calculated based on the Outstanding Principal Amount of a Note Claim or a Unit Claim *minus* the aggregate amount of all Prepetition Distributions received by the claimholders.[41] The Note and Unit claims are "netted" due to the conclusion that the Debtors operated as a Ponzi scheme, in which case the Prepetition Distributions to Noteholders or Unitholders could be avoided and recovered for the benefit of other investors under state and federal fraudulent transfer laws.[42]

The Plan's classification and treatment of claims and equity interests is as follows:[43]

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | PROJECTED RECOVERY |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | 100% |
| None | Professional Fee Claims | Unimpaired | 100% |
| None | Priority Tax Claims | Unimpaired | 100% |
| None | DIP Lender Claims[44] | Unimpaired | 100% |
| Class 1 | Other Secured Claims | Unimpaired | 100% |
| Class 2 | Priority Claims | Unimpaired | 100% |
| Class 3 | Standard Note Claims | Impaired | 60% - 70% |
| Class 4 | General Unsecured Claims | Impaired | 60% - 70% |
| Class 5 | Unit Claims | Impaired | 40% - 50% |
| Class 6 | Non-Debtor Loan Note Claims[45] | Impaired | 60% - 70% |
| Class 7 | Subordinated Claims | Impaired (deemed to reject) | 0% |
| Class 8 | Equity Interests | Impaired (deemed to reject) | 0% |

---

[41] *Id.*

[42] Disclosure Statement at 4-5.

[43] Disclosure Statement at 10 – 11.

[44] "DIP Claims" are defined in the Plan as "Any and all Claims held by any DIP Lenders or the DIP Agent arising from or in connection with the DIP Loan Documents or the DIP Orders." Plan, § 1.37.

[45] "Non-Debtor Loan Note Claims" are defined in the Plan as "Any Note Claims that are or were purportedly secured by an unreleased assignment or other security interest in any loans or related interests as to which the lender was not a Debtor and the underlying borrower actually is or actually was a Person that is not a Debtor to the extent set forth in the Schedule of Non-Debtor Loan Notes Claims. The loans to Persons that are not Debtors were made as part of the Debtors' "Riverdale" segment, as further described in the Disclosure Statement." Plan, § 1.93.

Plan Voting

The Young Declarations showed that, overall, impaired creditors overwhelmingly accepted

the Plan:[46]

|  | Dollar Amount Voted to Accept/ Percentage | Number of Votes to Accept/ Percentage | Dollar Amount Voted to Reject/ Percentage | Number of Voted to Reject/ Percentage |
|---|---|---|---|---|
| Class 3 | $ 642,287,310. / 94.82% | 5,715/ 95.12% | $ 35,069,584 / 5.18% | 293/ 4.88% |
| Class 4 | $ 6,906,309 / 99.84% | 38/ 97.44% | $ 11,160 / 0.16% | 1 / 2.56% |
| Class 5 | $ 194,474,404/ 96.77% | 974 / 97.01% | $ 6,487,594 / 3.23% | 30 / 2.99% |
| Class 6 | $ 428,000/ 53.17% | 6 / 50 % | $ 377,000 / 46.83% | 6 / 50% |

DISCUSSION

The Dissenting Creditors assert that they are secured creditors who invested money in

various real properties owned by the Debtors and, in return, received a note and assignment of an

interest in a mortgage that was secured by liens against the real properties.  Therefore, they

argue, they have the right to be repaid 100% of their claims from the proceeds of the sale of

certain real property subject to those liens.  Some of the Dissenting Creditors filed an adversary

proceeding against the Debtors seeking declaratory judgment that they hold pre-petition, valid,

perfected, first-priority liens against certain real property owned by the Debtors.[47] The Debtors

moved to dismiss the adversary complaint and, on October 5, 2018, I issued an Opinion and

---

[46] Young Decl. (D.I. 2836) at 12; Young Decl. (D.I. 2855) at 2.

[47] *See* Adv. Pro. No. 18-50371 (KJC).  The Complaint includes four counts: (i) seeking a declaratory judgment that the Plaintiffs hold pre-petition, valid, perfected, first-priority liens against certain real property owned by the Debtors, or, alternatively, (ii) seeking a declaratory judgment that the Plaintiffs hold pre-petition, valid, perfected, first-priority liens against any and all proceeds from the sale and/or liquidation of certain real property owned by the Debtors; or alternatively, (iii) seeking the creation of a constructive trust or equitable lien against certain real property owned by the Debtors, or any and all proceeds from the sale or liquidation of that real property; and (iv) seeking damages against the Debtors based on financial abuse of elderly individuals under California law.

Order granting dismissal of the complaint.[48]  The Dissenting Creditors filed an appeal of the

October 5, 2018 Opinion and Order, which is currently pending.[49]

In the objection to plan confirmation, the Dissenting Creditors argue that the Plan relies

on the "core assumption" that the Debtors operated a massive Ponzi scheme, yet the Debtors

have failed to provide any evidence of the Ponzi scheme.  Without proving the Ponzi scheme, the

Dissenting Creditors argue that the Plan settlements are not fair or reasonable, and the Plan's

proposed substantive consolidation is improper under the Bankruptcy Code and Third Circuit

law.  For the reasons that follow, I conclude that these arguments have no merit.

<u>The Debtors Presented Sufficient Evidence of the Ponzi Scheme.</u>

The SEC defines a Ponzi scheme as follows:

> A Ponzi scheme is an investment fraud that involves the payment of purported
> returns to existing investors from funds contributed by new investors.  Ponzi
> scheme organizers often solicit new investors by promising to invest funds in
> opportunities claimed to generate high returns with little or no risk.  In many
> Ponzi schemes, the fraudsters focus on attracting new money to make promised
> payments to earlier-stage investors to create the false appearance that investors
> are profiting from a legitimate business.[50]

Ponzi schemes typically share three common characteristics: (i) the business activity

depends on outside investor money; (ii) the investor money is not used according to the stated

purpose (some of the investor money is used to pay the returns promised to earlier investors); and

(iii) the business enterprise lacks profits sufficient to provide the promised returns and, therefore,

depends on an ever-increasing supply of investor money.[51]

---

[48] Counts I, II and III were dismissed with prejudice; Count IV was dismissed, but the Plaintiffs
were granted leave to file motions in the main bankruptcy case seeking allowance to file late proofs of
claim.

[49] The Dissenting Creditors also argue that the Debtors should establish a reserve to set aside
funds to pay their "secured" claims if their appeal is successful.  I remain unconvinced that they are
lienholders and, therefore, deny this request.

[50] Kapila Decl. ¶ 80.

[51] *Id.* ¶ 82.

The Debtors submitted the Declarations of Mr. Sharp and Mr. Kapila, which describe their

separate investigations and analyses of the Debtors that support their conclusions that the Debtors

were operated as a massive Ponzi scheme. Mr. Kapila was retained by the SEC to conduct a

forensic accounting investigation of the Debtors.[52]   At the confirmation hearing, Mr. Kapila

testified that he had extensive experience analyzing Ponzi schemes as a forensic accountant and as

a bankruptcy trustee.[53]  His analysis of the Debtors' cash flows and transactions beginning in July

2012 showed that the Debtor entities "were not generating sufficient cash flows by way of working

capital or income to be able to support the obligations they were incurring."[54]  In his Declaration,

Mr. Kapila wrote:

> From July 11, 2012 through September 30, 2017, the Woodbridge Entities
> generated approximately $47.9 million of income, of which only $13.7 million
> was interest payments from borrowers.  Conversely, they funded more than $103
> million of Returns to WMIF Investors labeled as interest and dividend payments.
> Based on the Bank Reconstruction, other than investor funds, there was no other
> meaningful source of operating or other cash flow to the Woodbridge Entities to
> fund the difference between the WMIF Investor Returns and mortgage interest
> income.  This mismatch of interest income and Returns was not consistent with
> the business model represented to WMIF Investors.[55]

Mr. Kapila concluded that "[t]he Woodbridge Entities did not generate sufficient cash flow from

mortgage receivables, other real estate investments or any other source to fund the payments to

investors.  Clearly, even with the use of the cash balance carried over from [Woodbridge Structured

Funding, LLC]'s activities the only other source of funds available to the Woodbridge Entities to

make the $265 million of principal payments and $103 million in Returns to WMIF Investors were

funds from later investors, a classic Ponzi scheme attribute."[56]  Further, Mr. Kapila determined

---

[52] Kapila Decl. ¶ 2.
[53] Tr. 10/24/2018 at 39:8 – 39:25. *See also* Kapila Decl., Ex. A.
[54] Tr. 10/24/2018 at 40:11 – 40:21.
[55] Kapila Decl. ¶ 86. "WMIF" refers to the various Woodbridge Mortgage Investment Fund entities. *See also* Tr. 10/24/2018 at 40:22 – 41:12.
[56] Kapila Decl. ¶ 88.

that, despite maintaining separate bank accounts, the Woodbridge Entities transferred approximately $1.66 billion (exceeding 10,700 transactions) among the Woodbridge Entities, resulting in extensive commingling of investor funds.[57]

Mr. Sharp also testified at the confirmation hearing about his forensic investigation of the Debtors.[58]  His investigation was able to utilize the analysis that Mr. Kapila had done through September 2017 and, with greater access to the Debtors' books and records, complete the analysis through the rest of the prepetition period.[59]  Mr. Sharp also concluded that the Debtors' cash flows were insufficient to make the promised "interest" and "principal" payments to investors and, therefore, "the prepetition Debtors used funds received primarily from new investors to make payments to old investors."[60]  He testified that it was not possible to track an individual investor's contribution to a fund to any specific piece of real property because the Debtors commingled those contributions.[61]  Routinely, investor monies were placed into a Fund Debtor's bank account and comingled with other investor monies; then, monies from the Fund Debtor's accounts were transferred to the Woodbridge Group's accounts and commingled on that level; and, further, the monies would be transferred to attorney trust accounts, which would be sent to escrow to purchase various properties.[62]

Both Mr. Kapila and Mr. Sharp have the experience and expertise to support their analyses that are detailed in their Declarations.  The Dissenting Creditors offered no contrary evidence of their own.  Therefore, I accept the conclusions of Mr. Kapila and Mr. Sharp that the Debtors were operated as a Ponzi scheme.

---

[57] Kapila Decl. ¶ 89.
[58] Tr. 10/24/2018 at 42:14 – 42:18.
[59] Id. at 42:19 – 43:8.
[60] Sharp Decl. ¶ 25.  Tr. 10/24/2018 at 51:2 – 51:8.
[61] Tr. 10/24/2018 at 51:13 – 52:8.
[62] Id.

The Plan Settlements are Reasonable.

The Dissenting Creditors object to the Plan settlement, including (i) the Plan's different treatment of the Unitholder Claims and Noteholder Claims, (ii) elimination of intercompany claims and liens; and (iii) the "netting" or fixing claim amounts by deducting the amount of any prepetition payments from the original principal amount of claim. In the Motion, the Debtors argue that:

> [T]he Plan is a vehicle for the near-term resolution of the myriad complex legal issues and disputes that have arisen in the Chapter 11 Cases, but several components of the Plan Settlements are warranted in their own right and independent of the Plan. The Plan Settlements will resolve several major issues that would otherwise have to be judicially determined through lengthy, expensive, and inherently uncertain litigation. There are colorable arguments on both sides of each of the foregoing issues, and the outcome of any litigation regarding such issues is necessarily uncertain. Moreover, if such issues were litigated to finality, it could be years before the Holders of Notes, Units and General Unsecured Claims received distributions, if any, from the Estates.[63]

The Motion - - and the Disclosure Statement - - provide a lengthy discussion of the nature of the claims and issues that are being compromised in the Plan.[64] A brief description of those claims follows:

1.  Noteholder Claims: A significant dispute exists regarding whether the Noteholders hold, directly or indirectly, any valid and enforceable lien or other security interest in any estate assets, not subject to avoidance. The Debtors dispute that any Noteholders are secured because (a) the Debtors believe that the steps legally necessary to "perfect" any such security interest in favor of a Noteholder have not been taken or would be avoidable, and (b) Shapiro did not use investor funds as he promised (i.e., he commingled all funds rather than using a particular Noteholder's money for the

---

[63] Motion at 18.
[64] See Motion at 6 – 14; Disclosure Statement at 62 – 71.

particular property or loan to an alleged third-party borrower that was referenced on the Noteholder's documents) creating legal hurdles for the Noteholders to claim secured status.

2. <u>Intercompany Loan and Liens:</u>  The Unsecured Creditors Committee filed an adversary action that raises a variety of complex issues (which are sub-issues in the Noteholder disputes) claiming that the asserted intercompany loans and related liens and security interests purportedly granted to the Fund Debtors are avoidable as actual or constructive fraudulent transfers.

3. <u>Unitholder Claims:</u>    Another significant dispute exists regarding whether the Unitholders hold "claims" or "equity securities" in the chapter 11 cases.  Unitholders maintain that they hold claims that are debt based (in part) upon (a) an interpretation of the applicable governing documents, (b) the receipt of monthly interest checks, not dividends, and the Debtors' tax forms characterizing the payments as interest income, and (c) the Units are recorded as liabilities in the Debtors' books and records.  Even if the Unitholders hold claims, they could be subject to subordination.

The Debtors argue that global compromises and settlements of these issues should be approved either independent of the Plan (through the Motion) or as part of the Plan.

"To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy.'"[65]  However, "the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them."[66]  "[T]he decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the

---

[65] *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).
[66] *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

estate."[67] It is the "duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."[68]

A bankruptcy court may approve settlements under Bankruptcy Rule 9019[69] or as part of a debtor's plan.[70] The standards for approving settlements under Rule 9019 or as part of a plan are the same.[71] Bankruptcy courts should consider four factors when evaluating a proposed settlement:

(1)    the probability of success in litigation;

(2)    the likely difficulties in collection;

(3)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4)    the paramount interest of the creditors.[72]

In evaluating the probability of success in litigation, the court is not required "to decide the numerous questions of law and fact raised by [the objections], but rather to canvass the issues to see whether the settlement fall[s] below the lowest point in the range of reasonableness."[73] Here, the Debtors note that the claims are highly-contested disputes between and among the different stakeholders. The description of the claims set forth in the Disclosure Statement shows that there are colorable claims on both sides of the issues. The settlements provide an arm's-length negotiated

---

[67] *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997).

[68] *Protective Committee for Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424, 88 S. Ct. 1157, 1163, 20 L.Ed.2d 1 (1968).

[69] Fed. R. Bankr. P. 9019 ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.")

[70] 11 U.S.C. § 1123(b)(3)(A) provides that a plan may include "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate;" and § 1123(b)(6) provides that a plan may include "any other appropriate provision not inconsistent with the applicable provisions of this title."

[71] *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008).

[72] *Martin*, 91 F.3d at 393 (citing *TMT Trailer*, 390 U.S. at 424-25).

[73] *In re Exide Technologies*, 303 B.R. 48, 68 (Bankr. D. Del. 2003) (quoting *In re Neshaminy Office Bldg. Assoc.*, 62 F.R. 798, 803 (E.D. Pa. 1986)).

resolution of the complex, uncertain issues that strikes a fair balance between the potential range of litigated outcomes.

The Dissenting Creditors, however, focus in particular on the Plan's extinguishment of liens between the various Debtor entities. Relying on *Matter of Gulfco Investment Corporation*[74] and *Mansaray-Ruffin*,[75] the Dissenting Creditors argue that the Debtors are prohibited from extinguishing liens in a plan. Initially, I note that neither case involves the elimination of the debtor entities' intercompany liens through a global settlement in a plan. *Mansaray-Ruffin* involved a chapter 13 debtor who amended her plan and filed a claim on behalf of a mortgagee in an effort to invalidate the lien upon her property without filing an adversary proceeding. The *Mansaray-Ruffin* court held, in part, that the debtor could not disregard Bankruptcy Rule 7001(2) and include a provision in her chapter 13 plan that would run afoul of the Bankruptcy Rules.[76] An adversary proceeding provides the creditor with "greater procedural protection" by requiring a complaint, a summons, an answer, and discovery, and generally only concludes after a trial or dispositive motion.[77] The *Mansaray-Ruffin* court also noted that:

> The level of process due to a party prior to the deprivation of a property interest, such as a lien, is highly dependent on the context. As the Supreme Court has repeatedly emphasized, "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Thus, process that may be constitutionally sufficient in one setting may be insufficient in another.[78]

The elimination of the Debtors' disputed intercompany liens in this matter is taking place through a global settlement negotiated at arm's-length between and among the Debtors and various creditor

---

[74] *Fed. Deposit Ins. Corp. v. Hogan (In re Gulfco Inv. Corp.)*, 593 F.2d 921 (10th Cir. 1979).
[75] *SLW Capital, Inc. v. Mansaray-Ruffin (In re Mansaray-Ruffin)*, 530 F.3d 230 (3d Cir. 2008). I was the bankruptcy judge in that case as a member of the Eastern District of Pennsylvania Bankruptcy Court.
[76] *Mansaray-Ruffin*, 530 F.3d at 236-37.
[77] *Id.* at 237.
[78] *Id.* at 239 (citations omitted).

constituencies. These facts are markedly different from the debtor's one-sided actions in *Mansaray-Ruffin*.

The *Gulfco* court held that a secured creditor's lien could not be eliminated through substantive consolidation.[79] In *Gulfco,* the Chapter X trustee, with the support of the SEC, requested consolidation to preserve the value of two debtor companies for the benefit of creditors.[80] The Court of Appeals for the Tenth Circuit wrote:

> This district court has said that the security, shares in [one debtor company], will be difficult to appraise and evaluate. This, however, does not furnish a reason to classify the claim as an unsecured one. Criteria such as administrative convenience, expediency and accounting difficulties are not adequate to warrant treatment of a secured creditor as an unsecured creditor. Nor is the awareness by the creditor of the existence of related corporations sufficient to destroy the creditor's security absent circumstances like fraud.[81]

Unlike *Gulfco*, this case presents compelling circumstances - - that is, fraud in the form of a massive Ponzi scheme - - to allow the parties to enter into a settlement concerning the Debtors' disputed intercompany liens. The settlement is not merely an administrative convenience. There are complex multi-layered issues involving the intercompany liens that the parties have carefully and vigorously negotiated. Moreover, for reasons discussed *infra*, substantive consolidation of the Debtors is consistent with Third Circuit law. The *Mansaray-Ruffin* and *Gulfco* cases are distinguishable from the facts of this case. I conclude that those cases do not hinder the Debtors' probability of success on the merits. The comprehensive settlement of the issues, including the elimination of the intercompany liens, clearly falls within a range of reasonableness.

---

[79] *Gulfco*, 593 F.2d at 927.
[80] *Id.* at 926.
[81] *Id.* at 927.

The likely difficulty of collection falls in favor of approval because the absence of a settlement would result in lengthy and expensive litigation on a variety of fronts that would eat up the successful litigants' ability to recover on their claims.

The third factor clearly supports approval of the global compromises and settlements in the Plan. The myriad of complex issues described in the Disclosure Statement could take years and millions of dollars to litigate to finality. Mr. Sharp described the multiple "all-day negotiating sessions" and "extensive debate and discussion" among the parties about those key legal issues that were necessary to reach resolution.[82] Certain parties distributed detailed position papers on the issues in advance of the meetings.[83] The Debtors aptly described the potential effect of the litigation in their Motion:

> During the time in which the litigation wars would be fought and additional professional fees would be incurred, the innocent victims of Shapiro's scheme would very likely have to sit and wait for a final resolution of the various issues through the judicial process. Given the binary nature of many of the disputes and the distributional implication of those disputes, there would not be a clear path whereby interim distributions could be made to any given Creditor. This could leave Creditors who are retired, elderly, or otherwise in need of timely liquidity sources without an accessible or economical way to recover something on their investment. . . . [T]he Plan Settlement Elements disentangle the Debtors and their Estate from these many disputes in one fell swoop, thereby removing the need for the Estates to incur any additional costs, while eliminating the risk that each of the different stakeholders could face if any particular issue were to be resolved adversely to the group's position.[84]

The Debtors argument is convincing. Here, the benefits of the plan settlement to the multitudinous investors heavily outweighs the lengthy and costly litigation that lies in wait if the settlements are not approved.

---

[82] Sharp Decl. ¶ 7.
[83] *Id.*
[84] Motion at 25-26.

The final element to consider – the paramount interest of creditors – easily falls in favor of approval of the settlement. The creditors voted overwhelmingly in favor of the Plan. The Debtors reported that 85% of the noteholders and unitholders participated in the voting.[85] Mr. Sharp stated that the Plan is proposed with "the honest purpose of maximizing the ultimate recoveries for all of the Debtors' creditor constituencies and efficiently resolving the Debtors' Estates."[86]

Consideration of the *Martin* factors leaves no doubt that the global settlements included in the Plan, and as set forth in the Motion, fall well within any range of reasonableness. I conclude that the settlements are fair and in the best interests of the various creditor groups. The settlement will be approved.

## The Plan's Proposed Substantive Consolidation of the Debtors is Appropriate and Permissible.

The Dissenting Creditors object to the substantive consolidation of Debtors in the Plan. The Court of Appeals for the Third Circuit described substantive consolidation in the 2005 *Owens Corning* opinion, as follows:

> Substantive consolidation, a construct of federal common law, emanates from equity. It treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor.[87]

The *Owens Corning* court recognized that substantive consolidation could disadvantage some creditors, writing "[t]he bad news for certain creditors is that, instead of looking to assets of the [entity] with whom they dealt, they now must share those assets with all creditors of all

---

[85] Tr. 10/25/2018 15:15 – 15:20.
[86] Sharp Decl. ¶ 10.
[87] *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 423 (3d Cir. 2005) (internal punctuation omitted)).

consolidated entities, raising the specter for some of a significant distribution diminution."[88]    The

Third Circuit said that courts should balance certain principles (not as a checklist) when deciding

whether to order substantive consolidation:

(1)    Limiting the cross-creep of liability by respecting entity separateness is a "fundamental ground rule[ ]." As a result, the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play.

(2)    The harms substantive consolidation addresses are nearly always those caused by *debtors* (and entities they control) who disregard separateness. Harms caused by creditors typically are remedied by provisions found in the Bankruptcy Code (*e.g.,* fraudulent transfers, §§ 548 and 544(b)(1), and equitable subordination, § 510(c)).

(3)    Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

(4)    Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code).

(5)    While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).[89]

Reviewing these policies led the *Owens Corning* court to hold that a party seeking

substantive consolidation must prove that:

(i)    prepetition, the entities disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity, or

---

[88] *Id.* at 206.
[89] *Id.* at 211 (citations and footnotes omitted).

(ii)    postpetition, the entities' assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.[90]

The Debtors argue that the facts of this case fall squarely within the second rationale for substantive consolidation (*i.e.,* the hopeless commingling of assets and liabilities). As the Third Circuit explained in *Owens Corning,*

> This [second] rationale is at bottom one of practicality when the entities' assets and liabilities have been "hopelessly commingled." *In re Gulfco Inv. Corp.,* 593 F.2d at 929; *In re Vecco Constr. Indus.,* 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise *Jarndyce and Jarndyce,* the fictional suit in Dickens' *Bleak House* where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy—enhancing the value of the assets available to creditors ...—often in a very material respect." [quoting Mary Elisabeth Kors, *Altered Egos: Deciphering Substantive Consolidation,* 59 U. Pitt. L. Rev. 381, 417 (citations omitted)].[91]

The Debtors have presented substantial evidence to demonstrate that Shapiro was running the Debtors as a Ponzi scheme. The Declarations of Messrs. Kapila and Sharp provide ample evidence that the Debtors' assets were hopelessly commingled, and their business affairs were entangled. I agree with the Debtors that the Debtors' assets and liabilities are so scrambled in this case that separating them would be prohibitive and would harm creditors. As Mr. Sharp testified:

> Once investor funds had been obtained by the Fund Debtors, those funds were almost always transferred and commingled in one central bank account at WGC [Woodbridge Group of Companies] (and before 2016, at Woodbridge Structured Funding "WSF"). Thus, with respect to PropCo and MezzCo loans, even though the underlying loan documents facially referenced a loan by a specific prepetition Fund Debtor to the applicable Other Debtor ( as defined in the Plan Settlements Motion), in reality, the funds typically originated from a commingled account and generally cannot be traced to any particular prepetition Debtor. In almost every single case (WGC (or, before 2016, WSF) – rather than any prepetition Fund Debtor or Other Debtor - - was the only source of funds used to purchase or develop a property. Moreover, the amount of money that an Other Debtor promised to repay a particular Fund cannot be correlated with the amount an Other Debtor received from the Fund or what the PropCo paid to purchase or

---

[90] *Id.*

[91] *Id.* at 211 n. 20.

develop a property. Indeed, in several circumstances, investors hold documents evidencing a note and deed of trust from a PropCo that never even acquired the underlying property. [92]

The Debtors' funds were also used for various other purposes, often without detailed records or accounting and some clearly improper. For example, Shapiro used these funds to pay for (i) general corporate overhead, (ii) broker commissions of approximately $80 million, (iii) payment of purported returns to old investors (as part of perpetration of a Ponzi scheme, as discussed further below) of approximately $425 million, and (iv) at least $30 million for the benefit of Shapiro and his wife, as well as their related entities (including (a) approximately $3.1 million for chartering private planes, (b) approximately $2.2 million for other travel expenses, (c) approximately $2.6 million on home improvements and expenses, (d) approximately $1.8 million for personal tax obligations, (e) approximately $1.4 million to Shapiro's ex-wife, (f) approximately $800,000 on political contributions, (g) approximately $600,000 on vehicle purchases and leases, (h) approximately $330,000 on country club fees, (i) over $6 million on other personal purchases and expenses, and (j) at least $10 million of payments to Shapiro's wife and related entities). In many instances, the transfers made by WGC (or WSF) to or for the benefit of one or more of the Other Debtors were funneled through attorney trust accounts or directly to escrow companies without any clear indication why the transfers were being made or complete records of where the money ultimately went after it was initially transferred to the trust accounts or escrow companies. Shapiro further used the commingled funds to pay for improvements, maintenance, operating expenses, or other expenses for individual properties.[93]

Professionals working at DSI[94] under my supervision have examined what are literally tens of thousands of transactions made between or among WGC (or WSF) and the Other Debtors, or by WGC (or WSF) or another Other Debtor on behalf of a different Other Debtor – including based on Quickbooks entries, bank records, and discussions with Woodbridge employees. Based on that review, I have determined that it would be exceptionally difficult, if not literally impossible, to trace, reconcile, and reconstruct a reliable and complete allocation of assets and liabilities across WGC (or WSF) and the Other Debtors. This conclusion comports with that reached by a separate forensic accounting investigation conducted on behalf of the SEC by Soneet R. Kapila of KapilaMukamal, LLP, as set forth in a declaration dated December 18, 2017 and filed in the SEC's enforcement action, Case No. 1:17-cv-24624-MGC, ECF No. 36-2 (S.D. Fla. Dec. 26, 2017),[95]

---

[92] Sharp Decl. ¶13.

[93] Sharp Decl. ¶ 14.

[94] "DSI" is Development Specialists, Inc., located in Los Angeles, California. Mr. Sharp is the President and CEO of DSI. Sharp Decl. ¶ 1.

[95] Sharp Decl. ¶ 15. The Debtors entered into Consent and Final Judgment in the SEC's enforcement action, which was approved by Order of this Court on October 22, 2018 (D.I. 2842). The

The Dissenting Creditors, relying on the *New Century* case, point out that other courts have rejected substantive consolidation as part of a plan settlement.[96] However, *New Century* did not involve a massive Ponzi scheme like the one run by Shapiro in this case. The facts and circumstances in this case comport with the principles discussed in *Owens Corning*: (i) this Ponzi scheme is the type of compelling circumstance that overcomes the general expectation of recognizing corporate separateness; (2) substantive consolidation addresses the harm caused by the Debtors to the creditors; (3) the Plan's substantive consolidation accomplishes more than "administrative convenience" because it results in equitable treatment of defrauded creditors; and (4) substantive consolidation is being used defensively to remedy the harm to creditors caused by the commingling of assets in the Ponzi scheme - - and is not being used offensively to disadvantage a particular group of creditors.

A substantial majority of the creditors constituencies voted in favor of the Plan, which includes substantive consolidation. The record before me supports the conclusion that substantive consolidation in the Plan is appropriate under the principals and holding of *Owens Corning*.

---

Final Judgment provides, in part, that the Debtors are liable for disgorgement in the amount of $892,173,765, representing profits gained as result of the conduct alleged in the SEC's amended complaint. The disgorgement "will be deemed satisfied by the Liquidation Trust (being formed pursuant to a Chapter 11 plan) becoming obligated to make distributions of substantially all of the net proceeds (taking into account the costs of administration of the Liquidation Trustee and the Wind-Down Entity) from the disposition of the Debtor Defendants' assets (distributions of net proceeds to general unsecured creditors shall be permitted) to investors pursuant to a confirm plan, provided that the Commission does not timely object to the plan." (D.I. 2842-1 at 2).

[96] *Schroeder v. New Century Liquidating Trust (In re New Century Holdings, Inc.)*, 407 B.R. 576 (D. Del. 2009).

The Plan Meets the Requirements of Bankruptcy Code § 1129(a) and 1129(b).

The Dissenting Creditors also argue that the Plan does not meet the confirmation requirements of Bankruptcy Code § 1129(a), specifically § 1129(a)(10), because there is no evidence that the Plan was accepted by impaired classes on a "per debtor" basis. In *Tribune*, I decided that "[*i*]*n the absence of substantive consolidation,* entity separateness is fundamental" and the requirement of § 1129(a)(10) must be satisfied by each debtor in a joint plan.[97]  This Plan provides for substantive consolidation; therefore, acceptance by one impaired class satisfied § 1129(a)(10).[98]  The Voting Tabulation showed that the Plan was accepted overwhelmingly by all but one of the impaired classes of creditors entitled to vote.[99]

The evidence submitted by the Debtors support the conclusion that the Plan meets all of the applicable requirements of Bankruptcy Code § 1129(a) and (b).[100]  The record clearly shows that the Debtors worked assiduously with all of the creditor constituencies in good faith and submitted this Plan as a result of those extensive arm's-length negotiations.   Mr. Sharp's Declaration supports the liquidation analysis performed by DSI, which demonstrates that the recovery under the Plan on Claims is greater than that which creditors would receive in a chapter 7 case.[101]

---

[97] *In re Tribune Co.,* 464 B.R. 126, 183 (Bankr. D. Del. 2011), *amended, in part, on reconsid.,* 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd, in part, vacated, in part,* 2014 WL 2797042 (D. Del. June 18, 2014), *aff'd, in part, rev'd, in part and remanded,* 799 F.3d 272 (3d Cir. 2015), *aff'd on remand,* 587 B.R. 606 (D. Del. 2018)

[98] *See In re Enron,* 2004 Bankr. LEXIS 2549, 234-35 (Bankr. S.D.N.Y. July 15, 2004) (deciding that "the substantive consolidation component of the global compromise" allowed confirmation of a 177-debtor joint plan when at least one class of impaired claims voted to accept the plan.).

[99] D.I. 2836, 2855.

[100] Sharp Decl. ¶¶ 32 – 44.

[101] Sharp Decl. ¶¶ 34 – 39.  Disclosure Statement, Ex. B.

CONCLUSION

For the reasons set forth above, I conclude that the Debtors have provided ample evidence that the Debtors were operated as part of a massive Ponzi scheme.  The settlements in the Plan are reasonable and, to a large degree, the product of an exceptional effort by the respective professionals. Substantive consolidation is appropriate.  The Debtors have met all of the applicable confirmation requirements of Bankruptcy Code §1129.  The Dissenting Creditors' Objection will be overruled.  The Motion will be granted and the Plan will be confirmed.  An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  October 26, 2018