**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ──────────────────────────── x | | |
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No.: 17-12560 (BLS) |
| WOODBRIDGE GROUP OF COMPANIES,[1] | : | (Jointly Administered) |
| LLC, et al., | : | |
| Debtors. | : | Hearing Date: March 3, 2021 |
| ──────────────────────────── X | | Related Docket No. 4576 |

**RESPONSES TO TRUST'S (I) OBJECTION TO PROOF OF CLAIM NO. 8961
ASSERTED BY ALIA SALEM AL-SABAH AND (II) REQUEST FOR A WAIVER OF
LOCAL RULE 3007-1(f)(iii), TO THE EXTENT SUCH RULE MAY APPLY**

Alia Salem Al-Sabah ("Ms. Al-Sabah") hereby responds to the Objection to Proof of Claim No. 8963 (the "Objection") [Dkt. No. 4576] filed by the Woodbridge Liquidation Trust (the "Trust"), seeking entry of an order disallowing and expunging Claim No. 8961 (the "Proof of Claim") asserted by Ms. Al-Sabah against Debtor Woodbridge Mortgage Investment Fund 4 LLC (the "Debtor") and respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Trust, cannot, and in fact, does not, dispute that Ms. Al-Sabah is a victim of a significant fraud and that the Debtor played an active role in such fraud. In that respect, Ms. Al-Sabah is, in many ways, no different than many of the other victims of the Debtor's fraudulent practices. Indeed, the Trust acknowledges that the United States District Court for the District of Maryland (the "District Court") awarded Ms. Al-Sabah a judgment against an individual named Jean Agbodjogbe ("Mr. Agbodjogbe"). However, the Trust fails to acknowledge the significance of that judgment, which was based on a unanimous jury verdict finding that Mr. Agbodjogbe

---

[1] The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423 .

1

perpetuated a significant fraudulent scheme against Ms. Al-Sabah. The Trust, choosing instead to turn a blind eye to the Debtor's own involvement in such scheme, suggests simply that because the Debtor was not named in the 2018 Action[2], no liability could possibly exist against it. This argument is curious as the Trust knows the impact of the imposition of the automatic stay, which prevented naming the Debtor as a defendant or asserting colorable claims in such Action which could potentially violate the stay. Thus, the failure to name the Debtor in the 2018 is of no import and supports relief from the injunction imposed by the Plan, if necessary, to properly adjudicate Ms. Al-Sabah's claims before the District Court.

2.      While not the same type of innocent victim which suffered by the Debtor's own well-known fraudulent scheme, Ms. Al-Sabah is nonetheless a victim in which liability should be imposed. Indeed, in addition to the claims asserted in the 2018 Action, which can and should be asserted against the Debtor, the Debtor is undisputedly the recipient of a fraudulent transfer. Indeed, the <u>undisputed</u> facts are as follows: (i) Mr. Agbodjogbe defrauded Ms. Al-Sabah out of a significant amount of money; (ii) Mr. Agbodjogbe then used that money to fraudulently purchase the Baltimore Properties; (iii) Mr. Agbodjogbe then turned to the Debtor to further his fraudulent scheme by securing a nearly $960,000 loan from the Debtor (the "<u>Fraudulent Loan</u>");and (iv) the liens securing such Fraudulent Loan themselves transferred any fraudulently obtained equity in the Baltimore Properties to the Debtor, all further victimizing Ms. Al-Sabah. While these facts are undisputed, the Trust fails to acknowledge that the Debtor is the recipient of fraudulently obtained property and, as a result, is a participant in Mr. Agbodjogbe's adjudicated fraudulent scheme. As a transferee of fraudulent property, the Debtor can only rely on its "good faith" which, as an acknowledged fraudulent enterprise itself, would be ironic at best.

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Objection.

2

**LACK OF JURISDICTION**

3.  As an initial matter, courts have recognized that when a "proof of claim contains a reservation of rights and is filed under the compulsion of the bar date, the proof of claim does not necessarily operate to transform a non-core claim into a core claim." *See In re Northwestern Corp.*, 319 B.R. 68, 74 n.1 (D. Del. 2005); *see also In re Mid-Atlantic Handling Sys.*, LLC, 304 B.R. 111 (Bankr. D.N.J. 2003) (same). Thus, when the basis of a proof of claim is fraud, as it is here, a non-core claim, and the proof of claim contains a reservation of rights provision, the bankruptcy court will most likely not have jurisdiction to adjudicate the matter. *See In re Allied Sys. Holdings*, 524 B.R. 598, 606 n.22 (Bankr. D. Del. 2015); *see also TTS, Inc. v. Stackfleth*, 142 B.R. 96, 99 (Bankr. D. Del. 1992) (concluding that allegations of fraud are not core). Furthermore, for a bankruptcy court to have post-confirmation jurisdiction with respect to a proceeding, "first, the confirmed plan must provide that the bankruptcy court will retain jurisdiction over the proceeding post-confirmation and second, the proceeding otherwise must fall within the ambit of the court's Section 1334 jurisdiction." *See In re Metro-Goldwyn-Mayer Studios Inc.*, 459 B.R. 550, 556 (Bankr. S.D.N.Y. 2011). Paragraph 52 of the Debtors' confirmation order retains jurisdiction "over all matters arising out of, or related to," the chapter 11 cases. [Docket No. 2658]. However, "most courts agree that once confirmation occurs, the bankruptcy court's jurisdiction [under Section 1334] shrinks." *In re Park Ave. Radiologists, P.C.*, 450 B.R. 461, 467 (Bankr. S.D.N.Y. 2011) (citation and internal quotation marks omitted). As a general rule, the "future fate of the . . . [reorganized debtor is] not within the control of the bankruptcy court, nor . . . [can] that court reserve power to adjudicate controversies in which it might become involved . . . ." *In re Ambassador Hotel Corp.*, 124 F.2d 435, 436 (2d Cir. 1942); *see also In re DPH Holdings*

*Corp.*, 448 Fed. Appx. 134, 137 (2d Cir. 2011) ("[a] party can invoke the authority of the bankruptcy court to exercise post confirmation jurisdiction if the matter has a close nexus to the bankruptcy plan.") (internal citations omitted); *Metro-Goldwyn-Mayer*, 459 B.R. at 556 ("The 'close nexus' test is met when a matter affects the interpretation, implementation, consummation, execution, or administration of the confirmed plan . . . .") (citation and internal quotation marks omitted)). Here, the Proof of Claim does not affect the confirmed Plan and otherwise does not have a "close nexus" with the administration of the Plan; regardless of the outcome in this matter, the Plan will continue to be administered in the ordinary course. Indeed, the Proof of Claim asserts a general unsecured claim and thus will have a *de minimis* impact, if any. Therefore, due to Ms. Al-Sabah's reservation of rights in her Proof of Claim, the basis of the Proof of Claim being fraud, and this Court's diminished jurisdiction post-confirmation under section 1334 of the Bankruptcy Code, adjudication and liquidation of the Proof of Claim should, respectfully, be heard before the District Court.

## BACKGROUND AND FURTHER RESPONSE

4. The majority of the background underlying Ms. Al-Sabah's claims is set out in the Objection and for purposes of brevity, is not recited again herein. Rather, certain additional facts[3] are necessary to illuminate such claims and further support that Ms. Al-Sabah should have her day in court to adjudicate such claims and that proper venue to do so is the District Court.

5. As set forth in the 2017 Amended Complaint, beginning in 2014, Mr. Agbodjogbe undertook a long running, sophisticated, multi-step, and multi-party scheme to defraud Ms. Al-Sabah out of nearly $8 million dollars. Among his many fraudulent uses, Mr. Agbodjogbe used a portion of this money to acquire the Baltimore Properties. However, fraudulently acquiring title

---

[3] The asserted facts and exhibits attached hereto should come as no surprise and thus no prejudice to the Trust, as all have been previously provided to counsel to the Trust in the course of settlement discussions.

to the Baltimore Properties was not enough for Mr. Agbodjogbe as it did not result in cash in his pocket. Accordingly, he undertook a scheme to liquidate the equity in the Baltimore Properties, for which he held no equitable title, by securing loans on such properties which he had no intention of repaying, and, in fact, has not repaid.

6. To effectuate this step in his scheme, Mr. Agbodjogbe proceeded to contact banks with which he had a relationship to secure loans on the Baltimore Properties. However, because Mr. Agbodjogbe was a person of modest financial means (but significant fraudulent intellect), traditional banks were extremely suspicious of Mr. Agbodjogbe's ability to acquire the valuable Baltimore Properties in the first instance, let alone actually repay the loans. Indeed, upon information and belief, his banks suspected that Mr. Agbodjogbe was likely involved in a money laundering scheme, as his limited finances did not support his acquisition of the Baltimore Properties, and his story of how he became able to acquire such properties simply did not add up. Accordingly, he turned to less diligent sources, including hard money lenders that would more readily participate in his scheme and the Debtor was the perfect participant.

7. With the assistance of other fraudulent participants, Mr. Agbodjogbe obtained the Fraudulent Loan secured by the Baltimore Properties. The Fraudulent Loan bore a commitment fee of $57,600 (6%), with a one year maturity rate at 12% and a 24% default rate, and required monthly interest only and escrow payments in the aggregate of $11,897.

8. The liens on the Baltimore Properties effectuated a transfer of their equity to the Debtor, putting Ms. Al-Sabah's fraudulently obtained property that much further out of reach. *See* 11 U.S.C. § 101(54).

9. Upon discovery of Mr. Agbodjogbe's fraud, Ms. Al-Sabah instituted the 2017 Action against Mr. Agbodjogbe and other, then-known defendants.

5

10. Through discovery in the 2017 Action, Ms. Al-Sabah learned of the other participants in the fraudulent scheme, including, but not limited to, the hard money lenders used by Mr. Agbodjogbe to fraudulently transfer value out of the properties he fraudulently acquired title, including, but not limited to, the Baltimore Properties (collectively, the "<u>2018 Lender Defendants</u>").

11. Accordingly, as stated in the Objection, on September 25, 2018, *nearly ten months after the Petition Date*, Ms. Al-Sabah initiated the 2018 Action against the 2018 Lender Defendants. Obviously, due to the Debtor's filing and the imposition of the automatic stay, Ms. Al-Sabah was prevented from naming the Debtor as a defendant in the 2018 Action. Moreover, counsel to Ms. Al-Sabah in both the 2017 and 2018 Actions was counsel to the Fiduciary Committee of Unitholders in the Debtor's bankruptcy proceedings and was thus conflicted in representing Ms. Al-Sabah against the Debtor.[4] *See* Docket No. 719. Further, as stated in the Objection, the proceedings against the 2018 Lender Defendants were stayed pending outcome of the 2017 Action against Mr. Agbodjogbe. Accordingly, despite suggestions to the contrary in the Objection, Ms. Al-Sabah was left with no choice other than filing her Proof of Claim against the Debtor and hoping for whatever modest recovery would be afforded general unsecured creditors.

12. As stated in the Objection, a nine-day jury trial commenced in the District Court on January 21, 2020. At trial, Ms. Al-Sabah tried five of claims to the jury: (i) Fraudulent Misrepresentation, (ii) Fraudulent Concealment, (iii) Breach of Agency Duties, (iv) Unjust Enrichment, and (v) Civil Conspiracy. *See* Memorandum Opinion Dated March 9, 2020 (the "<u>March 9th Opinion</u>") attached hereto as **Exhibit A**. However, the Objection fails to detail that:

> [a]*fter just hours of deliberation*, the jury found Agbodjogbe liable on each claim for relief, and further found that each corporate Defendant had conspired with

---

[4] Now that the Plan has gone effective and the Fiduciary Committee of Unitholders disbanded, it is unclear whether such conflict continues to exist.

>Agbodjogbe to perpetrate the fraud on Al-Sabah. The jury awarded Al-Sabah $7,641,800 in compensatory damages, and an additional $1,000,000 in punitive damages, jointly and severally against each Defendant.

*Id*. at p. 4 (emphasis added) (citing District Court ECF 259 (Order of Judgment) the ("Jury Verdict")). The Jury Verdict and related Verdict Form are attached hereto as **Exhibit B**. In short, Mr. Agbodjogbe's scheme to conspire and defraud Ms. Al-Sabah was both excessive and blatantly obvious to both the District Court and the jury. Indeed, as noted by the District Court in a subsequent opinion:

>[T]he jury's verdict evidences their conclusion that Defendants maintained a consistent pattern of fraudulent activity for nearly two consecutive years, resulting in a loss of over $7.6 million by Al-Sabah. As discussed in this Court's March 9, 2020 Opinion, that conclusion is in accordance with the clear weight of the evidence presented at trial. *See* ECF 282. Given the enormity of that sum, *the degree of heinousness involved in this scheme is severe*.

*See* Memorandum Opinion dated March 19, 2020 at p. 4, at District Court ECF No. 285 (emphasis added), attached hereto as **Exhibit C**. Indeed, assessing the propriety of the jury's award for punitive damages, the District Court stated:

>[a]lmost no cases have presented quite the level of fraudulent conduct at issue here, making it difficult to rely upon a like situation. The proverbial foot that fits the glass slipper that is this case, does not appear to exist.

*Id*.

13. The Verdict and the District Court's Opinions establish the undisputable facts that not only did Mr. Agbodjogbe fraudulently purchase the Baltimore Properties, but that as part of his conspiratorial scheme, he secured the Fraudulent Loan secured by such properties. *See* March 9 Opinion at pp. 3-4.

14. Courts in the Third Circuit and elsewhere have held that the placement of a lien on property may constitute a fraudulent transfer. *See, e.g.*, *In re Allserve Sys. Corp.*, 2007 Bankr.

LEXIS 1747, at *5, *13 (Bankr. D. N.J. May 17, 2007) (holding that it is possible that receiving a security interest could lead a reasonable person to either believe or inquire as to whether the transfer was voidable as a fraudulent transfer); *In re Purco, Inc.*, 76 B.R. 523, 530 (Bankr. W.D. Pa. 1987) (holding that the placement of a security interest was a fraudulent transfer under the Bankruptcy Code); *Nicholas Loan & Mortg., Inc. v. West Va. Coal Co-Op, Inc.*, 209 W. Va. 296, 303 (S.C. App. 2001) (holding that placement of a lien on assets could constitute a fraudulent transfer).

15. Because it is undisputed that the Baltimore Properties were fraudulently obtained, it should now be undisputed that the Debtor, at a *minimum*, is the transferee of property obtained by actual fraud through the perfection of the mortgages. Further, because Mr. Agbodjogbe never equitably owned the Baltimore Properties upon which the Debtor secured its mortgages, Ms. Al-Sabah also has colorable claims for constructive fraud because, *inter alia*, she was not the recipient or beneficiary (far from it) of the loan proceeds to which such mortgages were secured and the transferors were, at all times, insolvent. These claims should be combined with those asserted against 2018 Lender Defendants in the 2018 Action, which, as the Trust admits in the Objection, was recently re-opened and is now in the discovery stage.

16. Much like section 548 of the Bankruptcy Code, the Delaware Uniform Fraudulent Transfer Act (the "DUFTA") provides as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

      a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

      b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

DUFTA, § 1304.

      17.    Under the foregoing statute, it is clear that the transfer effectuated by the mortgaging of the Baltimore Properties was fraudulent as to Ms. Al-Sabah. First, based on the Jury Verdict and the District Court Opinions, it is clear that the transfers were the result of ***actual fraud***. DUFTA, § 1304(a)(1). Indeed, the transfer would fall within many of the enumerated examples set forth in UFTA section (b) thereof. *Id*. at (b)(1)-(11). Further, because the purported owners of the properties, 9 Jewels, LLC ("<u>9 Jewels</u>") and 5722 York Road, LLC (collectively, the "<u>LLC Borrowers</u>"), including Mr. Agbodjogbe, were all insolvent at the time or were made so by the transfers, the transfers were also constructively fraudulent. DUFTA, § 1304(a)(2) and § 1305(a); *see e.g.*, Bankruptcy Petition of 9 Jewels, attached hereto as **Exhibit D**; *see also* Maryland Judicial Judgement and Lien Search attached hereto as **Exhibit E**, showing that at the time of the Fraudulent Loan, 9 Jewels was not paying its contractors as their debts became due.

      18.    The DUFTA provides a wide range of possible remedies for fraudulent transfers, including, (i) avoidance of the transfer to the extent necessary to satisfy the creditor's claim (§ 1307(a)(1)) and (ii) subject to applicable principles of equity, any relief the circumstances require (§ 1307(a)(3)(c)).

      19.    Undoubtedly, the Trust will argue that the Debtor is a good faith transferee because it had no knowledge of Mr. Agbodjogbe's fraudulent scheme. As an initial matter, any assertion that the Debtor, an admitted Ponzi scheme perpetrator whose fraudulent business practices

defrauded thousands of innocent victims, could sustain a "good faith" defense before the District Court, where these claims should be adjudicated, is highly unlikely.

20. Moreover, the law is clear that a transferee cannot stick its head in the sand (by reliance on a lack of due diligence requirements or otherwise) and claim to be a good faith transferee. Indeed, in the Third Circuit, courts have held that if a subsequent transferee has "knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by [him] would reveal facts sufficient to alert him that the property is recoverable, cannot sit on his heels." *In re Bressman*, 327 F.3d 229, 236-37 (3d Cir. 2003). "Rather, in such situation, the transferee is held to have knowledge of the voidability of the transfer for purposes of the Bankruptcy Code provisions permitting recovery." *See Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 U.S. Dist. LEXIS 24559, at *18-19 (W.D. Pa. Mar. 26, 2009).

21. Holdings in this Circuit comport with the generally-accepted analysis of a good faith defense under the related provisions of either the Bankruptcy Code or the Uniform Fraudulent Transfers Act. *Id.*; *see also In re Bayou Group*, 396 B.R. 810, 827 (Bankr. S.D.N.Y. 2008) (concurring that federal courts have reached a consensus that "good faith" under the Bankruptcy Code provisions is determined according to an "objective" or "reasonable person" standard and not on the subjective knowledge or belief of the transferee, and that under this standard the "courts look to what the transferee objectively 'knew or should have known'"). Moreover, the court in In re Bayou Group cited extensively to case law, including cases interpreting and analyzing "analogous" provisions under UFTA and noting that a transferee "cannot be found to have taken a transfer in good faith 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose.'" *Id.* at 827, 845.

22. The holdings of many of the foregoing decisions indicate that a variety of circumstances may preclude a finding of good faith, including notice of (a) the transferor's fraudulent purpose, (b) an underlying fraud, (c) the transferor's unfavorable financial condition or insolvency, (d) the improper nature of a transaction, and/or (e) the voidability of the transfer. *See, e.g.*, *id*. at 845-46 (providing extensive case citations). Here, the Debtor had ample evidence that something was potentially fraudulent with respect to Mr. Agbodjogbe's ownership of the Baltimore Properties and his request for the Fraudulent Loan. Such evidence includes, but is not limited to, the following:

- At the time the Fraudulent Loan was made in the amount of almost $1 million, Mr. Agbodjogbe had a credit score of only 680.

- The Debtor was aware that Mr. Agbodjogbe was using the Fraudulent Loan, in part, to refinance an existing loan in the amount of $375,000 that was in default and that lender, which was charging default interest, would not extend maturity for Mr. Agbodjogbe.

- Notwithstanding Mr. Agbodjogbe's obvious inability to repay a $375,000 loan, the Debtor loaned him $960,000, more than twice the loan for which he was already in default.

- At the time the Debtor made the Fraudulent Loan, Mr. Agbodjogbe was the subject of multiple judgments.

- Despite having an alleged (and entirely unquestioned) aggregate income of $180,000 a year (and a 680 credit score), Mr. Agbodjogbe's personal financial statement claimed he owned 5 mortgage-free properties worth $5.8 million dollars and had $114,000 in cash on hand at the time of the Fraudulent Loan. Incredulously, that didn't raise any red flags to the Debtor, either by way of (a) questing how someone of such modest means could have such significant unencumbered assets, and/or (b) if Mr. Agbodjogbe had the means to own almost $6 million in unencumbered real estate and have $114k in cash on hand, why would he need a 12% interest loan with $72k in fees from a hard money lender?

- The Fraudulent Loan required monthly interest payments of $11,000 per month, yet neither LLC Borrower was producing any income at the time (nor was any required by the Debtor) and thus there was no conceivable way the Fraudulent Loan could have been repaid, other than through foreclosure.

- The LLC Borrowers were subject to tax levies.

- Unlike Mr. Agbodjogbe's traditional lenders (who became suspicious and thus turned him down), the Debtor failed to make any inquiry into Mr. Agbodjogbe's finances, including, but not limited to, failing to ask for (a) bank statements, (b) income statements, (c) tax returns, or (d) any documentation on how he obtained title of the properties.

- Mr. Agbodjogbe's personal financial statement failed to list any mortgage expenses, yet, that was clearly incorrect due to the pre-existing loan that was in default and being refinanced.

- The General Information Sheet obtained by the Debtor failed to list any income from the Baltimore Properties.

- The General Information Sheet lists rental income, but no lease was required to be produced.

- LLC Borrower, 9 Jewels, had a pre-existing $1.5 million loan from another lender on another property, but the Debtor failed to inquire about it.

- The Debtor failed to confirm, or even inquire into, an alleged income of $150,000 a year from operating a small Halal restaurant in Baltimore.

- The Debtor failed to consider blatant inaccuracies in Mr. Agbodjogbe's personal financial statement.[5]

23. Ms. Al-Sabah submits that the foregoing provided more than enough suspicion of Mr. Agbodjogbe's fraudulent intentions such that the Debtor should have inquired further, but intentionally chose not to do so in order to obtain significant fees. Indeed, as stated above and as submitted at trial in the 2017 Action, Mr. Agbodjogbe's banks were very suspicious of him and thus declined to aid in his conspiracy. While not having the same regulatory underwriting requirements as a traditional bank, the Debtor (themselves a fraudulent company) cannot use that excuse to ignore the numerous red flags and legitimately claim good faith as a defense. Indeed,

---

[5] The information set forth herein was derived from documents produced by the Debtor pursuant to a subpoena *duces tecum* issued as part of the 2017 Action and served on the Debtor prior to the Petition Date on or about September 8, 2017. Certain documentation containing this information, as produced by the Debtors prior to the Petition Date, is attached hereto as **Exhibit F**. Additional documentary and testimonial evidence is available in the trial submissions in 2017 Action.

the foregoing indicia of Mr. Agbodjogbe's fraud were clearly present to the Debtor. This, combined with the Debtor's own well-known fraudulent practices, makes a good faith defense dubious, at best.

24.    For the foregoing reasons, Ms. Al-Sabah submits that she has a valid claim. Moreover, such claim is more appropriately liquidated before the District Court and Ms. Al-Sabah respectfully submits that this Court is without jurisdiction to adjudicate such claim.

## RESERVATION OF RIGHTS

25.    Ms. Al-Sabah respectfully reserves all of her jurisdictional rights as set forth in her Proof of Claim as if fully set forth herein. Further, Ms. Al-Sabah reserves the right to seek relief pursuant to Section 11.13 of the Plan, submitting that relief under the three part balancing test for "cause" as recognized by the courts in this District is met based on the arguments set forth herein.

**WHEREFORE**, Ms. Al-Sabah respectfully requests that the Court enter an order denying the relief sought in the Objection, directing the parties to proceed with liquidating her claims set forth in the Proof of Claim before the District Court, and granting such other and further relief as is just and proper.

Date: February 11, 2021

                **SQUIRE PATTON BOGGS (US) LLP**

                */s/ Christopher J. Giaimo*
                Christopher J. Giaimo
                2550 M Street, NW
                Washington, DC 20037
                Telephone: 202-457-6000
                Facsimile: 202-451-6315
                Email: christopher.giaimo@squirepb.com

                *Counsel to Ms. Alia Salem Al-Sabah*

## CERTIFICATE OF SERVICE

    I hereby certify that on February 11, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will serve notice on all parties registered to receive notice in this case.

                                                */s/ Christopher J. Giaimo*
                                                Christopher J. Giaimo