# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ALIA SALEM AL-SABAH, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No. SAG-17-730 |
| | * | |
| JEAN AGBODJOGBE, *et al.*, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

On November 22, 2017, Plaintiff Alia Salem Al-Sabah ("Al-Sabah") filed a nine-count Amended Complaint against Defendants Jean Agbodjogbe ("Agbodjogbe"), N&A Kitchen, LLC ("N&A Kitchen"), N&A Kitchen II, LLC ("N&A Kitchen II"), 5722 York Road, LLC ("5722 York Road"), and 9 Jewels, LLC ("9 Jewels"). ECF 76. A nine-day jury trial commenced on January 21, 2020. *See* ECF 236-240, 242-45, 249. The jury entered a verdict in favor of Al-Sabah against each Defendant on each count submitted, and awarded her $7,641,800 in compensatory damages, and an additional $1,000,000 in punitive damages. ECF 256; *see also* ECF 259 (Order of Judgment). On February 10, 2020, the parties submitted post-trial motions. The final motion remaining for adjudication is Defendants' Motion for Remittitur ("the Motion"). ECF 265. Al-Sabah opposed, ECF 269, and Defendants replied, ECF 277. For the reasons that follow, Defendants' Motion will be granted, though the Court will reduce, but not eliminate, the punitive damages award.

## I.    FACTUAL BACKGROUND

The instant lawsuit dates back to Al-Sabah's initial filing of the Complaint on March 17, 2017, ECF 1, which she amended with Defendants' consent on November 22, 2017, ECF 75, 76.

The Amended Complaint sought money damages from Agbodjogbe and his co-conspirators, the corporate Defendants, under eight claims for relief:  Fraudulent Misrepresentation (Count I); Fraudulent Concealment (Count II); Conversion (Count III); Civil Conspiracy (Count IV); Detrimental Reliance (Count V); Unjust Enrichment (Count VI); Breach of Contract (Count VII); and Breach of Agency Duties (Count VIII).  *Id.*  ¶¶ 1, 46-89.  As relevant here, Al-Sabah requested both compensatory and punitive damages in each Count, save for her Breach of Contract claim.  *Id.*  Finally, Count IX of the Amended Complaint sought various forms of declaratory relief against all Defendants.  *Id.* ¶ 93.  Al-Sabah tried five of these claims to the jury:  Fraudulent Misrepresentation, Fraudulent Concealment, Breach of Agency Duties, Unjust Enrichment, and Civil Conspiracy.  Prior to trial, Al-Sabah abandoned her Detrimental Reliance claim, and all of her claims against Defendant ASA Foundation, Inc.  ECF 232 at 16.  During trial, Al-Sabah also abandoned her Conversion claim, as well as all remaining claims against Defendant Nandi Scott.  ECF 241; ECF 248.

The jury trial in this case began on January 21, 2020, and concluded on January 31, 2020. ECF 236-40, 242-45, 249.  Over the span of those nine days, the jurors heard extensive testimony from just two party-witnesses:  Alia Salem Al-Sabah, and Jean Agbodjogbe.  A brief summary of the trial testimony, relevant to the issue of punitive damages, follows.

The parties stipulated that between September, 2014, and April 16, 2016, Al-Sabah wired over $7.8 million to Defendants.  *See* ECF 232 at 17-18 (Stipulations of Fact).  These transfers were received by either 9 Jewels or N&A Kitchen, *id.*, and were used by Defendants to purchase various residential and commercial real estate properties, *id.* at 18-19.  The evidence demonstrated, however, that those properties are all heavily encumbered, with several having entered foreclosure proceedings.  Agbodjogbe testified that Nailah's Kitchen continues to

operate at the 5722 York Road property, and that the restaurant currently generates "tens of thousands" of dollars in net revenue.  Outside of this, neither party presented any evidence establishing any of the corporate Defendants' net worth.

As to Agbodjogbe, the jury heard evidence that he maintains a personal bank account with the Municipal Employees Credit Union of Baltimore, Inc. ("MECU"), Pl.'s Trial Ex. 505, 507-09, that was not disclosed to Al-Sabah during pre-trial discovery, Pl.'s Trial Ex. 9 at 15-16. Agbodjogbe did acknowledge that in May, 2017, he transferred $100,000 to Touba Bollo, a Senegalese company that he created and owns.  *See* Pl.'s Trial Ex. 512.  He also introduced two HUD-1 Settlement Statements showing the amounts of money disbursed to him pursuant to mortgages N&A Kitchen took out on two of the commercial properties, *see* Defs.' Trial Ex. 194-95.[1]  Agbodjogbe, however, did not present any financial statements or other documents indicating his current net worth.  Instead, he repeatedly testified that "every penny" that Al-Sabah sent to him "went into the business," for costs such as paying contractors, architects, and restaurant supply vendors.  However, the only limited evidence of such expenses was that introduced by Al-Sabah (such as an online order from the "Webstaurant Store" for equipment exceeding $200,000).  Agbodjogbe did not introduce any documentary evidence to support his contention that he had expended all of the monies received from Al-Sabah on renovating the commercial properties.

Prior to the Court's conference with the parties regarding the jury instructions on January 30, 2020, the Court raised concerns with counsel for both parties on the record, indicating that it was not sure whether it could submit the issue of punitive damages to the jury based on the factual record developed at trial.  After hearing arguments from both parties, the Court ruled that

---

[1] In fact, of their initial 336 proposed exhibits, the two HUD-1 Settlement Statements were the *only* documentary evidence that Defendants introduced in their case-in-chief.  *See* ECF 251.

the issue of punitive damages could go to the jury.  Relying on *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 245 (2004), the Court reasoned that Al-Sabah had no duty to put forward evidence regarding the Defendants' ability to pay punitive damages.  The Court further found that there had been some evidence of Defendants' finances adduced at trial.  Though the evidence was "probably not to the extent that one optimally would have in a punitive damages situation," the Court found that the evidence was sufficient to allow the jury to consider whether punitive damages were appropriate.  The Court thereafter gave the jury the following instruction on punitive damages:

> If you find for the plaintiff and award damages to compensate for the injuries or losses suffered, you may go on to consider whether to make an award for punitive damages.  To award punitive damages, you must find by clear and convincing evidence the defendant acted with malice.  Malice is conduct motivated by evil motive, intent to injure, ill will, or fraud.  The purpose of punitive damages is not to compensate the plaintiff, but to punish the defendant and to deter others from this type of conduct in the future.  An award for punitive damages should be:
>
> > (1) In an amount that will deter the defendant and others from similar conduct.
> >
> > (2) Proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay.
> >
> > (3) Not designed to financially destroy a defendant.
>
> An award of punitive damages in this case requires that the defendant acted with malice. While an award for compensatory damages may be based upon a finding that the defendant made a representation with reckless indifference to its truth, this is not sufficient to warrant the award of punitive damages.  Negligence, however gross, is not enough to award punitive damages.  A defendant's knowledge of the falsity of a representation, coupled with an expectation that a plaintiff would rely upon a representation, is the state of mind that justifies an award of punitive damages.
>
> For punitive damages to be recoverable as a result of the breach of a fiduciary duty owed by the defendant to the plaintiff, the wrongful conduct must be characterized by evil motive, intent to injure, ill will, or fraud.

After just hours of deliberation following nine days of testimony, the jury found Agbodjogbe liable on each claim for relief, and further found that each corporate Defendant had conspired with Agbodjogbe to perpetrate the fraud on Al-Sabah.  ECF 256.  The jury awarded Al-Sabah $7,641,800 in compensatory damages, and an additional $1,000,000 in punitive damages, jointly and severally against each Defendant.  *Id.*; ECF 259 (Order of Judgment).

## II.    LEGAL STANDARDS

Litigants may lodge two kinds of challenges to a jury's punitive damages award:  a constitutional challenge, or a Rules-based challenge.  In the first type of challenge, litigants may argue that the punitive damages award is "grossly excessive," in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996).  In making that assessment the Court must consider: (1) the reprehensibility of the defendant's conduct; (2) the "disparity" between the harm, or potential harm, that the plaintiff suffers, and the punitive damages award; and (3) the difference between the punitive damages award at issue, and those issued in other "comparable cases."  *Id.* at 574-75; *see also State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

In lieu of a constitutional challenge, litigants may pursue the second type of relief:  a motion under Federal Rule of Civil Procedure 59(a) for a new trial *nisi remittitur*.  *See Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 593 (4th Cir. 1996); *see also id.* at 595 ("[T]he Seventh Amendment imposes no barrier to the trial judge's participation in determining the amount of a punitive damages award through the review mechanism provided by remittitur and Rule 59(a).").  "Remittitur is a process, dating back to 1822, by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award."  *Id.* (citation omitted).  As has long been recognized in this Circuit, litigants may not receive a

judgment as a matter of law, under Federal Rule of Civil Procedure 50, on the issue of punitive damages, if a jury renders the award. *Def. Indus., Inc. v. Nw. Mut. Life Ins. Co.*, 938 F.2d 502, 507 (4th Cir. 1991) (en banc). While the Court is to respect the parties' Seventh Amendment right to a jury trial, "a remittitur may be assessed in an amount that will bring the verdict on damages to the maximum amount which the jury could have awarded under the evidence introduced at trial." *Korotki v. Goughan*, 597 F. Supp. 1365, 1386 (D. Md. 1984) (quoting *Call Carl, Inc. v. BP Oil Corp.*, 403 F. Supp. 568, 578 (D. Md. 1975)). If the plaintiff accepts the remittitur, no new trial is needed. *Id.* But the plaintiff need not accept a remittitur; she may instead choose to proceed to a new trial. *Id.*; *see also* CHARLES A. WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 2815 (3d ed. 2010). The Court does not have discretion in deciding whether to offer the plaintiff a new trial, because the Seventh Amendment "guarantees the right to a jury determination of the amount of punitive damages." *Def. Indus., Inc.*, 938 F.2d at 507.

In a diversity action, such as this case, "the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law." *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278 (1989). Thus, this Court must look to "whether the jury's verdict is within the confines set by state law, and [then] determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." *Id.* at 278-79; *accord Atlas Food*, 99 F.3d at 593-94.

Under Rule 59, "the district court must 'set aside the verdict and grant a new trial[] if . . . (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.'" *Knussman v. Maryland*, 272 F.3d 625, 639

(4th Cir. 2001) (quoting *Atlas Food*, 99 F.3d at 594).  These first two prongs are "purely factual questions," requiring "a comparison of the factual record and the verdict to determine their compatibility."  *Atlas Food*, 99 F.3d at 594.  In this analysis, the Court's review of the jury's factual determinations is limited to "whether the jury's verdict is against the weight of the evidence or based on evidence which is false."  *Id.*  The Court may, in doing so, "weigh the evidence and consider the credibility of witnesses."  *Cline v. Wal-Mart Stores*, 144 F.3d 294, 301 (4th Cir. 1998).  Ultimately, the decision of whether to grant a new trial *nisi remittitur* rests within the Court's discretion.  *Browning-Ferris*, 492 U.S. at 279; *accord Cline*, 144 F.3d at 301.

## III.   ANALYSIS

As previously stated, the jury awarded Al-Sabah $1 million in punitive damages. Defendants make no constitutional challenge to the award.  Instead, they challenge the punitive damages award under Rule 59, arguing that the award "was excessive and divorced from any consideration of the Defendants['] ability to pay."  ECF 265 at 2-3; ECF 277 at 2-5.  Defendants provide no proposed remittitur amount.

### A.     The Proper Rule 59 Framework for Review

Before addressing the merits of Defendants' Motion, the Court must elucidate the proper procedural framework for addressing Defendants' arguments.  Defendants contend that the Court should determine whether the jury's apparent view of Defendants' ability to pay punitive damages was against the clear weight of the evidence.  *See, e.g.*, ECF 265 at 3 ("[N]o evidence was provided to the jury upon which a finding or basis for punitive damages could have been predicated . . . .").  However, framing the Court's review as such would be contrary to binding Fourth Circuit precedent.

In *Atlas Foods*, the Fourth Circuit discussed the trial court's unique, but difficult, role in reviewing a jury's punitive damages award.  *See* 99 F.3d at 594-95.  Part of the difficulty, the court noted, lies in the fact that a punitive damages award is both quasi-factual, and quasi-policymaking, in nature.  *Id.* at 594.  Some of the jury's considerations in determining the precise amount of punitive damages – "e.g., the defendant's ability to pay" – are "well suited to the jury's role of finding facts."  *Id.*  However, other considerations – such as the proper amount needed to further the law's goal of general deterrence – "are not factual questions and, therefore, are more appropriately decided by the trial judge."  *Id.*  Thus, according to the Fourth Circuit, the review of a punitive damages award cannot be solely considered as a factual review, because "the jury's determination of the amount of such an award is almost entirely ungrounded in the factual record."  *Id.*  Trial courts must look also to factors outside of the factual record, such as the need for the deterrence, and whether the award rendered comports with those rendered in factually comparable cases, to determine if a jury's punitive damages award is appropriate under the circumstances of the particular case.  *Id.* at 594-95.

Given these unique considerations, the Fourth Circuit held that, upon a Rule 59 motion for remittitur of punitive damages, the trial court must determine whether the award results in a miscarriage of justice.  *Id.* at 595.  To do so, the trial court must compare its independent judgment of the appropriate amount, with the jury's ultimate award, and "determine whether the jury's award is so excessive as to work an injustice."  *Id.*  Given the trial court's "participatory decisionmaking role" in reviewing punitive damages awards, the court gives "less deferen[ce]" than it typically would in reviewing the jury's factual findings.  *Id.* at 595 (second emphasis added); *see also, e.g.*, *Butler v. Windsor*, 143 F. Supp. 3d 332, 336 (D. Md. 2015).

**B.      Application of the *Bowden* Factors to the Instant Punitive Damages Award**

In undertaking this review, the Court is mindful that Maryland law governs its independent judgment of the proper punitive damages amount.  *See Browning-Ferris*, 492 U.S. at 278; *Atlas Foods*, 99 F.3d at 593-94; *see also Snyder v. Phelps*, 533 F. Supp. 2d 567, 593-96 (D. Md. 2008) (applying Maryland's nine-factor test to determine whether a jury's punitive damages award was excessive), *rev'd on other grounds*, 580 F.3d 206 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011).  In *Bowden v. Caldor, Inc.*, the Maryland Court of Appeals set forth nine different factors for trial courts to consider in reviewing a jury's punitive damages award:  (1) the gravity of the defendant's wrongdoing; (2) the defendant's ability to pay; (3) the deterrence value of the award "under all of the circumstances of the case"; (4) how the award compares to the maximum criminal or civil fine for similar conduct; (5) the amount of the award, in comparison to awards in factually comparable cases; (6) any prior punitive damages awards against the same defendant for the same course of conduct; (7) if the award is based on separate torts, whether the separate torts arose from a single episode of events; (8) the plaintiff's reasonable expenses and costs that "are not covered by the award of compensatory damages"; and (9) whether the award "bears a reasonable relationship to the compensatory damages awarded."  350 Md. 4, 27-41 (1998) (citations omitted).

Importantly, however, not every factor will be relevant to every case, nor are these nine factors "intended to be exclusive or all-encompassing." *Id.* at 41.  Maryland courts utilize these "principles" or "guideposts" to "determin[e] if a punitive damages award is excessive and, if it is held to be excessive, the extent of the reduction." *Id.* at 25-26; *see also Khalifa v. Shannon*, 404 Md. 107, 142 (2008) (noting that the *Bowden* factors "are not criteria that must be established but, rather, [are] guideposts to assist a court in reviewing an award" for excessiveness).  Here, all

but factors four (the maximum civil and/or criminal fines for similar conduct)[2] and six (prior punitive damages awards against the same defendant) are relevant. Since Defendants address none of the factors relevant to this case, other than their ability to pay, the Court will briefly discuss each of the other factors before addressing the one that is contested.

### 1. The Uncontested *Bowden* Factors

First, under Maryland law, engaging in "heinous" or "egregiously bad" conduct "is a prerequisite for *any* award of punitive damages." *Bowden*, 350 Md. at 28. Thus, any award of punitive damages must properly calculate the degree of heinousness with which the defendant acts, and ensure that the punitive damages award is proportionate to the gravity of that wrong. *Id.* (quoting *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 242 (1995)). Defendants, rightfully, do not contest that the jury's punitive damages award is proportionate to the degree of their wrongdoing. The Court notes, as the Maryland appellate courts have in other cases, that Defendants' conduct "was not life threatening or the type of conduct which would likely lead to permanent physical injuries." *Id.* at 42; *see also, e.g.*, *Zachair, Ltd. v. Driggs*, 135 Md. App. 403, 419 (2000) ("[I]n those cases in which high awards of punitive damages have been allowed to stand, the harm has involved death or, at least, substantial health or environmental damage."); *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 88 Md. App. 672, 720-21 (1991). But, the jury's verdict evidences their conclusion that Defendants maintained a consistent pattern of fraudulent activity for nearly two consecutive years, resulting in a loss of

---

[2] The Court notes that section 7-113 of the Maryland Code Annotated, Criminal Law, which criminalizes the fraudulent misappropriation of money that a fiduciary holds for another, is directly on point with the facts of this case. However, section 7-113(b) only provides for a period of incarceration, and requires no imposition of a monetary fine. *See Harvey-Jones v. Coronel*, 239 Md. App. 145, 161 (2018) (dismissing as irrelevant the fourth *Bowden* factor in a defamation case involving a counterfeited criminal charging document "[b]ecause the legislature elected not to impose a monetary fine" for the crime of counterfeiting). Accordingly, this factor is of little relevance to the Court's instant analysis. .

over $7.6 million by Al-Sabah.  As discussed in this Court's March 9, 2020 Opinion, that conclusion is in accordance with the clear weight of the evidence presented at trial.  *See* ECF 282. Given the enormity of that sum, the degree of heinousness involved in this scheme is severe.

The third *Bowden* factor contemplates the need for punitive damages to promote both general and specific deterrence.  *See* 350 Md. at 29-30; *Owens-Croning v. Garrett*, 343 Md. 500, 537-38 (1996) ("The purpose of punitive damages is not only to punish the defendant for egregiously bad conduct toward the plaintiff, but also to deter the defendant and others contemplating similar behavior.").  The need for deterrence is at its greatest where the defendant repeatedly engages in the same type of misconduct, commits his tort over a long period of time, affirmatively acts to conceal his wrongdoing, and fails to take corrective action.  *Bowden*, 350 Md. at 29.  Every circumstance that the *Bowden* court contemplated is present in this case, making the need for a "significant award" compelling

Next, the Court must compare the instant punitive damages award with those in other factually comparable cases.  While an analysis of awards in other cases is not intended "to put a strict, judicially-created cap on the size of a punitive award," *Snyder*, 533 F. Supp. 2d at 593, the Court observes that punitive damages awards exceeding one million dollars are atypical in Maryland state courts, *see, e.g.*, *id.* at 32-33 (collecting cases, and observing that outside of a $700,000 punitive damages award, the Court of Appeals had not upheld a punitive damages award greater than $107,875); *Alexander & Alexander, Inc.*, 88 Md. App. at 710-11 (collecting cases, and observing that, outside of two cases issuing a $7.5 million and $910,000 punitive damages verdict, respectively, "[m]ost of the punitive damages awards to date have been well under $100,000).  However, as recently noted by the Court of Special Appeals in *Harvey-Jones*,

many of the awards discussed in *Bowden* that fail to exceed $100,000, when adjusted for inflation, approach and exceed $200,000.  *See* 239 Md. App. at 162-63.

In any event, it is noteworthy that the Maryland Court of Appeals recently upheld punitive damages verdicts of $900,000, and $1,100,000, against two defendants who tortiously interfered with a plaintiff-father's child custody and visitation rights.  *Khalifa*, 404 Md. at 142-49.  Other fraud cases from this Court provide further guidance.  *See, e.g.*, *Capital Fin., LLC v. Rosenberg*, 364 F. Supp. 3d 529, 551 (D. Md. 2019) (awarding $200,000, after a bench trial, in breach of contract and fraudulent misrepresentation case resulting in compensatory damages of over $500,000); *Kent Constr. Co. v. Global Force Auction Grp., LLC*, No. TJS-12-2839, 2015 WL 5315565, at *8-9 (D. Md. Sept. 10, 2015) (awarding $50,000 in punitive damages on a summary judgment motion in a fraud and conversion case); *In re Rood*, 459 B.R. 581, 609-10 (Bankr. D. Md. 2011) (awarding only nominal punitive damages against defendants whose fraud caused $500,000 in damages, because the likelihood of any defendant making compensatory damages payments was so small that fixing a large punitive damages was "a useless act").  At the same time, almost no cases have presented quite the level of fraudulent conduct at issue here, making it difficult to rely upon a like situation.  The proverbial foot that fits the glass slipper that is this case, does not appear to exist.

The final three uncontested factors can be addressed summarily.  The seventh factor is designed to ensure that juries do not award multiple "pyramided" punitive damages awards for a single episode of events that constitute multiple torts.  *Bowden* 350 Md. at 35 (quoting *Montgomery Ward & Co. v. Cliser*, 267 Md. 406, 425 (1972)).  That is not the case here, however; the jury's verdict contemplated one single punitive damages amount for the entirety of Defendants' conduct.  The eighth factor counsels in favor of a larger punitive damages award, as

12

Al-Sabah certainly has incurred, and will continue to incur, more litigation expenses in collecting on her monetary judgment. *See id.* at 36-37. Finally, the ninth factor (the ratio between the compensatory and punitive damages awards) speaks to the reasonableness of the jury's award, as the punitive damages award is only approximately thirteen percent of the compensatory damages award (a ratio of 1:7.6). *See id.* at 38-41; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) (observing, in the context of a constitutional challenge to punitive damages awards, that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process").

2.    Factor Two: Defendants' Ability to Pay

As previously alluded to, Defendants focus all of their attention on factor two. According to Defendants, the only evidence adduced at trial showed that "Defendants had exhausted not only all the funds that they received from the Plaintiff but also all alternative funding sources no matter how dubious." ECF 277 at 2. Thus, "in the absence of any such evidence of financial ability [to pay,] the punitive damage[s] award was excessive" and would only work to "subject the Defendants to financial ruin," thereby entitling them to a remittitur of the award. *Id.* at 2-3. Al-Sabah points to, *inter alia*, Agbodjogbe's testimony about the continuing stream of "tens of thousands of dollars" in net income from Nailah's Kitchen each month, as evidence of Defendants' ability to pay. ECF 269 at 5. Defendants counter, however, that the restaurant was not "fruitful to the degree [that] wo[uld] support a million dollar punitive damage award." ECF 277 at 3.

Defendants are correct that punitive damages awards "should not be disproportionate to . . . the defendant's ability to pay." *Bowden*, 350 Md. at 28 (alteration in original) (quoting *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 242 (1995)). This is because once "a punitive damages

award consumes a defendant's total wealth, it has ceased to serve the societal goal of punishment." *Fraidin v. Weitzman*, 93 Md. App. 168, 212 (1992). Accordingly, a defendant's ability to pay is "a limiting factor which must be considered by the . . . trial court upon its review of the jury's award." *Bowden*, 350 Md. at 28 (quoting *Fraidin*, 93 Md. App. at 212-13).

In a later case, however, the Court of Appeals reiterated that the *Bowden* factors "are not criteria that must be established but, rather, [are] guideposts to assist a court in reviewing an award." *Darcars Motors*, 379 Md. at 275. In fact, the *Darcars Motors* court explicitly held that plaintiffs in Maryland have no affirmative burden to prove a defendant's ability to pay punitive damages. *Darcars Motors*, 379 Md. at 275; *see also id.* at 276-77 (collecting cases from other jurisdictions that hold similarly). The court further explained the rationale behind this rule:

> Compelling a plaintiff seeking punitive damages to present evidence of a defendant's financial condition could, on the one hand, require a plaintiff with limited financial resources to wage a complicated discovery campaign against a monetarily sated defendant. On the other hand, it would license the plaintiff to conduct extensive pre-trial discovery of the defendant's finances to support a measure of damages that may never be awarded. Not only could the latter result in a severe invasion of the defendant's privacy, but it could also unnecessarily cost the defendant a great deal of time and money to compile all of its financial information.
>
> Moreover, placing a burden on plaintiff to introduce evidence of a defendant's financial condition will enhance the risk that a jury will place undue emphasis on the defendant's wealth. If that should occur, the jury may become more prone to use information of a wealthy defendant's finances to justify an award of punitive damages disproportionately higher than the gravity of the defendant's wrongdoing.

*Id.* at 275-76.

This Court, and Maryland's appellate courts, have considered punitive damages awards in cases with minimal evidence regarding a defendant's ability to pay. In *Khalifa v. Shannon*, the plaintiff, Michael Shannon ("Shannon"), filed suit against his ex-wife, Nermeen Khalifa Shannon and her mother, Afaf Nassar Khalifa ("the Khalifas"), and others, alleging that they

tortiously interfered with his custody and visitation rights to the minor child he had with Nermeen. 404 Md. at 111-12. The jury awarded Shannon $500,000 in compensatory damages, as well as a total of $2 million in punitive damages: $900,000 against Afaf Nassar Khalifa, and $1.1 million against Nermeen Khalifa Shannon. *Id.* at 113. On appeal, the Maryland Court of Appeals rejected the Khalifas' argument that the jury lacked insufficient evidence to justify the awards of punitive damages against them. *Id.* at 144-45. The court explained that at trial, Shannon provided "uncontroverted testimony" that the Khalifas had multiple residences across the world (one of which, Shannon claimed, was valued at $3 million), as well as a number of cars at each residence. *Id.* at 144. Though there was no evidence that the Khalifas actually had title to those residences, the court reasoned that Maryland law did not require Shannon to prove that the Khalifas owned those residences, or that the Khalifas could pay the awards altogether. *Id.* at 145. This accords with the Court of Appeals's earlier decision in *Darcars Motors*, in which the court upheld a $25,000 punitive damages award against a car dealership, despite the dealership's failure to offer evidence as to its ability to pay during the punitive damages phase of trial. *See* 379 Md. at 278.

The Maryland Court of Special Appeals has followed this directive in a number of cases, upholding punitive damages verdicts despite minimal, or a total lack of, evidence regarding the defendant's ability to pay. *See Harvey-Jones v. Coronel*, 239 Md. App. 145, 158-60 (2018) (affirming a $200,000 punitive damages verdict, despite defendant's failure to offer evidence of her ability to pay, because her failure to object to the plaintiff's requests for admissions permitted the court to infer that the defendant's net worth was over $1 million, and because there was evidence that during litigation, the defendant transferred a property worth $200,000); *Merritt v. Craig*, 130 Md. App. 350, 372 (2000) (upholding a $150,000 punitive damages verdict against a

defendant-school teacher, because the evidence showed that she owned a home and a partnership interest in property in a resort area, though there was no evidence as to the value of that interest). The only exception to this line of cases is *Fraidin*, in which the Court of Special Appeals vacated a punitive damages award because the evidence demonstrated that it was crafted to mirror the maximum approximation of the defendant's net worth.  *See* 93 Md. App. at 211-12.  Such an award, the court held, "ceased to serve the societal goal of punishment."  *Id.* at 212.

This Court has also previously addressed the issue on occasion.  In *Adams v. Morris*, a jury awarded two plaintiffs $75,000 each in punitive damages against the defendant employer, T.L. Morris Seafood, Inc. ("TLM"), and its sole owner and operator, Morris.  706 F. Supp. 2d 632, 634, 636 (D. Md. 2010).  Upon a Rule 59 motion, the Court rejected the defendants' argument that the awards were disproportionate to their ability to pay.  *Id.* at 639.  The only evidence offered was Morris's 2008 tax returns, which showed his business income was $20,600. *Id.*  Because the defendants "offered no evidence as to the value of the business, Morris's other assets, or his ability to borrow," the Court refused to alter the jury's punitive damages award.  *Id.* Conversely, however, in litigation spawning out of a debtor's bankruptcy proceedings, the United States Bankruptcy Court for the District of Maryland awarded only nominal punitive damages against the individual defendants (which included the debtor), despite their fraudulent conduct calling for a much higher award, because the court would have been "surprised" if any one of them made "any meaningful payment of compensatory damages."  *In re Rood*, 459 B.R. at 609.  The Bankruptcy Court found that fixing any sort of large punitive damages award would have been "a useless act."  *Id.* at 609-10.

Most often, the issue of a defendant's ability to pay punitive damages is presented in this Court upon a plaintiff's motion for default judgment.  Even still, this Court has not hesitated to

issue even large sums of punitive damages upon such a limited record. *See, e.g.*, *Legacy Inv. & Mgmt., LLC v. Susquehanna Bank*, No. WDQ-12-2877, 2014 WL 5325757, at \*10 (D. Md. Oct. 17, 2014) (awarding $300,000 in punitive damages, despite an absence of evidence from the plaintiff regarding the defendant's ability to pay); *HBCU Pro Football, LLC v. New Vision Sports Props., LLC*, No. WDQ-10-467, 2011 WL 2038512, at \*8 (D. Md. May 24, 2011) (awarding $1 million in punitive damages, despite plaintiff offering no evidence as to the defendant's ability to pay).

To be sure, here, the jury did not wholly lack evidence regarding Defendants' financial status. Yet this case does not fall neatly in line with those previously decided by this Court, or by Maryland's appellate courts. Many of the cases previously decided involved much more substantial, though technically unverified, evidence of the defendant's ability to pay than what Al-Sabah presented here. *See Khalifa*, 404 Md. at 144-45 (testimony regarding various luxury residences in different countries); *Darcars Motors*, 379 Md. at 278 (involving a defendant-car dealership); *Merritt*, 130 Md. App. at 372 (a teacher who owned a home and some partnership interest in resort property).

Indeed, to some extent, the Court shares the same concerns as the Bankruptcy Court in *In re Rood* that Defendants here may not make "any meaningful payment of compensatory damages," 459 B.R. at 609, because there is a potential that the holders of the mortgages on the other commercial properties at issue may prevail on their claims of title to those properties. Currently before this Court is a separate lawsuit initiated by Al-Sabah against those very mortgage holders, and one of the central issues in that case is whether Al-Sabah, or those mortgage holders, have a superior claim of title. *See generally* Complaint, *Al-Sabah v. World*

*Bus. Lenders LLC*, No. SAG-18-2958 (D. Md. Sept. 25, 2018), ECF 1 ("the Lender Lawsuit").[3]
At the same time, the Court cannot excuse Defendants from their burden to prove that they
cannot pay a punitive damages award, even if the evidence Al-Sabah herself introduced
generates some skepticism.  *See Adams*, 706 F. Supp. 2d at 639; *see also, e.g.*, *Darcars Motors*,
379 Md. at 275 ("Our cases have never *required* clear and convincing evidence of a defendant's
financial condition to support an award of punitive damages. . . .").  Indeed, the Court readily
recognizes that the jury was unaware of the pending Lender Lawsuit when considering its
punitive damages award, and the Court does not intimate one way or the other that such evidence
would have been admissible.

The fact remains, however, that Defendants could have had a bifurcated trial in this case
to litigate the issue of punitive damages more fully.  Federal Rule of Civil Procedure 42(b)
provides that the Court "may order" the separate trial "of one or more separate issues," which
includes the issue of punitive damages.  But Defendants here never sought bifurcation of the
issue of punitive damages.  Particularly apt, on this point, are the observations of the Second
Circuit in *Smith v. Lightning Bolt Products, Inc.*, 861 F.2d 363 (2d Cir. 1988), which the
Maryland Court of Appeals positively cited in *Darcars Motors*, 379 Md. at 276.  In *Smith*, the
Second Circuit addressed defendant Solerwitz's challenge to a $500,000 punitive damages award
against him, arguing that there was insufficient evidence regarding his ability to pay.  861 F.2d at
373-74.  The court rejected the challenge, explaining:

> The incompleteness of the record as to Solerwitz's net worth is not a basis for
> reducing the punitive damages award against him, for it is the defendant's burden
> to show that his financial circumstances warrant a limitation of the award. . . .

---

[3] Any discussion of the Lender Lawsuit herein shall not be construed as the Court looking
favorably, or unfavorably, upon the merits of any party's claim in that case.

Th[e] procedure [for bifurcating trial on punitive damages] was not followed in the present case, *and the fault for that lies with the defendants*. The trial court was not required to order this bifurcation *sua sponte*. Yet defendants did not move for a bifurcated submission of issues to the jury. The single set of special verdict questions submitted to the jury included questions as to the amount of punitive damages the jury believed appropriate; yet defendants did not protest that the inclusion of these questions was premature. Nor did they request any other procedure that would have preserved their ability to present timely evidence with respect to their financial condition.

We conclude that Solerwitz . . . has failed to carry his burden of showing that the award of $500,000 in punitive damages against him is disproportionate to his wealth.

*Id.* (internal citations omitted) (emphasis added).

### 3. The Governing Maryland Law Requires a Remittitur in this Case

Returning to the punitive damages award at issue here, the jury's clear intent was to impose the highest award permissible under Maryland law. There is no miscarriage of justice in the jury's punitive damages award in this regard. Given that each relevant (and uncontested) *Bowden* factor counsels in favor of a severe punitive damages award, the Court agrees that one is warranted, especially given the egregiousness of Defendants' conduct, and the need for general deterrence.

Nonetheless, having considered the entire record, and the relevant case law, the Court concludes that a remittitur of the punitive damages award in this case is required. Despite the justifiable need for a severe punitive damages award, the Court finds that the jury's punitive damages award was intended to match or exceed the maximum valuation of Defendants' remaining net worth, given the number of known encumbrances on the commercial properties. *See Fraidin*, 93 Md. App. at 211-12. Maryland appellate courts – courts whose rulings are binding on this Court – have expressly disallowed calculating punitive damages awards in this manner. *See id.* Therefore, cases such as *Adams*, 706 F. Supp. 2d at 639, *Khalifa*, 404 Md. at

19

144-45, *Harvey-Jones*, 239 Md. App. at 158-60, and *Legacy Investment*, 2014 WL 5325757, at *10, are inapposite, because there was no indication in any of those cases that the jury, or court, utilized a legally impermissible methodology in determining the amount of punitive damages. Because upholding a punitive damages award that is premised upon a legally impermissible methodology would result in a "miscarriage of justice," *Knussman*, 272 F.3d at 639, the question becomes the proper remittitur amount.

As discussed at the outset, the evidence showed that all but one of the Defendants' commercial properties are mortgaged, the exception being the 400 North Howard Street property, which is in such a dilapidated state that no company would accept it as collateral for a mortgage. Further, Agbodjogbe has a previously-undisclosed bank account with MECU, but the funds held therein are unknown. Agbodjogbe also acknowledged on the stand that he sent $100,000 to a Senegalese company he created, and that some unspecified portion of those funds still remain. Nailah's Kitchen continues to operate today, and according to Agbodjogbe, generates "tens of thousands" of dollars in monthly gross revenue. Defendants presented no evidence regarding the value of Nailah's Kitchen, but its value certainly is relevant to Defendants' net worth. Nor did Agbodjogbe, or any other Defendant, present evidence to verify Agbodjogbe's repeated assertions that "every penny" Al-Sabah sent him "went into the business," leaving millions of dollars that Al-Sabah sent unaccounted for by a paper trail. However, the evidence at trial did establish that a significant percentage of the funds sent by Al-Sabah were spent to purchase the properties themselves, making it highly unlikely that Agbodjogbe has millions of dollars stashed away at his disposal.

Giving as much deference as possible to the jury's approximation of Defendants' wealth based on these facts, an aspect of the punitive damages award process that is more appropriately

within the jury's purview, *see Atlas Foods*, 99 F.3d at 594, the Court finds that an award of $250,000 is appropriately tailored to the circumstances presented in this case. This figure serves three purposes: it is designed to further the jury's intent in awarding punitive damages; it accounts for a valuation of Defendants' net worth that is not against the clear weight of the evidence; and it is an amount that is not designed to financially ruin Defendants. This figure is also largely in accordance with those awarded in the many of the cases discussed above, which awarded similar (or more severe) punitive damages, despite weak evidence of a defendant's ability to pay. *See Legacy Inv.*, 2014 WL 5325757, at *10; *HBCU Pro Football*, 2011 WL 2038512, at *8; *Khalifa*, 404 Md. at 144-45; *Harvey-Jones*, 239 Md. App. at 158-60; *Merritt*; 130 Md. App. at 372. The Court is mindful that this amounts to a seventy-five percent reduction in the jury's punitive damages award. The Court does not take this result lightly. Were the evidence sufficient to show that Defendants could pay $1 million in punitive damages without going bankrupt, the Court would not hesitate to uphold the jury's verdict.

The evidence, however, suggests otherwise. Defendants already must pay over $7.6 million in compensatory damages, and Al-Sabah "concedes that the Defendants have squandered millions of dollars that they stole." ECF 269 at 2. In fact, it may ultimately be the case that Defendants cannot make even meaningful payments on the compensatory damages award. But Defendants availed themselves of none of the available opportunities to demonstrate that they cannot pay. Instead, Defendants relied exclusively on the testimony of Agbodjogbe. Based on the jury's findings, it is clear that they did not find his testimony credible. That strategic choice, and the consequences flowing therefrom, rest with Defendants. The long line of cases discussed above from Maryland's appellate courts, and from courts in this District, make clear that Defendants should not be rewarded a total remittitur, based upon their failure to present

sufficient evidence on their ability to pay punitive damages.  However, the Court cannot, on the current record, permit a punitive damages award that appears to have utilized a calculus impermissible under Maryland law.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion for Remittitur, ECF 265, is GRANTED, and the punitive damages award will be reduced to $250,000.  Al-Sabah will have until April 18, 2020, to advise whether she will accept the new award, or ask for a new jury trial on the issue of punitive damages.  A separate implementing Order is filed herewith.


Dated:  March 19, 2020                                              _____/s/_____
                                                                    Stephanie A. Gallagher
                                                                    United States District Judge